UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JENNIFER ECKHART and CATHY AREU,    :
                                    :
                    Plaintiffs,     :          Civil Case No. 1:20-cv-05593
                                    :
        against                     :
                                    :
FOX NEWS NETWORK, LLC, ED HENRY,    :
SEAN HANNITY, TUCKER CARLSON and    :
HOWARD KURTZ, in their individual and :
professional capacities,            :
                                    :
                    Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS FOX NEWS NETWORK, LLC, TUCKER CARLSON, SEAN HANNITY, AND HOWARD KURTZ'S RULE 11 MOTION FOR SANCTIONS

---

September 29, 2020

Anthony J. Dick
J. Benjamin Aguiñaga
Ariel N. Volpe
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
Tel. (202) 879-3939
Fax. (202) 879-1700
E-mail: ajdick@jonesday.com

Kathleen M. McKenna, Esq.
Lloyd B. Chinn, Esq.
Keisha-Ann G. Gray, Esq.
Danielle J. Moss, Esq.
Yonatan L. Grossman-Boder, Esq.
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036-8299
Tel. (212) 969-3000
Fax. (212) 969-2900
E-mail: kmckenna@proskauer.com

*Attorneys for Defendants Fox News Network, LLC,
Tucker Carlson, Sean Hannity, and Howard Kurtz*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND .............................................................................................................. 2

    A.   Eckhart's Allegations and Fox News's Immediate Suspension and Firing of Ed Henry............................................................................................................. 2

    B.   Areu's Unrelated Claims Against Other Individual Defendants ................................ 3

    C.   The Allegations in the Original Complaint.................................................................. 4

    D.   The Actual Facts ...................................................................................................... 7

    E.   The Wigdor Firm's Attempt to Evade Sanctions..................................................... 10

    F.   Areu's Refusal to Withdraw Her Frivolous Claims.................................................. 11

ARGUMENT ................................................................................................................... 12

I.   Areu's Claims Are Factually Frivolous ...................................................................... 13

    A.   Carlson ................................................................................................................... 15

    B.   Hannity................................................................................................................... 16

    C.   Kurtz ...................................................................................................................... 18

II.   Areu's Claims Are Legally Frivolous......................................................................... 20

    A.   Areu Was Not an "Employee" of Fox News ........................................................... 21

    B.   Areu Cannot Invoke Supplemental Jurisdiction ...................................................... 23

III.   Areu and Her Counsel Asserted Her Claims For an Improper Purpose ........................... 26

IV.   Dismissal and Monetary Sanctions Are Appropriate...................................................... 29

V.   The Wigdor Firm Cannot Escape Sanctions by Withdrawing........................................... 30

CONCLUSION................................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abner Realty, Inc. v. Adm'r of Gen. Servs. Admin.*,
No. 97 CIV. 3075 (RWS), 1998 WL 410958 (S.D.N.Y. July 22, 1998) ..........................26, 27

*Amorosa v. Ernst & Young LLP*,
No. 03 Civ. 3902(CM), 2010 WL 245553 (S.D.N.Y. Jan. 20, 2010) ....................................13

*Blackrock Balanced Capital Portfolio v. HSBC Bank USA, Nat'l Ass'n*,
95 F. Supp. 3d 703 (S.D.N.Y. 2015) ..................................................................................23, 24

*Brown v. Maxwell*,
929 F.3d 41 (2d Cir. 2019) .................................................................................................26

*Cameau v. Nat'l Recovery Agency*,
No. 15-CV-2861, 2018 WL 4853050 (E.D.N.Y. Sept. 28, 2018) .........................................13

*Farmer v. Shake Shack Enters.*,
No. 19 CIV. 9425, 2020 WL 4194860 (S.D.N.Y. July 21, 2020) .........................................21

*Figurowski v. Marbil Invs., LLC*,
No. 14-cv-7034, 2015 WL 4000500 (E.D.N.Y. July 1, 2015) ...............................................25

*Four Keys Leasing & Maint. Corp. v. Simithis*,
849 F.2d 770 (2d Cir. 1988) .................................................................................................20

*Galin v. Hamada*,
283 F. Supp. 3d 189 (S.D.N.Y. 2017) ...................................................................................29

*Galonsky v. Williams*,
No. 96 CIV. 6207 (JSM), 1997 WL 759445 (S.D.N.Y. Dec. 10, 1997) ....................26, 27, 28

*Geiss v. Weinstein Co. Holdings LLC*,
383 F. Supp. 3d 156 (S.D.N.Y. 2019) ...................................................................................24

*Gelfman Int'l Enters. v. Miami Sun Int'l Corp.*,
No. 05-CV-3826, 2009 WL 2957849 (E.D.N.Y. Sept. 10, 2009) .........................................14

*Gibb v. Tapestry, Inc.*,
No. 18-CV-6888, 2018 WL 6329403 (S.D.N.Y. Dec. 3, 2018) ............................................26

*Gutierrez v. Fox*,
141 F.3d 425 (2d Cir. 1998) .................................................................................................14

*Healey v. Chelsea Res., Ltd.*,
947 F.2d 611 (2d Cir. 1991) .................................................................................................20

*Hughes v. Twenty-First Century Fox, Inc.*,
304 F. Supp. 3d 429 (S.D.N.Y. 2018) ...................................................................................21

*In re Itel Sec. Litig.*,
791 F.2d 672 (9th Cir. 1986) ...............................................................................................30

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Klein v. Aicher*,
No. 19-CV-9172, 2020 WL 4194823 (S.D.N.Y. July 21, 2020) ............................................14

*LaVigna v. WABC Television, Inc.*,
159 F.R.D. 432 (S.D.N.Y. 1995) ................................................................................................20

*Lyndonville Sav. Bank & Tr. Co. v. Lussier*,
211 F.3d 697 (2d Cir. 2000) .....................................................................................................24

*Morley v. Ciba-Geigy Corp.*,
66 F.3d 21 (2d Cir. 1995) .........................................................................................................26

*Murray v. Dominick Corp. of Can., Ltd.*,
117 F.R.D. 512 (S.D.N.Y. 1987) ..............................................................................................29

*New V & J Produce Corp. v. NYCCaterers Inc.*,
No. 13 CIV. 4861 ER, 2014 WL 5026157 (S.D.N.Y. Sept. 29, 2014) ...................................23

*People ex rel. Abrams v. Terry*,
45 F.3d 17 (2d Cir. 1995) ...................................................................................................24, 25

*Pereira v. 3072541 Canada Inc.*,
No. 17-CV-6945, 2018 WL 5999636 (S.D.N.Y. Nov. 15, 2018) ...........................................13

*Regents of the Univ. of Cal., on behalf of UC Davis Health Sys. v.*
*Stidham Trucking Inc.*,
No. 16-cv-02835, 2017 WL 3840259 (E.D. Cal. Sept. 1, 2017) ............................................13

*Safe-Strap Co. v. Koala Corp.*,
270 F. Supp. 2d 407 (S.D.N.Y. 2003) ......................................................................................29

*Salovaara v. Eckert*,
222 F.3d 19 (2d Cir. 2000) .......................................................................................................13

*Sussman v. Bank of Isr.*,
56 F.3d 450 (2d Cir. 1995) .......................................................................................................27

*Turner v. Sungard Bus. Sys., Inc.*,
91 F.3d 1418 (11th Cir. 1996) ..................................................................................................29

*United Mine Workers of Am. v. Gibbs*,
383 U.S. 715 (1966) ..................................................................................................................24

*United States v. City of New York*,
359 F.3d 83 (2d Cir. 2004) .......................................................................................................21

*Wang v. Phx. Satellite Television US, Inc.*,
976 F. Supp. 2d 527 (S.D.N.Y. 2013) .................................................................................21, 22

*Watkins v. Smith*,
No. 12 CIV. 4635 DLC, 2013 WL 655085 (S.D.N.Y. Feb. 22, 2013) ...................................14

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Williamson v. Recovery Ltd. P'ship*,
542 F.3d 43 (2d Cir. 2008)........................................................................................13

*Wood v. Brosse U.S.A., Inc.*,
149 F.R.D. 44 (S.D.N.Y. 1993) .................................................................................23

**STATUTES**

18 U.S.C. § 1591 *et seq.*........................................................................................4, 24

28 U.S.C. § 1367.........................................................................................................24

N.Y. Exec. Law § 296-d .............................................................................................22

**OTHER AUTHORITIES**

Fed. R. Civ. P. 11 ................................................................................................ *passim*

5A Wright & Miller, Fed. Prac. & Proc. Civ. § 1337.1 (4th ed.) ...........................14, 30

N.Y.C. Admin. Code § 8-107, L.L. 172/2019 ............................................................22

David Bauder, *Fox stars Hannity, Carlson and fired anchor Henry in lawsuit*,
AP News (July 20, 2020) ..............................................................................................6

CBS This Morning, *Former Fox News host Ed Henry accused of rape*
(July 21, 2020) ..............................................................................................................6

Michael M. Grynbaum, *Two Women Sue Fox News, Claiming Misconduct by Ed
Henry and Others*, N.Y. Times (July 22, 2020)............................................................6

Gregory P. Joseph, Sanctions: The Federal Law of Litigation Abuse § 17
(3d ed. 2000) ...............................................................................................................14

Scott Neuman, *Civil Suit Against Former Fox News Anchor Ed Henry Alleges
Rape, Sexual Misconduct*, NPR (July 21, 2020).........................................................6

## PRELIMINARY STATEMENT

Plaintiff Cathy Areu's claims rest on a series of fabrications designed to extort a multi-million-dollar settlement out of Fox News. Failing that, she has continued to press her false charges to inflict maximum damage on the reputation of the network and some of its top on-air talent, heedless of the human cost. Her allegations are not only false, but are flatly contradicted by her own e-mails, texts, and other documentary evidence in her possession. She knew that her claims were false at the time she made them, and her counsel either knew or should have known through the most basic investigation.

In the weeks since, the maliciousness of Areu's complaint has only become more blatant. After Defendants notified Areu of their intent to seek Rule 11 sanctions and adduced an overwhelming array of evidence showing the falsity of her claims, she refused to withdraw them and instead filed an amended complaint doubling down on her deceptions. Dkt. 38. Although she has now rewritten major parts of her story and invented new facts in an attempt to maintain her false narrative, these changes do not cure the Rule 11 violation because they do not erase the core defect: Her new complaint, like her old one, is nothing more than a web of fabricated allegations of sexual misconduct that she knows did not occur.

After being confronted with the falsity of Areu's claims, her original counsel at Wigdor LLP withdrew and filed a letter with the court seeking to "prohibit" Defendants from filing a motion for sanctions. But the Wigdor Firm cannot evade responsibility so easily. The Firm violated Rule 11 by participating in the filing of her frivolous claims, and it remains on the hook because those claims have not been withdrawn. Indeed, the Wigdor Firm is especially culpable because it knew that it had no jurisdictional basis to file Areu's contrived claims in federal court, but it did so anyway in order to stir up media attention and to create pressure for a settlement in the unrelated case of one of its preexisting clients, Jennifer Eckhart.

1

Rule 11 was designed for exactly this type of case. Instead of asserting good-faith claims, Areu and her counsel have abused the court system in an attempt to extort a settlement and to smear Fox News and some of its top talent with false and frivolous claims under the cloak of litigation privilege. To address this misconduct and deter it in the future, sanctions are appropriate.

## BACKGROUND

### A.   Eckhart's Allegations and Fox News's Immediate Suspension and Firing of Ed Henry

On June 25, 2020, Jennifer Eckhart contacted Fox News through her counsel at Wigdor LLP ("the Wigdor Firm") alleging that Fox News Channel anchor Ed Henry had a clandestine relationship with her between 2014 and early 2017 that involved sexual assault and rape. Orig. Compl. ¶¶ 3-9. At the time of the alleged conduct, Eckhart was an associate producer who worked on a Fox Business Network show in New York, and Henry was a Fox News Channel correspondent in the Washington bureau. *Id.* ¶¶ 59, 61. Eckhart alleged that she had three sexual encounters with Henry while he was visiting New York—one in 2015 in a hotel room that was consensual but reflective of a power imbalance; another in 2015 on company premises that involved forced oral sex; and a third in 2017 in a hotel room that involved violent rape. *Id.* ¶¶ 70-73, 76-81, 86-102.

The day that Fox News learned of Eckhart's allegations, it suspended Henry and hired an outside firm, Davis & Gilbert, to conduct an independent investigation. Affidavit of Kevin Lord ¶¶ 2-3. Five days later, Fox News concluded that the alleged sexual encounters occurred, but that the evidence on consent was inconclusive. Fox News terminated Henry the next day. *Id.* ¶¶ 4-5.

Before Eckhart's claims, as far as Fox News is aware, no one had ever complained that Henry had sexually harassed them. *Id.* ¶ 6. In 2016, Henry had been suspended and demoted for publicity surrounding a consensual affair he had with a woman in Las Vegas. But that discipline was for lack of judgment and reputational damage to the company, not workplace misconduct.

Notwithstanding Henry's termination, the Wigdor Firm demanded that Fox News pay Eckhart a $10 million settlement to avoid a lawsuit that would damage the company's reputation by alleging a culture of institutional apathy to sexual misconduct in the workplace. Decl. of Kathleen McKenna ¶¶ 2-3, 10. Fox News declined. *Id.* ¶¶ 4, 7.

**B.    Areu's Unrelated Claims Against Other Individual Defendants**

Immediately after Henry's termination, Fox News received an e-mail from Cathy Areu, an unpaid guest who sometimes appeared on Fox News, alleging that Henry had sent her pornographic text messages. Affidavit of Deborah Steele, Ex. A. Fox News immediately asked Davis & Gilbert to open an independent investigation into Areu's allegations. Lord Aff. ¶ 7. Davis & Gilbert contacted Areu and learned she had retained the Wigdor Firm. *Id.* ¶ 8.

On July 9, Wigdor sent Fox News a demand letter on behalf of Areu seeking to pressure the company into a settlement by making new and unrelated allegations against some of the company's top on-air personalities. First, Areu alleged that after she appeared on Tucker Carlson's show on the night of the company Christmas party, he told her that he would be alone at a hotel without his wife and children, and then stopped booking her as a guest when she rebuffed what she understood to be a sexual advance. McKenna Decl. ¶ 8. Second, she claimed that Sean Hannity asked men on the set of his show to take her out on a date for $100 and stopped booking her when she wouldn't "play along." *Id*. Third, she claimed that Howard Kurtz asked her to meet him at his hotel for sexual purposes and stopped booking her when she refused. *Id*. And fourth, she alleged that Fox News contributor Gianno Caldwell tried to pressure her into going on a lunch date him in exchange for an introduction to a high-profile public personality. *Id.* Although none of these claims had anything to do with Eckhart's separate claims against Henry, the Wigdor Firm suggested that a mediated settlement should address both Areu and Eckhart's claims together. *Id.* ¶ 10.

Areu refused to cooperate with the Davis & Gilbert investigation without assurances that her statements would not be used in litigation, but the investigators refused that condition. Lord Aff. ¶ 11. Davis & Gilbert was nevertheless able to interview the accused parties and Fox News staff, and to examine relevant documents. McKenna Decl. ¶ 9; Lord Aff. ¶ 12. On July 16, the investigators reported that there was no evidence to support Areu's allegations. Lord Aff. ¶ 12.

## C.    The Allegations in the Original Complaint

On July 20, after Fox News refused to pay a settlement, the Wigdor Firm filed a single complaint on behalf of Eckhart and Areu. As the sole hook for federal jurisdiction, the complaint alleged that Henry and Fox News violated the federal ban on "sex trafficking." 18 U.S.C. § 1591, *et seq*. Orig. Compl. ¶¶ 17, 162-75. In particular, the complaint alleged that Henry coerced Eckhart into a commercial sex act, and "Fox News benefited" because it "received value from [his] services" and his "continued employment." *Id*. ¶¶ 167-68. Even though the company immediately suspended and then terminated Henry after learning of Henry's alleged misconduct, the complaint alleged that Fox News fostered a culture of "institutional apathy towards sexual misconduct." *Id*. ¶ 2. To bolster this sensationalized narrative, the complaint emphasized Areu's false and unrelated allegations against Carlson, Hannity, Kurtz, and Caldwell, all of whom remain with the company.

Areu did not assert any federal claims, but asserted several state-law claims alleging that Carlson, Hannity, Kurtz, and Fox News engaged in employment discrimination and retaliation against her. *Id.* ¶¶ 176-95. Even though Areu had only ever appeared on Fox News as an unpaid guest, she claimed that she was somehow an "employee" of Fox News who could assert claims of "hostile work environment" against the company. *Id.* ¶¶ 46, 124. The complaint made no attempt to explain how Areu's state-law claims were related to Eckhart's federal sex-trafficking claim, but nevertheless asserted that they fell within the court's "supplemental jurisdiction." *Id.* ¶ 41.

4

1.     With respect to Carlson, Areu alleged that she was harassed after appearing on *Tucker Carlson Tonight* "in December 2018." *Id.* ¶ 29. She claimed that "while she was on set," a producer "whispered in [her] ear" that "Mr. Carlson wanted her to stay until the very end of the show," and she "had no choice but to comply" because "she was on live television while tied to her chair with a microphone on her that was attached to the chair." *Id.* ¶ 30. After the show, Carlson "changed on set into his leather jacket for the annual Christmas party." *Id.* ¶ 32. He then purportedly "began telling Ms. Areu that he would be alone in New York City that night, and specifically said that he would be staying alone in his hotel room without any wife or kids." *Id.* ¶ 33. "Without question," Areu claimed, Carlson "was probing to see whether [she] was interested in a sexual relationship." *Id.* ¶ 34. And after she "declined to spend the night at his hotel," Carlson "promptly retaliated against Ms. Areu, who was featured on his show only three times in 2019 and has not appeared once in 2020." *Id.*

2.     As to Hannity, the complaint alleged that Areu "was a relatively regular face on *The Sean Hannity Show* until March 8, 2018." *Id.* ¶ 24. After she appeared on the show that night, she alleged that Hannity "threw $100 on the set desk," "in front of the entire studio crew," and "began calling out to the men in the room and demanding that someone take Ms. Areu out on a date for drinks at *Del Friscos*." *Id.* He "repeatedly yelled, 'who wants to take her on a date?' 'Take her on a date to *Del Friscos*.'" *Id.* And he "repeatedly chided one particular male employee for being 'afraid to take out a beautiful woman.'" *Id.* ¶ 26. Although Areu was "mortified and made clear that she was incredibly uncomfortable," she "could not even leave because . . . she was 'hooked into' studio equipment that could only have been removed by a stagehand." *Id.* ¶¶ 24-25. Then, after she refused to "play along," she "was hardly ever, if ever at all, invited back." *Id.* ¶ 28.

**3.**     With respect to Kurtz, Areu alleged that "while [he] was in New York City, he invited [her] to come to his hotel," which she "politely declined," but "invited [him] to dinner with her and a friend who was in town." *Id*. ¶ 35. She claimed that he "declined" because he "plainly wanted to see Ms. Areu only if she were alone and at his hotel (*i.e.*, for sexual reasons)." *Id*. The next morning, Kurtz "refused to meet with her at the studio," and later told her that she is "the only woman here who won't come to my hotel room." *Id*. ¶ 36. Areu alleged that Kurtz then retaliated against her by reducing her appearances on his show, because she "only appeared approximately three times on Media Buzz following her rejection of Mr. Kurtz's advances." *Id*.

**4.**     As to Caldwell, the original complaint did not name him as a defendant but contained several paragraphs alleging that he "attempt[ed] to coerce [Areu] into dating him" in exchange for an introduction to his friend Ann Coulter. *Id*. ¶ 37. Specifically, Caldwell allegedly "made clear that the 'price' to meet Ms. Coulter would be a date with Mr. Caldwell," because after she "asked, 'Can I take you two for lunch,' [he] responded, 'Take me to lunch.'" *Id*. ¶ 38.

The day of the complaint, Areu's counsel issued a press release repeating and embellishing her allegations. Among other things, the press release claimed that Hannity "auction[ed] off Ms. Areu to anyone in the studio [] 'man enough' to take her on a date after work" and that "Ms. Areu was hooked up to the studio equipment, to go on air live, and could not even walk away during the 'auctioning.'" Steele Aff., Ex. B at 2. The press release generated widespread coverage of the claims against Hannity, Carlson, Kurtz, and Caldwell, with particular focus on the sensational allegation that Hannity "conduct[ed] a mock dating auction with [Areu] as the prize."[1]

---

[1]Scott Neuman, *Civil Suit Against Former Fox News Anchor Ed Henry Alleges Rape, Sexual Misconduct*, NPR (July 21, 2020), https://tinyurl.com/yy23y9xx. *See also, e.g.*, CBS This Morning, *Former Fox News host Ed Henry accused of rape* (July 21, 2020), https://tinyurl.com/y5mr8wvj; Michael M. Grynbaum, *Two Women Sue Fox News, Claiming Misconduct by Ed Henry and Others*, N.Y. Times (July 22, 2020), https://tinyurl.com/y56gqg74; David Bauder, *Fox stars Hannity, Carlson and fired anchor Henry in lawsuit*, AP News (July 20, 2020), https://tinyurl.com/y69c2e6n.

**D.     The Actual Facts**

A review of Areu's own e-mails and texts, publicly available sources, and other information revealed that Areu's allegations contained several demonstrable falsehoods and were contradicted by a number of facts within her own direct knowledge and possession. On August 7, Defendants sent Areu's counsel a letter along with a draft Rule 11 motion laying out the following facts, stating that they would move for sanctions under Rule 11 if Areu did not withdraw her false allegations within the required 21-day grace period. McKenna Decl. ¶ 13.

*First*, the night that Areu claimed Carlson invited her to his hotel room was not the night of the company Christmas party "in December," but was actually the night of a party that Carlson and his wife hosted for the staff of *Tucker Carlson Tonight* at the end of November. Affidavit of Tucker Carlson ¶¶ 2, 8, *id.* Ex. A. Carlson attended the entire party and stayed in a hotel room with his wife, *id*. ¶ 6; he was not "alone in his hotel room without any wife or kids," Orig. Compl. ¶ 33. An eyewitness on set overheard the conversation between Areu and Carlson and flatly contradicted Areu's account (Affidavit of Emily Lynn ¶¶ 4, 6), dispelling any notion that he was "probing to see whether Ms. Areu was interested in a sexual relationship." Orig. Compl. ¶ 34. After the incident, contrary to Areu's claim of retaliation, she continued to appear on Carlson's show without interruption. Indeed, she appeared as a guest at least five more times, and the show attempted to book her several more times. Affidavit of Chelsea Gilman ¶¶ 2-3.

*Second*, contrary to Areu's claim that Hannity held a mock dating auction and "repeatedly chided" a male employee for "being 'afraid to take out a beautiful woman,'" Orig. Compl. ¶ 26, Hannity did nothing of the sort. Instead, Areu e-mailed ahead of time to ask permission to bring a male friend to the set with her. When Hannity learned that the male visitor to his set was with Areu, he asked if they were dating and graciously gave them $100 to have drinks with each other after the show. Affidavit of Sean Hannity ¶ 2; Affidavit of Christen Bloom ¶¶ 2-4; Steele Aff., Ex.

C. One eyewitness was in the green room with Areu, her male friend, and Hannity, and heard Areu thank Hannity and discuss going to Del Frisco's with her friend for drinks with the money Hannity gave them. Affidavit of Tiffany Fazio ¶ 7; Hannity Aff. ¶ 2. E-mails sent by Areu show her asking Hannity's booker to thank Hannity for the drinks, attaching a picture of one of the drinks she bought with Hannity's money, and confirming that she would appear again on his show in the near future. Steele Aff., Ex. C. She did so, bringing the same male friend with her, and Hannity again gave them money for drinks. Hannity Aff. ¶ 3; Bloom Aff. ¶ 8. Contrary to Areu's allegation that she "was hardly ever, if ever at all, invited back" (Orig. Compl. ¶ 144), she began appearing on Hannity's show far *more* frequently after the night of the alleged incident. Before that night, she had appeared on the show only four times over a span of *nine years.* But afterward, she appeared at least nine times over the next 16 months. Fazio Aff. ¶ 2.

*Third*, Kurtz did not engage in any inappropriate conduct. As Areu's own e-mails show, he agreed to meet her in the afternoon at Fox News's office, at her request. When she was unable to make the meeting due to a flight delay, she tried to connect with him after work hours. Affidavit of Howard Kurtz, Ex. A at 2-3, 6-7. E-mails show that he told her he was working at his hotel and "may just have a little time to chat in the hotel lobby." *Id*. at 2. Areu then invited him to dinner, which he declined. *Id.* at 1. She then tried to invite herself to his hotel room, stating: "What's your room number? What name are you under? What's your cell? I'm coming over. We can do it the easy way or the hard way." *Id.* at 7. Kurtz ignored this message but retained the entire e-mail exchange, which shows that *she* was the one who tried to come to *his* hotel room, but *he* declined. Nor did he "retaliate" against her. To the contrary, she continued to appear on Kurtz's show at the same rate. In the nine months before the incident, she appeared on his show four times. And in the nine months after, she also appeared four times. Affidavit of Owen Renfro ¶ 2.

8

*Fourth*, the text messages exchanged between Areu and Caldwell prove that he too engaged in no misconduct, and certainly did not try to pressure Areu into having lunch with him in exchange for anything. After Areu pushed for him to introduce her to Ann Coulter over lunch, he politely deflected by suggesting that the two of them have lunch instead. Affidavit of Gianno Caldwell, Ex. A., at 5. Areu offered to do "both"—lunch with him individually, and lunch with him and Coulter together—but Caldwell declined. *Id*. at 5-7. Throughout this innocuous exchange, Caldwell made no inappropriate comments and remained scrupulously polite despite Areu's profanity and her continuing pressure for an introduction. *Id*. at 1-7.

In addition to pointing out these frivolous factual allegations, the draft Rule 11 motion also emphasized two legally frivolous contentions in Areu's complaint. First, since she appeared on Fox News only as an unpaid guest, she could not assert claims based on her purported status as an "employee" of the company. McKenna Decl. Exhibit C, at 20. Since she did not work for the company, she could not bring a claim of a "hostile work environment." And second, since she did not assert diversity jurisdiction or allege any federal claims—and her state-law claims were completely unrelated to Eckhart's federal "sex trafficking" claim—she had no plausible basis to invoke federal jurisdiction. *Id*. at 18.

Finally, the draft Rule 11 motion also put Areu and her counsel on notice that her claims were sanctionable for the additional reason that they were asserted for an improper purpose. *Id*. at 22. The Wigdor Firm knew that Areu's false allegations against Carlson, Hannity, and Kurtz had nothing to do with Eckhart's allegations against Henry. But nevertheless, the Firm used her allegations to try to extort Fox News into settling Eckhart's unrelated claims—and, failing that, to create media attention around the false narrative of "institutional apathy" to sexual misconduct. *Id*.

**E.      The Wigdor Firm's Attempt to Evade Sanctions**

After confronting Areu and her counsel on August 7 with the evidence showing her claims to be frivolous, Defendants learned on August 22 that the Wigdor Firm would no longer represent her. McKenna Decl. ¶ 17. Instead, Areu retained new counsel at the firm of Valli Kane & Vagnini, LLP ("the Vagnini Firm"), which obtained an extension of the Rule 11 safe-harbor period (until September 11) to decide whether to withdraw Areu's claims. Dkt. 35.

On August 26, the Wigdor Firm submitted a letter to the Court asking that Defendants "be prohibited from filing a motion for sanctions against our firm in relation to the allegations in the original Complaint." Dkt. 34, at 1. Although Defendants were not yet permitted to present their Rule 11 motion to the Court, the Wigdor letter purported to describe the contents of the motion and argued that sanctions were "not warranted." *Id*. at 2. In so arguing, the letter significantly distorted the grounds of the Rule 11 motion. For example, the letter falsely portrayed Defendants as arguing that Areu must be lying solely "because she sent friendly messages to her harassers," while ignoring the vast bulk of overwhelming evidence that the motion actually contained. *Id*. The letter also argued that the Wigdor Firm should be held immune from sanctions even if it had willfully filed Areu's fabricated claims for an improper purpose: Due to her change of counsel, the Wigdor Firm stated that its "hands are tied" because it "cannot withdraw[] or appropriately correct[] the original Complaint." *Id.* at 4.

On August 27, the Wigdor Firm asked Defendants for consent to sever Areu from Eckhart so that the two could pursue their claims in separate cases, with the Wigdor Firm representing Eckhart alone. Defendants declined to consent, explaining that because Areu had asserted no federal claims and did not try to invoke diversity jurisdiction, she had no business being in federal court at all, much less in a freestanding case. *See* McKenna Decl. Exhibit D, at 8-9.

On August 28, the Court held a telephonic hearing where the parties discussed severance and the potential Rule 11 motion. Notwithstanding the Wigdor Firm's letter, the Court stated that it was "obviously not going to decide a motion for sanctions without full briefing on the issue." McKenna Decl., Ex. D, at 6. As to severance, the Court stated that it would not decide whether to sever the cases until after seeing Eckhart and Areu's "amended complaints." *Id*. at 17. For the first time, Areu's new counsel claimed that she had a freestanding right to be in federal court based on diversity jurisdiction because she is "a resident of Florida, not New York." *Id*. at 8. He did not address the assertion in Areu's previous complaint that she is "resident of the State of New York." Orig. Compl. ¶ 46. Nor did he address the publicly reported fact that Defendant Tucker Carlson is a resident of Florida, which precludes diversity jurisdiction.

### F.   Areu's Refusal to Withdraw Her Frivolous Claims

On the afternoon of September 11, Areu filed an amended complaint that retained the thrust of her false and frivolous claims against Carlson, Hannity, and Kurtz. As to Carlson, the new complaint continues to falsely claim that he made sexual advances by telling Areu that he would be "alone in his hotel room" on the night when he was actually in New York with his wife. Am. Compl. ¶ 204. As to Hannity, the complaint continues to assert the fiction that Hannity engaged in "misogynistic behavior" and "'auctioned off' [Ms. Areu] to the men on [his] set." *Id*. ¶¶ 156, 160. And as to Kurtz, the complaint continues to claim that he made sexual "advances" when Areu's own e-mails show otherwise. *Id*. ¶ 175.

The new complaint also maintains both of Areu's frivolous legal contentions that Defendants identified in the draft Rule 11 motion that they served. First, it continues to insist that she was an "employee" of Fox News. *Id*. ¶ 17 n.1. And second, it continues to claim that Areu can invoke "supplemental jurisdiction" based on Eckhart's unrelated federal sex-trafficking claim. *Id*. ¶ 13.

**ARGUMENT**

Rule 11 prohibits pleadings that are factually frivolous, legally frivolous, or submitted for an improper purpose. Here, Areu and her counsel violated all three rules. First, she asserted claims based on knowingly false factual allegations that were directly contradicted by documentary evidence, including text messages and e-mails in her own possession. After Defendants served a draft Rule 11 motion, she failed to cure the violation. She refused to withdraw her claims and instead filed an amended complaint that maintains the core of her false allegations while changing her story and adding new fabrications in an attempt to salvage her false narrative.

Second, Areu also violated Rule 11 by asserting two legally frivolous claims. On the merits, she does not have a plausible claim to be an "employee" of Fox News. She simply appeared occasionally as an unpaid on-air guest, and she cannot articulate any plausible legal basis for why such appearances give rise to an employment relationship. As to jurisdiction, she improperly injected herself into Eckhart's unrelated federal case by frivolously claiming to fall within the court's "supplemental" jurisdiction. That maneuver was frivolous because Areu's state-law claims are completely unrelated to the sole federal claim of "sex trafficking" asserted by Eckhart.

Third, Areu's complaint was plainly calculated to serve an improper purpose: to generate publicity, defame Defendants, and extort a settlement. This is clear not only from how badly she and her counsel contorted the law to shoehorn her claims into Eckhart's unrelated lawsuit, but also from the sensationalized press release that she and her counsel issued along with the original complaint. The circumstances make clear that her frivolous claims were not just the result of mistaken or sloppy lawyering, but were a calculated move to use false statements as a litigation and publicity ploy. The amended complaint does not erase the taint of that improper purpose but instead doubles down on it. The Court should impose sanctions.

## I.    Areu's Claims Are Factually Frivolous

Under Rule 11(b)(3), all "factual contentions" in a pleading must "have evidentiary support" or be "likely [to] have evidentiary support after a reasonable opportunity for further investigation or discovery." This prohibits parties and their counsel from making "false, misleading, improper, or frivolous representations to the court." *Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 51 (2d Cir. 2008). As this Court has recognized, "both a represented party and his attorney can be sanctioned under Rule 11(b)(3) for the factual insufficiency of a complaint." *Amorosa v. Ernst & Young LLP*, No. 03 Civ. 3902(CM), 2010 WL 245553, at *4 (S.D.N.Y. Jan. 20, 2010). Sanctions are especially appropriate when a party has "actual knowledge" of the "wrongful conduct," including when the party knows that the pleading contains "false statements." *Salovaara v. Eckert*, 222 F.3d 19, 33 (2d Cir. 2000).

Accordingly, courts award sanctions when a plaintiff's allegations are contradicted by publicly available evidence or evidence in the plaintiff's own possession. *See, e.g.*, *Cameau v. Nat'l Recovery Agency*, No. 15-CV-2861, 2018 WL 4853050, at *3 (E.D.N.Y. Sept. 28, 2018) (imposing sanctions where a call transcript in plaintiff's possession contradicted "key factual allegations in the Complaint"); *Regents of the Univ. of Cal., on behalf of UC Davis Health Sys. v. Stidham Trucking Inc.*, No. 16-cv-02835, 2017 WL 3840259, at *2, 7-9 (E.D. Cal. Sept. 1, 2017) (imposing Rule 11 sanctions where "allegations in Plaintiff's complaint [were] directly contradicted by email evidence in Plaintiff's possession"). And in applying Rule 11, this Court has found it "particularly concerning" when a plaintiff "take[s] unreasonable positions," "omit[s] crucial facts," and "make outright misrepresentations," especially for the purpose of "extort[ing] unwarranted settlements." *Pereira v. 3072541 Canada Inc.*, No. 17-CV-6945, 2018 WL 5999636, at *3 (S.D.N.Y. Nov. 15, 2018) (Abrams, J.).

Aside from knowing falsehoods, attorneys have an "affirmative duty . . . to conduct a reasonable inquiry into the viability of a pleading before it is signed." *Gelfman Int'l Enters. v. Miami Sun Int'l Corp.*, No. 05-CV-3826, 2009 WL 2957849, at *4 (E.D.N.Y. Sept. 10, 2009) (quoting *Gutierrez v. Fox*, 141 F.3d 425, 427 (2d Cir. 1998)). The inquiry must be "objective[ly]" reasonable. *Id*. Thus, for example, this Court recently imposed sanctions in a case involving baseless factual allegations, where the "pre-filing investigation [was] particularly lacking in light of what was available to [plaintiff and his counsel] at the time." *Klein v. Aicher*, No. 19-CV-9172, 2020 WL 4194823, at *10 (S.D.N.Y. July 21, 2020) (Abrams, J.).

A Rule 11 violation is typically complete at the time when the frivolous claim or allegation is filed. *See* 5A Wright & Miller, Fed. Prac. & Proc. Civ. § 1337.1 (4th ed.). After a violation occurs, the responsible party may be sanctioned if the offending claim or allegation is not "withdrawn or appropriately corrected" within the safe-harbor period. Fed. R. Civ. P. 11(c)(2). If the offending party files an amended complaint that fails to cure the original violation, then sanctions may be sought and imposed without starting a new safe-harbor period. *See Watkins v. Smith*, No. 12 CIV. 4635 DLC, 2013 WL 655085, at *7 (S.D.N.Y. Feb. 22, 2013); Gregory P. Joseph, Sanctions: The Federal Law of Litigation Abuse § 17(A)(2)(a) (3d ed. 2000).

Here, Areu and the Wigdor Firm violated Rule 11 by making patently false and frivolous factual allegations in her original complaint. She not only knew her allegations were false when she made them, but they were squarely refuted by e-mails, text messages, and other documentary evidence within her own possession. Although she has now filed an amended complaint signed by the Vagnini Firm, it does not cure the Rule 11 violation because it continues to suffer from the same basic defect: Its core claims against Carlson, Hannity, and Kurtz are based on wholly fabricated allegations of sexual misconduct that simply did not occur, as Areu is well aware.

14

### A.      Carlson

Areu's claim that Carlson made sexual advances is a bald-faced lie. In her original complaint, she claimed that he invited her to his empty hotel room where he was staying "without any wife or kids" on the night of the company's "annual Christmas party" in "December 2018." Orig. Compl. ¶¶ 130, 133-134. But the company's annual Christmas party occurred on December 10, and Areu was not on Carlson's show that night. Carlson Aff. ¶ 8; Lynn Aff. ¶ 8; Affidavit of Jacob Chludzinski, Ex. A ¶ 39. The only night during this period that Areu appeared on Carlson's show was November 30, the night of the smaller party that he hosted for his show staff. *See* Chludzinski Aff., Ex. A ¶ 37; Gilman Aff. ¶ 2. And on that night, Carlson's wife was with him in New York, and stayed with him in his hotel room. Carlson Aff. ¶ 6. The contention that Carlson "was probing to see" whether Areu would come to his empty hotel room is thus logically incoherent and contradicted by the indisputable facts. It is also demonstrably false for Areu to contend that Carlson "retaliated" against her by not inviting her on his show after the alleged incident. In fact, his staff invited her and she appeared again less than a month later, on December 28. Gilman Aff. ¶ 2. She then appeared on the show four times in 2019. And just as importantly, she was invited or booked several other times in the four months following, but had to be bumped due to her own unavailability, her viewpoint being redundant, or breaking news. *Id*. ¶ 3.

After being confronted with the evidence that she was lying, Areu refused to withdraw her false accusation but rewrote her story and added new fabrications in an effort to make her claim seem plausible. In her amended complaint, she now claims that the incident occurred on November 30—the night Carlson was in New York with his wife—but she still maintains that Carlson told her "that he would be alone in New York City that night, and that he would be staying alone in his hotel room." Am. Compl. ¶ 204. In an attempt to make some sense out of this tangled web, she

speculates that Carlson may have been making a "suggestion of a sexual encounter. . . at some point in the future." *Id*. ¶ 205. She also converts her allegation that Carlson donned a leather jacket into new claim that he "chang[ed] his clothes" on the set "in front of Ms. Areu and one other male employee." *Id*. ¶ 202. None of this happened. It is a willful fabrication, as confirmed by one of Carlson's female colleagues who witnessed the entire interaction between Carlson and Areu after the show. *See* Lynn Aff. ¶¶ 4-6.

### B.    Hannity

Areu's claims against Hannity are also lies. In her original complaint, she claimed that she was a "relatively regular face" on Hannity's show until "March 8, 2018," the night she refused to "play along." Orig. Compl. ¶¶ 139-44. After that night, she claims, she was retaliated against: she "was hardly ever, if ever at all, invited back to appear on 'Hannity.'" *Id*. ¶ 144. But the indisputable facts show otherwise. In fact, she had not been a "regular" on *Hannity* but had appeared as a guest only four times over a span of nine years before March 8. Fazio Aff. ¶ 2. And after that night, she was not "retaliated" against but was invited *nine more* times in less than two years. *Id.* The entire premise of her claim was thus blatantly false from the very beginning.

Even worse, Areu's evolving "harassment" allegations against Hannity are also concocted. Her original complaint alleged a bizarre and inherently implausible scenario in which Hannity, "on set and in front of the entire studio crew—and completely unsolicited—threw $100 on the set desk" and "then began calling out to the men in the room and demanding that someone take Ms. Areu out on a date for drinks." Orig. Compl. ¶ 140. But her own e-mails and the unanimous eyewitness testimony tell a different story. Her e-mails show that she e-mailed Hannity's booker on the night in question to ask permission to bring her male friend named "Alex" with her to the set. Steele Aff., Ex. C at 2. She explained, "He's my good luck charm. He does yoga. Very calming.

I run. I'm nuts. [smiley face emoji]." *Id.* The booker agreed, and the friend arrived on set with Areu and stayed during her appearance. *Id.*; Hannity Aff. ¶ 2; Bloom Aff. ¶ 2.

When Areu and her guest came to the studio, Hannity asked if they were dating and gave them $100 to go have drinks. Steele Aff., Ex. C at 2; Hannity Aff. ¶ 2; Bloom Aff. ¶¶ 2-4. Later that night, Areu wrote the *Hannity* booker, "Thanks so much for having me on. Way too much fun. Same time next week! Cathy." Steele Aff., Ex. C at 2. The next day, Areu wrote again to the *Hannity* staffer, "Please thank Sean [Hannity] for a fun evening. He shouldn't have! …but We did exactly as he and Alex's had bet [sic]. Down to the pineapple martini. [martini emoji]. See you next Thursday! Cathy [photo attached of the pineapple martini Areu ordered at Del Frisco's using Hannity's money]." *Id.* at 1. Shortly thereafter, Areu again appeared on Hannity and brought the same guest with her. She thanked Hannity again and stated how much she had enjoyed the cocktails, and Hannity again gave them $100 for drinks. Hannity Aff. ¶ 3; Bloom Aff. ¶ 8.

After Defendants served their draft Rule 11 motion, Areu again changed her story while desperately trying to preserve her claim that Hannity engaged in "misogynistic" behavior and "auctioned [her] off." Am. Compl. ¶¶ 156, 160, 230. She now acknowledges that Hannity gave her money to have drinks with her friend, and that she expressed gratitude. But in an attempt to maintain her false story, she says that she "was not actually grateful" and was just trying to "be polite and avoid retaliation." *Id.* ¶ 157. And she also adds new embellishments that contradict her original story: She previously claimed that, "Thankfully, none of the staff cooperated" when Hannity purportedly "began calling out to the men in the room and demanding that someone take Ms. Areu out on a date." Orig. Compl. ¶¶ 24, 26. But she now says that "[t]he other men in the room began laughing and saying they would take Ms. Areu on a date." Am. Compl. ¶ 153. Likewise, she previously said that Hannity "repeatedly chided one particular male employee for

17

being 'afraid to take out a beautiful woman.'" Orig. Compl. ¶ 26. But she now says that Hannity told *Areu's guest* that he "had to take this 'beautiful woman' out on a date and kept asking the guest whether he would agree to do so." Am. Compl. ¶ 152.

Like the original story that Areu invented, her new story continues to be a gross distortion of reality. As eyewitnesses have averred, Hannity engaged in no "misogynistic" behavior whatsoever, much less "auctioned [Areu] off" in any way. Fazio Aff. ¶¶ 3-6; Bloom Aff. ¶¶ 2-6; Hannity Aff. ¶¶ 2-6. He simply gave her money to have drinks with her friend—twice—and she has now twisted this innocent conduct in a malicious attempt to further her fabricated claims.

### C.   Kurtz

Areu's claims against Kurtz are also based on malicious fabrications. In her original complaint, she claimed that he invited her to his hotel for "sexual reasons." Orig. Compl. ¶ 127. But her own emails show that is a lie. In fact, *she* is the one who acted inappropriately by inviting herself to *his* hotel room. He made no sexual advances or inappropriate comments whatsoever. Yet instead of withdrawing her allegations, she has now embellished them by adding more fabrications into her amended complaint in an attempt to create a patina of plausibility.

As reflected in Areu's e-mails, she planned to meet with Kurtz on the afternoon of July 9, 2019, when he was working in New York City (he lives and works in the Washington, D.C. area). Kurtz Aff., Ex. A at 2-5. When Areu missed that meeting due to a flight delay, she invited Kurtz out for drinks that evening. *Id*. at 2. Kurtz did not respond to Areu's invitation. *Id*. Instead, he e-mailed Areu to say that, "I may just have a little time to chat in the hotel lobby." *Id*. Areu proposed that Kurtz join her and a friend for dinner instead, but Kurtz declined, saying that he had already eaten and didn't have time. *Id*. at 1. She responded, "Ugh. I want to see you! . . . he's my hair and makeup artist, and it's his bday. . . . will you be around at 9? . . . wait, don't have time? Where ya

18

going? [smiley face emoji]." *Id*. (ellipses in original). Kurtz replied, "I've got work, believe it or not. Try me at 9." *Id*. He followed up at 9, but when she did not respond he said he was going to bed at 9:09. *Id*. at 1, 7. Within seven minutes, Areu responded, "What?! Give me your cell. I'll be right there. I'm totally available right now!!!!!!" *Id*. at 6. She then e-mailed Kurtz again minutes later asking, "What's your room number? What name are you under? What's your cell? I'm coming over. We can do it the easy way or the hard way." *Id*. at 7. Kurtz did not respond. *Id*. at 8.

As this exchange shows, it is entirely baseless for Areu to contend that Kurtz tried to lure her to his hotel room "for sexual reasons." Orig. Compl. ¶ 127. She was the one who initiated the contact, invited him out for drinks after work, repeatedly expressed a desire to meet, and inappropriately demanded his cell phone and room number so that she could come to him—which he ignored. The undisputed facts thus refute Areu's allegations.

Areu also asserted the false claim that Kurtz "retaliated" against her by inviting her on his show less often after she "reject[ed]" his "advances." Orig. Compl. ¶ 128. Although it would have been understandable if Kurtz stopped inviting her after her inappropriate e-mails, she continued to appear on the show at the same rate as before. In the nine months before the alleged incident she appeared four times. And in the nine months after, she also appeared four times. Renfro Aff. ¶ 2.

Areu's amended complaint does not cure the Rule 11 violation because she continues to assert the fictitious claim that Kurtz made sexual "advances" that she "rejected." Am. Compl. ¶ 173. In an effort to maintain her false narrative, she has now concocted a new story that her aggressive attempt to come to his hotel room was nothing more than a ruse: Even though her e-mails show that she responded to him within minutes, she now claims and that she "decided to wait until as late possible to respond with the knowledge that it would likely be too late and Mr. Kurtz would be asleep or unavailable," and that she "hoped" he would not respond, "allowing [her]

to have fulfilled her obligation to contact him without actually having to meet him." *Id.* ¶¶ 171-72. The absurdity of this new spin speaks for itself. It is nothing more than a desperate attempt to salvage her credibility and evade sanctions after she was caught lying.

## II.    Areu's Claims Are Legally Frivolous

In addition to her false factual allegations, Areu and her counsel also violated Rule 11 by asserting legally frivolous claims. Rule 11(b)(2) requires that any "claims" or "legal contentions" asserted by a party must be "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." This provision prohibits parties from filing claims when "it is patently clear that [they have] absolutely no chance of success." *Healey v. Chelsea Res., Ltd.*, 947 F.2d 611, 626 (2d Cir. 1991). Thus, a violation occurs when "it should have been patently obvious to any attorney who had familiarized himself [or herself] with the law" that the claim could not succeed. *Four Keys Leasing & Maint. Corp. v. Simithis*, 849 F.2d 770, 773 (2d Cir. 1988). For example, this Court has awarded sanctions when a plaintiff's "Title VII and FLSA claims [were] wholly frivolous" because there was "no good faith basis for arguing that [the plaintiff] should have a cause of action." *LaVigna v. WABC Television, Inc.*, 159 F.R.D. 432, 435-36 (S.D.N.Y. 1995).

Here, it should have been obvious to Areu's counsel that her claims were legally frivolous for two simple reasons. First, Areu was never an "employee" of Fox News. She was an unpaid guest. Her claim to be an "employee"—and her claims that rest on her purported employment status—thus have no plausible basis. And second, her invocation of "supplemental" federal jurisdiction was patently frivolous, and nothing but a transparent attempt to inject her false allegations into Eckhart's unrelated federal suit. Areu did not assert any federal claims, and she

had no basis to invoke supplemental jurisdiction because her state-law claims were completely unrelated to the sole federal claim of "sex-trafficking" asserted by Eckhart.

The amended complaint does not cure the Rule 11 violation because it continues to assert both of these legally frivolous claims.

### A.    Areu Was Not an "Employee" of Fox News

In asserting her claims of workplace discrimination, Areu contends (in both her original and amended complaints) that she was an "employee" of Fox News. Orig. Compl. ¶¶ 45, 124; Am. Compl. ¶ 17 n.1. This contention is frivolous as a matter of law. As both she and her counsel know, she appeared on Fox News solely as an unpaid guest. Affidavit of Christine Henry ¶¶ 2-3. She was never an employee, and her claim to the contrary has no good-faith basis.

To qualify as an employee, a person "must establish" at the threshold that "she received remuneration in some form for her work." *United States v. City of New York*, 359 F.3d 83, 91-92 (2d Cir. 2004). If a person does not work in exchange for compensation, then no "employment relationship exists." *Wang v. Phx. Satellite Television US, Inc.*, 976 F. Supp. 2d 527, 535 (S.D.N.Y. 2013). *See also Farmer v. Shake Shack Enters.*, No. 19 CIV. 9425, 2020 WL 4194860, at *4 (S.D.N.Y. July 21, 2020) (noting the "antecedent requirement that an individual receive remuneration" is the "same test [that] has been applied under both the NYSHRL and the NYCHRL"). An unpaid guest who is invited on television to talk about politics is not an "employee." *Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 445 (S.D.N.Y. 2018). Merely incidental benefits, like travel to and from the studio or hair-and-makeup costs, are not compensation that could "establish employee status in the absence of a salary." *Id*. at 443.

In her original complaint, Areu did not even allege that she received any substantial benefit from the company in exchange for her television appearances. And in her amended complaint, she

21

admits that "she was never provided any compensation." Am. Compl. ¶ 235. Although the amended complaint now asserts in conclusory fashion that she received "substantial benefits . . . from appearing on Fox News," *id.*, ¶ 17 n.1, she does not allege any facts to back that assertion. She thus does not have any claim to be an "employee," and it is frivolous for her to insist otherwise.

Areu's amended complaint does not cure the Rule 11 violation because it continues to assert the frivolous claim that she was an "employee." *Id.* ¶ 17 n.1. To the extent Areu now suggests that the issue is moot because she can assert the same claims as an "applicant" or "non-employee," she is wrong. First, even if she somehow was an "applicant" for employment, applicants cannot assert hostile-work-environment claims because they do not have any "work environment" to complain about. *See, e.g., Wang*, 976 F. Supp. 2d at 533 (dismissing hostile environment claim under NYCHRL because plaintiff was not an employee, and stating "[h]ad [plaintiff], as a[] [non-employee], brought her hostile work environment claim pursuant to either [the NYSHRL or Title VII], her claim would plainly be foreclosed").[2]

Second, Areu is also wrong to contend that she can assert a hostile-work-environment claim as "a covered 'non-employee' under the NYSHRL and NYCHRL." Am. Compl. ¶ 17. The NYCHRL did not apply to non-employees until an amendment that became effective in January 2020, well after many of the violations that Areu alleges. *See* N.Y.C. Admin. Code § 8-107(23), L.L. 172/2019 § 2. And even as amended, the NYCHRL covers only non-employees who qualify as "interns, freelancers [or] independent contractors," N.Y.C. Admin Code § 8-107(23), which Areu was not. Likewise, the NYSHRL applies only to certain non-employees that "provid[e] services *pursuant to a contract* in the workplace." N.Y. Exec. Law § 296-d (emphasis added). And Areu admits that she never had a contract with Fox News. Am. Compl. ¶¶ 112, 164.

---

[2] Areu's "applicant" claim fails for reasons to be explained in the merits briefing.

In short, because Areu cannot assert her hostile-environment claims as a "non-employee," her frivolous claim to be an "employee" is far from moot. Without Rule 11 sanctions, Defendants will be forced to spend even more time and money addressing this frivolous issue, which they would not have to do but for her baseless assertion of an employment relationship. Because she refused to withdraw the claim in her amended complaint, sanctions are appropriate.

### B.      Areu Cannot Invoke Supplemental Jurisdiction

As this Court has recognized, "improperly invoking subject matter jurisdiction of a federal district court is sanctionable under Rule 11." *Wood v. Brosse U.S.A., Inc.*, 149 F.R.D. 44, 48 (S.D.N.Y. 1993). Sanctions are appropriate where the plaintiff has "name[d] the Defendants in a bad faith attempt to gain a foothold in federal court." *New V & J Produce Corp. v. NYCCaterers Inc.*, No. 13 CIV. 4861 ER, 2014 WL 5026157, at *8 (S.D.N.Y. Sept. 29, 2014).

That is exactly what Areu did here. Her original complaint did not invoke diversity jurisdiction, nor did it assert any federal claims to justify her being in federal court. Instead, it relied solely on her contention that her state-law claims fell within the court's "supplemental jurisdiction," based on the federal sex-trafficking claim asserted by Eckhart. Orig. Compl. ¶ 41. That contention was frivolous because her claims were and are completely unrelated to Eckhart's federal claim. Although Areu has now filed an amended complaint, it does not cure the violation because it still contains the same frivolous assertion of supplemental jurisdiction. Nor is the issue moot. Since both of her new purported grounds for jurisdiction fail, supplemental jurisdiction remains her only hook.

It is well established that supplemental jurisdiction extends only to state-law claims "that are so related to [the federal] claims in the action . . . that they form part of the same case or controversy." *Blackrock Balanced Capital Portfolio v. HSBC Bank USA, Nat'l Ass'n*, 95

F. Supp. 3d 703, 708 (S.D.N.Y. 2015) (quoting 28 U.S.C. § 1367(a)). Federal and state claims form part of the same case or controversy only when they "'derive from a common nucleus of operative fact' and are such that one would ordinarily expect them to be tried in one judicial proceeding." *People ex rel. Abrams v. Terry*, 45 F.3d 17, 23 n.7 (2d Cir. 1995) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)).

Accordingly, supplemental jurisdiction lies only where "the facts underlying the federal and state claims substantially overlap[], or where presentation of the federal claim necessarily [brings] the facts underlying the state claim before the court." *Lyndonville Sav. Bank & Tr. Co. v. Lussier*, 211 F.3d 697, 704 (2d Cir. 2000) (citation omitted). It is inappropriate "where the federal and state claims rest on essentially unrelated facts." *Blackrock*, 95 F. Supp. 3d at 708.

Here, it is frivolous to contend that this Court has supplemental jurisdiction over Areu's state-law claims against Carlson, Hannity, and Kurtz. The only federal claim in this case is Eckhart's sex-trafficking claim under 18 U.S.C. § 1591. That claim turns on whether Fox News knowingly participated in or benefited from Henry's alleged "sex trafficking" offense, with the requisite knowledge that he would coerce Eckhart to engage in a commercial sex act. *See id*. § 1591(a), (e)(4); *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 168-69 (S.D.N.Y. 2019). That federal issue pertaining to *Eckhart and Henry* has nothing to do with *Areu's* unrelated state-law claims against Carlson, Hannity, and Kurtz. All of the issues pertaining to Henry's alleged sexual violence are completely irrelevant to Areu's baseless allegations that, for example, Kurtz invited her to his hotel for sexual reasons, that Carlson told her he was staying alone in a hotel, or that Hannity publicly demanded that men take her on a date for drinks. Not only is there no "substantial[] overlap[]" between Eckhart's federal sex-trafficking claim and Areu's state-law claims; there is no overlap at all. *Lyndonville Sav. Bank & Trust Co.*, 211 F.3d at 704. The claims

"involve vastly different and unrelated factual issues." *Figurowski v. Marbil Invs., LLC*, No. 14-cv-7034, 2015 WL 4000500, at *3 (E.D.N.Y. July 1, 2015). And no one "would ordinarily expect them to be tried in one judicial proceeding." *People ex rel. Abrams*, 45 F.3d at 23 n.7. It is thus beyond dispute that these claims do not fall within the court's supplemental jurisdiction, and she and her counsel injected them into Eckhart's federal suit solely for improper strategic purposes.

The amended complaint does not cure the Rule 11 violation. To the contrary, it maintains the precise same frivolous assertion of supplemental jurisdiction. Am. Compl. ¶¶ 12-13. But it still fails to explain how Eckhart's federal claim against Henry has anything to do with Areu's claims against Carlson, Hannity, and Kurtz. And while Areu does assert some of her own claims against Henry, they too are completely unrelated to Eckhart's sex-trafficking claim.

In an effort to paper over this defect, Areu now asserts two new grounds for federal jurisdiction, but both fail. First, she claims diversity jurisdiction. In July 2020, she said that she was a "resident of the State of New York." Orig. Compl. ¶ 46. But she now says that she became a "resident of Florida," in "January 2019." Am. Compl. ¶¶ 11, 105. Even crediting this convenient change, her newfound Florida residency does not help her. For one thing, as she recognizes, there still is not complete diversity because her co-plaintiff Eckhart continues to be a New York resident like many of the Defendants. *Id.* ¶ 11. But even if Areu were to be "severed," *id.*, diversity *still* would not exist because Defendant Tucker Carlson is a Florida resident, as has been widely reported. Carlson Aff. ¶¶ 10-18. Areu's assertion of diversity jurisdiction thus cannot save her.

Second, Areu's newly asserted Title VII claims are invalid because 180 days have not yet passed since she filed her charges with the EEOC. As this Court recently held, the 180-day period is a jurisdictional prerequisite to a Title VII suit. Thus, if the EEOC issues a right-to-sue letter prematurely, there is "a jurisdictional deficiency requiring suspension and a remand of plaintiff's

Title VII claims to the EEOC." *Gibb v. Tapestry, Inc*., No. 18-CV-6888, 2018 WL 6329403, at *5 (S.D.N.Y. Dec. 3, 2018). Although Areu does not disclose when she filed her charges with the EEOC, by her own account she did not decide to press charges until after she heard about Eckhart's allegations in early July. Am. Compl. ¶ 233. Thus, even assuming Areu filed her EEOC charges in July, there is no way she could obtain a valid right-to-sue letter until January 2021.

## III.   Areu and Her Counsel Asserted Her Claims For an Improper Purpose

Rule 11(b)(1) prohibits claims that are "presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." As the Second Circuit has noted, courts must exercise "vigilance" to ensure that litigation does not "become a vehicle for improper purposes." *Brown v. Maxwell*, 929 F.3d 41, 47 (2d Cir. 2019). Because the "legal process is already susceptible to abuse," courts must ensure that "[u]nscrupulous litigants" do not "weaponize" litigation to "humiliate and embarrass their adversaries" by "defam[ing] [them] in court pleadings or depositions without fear of lawsuit and liability." *Id*.

As a general matter, "the total lack of substance" of a plaintiff's claims itself "give[s] rise to the inference that the action was filed for improper purposes." *Abner Realty, Inc. v. Adm'r of Gen. Servs. Admin.*, No. 97 CIV. 3075 (RWS), 1998 WL 410958, at *7 (S.D.N.Y. July 22, 1998). That is especially true when a plaintiff asserts "baseless claims as part of a public relations campaign in order to embarrass the defendants and thereby coerce a settlement." *Galonsky v. Williams*, No. 96 CIV. 6207 (JSM), 1997 WL 759445, at *6 (S.D.N.Y. Dec. 10, 1997). Thus, using frivolous filings to "intimidate the defendant into a large settlement" is "an improper purpose under Rule 11(b)(1)." *Morley v. Ciba-Geigy Corp*., 66 F.3d 21, 25 (2d Cir. 1995).

That is exactly what Areu and her counsel did here. They filed, publicized, and refused to withdraw her frivolous claims in an effort to generate publicity, destroy Defendants' reputations,

and extort a settlement. And even worse, they used Areu's frivolous allegations to generate extra publicity and increase the pressure for a settlement in Eckhart's completely unrelated case. After Defendants served a Rule 11 motion, Areu refused to withdraw her false claims and instead submitted an amendment complaint adding even more fabrications on top of her old ones. This is a flagrant abuse of the justice system, and the Court should not tolerate it.

First, and most importantly, the frivolous nature of Areu's claims speak for themselves. As explained at length above, Areu's core factual allegations are not only knowingly false, but easily disproved based on documentary evidence within her own possession and other irrefutable evidence that Defendants have since provided. If Areu and her counsel did not know her claims were frivolous at the time of filing, they should have known through the most rudimentary investigation. And they certainly knew after Defendants served a Rule 11 letter along with a draft of this motion. In addition, Areu's claims are also legally frivolous because she has no basis to invoke supplemental jurisdiction or to claim status as an "employee" of Fox News. The total lack of legal and factual support for her claims thus "give[s] rise to the inference that the action was filed for improper purposes." *Abner Realty*, 1998 WL 410958, at *7.

Second, Areu's baseless claims were also plainly asserted for the improper purposes of generating publicity and trying to extort a settlement. When a complaint "lack[s] foundation in law or fact," then filing it "with a view to exerting pressure on defendants through the generation of adverse and economically disadvantageous publicity reflect[s] an improper purpose." *Sussman v. Bank of Isr.*, 56 F.3d 450, 459 (2d Cir. 1995). Accordingly, "it is appropriate to consider" the "press" generated "by counsel in assessing the issue of his good faith in filing frivolous claims." *Galonsky*, 1997 WL 759445, at *6. Here, as explained above, the Wigdor Firm used Areu's false claims in an effort to generate a multi-million dollar settlement. McKenna Decl. ¶¶ 8, 10. When

27

that failed, her counsel stoked the flames of publicity by issuing a press release that not only repeated the complaint's fabrications, but embellished them with further falsehoods. Steele Aff., Ex. B. He thus "made good on [the] threat he had previously made to defense counsel . . . that unless defendants paid him," they would face public allegations that would "cause [them] personal embarrassment" and serious reputational harm. *Galonsky*, 1997 WL 759445, at *3.

The improper purpose of generating false publicity was especially egregious here because the Wigdor Firm seized on Areu's patently false and frivolous claims to heighten the publicity (and increase the pressure for a settlement) in the *unrelated* case of Eckhart, who was Wigdor's pre-existing client. As explained above, it was patently frivolous to include Areu's claims in this case, as they share nothing in common with Eckhart's federal "sex-trafficking" claim. The only reason for Wigdor to shoehorn Areu's false claims into Eckhart's unrelated federal complaint was to drag some of the network's biggest stars into the case and advance the false narrative of Fox News's "institutional apathy towards sexual misconduct." Orig. Compl. ¶ 2. Needless to say, that narrative otherwise would have refuted itself, since the company immediately suspended Henry as soon as it learned of Eckhart's allegations, and then investigated and fired him in less than a week.

Again, nothing in the amended complaint cures the Rule 11 violation that Areu and her counsel committed when they filed the original complaint. To the contrary, the amended complaint maintains the core of her fabricated allegations of sexual misconduct against Carlson, Hannity, and Kurtz. It also maintains both of her frivolous legal claims—that she was an "employee" of Fox News and that she can invoke supplemental jurisdiction based on the unrelated federal sex-trafficking claim filed by Eckhart. Although Areu and her counsel have now expressed a desire to sever her case from Eckhart's—thus effectively conceding that the two never should have been joined together—that does not undo the damage inflicted by the original joint filing and the

28

surrounding media stir it provoked. The proper course was for Areu to file her unrelated claims in state court, or to wait 180 days for a valid right-to-sue letter from the EEOC and file her own separate suit in federal court. At the very least, that is what the court should require her to do now.

## IV.    Dismissal and Monetary Sanctions Are Appropriate

Rule 11 permits a sanction of dismissal "for serious misconduct when lesser sanctions would be ineffective or are unavailable." *Safe-Strap Co. v. Koala Corp.*, 270 F. Supp. 2d 407, 418 n.8 (S.D.N.Y. 2003); *see also Murray v. Dominick Corp. of Can., Ltd.*, 117 F.R.D. 512, 516 (S.D.N.Y. 1987). The Court is likewise authorized to enter "an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c)(4). Such an order can encompass the fees and costs a party incurs for filing the Rule 11 motion, as well as the fees and costs of litigation that "the parties would have avoided" had the plaintiff "withdrawn [her] claims" after learning that the defendant intended to seek Rule 11 sanctions." *Galin v. Hamada*, 283 F. Supp. 3d 189, 204 (S.D.N.Y. 2017).

Here, both dismissal and monetary sanctions are appropriate. First, the Court should dismiss all of Areu's claims with prejudice, as that is the only way to end the Rule 11 violation by stopping her from pursuing her frivolous claims. And second, the Court should require Areu and her counsel to reimburse the fees and costs that Defendants have incurred to prepare and file this motion (and the earlier draft Rule 11 motion), and otherwise to defend themselves against Areu's malicious fabrications. Sanctions are appropriate against the Wigdor Firm because it participated in the Rule 11 motion by filing the original frivolous complaint. And sanctions are appropriate against the Vagnini Firm because it embraced Areu's frivolous claims and did not withdraw them despite being given an extended opportunity to do so by this Court. *See Turner v. Sungard Bus. Sys., Inc.*, 91 F.3d 1418, 1421 (11th Cir. 1996) ( "from the moment [substitute counsel] appeared

on the plaintiff's behalf, he [] had actual knowledge that there was no merit to the plaintiff's assertions, or, at the very least, he consciously decided not to inquire of the merits. . . . In this sense, it was as if [he] had refiled the complaint.").

## V.    The Wigdor Firm Cannot Escape Sanctions by Withdrawing

As noted above, Rule 11 makes clear that an attorney's violation is complete at the time the frivolous pleading is "present[ed] to the court." Fed. R. Civ. P. 11(b). And the rule authorizes sanctions as long as the offending *"claim" or "contention"* has not been "withdrawn or appropriately corrected," regardless of whether the *attorney* has withdrawn. Fed. R. Civ. P. 11(c)(2) (emphasis added). Accordingly, "[s]ince the conduct subject to sanctions typically is appraised as of the time of the filing, courts properly have held that an attorney cannot immunize himself from the imposition of sanctions under Rule 11 simply by withdrawing from the case." 5A Wright & Miller, Fed. Prac. & Proc. Civ. § 1337.1 (4th ed.); *see also In re Itel Sec. Litig.*, 791 F.2d 672, 675 (9th Cir. 1986) (a "lawyer may [not] escape sanctions for misconduct simply by withdrawing from a case before opposing counsel applies for sanctions"). If the rule were otherwise, unscrupulous attorneys could use the court system as a smear machine, making false allegations to damage their opponents and then retreating from the case to avoid accountability. This would undermine the purpose of sanctions to "deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c).

Here, monetary sanctions are the only way to hold the Wigdor Firm accountable for engaging in this type of smear job, and to deter the same tactics in the future. If such misconduct goes unpunished, it will only be repeated.

## CONCLUSION

For the foregoing reasons, the Court should impose Rule 11 sanctions.

Dated:  September 29, 2020

By:    */s/ Kathleen M. McKenna*
       Kathleen M. McKenna, Esq.
       Lloyd B. Chinn, Esq.
       Keisha-Ann G. Gray, Esq.
       Danielle J. Moss, Esq.
       Yonatan L. Grossman-Boder, Esq.
       PROSKAUER ROSE LLP
       Eleven Times Square
       New York, New York 10036-8299
       (212) 969-3000
       kmckenna@proskauer.com

       Anthony J. Dick
       J. Benjamin Aguiñaga
       Ariel N. Volpe
       JONES DAY
       51 Louisiana Ave., NW
       Washington, DC 20001
       (202) 879-3939
       ajdick@jonesday.com

       *Attorneys for Defendants*
       *Fox News Network, LLC, Tucker Carlson,*
       *Sean Hannity, and Howard Kurtz*