UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | | |
|---|---|---|
| JENNIFER ECKHART, | : | |
| | : | |
| Plaintiff, | : | Civil Case No. 1:20-cv-05593-RA |
| | : | |
| against | : | |
| | : | |
| FOX NEWS NETWORK, LLC, and ED HENRY, | : | |
| in his individual and professional capacities, | : | |
| | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

---

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS FOX NEWS NETWORK, LLC, TUCKER CARLSON, SEAN HANNITY, AND HOWARD KURTZ'S RULE 11 MOTION FOR SANCTIONS**

---

November 6, 2020

Anthony J. Dick
J. Benjamin Aguiñaga
Ariel N. Volpe
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
Tel. (202) 879-3939
Fax. (202) 879-1700
E-mail: ajdick@jonesday.com

Kathleen M. McKenna, Esq.
Lloyd B. Chinn, Esq.
Keisha-Ann G. Gray, Esq.
Danielle J. Moss, Esq.
Yonatan L. Grossman-Boder, Esq.
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036-8299
Tel. (212) 969-3000
Fax. (212) 969-2900
E-mail: kmckenna@proskauer.com

*Attorneys for Defendants Fox News Network, LLC,*
*Tucker Carlson, Sean Hannity, and Howard Kurtz*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

I.  There Is No Procedural Bar to Sanctions............................................................. 1

    A.  Areu Failed to Cure the Rule 11 Violations Within the Safe-Harbor Period .............. 2

    B.  Wigdor's Withdrawal Does Not Immunize It From Sanctions ................................. 6

    C.  No "Factual Dispute" Justifies Denying the Sanctions Motion................................ 11

II.  Areu's Fabricated Factual Allegations are Sanctionable ................................... 13

    A.  Carlson ..................................................................................................... 14

    B.  Hannity...................................................................................................... 15

    C.  Kurtz ......................................................................................................... 16

III.  Areu's Frivolous Legal Claims are Sanctionable .............................................. 18

    A.  Areu's Claim To Be an "Employee" Is Frivolous ..................................... 19

    B.  Areu's Invocation of Supplemental Jurisdiction Was Frivolous ............................. 22

IV.  Areu and Her Counsel Asserted Her Claims For an Improper Purpose ............................ 23

V.  Defendants' Motion for Sanctions is Appropriate .............................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Wade*,
  322 F. App'x 270 (4th Cir. 2008) ...................................................................................7

*Baskett v. Autonomous Research LLP*,
  2018 WL 4757962 (S.D.N.Y. Sept. 28, 2018)...............................................................25

*Bletas v. Deluca*,
  2011 WL 13130879 (S.D.N.Y. Nov. 15, 2011) .............................................................20

*Brave Bulk Transp. Ltd. v. Spot On Shipping Ltd.*,
  2007 WL 3255823 (S.D.N.Y. Oct. 30, 2007).................................................................20

*Brown Jordan Int'l, Inc. v. Carmicle*,
  846 F.3d 1167 (11th Cir. 2017) ....................................................................................25

*Campbell v. Chadbourne & Parke LLP*,
  2017 WL 2589389 (S.D.N.Y. June 14, 2017) ...............................................................25

*Cooter & Gell v. Hartmarx Corp.*,
  496 U.S. 384 (1990)..................................................................................................7, 10

*Cornfield v. Pickens*,
  2017 WL 6527299 (D. Ariz. July 25, 2017)....................................................................8

*Cornfield v. Thompson*,
  765 F. App'x 387 (9th Cir. 2019) ....................................................................................8

*Dangerfield v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  2003 WL 22227956 (S.D.N.Y. Sept. 26, 2003)..............................................................7

*Holgate v. Baldwin*,
  425 F.3d 671 (9th Cir. 2005) ..........................................................................................9

*Hughes v. Twenty-First Cent. Fox, Inc.*,
  304 F. Supp. 3d 429 (S.D.N.Y. 2018)......................................................................19, 21

*In re Itel Sec. Litig.*,
  791 F.2d 672 (9th Cir. 1986) ........................................................................................10

*In re Koper*,
  2020 WL 5075549 (Bankr. E.D.N.Y. Aug. 25, 2020).....................................................3

*Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*,
  2017 WL 3671036 (S.D.N.Y. July 18, 2017) ..................................................................7

*Keller v. Loews Corp.*,
  69 A.D.3d 451, 894 N.Y.S.2d 376 (2010) .....................................................................25

*Lawrence v. Richman Group of CT LLC*,
  620 F.3d 153 (2d Cir. 2010)............................................................................................3

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Lichtenstein v. Consol. Servs. Grp., Inc.*,
  173 F.3d 17 (1st Cir. 1999)............................................................................12

*Luv N' Care, Ltd. v. Shiboleth LLP*,
  2017 WL 3671039 (S.D.N.Y., Aug. 8, 2017)..................................................12

*Marceaux v. Lafayette City-Par. Consol. Gov't*,
  14 F. Supp. 3d 760 (W.D. La. 2014)................................................................4

*Marlin v. Moody Nat'l Bank, N.A.*,
  533 F.3d 374 (5th Cir. 2008) ...........................................................................7

*Miller v. Blattner*,
  676 F. Supp. 2d 485 (E.D. La. 2009).............................................................25

*Peer v. Lewis*,
  606 F.3d 1306 (11th Cir. 2010) ......................................................................10

*Robert Reiser & Co. v. Scriven*,
  130 F. Supp. 3d 488 (D. Mass. 2015) ............................................................25

*Safe-Strap Co. v. Koala Corp.*,
  270 F. Supp. 2d 407 (S.D.N.Y. 2003)......................................................11, 12

*St. Amant v. Bernard*,
  859 F.2d 379 (5th Cir. 1988) ..........................................................................10

*Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory*,
  682 F.3d 170 (2d Cir. 2012).............................................................................4

*Tapestry, Inc. v. Gibb*,
  2019 WL 1744251 (N.Y. Sup. Ct. Apr. 18, 2019).........................................25

*U.S. ex rel. Cieszynski v. Lifewatch Servs., Inc.*,
  2016 WL 2771798 (N.D. Ill. May 13, 2016) .................................................25

*Yien-Koo King v. Wang*,
  2018 WL 5650005 (S.D.N.Y. Oct. 31, 2018) ..................................................3

*York v. Ass'n of Bar of City of N.Y.*,
  286 F.3d 122 (2d Cir. 2002)...........................................................................20

**OTHER AUTHORITIES**

Fed. R. Civ. P. 11 ................................................................................... *passim*

Fed. R. Civ. P. 12 ........................................................................11, 13, 21

5A Wright & Miller, Fed. Prac. & Proc. Civ. § 1337.1 (4th ed.) ...............7, 9

Areu's arguments against sanctions fail for four reasons. First, there is no procedural bar because Areu did not withdraw her claims within the safe harbor. Second, Areu's own conduct and other evidence establish her misrepresentations, thus requiring sanctions. Third, her claims are legally frivolous on their face. And fourth, her improper purpose is undeniable.

## I.     There Is No Procedural Bar to Sanctions

To avoid engaging on the substance, Areu and her counsel conjure three procedural obstacles to prevent the court from even considering the sanctions motion. All of these obstacles are illusory. *First*, the filing of an amended complaint did not start a new safe-harbor period. Defendants are seeking sanctions for Rule 11 violations that were committed in the *original* complaint, which the amended complaint failed to cure. After Defendants gave notice that the original complaint contained a series of frivolous claims and fabricated allegations, the amended complaint did not "withdraw[] or appropriately correct[]" any of the core problems identified. Fed. R. Civ. P. 11(c)(2). Thus, because the amended complaint did not cure the original Rule 11 violations, it did not restart the clock on a new safe-harbor period.

*Second*, the Wigdor Firm is wrong to insist that it is immune from sanctions because it withdrew from representing Areu before the safe-harbor period expired. Wigdor contends that even if it filed a frivolous complaint, it cannot be held responsible because it was replaced as counsel two weeks later, and thus had no authority to withdraw the frivolous claims. That makes no sense. It is *always* the client's decision whether to withdraw a claim. The client is the decision-maker, the attorney a mere agent. If Wigdor wanted to be let off the hook, it was required to try to persuade its client to withdraw the offending claims—and, if she refused, to consult with the court about how to proceed. But it did the opposite. By its own account, Wigdor encouraged Areu to *continue pursuing* the offending claims. And it continues to advance them even today, in the face

1

of a Rule 11 motion. Wigdor's attempts to throw its client under the bus and portray itself as an innocent bystander ring hollow.

*Third*, Areu and her counsel contend that the sanctions motion should be denied because they insist that her fabricated allegations are true. Nothing to see here, they say, just a run-of-the-mill factual dispute, no different from any other case where a plaintiff makes allegations that the defendant denies. Not so. This is not the typical case because a host of objective indicators show that Areu's factual contentions are misleading and frivolous: Her original complaint contained several glaring and indisputable errors that cast serious doubt on the fundamental veracity of her claims, as she has tacitly conceded by quietly changing her story in multiple ways even as she maintains the core of her fabricated allegations. Her new story not only conflicts with her original story in several material respects, but spins several wildly implausible scenarios in an attempt to explain away various inconvenient facts that her original complaint either omitted or badly distorted to advance her false narrative. On top of all that, multiple eyewitnesses have submitted sworn statements flatly contradicting her account. None of this can be attributed to inadvertence or good-faith mistake, as it involves the blatant misrepresentation of basic facts within Areu's own direct knowledge.

### A.      Areu Failed to Cure the Rule 11 Violations Within the Safe-Harbor Period

Areu's main argument is that even if her original complaint was frivolous, she cannot be sanctioned because she filed an amended complaint. She claims that the amended complaint triggered a new safe-harbor period, requiring defendants to serve a new Rule 11 notice and wait another 21 days before seeking sanctions. *See* Case No. 20-cv-8678, Dkt. 31 ("Areu Opp.") at 7–8. She is wrong. Under the rule, a party may be sanctioned if she does not "withdraw[] or appropriately correct[]" her frivolous "claim[s]" or "contention[s]" within the safe-harbor period.

Fed. R. Civ. P. 11(c)(2). Thus, if the plaintiff files an amended complaint that simply repeats the same frivolous claims, the original violations are not withdrawn or corrected, and sanctions can be imposed. That is the case here. In filing her amended complaint, Areu did not drop the frivolous claims and allegations of sexual misconduct that she asserted in her original complaint. Thus, because she did not cure the Rule 11 violations she committed, she can be sanctioned for them.

In arguing to the contrary, Areu relies on *Lawrence v. Richman Group of CT LLC*, 620 F.3d 153, 158 (2d Cir. 2010). But *Lawrence* is inapposite because "the sanctioned conduct" there "was the filing of the second amended complaint." *Id*. at 157. The defendants improperly "move[d] for sanctions on the second amended complaint" without providing notice and an opportunity to cure the violations in that complaint. *Id*. Here, by contrast, the sanctionable conduct is the filing of Areu's *original* complaint. Defendants do not seek sanctions for any Rule 11 violation committed in the amended complaint. Instead, they seek sanctions for frivolous claims and allegations asserted in the original complaint, which the amended complaint failed to "withdraw[] or appropriately correct[]." *Lawrence* expressly allows for this, because it acknowledges that a court could be justified in "sanctioning [a] plaintiff for filing or maintaining" claims in an *earlier* complaint that were not withdrawn or corrected in a later amended complaint. *Id*. at 157.

The other cases cited by Areu (at 8) are likewise inapposite. In *Yien-Koo King v. Wang*, 2018 WL 5650005 (S.D.N.Y. Oct. 31, 2018), the defendants improperly asked for sanctions as part of "motion to strike" the amended complaint. *Id*., at *4. They violated the safe-harbor rule because they sought sanctions for violations in "the Amended [complaint]." *Id*. Unlike here, they did not seek sanctions based on uncured violations committed in the *original* complaint. Even farther afield is *In re Koper*, 2020 WL 5075549 (Bankr. E.D.N.Y. Aug. 25, 2020). That case did not involve any amended complaint, so there was no question of whether sanctions can be sought

3

based on frivolous claims or allegations in an original complaint that the amended complaint fails to withdraw or correct. Here, by contrast, sanctions are appropriate because Areu's "amendment d[oes] not cure anything," as it does not "remove any of the allegations . . . or amend out [the] claims that had no factual or legal basis." *Marceaux v. Lafayette City-Par. Consol. Gov't*, 14 F. Supp. 3d 760, 770–71 (W.D. La. 2014), *aff'd*, 614 F. App'x 705 (5th Cir. 2015).

Areu is wrong to claim that Defendants are seeking sanctions based on "new grounds in response to [new] purported deficiencies in the Amended Complaint." Areu Opp. 7. To the contrary, the Rule 11 motion seeks sanctions based on the same defects in the original complaint as identified in the Rule 11 notice on August 7. Specifically, the notice identified three fabricated allegations of sexual misconduct (against Carlson, Hannity, and Kurtz) and two frivolous legal claims (invoking supplemental jurisdiction and claiming to be an "employee"). The Rule 11 motion seeks sanctions on the very same grounds. *Compare* Case No. 20-cv-5593, Dkt. 54-1, Ex. C at 11–17, 18–21, *with* Case No. 20-cv-5593, Dkt. 53 ("Rule 11 Mot."), at 14–20, 21–25. Likewise, the Rule 11 motion makes the same improper-purpose argument. *Compare* Dkt. 54-1, Ex. C at 22–24, *with* Rule 11 Mot., at 26–29. The Rule 11 motion is thus proper because it "rest[s] on substantially the [same] grounds set forth in the earlier notice." *Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory*, 682 F.3d 170, 176 (2d Cir. 2012). Areu complains that Defendants did not provide the underlying "affidavits and evidence" in their Rule 11 notice. Areu Opp. 11–12. But Defendants provided more than enough advance notice, including a full draft brief explaining and quoting the key evidence in support of their sanctions motion. *See* Case No. 20-cv-8678, Dkt. 15, Ex. C; *Star Mark*, 682 F.3d at 176 ("supporting affidavits" not required).

Areu is mistaken to say that Defendants "raised several new alleged deficiencies that were not identified in the initial safe harbor notice provided in response to the initial complaint." Areu

Opp. 8. To the contrary, the Rule 11 motion simply explains why the amended complaint "does not cure" the violations in the original complaint. *See* Rule 11 Mot. at 14, 19, 21, 22, 23, 25. That is very different from *asserting new grounds for sanctions* based on the amended complaint.

Areu does not try to explain how her amended complaint "withdraw[s] or appropriately correct[s]" the frivolous claims and allegations in her original complaint. Nor could she.

First, both the original and amended complaints make the same core factual allegations— i.e., that Carlson, Hannity, and Kurtz made sexual "advances" or otherwise engaged in sexual misconduct, and then retaliated against Areu when she refused to play along. *See* Rule 11 Mot. at 15–16, 17–18, 19–20. To be sure, the amended complaint changes some of the details and invents new surrounding facts in an attempt to make the fabrications seem more plausible. But that obviously does not "withdraw[] or appropriately correct[]" the core fabrications. If anything, it only aggravates the Rule 11 violations that Areu committed when she filed her original complaint. And while the self-contradictory changes in Areu's story certainly provide further confirmatory evidence of her deceptions (*see infra* pp. 13–18), the fact remains that Defendants are seeking sanctions based on the uncured Rule 11 violations in the original complaint—not based on any new violations that may have been committed in the amended complaint.

Second, Areu's amended complaint also did not withdraw or correct her frivolous legal claim to be an "employee" of Fox News. The amended complaint asserts the very same claim. *See* Rule 11 Mot. at 22. To be clear, it makes no difference that she *also* claims to be an "applicant," or that she claims to be a covered "non-employee" under the NYSHRL and the NYCHRL. (Contrary to the assertions of Areu and her counsel, Defendants do not seek sanctions based on those separate claims, although Defendants do believe they are meritless and have moved to dismiss them.) Regardless of the merits of Areu's non-employee claims, they do not make it any

less frivolous for her to claim that she was an "employee" of Fox News (*see infra* pp. 18–21). That frivolous claim still inflicts harm on Defendants (and the court) by forcing them to spend unnecessary time and resources addressing it, instead of focusing exclusively on her other claims.

Third, Areu's amended complaint also did not withdraw her frivolous claim of supplemental jurisdiction. *See* Rule 11 Mot. at 25. After the safe-harbor period expired on September 11, Areu maintained her supplemental-jurisdiction argument for nearly a month, until the case was severed on October 7. During that time, Areu was frivolously asserting supplemental jurisdiction outside of the safe-harbor period, thereby inviting sanctions. It makes no difference that the amended complaint also asserted alternative jurisdictional grounds. That does not excuse the frivolous claim of supplemental jurisdiction, which Defendants had to waste time and resources to address. *See infra* pp. 21–23.

Finally, because Areu did not withdraw or correct her frivolous claims and allegations, she also did not cure the Rule 11 violation that she committed by filing her original complaint with an improper purpose. *See* Rule 11 Mot. at 28–29. Again, Areu does not even attempt to explain how her amended complaint could have cured this violation. And because her original complaint was filed for an improper purpose as explained below (*infra* pp. 23–24), sanctions are appropriate.

### B.    Wigdor's Withdrawal Does Not Immunize It From Sanctions

For its part, the Wigdor Firm argues that even if it filed a frivolous pleading, it is immune from sanctions because it ceased representing Areu before the safe-harbor period expired. *See* Case No. 20-cv-5593, Dkt. 102 ("Wigdor Opp.") at 13–16. Wigdor is mistaken.

At the outset, Wigdor is wrong to dispute the premise that an attorney's violation of Rule 11 is complete at the time he signs and files a frivolous pleading. *See* Wigdor Opp. 14. The Supreme Court has squarely held that a "violation of Rule 11 is complete when the paper is filed."

6

*Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395 (1990). That follows from the text of Rule 11(b), which obliges attorneys to avoid "signing" or "filing" frivolous pleadings. This obligation was not altered when 11(c)(2) safe-harbor language was added in 1993. *See, e.g., Anderson v. Wade*, 322 F. App'x 270, 272 n.3 (4th Cir. 2008) ("[T]he violation of Rule 11 is complete when the paper is filed"); *Marlin v. Moody Nat'l Bank, N.A.*, 533 F.3d 374, 380 (5th Cir. 2008) (Under Rule 11, the violation "exist[s] at the moment of filing."); *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, 2017 WL 3671036, at *28 (S.D.N.Y. July 18, 2017) (same).

The procedural safe harbor of Rule 11(c)(2) determines only when a sanctions motion can "be filed or be presented to the court," not when the underlying violation of Rule 11(b) occurs. The text says that a sanctions motion "must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets." Fed. R. Civ. P. 11(c)(2).

Under that provision, a sanctions motion may be filed as long as the offending "claim" or "contention" has not been "withdrawn or appropriately corrected" within the safe harbor. *Id*. Contrary to Wigdor's argument (at 13), it makes no difference whether the *attorney* who committed the Rule 11 violation has withdrawn before the safe harbor expires. That is why the leading treatise recognizes that "the conduct subject to sanctions typically is appraised as of the time of the filing," so that an attorney "cannot immunize himself from the imposition of sanctions under Rule 11 simply by withdrawing from the case." 5A Wright & Miller, Fed. Prac. & Proc. Civ. § 1337.1 (4th ed.); *see also Dangerfield v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2003 WL 22227956, at *7 (S.D.N.Y. Sept. 26, 2003) ("[A]n attorney's withdrawal from a case does not prevent the imposition of Rule 11 sanctions for papers filed prior to the withdrawal.").

7

Wigdor argues (at 13) that even if it signed and filed a frivolous pleading, sanctions would be unfair because, two weeks after the Rule 11 notice, Areu "disengaged Wigdor and retained new counsel," and "explicitly told Wigdor that it was no longer authorized to do work on her behalf." As a result, Wigdor says it was "ethically prohibited" from "'withdraw[ing] or appropriately correct[ing]' the Complaint," and thus did not receive the "due process that is a prerequisite . . . for sanctions." *Id*. at 14. This argument makes no sense for two reasons.

First, an attorney is *always* bound by his client's instructions, regardless of whether he continues to represent the client. Thus, if the client instructs the attorney not to withdraw a frivolous pleading (or fires the attorney), the attorney cannot override that decision. The client is the ultimate decision maker. As a result, if an attorney violates Rule 11 by signing and filing a frivolous pleading, he bears the risk that the client may choose not to withdraw it. Of course, courts have recognized that attorneys are not entirely "powerless to avoid Rule 11 sanctions." *Cornfield v. Pickens*, 2017 WL 6527299, at \*7 (D. Ariz. July 25, 2017) aff'd sub nom. *Cornfield v. Thompson*, 765 F. App'x 387 (9th Cir. 2019). If an attorney "believe[s] the pleading he drafted, signed, and filed should be withdrawn" but the client refuses to do so, then the attorney "should [seek] guidance from the Court regarding the appropriate path to pursue" to avoid sanctions. *Id*. The attorney is "not, however, entitled to draft, sign, and file a potentially sanctionable filing and then avoid all responsibility by withdrawing." *Id*. That is what Wigdor is trying to do here.

Second, by Wigdor's own account, it was not an innocent bystander that wanted to withdraw Areu's frivolous pleading but was unable to do so because Areu refused. Far from it. To this day, Wigdor continues to insist unrepentantly that the frivolous claims it filed on Areu's behalf are perfectly fine and should not be withdrawn. (E.g., Wigdor Opp. at 2–5, 20–26). Indeed, Wigdor continued to represent Areu for 15 days after the Rule 11 notice, and Wigdor does not even pretend

8

that it tried to counsel Areu to withdraw her claims during that time (much less that it sought guidance from the court about what to do if it felt ethically conflicted). Instead, Wigdor told Defendants that it viewed the Rule 11 notice as "frivolous," and that it would seek sanctions against Defendants if they filed a Rule 11 motion. Case No. 20-cv-5593, Dkt. 20 at 4. In this scenario, it would make no sense to immunize Wigdor from sanctions on the theory that it had no "opportunity" to withdraw the frivolous claims. Wigdor is seeking to invoke the safe harbor only as a loophole to escape sanctions, not because it wanted to withdraw the claims but couldn't.

Wigdor next fights the treatise and argues (at 15) that the "case law" cited by Wright & Miller "does not support" the conclusion that an attorney does not become immune from sanctions by withdrawing from a case. Wrong. In *Holgate v. Baldwin*, 425 F.3d 671, 678–79 (9th Cir. 2005), the Ninth Circuit held that "[t]he signing requirement in Rule 11 makes clear that any attorney who, at any time, certified to the court that a pleading complies with Rule 11 is subject to the rule, even if the attorney later withdraws from the case." *Id*. at 677. To be sure, the party seeking sanctions must "give the opposing *party* 21 days" to withdraw a frivolous pleading. *Id*. at 678 (emphasis added). But if the opposing "party" refuses to withdraw the pleading after 21 days, there is no rule that the party's *attorney* can immunize himself from sanctions by withdrawing before the safe harbor expires. *See id*. (noting that the "case law provides 'absolutely no hint . . . that a *lawyer* may escape sanctions for misconduct simply by withdrawing from a case before opposing counsel applies for sanctions'" (emphasis added)). Indeed, the Ninth Circuit in *Holgate* allowed sanctions against an attorney who "remained counsel for the [plaintiff] for only three days after he was served with [a Rule 11] motion," because he had ample notice of the alleged Rule 11 violation and yet "there [was] nothing in the record to indicate that he did anything to withdraw or otherwise correct the complaint in light of this motion." *Id*. at 678–79. Precisely the same is true here.

In *Peer v. Lewis*, 606 F.3d 1306 (11th Cir. 2010), the offending attorney had already withdrawn before anyone even *alleged* a Rule 11 violation, so he had no opportunity to even try to persuade his client "to correct or withdraw the challenged pleading." *Id*. at 1315. Here, by contrast, Wigdor had over two weeks as Areu's counsel to try to persuade her to withdraw her frivolous pleading after Defendants served their Rule 11 notice. But Wigdor chose not to take advantage of that opportunity, and instead affirmatively encouraged Areu to *maintain* her frivolous claims and allegations. As explained above, disallowing sanctions here would thus be nonsensical, as well as contrary to the plain text of the safe-harbor provision.

Wigdor tries (at 15) to discount the Fifth Circuit's holding in *St. Amant v. Bernard*, 859 F.2d 379, 384 (5th Cir. 1988), by saying that it "predates the 1993 Amendments that added the safe harbor provision." As explained above, however, the safe-harbor provision says nothing about whether a *lawyer* can avoid sanctions by withdrawing after committing a Rule 11 violation. It simply prevents a sanctions motion from being filed if the offending "*claim*[*s*]" or "*contention*[*s*]" are withdrawn or corrected during the safe harbor. Fed. R. Civ. P. 11(c)(2) (emphasis added). The addition of the safe-harbor language in 1993 thus did not displace the rule that a violation of Rule 11(b) is "complete when the paper is filed." *Cooter*, 496 U.S. at 395. Nor did it displace the rule that a lawyer's "withdraw[al] cannot protect him from fees based on his signature of [an earlier] complaint" that was frivolous. *Bernard*, 859 F.2d at 384.

Finally, *In re Itel Sec. Litig.*, 791 F.2d 672 (9th Cir. 1986), also rebuts Wigdor's argument for a similar reason. The court there held that lawyers cannot "escape sanctions for misconduct simply by withdrawing from a case before opposing counsel applies for sanctions." *Id*. at 675. Wigdor says that is no longer good law after the safe-harbor language was added in Rule 11(c)(2) in 1993. But that is incorrect because, as noted above, the procedural safe harbor of 11(c)(2)

changed only the time when sanctions may be *sought*, not when a substantive violation of 11(b) occurs. That is especially clear because Rule 11(c)(3) continues to allow the court on its own initiative—without any safe-harbor period—to sanction an attorney for conduct that "violated Rule 11(b)." This confirms that a substantive violation of Rule 11 can occur without regard to the safe-harbor period. It also shows that, contrary to Wigdor's argument (at 14), there is no "due process" problem with imposing sanctions on a lawyer who has violated Rule 11 even if he withdraws during the safe-harbor period. To the contrary, due process is fully satisfied as long as the attorney receives "notice and a reasonable opportunity to respond" to the charge that he has committed a Rule 11 violation. Fed. R. Civ. P. 11(c)(1). And Wigdor has had more than enough notice and an opportunity to respond here, because it had several weeks to respond to the Rule 11 motion.

### C.     No "Factual Dispute" Justifies Denying the Sanctions Motion

Areu argues (at 9–10) that the Rule 11 motion must be denied because it attacks the "factual veracity" of her complaint and relies on "untested facts" in the form of sworn affidavits that contradict her allegations. In her view, the allegations in her complaint "must be taken as true" for purposes of Rule 11. *Id.* at 1. Wigdor makes essentially the same argument (at 24–25).  Both of them are wrong. Unlike Rule 12(b)(6), Rule 11 does not require a plaintiff's factual allegations to be taken as true, because the whole point is that a plaintiff can be sanctioned for making "contentions" that are misleading and frivolous. Here, the evidence of Areu's fabrications is already clear enough to warrant sanctions. But at worst, the existence of a genuine factual dispute would require Rule 11 discovery in support of Defendants' motion. There is no basis to deny the motion.

Areu primarily relies (at 9–10) on *Safe-Strap Co. v. Koala Corp.*, 270 F. Supp. 2d 407, 414 (S.D.N.Y. 2003), but that case shows exactly why the Rule 11 motion here was filed at the

appropriate time and cannot be denied. As the court there explained, "parties that seek sanctions for the submission of a complaint are *encouraged* to file a Rule 11 motion promptly after the complaint is filed." *Id*. at 413 n.3 (emphasis added). Indeed, Defendants had no choice but to file their Rule 11 motion now, because "[p]arties that initially remain idle after a Rule 11 violation has come to their attention risk [a] denial . . . on the basis of unreasonable delay." *Id*. If there are genuinely disputed factual issues that would make resolution of the Rule 11 motion premature, then the appropriate course is not to *deny* the motion, but to "defer[] the resolution of [the] request for sanctions until the end of the litigation." *Id*. at 422. That is what the court in *Safe-Strap* did. *Id*.

Areu likewise cites several cases saying that sanctions motions should be deferred rather than denied if discovery is required. *See* Areu Opp. at 11 (noting that courts "often . . . defer consideration of certain kinds of sanctions motions until the end of trial" (quoting *Lichtenstein v. Consol. Servs. Grp., Inc.*, 173 F.3d 17, 23 (1st Cir. 1999)); Wigdor Opp. at 25 ("[I]n the case of pleadings the sanctions issue under Rule 11 normally will be determined at the end of the litigation." (quoting *Luv N' Care, Ltd. v. Shiboleth LLP*, 2017 WL 3671039, at *13 (S.D.N.Y., Aug. 8, 2017)). Indeed, Areu seems to recognize that it would be improper to deny Defendants' Rule 11 motion here, as she claims that it "requires fact discovery in order for the Court to properly resolve" it. Areu Opp. at 17. At the very least that means the motion cannot be denied.[1]

---

[1] To be sure, and as explained further below, Defendants believe that no discovery is necessary because the evidence of Areu's fabrications is sufficiently clear to impose sanctions now. *See infra* pp. 24–25. In addition, no factual development is required to determine that Areu should be sanctioned for invoking the court's supplemental jurisdiction and claiming to be an "employee," since those claims are legally frivolous on the face of the complaint. *See infra pp*. 18–23. But should the court believe that discovery is necessary to resolve the issues presented by the Rule 11 motion, Defendants would welcome the opportunity for targeted discovery to confirm that Areu's claims are fabricated, which would be much narrower than the discovery required for summary judgment.

Indeed, while Defendants have submitted a separate Rule 12 motion that explains why Areu's claims must be dismissed even if her fabricated allegations are assumed to be true (Case No. 20-cv-8678, Dkt. 4 at 11), granting that motion should not deny Defendants the opportunity to fully pursue their Rule 11 motion against Areu and her counsel. Outside of Rule 11, Defendants have little recourse to protect their reputations and pursue redress when unscrupulous plaintiffs fabricate claims for improper purposes. In the rare situation where such fabrications can be conclusively proved, as Defendants believe can be done here, the offenders should not be let off the hook. They should be appropriately sanctioned in order to deter similar behavior in the future.

## II.      Areu's Fabricated Factual Allegations are Sanctionable

Despite being confronted with an array of concrete evidence that Areu's claims are fabricated, Areu and Wigdor studiously ignore most of the key factual issues raised in the Rule 11 motion. Areu says that Defendants offer nothing more than their "subjective opinions" and "assumptions" that she made knowing misrepresentations. Areu Opp. at 14. And Wigdor says that the Rule 11 motion "is based almost entirely on the claim that Ms. Areu must be lying because she sent certain texts and emails that are inconsistent with the claim that she was sexually harassed." Wigdor Opp. at 24. But this is a whitewash of the facts set forth in the Rule 11 motion. It is not just that her own e-mails, social media posts, and multiple eyewitnesses contradict her claims. It is also that the original complaint contained major undisputed errors that badly undercut her core allegations. And far from curing the problem, the new complaint only heightens the appearance of deception by making new factual assertions that contradict her original story and are so facially implausible that they are virtually self-refuting.

13

A.    Carlson

As to Carlson, the core premise of Areu's complaint was that he was alone in New York on business and invited Areu back to his empty hotel room where he was staying "without any wife or kids." But as the Rule 11 motion explains—and as Areu now apparently does not dispute—Carlson was in New York with his wife who was staying with him in his hotel. Rule 11 Mot. at 15–16. The basic theory of the claim against Carlson is thus nonsensical. In response, Areu says that it is just a "subjective opinion" that Carlson "would not lie" about whether he was staying alone in his hotel. Areu Opp. at 15. But she cannot explain how this supposed "lie" would have made any sense even under her concocted theory. If it were true that Carlson was trying to invite her to have an illicit sexual encounter, why would he invite her back to a hotel room where he was staying with his wife? She does not make any attempt to explain. Instead she says this is just "a credibility issue" with her story, and that it "should not be decided on a Rule 11 motion." *Id*. But this type of willful fabrication is exactly what Rule 11 was designed for. Carlson has no other avenue to protect his reputation, as the litigation privilege prevents him from suing for defamation. This Court should not allow Areu to make such a damaging false allegation and then shrug it off and avoid any consequences when the facts clearly refute it.

Likewise, Areu says it is no big deal that she initially alleged that the incident with Carlson occurred on the night of the company Christmas party in November, while she now says it was on a different night in December. The fact that she "confused the date" is not sanctionable, she says. *Id*. at 14. But the date is important because the actual night in question is the one when Carlson indisputably was accompanied by his wife, thus conclusively rebutting the charge that he invited Areu back to his "empty" hotel room. Even if alleging the wrong date was not a strategic attempt to make Areu's false story seem plausible, it at least shows that Wigdor failed to conduct a

14

reasonable investigation by failing to consult the publicly available records of when Areu appeared on Carlson's show before filing the complaint. *See* Chludzinski Aff., Ex. A.

Finally, the Rule 11 motion explained that Areu's theory of "retaliation" made no sense because after the alleged incident with Carlson, she continued to be invited on his show several more times over the following months. Rule 11 Mot. at 15. She now says that this doesn't matter because she did not appear *as many times* in 2019 as she had in 2018. Areu Opp. at 15. But if Carlson were supposedly retaliating against her for refusing his purported "advances," why would he continue inviting her on the show at all? She does not venture any explanation.

### B.    Hannity

As to Hannity, the core of Areu's original complaint was that she was a "regular" on his show until the alleged incident, when he purportedly "harassed" her in March 2018, after which she "was hardly ever, if ever at all, invited back." Rule 11 Mot. at 16. She now admits that this is false. The publicly available records show that she barely appeared *at all before* the alleged incident, and she began appearing far *more frequently afterward*. *Id*. No big deal, she says, she "corrected" that error in her Amended Complaint by removing the allegation that she had been a "regular" who stopped being invited after the alleged harassment. Areu Opp. at 15. But that does not cure the Rule 11 violation, because that major defect undercuts the entire theory of her claim. Instead of admitting as much, the Amended Complaint tries to save face by continuing to assert the other crucial part of Areu's fabricated story—i.e., that Hannity "harassed" her by engaging in "misogynistic behavior" and "auctioning" her off to crew members for a date. Case No. 20-cv-5593, Dkt. 38 ¶¶ 156, 230. As the Rule 11 motion explains, however, those allegations are also knowingly false. They are not only contradicted by numerous eyewitnesses and Areu's own texts and e-mails, but the newly added details in the Amended Complaint also contradict Areu's original

story, thus confirming that she and her counsel are simply inventing facts out of thin air to serve their manufactured narrative. Rule 11 Mot. at 17–18. Especially egregious is the claim that Hannity somehow "auctioned her off"—which connotes that he sold her to the highest bidder—when not even the false facts that Areu alleges would support that characterization. Yet Areu and her counsel deliberately used her complaint to generate false and sensationalized media coverage about a Hannity-led "auction" (Rule 11 Mot. at 6), knowing that it had no basis in fact.

Areu's opposition brief says next to nothing about these glaring holes and inconsistencies in her story. She simply ignores them and tries to wave them away as legally irrelevant: It doesn't matter if none of this actually happened, she says, because "a factual allegation made upon Ms. Areu's knowledge and belief, even if later found to be untrue . . . is not a sanctionable offense." Areu Opp. at 16. But Areu actually *knows* that her allegations are false; she was there. These are not facts that she is indirectly inferring based on information and belief. They are fabricated assertions of what supposedly happened to her, as a matter of her own direct experience, and there is no way she could be making an innocent mistake about them. Just as her own Instagram page contains a record of when she appeared on Hannity's show (*see* Chludzinski Aff., Ex. A), her own experience necessarily refutes her fabricated account of the interactions with Hannity in March 2018. Indeed, her personal knowledge of the key facts in dispute is what makes her allegations sanctionable rather than merely false. The evidence in the record already reflects as much even at this early stage. And if the court believes discovery is warranted, Defendants are confident that it will only provide further support for sanctions.

### C.    Kurtz

As to Kurtz, the evidence of Areu's deception is even more glaring because almost all of the communications at issue occurred via e-mail, and the undisputed e-mail records show that her

complaint flagrantly distorted them.  As the Rule 11 motion explained, the e-mails show that Kurtz did not make any sexual advances or inappropriate comments, and Areu is the one who inappropriately invited herself to his hotel room. *See* Rule 11 Mot. at 18–20. When she was confronted with this indisputable fact in the Rule 11 notice, Areu amended her complaint to try to explain away her fabrications by inventing a new justification: She claimed that she "wait[ed] until as late possible" before demanding to come to his hotel room so that "it would likely be too late and Mr. Kurtz would be asleep or unavailable," thereby "allowing [her] to have fulfilled her obligation to contact him without actually having to meet him." Case No. 20-cv-5593, Dkt. 38 ¶¶ 171–72. But the e-mails show that after he last e-mailed her at 9:09 p.m., she responded within 7 minutes: "What?! Give me your cell. I'll be right there. I'm totally available right now!!!!!!" Kurtz Aff., Ex. A at 6. Then she sent another e-mail five minutes later: "What's your room number? What name are you under? What's your cell? I'm coming over. We can do it the easy way or the hard way." *Id*. at 7.

Areu's claim that Kurtz was pursuing her and that she "wait[ed] until as late possible" to respond is thus wildly implausible on its face. If she had wanted to wait until he was asleep, she would not have responded within 7 minutes. It is clear that she lied about their e-mail exchange in her original complaint, and that when she was caught lying she made up another lie in her amended complaint in a transparent attempt to maintain the deception.

Notably, even though this issue was fully laid out in Defendants' Rule 11 motion (at 18–20), Areu's response brief does not even address it. Nor does Areu explain how the Kurtz e-mail records can be read to show anything other than a continuing pattern of deception on her part. And once again, she does not deny that these records were within her own possession, such that any reasonable investigation would have put her counsel on notice of the actual facts.

Instead of addressing this core issue, Areu addresses only whether Kurtz invited her back on his show less frequently after the alleged incident in July 2019. She does not dispute that, "[i]n the nine months before the alleged incident she appeared four times," and "in the nine months after, she also appeared four times." Areu Opp. 16. Instead, she says that this nine-month period is "a completely arbitrary date range," which Defendants supposedly used as a way of "massaging" the data. *Id*. But that is demonstrably false; the date range makes no difference. In fact, only twelve months passed between the July 2019 incident and the filing of Areu's complaint in July 2020. During that time she appeared four times on Kurtz's show, and during the preceding twelve months she appeared five times. *See* Renfro Aff. ¶ 2; Chludzinski Aff., Ex. A ¶ 35. However one slices the data, Areu has no basis to assert that the rate of her appearances diminished in any material respect as a result of the July 2019 incident.

Finally, Areu tries to avoid responsibility for this distortion by saying she did not have "access" to the records of her appearances. Areu Opp. 16. But that is false. Her own Instagram page documents all of the relevant appearances. Chludzinski Aff., Ex. A.

## III.    Areu's Frivolous Legal Claims are Sanctionable

In the Rule 11 motion, Defendants explained that two of Areu's legal claims are frivolous. First, it is frivolous for her to claim "employee" status because she was only an unpaid guest. Rule 11 Mot. at 21–23. And second, she had no basis to invoke the court's "supplemental" jurisdiction, because she asserted nothing other than state-law claims that had nothing to do with the sole federal claim of "sex trafficking" asserted by her co-plaintiff, Jennifer Eckhart. *Id*. at 23–26. In response, Areu says that even if her claims were "unlikely to be successful, sanctions are not warranted" because she does not have "no chance of success." Areu Opp. at 18. She is wrong.

### A.      Areu's Claim To Be an "Employee" Is Frivolous

At the outset, Wigdor tries to evade responsibility for pleading a frivolous "employee" claim by mischaracterizing the basis of Defendants' Rule 11 motion on this point. Specifically, Wigdor claims that Defendants are seeking sanctions over Areu's claim that she "was an employee of Fox News *or an applicant for employment*." Wigdor Opp. at 26 (emphasis added). But Defendants are not seeking sanctions against Areu for claiming to be an "applicant." They are seeking sanctions because the original complaint made the freestanding claim that "Areu is a former employee of Fox News" (Case No. 20-cv-5593, Dkt. 1 ¶ 46). And while the Amended Complaint says that Areu was a job applicant, it claims that "she *also* was an 'employee.'" Dkt. 38 at 5 n.1 (emphasis added). The distinction matters because (as the Rule 11 motion explained and nobody disputes) employees can bring some claims (such as hostile-work-environment claims) that mere job applicants cannot. *See* Rule 11 Mot. at 22 & n.2. To be sure, Defendants believe Areu's "applicant" claims fail, and they have moved to dismiss those claims. But they are seeking sanctions only on her *frivolous* claim to be an "employee," which has no conceivable legal basis and is a waste of time and resources for both Defendants and the court.

It is thus entirely inapposite for Wigdor to rely on *Hughes v. Twenty-First Cent. Fox, Inc*., 304 F. Supp. 3d 429, 444 (S.D.N.Y. 2018). That case held that an unpaid guest on Fox News could theoretically qualify as a job applicant if she was truly applying for a paid contributorship through an informal process, but it squarely rejected the claim that an unpaid guest could assert claims as an "employee." *Id*. at 443. Wigdor does not even attempt to explain how the law should apply any differently here. Nor does Wigdor offer any response to the point that Areu's claiming to be an "applicant" does not moot out the employee issue, since employees can bring some claims that mere applicants cannot. And since the distinction has real legal consequences, making a frivolous

claim to be an "employee" requires the expenditure of significant time and resources that neither Defendants nor the court should have been required to bear.

For her part, Areu tries to show that her "employee" claim is not frivolous. Recognizing that she cannot be an employee unless she was paid some "substantial benefits" in exchange for her work, she asserts (for the first time) that she supposedly received three "benefits" for appearing on Fox News as an unpaid guest. Areu Opp. at 19. At the outset, these concocted new benefits should not be considered because she did not allege them—not in her original complaint, and not in her amended complaint after Defendants served their Rule 11 notice. *Cf. Bletas v. Deluca*, 2011 WL 13130879, at *5 n.4 (S.D.N.Y. Nov. 15, 2011) ("A complaint cannot be amended merely by raising new facts and theories in Plaintiff's opposition papers, and hence such new allegations and claims should not be considered."); *Brave Bulk Transp. Ltd. v. Spot On Shipping Ltd*., 2007 WL 3255823, at *6 (S.D.N.Y. Oct. 30, 2007) (allegations to avoid Rule 11 sanctions, "should appear [] in the complaint—not in material submitted to the Court for the first time in opposition"). But even if these new points could be considered, they would not save Areu's frivolous claim.

First, Areu claims that "[d]uring her appearances on Fox News, [she] received 'plugs' for her magazine, which led directly to companies purchasing advertisements." *Id*. But unpaid guests on television shows routinely receive "plugs" and other networking opportunities when they appear. This obviously is not "remuneration," and it does not make them employees. Otherwise, the *Tonight Show* would employ half of Hollywood. *See York v. Ass'n of Bar of City of N.Y.*, 286 F.3d 122, 126 (2d Cir. 2002) ("networking opportunities" are not remuneration).

Second, Areu claims that she "received paid speaking opportunities as a result of her regular appearances on Fox News." Areu Opp. at 19. But she does not claim that Fox News itself paid her for any speaking opportunity. And even if *others* gave her paid speaking opportunities

because she appeared on Fox News, that clearly does not constitute remuneration "from the defendant" in exchange for any work. *Hughes*, 304 F. Supp. 3d at 443. Her argument on this point only highlights the frivolousness of her claim.

Third, Areu claims that "Fox News hired and paid [her] company to provide hair and makeup services to Fox on air personalities irrespective of whether Ms. Areu was appearing on air." Areu Opp. at 19. But tellingly, Areu does not provide an invoice, a company name, or any date or amount of payment, so Fox News cannot even look up whether it ever used any company associated with Areu to provide "hair and makeup services." And in any event, even if Fox News did unwittingly hire some Areu-affiliated company to "provide hair and makeup services," that plainly does not constitute "remuneration" that the company paid her *in exchange for* her unpaid guest appearances. Indeed, she admits as much by saying that her purported company was supposedly paid to perform these services "irrespective of whether Ms. Areu was appearing on air." *Id.* So again, even if true, this novel assertion is not even conceivably relevant to her frivolous claim that she was an "employee" of Fox News.

Finally, Areu argues that it is not frivolous for her to claim that she was a covered "non-employee" under the NYCHRL and the NYSHRL. But Defendants have never argued otherwise. To be sure, Defendants have filed a Rule 12 motion seeking to dismiss her "non-employee" claims because those claims are meritless. *See* Case No. 20-cv-8678, Dkt. 4, at 11–12. But Defendants do not argue those claims are *sanctionable*. For purposes of the sanctions motion, it is enough to show that Areu's freestanding claim to "employee" status is frivolous, and that she should not have forced Defendants to waste time and resources addressing it. To the extent her meritless "non-employee" claims are relevant to the Rule 11 motion, they simply illustrate that she has no valid alternative basis for asserting hostile-environment claims.

### B.       Areu's Invocation of Supplemental Jurisdiction Was Frivolous

In the Rule 11 motion, Defendants explained that it was frivolous for Areu to invoke the court's supplemental jurisdiction because her state-law claims against Carlson, Hannity, and Kurtz have nothing to do with the sole federal claim of "sex trafficking" asserted by Jennifer Eckhart. Rule 11 Mot. at 23–26. When Areu and Eckhart filed their joint amended complaint on September 11 (and the safe harbor expired the same day), Eckhart did not assert any new federal claims, but Areu nevertheless maintained her frivolous assertion of "supplemental jurisdiction" based on Eckhart's sex-trafficking claim. Case No. 20-cv-5593, Dkt. 38 ¶¶ 12–13. Areu and Wigdor make three arguments to defend their invocation of supplemental jurisdiction, but all fail.

First, they wrongly conflate the issues of supplemental jurisdiction and "joinder," which is not a jurisdictional doctrine. Based on this conflation, they argue that Areu's claims were properly joined with Eckhart's because they both asserted *state-law claims* of "sexual harassment" based on the conduct of Ed Henry. Wigdor Opp. at 20–22; Areu Opp. at 22. But that simply dodges the relevant jurisdictional question, which is whether Eckhart's *federal* claim of sex trafficking against Henry was part of the same "case or controversy" as Areu's state-law claims against Carlson, Hannity, and Kurtz. *See* Rule 11 Mot. at 23–24. The answer is clearly no. Indeed, Areu has already admitted as much: In her severance motion, she conceded that she and Eckhart's claims "do not arise out of the same transaction or occurrence," "are based on different facts," and "while [they] have some overlapping issues of law, they do not share the same overlapping issues of fact." Case No. 20-cv-5593, Dkt. 49 at 2–3. That is exactly why Areu had no colorable claim of "supplemental jurisdiction." She cannot argue the exact opposite now for the purpose of avoiding sanctions.

Second, Wigdor claims that this Court has blessed Areu's claim of supplemental jurisdiction by designating her and Eckhart's cases as "related" post-severance. Wigdor Opp. at

22. This is a red herring. The legal test for supplemental jurisdiction is much different—and much more demanding—than the test for relatedness. For the latter, it is enough that the cases were originally filed together and are both the subject of the same sanctions motion. That does not mean that Eckhart's grounds for federal jurisdiction extend to Areu's state-law claims.

Third, Areu and Wigdor claim that her frivolous assertion of supplemental jurisdiction made no difference because even if she had no valid federal claims at the time, she "would eventually be able to assert federal claims under Title VII." Wigdor Opp. at 3, 23; Areu Opp. at 22–23. That is incorrect. The fact that Areu might *later* be able to assert her own federal claims is no excuse for frivolously invoking supplemental jurisdiction when she did—which, as explained below, was done for the improper purpose of maximizing sensational press coverage. And in any event, even after she added her Title VII claims, that does not excuse her for continuing to make a frivolous argument about supplemental jurisdiction. Defendants have moved to dismiss the Title VII claims as jurisdictionally barred, and they should not have been forced to spend time and resources addressing a frivolous claim of supplemental jurisdiction in parallel.

## IV.    Areu and Her Counsel Asserted Her Claims For an Improper Purpose

Areu does not seriously dispute that an improper purpose can be readily inferred if her claims and allegations were substantively frivolous and fabricated. Rule 11 Mot. at 26–27. Nor could she, as it is never "proper" to assert knowingly false claims of sexual misconduct.

For its part, Wigdor does not deny that before filing the complaint, it sent Defendants an e-mail asking for mediation with the subject line referencing "Eckhart and Areu." *See* Declaration of Kathleen McKenna ¶ 10. That e-mail improperly tied together the unrelated allegations, and conveyed the threat that Areu's claims against some of the company's biggest stars—Carlson, Hannity, and Kurtz—would be publicly filed if the company did not agree to a mediated settlement

that included Eckhart's claims against Henry. Wigdor thus tried to use the threat of Areu's frivolous claims as leverage, since Eckhart's claims against Henry had otherwise fizzled when the company fired him. After the company refused to give in to these pressure tactics, Wigdor followed through on the threat by improperly filing Areu's and Eckhart's claims together and issuing a sensationalized press release (Rule 11 Mot. at 6) that tarnished all of the other individual Defendants by associating them with Eckhart's attention-grabbing claims against Henry.

Areu says that she "had no knowledge" of Wigdor making any monetary demand or using her allegations to try to create pressure for a settlement of Eckhart's claims. *See* Areu Opp. at 25. Perhaps that explains why Areu terminated Wigdor as her counsel. Wigdor makes the carefully worded representation that Areu did not "make any monetary demand *on her own behalf* or Ms. Eckhart's." Wigdor Opp. at 9 (emphasis added). But this only underscores Wigdor's improper purpose of using Areu as an unwitting pawn by seeking a joint Areu/Eckhart mediation.

## V.     Defendants' Motion for Sanctions is Appropriate

Areu and Wigdor argue that Defendants' sanctions motion is itself improper, but the merits of the motion speak for themselves. Fox News has an acute interest in deterring this type of false charge. In the wake of past scandals, the company has dramatically changed its culture and engaged in painstaking efforts to adopt new policies and procedures to combat sexual harassment. False accusations are extraordinarily damaging not just to the company, but also to others who may be true victims, who are done a serious disservice when unscrupulous plaintiffs seek to exploit the "me too" movement by pushing false claims for their own financial gain.

Finally, Wigdor claims (at 11 n.2) that Defendants' counsel at Proskauer Rose have a history of filing meritless sanctions motions and otherwise retaliating against plaintiffs. But that is false. The two cited cases handled by Ms. McKenna involved only party allegations and proved

nothing regarding any "retaliatory" conduct. *Campbell v. Chadbourne & Parke*, No. 16-cv-6832 (S.D.N.Y)*; Bertram v. Proskauer Rose LLP*, No. 17-cv-00901-ABJ (D.D.C.). Indeed, contrary to Wigdor's assertion, the Court actually denied a motion to dismiss the Proskauer-represented party's counterclaims in *Chadbourne. See Campbell v. Chadbourne & Parke LLP*, 2017 WL 2589389, at *4 (S.D.N.Y. June 14, 2017). In two of the cases handled by Mr. Chinn, sanctions were granted. *See McLaughlin v. Macquarie Capital (USA) Inc.*, No. 1:17-cv-9023-RA (S.D.N.Y.) (arbitrator granted sanctions); *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1172 (11th Cir. 2017). And in the sole cited case where a court *denied* sanctions, the Court noted that the plaintiff's conduct "was possibly improper" even though the court found it "not so severe as to rise to the level of sanctionable." *Baskett v. Autonomous Research LLP*, 2018 WL 4757962, at *6 n.8 (S.D.N.Y. Sept. 28, 2018).

The other cases cited are either confidential arbitrations that Wigdor improperly disclosed or litigation where Proskauer's clients *prevailed* on allegedly retaliatory counterclaims. *Keller v. Loews Corp.*, 69 A.D.3d 451, 452, 894 N.Y.S.2d 376 (2010); *Tapestry, Inc. v. Gibb*, 2019 WL 1744251, at *3 (N.Y. Sup. Ct. Apr. 18, 2019); *Miller v. Blattner*, 676 F. Supp. 2d 485, 489 (E.D. La. 2009). Most remarkably, Wigdor cites two cases where Proskauer was not even counsel of record. *Robert Reiser & Co. v. Scriven*, 130 F. Supp. 3d 488, 491 (D. Mass. 2015) (error on docket sheet concerning attorney who switched firms); *U.S. ex rel. Cieszynski v. Lifewatch Servs., Inc.*, 2016 WL 2771798, at *1 (N.D. Ill. May 13, 2016). Wigdor's sloppy citations only confirm Defendants' contention that its lack of care in presenting demonstrably false allegations constitutes sanctionable conduct.

Dated:  November 6, 2020

By:     */s/ Kathleen M. McKenna*
         Kathleen M. McKenna, Esq.
         Lloyd B. Chinn, Esq.
         Keisha-Ann G. Gray, Esq.
         Danielle J. Moss, Esq.
         Yonatan L. Grossman-Boder, Esq.
         PROSKAUER ROSE LLP
         Eleven Times Square
         New York, New York 10036-8299
         (212) 969-3000
         kmckenna@proskauer.com

         Anthony J. Dick
         JONES DAY
         51 Louisiana Ave., NW
         Washington, DC 20001
         (202) 879-3939
         ajdick@jonesday.com

         *Attorneys for Defendants*
         *Fox News Network, LLC, Tucker Carlson,*
         *Sean Hannity, and Howard Kurtz*

26