**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
JENNIFER ECKHART,                                    :
                                                     :          Civil Case No. 1:20-cv-05593 (RA)
                            Plaintiff,               :
                                                     :
                   v.                                :
                                                     :
FOX NEWS NETWORK, LLC and ED HENRY,                  :
in his individual and professional capacities,       :
                                                     :
                            Defendants.              :
-----------------------------------------------------------------X


## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT FOX NEWS NETWORK, LLC'S MOTION TO DISMISS PLAINTIFF'S THIRD AMENDED <u>COMPLAINT</u>

**WIGDOR LLP**

Michael J. Willemin
Renan F. Varghese

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
mwillemin@wigdorlaw.com
rvarghese@wigdorlaw.com

*Counsel for Plaintiff*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................... iii

PRELIMINARY STATEMENT ....................................................................................................1

FACTUAL SUMMARY ................................................................................................................2

I.     Henry Preys on Eckhart, Culminating in a Violent Rape ....................................................2

II.    Henry's History of Sexual Harassment and Misconduct.....................................................4

ARGUMENT .................................................................................................................................5

I.     Legal Standard for a Rule 12(b)(6) Motion .......................................................................5

II.    The Third Amended Complaint Properly Pleads Claims Under the TVPRA Against
Fox .....................................................................................................................................6

       A.     Fox Knew or Should Have Known About Henry's Sex Trafficking Activities ......7

       B.     Fox Participated in Henry's Sex Trafficking Scheme ...........................................10

       C.     Fox Benefited From its Association with Henry ...................................................12

III.   Eckhart's Discrimination Claims Are Not Time-Barred .................................................14

IV.   Eckhart Properly Exhausted her Administrative Remedies...............................................17

V.    Fox Is Liable for Henry's Sexual Harassment .................................................................18

       A.     Fox Is Liable For Henry's Conduct Even if He Was Eckhart's Co-Worker .........20

       B.     The TAC Alleges Sufficient Facts to Plead that Henry Was Eckhart's
Supervisor ...........................................................................................................21

       C.     Fox's Arguments in Support of Dismissal Are Without Merit..............................23

VI.   The Third Amended Complaint States a Claim Against Fox for Retaliation ....................25

       D.     The TAC Alleges that Eckhart Engaged in Protected Activity .............................25

       E.     The TAC Alleges that Fox is Liable for Post-Termination Retaliatory Conduct ..27

i

VII.    The TAC Alleges that Fox Is Liable for the Unlawful Dissemination of Intimate
Images ................................................................................................................................29

CONCLUSION ............................................................................................................................31

# TABLE OF AUTHORITIES

## Cases

A.B. v. Hilton Worldwide Holdings Inc.,
   No. 19 Civ. 01992 (IM), 2020 WL 5371459 (D. Or. Sept. 8, 2020) .......................... 9

A.B. v. Marriott Int'l, Inc.,
   455 F. Supp. 3d 171 (E.D. Pa. 2020) ..................................................................... 11

Amaya v. Ballyshear LLC,
   295 F. Supp. 3d 204 (E.D.N.Y. 2018) ..................................................................... 25

Annunziata v. Int'l Bhd. of Elec. Workers Local Union # 363,
   No. 15 Civ. 03363 (NSR), 2018 WL 2416568 (S.D.N.Y. May 29, 2018) .............................. 17

Ashcroft v. Iqbal,
   556 U.S. 662 (2009) ........................................................................................ 6

Bass v. World Wrestling Fed'n Entm't, Inc.,
   129 F. Supp. 2d 491 (E.D.N.Y. 2001) ............................................................... 19, 20

Bell Atl. Corp. v. Twombly,
   550 U.S. 544 (2007) ....................................................................................... 23

Bridges v. Poe,
   No. 19 Civ. 01399 (LSC), 2020 WL 5408915 (N.D. Ala. Sept. 9, 2020) .................................. 7

Burlington Northern Fe Ry. Co. v. White,
   548 U.S. 53 (2006) ........................................................................................ 27

Canosa v. Ziff,
   No. 18 Civ. 4115 (PEA), 2019 WL 498865 (S.D.N.Y. Jan. 28, 2019) ................................. 9, 13

Corrado v. New York Unified Court Sys.,
   163 F. Supp. 3d 1 (E.D.N.Y. 2016) ....................................................................... 15

Davis v. NYC Dep't of Educ.,
   No. 10 Civ. 3812 (KAM)(LB), 2012 WL 139255 (E.D.N.Y. Jan. 18, 2012) ........................... 24

Distasio v. Perkin Elmer Corp.,
   157 F.3d 55 (2d Cir. 1998) ............................................................................ 16, 21

Doe 4 v. Red Roof Inns, Inc.,
   No. 19 Civ. 03845 (WMR), 2020 WL 1872336 (N.D. Ga. Apr. 13, 2020) ........................... 9, 11

Doe S.W. v. Lorain-Elyria Motel, Inc.,
    No. 19 Civ. 1194, 2020 WL 1244192 (S.D. Ohio Mar. 16, 2020) ............................. 7

Doe v. Rickey Patel, LLC,
    No. 20 Civ. 60683 (WPD) (CIV), 2020 WL 6121939 (S.D. Fla. Sept. 30, 2020)..................... 7

Dollinger v. New York State Ins. Fund,
    No. 14 Civ. 00908 (MAD), 2015 WL 1446892 (N.D.N.Y. Mar. 30, 2015) ............................ 20

Figueira v. Black Entm't Television, Inc.,
    944 F. Supp. 299 (S.D.N.Y. 1996)........................................................ 17

Figueroa v. RSquared NY, Inc.,
    89 F. Supp. 3d 484 (E.D.N.Y. 2015) .................................................... 19

Fitzgerald v. Henderson,
    251 F.3d 345 (2d Cir. 2001)............................................................. 15

Geiss v. Weinstein Co. Holdings LLC,
    383 F. Supp. 3d 156 (S.D.N.Y. 2019).................................................... 13

Gilbert v. United States Olympic Comm.,
    423 F. Supp. 3d 1112 (D. Colo. 2019) .................................................. 14

Gliatta v. Tectum, Inc.,
    211 F. Supp. 2d 992 (S.D. Ohio 2002) .................................................. 28

Gostanian v. Bendel,
    No. 96 Civ. 1781 (LAP), 1997 WL 214966 (S.D.N.Y. Apr. 25, 1997)..................... 19

Hernandez v. Premium Merch. Funding One, LLC,
    No. 19 Civ. 1727 (WHP), 2020 WL 3962108 (S.D.N.Y. July 13, 2020) ............................ 18

Howley v. Town of Stratford,
    217 F.3d 141 (2d Cir. 2000).............................................................. 19

Hussein v. Pierre Hotel,
    No. 99 Civ. 2715 (DC), 2000 WL 776920 (S.D.N.Y. June 14, 2000)...................... 18

Illiano v. Mineola Union Free Sch. Dist.,
    585 F. Supp. 2d 341 (E.D.N.Y. 2008) ................................................... 28

Inguanzo v. Hous. & Servs., Inc.,
    No. 12 Civ. 8212 (ER), 2014 WL 4678254 (S.D.N.Y. Sept. 19, 2014) ................... 25

J. B. v. G6 Hospitality, LLC,
    No. 19 Civ. 07848 (HSG), 2020 WL 4901196 (N.D. Cal. Aug. 20, 2020) ................................ 9

Jean-Charles v. Perlitz,
    937 F. Supp. 2d 276 (D. Conn. 2013) ..................................................................... 8

Karibian v. Columbia Univ.,
    14 F.3d 773 (2d Cir. 1994).................................................................................... 22

Kassner v. 2nd Ave. Delicatessen Inc.,
    496 F.3d 229 (2d Cir. 2007)................................................................................. 15

Lawson v. Rubin,
    No. 17 Civ. 6404 (BMC), 2018 WL 2012869 (E.D.N.Y. Apr. 29, 2018) ................................ 10

Lenzi v. Systemax, Inc.,
    944 F.3d 97 (2d Cir. 2019) (reversing ................................................................... 25

M.A. v. Wyndham Hotels & Resorts, Inc.,
    425 F. Supp. 3d 959 (S.D. Ohio 2019) ........................................................... 8, 11, 12

McGrath v. Nassau Health Care Corp.,
    217 F. Supp. 2d 319 (E.D.N.Y. 2002) ................................................................... 18

McGullam v. Cedar Graphics, Inc.,
    609 F.3d 70 (2d Cir. 2010)................................................................................... 17

Nat'l R.R. Passenger Corp. v. Morgan,
    536 U.S. 101 (2002)................................................................................... 15, 16

Noble v. Weinstein,
    335 F. Supp. 3d 504 (S.D.N.Y. 2018)................................................. 7, 10, 11, 13

Patane v. Clark,
    508 F.3d 106 (2d Cir. 2007).................................................................................. 24

Perks v. Town of Huntington,
    251 F. Supp. 2d 1143 (E.D.N.Y. 2003) ................................................................. 19

Robinson v. Brooklyn Coll.,
    No. 09 Civ. 2174 (DLI)(LB), 2010 WL 3924012 (E.D.N.Y. Sept. 29, 2010)......................... 17

S.Y. v. Naples Hotel Co.,
    No. 20 Civ. 118 (FTM) (MRM), 2020 WL 4504976 (M.D. Fla. Aug. 5, 2020) ........................ 8

Schwab v. Smalls,
    435 F. App'x 37 (2d Cir. 2011) ........................................................... 6

Scott-Iverson v. Indep. Health Ass'n,
    No. 13 Civ. 0451 (RJA), 2014 WL 3107289 (W.D.N.Y. July 7, 2014) ................................. 15

Swierkiewicz v. Sorema, N.A.,
    534 U.S. 506 (2002) ........................................................... 6

Taylor v. City of New York,
    207 F. Supp. 3d 293 (S.D.N.Y. 2016) ........................................................... 17

Torres v. Gristede's Operating Corp.,
    628 F. Supp. 2d 447 (S.D.N.Y. 2008) ........................................................... 28

Truskoski v. ESPN, Inc.,
    823 F. Supp. 1007 (D. Conn. 1993) ........................................................... 26

United States v. Afyare,
    632 F. App'x 272 (6th Cir. 2016) ........................................................... 11, 13

Vega v. Hempstead Union Free Sch. Dist.,
    801 F.3d 72 (2d Cir. 2015) ........................................................... 6

Williams v. New York City Hous. Auth.,
    61 A.D.3d 62 (1st Dep't 2009) ........................................................... 27

Yankelevitz v. Cornell Univ.,
    No. 95 Civ. 4593 (PKL), 1996 WL 447749 (S.D.N.Y. Aug. 7, 1996) ................................. 28

Zamora v. N. Salem Cent. Sch. Dist.,
    414 F. Supp. 2d 418 (S.D.N.Y. 2006) ........................................................... 24

**Statutes**

18 U.S.C.A. § 1595 ........................................................... 6, 7

29 C.F.R. § 1601.28(a)(2) ........................................................... 18

NYC Admin. Code §8-107(13)(b) ........................................................... 19, 20

N.Y. Civ. Rights Law §52-b ........................................................... 29, 30

**Rules**

Fed. R. Civ. P. 11 ..................................................................................... 2, 28

Fed. R. Civ. P. 12 ....................................................................................... 6

Fed. R. Civ. P. 56 ....................................................................................... 7

Plaintiff Jennifer Eckhart ("Eckhart" or "Plaintiff") submits this memorandum of law in opposition to Defendant Fox News Network, LLC's ("Fox" or the "Company") motion to dismiss her Third Amended Complaint ("TAC") in this action.

## PRELIMINARY STATEMENT

For several years, Fox Anchor Ed Henry ("Henry") (Henry and Fox, together, "Defendants"), with the aid of his employer, preyed on Eckhart, sexually harassing and assaulting her, and, in February 2017, violently raping her. All the while, much like Harvey Weinstein, Henry used his position of power and promises of career advancement to coerce Eckhart into compromising situations, at which point Henry would use force to gratify his sexual desires. While Fox would prefer to avoid liability for Henry's actions – and has filed a motion seeking just that – it cannot do so. Indeed, the TAC alleges facts sufficient to support a number of theories of liability against Fox under all causes of action.

As described in great detail in the Third Amended Complaint ("TAC") and herein, Fox was well aware of the risk that Henry posed to its female employees and did nothing to protect them. In fact, Fox ignored repeated complaints about Henry and, instead of taking corrective action, inexplicably continued to promote Henry and put him in a position from which he felt emboldened to violate the law and prey upon women, including Eckhart.

Henry's pattern and practice of unlawful sexual misconduct and assault towards Ms. Eckhart began in 2014 and persisted through 2018, well into all relevant limitations periods. Moreover, when Eckhart engaged in protected activity by complaining about her toxic work environment – a complaint that her manager and human resources personnel surely understood to be related to sexual misconduct – Fox retaliated against her and terminated her employment. As though this were not enough, Fox then subjected Eckhart to continuing trauma and threats,

including, but not limited to, the false accusation contained in Fox's pending Rule 11 motion, that Eckhart attempted to extort Fox.

Put simply, the claims alleged in the TAC are well sufficiently supported and Fox's motion to dismiss should be denied.

## FACTUAL SUMMARY

## I.   HENRY PREYS ON ECKHART, CULMINATING IN A VIOLENT RAPE

In or around 2014, Henry began to target Eckhart, a recently hired employee of Fox, sending her unsolicited and flirtatious messages, clearly telegraphing his desire to engage in an inappropriate relationship with her.  ¶¶ 35-37.[1]  Though Eckhart was uncomfortable with Henry's conduct, she felt pressured to respond.  ¶¶ 38-40.  Unfortunately, Henry ignored Eckhart's protests that she was only interested in a professional relationship and instead began sending her increasingly inappropriate and graphic text messages, pressuring her to meet him socially and refusing to take no for an answer.  ¶¶ 42-43.  Feeling as if she had no choice, Eckhart agreed to meet with Henry but sought to keep their conversation strictly related to her career and professional development.  ¶¶ 44-46.  Henry seized upon this meeting to prey on Eckhart and compelled her to have sexual intercourse with him against her will.  ¶¶ 48-49. Afterwards, in an open acknowledgement of the career concerns that Eckhart had discussed with him earlier, Henry told Eckhart that she was "wasting her time" in her role at Fox but that he could help her by leveraging his status to "get her in a room with some really powerful people." ¶¶ 50-51.

Later, in September 2015, Henry continued sexually harassing Eckhart, this time using Fox's New York offices to do so.  ¶¶ 53-57.  Henry initially demanded that Eckhart remove her

---

[1]        "¶ __" or "¶¶ __" throughout this memorandum of law cite paragraphs within Plaintiff's Third Amended Complaint, unless otherwise expressly stated.

underwear, while at work, and provide it to him for his perverted gratification.  ¶ 45.  Henry then

demanded that Eckhart meet him in one of Fox's offices where he proceeded to physically force

her to perform oral sex on him against her will.  ¶¶ 53-57.  After Henry finished sexually

assaulting Eckhart, Eckhart ran out of the guest office in a state of shock, panic and fear.  ¶ 57.

Thereafter, Henry continued to harass Eckhart through lewd and extremely graphic

communications that often-contained pornographic images, videos and GIFs.  ¶¶ 58-59.  In one

set of messages, he referred to Eckhart as a "little whore," who he would "toss around" and

"discipline" if she refused to "obey" his commands.  ¶¶ 61-62.  In another, he flouted the fact

that he purportedly "owned" Eckhart and could demand that she provide him with "[m]ore anal"

sex (the two never had anal sex).  ¶ 63.  It was clear that Henry saw women such as Eckhart as

being less than human – objects that he could use for his pleasure and discard as he saw fit.

In February 2017, Eckhart, feeling powerless in the face of Henry's threats to

"discipline" her if she did not "obey" him, relented to Henry's advances and agreed to meet him

for a drink.  ¶¶ 62, 64.  During this meeting, Henry doubled down on his earlier promises to help

her career, telling her that he could introduce her to his agent (one of the most powerful people in

the journalism industry) so that she was no longer "wasting her time" professionally.  ¶ 65.  He

also informed Eckhart that he had been awarded his own new show by Fox, further elevating his

position within the Company.  Id.  As yet another inducement to convince Eckhart to be

"submissive" towards him, Henry promised Eckhart that he would bring her onto his new show

as a frequent on-air guest.  Id.  He then invited her to his hotel room, ostensibly so they could

further discuss Eckhart's "career opportunities."  ¶¶ 65-66.  Once there, Henry proceeded to

handcuff, physically attack, brutally rape, and take nude photographs of Eckhart despite her

pleading with him to stop.  ¶¶ 68-74.

Even after the rape, Henry continued to harass Eckhart, to the point that Eckhart had to openly flee from him in the hallways of Fox News on numerous occasions. ¶¶ 83-87. Henry followed-up his attempts to corner Eckhart in the hallways with text messages referencing her attempts to escape further interaction with him, part of a pattern he had established to escalate their interactions until such time as he could further sexually proposition her. Id.

## II.    HENRY'S HISTORY OF SEXUAL HARASSMENT AND MISCONDUCT

Eckhart was neither the first victim of Henry's sexual misconduct, nor the last. Throughout his employment at Fox, Henry engaged in a pattern of sexual misconduct involving several women, including other employees at Fox. ¶¶ 124-126, 129, 133, 140-161, 173-181. These women have all reported about Henry's repeated sexual advances, pushing them to submit to sexual activity, even if it was against their will. ¶¶ 135-138, 140-146, 150-151, 159, 165-180. He also repeatedly referred to women as being "whores," and became physically and emotionally abusive towards them. ¶ 149-158, 179-180.

As a result, several of Fox's female employees complained about Henry's sexual misconduct and gross behavior, with one written complaint going so far as to suggest that continuing to employ Henry flew in the face of Fox's promise to make sweeping changes following the ouster of Roger Ailes, the former CEO of Fox who was infamous for sexually preying on younger female employees. ¶¶ 113. In fact, it was an "open secret" at Fox that Henry was a serial harasser who used his power to pray on younger female employees. ¶¶ 4, 114, 131. Senior management was additionally made aware of Henry's misconduct when women came forward during sexual harassment investigations occurring in 2016 into 2017. ¶ 5, 111. Thus, Fox was at all relevant times aware that Henry was leveraging his position to coerce and groom young, impressionable women into sexual relationships. ¶ 118.

Nevertheless, Fox failed to put adequate measures in place to protect its female employees from Henry and instead, rewarded him with promotions and lucrative publishing deals, thereby increasing the influence he would use to prey on his victims. ¶¶ 2-4, 131. Since Fox economically benefited from having Henry on its payroll, it chose to turn a blind eye as it was repeatedly made aware of his pattern and practice of sexual misconduct. ¶¶ 7-9, 12, 120, 124-126, 129, 133, 140-161, 173-181. In excusing Henry's sexual misconduct, Fox was acting in keeping with its lengthy and unsavory practice of ignoring and covering up sexual misconduct while protecting the individuals who engage in it. ¶¶ 95-106.

Fox continued to enable Henry in December 2019 when it announced that he was being promoted to the position of co-anchor of the "America's Newsroom" program. ¶ 89. Shortly thereafter, in February 2020, Eckhart reported to her supervisor, Brad Hirst, and Fox's Senior Vice President of Human Resources ("HR"), Denise Collins, that she was being subjected to a "toxic working environment." ¶¶ 90-91. Despite the fact that Fox was aware of the culture of sexual harassment that had permeated its offices for years, it intentionally and inexcusably refused to ask the follow up questions that it knew would have made Eckhart's complaints of sexual harassment explicit. ¶ 90. Fox also failed to investigate Eckhart's complaints and ignored her obvious plea for help. ¶ 91. To the contrary, Eckhart's supervisor, Mr. Hirst, *threatened* Eckhart in response to her complaints in a transparent effort to silence her before she could explicitly complain about sexual harassment (as he no doubt feared she would). ¶ 91.

Under the circumstances, Ms. Collins and Mr. Hirst should have understood and, upon information and belief, did understand Eckhart to be "complaining" about unlawful harassment. It responded by retaliating against her. Specifically, Fox promptly placed Eckhart on an unjustified "Performance Improvement Plan" and subsequently terminated her employment, on

June 12, 2020. ¶ 94. Tellingly, during Eckhart's termination meeting, Fox confirmed that it had understood her earlier complaint to implicate issues of sexual harassment, as its HR representative asked Eckhart if she had been sexually harassed and/or assaulted while employed by Fox. ¶ 94.

## ARGUMENT

## I. LEGAL STANDARD FOR A RULE 12(b)(6) MOTION

In reviewing a motion for dismiss under Rule 12(b)(6), all factual allegations in the complaint are accepted as true and all reasonable inferences are drawn in the plaintiff's favor. Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 78 (2d Cir. 2015). To survive a motion to dismiss, the complaint must "state a claim to relief that is plausible on its face," which requires the plaintiff to plead facts permitting "'the reasonable inference that the defendant is liable for the misconduct alleged.'" Schwab v. Smalls, 435 F. App'x 37, 39 (2d Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). The complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim for relief. See, e.g., Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 508 (2002).

## II. THE THIRD AMENDED COMPLAINT PROPERLY PLEADS CLAIMS UNDER THE TVPRA AGAINST FOX

To state a claim under the Trafficking Victims Protection Reauthorization Act ("TVPRA") under a beneficiary theory of liability, a plaintiff need only allege facts sufficient to permit the court to plausibly infer that the party or entity at issue: (1) it "knew or should have known" that sex trafficking was occurring; (2) it participated in the venture committing sex trafficking; and (3) it "knowingly benefit[ted] financially or by receiving anything of value;" from that venture. 18 U.S.C.A. § 1595. The TAC alleges sufficient conduct to hold Fox liable for its role in facilitating, and benefiting from, Henry's violations of the TVPRA. In a futile

attempt to escape liability under the TVPA, Fox proffers three arguments, none of which are sufficient to support its motion to dismiss.

### A.     <u>Fox Knew or Should Have Known About Henry's Sex Trafficking Activities</u>

As a threshold matter, the TAC indisputably alleges that Fox was aware, or should have been aware, of Henry's sex trafficking activities. Fox nevertheless seeks dismissal on the grounds that, because it purportedly did not specifically know that *Henry* was personally engaging in activity that constituted a "commercial sex act," it cannot be held liable under the TVPRA. Fox's novel interpretation of the TVPRA is contrary to the broad remedial framework contemplated by §1595 and does not find support in the case law. <u>See</u>, <u>e.g.</u>, <u>Noble v. Weinstein</u>, 335 F. Supp. 3d 504, 515 (S.D.N.Y. 2018) ("The remedial provision at issue, Section 1595, which permits civil actions for damages under Section 1591, requires broad interpretation").

Courts have found that "for a civil claim under the TVPRA actual knowledge of the sex trafficking venture is not required." <u>Doe v. Rickey Patel, LLC</u>, No. 20 Civ. 60683 (WPD) (CIV), 2020 WL 6121939, at *6 (S.D. Fla. Sept. 30, 2020). Instead, allegations against a defendant are sufficient to state a claim for violations of the TVPRA where the circumstances, *taken as a whole*, have provided enough information to show that the entity at least *should have known* about the sex trafficking and refused to take appropriate remedial action. By way of example only, courts have found defendants liable under the TVPRA where they were aware of similar conduct by other individuals and/or employees and did not take sufficient steps to remedy such conduct before the plaintiff was victimized. <u>See</u> <u>Bridges v. Poe</u>, No. 19 Civ. 01399 (LSC), 2020 WL 5408915, at *8 (N.D. Ala. Sept. 9, 2020) (holding that a defendant's knowledge of generalized and widespread sexual misconduct by other employees was sufficient to impute constructive knowledge of TVPRA violation); <u>Doe S.W. v. Lorain-Elyria Motel, Inc.</u>, No. 19

Civ. 1194, 2020 WL 1244192, at *6 (S.D. Ohio Mar. 16, 2020) (denying motion to dismiss TVPRA claim where the plaintiff alleged that, "[T]he Best Western brand and its corporate parent have been aware of sex trafficking occurring on Best Western properties through online review websites such as TripAdvisor and www.yelp.com. Online reviews show the pervasiveness of customer reported sex trafficking on Best Western brand properties and Best Western's inattentiveness"); <u>M.A. v. Wyndham Hotels & Resorts, Inc.</u>, 425 F. Supp. 3d 959, 968 (S.D. Ohio 2019) (finding that plaintiff pled constructive knowledge based on allegations that, "[d]efendants were on notice about the prevalence of sex trafficking generally at their hotels and failed to take adequate steps to train staff in order to prevent its occurrence"); <u>S.Y. v. Naples Hotel Co.</u>, No. 20 Civ. 118 (FTM) (MRM), 2020 WL 4504976, at *4 (M.D. Fla. Aug. 5, 2020) (finding "Online reviews of [d]efendants' properties which described prostitution and commercial sex work taking place at [d]efendants' properties" relevant to constructive knowledge inquiry).

In the instant case, as alleged in the TAC, Fox has a long and ignominious history of allowing its powerful male figures, such as Ailes and O'Reilly, to engage in sexual misconduct against its female employees, including through the use of force or fraud. ¶¶ 95-105. Despite knowing full well what was happening on its premises, Fox refused to take appropriate action, choosing instead to cover it up to protect its bottom line. Fox's knowledge of an institutional culture of sexual misconduct, and its refusal to take action that could impact its profits, is sufficient to allege a violation of the TVPRA at the pleading stage.

Moreover, other courts have also found defendants liable under a beneficiary theory of liability for violations of the TVPRA by the primary wrongdoer by citing to the fact that the defendants were aware of the wrongdoer's sexual misconduct towards *other* victims. See <u>Jean-</u>

<u>Charles v. Perlitz</u>, 937 F. Supp. 2d 276, 288 (D. Conn. 2013) (finding allegations that the defendant was aware that the wrongdoer engaged in sexually abusive behavior with others was sufficient to state a claim of constructive knowledge); <u>Canosa v. Ziff</u>, No. 18 Civ. 4115 (PEA), 2019 WL 498865, at *23 (S.D.N.Y. Jan. 28, 2019) (citing to the company's awareness of similar allegations of sexually abusive behavior by the wrongdoer in denying its motion to dismiss).

Thus, even putting aside Fox's knowledge of a pervasive culture of sexual harassment perpetrated by its powerful male employees, Fox's knowledge of several complaints from other women concerning Henry's use of his position to prey on female employees is sufficient to plead a claim for a violation of the TVPRA. Specifically, beginning in mid-2016, prior to when Henry raped Eckhart, several of Fox's female employees came forward to complain that Henry "had engaged in sexually inappropriate conduct towards them." ¶¶ 110-113. Notably, in making these complaints, Fox's female employees drew comparisons between Henry and Ailes, a serial sexual abuser at Fox. ¶ 113. As a result of these repeated complaints by Fox's female employees, it was an open secret that Henry was a sexual predator roaming the halls of Fox, targeting young women for grooming and subsequent abuse. ¶¶ 114-118. Indeed, Henry felt empowered to use Fox's own offices to sexually assault Eckhart, in the middle of the workday, ultimately resulting in her fleeing the office in a state of shock and terror, in full view of other employees. [2] ¶¶ 54-58. As a result, there is no question that Fox had sufficient knowledge of

---

[2]    The cases to which Fox cites are readily distinguishable in that they do not allege sufficient facts to show that the defendant had a basis under which it at least should have known about the sex trafficking activities . <u>See J. B. v. G6 Hospitality, LLC</u>, No. 19 Civ. 07848 (HSG), 2020 WL 4901196, at *10 (N.D. Cal. Aug. 20, 2020) (finding that plaintiff's allegations that hotel employees saw plaintiff in a car in the parking lot or in rented rooms insufficient to show that employees knew she was being trafficked); <u>Doe 4 v. Red Roof Inns, Inc.</u>, No. 19 Civ. 03845 (WMR), 2020 WL 1872336, at *3 (N.D. Ga. Apr. 13, 2020) (complaints by customers of prostitution occurring on hotel's premises insufficient to put defendant on notice of sex trafficking); <u>A.B. v. Hilton Worldwide Holdings Inc.</u>, No. 19 Civ. 01992 (IM), 2020 WL 5371459, at *8 (D. Or. Sept. 8, 2020) (general allegations that plaintiff was engaged in sexual activity at the defendant's hotels was insufficient under the TVPRA where "the complaint cites no news articles or online reviews describing sex trafficking ***at the specific hotel properties at issue in this case***") (emphasis added). In contrast, in the instant case, the TAC sets forth specific allegations that Fox itself was aware of similar

Henry's trafficking activities to survive a motion to dismiss. See Lawson v. Rubin, No. 17 Civ. 6404 (BMC), 2018 WL 2012869, at *20 (E.D.N.Y. Apr. 29, 2018) (a defendant's knowledge of the perpetrator's use of force in sexual relationships with other women sufficient to allege a claim of a violation of the TVPRA).

Put simply, the allegations in the TAC, taken as true, establish that Fox had ample evidence to know that powerful men in the news organization in general, and Henry in particular, routinely engaged in the type of conduct that put vulnerable women such as Plaintiff at risk. Fox's knowledge, and its abject refusal to take remedial action to protect its female employees from a known sexual predator, is sufficient to plead liability under the TVPRA.

### B. Fox Participated in Henry's Sex Trafficking Scheme

Second, the TAC sufficiently alleges that Fox had sufficient knowledge that it was participating in, or enabling, Henry's sex trafficking activities to give rise to liability under the TVPRA. Fox argues that, because it did not "knowingly" participate in Henry's sex trafficking, it cannot be held liable for such conduct under the TVPRA. In claiming that liability does not lie in the absence of "actual knowledge," Fox cites the decision in Noble, as well as §1591 of the TVRPA. However, courts that have considered the issue after Noble have recognized that it misinterpreted the relevant provisions of the TVPRA. Specifically, the court in Noble relied on caselaw and rationale related to §1591 of the TVPRA. §1591 sets the standard for *criminal* liability under the TVPRA, which requires a defendant's *actual knowledge* of the specific sex trafficking. In contrast, the standard for *civil* liability, which is far broader and extends to entities with *constructive knowledge*, is contained in §1595.

---

sexual misconduct by its male employees and that Henry in particular was the subject of numerous complaints by female employees.

Moreover, as one court correctly explained, <u>Noble</u> incorrectly based its reasoning on the Sixth Circuit's decision in <u>United States v. Afyare</u>, 632 F. App'x 272 (6th Cir. 2016). <u>Afyre</u> was a *criminal* case brought under §1591(a)'s standard for criminal liability. Thus, as explained in <u>Wyndham Hotels</u>:

> In <u>Afyare</u>, the Sixth Circuit panel looked to the statutory definitions and to the surrounding context. The language of § 1591 differs from the language of § 1595—the former does not have a constructive knowledge element manifested by "should have known" language. . . Some [d]efendants have relied on the definition of "participation in a venture" supplied in § 1591(e)(4). Generally, there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning. But this presumption does not apply where there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent. Here, § 1591(e) purports to only apply to "this section," i.e., § 1591.

<u>Id.</u>, 425 F. Supp. 3d at 969 (internal citations and quotations omitted). <u>See also</u> <u>A.B. v. Marriott Int'l, Inc.</u>, 455 F. Supp. 3d 171, 188 (E.D. Pa. 2020) ("Both the court in the <u>Red Roof</u> cases and the court in <u>Noble</u> essentially required the victim of sex trafficking seeking a civil remedy to first prove a criminal violation of section 1591(a)(2). And this is where we diverge from the judges in the Northern District of Georgia in the <u>Red Roof</u> cases and the Southern District of New York in <u>Noble</u>"). Thus, contrary to Fox's arguments, the appropriate inquiry in this case is whether Fox participated in Henry's sex trafficking schemes and whether it knew *or should have known* that it was doing so based on the information in its possession.

In applying the appropriate legal standard, courts have found corporate entities liable where, as here, they had knowledge of a defendant's sexually inappropriate conduct, even generally, notwithstanding the fact that they did not have specific knowledge that the specific wrongdoer was using fraud or force to enable a commercial sex act. <u>See</u> <u>id.</u> at 194 (denying

motion to dismiss where "A.B. alleges Marriott knew of the problem of sex trafficking in its and other hotels, Marriott failed to take steps to implement staff training and other preventative measures, and, as to A.B. herself, failed to act on signs of sex trafficking in each of its three Philadelphia Airport hotels").

Based on the myriad allegations demonstrating that Fox knew or should have known about Henry's sex trafficking activities, see supra at pp. 4-5, 8-9, there is no question that it had sufficient knowledge that, by rewarding him with greater positions of power and authority, it was putting him in a position where he could continue to use that power to abuse women. Wyndham Hotels, 425 F. Supp. 3d at 970 (explaining that to plead participation under the TVPRA, "[p]laintiff must allege at least a showing of a continuous business relationship between the trafficker and the hotels such that it would appear that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement"). Precisely that relationship exists here between Henry and his employer Fox. Notwithstanding its knowledge that Henry was using the high-profile positions given to him by Fox to prey on women, including female employees, Fox chose to ignore his blatant misconduct because of the substantial revenue he was generating for the Company. ¶ 111-133.

### C.      Fox Benefited From its Association with Henry

Finally, the TAC pleads that Fox benefited from its association with Henry. Indeed, the TAC specifically alleges that:

> Fox News was at all times aware that if it took action in response to the complaints about Mr. Henry, it would potentially be costing itself millions of dollars. The Company further knew that, so long as it employed Mr. Henry, he would continue to prey on innocent young women. Fox News therefore effectively entered into a devil's bargain – so long as Mr. Henry was continuing to generate revenue for the Company, it was willing to look the other way and even provide him access to additional victims.

¶ 133.

In light of Henry's increasing popularity and prominence within the Company, his work –
including his show, which generated advertising revenue – contributed to millions of dollars in
advertising revenue for Fox.  ¶¶ 106-109.

Given the several complaints it had received from female employees about Henry's
sexual misconduct, and the fact that senior employees openly acknowledged that Henry was a
known sexual "addict," the only way for Fox to truly protect its female employees was to
terminate Henry's employment.  However, as it had with Ailes and O'Reilly, Fox was not willing
to take even this basic step given its potential impact on the Company's bottom line.  Instead, it
continued to allow a known sexual "addict" and predator to continue to roam its halls, in
exchange for the millions of dollars of advertising revenue he brought in.  See Canosa, 2019 WL
498865 (finding that the defendants benefited from their association with Weinstein because
facilitating his sexual abuse "as a means of keeping him happy, productive, and employable"
helped the companies "achieve fame and reap financial benefits").

Fox attempts to minimize the benefits it derived from Henry's employment by claiming
that its ratification and approval of his sexual misconduct did not *directly* result in any revenue
coming into the Company.  This argument is misplaced.  In making it, Fox cites to Geiss v.
Weinstein Co. Holdings LLC, 383 F. Supp. 3d 156 (S.D.N.Y. 2019).  In Geiss, the court held
that in order to be held liable under the TVPRA, a defendant must directly profit from the sex
trafficking venture itself, not from other activities by the sex traffickers, even if they are related
to the venture.  Id. at 169.  In reaching this conclusion, the court, like the court in Noble, relied
on the Sixth Circuit's decision in Afyare, 632 F. App'x 272.  Respectfully, as explained above,
see supra at pp. 10-11, the more stringent standard set forth in Afyare only applies to *criminal*

violations under §1591(a).  Civil violations under §1595(a) do not require the same kind of direct participation in a sex trafficking venture.  Accordingly, the benefit to Fox does not have to stem directly from the sex trafficking itself, but can also encompass any commercial benefits that Fox realizes as a result of intentionally turning a blind eye to Henry's conduct.  Plaintiff is seeking recovery based on the theory that Fox knew *or should have known* that it was benefiting from enabling Henry's sex trafficking activities.  Thus, the allegations in the Complaint are sufficient to demonstrate that Fox unlawfully benefited from Henry's activities.  See, e.g., Gilbert v. United States Olympic Comm., 423 F. Supp. 3d 1112, 1139 (D. Colo. 2019) (holding that a sports organization benefited from its coach's sexual trafficking conduct "including by collecting money through sponsorships, licensing, grants, publicity, [and] for medals achieved at competitions").  At a minimum, Plaintiff has alleged sufficient facts to warrant discovery as to the benefits that Fox attained from its association with Henry and its knowledge that holding Henry responsible for his sexual misconduct would jeopardize those benefits.

## III.  ECKHART'S DISCRIMINATION CLAIMS ARE NOT TIME-BARRED

Fox also argues that Eckhart's claims for discrimination and sexual harassment under New York's anti-discrimination laws are time-barred.  In doing so, Fox attempts to parse Henry's harassing conduct into discreet sexual assaults that occurred more than three years ago so as to avoid liability under the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL").  Fox's argument fundamentally misstates both Eckhart's claims and the relevant case law pertaining to statute of limitations.

As a threshold matter, Eckhart's harassment claims in this case do not stem merely from her non-consensual sexual encounters with Mr. Henry.  Rather, Eckhart has alleged that Henry repeatedly, and over the course of several years, engaged in a continuing pattern of harassing

behavior, encompassing, *inter alia*, his in-person interactions with Eckhart, the text messages

that he sent her, *and* by repeatedly sexually assaulting her.  See ¶¶ 37, 41-50, 60-73, 83-88.

These actions cannot be separated into isolated incidents but are instead part of a larger hostile

work environment that Henry created (and that Fox facilitated through its willful blindness).

In such a hostile work environment case, the continuing violation doctrine entitles

Eckhart "to have a court consider all relevant actions allegedly taken pursuant to the employer's

discriminatory policy or practice, including those that would otherwise be time barred."

Fitzgerald v. Henderson, 251 F.3d 345, 359 (2d Cir. 2001) (internal quotations omitted).  Thus, it

is not true, as Fox now contends, that Plaintiff cannot allege continuous and related conduct

during the three-year statute of limitations period of the NYSHRL and the NYCHRL.  As the

Supreme Court has explained:

> Hostile environment claims are different in kind from discrete acts.
> Their very nature involves repeated conduct. The "unlawful
> employment practice" therefore cannot be said to occur on any
> particular day.  It occurs over a series of days or perhaps years and,
> in direct contrast to discrete acts, a single act of harassment may
> not be actionable on its own.

Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002) (internal citations and

quotations omitted).  The Court went on to explain that "consideration of the entire scope of a

hostile work environment claim, including behavior alleged outside the statutory time period, is

permissible for the purposes of assessing liability, ***so long as __an__ act contributing to that hostile***

***environment takes place within the statutory time period***."  Id. at 105 (emphasis added).[3]

---

[3]      It is for this reason that Fox's reliance on Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229 (2d Cir. 2007) and Corrado v. New York Unified Court Sys., 163 F. Supp. 3d 1 (E.D.N.Y. 2016) is inapposite.  In both Kassner and Corrado, the courts examined the continuing violation doctrine as it applied to discrete acts of discrimination.  However, because Eckhart brings claims arising from Henry's ongoing sexual harassment, there is no requirement that she allege that she was subjected to discrete adverse employment actions during the statute of limitations period.  Scott-Iverson v. Indep. Health Ass'n, No. 13 Civ. 0451 (RJA), 2014 WL 3107289, at *3 (W.D.N.Y. July 7, 2014) (explaining that for application of continuing violation doctrine to hostile work environment claim, there is no requirement for "discrete acts of discrimination" because "the incidents constituting a

Here, the TAC alleges that Henry continued his harassing behavior into the statutory time period by sending her repeated messages attempting to engage Eckhart in further conversations as late as October 2018. ¶¶ 83-88. Although Fox attempts to dismiss these messages as being "non-sexual in nature," it ignores the well-settled principle that a hostile work environment analysis requires that a court examine "the totality of the circumstances." Distasio v. Perkin Elmer Corp., 157 F.3d 55, 62 (2d Cir. 1998). When assessed in the totality of the circumstances, it is obvious that the messages that Henry sent Plaintiff in October 2018 were not innocuous at all. Rather, by that point, Henry had established a pattern of sending Plaintiff facially non-sexual messages as a way of initiating conversations that he would then escalate with more graphic messages, culminating in his sexual advances. See ¶¶ 37, 41-50, 60-73, 83-88. Thus, the October 2018 messages were merely the first step of Henry's pattern of sexual harassment, which undoubtedly would have culminated in further sexual demands had Eckhart not learned her lesson and refused to engage. Indeed, even the content of these messages reflected the pattern of Henry's communications. Compare ¶ 42 (telling Eckhart that she was playing "hard to get") with ¶ 85 (asking Eckhart "why'd you turn away today"), ¶ 87 (sending Eckhart an image of a football player doing the Heisman pose, thereby acknowledging that she was rejecting his advances, or playing "hard to get"). However, receiving these messages, from a powerful and host at Fox, terrified Eckhart and certainly contributed to the hostile work environment she experienced. Given that these messages were part of Henry's pattern of sexually harassing conduct, under the continuing violation doctrine, they operate to bring his earlier harassment into

hostile work environment are part of *one* unlawful employment practice") (emphasis added) (citing Morgan, 536 U.S. at 117).

this case.[4]  Robinson v. Brooklyn Coll., No. 09 Civ. 2174 (DLI)(LB), 2010 WL 3924012, at *5

(E.D.N.Y. Sept. 29, 2010) (finding that an e-mail sent during the limitations period was

sufficient to establish the application of the continuing violation doctrine at the pleading stage).

## IV.   ECKHART PROPERLY EXHAUSTED HER ADMINISTRATIVE REMEDIES

Fox further claims that this Court must dismiss Plaintiff's Title VII claims because the

Equal Employment Opportunity Commission ("EEOC") issued Eckhart an early right to sue

notice.  Fox contends that such an early right to sue notice is incompatible with Title VII and that

the notice is therefore "unlawful and does not satisfy the administrative exhaustion

requirements" of Title VII.  Def. Br. at p. 15.  Fox's motion to dismiss on this point should be

denied.

As a threshold matter, contrary to what Fox now claims, there is nothing in the language

of Title VII that prohibits the EEOC from issuing an early right to sue letter.  Rather, although

the exhaustion statute *requires* that a right-to-sue letter be issued if the EEOC dismisses the

charge or 180 days have elapsed since the charge was filed, the exhaustion statute neither states

that those are the only situations in which the EEOC may issue a right-to-sue letter nor otherwise

prohibits issuance of right-to-sue letters where the EEOC determines that it would be

administratively infeasible or impractical to wait 180 days.  See Figueira v. Black Entm't

Television, Inc., 944 F. Supp. 299, 305 (S.D.N.Y. 1996) (observing that "the word 'if' together

---

[4]       Because Henry's conduct during the limitations period was part of a pattern that he had established prior,
the cases cited by Fox are distinguishable.  See McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 78 (2d Cir. 2010)
(comment by a different employee in a different department and of a different kind than earlier comments not
related); Taylor v. City of New York, 207 F. Supp. 3d 293, 309 (S.D.N.Y. 2016) (comments by different employees
inside and outside the limitations period not considered related); Annunziata v. Int'l Bhd. of Elec. Workers Local
Union # 363, No. 15 Civ. 03363 (NSR), 2018 WL 2416568, at *16 (S.D.N.Y. May 29, 2018) (same).

with 'shall' [in the exhaustion statute] does not bar the conclusion that when neither of the two conditions occurs, the [EEOC] still *may* issue a notice of right to sue").

Indeed, the EEOC's regulations specifically permit it to issue a right-to-sue letter before 180 days if: (i) the claimant requests an early right to sue; (ii) the EEOC has determined that it is probable that it will be unable to complete its administrative processing within 180 days of filing; and (iii) the EEOC has attached a written certificate to that effect. 29 C.F.R. § 1601.28(a)(2). Given the clear language of the regulation, courts have observed that the EEOC regulation permitting early right-to-sue letters advances Title VII's enforcement provisions. See Hernandez v. Premium Merch. Funding One, LLC, No. 19 Civ. 1727 (WHP), 2020 WL 3962108, at *6 (S.D.N.Y. July 13, 2020) (examining statutory language and affording EEOC's regulations Chevron deference); see also McGrath v. Nassau Health Care Corp., 217 F. Supp. 2d 319, 327 (E.D.N.Y. 2002) (finding that dismissing of a case because of an early right to sue notice would lead to an inequitable waste of time and resources); Hussein v. Pierre Hotel, No. 99 Civ. 2715 (DC), 2000 WL 776920, at *5 (S.D.N.Y. June 14, 2000) (holding that "right to sue letters issued by the EEOC . . . prior to the expiration of the 180-day administrative review period are valid").

## V.     FOX IS LIABLE FOR HENRY'S SEXUAL HARASSMENT

In seeking dismissal of Eckhart's sexual harassment claims, Fox contends that Plaintiff has failed to allege sufficient facts to hold the Company liable for Henry's harassing conduct under a hostile work environment theory.[5] While it is true that a plaintiff alleging a hostile work

---

[5]     Notably, Fox does not even address Plaintiff's claim for sexual harassment under a *quid pro quo* theory of liability. Here, the TAC, which alleges that, prior to raping Eckhart, Henry sought to entice her into submitting to his sexual advances by promising that he would make her a frequent on-air guest on his new show, clearly states a claim for *quid pro quo* sexual harassment. See ¶ 227 (defining the claims against Fox to include "subjecting [Plaintiff] to sexual harassment and assault, rape *and* a hostile work environment") (emphasis added). Moreover, unlike Fox's claim that it cannot be held liable under a hostile work environment theory because Henry was a coworker, *quid pro quo* sexual harassment does not require that the perpetrator be a supervisor in fact. Instead, an

environment claim must allege a specific basis for imputing the misconduct onto the employer, Fox is incorrect in claiming that it cannot be held liable for Henry's sexual assaults.

Under the NYCHRL, an employer is liable for the harassing conduct of one of its employees if:

> (1) the employee or agent exercised managerial or supervisory responsibility; or (2) the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or (3) the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

NYC Admin. Code §8-107(13)(b). Likewise, under Title VII and the NYSHRL, an employer is automatically subject to vicarious liability where the conduct was perpetrated by a supervisor. Bass v. World Wrestling Fed'n Entm't, Inc., 129 F. Supp. 2d 491, 501 (E.D.N.Y. 2001). The employer is also liable for the harassing conduct of a coworker if it "failed to provide a reasonable avenue for complaint or if it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." Howley v. Town of Stratford, 217 F.3d 141, 154 (2d Cir. 2000). Here, the TAC alleges sufficient facts to warrant discovery as to whether Henry Eckhart's co-worker or supervisor. Based on the allegations in the TAC, Fox is liable for Henry's conduct in either case.

---

employer is liable even where the individual is a *de facto* supervisor who "possesses the authority to affect the terms and conditions of plaintiff's employment"). Figueroa v. RSquared NY, Inc., 89 F. Supp. 3d 484, 491 (E.D.N.Y. 2015) (citing Gostanian v. Bendel, No. 96 Civ. 1781 (LAP), 1997 WL 214966, at *6 (S.D.N.Y. Apr. 25, 1997)). Notably, an employer can be held liable for such harassment even if the wrongdoer is not, in fact, the plaintiff's *de facto* supervisor but if the plaintiff *reasonably believes* that he can affect the terms and conditions of her employment. Perks v. Town of Huntington, 251 F. Supp. 2d 1143, 1155 n.11 (E.D.N.Y. 2003) (denying summary judgment where there was a question whether the wrongdoer was a *de facto* supervisor and even if she was not, "Perks' perception that she did have that authority was reasonable"). Similarly, in the instant case, whether Henry was Eckhart's *de facto* supervisor is a question of fact that cannot be determined on the pleadings. In any event, because Fox did not move on this theory of liability in their moving papers, it is estopped from doing so now.

## A. Fox Is Liable For Henry's Conduct Even if He Was Eckhart's Co-Worker

Even assuming, *arguendo*, that Henry was not Eckhart's supervisor, but see infra at Section V(B), Fox nevertheless can be held vicariously liable for his conduct. In order to demonstrate that the employer should be liable for the sexual harassment perpetrated by a coworker, a plaintiff needs to only allege that "[t]he employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct." NYC Admin. Code §8-107(13)(b)(3).

In the instant case, Fox received numerous complaints of sexual misconduct by Henry from female employees of the Company, dating back to at least 2016, and refused to take meaningful remedial action. ¶¶ 110-121. To the contrary, it repeatedly rewarded Henry with promotions and lucrative career advancement opportunities, sending a clear signal to all of its female employees that such complaints would fall on deaf ears and that Fox was more interested in rewarding popular hosts than protecting victims of sexual harassment. ¶¶ 121-132. Fox's utter indifference to such complaints provides ample support for a finding that Fox should have known about Henry's repeated sexual harassment and failed to take action to safeguard its employees. Such inaction is sufficient to support a finding of vicarious liability against Fox under the law. See, e.g., Bass, 129 F. Supp. 2d at 501 (finding that allegation that culture of sexual harassment at the employer was "well known to the senior management of the WWF, yet it failed and refused to take any steps to prevent such conduct" sufficient to impute liability against the employer); Dollinger v. New York State Ins. Fund, No. 14 Civ. 00908 (MAD), 2015 WL 1446892, at *12 (N.D.N.Y. Mar. 30, 2015) (evidence that employer knew of history of inappropriate behavior and refused to address it was sufficient to impute liability).

In addition, the Second Circuit has explained that an employer cannot rely on its purported lack of knowledge of incidents of harassment by a coworker where the plaintiff's failure to report them was based on the conduct of the employer itself.

> An employer is not necessarily insulated from Title VII liability simply because a plaintiff does not invoke her employer's internal grievance procedure if the failure to report is attributable to the conduct of the employer or its agent.

Distasio v. Perkin Elmer Corp., 157 F.3d 55, 64 (2d Cir. 1998) (finding that supervisor's threatening employee's job status in response to some complaints precluded the employer from arguing that it was not aware of other complaints). Here, in response to Eckhart's complaints during the February 2020 meeting, her supervisor, Mr. Hirst, warned her that she would "face repercussions" if she made any further complaints. ¶ 91. In doing so he was clearly attempting to dissuade her from making her sexual harassment claims explicit and was successful in doing so. Based on the foregoing, there is simply no basis for Fox to contend that it cannot be held liable for Henry's sexually harassing conduct.

### B.     The TAC Alleges Sufficient Facts to Plead that Henry Was Eckhart's Supervisor

Moreover, and contrary to Fox's contentions, the allegations in the TAC are sufficient to state a claim that Henry exercised sufficient supervisory authority over Eckhart to hold Fox liable for the assaults that he committed. Though Fox points to the fact that Eckhart does not specifically identify Henry as being her "supervisor," such a *pro forma* allegation is not required under the law. It is misleading and inaccurate to merely look at the formal organizational charts at massive organizations such as Fox[6] to identify a particular employee's supervisor. Further,

---

[6]     As a result of the size and interrelatedness of the operations among the various Fox entities, the Company's claim that Henry could not exercise supervisory authority over Eckhart because they ostensibly worked for two separate networks is unavailing. As alleged in the TAC, despite nominally being an employee of Fox Business Network, Eckhart often appeared on television programs on the Fox News Network. ¶ 32. Indeed Fox News

Henry is not a low level employee who clearly has no control or authority over other employees. Rather, on-air talent such as Henry were at all times the most prominent, visible, and powerful employees at the Company, from which Fox derived most of its revenue and whose persona it marketed to the viewing public. Fox cannot, on the one hand, use its on-air personalities as the focus of its advertising campaigns as the "face" of the Company, while, on the other, disclaim any responsibility for the actions of these same individuals. Based on Fox's public representations, for an aspiring television journalist, *all* of the on-air talent, who had the power to determine who would appear on their shows, exercised a degree of supervisory authority over the Company's employees. It is in deference to this reality that the Second Circuit has explained, "an employer is liable for the discriminatorily abusive work environment created by a supervisor if the supervisor uses his actual *or apparent authority to further the harassment*, or if he was otherwise aided in accomplishing the harassment by the existence of the agency relationship." Karibian v. Columbia Univ., 14 F.3d 773, 780 (2d Cir. 1994).

Here, there is no question that the TAC alleges that Henry used his apparent authority over Eckhart to perpetrate his sexual harassment. Henry specifically used his status at Fox to burnish his credentials and to lure Eckhart into unwillingly submitting to his depraved sexual desires including by, *inter alia,* telling Eckhart that he had the power to bring her onto his new show as a frequent on-air guest. ¶¶ 42-47, 50, 65, 68, 81. For Eckhart, whose career trajectory was inherently dependent on such on-air appearances, the opportunity to appear frequently on a program with one of the most powerful men at Fox had the potential to change the course of her professional life. Similarly, as Henry was well aware, refusing one of Fox's highest-rated, and thus most valuable, employees was certain to be a death knell to her career. ¶¶ 43, 48-52, 54.

employees, including an anchor, made it a point to emphasize to Eckhart that one of her job duties was to "always be available" to Fox News. ¶ 62, n. 1.

## C.   <u>Fox's Arguments in Support of Dismissal Are Without Merit</u>

Fox attempts to deny that the TAC contains sufficient allegations to demonstrate that it had knowledge of Henry's history of sexual misconduct by advancing several legally untenable arguments.  First, Fox claims that the written complaint that it received from an employee imploring the Company not to promote Henry because it would be "crushing for female colleagues," is irrelevant to Ms. Eckart's claims because the complaint was purportedly "related to the stripper controversy."  Def. Br. at p. 17.  However, there is nothing in the TAC, or the news article that reported the complaint, that supports the contention that the written complaint was limited to any single event.  <u>See</u> ¶ 113.  To the contrary, the complaint specifically tied Henry's conduct to that of disgraced former executive Roger Ailes, supporting the allegation that it was targeted at Henry's repeated pattern of misconduct.  <u>Id.</u>  This is especially true given that the complaint came on the heels of Fox learning, through an investigation, of other complaints of sexual misconduct against Henry.  ¶¶ 110-111.  At a minimum, Plaintiff is entitled to discovery to determine the scope and contents of the written complaint.

Second, Fox claims that the TAC does not contain sufficient allegations to demonstrate that Fox had "reason to know that Henry would assault her."  Def. Br. at p. 18.  However, the TAC contains several allegations about Fox's knowledge about Henry's pattern of sexual misconduct, including by virtue of complaints by other female employees, at least some of which preceded Henry's violent rape of Eckhart.  ¶¶ 110-121.  Though Fox attempts to dismiss the import of these complaints by claiming that they are "false" and "inadequate" under the federal pleading standards, such an argument is wholly without merit.  It is axiomatic that, for the purposes of a motion to dismiss, the court *must* proceed "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  <u>Bell Atl. Corp. v. Twombly</u>, 550

U.S. 544, 555 (2007).  Plaintiff needs only to plead facts with sufficient particularity to put Fox

on notice about her claims.  Plaintiff's allegations about the information communicated to Fox

are not legal conclusions that can be adjudicated at the motion to dismiss stage.  Instead, they are

factual allegations that Plaintiff should have an opportunity to prove during discovery.  <u>Davis v.

NYC Dep't of Educ.</u>, No. 10 Civ. 3812 (KAM)(LB), 2012 WL 139255, at *8 (E.D.N.Y. Jan. 18,

2012) (finding that a plaintiff is not required to identify other employees who were similarly-

situated by name at the pleading stage).  Additionally, these allegations provide ample notice to

Fox about the nature of its knowledge, the source of the information and the time frame under

which it was learned.  This is plainly sufficient to survive a motion to dismiss.  <u>See</u> <u>Zamora v. N.

Salem Cent. Sch. Dist.</u>, 414 F. Supp. 2d 418, 423 (S.D.N.Y. 2006) (in denying summary

judgment on Title IX sexual harassment claim, finding that evidence of school's knowledge of

repeated past abuse by teacher and refusal to take appropriate conduct was sufficient to

demonstrate actual notice and deliberate indifference).

 Third, Fox claims that Plaintiff cannot allege that the Company had knowledge of the

complaints made to the law firm that it retained to investigate her complaints.  However, the law

is clear that, at the pleading stage, a company can be presumed to have knowledge of complaints

made to an investigative agent.  <u>See</u> <u>Patane v. Clark</u>, 508 F.3d 106, 115 (2d Cir. 2007) ("It is not

inappropriate at this stage in the litigation to assume that in investigating [p]laintiff's complaints,

[the investigator] made Clark aware of their existence").  Similarly, in the instant case, Plaintiff

is entitled to take discovery on the information that Fox's investigator shared with management.

## VI.  THE THIRD AMENDED COMPLAINT STATES A CLAIM AGAINST FOX FOR RETALIATION

### A.  The TAC Alleges that Eckhart Engaged in Protected Activity

As with its other arguments, Fox's claim that the TAC does not allege sufficient conduct to support a retaliation claim is without merit.  Fox claims that Eckhart's complaint to HR and her manager in February 2020 do not constitute protected activity sufficient to sustain a retaliation claim because her complaints were of general mistreatment rather than complaints of unlawful discrimination.  Fox's argument misreads the relevant law.

Under the law, there is no requirement that a plaintiff use any specific or "magic" words such as "discrimination," "harassment" or "hostile work environment" in order to have engaged in protected activity.  Inguanzo v. Hous. & Servs., Inc., No. 12 Civ. 8212 (ER), 2014 WL 4678254, at *21 (S.D.N.Y. Sept. 19, 2014) (no "magic words" required to put employer on notice of discrimination).  Rather, any expression or disapproval of employment discrimination, whether formal or informal, is protected.

In determining whether specific complaints constitute protected activity, the courts look at the total context of the complaints to determine whether they were sufficient to show that the defendant could "reasonably have understood" that the plaintiff was complaining of discrimination.  Amaya v. Ballyshear LLC, 295 F. Supp. 3d 204, 227 (E.D.N.Y. 2018).  See also Lenzi v. Systemax, Inc., 944 F.3d 97, 113 (2d Cir. 2019) (reversing grant of summary judgment where district court read complaint "in isolation" and instead finding that it was important to read the complaint in "context" to determine whether it "reasonably suggested" that the plaintiff was engaging in protected activity).

Here, as in Lenzi, Fox improperly suggests that the Court look at Eckhart's complaint in isolation, divorced from the larger context in which the complaint was made.  As alleged in the

TAC, Fox has a history of systematic sexual harassment by powerful male employees, including, notably, Henry himself. ¶¶ 95-104, 111-121. Given the systemic sexual harassment that pervaded Fox for *years*, it was patently unreasonable for Fox to respond to Eckhart's complaints about being subjected to a "toxic work environment" without asking basic follow up questions to determine whether her complaints touched on similar issues. Fox made the intentional decision not to inquire further in a transparent attempt to insulate itself from liability for the sexual harassment it undeniably suspected Eckhart had experienced. Indeed, Fox's argument that Eckhart did not engage in protected activity is especially incredible given that there is no question that the Company "reasonably understood" that Plaintiff was complaining about sexual harassment. In Eckhart's exit interview, Ms. Collins, who had notably been present during Plaintiff's February 2020 complaint, specifically asked her whether she had been sexually harassed and/or assaulted while employed by Fox.[7] ¶ 94. Such a question itself is strong evidence that Fox understood that Eckhart was engaging in protected activity, sufficient to sustain a retaliation claim at the pleading stage. At the very least, Plaintiff is entitled to take discovery as to what Mr. Hirst and Ms. Collins understood about the content and context of Plaintiff's complaints. See Truskoski v. ESPN, Inc., 823 F. Supp. 1007, 1012 (D. Conn. 1993) ("While it cannot be said to have been crystal clear to each in ESPN's chain of command to whom she spoke—Scanlon, Kemmler, Farley and Conway—that she was asserting gender bias, it did not require too much thought to realize that while her complaints were substantially self-focused, her complaint had definite overtones of gender bias and discrimination").

---

[7]      Fox's self-serving claim that such a question was "standard" and part of "best practices" followed by many employers has no bearing on a motion to dismiss. Such purported facts, that are not found anywhere in the pleadings, cannot be used as a basis to dismiss the TAC. Rather, Plaintiff is entitled to discovery to test the veracity of Fox's claims.

### B. The TAC Alleges that Fox is Liable for Post-Termination Retaliatory Conduct

Fox further claims that it cannot be held liable for its conduct after Eckhart engaged counsel and made the decision to pursue her claims. Again, Fox misstates the law.

Under Title VII and the NYSHRL, it is well settled that retaliatory acts are "not limited to discriminatory actions that affect the terms and conditions of employment." Burlington Northern Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006). Rather, these statutes prohibit all conduct that "well might . . . dissuade[] a reasonable worker from making or supporting a charge of discrimination." Id. at 68. Under the NYCHRL, which provides even more expansive protections to victims of unlawful conduct, it is unlawful to retaliate "in any manner." Williams v. New York City Hous. Auth., 61 A.D.3d 62, 70 (1st Dep't 2009). Based on this standard, each of the acts of post-termination retaliation in the TAC are actionable.

First, Fox misleadingly claims that Eckhart's retaliation claim simply stems from the fact that Fox announced that it had terminated Henry's employment. This utterly misstates Ms. Eckart's allegations. Fox did not retaliate against Eckhart by terminating Henry's employment. Rather, Fox's retaliation stems from the fact that it whitewashed Henry's rape of Eckhart by claiming it was merely "sexual misconduct." ¶ 189. In doing so, the Company sent a message to Eckhart that, even after it learned of her allegations, it remained committed to its years-long policy of protecting the reputations of serial harassers, and even rapists, even if it meant minimizing the concerns of their victims. [8] Moreover, in publicly announcing Henry's

---

[8] Fox also claims that Plaintiff's retaliation claim must fail because she cannot show that its announcement would have prevented Eckhart herself from engaging in protected activity in the future. However, this is not required under the law. Rather, a plaintiff must only allege specific facts supporting a finding that the defendant's conduct would dissuade "a reasonable worker from making or supporting a charge of discrimination." Burlington, 548 U.S. at 68. Clearly, Fox's public commitment to protecting the reputations of the perpetrators of misconduct would lead a reasonable employee to believe that it would not take appropriate action towards protecting victims, making it retaliatory.

termination, without providing Plaintiff with any advance notice, Fox forced Eckhart to confront

her rapist and relive her experience through public news reports.  Given that Fox knew Eckhart

was represented by counsel, it could have easily taken steps to prepare her for the shock and

trauma of having to relive her sexual assaults in a public forum.  By failing to do so, Fox was

attempting to sandbag Eckhart, knowing full well the harm its callous conduct would case.[9]

Second, Fox claims that its Rule 11 motion cannot be retaliatory because it was not

directed towards Eckhart and because such motions are permissible under the Federal Rules.

Although the Rule 11 motion was not directed at Eckhart specifically, it sought sanctions against

her then co-plaintiff *and* Eckhart's lawyers.  Moreover, it mentioned Eckhart throughout the

motion, even going so far as to publicly accuse Eckhart of engaging in extortionate conduct.  ¶¶

194-196.  Thus, by filing it, Fox was clearly attempting to dissuade Eckhart (and her counsel)

from fully prosecuting her claims in this case.  Nor does the fact that Rule 11 motions are

permitted under the law serve to insulate Fox from liability.  Numerous cases have held that

where a defendant abuses otherwise valid legal process to punish a plaintiff for engaging in

protected activity, it has committed unlawful retaliation.  Torres v. Gristede's Operating Corp.,

628 F. Supp. 2d 447, 473 (S.D.N.Y. 2008) ("bad faith or groundless counterclaims and other

legal proceedings against employees who assert statutory rights are actionable retaliation

precisely because of their *in terrorem* effect"); Illiano v. Mineola Union Free Sch. Dist., 585 F.

Supp. 2d 341, 352 (E.D.N.Y. 2008) (filing an action constitutes an adverse action); Yankelevitz

v. Cornell Univ., No. 95 Civ. 4593 (PKL), 1996 WL 447749, at *4 (S.D.N.Y. Aug. 7, 1996)

(defendants' act of filing a counterclaim constitutes an adverse action); Gliatta v. Tectum,

Inc., 211 F. Supp. 2d 992, 1009 (S.D. Ohio 2002) (counterclaim brought by employer against

---

[9]     While Fox claims that the TAC does not explain how its conduct caused Eckhart any harm, Plaintiff
specifically alleged that Fox's abhorrent behavior directly led her to seeking trauma counseling.  ¶¶ 190-191.

employee can constitute an adverse action). Here, Fox's Rule 11 motion was precisely the type of "bad faith or groundless" legal filing that constitute retaliatory conduct. See Dkt. No. 102.

Third, Fox claims that it cannot be held liable for Henry's actions in including lewd pictures purporting to be of Eckhart in a nude or semi-nude state in connection with his motion to dismiss the Second Amended Complaint because the TAC does not allege any facts supporting the proposition that Fox and Henry worked together to effectuate the filing. To the contrary, the TAC contains ample allegations supporting the proposition that Fox's lawyers and Henry's lawyers have been working in conjunction in this case. As alleged in the TAC, Fox has a history with Henry's lawyers which includes steering other former employees accused of discrimination and harassment to them. ¶¶ 207-209. Moreover, such conduct, namely, seeking to use legal filings to retaliate against employees who assert claims against their former employers is a standard part of the legal strategy for both Fox and its lawyers. ¶¶ 208, 210. Finally, it is not unreasonable that multiple defendants whose interests align in a lawsuit would be working together and coordinating their legal strategy. At the very least, Eckhart has alleged sufficient facts to warrant discovery as to the nature of the relationship between Fox's and Mr. Henry's law firms and their respective roles in the retaliatory conduct at issue.

## VII.    THE TAC ALLEGES THAT FOX IS LIABLE FOR THE UNLAWFUL DISSEMINATION OF INTIMATE IMAGES

Finally, Fox seeks dismissal of Plaintiff's claims under the N.Y. Civ. Rights Law §52-b ("§52-b"), which provides for a private right of action where a defendant disseminates or publishes private images that show a plaintiff in a nude or semi-nude state, without the plaintiff's consent. None of Fox's arguments on this cause of action have any merit.

First, Fox claims that it cannot be held liable for Henry's publication of nude or semi-nude images purporting to be of Plaintiff. However, as discussed above, the TAC contains

sufficient allegations at the pleading stage to show that Fox and Henry were working in concert to retaliate against Plaintiff. See ¶ 206; supra at pp. 1, 28-29.

Second, Fox claims that Defendants are immune from liability under §52-b where they make their disclosures in the context of legal proceedings. However, there is nothing in the text of the law that provides for the blanket immunity that Fox seeks here. Rather, §52-b provides for a narrow exception to liability where the images were disclosed "***during lawful and common practices*** of . . . legal proceedings." N.Y. City Admin. Code §52-6(2)(b) (emphasis added). Defendants' public dissemination of nude and/or semi-nude pictures purportedly of Eckhart were not part of lawful or common practices of legal proceedings. As Defendants are well aware, and as this Court confirmed, the photographs "constitute extrinsic evidence which this Court is not permitted to consider – and ***thus should not have been filed*** – in conjunction with this motion to dismiss." Dkt. No. 95 at p. 2 (emphasis added). Here, not only should the photographs not have been filed, there is *no* justification for Defendants' decision to file them *publicly*, when they had the opportunity to file them under seal. Indeed, Defendants' true motivation is laid bare by the fact that Ms. Foti *refused to consent to Plaintiff's sealing request*. Clearly, Defendants wanted the pictures in the public sphere solely to harass Eckhart.

This is no different from Fox's use of a Rule 11 motion to retaliate against Plaintiff. While in *some* situations such a motion would be non-actionable, that is not the case where, as here, Defendants' conduct was based on legally frivolous grounds. Just because a plaintiff files a lawsuit does not give a defendant the right to publish graphic, lewd and/or lascivious photos, no matter how relevant, on the grounds that such publication is permitted under the guise of a "legal proceeding."

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Fox's

motion to dismiss Plaintiff's Third Amended Complaint in its entirety, and for such other and

further relief as this Court deems just and proper.

Dated:  January 6, 2020
        New York, New York

**WIGDOR LLP**

By: _____
     Michael J. Willemin
     Renan F. Varghese

85 Fifth Avenue
New York, New York 10003
Tel: (212) 257-6800
mwillemin@wigdorlaw.com
rvarghese@wigdorlaw.com

*Counsel for Plaintiff*