**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
JENNIFER ECKHART,                                         :
                                                          :     Civil Case No. 1:20-cv-05593 (RA)
                          Plaintiff,                      :
                                                          :
              v.                                          :
                                                          :
FOX NEWS NETWORK, LLC and ED HENRY,                       :
in his individual and professional capacities,            :
                                                          :
                          Defendants.                     :
-------------------------------------------------------------X


**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT ED HENRY'S
MOTION TO DISMISS PLAINTIFF'S THIRD AMENDED COMPLAINT, MOTION TO
STRIKE, MOTION FOR SANCTIONS AND MOTION FOR A MORE DEFINITE
STATEMENT**


**WIGDOR LLP**

Michael J. Willemin
Renan F. Varghese

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
mwillemin@wigdorlaw.com
rvarghese@wigdorlaw.com

*Counsel for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL SUMMARY ................................................................................................. 2

I.     Henry Preys on Eckhart, Culminating in a Violent Rape ..................................... 2

II.    Henry's History of Sexual Harassment and Misconduct ....................................... 5

ARGUMENT .................................................................................................................. 6

I.     Legal Standard for a Rule 12(b)(6) Motion ......................................................... 6

II.    Henry Improperly Relies on Substantial Extrinsic Evidence in Violation of This Court's Prior Orders ........................................................................................... 7

III.   The Third Amended Complaint Properly Pleads Claims Under the TVPA Against Henry ................................................................................................................... 9

      A.    Henry Enticed Eckhart Into a Commercial Sex Act .............................. 10

      B.    The TAC Alleges that Henry Knew That Force and/or Fraud Would be Used Against Eckhart ...................................................................................... 13

      C.    Henry Forced Eckhart to Engage in a Commercial Sex Act ................. 16

IV.   The TAC States a Claim Against Henry for Harassment and/or Retaliation ................... 18

      A.    Henry Is Individually Liable for his Harassing Conduct ....................... 18

      B.    The TAC Alleges that Henry Aided and Abetted the Hostile Work Environment at Fox ............................................................................... 19

      C.    The TAC Alleges that Henry Retaliated Against Plaintiff ..................... 20

      D.    Eckhart's Discrimination Claims Are Not Time-Barred ....................... 24

V.    The TAC Alleges Claims Against Henry in Violation of the GMVA .............................. 27

VI.   The TAC Alleges that Henry Is Liable for the Unlawful Dissemination of an Intimate Image .................................................................................................................. 28

VII.    Henry's Motion to Strike Should be Denied....................................................................30

    A.     Standard ....................................................................................................................30

    B.     The Allegation in The TAC About the Sexual Harassment of Other Women Are Relevant to Eckhart's Claims..........................................................................31

    C.     The Allegations in the TAC about Defendants' Litigation Tactics Are Relevant to Eckhart's Claims................................................................................35

VIII.   Henry's Motion for Sanctions Should be Denied............................................................36

IX.    Henry's Motion for a More Definite Statement Should be Denied..................................37

CONCLUSION...............................................................................................................................38

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

Ardolf v. Weber,
   332 F.R.D. 467 (S.D.N.Y. 2019) ................................................................. 11, 13, 15

Armstrong v Metro. Transp. Auth.,
   No. 07 Civ. 3561 (DAB), 2015 WL 992737 (S.D.N.Y. Mar. 3, 2015) ................................... 19

Ashcroft v. Iqbal,
   556 U.S. 662 (2009).................................................................................. 6

Banks v. Corr. Servs. Corp.,
   475 F. Supp. 2d 189 (E.D.N.Y. 2007) ................................................................ 19

Belt v. Emcare, Inc.,
   299 F. Supp. 2d 664 (E.D. Tex. 2003) ............................................................... 34

Berry v. Stevinson Chevrolet,
   74 F.3d 980 (10th Cir.1996) ........................................................................ 23

Breest v. Haggis,
   180 A.D.3d 83 (1st Dep't. 2019) .................................................................... 27

Brown v. Austin,
   No. 05 Civ. 9443 (PKC), 2007 WL 2907313 (S.D.N.Y. Oct. 4, 2007)..................................... 7

Bublitz v. E.I. DuPont de Nemours & Co.,
   196 F.R.D. 545 (S.D. Iowa 2000) .................................................................... 34

Burlington Northern & Santa Fe Ry. Co. v. White,
   548 U.S. 53 (2006)................................................................................. 21, 23

Camp v. Alexander,
   300 F.R.D. 617 (N.D. Cal. 2014)..................................................................... 34

Chambers v. Time Warner, Inc.,
   282 F.3d 147 (2d Cir. 2002)......................................................................... 8

Corrado v. New York Unified Court Sys.,
   163 F. Supp. 3d 1 (E.D.N.Y. 2016) .................................................................. 26

Crisonino v. New York City Hous. Auth.,
   985 F. Supp. 385 (S.D.N.Y. 1997).................................................................... 28

Cruz v. Coach Stores, Inc.,
    202 F.3d 560 (2d Cir. 2000) ................................................................................. 32

David v. Weinstein Co. LLC,
    431 F. Supp. 3d 290 (S.D.N.Y. 2019) ............................................... 10, 12, 14, 17

Diesel Props S.r.L. v. Greystone Bus, Credit II LLC,
    No. 07 Civ. 9580, 2008 WL 4833001 (S.D.N.Y. Nov. 5, 2008) .......................... 31

Doe v. Columbia Univ.,
    831 F.3d 46 (2d Cir. 2016) ..................................................................................... 6

Drew v. Plaza Const. Corp.,
    688 F. Supp. 2d 270 (S.D.N.Y. 2010) ................................................................. 25

Dunson v. Tri–Maintenance & Contractors, Inc.,
    171 F.Supp.2d 103 (E.D.N.Y.2001) .................................................................... 18

EEOC v. Outback Steakhouse of Florida, Inc.,
    75 F. Supp. 2d 756 (N.D. Ohio 1999) ................................................................. 23

Emmons v. City Univ. of N.Y.,
    715 F.Supp.2d 394 (E.D.N.Y. 2010) ................................................................... 18

Fierro v. Taylor,
    No. 11 Civ. 8573 (BSJ), 2012 WL 6965719 (S.D.N.Y. Oct. 22, 2012) ............... 27

Fitzgerald v. Henderson,
    251 F.3d 345 (2d Cir. 2001) ................................................................................ 24

Gaughan v. Rubenstein,
    261 F. Supp. 3d 390 (S.D.N.Y. 2017) ................................................................. 23

Geiss v. Weinstein Co. Holdings LLC,
    383 F. Supp. 3d 156 (S.D.N.Y. 2019) ............................................................ 12, 18

G-I Holdings, Inc. v. Baron & Budd,
    238 F. Supp. 2d 521 (S.D.N.Y. 2002) ................................................................. 32

Giroux v. Foley,
    No. 19 Civ. 00187, 2020 WL 1677073 (D. Vt. Apr. 6, 2020) ............................. 32

Gliatta v. Tectum, Inc.,
    211 F. Supp. 2d 992 (S.D. Ohio 2002) ................................................................ 22

Hansen v. Danish Tourist Bd.,
  147 F. Supp. 2d 142 (E.D.N.Y. 2001) ................................................................ 26

Henry-Offor v. City Univ. of New York,
  No. 11 Civ. 4695 (NRB), 2012 WL 2317540 (S.D.N.Y. June 15, 2012) ............................... 20

Huett v. Weinstein Co. LLC,
  No. 18 Civ. 06012 (SVW)(MRW), 2018 WL 6314159 (C.D. Cal. Nov. 5, 2018) .................. 14

Hughes v. Twenty-First Century Fox, Inc.,
  304 F. Supp. 3d 429 (S.D.N.Y. 2018) .................................................................. 18

Illiano v. Mineola Union Free Sch. Dist.,
  585 F. Supp. 2d 341 (E.D.N.Y. 2008) ................................................................ 22

In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,
  218 F.R.D. 76 (S.D.N.Y. 2003) ......................................................................... 30

Isbell v. City of N.Y.,
  316 F. Supp. 3d 571 (S.D.N.Y. 2018) .................................................................. 25

Jackson v. New York State,
  523 F. App'x 67 (2d Cir. 2013) ......................................................................... 24

Kassner v. 2nd Ave. Delicatessen Inc.,
  496 F.3d 229 (2d Cir. 2007) ............................................................................. 26

Kreinik v. Showbran Photo,
  No. 02 Civ. 1172 (RMB)(DF), 2003 WL 22339268 (S.D.N.Y. Oct. 14, 2003) ...................... 23

Lawhorn v. Algarin,
  No. 16 Civ. 6226 (FPG), 2018 WL 1046794 (W.D.N.Y. Feb. 26, 2018) ............................... 9

Leary v. Al-Mubaraki,
  No. 18 Civ. 0048, 2019 WL 4805849 (S.D.N.Y. Sept. 30, 2019) ........................................ 22

Lipsky v. Commonwealth United Corp.,
  551 F.2d 887 (2d Cir.1976) ............................................................................. 31

Littlejohn v. City of N.Y.,
  795 F.3d 297 (2d Cir. 2015) ............................................................................. 6

Low v. Robb,
  No. 11 Civ. 2321 (JPO), 2012 WL 173472 (S.D.N.Y. Jan. 20, 2012) .................................... 36

Lynch v. Southampton Animal Shelter Found. Inc.,
    278 F.R.D. 55 (E.D.N.Y. 2011) ........................................................................... 31

Malena v. Victoria's Secret Direct, LLC,
    886 F. Supp. 2d 349 (S.D.N.Y. 2012) ................................................................. 18

Mevorah v. Wells Fargo Home Mortg., Inc.,
    No. 05 Civ. 1175 (MHP), 2005 WL 4813532 (N.D. Cal. Nov. 17, 2005) .............. 34

Nat'l R.R. Passenger Corp. v. Morgan,
    536 U.S. 101 (2002) ............................................................................................ 26

Noble v. Weinstein,
    335 F. Supp. 3d 504) (S.D.N.Y. 2018) ................................................. 10, 13, 14, 15

Palmer v. Cook,
    64 Misc. 3d 1222(A) (N.Y. Sup. Ct. 2019) .......................................................... 18

Plumbers and Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Arbitron, Inc.,
    278 F.R.D. 335 (S.D.N.Y. 2011) ........................................................................ 33

Riccio v. Gent Unif. Rental Corp.,
    No. 06 Civ. 0708 (SJF)(WDW), 2006 WL 3499219 (E.D.N.Y. Dec. 2, 2006)....... 37

Rifkinson v. CBS, Inc.,
    No. 94 Civ. 7985 (KTD)(JCF), 1997 WL 634514 (S.D.N.Y. Oct. 14, 1997) ........ 32

Rivera v. New York City Health & Hosps. Corp.,
    191 F. Supp. 2d 412 (S.D.N.Y. 2002) ................................................................... 9

Robinson v. Brooklyn Coll.,
    No. 09 Civ. 2174 (DLI)(LB), 2010 WL 3924012 (E.D.N.Y. Sept. 29, 2010)........ 25

Rodriquez v. Nat'l Golf Links of Am.,
    No. 19 Civ. 7052, 2020 WL 3051559 (E.D.N.Y. Jun. 8, 2020) ............................ 22

Roe v. City of N.Y.,
    151 F. Supp. 2d 495 (S.D.N.Y. 2001)................................................................... 31

RSM Prod. Corp. v. Fridman,
    643 F. Supp. 2d 382 (S.D.N.Y. 2009)................................................................... 36

Schanfield v. Sojitz Corp. of Am.,
    663 F. Supp. 2d 305 (S.D.N.Y. 2009)................................................................... 18

Schwab v. Smalls,
    435 F. App'x 37 (2d Cir. 2011) ......................................................... 6

Sloup v. Loeffler,
    No. 05 Civ. 1766, 2006 WL 767869 (E.D.N.Y. Mar. 13, 2006) ............................................. 31

Steffes v. Stepan Co.,
    144 F.3d 1070 (7th Cir. 1998) ......................................................... 22

Swierkiewicz v. Sorema N.A.,
    534 U.S. 506 (2002) ......................................................... 6

Tomka v. Seiler Corp.,
    66 F.3d 1295 (2d Cir. 1995) ......................................................... 20

Tommy Lee Handbags Mfg. Ltd. v. 1948 Corp.,
    971 F. Supp. 2d 368 (S.D.N.Y. 2013) ......................................................... 7

Torres v. Gristede's Operating Corp.,
    628 F. Supp. 2d 447 (S.D.N.Y. 2008) ......................................................... 22

Townsend v. Benjamin Enterprises, Inc.,
    679 F.3d 41 (2d Cir. 2012) ......................................................... 19

U.S. v. N.Y.C. Trans. Auth.,
    97 F.3d 672 (2d Cir. 1996) ......................................................... 23

United States v. Woods,
    571 U.S. 31 (2013) ......................................................... 29

Vega v. Hempstead Union Free Sch. Dist.,
    801 F.3d 72 (2d Cir. 2015) ......................................................... 6

Wait v. Beck's N. Am., Inc.,
    241 F. Supp. 2d 172 (N.D.N.Y. 2003) ......................................................... 32

Ward v. Wal-Mart Stores, Inc.,
    140 F. Supp. 2d 1220 (D.N.M. 2001) ......................................................... 22

Williams v. City of New York,
    No. 14 Civ. 5123 (NRB), 2015 WL 4461716 (S.D.N.Y. July 21, 2015) ......................................................... 8

Williams v. New York City Hous. Auth.,
    61 A.D.3d 62 (1st Dep't 2009) ......................................................... 21

Williams v. Time Warner Inc.,
   440 Fed. App'x 7 (2d Cir. 2011) ............................................................. 8

Winfield v. Citibank, N. A.,
   No. 10 Civ. 7304 (JGK), 2012 WL 266887 (S.D.N.Y. Jan. 30, 2012) .................... 30

Yankelevitz v. Cornell Univ.,
   No. 95 Civ. 4593 (PKL), 1996 WL 447749 (S.D.N.Y. Aug. 7, 1996) ................... 22

## Statutes

18 U.S.C. 1595(a) ................................................................................. 10

18 U.S.C. § 1591(e)(3) .......................................................................... 10

18 U.S.C.A. § 1591 ............................................................................... 10

NYC Admin. Code §8-107(1)(a) ............................................................. 18

N.Y. Civ. Rights Law §52-b ........................................................... 28, 29, 30

N.Y. Civ. Rights Law §52-b(1)(b) ........................................................... 29

N.Y. Exec. Law § 296(6) ....................................................................... 19

N.Y. Penal Law §245.15(2) ................................................................... 29

## Rules

Fed. R. Civ. P. 11 ................................................................................ 2

Fed. R. Civ. P. 12 ................................................................................ 6

Fed. R. Civ. P. 56 ................................................................................ 7

Plaintiff Jennifer Eckhart ("Eckhart" or "Plaintiff") submits this memorandum of law in opposition to Defendant Ed Henry's ("Henry") motion to dismiss her Third Amended Complaint ("TAC") in this case, motion to strike, motion for sanctions and motion for a more definite statement.

## PRELIMINARY STATEMENT

For several years, Henry, with the assistance of his employers at Fox News Network, LLC ("Fox" or the "Company") (Henry and Fox, together, "Defendants"), preyed on Eckhart, sexually harassing and assaulting her, and, in February 2017, violently raping her. All the while, much like Harvey Weinstein, Henry used his position of power and promises of career advancement to coerce Eckhart into compromising situations, at which point Henry would use force to gratify his sexual desires.

As described in great detail in the Third Amended Complaint ("TAC") and herein, Henry's pattern and practice of unlawful sexual misconduct and assault towards Eckhart began in 2014 and persisted through 2018, well into all relevant limitations periods. Although the harassment is now of a different nature, it continues through the present, including, but not limited to, *via* his present threatening request for sanctions, as well as his unlawful dissemination of Eckhart's private photographs and personal cell phone number.

Even after this Court admonished Henry for his decision to disseminate private photographs in connection with his initial motion to dismiss (by making clear that such extrinsic evidence should not have been filed at this stage), Henry has doubled down on his conduct. His present motion again improperly attaches extrinsic evidence and, incredibly, again asks the Court to consider the private photographs attached to his previous legal filings in deciding the present motion. Indeed, Henry has continued to use these motions as a tool to overwhelm Plaintiff with

a series of frivolous and legally unsupported arguments in a clear effort to continue to punish her for daring to seek to hold him accountable for raping her.

As amply demonstrated herein, the TAC alleges facts sufficient to hold Henry liable under the federal, state and city laws under which this action is brought.  Moreover, all of the allegations in the TAC are relevant and properly interposed, and none should be stricken. Finally, Henry's request for sanctions – which itself is an end run around Fed. R. Civ. P. 11 – is frivolous.  As such, Henry's motions should be denied in its entirety.

## FACTUAL SUMMARY

Eckhart began her employment with Fox as a Freelance Administrative Assistant to Liz Claman ("Claman") on January 2, 2013.  ¶ 23.[1]  Eckhart performed a variety of roles during her more than seven years at Fox including, producing "Countdown to the Closing Bell;" writing and producing interview segments for Fox News and Fox Business; appearing as a frequent on-air personality; and conducting interviews of high-profile guests.  ¶ 32.  Throughout her employment, Eckhart received substantial praise for her outstanding work performance and dedication, often in the face of incredible pressure and demeaning treatment.  ¶¶ 25-27, 33.  As a result of Eckhart's excellent work performance, Fox promoted her three times during the course of her tenure, first to Production Assistant, then to Booker and finally to Associate Producer.  ¶¶ 30-31.

## I.     HENRY PREYS ON ECKHART, CULMINATING IN A VIOLENT RAPE

In or around 2014, Henry began to target Eckhart, sending her unsolicited and flirtatious messages, clearly telegraphing his desire to engage in an inappropriate relationship with her.  ¶¶ 35-37.  Though Eckhart was uncomfortable with Henry's conduct, she felt pressured to respond.

---

[1]     "¶ __" or "¶¶ __" throughout this memorandum of law cite paragraphs within Plaintiff's Third Amended Complaint, unless otherwise expressly stated.

¶ 38.  His stature at Fox as a White House Correspondent, coupled with her position as a young, aspiring journalist in need of professional guidance and mentors, left her feeling as if she could not turn aside Henry completely.  Instead, she attempted to deflect Henry by keeping their interactions completely professional.  ¶¶ 38-40.  Unfortunately, Henry ignored Eckhart's protestations and instead began sending her increasingly inappropriate and graphic text messages, pressuring to meet him socially for drinks and refusing to take no for an answer.  ¶¶ 42-43.  Feeling as if she had no choice, Eckhart agreed to meet with Henry but sought to keep their conversation strictly related to her career and professional development.  ¶¶ 44-46.  Henry seized upon this meeting to prey on Eckhart and, after pressuring her to join him for additional drinks and conversation in his hotel room, compelled her to have sexual intercourse with him against her will.  ¶¶ 48-49.  Afterwards, in an open acknowledgement of the career concerns that Eckhart had discussed with him earlier, Henry told Eckhart that she was "wasting her time" in her role at Fox but that he could help her by leveraging his status to "get her in a room with some really powerful people."  ¶¶ 50-51.  Henry's unspoken, but obvious, message was that Eckhart's advancement at Fox would be contingent on her succumbing to his future sexual advances.

A few months later, in September 2015, Henry continued sexually harassing Eckhart, this time using Fox's New York offices to do so.  ¶¶ 53-57.  Henry initially demanded that Eckhart remove her underwear, while at work, and provide it to him for his perverted gratification.  ¶ 45.  Henry then demanded that Eckhart meet him in one of the guest offices where he proceeded to physically force her to perform oral sex on him against her will.  ¶¶ 53-57.  After Henry finished sexually assaulting Eckhart, Eckhart ran out of the guest office in a state of shock, panic and fear.  ¶ 57.

Thereafter, Henry continued to harass Eckhart through lewd and extremely graphic communications that often-contained pornographic images, videos and GIFs.  ¶¶ 58-59.  In one set of messages, he referred to Eckhart as a "little whore," who he would "toss around" and "discipline" if she refused to "obey" his commands.  ¶¶ 61-62.  In another, he flouted the fact that he purportedly "owned" Eckhart and could demand that she provide him with "[m]ore anal sex (the two never had anal sex).  ¶ 63.  It was clear that Henry saw women such as Eckhart as being less than human – objects that he could use for his pleasure and discard as he saw fit.

In February 2017, Eckhart feeling powerless in the face of Henry's threats to "discipline" her if she did not "obey" him, relented to Henry's advances and agreed to meet him for a drink. ¶¶ 62, 64.  During this meeting, Henry doubled down on his earlier promises to help her career, telling her that he could introduce her to his agent (one of the most powerful people in the journalism industry) so that she was no longer "wasting her time" with her career.  ¶ 65.  He also informed Eckhart that he had been awarded a new show of his own by Fox, further elevating his position within the Company.  Id.  As yet another inducement to convince Eckhart to be "submissive" towards him, Henry promised Eckhart that he would bring her onto his new show as a frequent on-air guest.  Id.   He then invited her to his hotel room, ostensibly so they could further discuss Eckhart's "career opportunities."  ¶¶ 65-66.  When Eckhart refused, Henry proceeded to physically drag her to his hotel room.  ¶ 66.  Once there, Henry proceeded to handcuff, physically attack, brutally rape and take nude photographs of Eckhart despite her pleading with him to stop.  ¶¶ 68-74.  Henry's conduct left Eckhart bruised and bleeding.  ¶ 75. Henry then compounded his malevolent conduct by sending Eckhart a series of messages making light of his rape and violent attack – even boasting that he left her "bruised," "dazed" and "batter[ed]."  ¶¶ 76-80.

Even after the rape, Henry continued to harass Eckhart, to the point that Eckhart had to openly flee from him in the hallways of Fox on numerous occasions.  ¶¶ 83-87.  Henry followed-up his attempts to corner Eckhart in the hallways with text messages referencing her attempts to escape further interaction with him.  ¶¶ 83-87.  By this point, Eckhart was familiar with Henry's pattern of conduct – he would send her seemingly innocuous messages in the past as a way to strike up a conversation with her.  When she attempted to respond by making clear that she sought to keep their relationship strictly professional, Henry would escalate the tone of his messages, making them increasingly graphic and sexual, ultimately culminating in sexual advances.  Eckhart therefore ignored these additional messages, all the while terrified that he would find another way to victimize her.

## II.     HENRY'S HISTORY OF SEXUAL HARASSMENT AND MISCONDUCT

Eckhart was neither the first victim of Henry's sexual misconduct, nor was she the last. Throughout his employment at Fox, Defendant Henry engaged in a pattern of sexual misconduct involving several women, including other employees at Fox.  ¶¶ 124-126, 129, 133, 140-161, 173-181.  These women have all reported about Henry's repeated sexual advances, pushing them to submit to sexual activity, even if it was against their will.  ¶¶ 135-138, 140-146, 150-151, 159, 165-180.  He also repeatedly referred to women as being "whores," and became physically and emotionally abusive towards them.  ¶ 149-158, 179-180.

As a result, several of Fox's female employees complained about Henry's sexual misconduct and gross behavior, with one written complaint going so far as to suggest that continuing to employ Henry flew in the face of Fox's promise to make sweeping changes following the ouster of Roger Ailes, the former CEO of Fox who was infamous for sexually preying on younger female employees.  ¶¶ 113.  Despite this fact, Henry was repeatedly

rewarded by Fox and its related entities with promotions and lucrative publishing deals, culminating with his promotion in December 2019 to the position of co-anchor of the "America's Newsroom" program.  ¶ 89.  Throughout this time period, and up until the termination of his employment, several women came forward and informed Fox about his sexually inappropriate behavior, to no avail.  ¶ 111-123.

**ARGUMENT**

## I.  LEGAL STANDARD FOR A RULE 12(b)(6) MOTION

In reviewing a motion for dismiss under Rule 12(b)(6), all factual allegations in the complaint are accepted as true and all reasonable inferences are drawn in the plaintiff's favor.  <u>Vega v. Hempstead Union Free Sch. Dist.</u>, 801 F.3d 72, 78 (2d Cir. 2015).  To survive a motion to dismiss, the complaint must "state a claim to relief that is plausible on its face," which requires the plaintiff to plead facts permitting "'the reasonable inference that the defendant is liable for the misconduct alleged.'"  <u>Schwab v. Smalls</u>, 435 F. App'x 37, 39 (2d Cir. 2011) (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009)).  The complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief.  <u>See</u>, <u>e.g.</u>, <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 508 (2002); <u>Littlejohn v. City of N.Y.</u>, 795 F.3d 297, 307-08 (2d Cir. 2015).  As explained in <u>Doe</u>:

> The role of the court at this [Rule 12(b)(6)] stage of the proceedings *is not in any way to evaluate the truth as to what really happened*, but merely to determine whether plaintiff's factual allegations are sufficient to allow the case to proceed.

<u>Doe v. Columbia Univ.</u>, 831 F.3d 46, 59 (2d Cir. 2016) (emphasis added).

6

## II.   HENRY IMPROPERLY RELIES ON SUBSTANTIAL EXTRINSIC EVIDENCE IN VIOLATION OF THIS COURT'S PRIOR ORDERS

As a threshold matter, Henry's effort to support his motion to dismiss by drawing from "evidence" outside of the pleadings fails as a matter of law.  It is well settled that, in deciding a motion to dismiss, a court is limited to the four corners of the complaint.  See Tommy Lee Handbags Mfg. Ltd. v. 1948 Corp., 971 F. Supp. 2d 368, 382 (S.D.N.Y. 2013) (disregarding extrinsic evidence and considering only "the complaint and any documents incorporated therein").  Where a movant submits extrinsic materials in support of a motion to dismiss, the court must disregard such improperly submitted extrinsic materials.  See Brown v. Austin, No. 05 Civ. 9443 (PKC), 2007 WL 2907313, at *1 (S.D.N.Y. Oct. 4, 2007) ("The [c]ourt declines to convert the motion to dismiss into a motion for summary judgment under Rule 56, Fed. R. Civ. P., and accordingly, does not consider the extrinsic evidence submitted by the moving defendants").

Henry's motion relies in large part on emails and other communications that he claims undermine Eckhart's credibility.  This is the second time that Henry has engaged in such conduct – the first was on October 19, 2020 when he filed his initial motion to dismiss.  The initial motion to dismiss attached various extrinsic communications, as well as nude and/or partially nude photographs that Henry claimed were of Eckhart.  Eckhart moved to seal the photographs and the Court granted the motion, noting that the photographs "constitute extrinsic evidence which this Court is not permitted to consider – and ***thus should not have been filed*** – in conjunction with this motion to dismiss."  Dkt. No. 95 at p. 2 (emphasis added).

Although the Court's prior holding was related specifically to the photographs that had been filed, it obviously applies with equal force to the emails and any other extrinsic communications.  Yet, Henry's operative motion to dismiss attaches many of the same exhibits

and continues to urge that the Court consider the very same photographs (although without attaching them) that the Court already ruled cannot be considered in connection with a motion to dismiss.  Def. Br. at p. 6, n.1, p. 9, n.2.  Indeed, this extrinsic evidence is relied on throughout Henry's motion to dismiss.  See generally Def. Br. at pp. 5-12.

In an attempt to justify his disregard of the Court's order and black letter law, Henry falsely claims that the TAC incorporates the relevant exhibits by reference because the TAC acknowledges the existence of certain pictures and text messages.  Henry's argument misstates the relevant law.

Indeed, the Second Circuit has explained, "[a] mere passing reference or even references [ ] to a document outside of the complaint does not, on its own, incorporate the document into the complaint itself."  Williams v. Time Warner Inc., 440 Fed. App'x 7, 9 (2d Cir. 2011).  Here, the mere fact that Plaintiff mentioned certain text messages and photographs does not, as Henry now claims, provide him with a license to self-select, and rely upon, whatever text messages and photographs he believes support his motion to dismiss.  See Williams v. City of New York, No. 14 Civ. 5123 (NRB), 2015 WL 4461716, at *2 (S.D.N.Y. July 21, 2015) ("a document is not 'integral' simply because its contents are highly relevant to a plaintiff's allegations, but only when it is clear that the plaintiff *relied* on the document in preparing his complaint").  Plaintiff's claims obviously do not "rely" on communications and photographs that Henry claim are damning, and there is nothing in the TAC to suggest otherwise.  See, e.g., Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) ("[b]ecause this standard has been misinterpreted on occasion, we reiterate here that a plaintiff's ***reliance*** on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough") (emphasis

added); <u>Lawhorn v. Algarin</u>, No. 16 Civ. 6226 (FPG), 2018 WL 1046794, at *4 (W.D.N.Y. Feb. 26, 2018) (holding that, even where the complaint cited facts contained in extrinsic materials, they were not relied upon heavily, and therefore were not integral to the complaint).

Henry's refusal to abide by the Court's clear order in this case and insistence on going beyond the face of the pleadings should be rejected as a matter of law.  In the alternative, Plaintiff respectfully requests that Henry's brief be converted to a motion for summary judgment and that Plaintiff permitted to take discovery prior to the motion's adjudication. <u>See</u> <u>Rivera v. New York City Health & Hosps. Corp.</u>, 191 F. Supp. 2d 412, 425 (S.D.N.Y. 2002) ("I decline to convert the motion to dismiss to a summary judgment motion and thus I will not consider the extrinsic materials.").

## III.   THE THIRD AMENDED COMPLAINT PROPERLY PLEADS CLAIMS UNDER THE TVPRA AGAINST HENRY

The Trafficking Victims Protection Reauthorization Act ("TVPRA") provides, in relevant part:

> (a) Whoever knowingly—
>
> (1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
>
> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
>
> knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the

> person has not attained the age of 18 years and will be caused to
> engage in a commercial sex act, shall be punished . . .

18 U.S.C.A. § 1591.

The statute further defines the term "commercial sex act" to mean a "sex act, on account of which anything of value is given to or received by any person."  18 U.S.C. § 1591(e)(3).  In 2003, Congress added a private right of action for TVPRA victims.  18 U.S.C. 1595(a) ("An individual who is a victim of a violation of Section . . . 1591 of title 18, United States Code, may bring a civil action in any appropriate district court of the United States").  In a futile attempt to obtain dismissal of Eckhart's claims under the TVPRA, Henry repeatedly and impermissibly goes outside of the allegations in the TAC and misstates the applicable legal precedent.  Henry's arguments in this case merely repackage arguments that have been considered by courts in the past in adjudicating TVPRA claims and resoundingly rejected (including by this Court).

### A.   Henry Enticed Eckhart Into a Commercial Sex Act

Henry first argues that the TAC fails to state a claim under the TVPRA because Plaintiff has never alleged that Henry enticed her into performing a sexual act.  In making this argument, Henry falsely claims that the TVPRA requires that a plaintiff allege "extraordinary, specific, repeated, and persistent acts" before the enticement prong of a TVPRA claim is satisfied.  This is simply incorrect.  As this Court has explained, the term "entice" as used in the TVPRA is "based on its ordinary meaning, which is to attract artfully or adroitly or by arousing hope or desire, and to attract or tempt by offering pleasure or advantage."  David v. Weinstein Co. LLC, 431 F. Supp. 3d 290, 300 (S.D.N.Y. 2019) (Abrams, J.) (quoting Noble v. Weinstein, 335 F. Supp. 3d 504, 517 (S.D.N.Y. 2018)).  As a result, a defendant has been found to entice a plaintiff where, as here, the defendant has made "empty promises" of providing the plaintiff with career opportunities.  Id. at 301.

In the instant case, Henry likewise made similar empty promises to entice Plaintiff into unwillingly submitting to his sexual demands.  After their first sexual encounter, Henry told Plaintiff that she was "wasting her time" in a production role at Fox and that he could advance her career because he could leverage his position as the then-White House Correspondent for one of the largest news networks in the world to "get her in a room with some really powerful people."  ¶ 50.  Thereafter, Henry demanded that Eckhart provide him with her underwear while she was at the office.  ¶ 54.  That same day, he demanded that Eckhart meet him in a guest office at Fox where he proceeded to violently force her to perform oral sex on him.  ¶¶ 55-57.

Subsequently, in February 2017, Henry informed Eckhart that he had been awarded his own show at Fox, officially solidifying his position as one of the most powerful men at the Company.  ¶ 65.  He proceeded to tell Eckhart that he would introduce Plaintiff to his agent (who was one of the most powerful agents in the journalism industry).  Id.  Importantly, he also told her that he would be able to use his newly-gained power to substantially increase Eckhart's profile by bringing her on his new show as a "frequent" guest.  Id.  Henry then sought to lure Eckhart to his hotel room with promises that he wanted to discuss these same career opportunities with her.  ¶ 66.  Instead, once they reached his hotel room, Henry proceeded to violently rape Eckhart.  ¶¶ 68-74.

The import of these promises cannot be overstated to an aspiring television journalist such as Eckhart.  Though she had appeared on Fox shows before, the opportunity to appear frequently on a show hosted by one of the Company's most successful and powerful anchors represented a substantial increase in both her exposure to the outside world and prominence within Fox.  See Ardolf v. Weber, 332 F.R.D. 467, 476-477 (S.D.N.Y. 2019) (finding that "[d]efendant's promises of career advancement were undoubtedly material because he was very

powerful and influential in the fashion industry, so it was perfectly reasonable for aspiring male models to rely on them").

In seeking dismissal, Henry impermissibly attempts to parse the sexual assaults he committed into isolated events that are wholly unrelated.  Specifically, Henry claims that because he only promised to introduce Eckhart to powerful people after he had sexual intercourse with her, Henry's statement could not be relevant to her TVPRA claim.  Def. Br. at 16.  However, the law is clear that a defendant's conduct should be examined in its totality under the TVPRA.  For example, in Noble, the court looked to the promises that the defendant made months before he assaulted the plaintiff as evidence that he had enticed her into committing a commercial sex act in contravention of the TVPRA.  Id., 335 F. Supp.3d at 517.  See also David, 431 F. Supp. 3d at 300 (finding that promises of film role on two separate occasions demonstrated that the defendant enticed the plaintiff); Geiss v. Weinstein Co. Holdings LLC, 383 F. Supp. 3d 156, 168 (S.D.N.Y. 2019) ("the TVPRA extends to enticement of victims by means of fraudulent promises of career advancement, for the purpose of engaging them in consensual or, as alleged here, non-consensual sexual activity").  Here, Henry's promises provide context for his subsequent sexual assaults.

Henry further attempts to evade liability under the TVPRA by claiming that his promises to make her a frequent guest on the new television program that Fox had awarded him were too vague to constitute enticement under the TVPRA because the TAC does not include details about the type of show Henry was awarded or the nature of the show.[2]  Notably, Henry does not cite to

---

[2]     Henry further claims that Plaintiff's allegations should be rejected because Eckhart purportedly "would have known" that Henry could not guarantee her appearances on his new show.  As with Henry's attempts to impermissibly introduce extrinsic evidence in a motion to dismiss, Henry's attempts to rely on facts outside of the pleadings should be rejected.  Henry's conclusory statements about what Eckhart purportedly should have known are not contained within the allegations of the TAC and cannot be used as a basis for dismissal.  Moreover, whether he actually had the power to fulfill his promises is irrelevant to liability under the TVPRA.

a single case requiring this level of specificity to sustain a TVPRA claim at the pleading stage. To the contrary, courts have found that similar allegations, relating to general promises of career advancement, are sufficient to withstand a motion to dismiss, even without additional details. See Noble, 335 F. Supp at 517 (the defendant's claim that he had "a film role in mind for her" without identifying the specific role sufficient to state a TVPRA claim).

Importantly, at least one other court has rejected the very argument that Henry proffers in this case.  In Ardolf, 332 F.R.D., a case that Henry himself cites, the court explained:

> Defendant argues that he did not "entice" Plaintiffs because, unlike Weinstein in Noble, he did not lure them to his photoshoots through "extraordinary, specific, repeated, and persistent acts." (MTD Mem. at 5.) But there is no legal authority for Defendant's proposition that Plaintiffs must plead "substantial and specific promises designed to arouse specific kinds of hopes and expectations." (*Id*.) **Sufficiently, a defendant is liable under the TVPA for a single act of enticement or recruitment if it is successful**.

Id. at 474–75 (emphasis added).

### B.  The TAC Alleges that Henry Knew That Force and/or Fraud Would be Used Against Eckhart

Henry next argues that the TAC fails to state a claim under the TVPRA because Plaintiff cannot show that Henry engaged in a "pattern" of using fraud or force with other women.  Once again, Henry is attempting to impermissibly read a requirement into the TVPRA that the case law does not support.

According to Henry, to satisfy the knowledge requirement of the TVPRA, a plaintiff need demonstrate that a defendant has engaged in a pattern of fraudulent or forceful conduct, or has a *modus operandi* of doing so.  Def. Br. at 19.  While such a *modus operandi* has been found to be sufficient to satisfy the TVPRA's knowledge requirement, it is by no means a prerequisite, as Henry now claims.  Instead, where the defendant himself is the individual who perpetrated the

unlawful conduct (as opposed to someone who merely benefited from unlawful conduct committed by others), the knowledge requirement is assumed.  See Huett v. Weinstein Co. LLC, No. 18 Civ. 06012 (SVW)(MRW), 2018 WL 6314159, at *2 (C.D. Cal. Nov. 5, 2018) (denying motion to dismiss because the complaint "sufficiently alleges that [d]efendant engaged in a pattern of conduct—and given that the [d]efendant is alleged to have personally engaged in the conduct, he necessarily would have known about it").

Indeed, were Henry's argument to be accepted, the TVPRA would only create liability for serial sexual abusers.  Effectively, a sexual abuser would get one "free pass" because his first victim would be unable to prove the *modus operandi* Henry claims is required.  Nothing in the language of the statue supports the idea that Congress intended to create such a glaring loophole. Indeed, even the case law Henry himself cites undermines his argument.

By way of example only, in Noble, the court found that the defendant knew that fraud would be used in forcing the plaintiff to engage in a commercial sex act by looking solely at the interactions between the plaintiff and the defendant, without relying on, or even mentioning, the defendant's history with other women.  Id. at 518.  Specifically, the court looked to the fact that the defendant's professional promises became increasingly more elaborate as he sought to engage her in a sexual relationship and viewed the increasing specificity of the promises as evidence of "conscious behavior and fraudulent intent."  Id.  See also David, 431 F.Supp.3d at 301-302 (holding that the defendant's failure to perform on the alleged promises he made to *the plaintiff* alone "suggests that he *knew* his promises had no factual basis when he enticed [p]laintiff to meet with him") (internal quotations omitted and emphasis in original).

Similarly, in the instant case, Henry began by promising Eckhart that he would introduce her to "powerful people."  He then escalated his offers by claiming that he would put her in

contact with his powerful agent, and, ultimately, would have her frequently appear on a new

show that Fox purportedly awarded him.  To the extent that Henry argues that he never was

given a show by Fox until 2020, and that he, as an anchor, had no ability to provide Eckhart with

on-air appearances on any show that he did have, Henry's argument proves too much.  If

discovery shows that Henry knew that he did not have a show and/or did not have authority to

promise to include Eckhart as a frequent on-air guest on such a show, it would clearly indicate

that he knew he would use fraud to entice her into committing a commercial sex act.

The TAC also alleges that Henry knew that he would use force when he assaulted

Eckhart, both in forcing her to perform oral sex in Fox's offices and when he later raped her at a

hotel.  With respect to the force allegation, the TAC alleges that Henry has used force on women

in the past to convince them to submit to his sexual desires.[3]  ¶¶ 140-144, 156-157.

The TAC likewise alleges sufficient facts to support a finding that Henry knew he would

use force with Eckhart in particular.  Specifically, prior to forcing Eckhart to perform oral sex on

him, she made it clear that she did not have time to stay in his office and was anxious to leave.

¶¶ 55-56.  He then proceeded to shut the door, subjected her to forceful and unwanted kissing

and forcibly moved her head down to his exposed penis and forced her to perform oral sex on

him.  ¶ 57.  See Noble, 335 F. Supp.3d at 518-519 (allegations that the defendant "forcefully

grabbed [Noble's] hand, placed it on his penis, and forced her hand to masturbate him," that he

"used his other hand to control [Noble] and defeat her resistance" were sufficient to allege that

the defendant knew or should have known that he intended to use force on the plaintiff).

---

[3]      Importantly, the TVPRA does not require that Henry have used violence in order to establish liability.
Rather, the only "force" that is required is some physical effort or touching.  See Ardolf, 332 F.R.D. at 476 (finding
that TVPRA's use of the term "force" refers to the noun, which is defined as exerting "energy or strength and
caus[ing] motion or change" rather than verb of using "strength in a struggle or violence").

Similarly, prior to raping Eckhart, Henry sent her a series of text messages telegraphing his intention to use force to make her submit to him sexually.[4]  In one text message, he explicitly told Eckhart that she was "gonna get tossed around like a lil rag doll."  ¶ 61.  In another message he told her that if she did not "obey" him, she would be "disciplined."  ¶ 63.  Henry also brought handcuffs to the hotel, indicating that he had planned on physically restraining her prior to her arrival.  ¶¶ 69-70.  He then took pictures of her while she was restrained, a further indication that his actions that night were carefully planned.  ¶¶ 71-73.  He subsequently violently raped Eckhart while she was still in the handcuffs.  ¶¶ 73-75.  Based on the foregoing allegations, it is beyond dispute that the allegations in the TAC are sufficient to state a claim against Henry for violating the TVPRA.

### C.   Henry Forced Eckhart to Engage in a Commercial Sex Act

Finally, Henry claims that the TAC does not allege that he enticed Eckhart into engaging in a commercial sex act under the TVPRA.  In making this argument, Henry admits that the "Weinstein cases are instructive in showing how courts apply the 'commercial sex act' element of the TVPA to non-archetypal TVPA claims."  Def. Br. at p. 21.  Incredibly, Henry proceeds to completely ignore the clear language in the Weinstein cases that leave absolutely no doubt that his conduct implicated a commercial sex act.

Specifically, Henry acknowledges that Plaintiff contends that he both promised to introduce her to powerful people and to allow her to appear frequently on his television program.  Notwithstanding these facts, which in themselves are clearly sufficient to constitute commercial sex acts, Henry contends that Eckhart's claims must fail because she does not allege that Henry

---

[4]     Henry attempts to elide these text messages by stating that they are undated and therefore could not show that he intended to use force on Eckhart before raping her.  This argument misstates the allegations in the TAC.  Specifically, Eckhart alleges that Henry sent her a series of text messages indicating that he intended to be violent towards her "in early 2017," *before* the alleged rape occurred.  See ¶¶ 61-63.

directly conditioned his promises to provide her with career advancement on her submission to

him sexually.  Def. Br. at 22.  According to Henry, unless the sexual activity is explicitly made a

"but for" condition of the promises of career advancement, Eckhart cannot plead a valid TVPRA

claim.  Henry's interpretation of the TVPRA is flatly contradicted by the very <u>Weinstein</u> cases he

concedes provide an analytical framework for assessing the statute.

By way of example, in <u>David</u>,  there is no allegation that the defendant directly told the

plaintiff that she would receive a role only if she submitted to his sexual advances.  Instead,

during a meeting that the defendant had claimed was for the purposes of discussing the plaintiff's

career prospects, he excused himself, "returned wearing a bathrobe," "grabbed her," "pulled her

into the bedroom," "threw her on the bed, pulled down her jeans and started to perform oral sex

on her."  <u>Id.</u>, 431 F.Supp.3d at 295-296.  He then "used his massive weight and strength to hold

her down and force his penis inside her vagina."  <u>Id.</u>  Despite the fact that the plaintiff did not

allege that the defendant only promised her an acting role if she engaged in sexual intercourse,

this Court nevertheless found that the complaint stated a violation of the TVPRA.  In so holding,

this Court held that it "agrees with the other judges who have considered this issue that these

meetings, ***as well as the promises of professional opportunities and success attendant to these***

***meetings***, are things of value for the purposes of a TVPRA claim."  <u>Id.</u> at 303 (emphasis added

and collecting cases).

In the instant case, Plaintiff has alleged that Henry lured her into a position where he

could sexually assault her by promising her first that he would introduce her to powerful people

and then by insisting that she accompany him to his hotel room to discuss his claim that he

would allow her to be a frequent guest on his new television program.  Such conduct

indisputably constitutes a commercial sex act under the TVPRA, even if Henry ultimately never

followed through on his promises.  See, e.g., Geiss, 383 F.Supp.3d at 163-165 (finding that the

defendant's conduct implicated a commercial sex act where he lured plaintiffs into private

meetings with promises of career advancement and then proceeded to assault them).

IV.   **THE TAC STATES A CLAIM AGAINST HENRY FOR HARASSMENT AND/OR
      RETALIATION**

A.   **Henry Is Individually Liable for his Harassing Conduct**

Henry next argues that he cannot be held liable for his conduct under the New York anti-

discrimination laws because he was not Eckhart's employer or supervisor.  Once again, Henry

misstates the law.

As a threshold matter, and contrary to what Henry claims, the New York City Human

Rights Law ("NYCHRL") provides for broad individual liability against defendants for acts of

discrimination.  Specifically, the relevant anti-discrimination provision states that it shall be

unlawful for "an employer *or an employee or agent thereof*" to discriminate against or harass an

employee.  See NYC Admin. Code §8-107(1)(a) (emphasis added).  Thus, courts have

recognized that "the NYCHRL provides for individual liability of an employee 'regardless of

ownership or decisionmaking power,'" provided that the individual employee actually

participated in the discriminatory conduct at issue.[5]  Malena v. Victoria's Secret Direct, LLC,

---

[5]     The cases to which Henry cites in support of his claim that the NYCHRL only allows for individual
liability against supervisors are readily distinguishable.  First, although the court in Hughes v. Twenty-First Century
Fox, Inc., 304 F. Supp. 3d 429 (S.D.N.Y. 2018), seems to suggest this holding, it actually conflated the standard for
individual liability with the standard for aiding and abetting liability.  In Hughes, the court based its holding on the
decision in Emmons v. City Univ. of N.Y., 715 F.Supp.2d 394, 420 (E.D.N.Y. 2010).  Emmons, however, cited to
two cases that held that the language for *aiding and abetting* liability in the New York State Human Rights Law
("NYSHRL") and NYCHRL is largely the same.  Id. (citing Dunson v. Tri–Maintenance & Contractors, Inc., 171
F.Supp.2d 103, 113-114 (E.D.N.Y.2001) and Schanfield v. Sojitz Corp. of Am., 663 F. Supp. 2d 305, 344 (S.D.N.Y.
2009) ("A claim for aider and abettor liability is also cognizable under the NYCHRL and is susceptible to the same
standard as under the NYSHRL, as language of the two laws is virtually identical")).  These cases did not, however,
address the clearly different language used in the two statutes for direct individual liability.  Second, in Palmer v.
Cook, 64 Misc. 3d 1222(A) (N.Y. Sup. Ct. 2019), the court dismissed the claims against the individual defendant not
because she was not the plaintiff's supervisor, as Henry now claims, but because the court found that New York
state employees are not liable under the NYCHRL "when they are acting within the scope of their duties."  Id. at *3.

886 F. Supp. 2d 349, 366 (S.D.N.Y. 2012) (quoting Banks v. Corr. Servs. Corp., 475 F. Supp. 2d 189, 200 (E.D.N.Y. 2007)).  Here, there is no question that Henry personally and directly participated in sexually harassing Eckhart – he was the individual who sexually assaulted and raped her, and he was also the individual who sent her harassing and inappropriate text messages.  Thus, Henry can be held liable under the NYCHRL for his misconduct.

The TAC also alleges sufficient conduct to demonstrate that Henry should be directly liable under the NYSHRL.  Under the NYSHRL, an individual can be held directly liable if he is the plaintiff's employer.  As the Second Circuit has explained, "an individual qualifies as an 'employer' when that individual has an ownership interest in the relevant organization or the 'power to do more than carry out personnel decisions made by others.'"  Townsend v. Benjamin Enterprises, Inc., 679 F.3d 41, 57 (2d Cir. 2012).  Here, Plaintiff has alleged that Henry promised to bring her onto his new show, a substantial employment benefit to an aspiring television journalist such as Eckhart.  ¶ 65.  Notably, at no point did Henry claim that his ability to bring her onto his show was dependent on the approval of others.  As such, it is clear that the TAC alleges sufficient facts to demonstrate that Henry had the power to do more than carry out decisions made by others.

### B.    The TAC Alleges that Henry Aided and Abetted the Hostile Work Environment at Fox

The NYSHRL and NYCHRL also provide for aiding and abetting liability: it is unlawful "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this [provision], or to attempt to do so."  N.Y. Exec. Law § 296(6); Admin. Code N.Y.C. § 8–107(6).  "Actual participation in conduct giving rise to a discrimination claim may support liability under both statutes."  Armstrong v Metro. Transp. Auth., No. 07 Civ 3561 (DAB), 2015 WL 992737, at *9 (S.D.N.Y. Mar. 3, 2015).  Here, Fox and Henry worked together to create a

19

culture of sexual harassment wherein Henry was given free rein to prey on women, including

female employees.  Furthermore, as Henry "actually participated in" the unlawful conduct, he can

be liable as an aider and abettor under both statutes.  Henry-Offor v. City Univ. of New York, No.

11 Civ. 4695 (NRB), 2012 WL 2317540 (S.D.N.Y. June 15, 2012).

      Henry claims that he cannot be held liable for aiding and abetting his own conduct in this

case.  Even if that were true, but see Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995)

(holding that individual defendant could be held liable for aiding and abetting his own

discriminatory conduct), Plaintiff does not seek to hold him liable for his conduct alone.  Rather,

Henry's actions have aided Fox in establishing a work environment that has, for years, permitted

the unrepentant sexual harassment and assault of women.  ¶¶ 95-133.  Fox knew about Henry's

conduct and allowed it to continue, unaddressed, in the face of numerous complaints.  Henry

therefore can be held liable as an aider and abettor.

### C.      The TAC Alleges that Henry Retaliated Against Plaintiff

      Henry also contends that the TAC fails to allege sufficient conduct by Henry to hold him

liable for retaliation directly or under an aiding and abetting theory.  According to Henry,

because he purportedly did not participate in the decision to terminate Eckhart's employment, the

TAC does not state a claim against him for retaliation.  This is nothing more than a strawman.

Plaintiff is not alleging that Henry retaliated against her by terminating her employment.  Rather,

the crux of Plaintiff's retaliation claims against Henry stems from his conduct after Plaintiff filed

the instant action, all of which is unquestionably retaliatory under the law.

      First, as alleged in the TAC, Henry's decision to publicly file nude and semi-nude photos

purporting to be of Eckhart, as well as her personal cellphone number, clearly constitutes

retaliatory conduct.  Under Title VII and the NYSHRL, it is well settled that retaliatory acts are

"not limited to discriminatory actions that affect the terms and conditions of employment."
Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006).  Rather, these statutes prohibit all conduct that "well might . . . dissuade[]a reasonable worker from making or supporting a charge of discrimination."  Id. at 68.  Under the NYCHRL, which provides even more expansive protections to victims of unlawful conduct, it is unlawful to retaliate "in any manner."  Williams v. New York City Hous. Auth., 61 A.D.3d 62, 70 (1st Dep't 2009).  Accordingly, no "challenged conduct" may "be categorically rejected as nonactionable."  Id. at 71.

There is no question that having the cell phone number and intimate pictures of an individual exposed to the public would dissuade a reasonable employee from making a discrimination complaint.  Such "slut-shaming" and doxing of victims of rape is a common tactic used by perpetrators to make it appear as if such victims were "asking" to be sexually assaulted. ¶¶ 199-205.  There is ample evidence as to the harmful and traumatic effects such conduct creates in rape victims.  Id.  As the legislative history of New York's Unlawful Disclosure of an Intimate Image Statute makes clear, "[v]ictims of revenge porn, like victims of child pornography, suffer from mental health effects such as depression, withdrawal, low self-esteem, and feelings of worthlessness."  As a result of being a victim of revenge porn, victims must also undergo a "lifelong battle to preserve their integrity."  See New York City Council, Committee on Public Safety, Report of the Governmental Affairs Division on Proposed Int. No. 1267-A, November 16, 2017 (available at https://legistar.council.nyc.gov/View.ashx?M=F&ID=5790402&GUID=DC629127-4131-43A7-8B47-EFFC138C80F5 (last visited December 29, 2020)).

In a desperate attempt to avoid discovery, Henry claims that "courts presume that filings made in the connection with all legal proceeding fall outside the scope of retaliation actions." Def. Br. at p. 28. This is simply wrong. Indeed, Henry's own caselaw belies this claim. As the Seventh Circuit explained in rejecting the type of absolute bar against legal proceedings forming the basis for retaliation claims advocated by Henry here:

> more fundamentally, recognition of the litigation privilege sought by the appellees could interfere with the policies underlying the anti-retaliation provisions of Title VII and the ADA. Retaliatory acts come in infinite variety, ***and even actions taken in the course of litigation could constitute retaliation in appropriate circumstances***.

Steffes v. Stepan Co., 144 F.3d 1070, 1075 (7th Cir. 1998) (emphasis added).

As such, and contrary to what Henry now claims, courts in this circuit have repeatedly held that actions taken in the course of litigation, or otherwise employing the legal process, can constitute an actionable claim of retaliation. See Torres v. Gristede's Operating Corp., 628 F. Supp. 2d 447, 473 (S.D.N.Y. 2008) ("Bad faith or groundless counterclaims and other legal proceedings against employees who assert statutory rights are actionable retaliation precisely because of their *in terrorem* effect"); Rodriquez v. Nat'l Golf Links of Am., No. 19 Civ. 7052, 2020 WL 3051559 (E.D.N.Y. Jun. 8, 2020); Leary v. Al-Mubaraki, No. 18 Civ. 0048, 2019 WL 4805849 (S.D.N.Y. Sept. 30, 2019); Illiano v. Mineola Union Free Sch. Dist., 585 F. Supp. 2d 341, 352 (E.D.N.Y. 2008) (filing an action constitutes an adverse action); Yankelevitz v. Cornell Univ., No. 95 Civ. 4593 (PKL), 1996 WL 447749, at *4 (S.D.N.Y. Aug. 7, 1996) (defendants' act of filing a counterclaim constitutes an adverse action); Gliatta v. Tectum, Inc., 211 F. Supp. 2d 992, 1009 (S.D. Ohio 2002) (counterclaim brought by employer against employee can constitute an adverse action); Ward v. Wal-Mart Stores, Inc., 140 F. Supp. 2d 1220, 1231 (D.N.M. 2001) (filing "lawsuits may constitute an adverse employment action for purposes of a

retaliation claim"); <u>EEOC v. Outback Steakhouse of Florida, Inc.</u>, 75 F. Supp. 2d 756, 758 (N.D. Ohio 1999) (employer filing action motivated by retaliation, can be basis for retaliation claim); <u>Berry v. Stevinson Chevrolet</u>, 74 F.3d 980, 986 (10th Cir.1996) (retaliatory prosecution may constitute adverse action sufficient to violate Title VII); <u>Kreinik v. Showbran Photo</u>, No. 02 Civ. 1172 (RMB)(DF), 2003 WL 22339268, at *1 (S.D.N.Y. Oct. 14, 2003) (permitting claims of retaliation based on the filing of counterclaims).

The case law relied upon by Henry is readily distinguishable.  Importantly, the Second Circuit's decision in <u>U.S. v. N.Y.C. Trans. Auth.</u>, 97 F.3d 672 (2d Cir. 1996)[6] was decided before the <u>Burlington</u> court changed the definition of an "adverse action" in a retaliation case to encompass any conduct that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  <u>Burlington</u>, 548 U.S. at 68.  In contrast, in <u>N.Y.C. Trans. Auth.</u>, the court specifically stated that, for conduct to be considered retaliatory, it must be "***an employment action*** disadvantaging the person engaged in the protected activity."  <u>Id.</u> at 677 (emphasis added).  <u>See</u> <u>also</u> <u>id.</u> (in denying the retaliation claim, also explaining that "We also note that the Transit Authority's defensive measures do not affect the complainant's work, working conditions, or compensation").

Additionally, even if <u>N.Y.C. Trans. Auth.</u> and its progeny were not based on an outdated interpretation of the law, it still fails to support Henry's argument in this case.  In <u>N.Y.C. Trans. Auth.</u>, the court limited its holding to encompass "reasonable defensive measures" taken in defense of a claim.  <u>Id.</u> at 677.  In contrast, Henry's decision in this case to include private images he received from Eckhart had no reasonable basis and was wholly unrelated to the proper defense of this case (at least at this stage), as this Court recognized in its sealing order.

---

[6]      The other case to which Henry cites, <u>Gaughan v. Rubenstein</u>, 261 F. Supp. 390 (S.D.N.Y. 2017), in turn cites to the court's decision in <u>N.Y.C. Trans. Auth.</u>  <u>See</u> <u>Gaughan</u>, 261 F. Supp. 3d at 420, n.4.

Dkt. No. 95 at p. 2 (finding that the photographs "constitute extrinsic evidence which this Court is not permitted to consider – and ***thus should not have been filed*** – in conjunction with this motion to dismiss") (emphasis added).  Given that the photographs "should not have been filed," to say nothing of being filed publicly, it is obvious that Henry's sole motivation in attaching them to a motion to dismiss was to publicly humiliate Eckhart and punish her for her decision to exercise her legal rights.  Such conduct fits squarely within the definition of retaliation and Henry should be held accountable for his deplorable – and unlawful – behavior.

**D.      Eckhart's Discrimination Claims Are Not Time-Barred**

Finally, Henry argues that Plaintiff's claims for discrimination and sexual harassment are time-barred because all of her allegations pre-date the three-year statute of limitations period imposed by the NYSHRL and the NYCHRL.  Once again, Henry blatantly misstates the relevant law in a vain attempt to secure dismissal of Plaintiff's claims in this case.

As the Second Circuit has explained, under the continuing violation doctrine, "a plaintiff is entitled to have a court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred." Fitzgerald v. Henderson, 251 F.3d 345, 359 (2d Cir. 2001) (internal quotations omitted).  In the instant case, the TAC alleges that, as part of his pattern[7] of sexually harassing conduct towards Eckhart, Henry sent her unsolicited text messages, including some that were not explicitly sexual.  See ¶¶ 37, 41-43, 60.  When Eckhart responded to these messages, Henry proceeded to

---

[7]      Henry also appears to claim that Plaintiff must allege that his sexually harassing conduct occurred pursuant to "a common policy," in order to be qualify as a continuing violation, relying on misconduct Jackson v. New York State, 523 F. App'x 67 (2d Cir. 2013), a non-precedential opinion.  Such an argument misses the mark.  Under the law, Eckhart must merely allege that Henry behaved pursuant to a "policy *or* practice." Fitzgerald, 251 F.3d at 359 (emphasis added).  Here, the TAC clearly alleges that Henry had a specific pattern of sexually harassing women, including other Fox employees, by sending them unsolicited and/or inappropriate text messages followed by unwelcome sexual advances.  ¶¶ 123, 134-181.

seize upon the opportunity to send her more graphic and/or lewd messages, which, in turn, were invariably a precursor to his sexual advances.  See ¶¶ 43-50, 61-73.

In keeping with Henry's established pattern of misconduct, he attempted to reengage Eckhart as recently as October 2018, sending her two separate text messages that were clearly intended to be similar invitations for Eckhart to engage in further communications.  ¶¶ 83-88. The messages themselves exemplify the pattern of Henry's communications.  Compare ¶ 42 (telling Eckhart that she was playing "hard to get") with ¶ 85 (asking Eckhart "why'd you turn away today"), ¶ 87 (sending Eckhart an image of a football player doing the Heisman pose, thereby acknowledging that she was rejecting his advances, or playing "hard to get").

Based on Henry's previous conduct, had Eckhart responded to these messages, Henry would have undoubtedly seized on the opportunity to further harass Eckhart and to escalate the explicit nature of both his messages and conduct.  Thus, these messages, both before and during the statute of limitations period, are part of Henry's continuing practice of sexually harassing Eckhart, and are sufficient to make Henry's earlier sexual harassment timely under a continuing violations theory.  See Robinson v. Brooklyn Coll., No. 09 Civ. 2174 (DLI)(LB), 2010 WL 3924012, at *5 (E.D.N.Y. Sept. 29, 2010) (finding that an e-mail sent during the limitations period was sufficient to establish the application of the continuing violation doctrine at the pleading stage); Isbell v. City of N.Y., 316 F. Supp. 3d 571, 586 (S.D.N.Y. 2018) (denying motion to dismiss hostile work environment claim where "Plaintiffs allege numerous actions that are part of the alleged unlawful employment practice that occurred within the limitations period"); Drew v. Plaza Const. Corp., 688 F. Supp. 2d 270, 279 (S.D.N.Y. 2010) (denying motion to dismiss hostile work environment claim where the defendant "directed profanity at [the plaintiff] and raised his voice in a demeaning manner" during the limitations period).  See,

generally, Hansen v. Danish Tourist Bd., 147 F. Supp. 2d 142, 156 (E.D.N.Y. 2001) (recognizing that broader application of the continuing violation doctrine is appropriate at the pleading stage).

While Henry acknowledges the application of the continuing violation doctrine, he incorrectly claims that Eckhart cannot avail herself of it. According to Henry, the continuing violation doctrine is only available to Eckhart if she can allege that the conduct within the statute of limitations period constituted an adverse employment action. In making this argument, Henry conflates the standards for the continuing violation theory in the discrimination context and the hostile work environment context. For hostile work environment claims, unlike discrimination claims, a plaintiff need not prove that each individual act amounts to an adverse employment action. Rather, as the Supreme Court has explained:

> Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.

Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002). Thus, the Supreme Court held that "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, ***so long as an act contributing to that hostile environment takes place within the statutory time period***." Id. at 105 (emphasis added). As explained above, because the claims in the instant case do not involve a set of discrete acts, but instead encompass Henry's unlawful conduct over a period of years, [8] the continuing violation theory serves to make all of Eckhart's claims timely. [9]

---

[8]      To the extent that Henry relies on the fact that over a year elapsed between when he raped Plaintiff and when he sent her additional text messages in 2018 to overcome a continuing violations argument, the Supreme Court has already explained that "it does not matter whether nothing occurred within the intervening [ ] days so long as each act is part of the whole." Morgan, 536 U.S. at 118.

V.     **THE TAC ALLEGES CLAIMS AGAINST HENRY IN VIOLATION OF THE GMVA**

The TAC alleges valid claims under the Gender Motivated Violence Act ("GMVA").  It contains detailed allegations that Henry violently sexually assaulted Eckhart because of her gender or on the basis of her gender, and that he was motivated, at least in part, by a gender-based animus.  Henry contends that this claim must be dismissed because the complaint fails to allege facts showing such an animus.  Henry's arguments concerning Plaintiff's GMVA claim fail for two reasons.

First, Henry relies on outdated cases for the proposition that a GMVA claim must allege conduct beyond a rape or sexual assault in order to sufficiently demonstrate gender-based animus.  As a New York appellate court recently explained,

> Rape and sexual assault are, by definition, actions taken against the victim without the victim's consent. Without consent, sexual acts such as those alleged in the complaint are a violation of the victim's bodily autonomy and an expression of the perpetrator's contempt for that autonomy. Coerced sexual activity is dehumanizing and fear-inducing. ***Malice or ill will based on gender is apparent from the alleged commission of the act itself. Animus inheres where consent is absent.***

Breest v. Haggis, 180 A.D.3d 83, 94 (1st Dep't. 2019) (emphasis added).  Here, as in Breest, Eckhart alleges that Henry sexually assaulted her without her consent on three separate occasions.  These nonconsensual acts are enough, standing alone, to state a claim under the GMVA.  See also Fierro v. Taylor, No. 11 Civ. 8573 (BSJ), 2012 WL 6965719, at *1 (S.D.N.Y.

---

[9]     It is for this reason that Henry's reliance on Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229 (2d Cir. 2007) and Corrado v. New York Unified Court Sys., 163 F. Supp. 3d 1 (E.D.N.Y. 2016) is inapposite.  In both Kassner and Corrado, the courts examined the continuing violation doctrine as it applied to discrete acts of discrimination.  However, because Eckhart brings claims arising from Henry's ongoing sexual harassment, there is no requirement that she allege that she was subjected to discrete adverse employment actions during the statute of limitations period.

Oct. 22, 2012) (plaintiff claimed she was forced into nonconsensual sex, court held that gender motivation can be factually determined "without difficulty").

Second, even assuming, *arguendo*, that a GMVA claim need allege additional facts to support a finding of gender-based animus, the TAC amply provides such allegations.  Henry repeatedly called Eckhart a "whore," during their interactions.  ¶¶ 61, 77.  On one such occasion, he followed up his use of this vile epithet by stating that Eckhart was "Gona [*sic*] get tossed around like a lil rag doll," clearly telegraphing his belief that he had the right to physically abuse the woman he viewed as nothing more than a "whore."  ¶ 61.  He further claimed that he "owned" Eckhart and she did not "get a 'choice'" as to how he used her for his own perverted pleasure.  ¶¶ 77, 79.  Such comments make clear that Henry viewed women as mere property, wholly lacking in agency or free will of their own.  Henry made similar degrading comments to other women, also referring to them as being a "whore," ¶ 154, becoming violent with them, ¶ 156, pressuring them to submit to unwanted sexual advances, ¶¶ 134-138, 140-144, 157, 159, and sending them lewd, graphic and unwanted pictures and messages.  ¶¶ 123, 151, 162-164, 173-180.  These allegations, of degrading and offensive comments, all of which were directed only at women, are more than sufficient to plead a claim for a violation of the GMVA at the pleading stage.  See, e.g., Crisonino v. New York City Hous. Auth., 985 F. Supp. 385, 391-93 (S.D.N.Y. 1997) (gender animus pled when plaintiff alleged that defendant "called [her] a 'dumb bitch' and later shoved her").

## VI.    THE TAC ALLEGES THAT HENRY IS LIABLE FOR THE UNLAWFUL DISSEMINATION OF AN INTIMATE IMAGE

N.Y. Civ. Rights Law §52-b ("§52-b") provides for a private right of action where a defendant disseminates or publishes private images that show a plaintiff in a nude or semi-nude

state, without the plaintiff's consent.  Henry seeks to dismiss Plaintiff's claims under this statute,

advancing three arguments, all of which are frivolous.

First, Henry claims that, because he redacted the images of Eckhart, he cannot be held

liable under §52-b.  However, by its express terms, §52-b provides for liability where the images

depict the plaintiff's "unclothed *or* exposed intimate parts."  N.Y. Civ. Rights Law §52-b(1)(b).

In turn, the term "intimate part" is defined as including the plaintiff's "pubic area."  N.Y. Penal

Law §245.15(2).  As a result, though Henry has attempted to redact portions of the images he

claims are of Eckhart's nude body, there is no question that at least part of the pubic areas in the

images are exposed.

In addition, the use of the disjunctive "or" in §52-b mandates that any image that shows

either an unclothed or exposed body part is subject to liability.  See United States v. Woods, 571

U.S. 31, 45 (2013) (in statutory construction the use of the disjunctive "or" indicates that "the

words it connects are to be given separate meanings") (internal quotations omitted).  Here, there

is no question that the pictures filed by Henry purport to depict Eckhart's "unclothed" breasts

and genitalia.  Henry's reading of the statute would render the use of the term "unclothed"

superfluous.  Moreover, it simply defies belief that the statute would make it permissible for a

defendant to send nude pictures of victims to harass and demean them, yet nevertheless escape

liability by making a cursory effort to conceal the victim's private body parts.  Anyone looking

at the pictures would know what they purport to represent.

Second, Henry claims that, because he published the obscene images of Eckhart in

connection with his motion to dismiss the Second Amended Complaint, his conduct falls outside

the ambit of §52-b because he did not intend to harass Plaintiff.  However, as Henry was no

doubt well aware, and as this Court has already held, the photographs "constitute extrinsic

evidence which this Court is not permitted to consider – and ***thus should not have been filed*** – in conjunction with this motion to dismiss." Dkt. No. 95 at p. 2 (emphasis added). More importantly, even if Henry somehow believed that the pictures were relevant to his motion to dismiss, he cannot justify his decision to both file the pictures publicly and ***subsequently refuse Plaintiff's request to have the pictures placed under seal***. See Dkt. No. 94. Obviously, sealed photographs would be equally valid from a purely evidentiary standpoint. However, by having the photographs under seal, Henry would not have been able to accomplish his true goal – to harass and intimidate Eckhart by publicly humiliating her and attempting to "slut shame" her by depicting her as a woman who was somehow "asking" to be raped.

Third, Henry claims that he cannot be liable under §52-b because he publicly published the pictures during the course of a legal proceeding. However, there is nothing in the text of the law that provides for the blanket immunity that Henry seeks here. Rather, §52-b provides for a narrow exception to liability where the images were disclosed "***during lawful and common practices*** of . . . legal proceedings." N.Y. City Admin. Code §52-6(2)(b). Defendants' public dissemination of nude and/or semi-nude pictures of Eckhart were not part of lawful or common practices of legal proceedings. Again, there was no basis to include such photographs as part of a motion to dismiss, where such extrinsic evidence cannot be considered as a matter of law. By filing such lewd and irrelevant pictures publicly, Henry's conduct has far exceeded that which is lawful and common under the law.

## VII.    <u>HENRY'S MOTION TO STRIKE SHOULD BE DENIED</u>

### A.    <u>Standard</u>

The law in this circuit is clear that motions to strike are disfavored and rarely granted.

See <u>Winfield v. Citibank, N. A.</u>, No. 10 Civ. 7304 (JGK), 2012 WL 266887, at * 9 (S.D.N.Y.

Jan. 30, 2012) ("motions to strike are generally disfavored, and should be granted only when there is a strong reason for doing so"); In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 218 F.R.D. 76, 78 (S.D.N.Y. 2003) ("[g]enerally, motions to strike are viewed with disfavor and infrequently granted").

As a result, a party moving to strike has a high burden and must demonstrate that: "(1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant." Roe v. City of N.Y., 151 F. Supp. 2d 495, 510 (S.D.N.Y. 2001).  The court must "deem the non-moving party's well-pleaded facts to be admitted, draw all reasonable inferences in the pleader's favor, and resolve all doubts in favor of denying the motion to strike." Diesel Props S.r.L. v. Greystone Bus, Credit II LLC, No. 07 Civ. 9580, 2008 WL 4833001, at *4 (S.D.N.Y. Nov. 5, 2008).  An allegation should not be stricken from a complaint when it is found to be "directly relevant to one of the main issues in th[e] case." Lynch v. Southampton Animal Shelter Found. Inc., 278 F.R.D. 55, 69 (E.D.N.Y. 2011).  "It is not the job of the [c]ourt to micro-manage pleadings and the Second Circuit has stated that 'the courts should not tamper with the pleadings unless there is strong reason for so doing.'" Sloup v. Loeffler, No. 05 Civ. 1766, 2006 WL 767869, at *3 (E.D.N.Y. Mar. 13, 2006) (quoting Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893 (2d Cir.1976)).

### B.   The Allegations in The TAC About the Sexual Harassment of Other Women Are Relevant to Eckhart's Claims

Henry first seeks to strike the allegations concerning four unnamed women who are identified in the TAC as "Jane Does" on two grounds.  First, Henry claims that the allegations made by other women are irrelevant to Eckhart's claims in this case.  Second, he alleges that he

31

is unfairly prejudiced by having to defend against allegations made by unnamed individuals. Neither argument has merit.

It is beyond dispute that allegations about the treatment of other women are relevant to an individual plaintiff's hostile work environment claim.  See, e.g., Cruz v. Coach Stores, Inc., 202 F.3d 560, 571 (2d Cir. 2000) ("even if Cruz herself were not present or were not the target of some of Bloom's racial remarks, a jury could plausibly find that his persistent offensive conduct [towards others] created an overall hostile or abusive argument which exacerbated the effect of the harassment Cruz experienced individually") (internal quotations omitted); Wait v. Beck's N. Am., Inc., 241 F. Supp. 2d 172, 177-178 (N.D.N.Y. 2003) ("[d]efendants' argument that harassment directed at other co-workers is only relevant provided that plaintiff was present when the alleged harassment occurred or knew of the harassment while it was ongoing is untenable and contrary to settled Second Circuit precedent") (citing cases).  Thus, Henry's treatment of the Jane Does, three of whom are Fox employees, and Fox's knowledge of that treatment, is relevant to both Henry's motive and *modus operandi*, as well as Fox's liability for his conduct.

Similarly, to the extent that the Court finds that Eckhart must allege additional evidence of Henry's animus towards women beyond the fact that she herself was assaulted to satisfy her pleading requirements under the GMVA, but see supra at Section V, Henry's disparaging and derogatory treatment of other women is certainly relevant to show such animus.[10]  See Rifkinson v. CBS, Inc., No. 94 Civ. 7985 (KTD)(JCF), 1997 WL 634514, at *2 (S.D.N.Y. Oct. 14, 1997) ("Demonstrated bias by a decisionmaker is probative of discriminatory animus, and is therefore

---

[10]     The unquestionable relevance of Plaintiff's allegations to her claims in this case distinguishes the instant action from the cases to which Henry cites.  In G-I Holdings, Inc. v. Baron & Budd, 238 F. Supp. 2d 521 (S.D.N.Y. 2002), the court struck allegations that a partner at a law firm instructed a colleague to have sex with a client because it was irrelevant to the plaintiff's claims of fraud and tortious interference.  Id. at 556.  Similarly, in Giroux v. Foley, No. 19 Civ. 00187, 2020 WL 1677073 (D. Vt. Apr. 6, 2020), the court struck allegations of "generalized allegations of torts committed against unnamed individuals" in a four-page complaint where those allegations were unrelated to the plaintiff's claims.  Id. at *7.  In contrast, in the instant case, Plaintiff has alleged ample facts tying Henry's conduct against the Jane Does to her own claims against Henry.

admissible even if that bias was directed against employees not similarly situated to the plaintiff").

Likewise, Henry's claim that he is somehow prejudiced by not knowing the identity of the Jane Does in this action is utterly frivolous.  As a threshold matter, Plaintiff **offered** to provide Henry with the names of the Jane Doe witnesses provided that he agreed that he would not contact them prior to start of discovery.  See Willemin Decl. at Ex. A.  Tellingly, Henry responded by **rejecting** Plaintiff's proposal.  Id. ("I would not have been able to agree with the condition you set out below in any case").  Of course, if Henry truly felt he was being prejudiced by not having the identities of these individuals, he would have agreed to the terms proposed by Plaintiff.

Similarly, rather than filing a motion to strike, which are disfavored under the law, if Henry felt prejudiced by not having the names of the Jane Does discussed in the TAC, he could have sought to have these women identified in the context of his motion for a more definite statement.  He did not.  Instead, it is clear that not having those names poses no real prejudice to Henry, and he only sought the names in an effort to contact relevant witnesses prior to discovery.

Henry's motion to strike should further be denied given that, even if he needed the names of the Jane Doe witnesses, he will be able to seek such information during discovery and investigate Plaintiff's allegations at that time.  Plumbers and Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Arbitron, Inc., 278 F.R.D. 335, 341 (S.D.N.Y. 2011) (stating that it is "entirely proper and common for a plaintiff to rely on confidential witnesses in a complaint," and acknowledging that the parties will be able to sue discovery devices to learn information about the confidential witnesses).  It is therefore disingenuous for Henry to claim that having the identity of these women pre-discovery has prejudiced or will prejudice him in any way.

33

Finally, Henry claims that Eckhart's allegations concerning Jane Doe 1 should be stricken because: (i) Jane Doe 1 purportedly disclaimed the allegations attributed to her; and (ii) Eckhart knew that these allegations were false at the time they were made.  While Jane Doe 1 has disclaimed or modified three allegations (out of 12 related to her in the TAC), this does not mean that such allegations are false, much less that they should be stricken.  Jane Doe 1 is a current employee of Fox.  Current employees are often fearful of retribution should their employer discover that they are supporting victims of discrimination, especially when their employer has a history of such retaliatory conduct.  Mevorah v. Wells Fargo Home Mortg., Inc., No. 05 Civ. 1175 (MHP), 2005 WL 4813532, at *4 (N.D. Cal. Nov. 17, 2005) ("[I]t is [ ] reasonable to assume that an employee would feel a strong obligation to cooperate with his or her employer in defending against a lawsuit.").  Indeed, Jane Doe 1 specifically told Eckhart that she and other women at Fox were afraid to come forward because they were afraid of retaliation. ¶ 161.  The inherent power imbalance between an employer and current employee, particularly one who is at-will, is one of the reasons that courts often look at statements made by current employees with skepticism in similar contexts.  See, e.g., Camp v. Alexander, 300 F.R.D. 617, 624 (N.D. Cal. 2014) ("The caselaw nearly universally observes that employer-employee contact is particularly prone to coercion"); Bublitz v. E.I. DuPont de Nemours & Co., 196 F.R.D. 545, 548 (S.D. Iowa 2000) ("Where the defendant is the current employer of putative class members who are at will employees, the risk of coercion is particularly high; indeed, ***there may in fact be some inherent coercion in such a situation***") (emphasis added); Belt v. Emcare, Inc., 299 F. Supp. 2d 664, 668 (E.D. Tex. 2003) ("[W]here the absent class member and the defendant are involved in an on-going business relationship, such as employer-employee, any communications are more likely to be coercive").  Here, all of the allegations in the TAC concerning Jane Doe 1

stem from statements that Jane Doe 1 made to Eckhart directly.  Eckhart Aff. at ¶¶ 4-17.  Thus,

Plaintiff has a good faith basis to believe that the allegations are a true and accurate

representation of Jane Doe 1's experiences with Henry.  To the extent that Henry takes issue

with these allegations, he can obviously take discovery as to the allegations about Jane Doe 1

before any decision can be made about the veracity, or relevance, of these allegations.

> ### C.    The Allegations in the TAC about Defendants' Litigation Tactics Are Relevant To Eckhart's Claims

As with the allegations about the Jane Does, Plaintiff's allegations about the relationship

between Henry's counsel and Fox are plainly relevant to the claims in this case.  As part of

Plaintiff's claims that Fox and Henry cooperated in engaging in post-termination retaliation

towards Eckhart, including by, *inter alia*, jointly publishing pictures of her in a nude or semi-

nude state, Plaintiff must establish a relationship between Fox and Henry.  Absent such a

relationship, Fox has argued that it cannot be held liable for what is ostensibly Henry's conduct.

See Dkt. 118 at pp. 24-25.  The allegations about the past conduct of Fox's and Henry's counsel

are directly relevant to establishing the necessary relationship at the pleading stage.  As alleged

in the TAC, Fox has a history with Henry's lawyers, which includes steering other former

employees accused of discrimination and harassment to them.  ¶¶ 207-209.  Moreover, such

conduct, namely seeking to use legal filings to retaliate against employees who assert claims

against their former employers, is a standard part of the legal strategy for both Fox and its

lawyers.  ¶¶ 208, 210.  As a result, the claims in the TAC about Henry's counsel's litigation

tactics are relevant to the issues in this case and do not warrant being stricken.[11]

---

[11]    Unlike the cases to which Henry cites, the allegations in Paragraphs 207 and 208 are not included to
demonstrate the truth of the allegations contained therein, nor are they used to prove that Fox discriminated against
other employees.  It is therefore not relevant whether that case "was ultimately resolved on the merits."  See RSM
Prod. Corp. v. Fridman, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009); Low v. Robb, No. 11 Civ. 2321 (JPO), 2012
WL 173472, at *9 (S.D.N.Y. Jan. 20, 2012).  Instead, these allegations show that Fox has a history of referring

**VIII.   HENRY'S MOTION FOR SANCTIONS SHOULD BE DENIED**

Henry's motion for sanctions merely rehashes his arguments in support of his motion to strike.  Specifically, Henry claims that because Plaintiff included allegations about other women who were harassed by Henry and allegations concerning his counsel's conduct in another matter, despite knowing these allegations to be irrelevant, sanctions are warranted.  However, as explained above in connection with Henry's motion to strike, all of the allegations at issue are relevant to various claims asserted by Eckhart in this case.  The allegations concerning Jane Does are relevant both to Plaintiff's hostile work environment claim and her GMVA claim.  Henry himself argues that a GMVA claim requires a plaintiff to allege facts demonstrating an "animosity towards *women*."  Def. Br. at p. 33 (emphasis added).  It is therefore simply incredible for Henry to simultaneously argue that, not only are such allegations squarely addressing this issue irrelevant, but that they are somehow *sanctionable.*

Nor does the fact that a single Jane Doe disclaimed or modified three allegations change this analysis.  The allegations in the TAC are based on statements that Jane Doe 1 made to Eckhart.  There is nothing improper about Eckhart making allegations based on her conversations with Jane Doe 1.

Similarly, Fox has argued that it cannot be held liable for Henry's post-termination retaliation in publishing nude and semi-nude pictures purporting to be of Eckhart.  See Dkt. 118 at pp. 24-25.  Plaintiff was therefore required to include allegations setting forth the basis for Fox's liability.  Fox's prior relationship with Ms. Foti, and evidence strongly suggesting that they are cooperating in this case, is squarely relevant.

---

disgraced executives that it has ostensibly terminated to Ms. Foti for legal representation.  It is this relationship that forms the basis for Plaintiff's claims in the instant case that Fox should be liable for Henry's post-termination conduct and likely participated in the same.  See, e.g., Dkt. No. 128 at pp. 29-30.

Henry's frivolous motion for sanctions represents yet another effort by Defendants in this case to retaliate against Eckhart for raising her claims of harassment and/or retaliation by making her spend substantial time and resources in defending against baseless legal filings.  This Court should put an end to such misconduct and allow the parties to proceed to discovery, where Eckhart's claims can be adjudicated on the merits.

## IX.   HENRY'S MOTION FOR A MORE DEFINITE STATEMENT SHOULD BE DENIED

Finally, Henry seeks a more definite statement from Eckhart as to the dates on which Henry raped her and on which he sent her certain messages.  However, the TAC does provide a date for Henry's rape – specifically, February 2017, before Valentine's Day.  ¶¶ 64, 78.  That Eckhart does not have the exact date of the rape in no way impedes Henry's ability to defend against her allegations, nor is such exactitude mandated by Rule 8.  See Riccio v. Gent Unif. Rental Corp., No. 06 Civ. 0708 (SJF)(WDW), 2006 WL 3499219, at *2 (E.D.N.Y. Dec. 2, 2006) (denying motion for more definite statement where "by examining the complaint as a whole as well as additional material [p]laintiff provided, [d]efendant can discern dates and approximate dates of events and the bases of the discrimination claims").

Henry is likewise not entitled to a more definite statement about the dates of certain messages he sent to Eckhart at the pleading stage.  In almost every case, Plaintiff has quoted the text messages verbatim.  Given the fact that the messages were sent by Henry to Eckhart, he should have the messages himself and can easily determine the exact date, based on both the content of the messages and the approximate time frame identified in the TAC.  Henry's claim that he cannot defend against Eckhart's claims in this case because the specific dates are not identified in the TAC is therefore patently disingenuous.  In any event, he can seek further information regarding these messages in discovery.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Henry's

motion to dismiss Plaintiff's Third Amended Complaint in its entirety, motion for sanctions,

motion to strike and motion for a more definite statement, and for such other and further relief as

this Court deems just and proper.

Dated:  January 6, 2020        **WIGDOR LLP**
      New York, New York

By: _____
      Michael J. Willemin
      Renan F. Varghese

85 Fifth Avenue
New York, New York 10003
Tel: (212) 257-6800
Fax: (212) 257-6845
mwillemin@wigdorlaw.com
rvarghese@wigdorlaw.com

*Counsel for Plaintiff*