L7LKECKM

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   JENNIFER ECKHART, et al.,

4                Plaintiffs,

5          v.                              20 CV 5593 (RA)

6   FOX NEWS NETWORK, LLC, et al.,

7                Defendants.

8   ------------------------------x
                                          New York, N.Y.
9                                         July 21, 2021
                                          2:00 p.m.
10
    Before:
11
                        HON. RONNIE ABRAMS,
12
                                          District Judge
13
                            APPEARANCES
14
    WIGDOR LLP
15       Attorneys for Plaintiffs
    BY:  MICHAEL JOHN WILLEMIN
16       RENAN F. VARGHESE

17  PROSKAUER ROSE LLP
         Attorneys for Defendants Fox News Network, LLC, Tucker
18  Carlson, Howard Kurtz
    BY:  KATHLEEN M. McKENNA
19       YONATON GROSSMAN-BODER

20  MORVILLO ABRAMOWITZ GRAND IASON & ANELLO PC
         Attorneys for Defendants Ed Henry, Sean Hannity
21  BY:  CATHERINE FOTI
         DOUGLAS CHALKE

22

23

24

25

L7LKECKM

1           (Case called)

2           MR. WILLEMIN:  Good afternoon, your Honor.  Michael

3   Willemin, with Wigdor LLP, for the plaintiff, as well as, I

4   suppose, for Wigdor LLP.

5           THE COURT:  Good afternoon.

6           MR. VARGHESE:  Good afternoon, your Honor.  Renan

7   Varghese, from Wigdor LLP, for the plaintiff.

8           THE COURT:  Good afternoon.

9           MS. McKENNA:  Good afternoon, your Honor.  Kathleen

10  McKenna, Proskauer Rose, for Fox News Network, together with my

11  colleague...

12          MR. GROSSMAN-BODER:  Good afternoon.  Yonaton

13  Grossman-Boder, also from Proskauer Rose, for Defendant Fox

14  News.

15          THE COURT:  Good afternoon.

16          MS. FOTI:  Good afternoon, your Honor.  Catherine

17  Foti, from Morvillo Abramowitz Grand Iason & Anello, for the

18  defendant, Ed Henry, with my colleague...

19          MR. CHALKE:  Douglas Chalke.

20          THE COURT:  Good afternoon, everyone.

21          Why don't we jump right in.  Who would like to be

22  heard first on their motion to dismiss, Fox or Mr. Henry?

23          Mr. Henry, why don't we start with Fox, then.

24          MS. McKENNA:  May I stay seated?

25          THE COURT:  You may, you may.  I'm just going to ask

L7LKECKM

1    everyone to speak into the microphones.

2            MS. McKENNA:  Will do.

3            Your Honor, Fox News Network respectfully suggests

4    that Ms. Eckhart's claims, all of them, are subject to

5    dismissal as a matter of law.  I'd like to begin, if I might,

6    with the claim that purportedly gives her federal jurisdiction,

7    which is her sex trafficking claim.  As your Honor knows from

8    our briefing, we believe Ms. Eckhart cannot make out a claim,

9    either a direct claim of sex trafficking under the act, nor can

10   she make out a claim, a beneficial claim, for sex trafficking.

11           She cannot make out a direct claim of sex trafficking

12   because Fox News didn't commit sex trafficking.  It requires --

13           THE COURT:  Is plaintiff even making a direct claim

14   anymore, or is plaintiff only making a beneficiary claim at

15   this point?  I thought just beneficiary.  Is that right?

16           MR. WILLEMIN:  That's correct, your Honor.

17           MS. McKENNA:  I'll move on, your Honor.

18           THE COURT:  Thank you.

19           MS. McKENNA:  With respect to beneficiary claim, that

20   also fails because she has failed to note that there is any

21   knowledge on the part of Fox News that there would be the use

22   of fraud, force, or coercion into a commercial sex act.

23           What plaintiff alleges is that allegedly Fox News

24   should have known of some nefarious conduct on the part of

25   Mr. Henry, but that is not enough to show knowledge of engaging

1   in sex trafficking.  In her --

2               THE COURT:  Why should Fox not have known that

3   Mr. Henry was essentially exchanging empty promises for sex,

4   having sex with individuals with the promise that he could help

5   them in some way, even if it was just to get them in the room

6   with some important people?

7               MS. McKENNA:  Yes, a mere promise to extend a benefit

8   is not sufficient to state a claim under the sex trafficking

9   act.  There has to be a reason to believe that there was fraud,

10  that there was coercion, that there was some kind of seriously

11  illegal activity going on.  In fact, the cases, your Honor,

12  that find sex trafficking, including those that don't, are very

13  illustrative of this point because the cases are clear that

14  knowledge of sufficiently more egregious conduct than it is

15  alleged here were insufficient as a matter of law.  In fact,

16  even knowledge of prostitution has been found to be

17  insufficient to state a claim of beneficial sex trafficking.

18              In addition to the fact that the complaint does not

19  allege knowledge or any reason that Fox News should have known

20  that Mr. Henry had coerced or would coerce anyone into sex

21  trafficking.  In fact, Ms. Eckhart herself says she couldn't

22  have imagined the rape that she says happened in February of

23  2016.  And she admits that once she reported the rape, Fox

24  immediately investigated that claim, and Mr. Henry was

25  thereafter fired.  So not only has she not alleged that

L7LKECKM

Mr. Henry coerced anyone into a sex act, let alone a commercial

sex act, let alone that anyone at Fox ought to have been aware

of it, there's nothing about the allegations that she alleges

that shows that Fox News could have or should have known that

Mr. Henry would commit a sex trafficking offense.

THE COURT:  Let me just stop you there.  Suppose I

accept as true that plaintiff's allegation in paragraph 4 of

the complaint, that Fox News was on notice that Henry engaged

in sexual misconduct at work and that it was an open secret,

which is in quotes here, at Fox News that Henry was a serial

harasser, he used his power to prey on younger female

employees, why is that not enough to make it plausible that Fox

News should have known that he was engaging in this kind of

conduct, that he was engaging in, at the very least, again,

exchanging empty promises for sex?

MS. McKENNA:  So, if empty promises for sex were

sufficient, your Honor, every sexual harassment case, every

quid pro quo case, would constitute a violation of the sex

trafficking act.  That is not what the cases hold.

Additionally, I would note — and we'll get to this,

I'm sure, when we talk about whether substantively her claims

of harassment are sufficient for purposes of Title 7 and state

law — in point of fact, she does not allege behavior that would

have put Fox News on notice that he was engaging in sex

trafficking, which she generically says is that he was engaged

L7LKECKM

1    in sexual misconduct.  That's not sufficient to say he engaged

2    in workplace sexual misconduct.  She says he had an affair with

3    a Las Vegas stripper.  That was nonwork behavior, whatever one

4    thinks of it.  And we know the complaint alleges that there

5    were women in the company who complained that that affair was

6    distressing to them — crushing, I think, was the word.  It is

7    not sufficient for sexual harassment, and it is certainly not

8    sufficient to put Fox on notice that Mr. Henry would commit a

9    sex trafficking offense.

10           THE COURT:  So, with respect to the definition of

11   commercial sex act, under the statute, it's defined as any sex

12   act on account of which anything of value is given to or

13   received by any person.

14           So, why is promising to get someone in a place with

15   important people that could help with that person's career not

16   something of value?

17           MS. McKENNA:  It is not a thing of value.  For

18   purposes of sex trafficking, it has to be a significant thing

19   of value, but, in any event, he has to have used inappropriate

20   means to get it.  A mere promise is not sufficient to

21   constitute coercion, your Honor.

22           THE COURT:  How is this different from the Weinstein

23   cases in that respect?

24           MS. McKENNA:  So, the Weinstein cases, it's different

25   in two respects, your Honor.  In the Weinstein cases, his

L7LKECKM

1    tremendous influence in the industry — and I'm quoting here

2    from the *Noble* case, Weinstein case — was not enough to

3    establish coercion for purposes of sexual behavior.  And I will

4    also note that with respect to holding a third party

5    responsible, the case involving his brother, the court

6    concluded, and we have not yet talked about this, your Honor,

7    but Fox News did not benefit from the alleged sex acts here.

8    And when there was no benefit to the alleged sex act, it does

9    not establish sex trafficking.

10             THE COURT:  Do you have to benefit from the sex act,

11   or can you benefit with the venture, with the person?  So,

12   looking at 18 --

13             MS. McKENNA:  1595(a), your Honor?

14             THE COURT:  Right.

15             So, an individual who is a victim of a violation of

16   this chapter may bring a civil action against the perpetrator,

17   or whoever knowingly benefits financially or by receiving

18   anything of value from participation in a venture which that

19   person knew, or should have known, has engaged in an act in

20   violation of this chapter.

21             So why is it insufficient just to benefit from the

22   venture?

23             MS. McKENNA:  Yes.  So, your Honor, both cases, both

24   the *Geiss* and *Canosa* case that we cite to, make it clear that,

25   here, the knowledge has to be knowing that you're benefiting

L7LKECKM

1   from sex trafficking, you need to know that the benefits flow

2   from the sex trafficking.  That's what *Geiss* holds, that's what

3   *Canosa* holds, that the allegation that there are benefits that

4   The Weinstein Company affirmatively -- they knew about, they

5   enabled, and concealed his actions was sufficient to create a

6   benefit from the sex trafficking.

7           In the *Geiss* case, the benefits alleged were

8   insufficient because there, the company benefited despite his

9   activities.  So, it is clear that the company, in order to be

10  responsible, held responsible, needs to know that they were

11  benefiting from the sex trafficking.  And in the Weinstein

12  case, the one in which liability was found, there were factual

13  findings that, in fact, they knew that he was engaging in this

14  sexual behavior and that was keeping him happy and productive.

15  We don't have those kind of allegations here at all, your

16  Honor.  What we have is allegations that assertedly we knew

17  about sexual misconduct.

18          THE COURT:  Is the Paul Weiss report public?

19          MS. McKENNA:  No, your Honor.

20          THE COURT:  All right.

21          You may proceed.  Thank you.

22          MS. McKENNA:  Your Honor, turning, then, to the sexual

23  harassment claims, which are the second, fourth, and seventh

24  cause of action, seriatim, Title 7 New York State, New York

25  City Human Rights Law, all of those harassment claims alleged

L7LKECKM

by Ms. Eckhart are time-barred.  The last sexual encounter she

alleges occurred in February of 2017.  This is the alleged rape

in the hotel room followed by an exchange of text messages on

Valentine's Day.  It is not until July 2020 that she filed her

complaint.  Thus, her complaint was filed beyond the 300 days

permitted under Title 7 and beyond the three years set forth

both in the New York State and the New York City human rights

acts.

THE COURT:  Why can I not consider the 2018 messages

to constitute a continuing violation, in particular the

October 5th, 2018 one, where he says, "Why did you turn away

today?"  These are people working, as I understand it, in

different cities, they don't see each other that often, the

alleged harassment occurred over a number of different years,

with long time spans in between.  Why could that not be

considered part of the conduct overall?

MS. McKENNA:  Right.  These allegations are

insufficient, your Honor, to state a continuing violation

allegation.  Plaintiff, obviously recognizing that her claims

are time-barred, is looking to find something to hook them

together to the prior conduct.

Those communications are entirely nonsexual

allegations, and, therefore, they're not related conduct to the

rape and the sexual encounters that she alleges occurred.

THE COURT:  Well, why is that comment, "Why did you

L7LKECKM

1    turn away today," if people are engaged in -- if there had been

2    harassment, and it had been ongoing over a period of time,

3    even, again, if sporadic, because they didn't see each other

4    that often, why is a line like "Why did you turn away today"

5    not part of that conduct, part of that harassment?

6          MS. McKENNA:  Well, for the second reason, but I

7    think -- I want to go back to the statement itself, but it is

8    far too remote in time to resurrect that prior allegation, that

9    time-barred allegation, the rape in 2017.  A gap of here more

10   than 20 months is far too remote in time to be part of a

11   continuing violation, stretching back to conduct that was in

12   2014 through 2017, your Honor.

13         And on its face, people who have a relationship,

14   saying "Why did you turn away" does not resurrect.  It's

15   neither related to, nor too remote in time, to resurrect a

16   claim of sexual misconduct.

17         THE COURT:  But this is in the context of a

18   relationship where there are texts saying, you know, are you

19   playing hard to get and things to that effect.  I think it's

20   the *Morgan* case that said something to the effect that no

21   stretch of time is categorically too remote.

22         MS. McKENNA:  Well, I think you're thinking of the

23   *McGullam* case, your Honor, and in that case, it said, although

24   the incident-free interview doesn't preclude relatedness, it

25   renders less plausible the notion — in that case, there was a

L7LKECKM

sleepover comment — is of a piece with the production

department conduct, which was obviously sexual behavior.  And

so for exactly that reason, we cite *McGullam* for that reason,

that this totally nonsexual greeting kind of comment, even if

it's a greeting from someone you don't want, is not sufficient

to resurrect a sexual harassment claim.

I think it is more analogous to the Second Circuit's

decision in *Purcell*, where the incidents are not part of the

same practice when they are separated in such a long period of

time, as they are here.  And they are not related because

they're not of a similar nature.  This is hello, this isn't

sexual behavior.

And the frequency and the temporal proximity are such,

that it doesn't seek to go back under the law and resurrect

claims that are already stale and done.  Those are single

incidents, they're clearly time-barred, she knows it, and she

points to three completely nonsexual comments.  That, as a

matter of law, is insufficient to resurrect stale claims.

Your Honor, even if there was a continuing violation,

which there is not, as a matter of law, the claims are

insufficient.

So, first, I'd like to turn to plaintiff's claim that

she has a cognizable federal claim under Title 7.  She does

not, as she failed to exhaust the requirements under Title 7.

We know plaintiffs have to file a charge with the EEOC, and the

L7LKECKM

1    EEOC has to investigate and dismiss the charge or 180 days have

2    to elapse.

3         Ms. Eckhart filed her EEOC charge in either July or

4    August of 2020, 180 days would not elapse until January or

5    February of 2021, and it is not disputed that there was no

6    investigation and no dismissal as of the time she filed her

7    suit.  Because she did not exhaust her pre-filing requirements,

8    she cannot pursue a Title 7 claim.  So found the Court, as your

9    Honor knows, in the *Gibb v. Tapestry* case.  There are

10   additional cases cited in the brief — the *Hardy v. Lewis* case

11   and the *Henschke v. New York Hospital-Cornell Medical Center*

12   case.

13        If your Honor has no questions about the EEOC claim, I

14   will move forward to whether or not any of her claims, Title 7

15   or the state or city claims, can be imputed to Fox News.

16        As your Honor knows, there are only two ways you can

17   make Fox News responsible for Mr. Henry's behavior.  One is to

18   be able to show that he was a supervisor or manager, and,

19   failing that, because they were coworkers, she needs to be able

20   to show that Fox News knew, or should have known, of

21   discriminatory or harassing behavior.

22        She does not, and cannot, allege that Mr. Henry was a

23   manager or supervisor, not that he managed or supervised her or

24   anyone else at Fox News.  In fact, the complaint alleges that

25   Ms. Eckhart's supervisor was another individual, Brad Hirst.

L7LKECKM

1    He was her manager pursuant to paragraph 29 of the complaint.
2    She admits she never worked with Mr. Henry.  As your Honor
3    noted before, they worked in different cities.  In fact, they
4    worked in different networks.  Their first contact with each
5    other was through a private Twitter message, not through Fox
6    News, and she says he invited her on air.  Even nonemployees,
7    in fact, most frequently nonemployees are invited on the air.
8    So he was not her supervisor and manager.

9         Nor is there a sufficient allegation that Fox News
10   knew, or should have known, of Mr. Henry's misconduct.  In
11   fact, it is clear that Fox News did not know of Mr. Henry's
12   misconduct until she reported it three years after it was
13   alleged.  The complaint nowhere alleges that Fox News knew of
14   Mr. Henry's misconduct towards her.  The last act of
15   misconduct, as we have established, was in February of 2017.
16   She did not report that misconduct until 13 days after she was
17   fired, and when she reported it, Fox News investigated it, and
18   Mr. Henry was terminated.

19        THE COURT:  What am I to make of the allegation that
20   in her exit interview, she was asked if she had been sexually
21   harassed or assaulted at Fox News?

22        MS. McKENNA:  That is Ms. Areu's last-ditch effort to
23   attempt to construe that --

24        THE COURT:  Ms. Eckhart.

25        MS. McKENNA:  I'm sorry.  Thank you, your Honor.

L7LKECKM

1          That Ms. Eckhart is trying to construe to a last-ditch

2     effort that we knew, or should have known -- it is not an

3     admission of knowledge.  For purposes of *Iqbal* and *Twombly*, it

4     has to be a reasonable conclusion.  In this day and age, it is

5     common, and certainly not an indication of knowledge of sexual

6     harassment, let alone sexual harassment, by Mr. Henry, to ask,

7     in an exit interview, whether you have ever been a victim of

8     sexual harassment.  In fact, to find that way would really

9     disincentivize employers from doing that, let alone an employer

10    like Fox News, who obviously was trying, as they did by

11    investigating Ms. Eckhart's allegations about Mr. Henry, to

12    take these matters seriously.  So the fact that after she's

13    been terminated, after she has complained that we ask people

14    whether or not they've been the victim of sexual harassment,

15    it's a pretty common exit interview question, your Honor.  I

16    don't think it shows any reason to believe that Mr. Henry, who

17    she didn't even work with, who was in a different city, that we

18    would have knowledge, or should have knowledge, of misbehavior

19    by Mr. Henry.

20          With respect to knew or should have known, I would

21    also note that there is no allegation of Fox being on notice of

22    any workplace misconduct, sexual misconduct, by Mr. Henry, as I

23    noted before, your Honor.

24          If you have no questions about that, I will move to

25    the retaliation claim, your Honor, which is her third, fifth,

L7LKECKM

1    and eighth cause of action, again, respectively under federal,

2    state, and city law.

3            It's axiomatic, your Honor, that if there is a failure

4    to allege protected activity, one doesn't get to assert a

5    retaliation claim.  And as the complaint is clear, Ms. Eckhart

6    did not engage in any protected activity prior to her

7    termination, which is fatal to her claim.

8            At best, she engaged -- not at best, she did engage in

9    protected activity 13 days after she was fired, when she told

10   us of Mr. Henry's alleged rape, and it was investigated, and

11   Mr. Henry was terminated.  She did not complain of any behavior

12   that was sexual in nature until after her termination.  And she

13   concedes as much, and, therefore, she has focused her attention

14   into behavior that was engaged in after her termination.

15           The only other exception, your Honor, is she does

16   allege earlier, in February of 2020, that she had complained to

17   her manager, Mr. Hirst, and Ms. Collins, the Senior Vice

18   President of Human Resources, that she was experiencing a toxic

19   work environment at Fox News.  She concedes, in her briefing,

20   that she did not mention sexual harassment or sexual misconduct

21   in that conversation.  She now claims that Fox News should have

22   reasonably understood that what she was complaining about was

23   sexual harassment.

24           First, as a matter of law, it's not what we should

25   have understood — we don't have to read her mind.  The cases

L7LKECKM

say we look at exactly what the plaintiff has said, not what

she imagines that we think she said.  But, more importantly,

for purposes of *Twombly* and *Iqbal*, it is clear from the context

of plaintiff's complaint, that what she was complaining about

that was allegedly toxic was the abuses from her female boss,

and on a motion to dismiss, inferences have to be based on the

facts that are alleged and have to be reasonable.  What she

alleges is that she was complaining about Ms. Claman, that she

alleges that she was belittled and mistreated by Ms. Claman,

that Mr. Hirst himself acknowledged and recognized that.  Given

the allegations in the complaint, it's unclear how it could

have been referring to anything other than the environment

created by Ms. Claman, let alone a complaint about Mr. Henry,

with whom she did not work, in a different city, in a different

network.

         And so, for those reasons, that, and the notice in her

exit interview, are insufficient to demonstrate that she

engaged in protected activity prior to her termination.

         She also, to try and cure that deficiency, makes

allegations about alleged protected activity after her

termination.  First, she says an argument that is really

inexplicable, that somehow firing Mr. Henry, without giving her

prior notice that we were going to fire him, is retaliation.

How, after someone has been terminated, that they learn that

their harasser has been terminated, would discourage someone

L7LKECKM

1    from engaging in protected activity is a mystery, your Honor.

2    There's no rationale for this argument, and she doesn't even

3    claim that anything about the announcement of Mr. Henry's

4    termination somehow was mentioned to her or was discouraging to

5    her.

6        She next says that the fact that Fox has filed a

7    Rule 11 motion constitutes retaliation.

8        First of all, she -- as we note in our papers, your

9    Honor, she cites no case to support this point, and I think the

10   case law that is there demonstrates that that cannot be a

11   cognizable claim.  The threat of a sanctions motion couldn't

12   reasonably deter a person from filing a suit.  In any event,

13   she had already filed here and amended.  And the Rule 11 motion

14   is expressly authorized by the Federal Rules, and we have to

15   read federal legislation in harmony.

16       Lastly, she says that Mr. Henry's motion to dismiss,

17   which included intimate photographs, is somehow retaliation by

18   Fox News.  She does not allege any facts to substantiate her

19   false allegation that somehow Fox News had something to do with

20   Mr. Henry's motion.  She identifies no case holding that an

21   improper responsive pleading could constitute unlawful

22   retaliation, and she doesn't allege that Fox News did or said

23   anything to endorse Mr. Henry's filing.  And last, but not

24   least, your Honor, that Rule 11 filing is not as to

25   Ms. Eckhart; that motion was filed when the cases were joined,

L7LKECKM

1    and days later, as your Honor knows, you severed those cases.

2    Those cases seek sanctions against Ms. Areu, against the Wigdor

3    firm as counsel for Ms. Areu, and against her current counsel,

4    but they have nothing to do with Ms. Eckhart and, therefore,

5    cannot be the basis of filing a retaliation claim.

6           Last, but not least, I feel an obligation to defend my

7    honor here a little bit, your Honor.  Ms. Eckhart is wrong, as

8    a matter of law, to say that her retaliation claim is supported

9    by Fox News' choice of hiring current counsel.

10          THE COURT:  I'll tell you, I find that argument

11   offensive.

12          MS. McKENNA:  Thank you, your Honor.

13          Last, but not least, the remaining claim as to Fox

14   News involves the eleventh cause of action, which alleges that

15   Fox can be responsible for the dissemination or publication of

16   intimate images.  Fox News had nothing to do with the filing of

17   the images in Mr. Henry's motion to dismiss, nor does

18   Ms. Eckhart allege any facts that plausibly suggest otherwise.

19          The claim also fails as a matter of law.  The New York

20   State statute provides a cause of action only against an

21   individual who disseminated or published the photograph.  She

22   doesn't allege that Fox News disseminated or published

23   anything.  It's obvious that Mr. Henry did.  So if there is to

24   be any liability, it runs solely to Mr. Henry.

25          In any event, we don't believe that the New York law

L7LKECKM

1      here applies to the filing here in federal court because the

2      statute, on its face, says that it doesn't apply to legal

3      proceedings.  Filings made in legal proceedings and the images

4      here were obviously related to the claims and defenses in the

5      lawsuit, and, therefore, the statute doesn't apply to filings

6      made in a legal proceeding.

7              That disposes of all the causes of action that are

8      alleged against Fox News.  I'm happy to answer any other

9      questions your Honor might have.

10             THE COURT:  Thank you.

11             Ms. Foti, why don't I hear from you with respect to

12     Mr. Henry.

13             MS. FOTI:  Yes, of course, your Honor.

14             So just an initial statement:  About the paragraph 4,

15     in which you -- it references that is a well-known secret

16     somehow at Fox that Mr. Henry's a serial harasser, that's just

17     a blatant conclusory statement without any supporting facts.

18     There's nothing that supports the fact that there was any

19     serial harassment that Mr. Henry engaged in at Fox News.  The

20     only thing that's being alleged here, which we can actually

21     concede, is that he had a relationship with this woman,

22     Ms. Eckhart.  There is nothing else that would support that

23     statement, and, indeed --

24             THE COURT:  There are a lot of other statements in the

25     complaint about other people saying, you know, watch out for

L7LKECKM

1   him -- I don't want to misquote anything, so I'll turn to that

2   section of the complaint, but there's paragraph --

3            MS. FOTI:  Your Honor --

4            THE COURT:  -- 114, 115, 116 --

5            MS. FOTI:  But, your Honor, I'm talking about

6   harassment.  We're talking specifically about sexual harassment

7   in the workplace.  Almost all of those statements have to do

8   with people who are people that, if, in fact, they're even

9   true, Mr. Henry approached outside the workplace have nothing

10  to do with his workplace.

11           THE COURT:  What does it mean to watch out for

12  someone?  I hear your point about workplace versus not, and I

13  will look more closely at those.

14           MS. FOTI:  I don't know what it means to watch out for

15  someone, but the fact of the matter is, if, in fact, Mr. Henry

16  chooses to make an approach to someone, to try to date someone,

17  have some relationship with someone, it does not support sexual

18  harassment in claims in this case, and he being a serial sexual

19  harasser at Fox, it does not support those allegations.

20           So, the allegation is --

21           THE COURT:  Sorry, I don't mean to cut you off, but

22  what it says in paragraph 111 -- I understand that the Paul

23  Weiss report is not public, but in paragraph 111, it says,

24  "Indeed, starting mid-2016, Fox News, through the law firm of

25  Paul Weiss," et cetera, "conducted a series of companywide

L7LKECKM

1   investigations into issues of sexual harassment.  During the

2   investigations, multiple women came forward to complain that

3   Mr. Henry had engaged in sexually inappropriate conduct towards

4   them," and then it goes on from there.

5          MS. FOTI:  And Fox News has denied any knowledge of

6   any type of allegations that Mr. Henry engaged in any type of

7   harassment prior to this.

8          I don't know what's in the Paul Weiss report — it's

9   obviously confidential — but they've denied knowledge of that.

10  So a blatant allegation that is not supported by facts, I don't

11  think it's something that this Court can rely on.

12         But turning now to the sex trafficking statute:  I

13  think what's very significant that we're missing in the

14  analysis is the concept of the enticement.  First of all, there

15  was no basis under any of the elements, and I would like to go

16  through all of them, but specifically in connection with

17  enticement, the allegation that you've referenced a number of

18  times, that he'd get her in a room with important people,

19  happened after the first sexual encounter, the consensual

20  sexual encounter.  They agreed that Ms. Eckhart and Mr. Henry

21  engaged in a consensual sexual encounter to begin with, and

22  that statement happened at the end.  It may even have been

23  right then after they finished the sexual encounter, that that

24  statement was made.

25         THE COURT:  Well, what about paragraph 65, where I

L7LKECKM

1    think it's -- you'll correct me if I am wrong, but I think this

2    is before the alleged rape, where Mr. Henry asks Ms. Eckhart

3    over drinks if she had an agent, offered to introduce her to

4    his agent, and told her he would bring Ms. Eckhart on his

5    future new show at Fox News as a frequent on-air guest?

6         MS. FOTI:  That is after they started their

7    relationship.  I think the Court is treading in very dangerous

8    waters to say that once someone is involved in a sexual

9    relationship with someone else, and someone offers them

10   something to help them or offers them advice, that somehow that

11   turns that relationship into sex trafficking if, in fact, that

12   advice could arguably be something of value.  I think that's

13   where we would be going with that type of argument.  This

14   relationship had started.  There was no attempt prior to the

15   start of the relationship to offer Ms. Eckhart anything of

16   value.  There was nothing given to entice her to engage in a

17   sexual encounter with her.  They had sex, they had a

18   relationship, the relationship continued.

19        I don't think you can take it apart piece by piece and

20   analyze it and say, all of a sudden, we have -- which is at

21   first an encounter that is completely consensual, all of a

22   sudden, somehow it turns into sex trafficking because in

23   connection with their relationship, they start talking about

24   supporting each other in some way.  I think that is a really

25   dangerous road.

L7LKECKM

1        I will deal directly with those comments, though, your

2   Honor.  To the extent the Court disagrees with us, those

3   comments themselves do not support enticement.  Specifically, I

4   think if you look at the *Noble* case --

5        THE COURT:  Just to go back, does she allege that any

6   of the interactions were consensual?  Does she acknowledge that

7   the first two or either of them were consensual?

8        MS. FOTI:  In her first complaint, she acknowledged

9   that the first interaction was consensual.  She then now has

10  changed the allegation slightly to suggest that she felt

11  somewhat coerced to engage in that first interaction, but she

12  has a judicial admission in the first complaint that that was a

13  consensual --

14       THE COURT:  Do you know what paragraph that is

15  offhand?

16       MS. FOTI:  I don't know if I have the --

17       THE COURT:  No worries.  Why don't you proceed.  Thank

18  you.

19       MS. FOTI:  Going back to paragraph 65, to the extent

20  you want to parse the sexual interactions, the paragraph 65

21  specifically says, according to Ms. Eckhart, that Mr. Henry

22  said he was going to be rewarded with his very own show, and

23  that, at some point, he possibly would get her to appear on

24  this new show.  First of all, I think the fact that the

25  allegation is vague, not specific, there was no certainty that

L7LKECKM

1    he would actually ever actually get a show, there's no

2    certainty that he could ever actually get her on his show.

3    Certainly at this point in time in their relationship, they

4    work at different places, he's not a supervisor, he doesn't

5    have the show.  He actually never gets such a show.

6            Ms. Eckhart, of all people, would know the likelihood

7    that someone actually might get a show at Fox somewhere down

8    the road, and that, at some point, she might be able to get on

9    such a show.

10           THE COURT:  But maybe he's defrauding her about it,

11   right?

12           MS. FOTI:  I'm sorry?

13           THE COURT:  Maybe he's defrauding her, maybe he's

14   lying, maybe he's bluffing, maybe he's puffing.  I mean --

15           MS. FOTI:  Your Honor, maybe he's puffing, but that is

16   not sufficient under the sex trafficking statute.

17           Statements made incidental to sex, and made for

18   reasons other than to bring about the act, are not enough.  So,

19   there has to be something specific, something material, that is

20   offered to them.  That's why in the Weinstein cases, there are

21   very specific allegations about the fact that Harvey Weinstein

22   meets with these women a number of times before he actually

23   gets them into the hotel room, and in most of the occasions

24   under those cases, the *Noble* case and in the *David* case, he

25   meets with them, promises them some sort of position in film,

L7LKECKM

1    some sort of acting role, promises to introduce them to a

2    producer.  Actually, in the *David* case that you decided, your

3    Honor, told the plaintiff in that case that, in fact, suggested

4    she had the film role, and did that over and over and over

5    again with multiple women.  There was no allegation of that

6    type of material, promise, or alleged fraud that Mr. Henry has

7    committed in this case.

8         THE COURT:  He's allegedly telling her in paragraph

9    65, which I believe is the same day as the alleged rape, that

10   he's going to bring her on this new show as a frequent on-air

11   guest.  Why is that not something of value to her?

12        MS. FOTI:  Because, your Honor, the fact of the matter

13   is, it has to be material.  This is a promise for something in

14   the future.  There's no likelihood that this is actually going

15   to occur.  And, again, they've already started a relationship,

16   so it's a completely different context than what we're talking

17   about in terms of enticement.  There's no actual need to

18   actually entice her.  He's already in a relationship with her.

19        And, again, as I said, the likelihood of Ms. Eckhart

20   actually believing that this is the case is less likely than

21   almost any of the other examples in the cases dealing with

22   Weinstein because Ms. Eckhart knows that the likelihood of this

23   happening is very, very low.  And she knows that she is not a

24   political consultant.  He's a political anchor.  That's what he

25   talks about.  She doesn't talk about politics.  That's not what

L7LKECKM

1    she does.  Why would she actually believe that she, in fact,

2    would be on a political show?

3         THE COURT:  Why is it not plausible, just to one of

4    your points a moment ago, that if you've had two sexual

5    encounters with someone, you're essentially saying it's no

6    longer plausible that you could entice them to have sex for

7    something of value?  Right?  Is that your point?

8         MS. FOTI:  Now you're saying that the sex trafficking

9    act would apply to one sexual encounter, where there is no

10   pattern.  There has to be a pattern.  So if I move on to the

11   other requirements, even to the extent you say that that's

12   enough to say enticement, there has to be, first of all,

13   knowing force -- knowing that a force would be used or fraud.

14   I don't agree there are any allegations of fraud.  I think the

15   promise here --

16        THE COURT:  Well, is it fraud if it's a lie?  If he's

17   lying about his new show and bringing her on the air, why is

18   that not fraud?

19        MS. FOTI:  I'm not saying he's lying about that.  I'm

20   saying that it is something in the future that is not -- it's

21   not like I have a new show in hand, and I'm going to put you on

22   this show.  It's like he says we're -- he's in discussions,

23   that Fox might be giving him his own very show.  It never

24   actually happens.  That's what I'm saying.  I'm not saying that

25   he's lying about anything.

L7LKECKM

1          And that is taking these facts, obviously, as true,

2     which we don't agree with.

3          THE COURT:  Where are you getting -- you said that

4     there needs to be a pattern.  What are you relying on for that

5     requirement that there be a pattern?

6          MS. FOTI:  For the knowledge requirement, your Honor.

7     So, in terms of the sex trafficking act, the cases that have

8     developed have said there has to be a knowing use of force or

9     fraud, an expectation that this is going to happen.  And that

10    has been demonstrated through modus operandi in all these

11    cases, and that's the pattern I'm talking about, that the cases

12    have looked at and seen men engaging or -- I'm sorry,

13    perpetrators engaging in this type of conduct previously, over

14    and over, and that MO is what establishes the knowledge

15    element, of the knowledge of force or fraud would be, in fact,

16    used.  There was no allegation in this complaint that that

17    occurred.  There's no pattern alleged in connection with

18    Mr. Henry.

19          Again, the fact that they put in all these various

20    women — they've gone out, they've scoured the country,

21    apparently, to find people that he might have asked out on a

22    date — and suggest that somehow that establishes a pattern for

23    sex trafficking, first of all, it does not, and the conduct

24    that they're alleging does not have to do with force or fraud.

25    The conduct they're alleging is he happened to talk to a woman,

L7LKECKM

1    he sent her some sexually explicit texts at some point, maybe

2    suggested to try to have a relationship with her, and she said

3    no, that was done.  That was Brooke Hammerling.  Then they

4    suggested another woman, Roxie Marroquin, that he had a bubble

5    bath with her.  No suggestion of force in that at all.  And he

6    ends up having an encounter with somebody where he has a bubble

7    bath with her and doesn't even have a suggestion of sex in

8    that, and that somehow establishes a pattern?  It doesn't

9    establish a pattern in any way.  It's completely different from

10   the previous encounter with Ms. Amerlin.  It's completely

11   different from the encounters they're talking about having to

12   do with Ms. Eckhart.

13          Then they talk about these various Jane Does.  What's

14   particularly egregious, your Honor, and we'll get to it as well

15   in the context of our motion for sanctions and to strike, is

16   the fact that they include an allegation by a Jane Doe 1 that

17   the Jane Joe 1 says is not truthful.  They've included it in

18   there about a relationship they've said which was not

19   consensual.  Jane Doe said absolutely not, that is not what I

20   said.  They talk about something having to do with a physical

21   slap across the face.  Jane Doe 1 apparently told Ms. Eckhart

22   that anything that happened between her and Mr. Henry was

23   completely consensual.  Notwithstanding the fact that it

24   included that in the complaint, we've suggested that that needs

25   to come out of the complaint because she has clearly disavowed

L7LKECKM

1    it.  They've left it in the complaint, but that cannot

2    establish a pattern, it's been disavowed, and it says -- and

3    the person who's being described in that allegation has said

4    she was engaged in some sort of consensual relationship with

5    Mr. Henry.  That can't be the basis of a sex trafficking

6    allegation.

7            The other elements, your Honor, in particular, would

8    have to be the commercial nature of the sex act.  Again,

9    something of value.  And I think we've already touched on the

10   fact that we don't agree that the promises of some sort of

11   future potential connection with either people in the room who

12   could help her, speaking to an agent, that that, in fact, is

13   anything of value.  What we're relying on in those situations

14   are other people who would have to actually do something for

15   her, not Mr. Henry saying I'm going to give you a film role, as

16   Mr. Weinstein did, I'm going to use my company to make you a

17   star, none of that.  It's like I might introduce you to this

18   person I know who then might be able to help you.  So, again,

19   not material under the sex trafficking statute.

20           Unless you have any other questions on that, I'll move

21   on.

22           THE COURT:  No, thank you.

23           MS. FOTI:  Thank you.

24           Just to touch again, and Ms. McKenna obviously did a

25   very capable job on the statute of limitations, but I would

L7LKECKM

just like to comment again on the issue about the continuing

violation also is problematic.  The Second Circuit has very

clearly said that the "Continuing violation doctrine is heavily

disfavored, and courts have been loathe" -- I was reading a

quote:  "Continuing violation doctrine is heavily disfavored,"

it goes on "in the Second Circuit, and courts have been loathe

to apply it absent a showing of compelling circumstances."

So, your Honor, the fact of the matter is, the three

incidents they talk about certainly should not be considered to

be -- to extend the statute of limitations, because if you

extend the statute of limitations on those types of incidents,

it basically guts any statute of limitations.  What happens if

you have a harassment case, the people continue to work

together?  It's done, it's over, the harassment is complete.

These people continue to work together, they pass each other in

the hall because they actually work in the same office, someone

greets -- someone greets the person he or she allegedly

harassed, does that make a continuing violation because the

person who was the alleged victim is then uncomfortable?  That

can't be the case.  There has to be something more compelling.

And the "yo," basically saying hello, "why did you turn away,"

is just a greeting, and it's clearly distinct in kind from the

allegations of the harassment, and the time period that has

elapsed is far too extended to allow it to be a continuing

violation.

L7LKECKM

1    As for the substantive claims in connection with the

2    New York State and City Human Rights Laws, as your Honor knows,

3    Ms. McKenna has made some --

4    THE COURT:  I'm sorry, I didn't hear the last part.

5    MS. FOTI:  -- Ms. McKenna has made very good arguments

6    on this.  I would just like to also add the fact that, again,

7    Mr. Henry cannot be personally liable as a person in his

8    position who he did not supervise.  He did not supervise

9    Ms. Eckhart.  So, under those statutes, he wouldn't have direct

10   liability.

11   And as to the aiding and abetting statute, I think

12   we've, at length, discussed in our briefs the fact that he

13   can't aid and abet his own liability.  So to the extent there

14   is no liability for Fox under these allegations — and I think

15   there should not be liability for Fox under these allegations —

16   he can't aid and abet the allegations that he engaged in some

17   sort of harassment because those are about his own conduct.

18   THE COURT:  Do you want to turn to the GMVA?

19   MS. FOTI:  Yes.

20   THE COURT:  One question I did have is whether you

21   agree that the elements other than gender animus have been met.

22   I know you're contesting gender animus, and we can talk about

23   that or not, but are you conceding that the other elements have

24   been met?  Are you not?  It's basically that the alleged act

25   constitutes a misdemeanor or felony against the plaintiff; (2)

L7LKECKM

1    presenting a serious risk of physical injury; (3) that was

2    perpetrated because of plaintiff's gender; (4) in part because

3    of animus against plaintiff's gender; and (5) resulted in

4    injury.  Are you contesting 3 and 4 relating to gender, but

5    conceding the others?

6         MS. FOTI:  We're not conceding that there was any type

7    of criminal conduct here.

8         THE COURT:  No, but based on the allegations, assuming

9    the allegations are true.  I understand that factually you're,

10   of course, denying the allegations, but --

11        MS. FOTI:  Based on -- yes, if you take the

12   allegations as true, we are contesting, really, only that the

13   animus based on gender, that is not supported by the

14   allegations in the complaint.  Again, the Southern District

15   has, I think, ruled on this before and determined that there

16   has to actually be some allegation of gender animus.  Without

17   that, then all you have is an assault.

18        THE COURT:  You don't think comments like, and I'm

19   quoting now, "Gentle little whore, you're going to get tossed

20   around like a little rag doll," or all of the other comments

21   using the word whore and others have a gender-based component

22   to them?

23        MS. FOTI:  No, I don't think they do, your Honor.

24   It's common -- unfortunately, it's common words in everyday

25   speech.  It could be consistent with the nature of the

L7LKECKM

1   relationship they were having, a consensual relationship, and

2   the fact that those words were used does not suggest that the

3   conduct was based on gender animus.  You have similar words,

4   unfortunately, that could be used against an individual who

5   was -- if you raped a man rather than a woman allegedly, and

6   you used those allegations -- I mean those statements.

7          THE COURT:  All right.  You may proceed.  Thank you.

8          MS. FOTI:  Your Honor, we have two other motions that

9   I just want to talk about briefly -- I'm sorry, let me just

10  turn -- I didn't address the issue about civil rights law and

11  the allegations that somehow we violated the civil rights law

12  by appending the pictures to our motion to dismiss.  Again,

13  Ms. McKenna has gone through sort of the requirements of that,

14  but, certainly, there is an exception that allows those

15  pictures to be put into legal proceedings.  We filed it in

16  connection with the legal proceeding.  And specifically, in

17  addressing a question you had yesterday, I think we are

18  completely within our right to append those pictures because

19  they were referenced in the complaint.

20         THE COURT:  Why didn't you just refer to those

21  pictures and describe them as opposed to attaching them, given

22  their nature?

23         MS. FOTI:  Given their nature?  Well, we redacted the

24  more intimate pieces of those pictures.  Why did we not just

25  refer to them?  Because we are defending a man whose life has

L7LKECKM

1    been ruined.  This man's career has been ruined.  His position

2    is that this was a consensual relationship.  The pictures

3    demonstrate that this is a consensual relationship.  We were

4    entitled to attach them to the complaint because the plaintiff

5    referred to them.  She specifically relied on them in drafting

6    the complaint and making the allegations.  She alleged he

7    engaged in blackmail.  None of that is true.  And because she

8    was referring to them, and she relied on them, we were entitled

9    to defend our client as aggressively as we could within the

10   bounds of the law and put the pictures into a motion to dismiss

11   so that it was clear that these were consensual and they were

12   provided to our client consensually.  They do not have the same

13   impact, your Honor, even on you by just describing them.  Once

14   you see them, you know that this was a relationship that

15   Mr. Henry and Ms. Eckhart had that was consensual once you see

16   those pictures.  I don't think you'd have the same

17   understanding if I just described them.  I was doing what I was

18   required to do to defend my client, and we were entitled to do

19   so under the law.

20           Similarly, with the text messages, I have the case law

21   that you requested, if you'd like me to refer to it, yesterday,

22   when we talked about -- in the Areu matter about whether or not

23   text messages, you could incorporate the portions that were

24   left out.

25           THE COURT:  Right.

L7LKECKM

| 1 | MS. FOTI:  I have a number of cases on that.  One is

2 *Lopez-Serrano v. Rockmore*.  They're cited in our papers.

3 THE COURT:  Okay.  If they're cited in your papers,

4 feel free to just write an email with the cites -- a letter,

5 rather, and just file it on the docket with the cites, but

6 we'll look back on your papers as well.

7 MS. FOTI:  They are cited.  Thank you, your Honor.

8 THE COURT:  You can just move on for now.

9 MS. FOTI:  So, again, those citations make it very

10 clear that we are entitled to submit the entire text message

11 for your consideration and that the Court can consider it on

12 the motion to dismiss and should consider it on the motion to

13 dismiss.

14 Finally, on the motion to strike, I believe you've

15 already suggested on the issues about my conduct or supposed

16 conspiracy with Proskauer, that that is not something you're

17 giving serious consideration to, but I do think it should be

18 struck from the complaint.

19 In addition, all the allegations about these other

20 women that have nothing to do with harassment in the workplace,

21 have nothing to do with Ms. Eckhart, I believe all those

22 allegations should be struck.  They don't support, again, the

23 sex trafficking, they don't support any type of harassment --

24 THE COURT:  Don't they go to knowledge, particularly

25 Fox News' knowledge, of these other allegations?

L7LKECKM

1          MS. FOTI:  First of all, I don't believe there's any

2     allegation that Fox knew about those allegations, but whether

3     or not they go to knowledge, I think it's irrelevant.  The fact

4     that Mr. Henry might have relationships outside of work is

5     irrelevant to whether or not he is a harasser within the

6     workplace.  I don't believe that they go to knowledge, your

7     Honor, so I strongly request that they all be struck, the

8     Brooke Hammerling, Roxie Marroquin, and all the Jane Doe

9     allegations.

10          Finally, we do have another motion for a more definite

11     statement, and that is, in particular, in connection with the

12     sex trafficking allegations.  To the extent you believe those

13     should be sustained, I think we are entitled to know when the

14     text that the plaintiff relies on suggesting that there were

15     certain text messages that enticed her, when those text

16     messages actually were exchanged, because we have no reason to

17     believe that they were exchanged actually before the alleged

18     rape.  If they're exchanged after the alleged rape, they cannot

19     be used to support a claim of enticement.

20          THE COURT:  Thank you very much.

21          MS. FOTI:  Thank you very much.

22          THE COURT:  Mr. Willemin.

23          MR. WILLEMIN:  Thank you, your Honor.

24          THE COURT:  I have a hard stop a little before 3:30.

25     Keep it to maybe 20 minutes ideally.

L7LKECKM

1          MR. WILLEMIN:  I'll go as speedy as possible.

2          THE COURT:  Thank you.

3          Do you want to just start with that last point?  Do

4  you know the date of those texts?

5          MR. WILLEMIN:  The way that we pled the complaint

6  wasn't intended to trick anybody.  My understanding, based on

7  conversations with the client, is that those texts were sent in

8  the order that we pled them, and sent in the order like we did

9  a text and then we did an event, that that was the order that

10  proceeded.  Some of those texts, for various reasons, I don't

11  think we have the exact date on, so that will be something that

12  we can continue to inquire into in discovery, but I'm happy to

13  answer an interrogatory, to the best of our ability, the dates

14  of various texts, or I could try to redo this complaint to make

15  it as more specific as possible.  I'm not necessarily opposed

16  to that.  But we did our best to at least put it in

17  chronological order, and it wasn't our intent to trick anybody.

18          THE COURT:  So, in any event, you're amenable to

19  providing that information?

20          MR. WILLEMIN:  Yes.

21          THE COURT:  So why don't we move on.

22          MR. WILLEMIN:  Okay.

23          So I'd like to start with the discrimination claims

24  against Fox News.  So, Fox News indicates that it should be off

25  the hook on these claims because of a lack of knowledge and

L7LKECKM

because of the statute of limitations issue.  And I'd like to
start with the purported lack of knowledge.

           As your Honor knows, this is a motion to dismiss, and
in seeking dismissal, the defendant is essentially saying,
well, we're claiming we didn't know, and so you have to dismiss
the case.  And you can't get a case dismissed that way.  Fox
News cited literally no cases in their briefing — not in their
moving brief or the reply brief — in which a pleading was
dismissed based on a purported failure to allege knowledge.
And, in this case, we've alleged many facts that could put Fox
on notice that Mr. Henry could be engaging in this type of
misconduct.  As your Honor knows, this is nothing more than a
negligence standard.

           The facts are that -- and I understand the argument,
and I won't get into it, whether his affair with the stripper
is relevant or not relevant to the workplace, but what's
relevant is that Fox News, after becoming aware of that,
suspended him and required him to complete a sexual addiction
rehab program.

           THE COURT:  So if he, in his personal life, has a sex
addiction and had an affair, whether it was with a stripper or
someone else, why does that necessarily translate into Fox
being on notice that he was actually going to harass people or
sexually traffic them?

           MR. WILLEMIN:  Well, so, in the first instance, given

L7LKECKM

1    that they required him to go through this process, they should

2    have at least had a heightened awareness to pay attention to

3    what was going on in the workplace and his interaction with

4    women in the workplace.  At that point, I think they had an

5    obligation to take measures to ensure that nothing happened in

6    the workplace.  This is just the beginning, right?  So, after

7    this, Fox hires an outside law firm, and multiple women

8    complain about sexually inappropriate conduct perpetrated by

9    Mr. Henry.  This is known to the VP of HR and the president of

10   Fox News.  Totally separately, a letter was sent to the VP of

11   HR and the chief news executive, in which the letter wrote that

12   women were crushed by the possibility of Henry's more prominent

13   role, given promises to clean up the company after the

14   departure of Ailes.

15         So, there's a clear -- two things here:  One is that

16   we don't allege that this has specifically to do with the

17   incident relating to the stripper.  In fact, given the fact

18   that multiple women complained about sexually inappropriate

19   conduct, it's a reasonable inference to assume that the letter

20   could assert that as well.  Obviously, we're going to get into

21   that in discovery in this case, but there's also a direct

22   correlation to the departure of Mr. Ailes.  And we all know the

23   nature of Mr. Ailes' departure was not because he had an affair

24   with a stripper; it was because of what he did in the workplace

25   to women at Fox News for many years.

L7LKECKM

1        And then, as your Honor pointed out during questioning

2   of the defense counsel, there are multiple other women who have

3   reported that Mr. Henry's reputation for sexually inappropriate

4   conduct was, quote, well-known, and warnings about him were

5   circulating as early as 2016.  So, we have a more lengthy

6   recitation of that article from which that information came in

7   the complaint, but this is way more than enough, from a factual

8   allegation perspective, to suggest that Fox should have known

9   that Mr. Henry could engage in sexually inappropriate conduct

10  in the workplace.  They did know.  People complained about it.

11       And this is in the context -- and I won't belabor the

12  point, but this is in the context where there's a company that

13  has a propensity to bury its head in the sand with respect to

14  these types of things.

15       THE COURT:  I just want to stop you.  I'm looking at

16  the transcript.  I think you said twice that Fox should have

17  known that Mr. Henry could engage.  Is that the standard?  Is

18  the standard that you should have known that he could have, or

19  is it that you should have known that he was or would?

20       MR. WILLEMIN:  That's fair, your Honor.  I think I'd

21  have to look back at the precise language.  I think the

22  standard is that they should have known that he would engage in

23  this type of behavior.  But they did, in fact, know that he was

24  engaged in sexually inappropriate behavior based on the

25  complaints that were made, that were alleged, the letter that

L7LKECKM

 1   came in, the fact that it was an open secret there that he was

 2   trying to entice and lure young women into sexual

 3   relationships.  All of this is pled.  It's enough to get this

 4   case to discovery.

 5        When you look at the way in which they treated other

 6   men where similar types of allegations had been made — Roger

 7   Ailes, open secret, Bill Shine, open secret, Bill O'Reilly,

 8   open secret — and continuing to employ these people even

 9   knowing -- Bill O'Reilly, they gave him a $25 million deal

10   contract after knowing he had settled at least six cases of

11   sexual harassment.  So the idea that they can just come into

12   court and say we didn't know in the face of all these

13   allegations and get the case dismissed right off the bat would

14   really be a perversion of the pleading standard.

15        This is continuing.  Literally, just yesterday, news

16   broke of another settlement of a sexual harassment case by an

17   individual at Fox News who's still there.  So, that's with

18   respect to the knowledge.  I think we've pled well more than

19   enough with respect to knowledge.

20        With respect to the continuing violations doctrine, I

21   think --

22        THE COURT:  I want to stop you there.  So, under the

23   state human rights law, an employer may be liable for an

24   employee's discriminatory act if the employer became a party to

25   it by encouraging, condoning, or approving it.  Which one

L7LKECKM

1   happened here?

2          MR. WILLEMIN:  Condoning it.  I mean, we have multiple

3   instances of complaints about Mr. Henry's conduct, with no

4   appropriate remedial action taken.  And, in fact, he continues

5   to be -- I would say even approving it because he continues to

6   be, over the years, given more responsibility and more

7   prominent roles at the company.

8          THE COURT:  How are they condoning it?  It's one thing

9   to say that they should have been on notice of it, right?  But

10  to say that they were condoning it suggests that they knew

11  precisely what was happening and were encouraging it in some

12  fashion, no?

13         MR. WILLEMIN:  Well, I think even under the New York

14  State Human Rights Law — and I know that this is the case under

15  Title 7, although we're out of SOL on Title 7, but under the

16  New York State Human Rights Law, I believe negligence is also

17  essentially the standard under all three under Title 7.  So I'm

18  not sure that you have to sort of affirmatively -- let me put

19  it this way, if that were the case, then under the New York

20  State Human Rights Law, actual knowledge would be required.

21  And I'm certain that actual knowledge is not required.

22         THE COURT:  We'll look at that.

23         Even if the continuing doctrine applies — I know you

24  were about to touch on that — but why isn't your Title 7 claim

25  still untimely?

1          MR. WILLEMIN:  The Title 7 claim is not -- it's not

2     untimely with respect to the retaliation, but it is untimely

3     with respect to the sexual harassment and the hostile work

4     environment.

5          THE COURT:  Thanks.

6          MR. WILLEMIN:  So, as your Honor noted during

7     questioning earlier, especially the "Why did you turn away

8     today" and, also, the Heisman pose message, these are very

9     reminiscent of the previous hard-to-get messages, which were

10    both sent to Ms. Eckhart, both in 2014 or '15 and also in 2017,

11    and preceded nonconsensual sexual acts.  This is his way of

12    getting in, because he, in both of those earlier instances, by

13    saying that she was hard to get, is essentially saying that --

14    she is now feeling I got to appease this guy because he's going

15    to be mad at me.  This is his way of using his power to get her

16    to engage in sexual activity, this is his MO, and this is

17    exactly what he was trying to do again.

18          And with respect to the temporal distance, that is a

19    complete nonissue.  I know Ms. McKenna brought it up a lot, but

20    there's no cases that suggest that.  And your Honor was

21    correct, actually, it is the *Morgan* case, the U.S. Supreme

22    Court case, and the hypothetical in that case was that there

23    was a 301-day gap between acts, and the Court said that that

24    gap would not destroy the continuing violations doctrine.

25          THE COURT:  Just putting aside the timing issue for a

L7LKECKM

1    minute, I want to talk about supervisory liability.  So the

2    court in *Hughes* said for both claims under the state and city

3    human rights law, the defendant must be the plaintiff's

4    supervisor to be liable.  Do you think *Hughes* was wrong?  I

5    mean, I know you briefed this a little bit, but how was he her

6    supervisor when they're in different cities, on different

7    shows?

8            MR. WILLEMIN:  Well, I would just say, with respect to

9    the first question, *Hughes* was wrong, and that's actually been

10   recognized by your Honor in the *Spires v. MetLife Group, Inc.*

11   decision.  An individual is directly liable for discrimination

12   regardless of whether he's a supervisor under the city human

13   rights law.  That's also been held by Judge Carter, Judge

14   Engelmayer, Judge Failla, Judge Batts, Judge Ramos, and many,

15   many others in the district.

16           With respect to the supervisory --

17           THE COURT:  I meant with respect to Fox.

18           MR. WILLEMIN:  I'm sorry?

19           THE COURT:  I was focusing specifically on Fox.

20           MR. WILLEMIN:  Oh, whether or not there's a separate

21   angle for liability?

22           THE COURT:  Yes.  For Fox to be liable for Henry's

23   conduct, does Henry not have to have been Eckhart's supervisor?

24           MR. WILLEMIN:  Only if Fox didn't know or should have

25   known.  So it's neither or.  So, if you can establish that Fox

L7LKECKM

| 1 | should have known that the conduct was occurring, then that is
| 2 | sufficient to give liability under a coworker circumstance.  So
| 3 | that's the theory upon which we're primarily going.

        I do think, frankly, given the Supreme Court's
decision — I believe it is in *Vance*— where the Supreme Court
held sort of better defines what a supervisor is in this
context left some gray area open for people who have apparent
authority to do things, and if Fox is letting its hosts run
around promising people to get them on shows and meet their
agents and advance their careers, et cetera, even if there's
not a direct reporting line relationship, I'm not so sure that
wouldn't still constitute a claim, but that's not the primary
theory --

        THE COURT:  Was he host at the time of the allegations
regarding the comments he made in question?

        MR. WILLEMIN:  At that point, I believe -- I believe,
at that point, he had not been starting to host, but that was
the promise, essentially, was that he was getting his own show
and that he would then be able to put her on that show.  So
that was the context there.

        I don't know if you have any further questions on the
continuing violations doctrine, but the only other thing I'd
say is that the cases like *McGullam*, which Ms. McKenna cited,
that would involve separate harassment -- harassment by
separate people in separate departments, like nothing to do one

L7LKECKM

1   with the other, and the same with *Annunziata*, it was

2   perpetrated by a completely different person where they were

3   trying to connect the continuing violations.  That's not

4   analogous to what we have here.

5          With respect to retaliation, as your Honor knows,

6   there are -- when we're talking about the meeting in February

7   with Denise Collins and Brad Hirst, there are no magic words

8   that need to be used.  In this case, we have an organization in

9   Fox News that had just gone through four years of continued,

10  continued, continued sexual harassment allegations, and our

11  client says that she was subjected to a toxic work environment.

12  Not only do they not ask her any follow-up questions at all,

13  one of them looks to the other and says do you think the work

14  environment is toxic?  The person says no.  And then that was

15  the end of that.  And then Mr. Hirst says you're going to face

16  repercussions if you pursue the complaint.

17         In the context of Fox News, it certainly could

18  reasonably be understood -- and that's the standard, by the

19  way, reasonably understood to have been a complaint of

20  protected activity, one of discrimination.  So we do assert

21  that that was a protected activity in February, after which our

22  client was terminated despite her outstanding performance,

23  according to all of the emails and documents we cite in the

24  complaint.

25         They can't just -- on the exit interview question, we

L7LKECKM

1    didn't plead that that's Fox's modus operandi, to ask every

2    single person leaving the organization whether they've been

3    sexually harassed or assaulted.  So, Ms. McKenna can say that,

4    but that's not what we pled, so that is a consideration that

5    shouldn't be taken into account.

6           THE COURT:  But when you talk about a toxic work

7    environment and the fact that she mentioned that, the beginning

8    of the complaint all deals with problems that she had at Fox

9    that had nothing to do with sexual harassment or any

10   gender-based misconduct, right?  And so why should I read into

11   that toxic environment an allegation that she was essentially

12   alleging protected activity?

13          MR. WILLEMIN:  Well, I think --

14          THE COURT:  Or discrimination, gender-based

15   discrimination.

16          MR. WILLEMIN:  First of all, we also don't allege that

17   she was complaining about this claim, so that allegation, it

18   could be an inference that could be drawn, but I don't think

19   it's the one that would be drawn in favor of the plaintiff, of

20   course.  But I think, again, it's in the context of what did

21   Fox understand her to be doing, and I think given the

22   surrounding, as I just described, that Fox would have

23   understood that she could at least, could at least, have been

24   raising a concern about discrimination, sexual harassment, and,

25   at that point, it had an obligation not to just make light of

L7LKECKM

1    it and tell her that she faced repercussions if she pursued it.

2           So, that's, I think, the best way I can answer your

3    question.

4           THE COURT:  Can we turn briefly to sex trafficking?

5           MR. WILLEMIN:  Yes.

6           THE COURT:  I cut you off.  Did you want to say one

7    more thing?

8           MR. WILLEMIN:  No.  No, there are other acts of

9    retaliation we can get to if we get to them.

10          THE COURT:  Okay.  With sex trafficking, I guess the

11   main thing I want you to respond to is the argument that in

12   reading the sex trafficking statute the way that you're

13   proposing, it would apply to so many different scenarios in

14   which someone promised to help someone and engage in sexual

15   activity with them, promised to help them in their life in one

16   way or another and engage in sexual activity.  Obviously, there

17   are other elements, like the interstate component, but do you

18   want to respond to that kind of general critique?

19          MR. WILLEMIN:  I would say one thing.

20          The first thing is that's really not what happened

21   here.  I mean, he made promises to her which were fraudulent,

22   and I think, almost essentially admittedly, because he says

23   he -- he says he can't actually go through on them, but then he

24   violently attacked her.  This is not like they went to the

25   hotel, and, you know, they had what's seemingly completely

L7LKECKM

1    consensual sex; this is a Weinstein act, but worse.  First, he

2    forces her to give him oral sex by physically pushing her head

3    down and physically pushing his penis into her mouth, and then,

4    the second time, he gets into a hotel room and handcuffs her,

5    throws her on the bed, hits her in the face, leaves all her

6    bloodied and battered and bruised.  Even if you buy this

7    concept of this slippery slope argument, this is not the

8    slippery slope case.

9            And, secondly, I don't think that the elements would

10   permit that because you still need to establish fraud or force.

11   And so if I make a promise to you -- frankly, I mean, if I make

12   a promise to you, and there's interstate commerce and other

13   elements of that to some sort of benefit, like a movie role or

14   meeting my agent or getting on my show, and because of that,

15   you end up sleeping with me, and I procured that through fraud,

16   that is what the statute requires.  And it's supposed to be

17   something that's a broadly interpreted statute, as your Honor

18   did notice in the *David* case.

19           And I believe your Honor also noted in the *David* case

20   that empty promises of career advancement are of the sort of

21   enticement that could give rise to liability once you have

22   those other elements in place.  And the actual word

23   "enticement" in this case, in the statute, I believe, your

24   Honor -- I'm not sure if your Honor was quoting the statute or

25   the dictionary definition, but, in that case, it was to attract

L7LKECKM

1    by arousing hope or desire.  So that's the statute.  But, in

2    this case, it's not that, this is not that borderline case.

3    The guy clearly used his influence to suggest he'd get her

4    meetings with agents and powerful people and get her on his

5    show, all of which she viewed -- and this is in the context of

6    that first meeting, by the way, before the first encounter,

7    which she never said it was consensual in the first complaint.

8    That meeting was for the purposes of discussing her career

9    advancement.

10          So from the very start, this relationship was one in

11   which he had a coercive ability over her, she's looking for him

12   for career advice, he's making various promises to her.  And

13   then with respect to just moving on to the knowledge issue,

14   first of all, you don't get a free pass to, like, rape someone

15   and put them in handcuffs and beat them up because they

16   happened to have sex with you before.  That's unbelievably

17   offensive.

18          But, secondly, of course, he knew he was going to have

19   to use force the third time because he used force the second

20   time.  He forcefully used his hands to push her head to

21   physically force her to give him oral sex, so the idea that he

22   wasn't expecting to have to use force the second time -- or the

23   third time, rather, is kind of preposterous, and, in any event,

24   he used fraud to get her into that hotel room.  And he

25   harbored, that's another one of the ways in which you can

L7LKECKM

violate the act, because he literally handcuffed her in the
room.

          Again, these cases are very similar to the Weinstein
cases, to the *David* case, to the *Geiss* case, although I think
that came out wrong in one other area I'll get to in a minute.

          But this is not -- this would not be a unique
application of the TVPA by any way, shape, or form.  As your
Honor, I think, noted, and similar to some of the promises that
were given to people in the Weinstein cases, these are real
benefits, these are real, material, valuable benefits, and to
suggest otherwise, especially in an industry like this where
connections are everything, and you are talking about TV?
That's a real benefit.

          With respect to Fox's arguments, I mean, this is --
again, I think your Honor hit the nail on the head on some of
this stuff, a should have known situation based on all the
allegations of the complaint — I won't repeat them — but I'm
trying to see what other -- oh.  So, an issue -- I think *Canosa*
gets it right on the issue of whether or not there needs to be
a benefit to the enterprise as a result of the sex trafficking
or versus whether it just needs to be a benefit of essentially
that person's continued being around.  And I think *Canosa* gets
it right:  By facilitating and covering up Weinstein's sexual
assaults, TWC made Weinstein more likely to continue to work
for TWC.  While the facts developed at discovery may or may not

L7LKECKM

1    substantiate this allegation, the AC adequately pleads a

2    symbiotic relationship between the companies and Weinstein, in

3    which the companies affirmatively enabled to conceal his

4    predations as a means of keeping him happy, productive, and

5    employable, and then the company reaped benefits.

6         So that's the theory of the case in this case.  I

7    think *Geiss* got it wrong because, as we explained in our

8    briefing, it relied erroneously on the Sixth Circuit decision

9    that turned on the criminal provision of this.

10        And then in *David*, that, I think, is distinguishable

11   pretty significantly because, in that case, the ruling was

12   based on a lack of a duty that Robert Weinstein owed to the

13   plaintiff.  He had never met her, he didn't even know who she

14   was.  There is obviously --

15        THE COURT:  I'm obviously familiar with that case.

16        MR. WILLEMIN:  Understood.

17        THE COURT:  I do have other questions about other

18   matters, if you don't mind my just moving along.

19        One on unlawful dissemination:  Do you have any case

20   law to support your argument that the submission of the

21   photographs was not lawful or common?  Where is that language

22   coming from?

23        MR. WILLEMIN:  Well, the actual language of the

24   statute only provides an exception for the lawful and common

25   dissemination in connection with the lawsuit.  There's no case

L7LKECKM

law, that I'm aware of, that defines that, but common, in this
case?  I haven't been practicing forever, but I've been
practicing for ten years, I've never seen a defendant do
anything like this before, putting these types of pictures in a
public docket.  There were so many other ways they could have
gone about it.  They could have reached out to us first to see
how we wanted to handle it.  They didn't even agree to have
them sealed after we made the request to the Court.  And, as
your Honor noted, they shouldn't have been filed in the first
place because they're extrinsic evidence, and we did not
reference those photographs in the complaint — that is
completely false.  The photographs we referenced in the
complaint were photographs that Mr. Henry took of our client
when she was in handcuffs on the bed as he was about to rape
her, not photographs that now they're putting on the public
docket.  This is a completely unusual maneuver, and the worst
part about all of it, in my view, other than, of course, the
shame that this causes my client, is that the legal arguments
don't even rely on these photographs.  They were done
completely gratuitously.  They're not even arguing that we pled
a consensual sex case or that the case needs to be dismissed
because these photographs exist.

        So, there was no legal basis whatsoever to even attach
the photographs to them to begin with, so how you could argue
that that is a common legal practice, to me, is just beyond --

L7LKECKM

1   I just don't understand.

2          THE COURT:  When I was asking that, I didn't mean to

3   ask where the language came from, I meant to ask, which you've

4   already answered, sort of how your interpretation of why this

5   was not lawful and common, where that came from and what you're

6   relying on.

7          Do you want to respond to the argument with respect to

8   the redaction of the photos?

9          MR. WILLEMIN:  Well, there's a number of photographs

10  where you can see area around the pubic area, so the intimate

11  parts.  Like all the photographs where -- they're not all hers,

12  but there are various photographs where she's wearing a thong,

13  and you can see around the pubic area.  And also the fact that

14  you redact something doesn't mean that she's now not naked.

15  It's still a picture of her naked.  You've redacted it to a

16  degree, but it's still a photograph of her unclothed, which is

17  what the law prohibits you from doing.

18          THE COURT:  One other issue I wanted to ask you about,

19  and then you can just be heard on whatever else you'd like to

20  be heard on, is on the GMVA, and if you can respond to the

21  arguments with respect to whether this was specifically gender

22  based, what the evidence of that is or has been alleged, and

23  then whether extrinsic evidence of animus beyond the rape

24  itself is required.

25          MR. WILLEMIN:  So, as to the second question, the

L7LKECKM

answer is no, that, in my view, this Court should look to the

decision in *Breest v. Haggis*.  This is a state law -- I'm

sorry, this is a city law, but this is a state court, the

Appellate Division, First Department, it is the highest court

in the state that has decided this issue, and has decided, very

clearly, that rape and sexual assault are, by definition,

demonstrative of malice or ill will based on gender.  I think

that that case got it right.

Even before that case, there was a split between

various cases in the district, and I think it's, to me anyway,

and perhaps people will disagree, pretty obvious that if you're

raping a woman, the fact that she is a woman has something to

do with it, unless he's saying I rape men, I rape women, I rape

nonbinary people, and I think that this clearly is motivated in

part by the fact that this is a woman.

Now, the animus piece of it, again, the *Breest* case, I

think, puts to bed that inquiry, but the messages that he sent

here are clearly demonstrative of his view of women.  He said

she's going to be owned and submissive.  I mean, he didn't --

he didn't, by the way, just rape her, which is crazy for me to

even be saying that, he hit her, he handcuffed her, he bruised

her up.  I mean, the idea that he was calling -- as your Honor

noted, he's calling her a whore, he's saying she doesn't have a

choice.  So, I mean, all of this language, and also, the

acts -- and I'm not -- you don't need to have -- either for the

L7LKECKM

1    TVPA or the GMVA, you don't need to have a modus operandi,

2    that's just not the law.  You can prove certain elements with

3    modus operandi, but you don't need to have one, though.  But,

4    in this case, I'm not suggesting a modus operandi of violent

5    rape, but the way in which he treated the other women whose

6    allegations are contained in the complaint, many of whom are

7    Fox employees, further demonstrates his misogynistic viewpoint

8    and his disregard for the rights and liberties of women.

9              THE COURT:  Thank you.

10             MR. WILLEMIN:  If you don't mind, can I ask the time

11   again?

12             THE COURT:  Yes.  It's 3:24.  But I know I gave

13   defendants more time, so if you want to make some final points,

14   just do so quickly.

15             MR. WILLEMIN:  No.  What I really want to do,

16   actually, is at least speak for two minutes on the sanctions

17   issue.  So I'd like to have the opportunity --

18             THE COURT:  Make it one.

19             MR. WILLEMIN:  Okay.  Just two things:

20             The briefs say what the briefs say.  I understand

21   zealous advocacy, and I understand that that's part of the game

22   here.  I am accused in those briefs of extortion three times.

23   I have never been accused of extortion in my life.  Ms. McKenna

24   and the Proskauer firm know, and Fox know, that we did not

25   extort them.  If I extorted them, I'd be reported to the

L7LKECKM

disciplinary committee, I would be reported probably to federal

prosecutors, and if I extorted anyone, I'd probably be in jail

right now.

The second point I want to make -- so I feel like

that's an unbecoming accusation.

The second point I want to make is that yesterday,

Ms. McKenna stated that we passed the hot potato of Kathy Areu

over to the new firm.  That's factually inaccurate, which she

knows, but, even more so, I think it's really inappropriate to

be referring to litigants in open court as a hot potato.

So, I don't believe sanctions are warranted for the

reasons in the briefing, but I did feel very much compelled to

note that everyone knows there was no extortion here.

THE COURT:  All right.  Thank you.

If you each want one minute to respond?

MS. McKENNA:  Two quick things, your Honor:

First, the hot potato was certainly not a reference to

Ms. Areu, not the first time I used it, nor the second time,

but a reference to the situation created by the Wigdor firm

that they tried to pass off.

Second, with respect to the allegations -- the

argument Mr. Willemin made that Fox News, on its motion to

dismiss with respect to the harassment claim and the imputation

of knowledge, that we are just claiming we didn't know, that

distorts Fox News' argument.  What we argued is that the

L7LKECKM

1    complaint, Ms. Eckhart's complaint, does not allege a single

2    incident of anyone telling Fox News about alleged work-related

3    harassment committed by Mr. Henry prior to February of 2017.

4    The only thing they allege is, with respect to the Paul Weiss

5    letter, of allegedly sexually inappropriate conduct, not

6    sufficient for *Iqbal* and *Twombly*.  It doesn't say whether they

7    were employees, it doesn't describe whether it's work-related

8    conduct, it doesn't say when the report was made, it doesn't

9    say when or if that information was communicated.  That is the

10   only allegation to try and allege that Fox News should have

11   been on notice of Mr. Henry's work-related behavior, and it

12   fails.  It is undisputed that when Fox News learned of his

13   alleged conduct towards Ms. Eckhart, it investigated, and it

14   fired him.

15              THE COURT:  All right.  Thank you.

16              Any final thoughts, Ms. Foti?

17              MS. FOTI:  Yes.

18              Specifically as to the images, they're redacted, so

19   the redaction makes it not fall within the statute.  That's

20   number one.

21              They are absolutely relevant to whether or not the

22   enticement element was met in terms of the sex trafficking, so

23   they're relevant to that.

24              The fact that the rape was violent, as alleged, does

25   not turn it into a sex trafficking violation, no matter how --

L7LKECKM

1   whatever the allegation is in terms of what happened.  What the

2   allegation needs to be is somehow she was enticed by fraud, and

3   we are not saying that the representation that Mr. Henry said

4   he may be getting his very own show was a fraud.  There's no

5   allegation that -- there's no proof that that would have been a

6   fraud.  He may have said that.  Whether or not he got it only

7   shows that it was not material.  That's the issue.

8        And just one more thing:  In terms of the continuing

9   violation, *Williams v. New York City* specifically says that

10  none of the statements come close to actual conduct.  But,

11  basically, what that case is saying is that the conduct itself

12  which is being alleged to be the continuing violation, so, "Yo,

13  the Heisman trophy," that in and itself has to be actionable.

14  It can't be a petty slight.  You can't continue the alleged

15  harassment using a petty slight years in advance.  So, those

16  actions, in and of themselves, cannot extend the statute of

17  limitations.

18       THE COURT:  All right.  Okay.

19       Thank you, all.  It was very well argued on all sides.

20  I will reserve decision.

21       MR. WILLEMIN:  Thank you, Judge.

22       MS. McKENNA:  Thank you, your Honor.

23       MS. FOTI:  Thank you, your Honor.

24                              * * *

25