UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JENNIFER ECKHART, | |
| Plaintiff, | |
| v. | |
| FOX NEWS NETWORK, LLC and ED HENRY, | |
| Defendants. | |

```
┌─────────────────────────────────┐
│ USDC-SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC#:                            │
│ DATE FILED: 09/09/2021           │
└─────────────────────────────────┘
```

20-CV-5593 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Jennifer Eckhart, a former Fox News employee, brings this action against the network and its former anchor, Ed Henry. She accuses Henry of sexual harassment, sexual assault, and rape. She alleges that Henry pursued her, sent her unsolicited and inappropriate text messages, and manipulated and coerced her into having a sexual relationship with him that was at times violent. On at least one occasion, Henry is alleged to have enticed Eckhart to his hotel room based on the false pretense that he would discuss and aid her career progression at Fox News, only to handcuff and violently rape her upon her arrival. She accuses Fox News of facilitating Henry's sexual misconduct by failing to take action as "complaints against [Henry] piled up," and of retaliating against her when she sought to hold both Henry and the network accountable for their conduct. Both Defendants deny all of Eckhart's allegations and have filed motions to dismiss this action. The motions are granted in part and denied in part.

Eckhart seeks to hold Henry liable under a host of legal theories. She asserts that he is liable for sex trafficking because she says he used empty promises of career advancement to defraud her into coming to his hotel room, then used force to cause her to have sexual intercourse with him. To be sure, this is not a conventional claim of sex trafficking. Eckhart has not alleged, for example, that Henry forced her into prostitution or sexual slavery. But because her allegations, which the Court must accept

as true at this stage of the litigation, comport with the relatively broad language of the applicable statute—which classifies as sex trafficking the use of "force [or] fraud . . . to cause [a] person to engage in a . . . sex act . . . on account of [some]thing of value"—the Court finds her claim for sex trafficking to be sufficiently pled.  She also seeks to hold Henry liable for the alleged assaults under New York City's Gender Motivated Violence Act, and succeeds in stating a claim under that statute because of her plausible allegations that he acted with animus toward women.  Eckhart further seeks to establish Henry's liability for gender discrimination, a term that includes sexual harassment and the creation of a hostile workplace.  Considering the different standards for Eckhart's claims under the federal, New York State, and New York City antidiscrimination laws, Eckhart's discrimination and harassment claims against Henry under city law will proceed, while her claims under federal and state law must be dismissed.

Eckhart also brings claims against Henry for the retaliatory "harassment and trauma" to which he allegedly subjected her after she made public her claims against him.  Among other things, she alleges that Henry—through his attorneys—posted nude photographs of her on the public docket in this case in an attempt to "victim shame" her.  Because Eckhart plausibly alleges that this conduct was indeed intended to "shame" her, and because the Court finds that posting these photographs was not a reasonable litigation tactic, this claim survives, as does Eckhart's related claim against Henry for violation of New York's "revenge porn" law.

Eckhart also seeks to hold Fox News liable for Henry's conduct in several regards: first, for Henry's alleged "sex trafficking," which she claims the network benefitted from, and second, for Henry's sexual harassment, which she alleges created a hostile work environment.  At this juncture, the Court concludes that Eckhart has plausibly alleged that the network knew or should have known about Henry's sexually harassing behavior but not necessarily the specific conduct that amounts to sex trafficking.  Accordingly, Eckhart's claims against Fox News for harassment survive while her claim for sex

trafficking does not.  Eckhart's efforts to hold the network liable for Henry's dissemination of her photographs also fail for the reasons articulated below, although her claim that the network fired her in retaliation for complaining of Henry's abuse survives.

A more fulsome analysis of Eckhart's claims as well as a recitation of the factual allegations underlying them follows.

## BACKGROUND

The Court draws the following facts from the Third Amended Complaint (the "Complaint").  Dkt. 113.  For the purposes of this motion, the Court accepts all of Plaintiff's well-pled facts as true, as it must.  *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).[1]

### I.    The Parties

Defendant Ed Henry is a former on-air personality at Defendant Fox News, a national news network headquartered in New York, NY.  Compl. ¶ 21.  In 2014, Henry worked as the Chief White House Correspondent for the network.  *Id*. ¶ 36.  He later became the substitute host of "Fox & Friends Weekend" and a Chief National Correspondent.  *Id*. ¶ 123.  In December 2019, he was promoted to be the co-anchor of "America's Newsroom."  *Id*. ¶ 89.  During his time at Fox News, he was based out of Washington, D.C.  *See id*. ¶¶ 22, 36.

Plaintiff Jennifer Eckhart is a former producer at Fox News.  After graduating from journalism school, Eckhart began working at Fox News in January 2013.  *Id*. ¶ 23, 38.  Her first position was as a freelance administrative assistant to Liz Claman, the anchor of "Countdown to the Closing Bell" on Fox Business Network.  *Id*. ¶ 23.  While working for Claman, Eckhart alleges that she, along with the other members of Claman's staff, suffered "incessant verbal, written and emotional abuse."  *Id*. ¶ 29; *see also*

---

[1] This opinion uses the following citations: "Compl." for the Third Amended Complaint, Dkt. 113; "Fox Mem." for the memorandum of law in support of Fox News's motion to dismiss, Dkt. 118; "Henry Mem." for the memorandum of law in support of Henry's motion to dismiss, Dkt. 124; "Pl. Fox Opp." for Eckhart's memorandum of law in opposition to Fox News's motion to dismiss, Dkt. 128; "Pl. Henry Opp." for Eckhart's memorandum of law in opposition to Henry's motion to dismiss, Dkt. 129; "Fox Reply" for the reply memorandum in support of Fox News's motion to dismiss, Dkt. 137; "Henry Reply" for the reply memorandum in support of Henry's motion to dismiss, Dkt. 136.

*id.* ¶¶ 25–29.  Eckhart's manager, Brad Hirst, would order production staff "celebrat[ory]" lunch on the days Claman was absent, which Eckhart interpreted as an admission by Hirst that Claman committed "toxic abuse" against her employees, and that Hirst was aware of this abuse.  *Id.* ¶ 29.

During the course of her seven-year tenure at Fox News, Eckhart received three promotions: from administrative assistant, to production assistant, to booker, to associate producer.  *Id.* ¶¶ 30–31. She worked on a variety of programs, both behind the scenes and on air.  *Id.* ¶ 32.  Eckhart says that she received "substantial praise" for her work throughout her time at Fox News.  *Id.* ¶ 33.  During her time at Fox News, she was based out of New York.  *Id.* ¶ 20.

**II.    The Parties' Relationship**

In 2014, Henry followed Eckhart on Twitter and sent her a message saying "beautiful."  Compl. ¶¶ 36–37.  Eckhart asserts she was "put off" by the message, but, given their relative statuses at the network—Henry was the Chief White House Correspondent, Eckhart was a new hire who had recently graduated journalism school—she "felt compelled to respond."  *Id.* ¶ 38.  Shortly thereafter, the two met in person, when Henry was appearing on a Fox News show based in New York and he invited Eckhart to meet him at the studio prior to his appearance.  *Id.* ¶ 39.  Henry later asked Eckhart out to drinks; when Eckhart declined, he sent her an email, calling her "[h]ard to get."  *Id.* ¶ 42.  He then began sending Eckhart "unsolicited inappropriate, flirtatious and, at times, sexually disturbing and graphic text messages."  *Id.* ¶ 43.  Eckhart "play[ed] along" with Henry's messages, stating that she was "in fear of losing her job" if she did not.  *Id.*

In early 2015, after several months of Henry asking, Eckhart agreed to meet for drinks.  *Id.* ¶ 44.[2] They met at the bar of the hotel at which Henry was staying.  *Id.* ¶ 45.  Henry then invited Eckhart to his room.  *Id.* ¶ 48.  Eckhart asserts that she did not want to go, but agreed because she "was fearful of the

---

[2] The Complaint does not state the date on which this event occurred, other than noting that it was "a few months" prior to September 2015.  *Id.* ¶ 53.

repercussions of refusing a request by one of the most powerful on-air figures at Fox News." *Id*. Once in the hotel room, Henry began forcefully kissing Eckhart. *Id*. ¶ 49. "[F]earing that her career would be over if she refused Mr. Henry's sexual advances," Eckhart "relented to sexual intercourse with him against her will." *Id*. Immediately after they had sexual intercourse, Henry offered to help Eckhart's career, and told her that he could "get her in a room with some really powerful people." *Id*. ¶ 50. Eckhart and Henry did not see each other for several months after this. *Id*. ¶ 53.

In September 2015, when Henry was again in Fox News's New York offices, he sent her a message demanding she remove her underwear and put them in an envelope for him. *Id*. ¶ 54. Although she considered this request "extremely humiliating and disgusting," she complied, fearing retaliation if she did not. *Id*. ¶ 54. Later that day, Henry told Eckhart to meet him in the guest offices. *Id*. ¶ 55. When she arrived, he pinned her to a wall, subjected her to forceful and unwanted kissing, and physically forced her to perform oral sex on him against her will. *Id*. ¶ 57. After this incident, Eckhart did not see Henry for over a year, although he continued to send her pornographic images, videos, and gifs during that time. *Id*. ¶ 58.

In early 2017, Henry's texts to Eckhart became even more degrading and suggestive of violence. In one message, he called her a "[g]entle little whore" and said she was going to "get tossed around like a little rag doll." *Id*. ¶ 61. Shortly thereafter, Henry asked Eckhart to meet; when Eckhart declined, he again called her "[h]ard to get." *Id*. ¶ 62. He then sent her a series of texts that read: "#obey" "[o]r" "#discipline." *Id*. He also texted her "[o]wned & submissive." *Id*. ¶ 63.

In February 2017, Henry asked Eckhart to meet at a New York restaurant for a drink. *Id*. ¶ 64. Because Henry had "explicitly told her that if she did not 'obey' him, she would be 'disciplined,'" Eckhart states that she felt obligated to comply with this request, fearful that "if she refused again, Mr. Henry would retaliate." *Id*. When the two met, Henry told Eckhart that Fox News was giving him his own show and offered to bring her on the show as a frequent on-air guest. *Id*. ¶ 65. After they had

drinks, Henry invited Eckhart to "further discuss her career opportunities at his hotel in midtown Manhattan." *Id*. ¶ 66. She told him she could not go because her feet were hurting her; he grabbed her hand and pulled her to his hotel anyway. *Id*. "Out of extreme fear and concern for keeping her job," Eckhart went with him. *Id*. Once they entered his hotel room, Henry pinned Eckhart to a wall, forcefully ripped off her clothes, and applied handcuffs to her wrists, restraining her. *Id*. ¶ 68–69. He threw her onto the bed and took a series of photographs of her lying naked on the bed. *Id*. ¶ 71. She says she "pleaded for him to stop" and told him that the handcuffs were hurting her. *Id*. He ignored her pleas. *Id*. ¶ 70. According to Eckhart, Henry then violently raped her, hitting her multiple times in the face while he did. *Id*. ¶ 73. Eckhart remained handcuffed throughout this encounter. *Id*. After, she was left with bloody wrists, a bloody lip, and bruises on her legs. *Id*. ¶ 75–76.

Henry later sent Eckhart a series of messages that read "You'll cum back for more," "Will let you know," "If/when avail" "so you can get slapped around some more" and "Gona make you my little whore again." *Id*. ¶ 77. He also wrote, "You know" "Who" "Your daddy" "Is[.]" "Good long session last time[.]" "Left you bruised[,] batter[ed][,] dazed." "When u r owned" "U don't get a" "choice." *Id*. He later, on Valentine's Day, texted Eckhart, "Again please," and again referenced having left her "bruised" and "battered." *Id*. ¶ 78. When Eckhart responded that she was "STILL bruised and battered," Henry told her that she needed to "take her punishment." *Id*. That same day, Henry texted her "Fuck you and your safe word. You will know when I am done." *Id*. ¶ 79. When Eckhart "tried to end the conversation by saying that Mr. Henry needed to be nicer to her because it was Valentine's Day" and sending him emojis, he responded, "Get on your knees again and I'll give you your valentine." *Id*. 80.

Henry and Eckhart then had almost no contact for nearly two years. *See id*. ¶¶ 78, 85. Eckhart states that she "made every possible effort to cease all communications with Mr. Henry [because] she was in fear for her safety." *Id*. ¶ 82. On several occasions, however, she saw Henry in the hallways at Fox News. *Id*. ¶ 83. On October 5, 2018, Eckhart saw Henry approaching, then turned and walked

away.  *Id*. ¶ 85.  Henry emailed her later that day saying "Why'd you turn away today?"  *Id*.  Less than three weeks later, Henry sent Eckhart a message on Twitter saying "YO!"  *Id*. ¶ 86.  Another time, after Eckhart physically ran away from Henry, he sent her an image of a football player doing the Heisman pose (a pose in which the player is extending his arm to block contact), which she interpreted as implying that she was trying to get away from him.  *Id*. ¶ 87.

## III.   Other Victims

Eckhart alleges that Henry engaged in similar sexual misconduct against other women.  For example, she asserts that Henry's former CNN colleague, Brooke Hammerling, accused Henry of sending her "sexual and perverted" messages and "mak[ing] the moves on [her]."  Compl. ¶ 135.  Eckhart also relays the account of Roxie Marroquin, the former girlfriend of a Fox News correspondent, who also received sexual messages from Henry and on one occasion engaged in sexual touching with Henry, allegedly because she felt "fear[ful] of rejecting him."  *Id*. ¶¶ 140–44.  Eckhart also shares allegations by "Jane Doe 1," a current Fox News employee, which closely resemble her own.  *Id*. ¶¶ 149–60.  Henry sent Jane Doe 1 pornographic images shortly after meeting her.  *Id*. ¶ 150.  The two then engaged in a sexual relationship.  *Id*. ¶ 152.  During the course of this relationship, Henry would often refer to Jane Doe 1 as a "whore."  *Id*. ¶ 154.  During one sexual encounter, Henry "slapped her face so hard that she cried right away."  *Id*. ¶ 156.  Lastly, Eckhart notes that Henry has been accused of inappropriate conduct by former Fox contributor Cathy Areu, who alleges that he sent her "wildly grotesque and inappropriate texts."  *Id*. ¶ 175.[3]

## IV.   Fox's Knowledge

According to Eckhart, "Fox News was well aware" that Henry often engaged in "inappropriate sexual misconduct."  Compl. ¶¶ 126, 131.  She pleads the following facts to support this assertion.  In

---

[3] Areu was initially a plaintiff in this action. On October 8, 2020, the Court severed Areu and Eckhart's claims into two separate actions. *See* Dkt. 75; *see also Areu v. Fox News Network, LLC*, 20-CV-8678 (RA). Alongside this opinion, the Court is simultaneously issuing its decision on the defendants' motion to dismiss Areu's claims.

2016, Henry was suspended from Fox News for four months after it was revealed that he had an affair with a Las Vegas stripper. *Id.* ¶ 3. Fox required him to complete a sex addiction rehabilitation program before allowing him to return to work. *Id.* ¶ 4.

In 2016, Claman told Eckhart that "everyone at Fox News knows that [Mr.] Henry is a sex addict. That's no secret." *Id.* ¶ 117. Eckhart alleges that "it was an 'open secret' at Fox News that Mr. Henry was a serial harasser who used his power to prey on younger female employees." *Id.* ¶¶ 4, 114. According to a news report in the Daily Beast, "One [Fox News] staffer . . . recalled how she was repeatedly warned about [Mr.] Henry's behavior before she engaged in a sexual relationship with him." *Id.* ¶ 114. That same staffer remarked, "[i]t was well-known [Henry] flirted with younger women in the office. I heard people say, in general, to be careful with him because of his flirtatious nature." *Id.* ¶ 115. Another staffer reported that she "heard it from some males who were aware about names [she] should stay away from or watch out for [and] Henry consistently came up." *Id.* ¶ 116. A former Fox News producer similarly told Eckhart that she "[couldn't] see how [Fox News] couldn't" have known about Henry, and that "I feel like I knew about this even before I went to Fox. If not then, early on there." *Id.* ¶ 117. In a 2020 news story by NPR, several former Fox News employees reported that Henry "sometimes sent graphic notes and even graphic images to them." *Id.* ¶ 123.

In mid-2016, Fox News retained the law firm Paul, Weiss to conduct an internal investigation into sexual harassment at the company. *Id.* ¶¶ 5, 111. During the investigation, multiple women reported that Henry had engaged in sexually inappropriate conduct towards them. *Id.* According to the Complaint, "[t]hese reports were received by multiple members of Fox News' senior management" including "Fox News' Executive Vice President of Human Resources, Kevin Lord, as well as Fox News['] President and Executive Editor, Jay Wallace, and Fox Business Network['s] President, Lauren Petterson." *Id.* Although Eckhart does not identify the precise dates of these reports, she alleges that

"[u]pon information and belief, these women came forward to complain before [she] was raped by Mr. Henry." *Id.* ¶ 111.

In 2017, Fox News received a written complaint, stating that "the prospect of Henry's greater prominence on Fox [News] was crushing for female colleagues after the network had promised sweeping changes following [Roger] Ailes' ouster." *Id.* ¶¶ 6, 113.[4]   Again, although the precise date of this complaint has not been identified, Eckhart alleges that "[u]pon information and belief, this written complaint was sent to Fox News prior to Mr. Henry raping [her]." *Id.* ¶ 113.   Upon Henry's 2019 promotion to anchor of America's Newsroom, Fox News correspondent Charlie Gasparino told Eckhart that he believed Henry should not have been promoted. *Id.* ¶ 128.   Eckhart further alleges that Fox News knew that "so long as it employed Mr. Henry, he would continue to prey on innocent young women." *Id.* ¶ 133.

Despite its purported knowledge of Henry's past and potential future misconduct, Eckhart alleges that Fox News turned a blind eye because it knew that "if it took action in response to the complaints about Mr. Henry, it would potentially be costing itself millions of dollars." *Id.* ¶¶ 133, 207.   Eckhart alleges that "so long as Mr. Henry was continuing to generate revenue for the Company, it was willing to look the other way and even provide him access to additional victims." *Id.* ¶ 133.

## V.   Eckhart Complains and Fox News Responds

On February 10, 2020, during a conversation with her manager Brad Hirst and Denise Collins, the Senior Vice President of Human Resources at Fox News, Eckhart spoke of "the abuse and hostility that she had endured for years" at Fox News.   Compl. ¶ 90.   She did not explicitly mention sexual harassment in this conversation.   *Id.*   During this meeting, Collins asked Hirst whether he thought the environment was toxic; he said no.   *Id.* ¶ 91.   Seeming satisfied with this answer, Collins made no further

---

[4] "Ailes" refers to Fox News's former Chief Executive Office Roger Ailes, who left Fox News after being accused by at least 20 women of sexual misconduct.  Compl. ¶¶ 96–97.

efforts to investigate Eckhart's claim or to remedy the situation. *Id*. Nor did Hirst, who instead allegedly told Eckhart to "prepare herself to face repercussions" if she lodged any further complaints. *Id*.

After this meeting, Eckhart was put on a performance improvement plan, and on June 12, 2020, she was notified that her employment would be terminated on June 26, 2020. *Id*. ¶¶ 92–94. Prior to her departure, Eckhart had an exit interview with Hirst and Collins. *Id*. ¶ 94. During this interview, Collins asked Eckhart "if she had been sexually harassed and/or assaulted while employed by Fox News." *Id*. Eckhart interpreted this question as an indication that Collins understood Eckhart's February complaint to have been about sexual harassment. *Id*. The Complaint does not specify how Eckhart responded to Collins.

## VI.   Eckhart Sues and Defendants Respond

On June 25, 2020, Eckhart put Fox News on notice that she had retained legal counsel in connection with her claims against Henry and Fox News. Compl. ¶ 182. Her counsel relayed to Fox News, in detail, the facts underlying her claims. *Id*. ¶¶ 183–85.

On July 1, 2020, Fox News issued a press release, stating that "it had terminated Mr. Henry based on the findings of an internal investigation" and that Henry had engaged in "sexual misconduct." *Id*. ¶¶ 188–89. Fox News did not inform Eckhart ahead of the press release that Henry would be terminated. *Id*. ¶ 190.

On July 20, 2020, Eckhart filed the original complaint with this Court. Dkt. 1.

On August 7, 2020, Fox News served against Eckhart's counsel a motion for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure. Compl. ¶ 194. The sanctions motion related to the claims brought by Cathy Areu, not Eckhart, but implicated Eckhart because it "assert[ed] that Ms. Areu was used as part of a conspiracy to extort Fox News and obtain a settlement for the benefit of Ms. Eckhart," and included "reference to settlement communications between Fox News and [Eckhart's

attorneys at] Wigdor LLP" which Eckhart asserts "paint[ed] [her] out to be a greedy extortionist rather than a victim of sexual harassment, assault and rape." *Id.* ¶ 194.

On October 19, 2020, in connection with a motion to dismiss Eckhart's claims, Henry filed on the docket a series of photographs showing Eckhart "in a nude or partially nude state." *Id.* ¶ 197. The photos were redacted in part. Henry also posted Eckhart's personal phone number in connection with these photographs. *Id.* ¶ 200. Eckhart has accused Fox News of "ratif[ying] the retaliatory decision to file these highly sensitive photographs." *Id.* ¶ 206. Although Henry and Fox News have different counsel in this matter, Eckhart claims that it is Fox News's "common practice" to steer its former employees to Catherine Foti, Henry's counsel, who "engage[s] in retaliatory litigation" on these former employees' behalf. *Id.* ¶¶ 206, 209. Eckhart similarly alleges that Fox News's counsel has "a history of filing retaliatory litigation." *Id.* ¶ 210.

On November 9, 2020, Eckhart filed her Third Amended Complaint, which is the operative complaint. Dkt. 113. In it she raises eleven causes of action: (1) sex trafficking in violation of 18 U.S.C. §§ 1591, *et seq.*, against both Defendants; (2) hostile work environment, sexual harassment, and gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C §§ 2000-e, *et seq.*, against Fox News; (3) retaliation under Title VII of the Civil Rights Act of 1964 against Fox News; (4) hostile work environment, sexual harassment, and gender discrimination under the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. Law §§ 290, *et seq.*, against both Defendants; (5) retaliation under the NYSHRL against both Defendants; (6) aiding and abetting sex discrimination in violation of the NYSHRL against Henry; (7) hostile work environment, sexual harassment and gender discrimination under the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code §§ 8-101, *et seq.*, against both Defendants; (8) retaliation under the NYCHRL against both Defendants; (9) aiding and abetting sex discrimination in violation of the NYCHRL against Henry; (10) gender-motivated violence in violation of the New York City Gender Motivated Violence Act, N.Y.C. Admin. Code § 8-903, against

Henry; and (11) unlawful dissemination or publication of an intimate image in violation of the New York Civil Rights Law, N.Y. C.L.S. Civ. R. § 52-b, against both Defendants.  Compl. ¶¶ 211–76.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Facial plausibility" means that the plaintiff's factual pleadings "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  In reviewing a motion to dismiss, a court must "draw all reasonable inferences in [the] plaintiff['s] favor." *Freedom Holdings Inc. v. Spitzer*, 357 F.3d 205, 216 (2d Cir. 2004).  A court must also proceed "on the assumption that all the allegations in the complaint are true," even if some allegations are "doubtful in fact." *Twombly*, 550 U.S. at 555.

## DISCUSSION

### I.   Sex Trafficking

Eckhart first seeks to hold Henry and Fox News liable for sex trafficking. Section 1591 of the Trafficking Victims Protection Act ("TVPA") provides, in relevant part:

> Whoever knowingly—
>
> (1) in or affecting interstate or foreign commerce . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1)
> knowing . . . that means of force, threats of force, fraud, coercion . . . , or any combination of such means will be used to cause the person to engage in a commercial sex act, . . . shall be punished . . . .

18 U.S.C. § 1591.  This law criminalizes the knowing participation in and benefit from "sex trafficking" as that term is defined, which extends beyond the ordinary or traditional meaning of the word.  *See David v. Weinstein Co. LLC*, 431 F. Supp. 3d 290, 299 (S.D.N.Y. 2019).

Section 1595 of the TVPA establishes a private right of action for victims of such conduct to bring civil suits against their traffickers.  18 U.S.C. § 1595.  It provides that "[a]n individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys' fees."  *Id*. § 1595(a).

Most TVPA cases present claims of archetypal sex trafficking—that is, forced prostitution or sexual slavery.  *See*, *e.g.*, *S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 150–52 (E.D.N.Y. 2020); *Starr Indem. & Liab. Co. v. Choice Hotels Int'l, Inc.*, 20-CV-3172 (PKC), 2021 WL 2457107 (S.D.N.Y. June 16, 2021).  But in light of the plain text of the statute, numerous courts in this Circuit—including this one—have also applied the TVPA to cases where a victim claims to have been forced or defrauded into sexual activity with the promise of career advancement.  *See David*, 431 F. Supp. 3d 290; *Geiss v. Weinstein Holdings LLC*, 383 F. Supp. 3d 156 (S.D.N.Y. 2019); *Noble v. Weinstein,* 335 F. Supp. 3d 504 (S.D.N.Y. 2018); *Canosa v. Ziff*, 18-CV-4115 (PAE), 2019 WL 498865 (S.D.N.Y. Jan. 28, 2019) (collectively, "the Weinstein cases").

Eckhart alleges that both Henry and Fox News violated the TVPA, albeit in different ways. She claims that Henry did so by enticing her to engage in sexual acts with him in exchange for career opportunities.  Compl. ¶¶ 214–15.  As to Fox News, she claims that the network "knowingly assist[ed] and facilitate[ed] Mr. Henry with the resources and authority to engage in sexual misconduct and . . . help[ed] to 'clean up after' and 'cover up' th[at] sexual misconduct" because it benefitted financially from Henry's continued employment at the network.  *Id.* ¶¶ 218, 220.  Because the elements of each of these claims differ, the Court will analyze them separately.

### A. Henry

Eckhart accuses Henry of directly engaging in sex trafficking.  To state such a claim, Eckhart must plausibly plead that Henry "knowingly and in interstate or foreign commerce: (1) recruited, enticed, harbored, transported, provided, obtained, or maintained by any means a person; (2) knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud . . . or any combination of such means will be used; (3) to cause the person to engage in a commercial sex act."  *Noble v. Weinstein*, 335 F. Supp. 3d at 515 (citing 18 U.S.C. § 1591).  In his motion to dismiss, Henry contends that Eckhart has satisfied none of these three prongs.  Henry Mem. at 13.  The Court disagrees.

### 1. Entice

The TVPA does not define the term entice.  "When a word is undefined in a statute 'we normally construe it in accord with its ordinary or natural meaning.'"  *Noble*, 335 F. Supp. 3d at 517 (quoting *Smith v. United States*, 508 U.S. 223, 228 (1993)); *see also United States v. Gagliardi*, 506 F.3d 140, 147 (2d Cir. 2007) (recognizing that "induce, entice, [and] coerce, though not defined in the statute, are words of common usage that have plain and ordinary meanings").  "The ordinary or natural meaning of 'entice' is supplied by the Merriam-Webster and Oxford dictionaries, which define it as 'to attract artfully or adroitly or by arousing hope or desire,' and '[to] attract or tempt by offering pleasure or advantage,' respectively."  *Noble*, 335 F. Supp. 3d at 517 (citing MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/entice–; OXFORD DICTIONARIES, https://en.oxforddictionaries.com/definition/entice).  Courts in this Circuit, applying this ordinary meaning of the term, have held that making empty promises of career opportunities can qualify as enticement.  *See David*, 431 F. Supp. 3d at 301 (concluding that the defendants' "empty promises of a film role" were "more than enough to arouse hope and desire in [the plaintiff], an aspiring actress, thereby sufficiently enticing her"); *Noble*, 335 F. Supp. 3d at 517 ("What proved to be empty promises of a film

14

role and a modeling meeting were more than enough to arouse hope and desire in [the plaintiff], an aspiring actress and model.").

Here, Eckhart alleges that Henry had offered to help advance her career, telling her that he could "get her in a room with some really powerful people." Compl. ¶ 50. Immediately prior to the alleged rape, Henry "offered to introduce [Eckhart] to his agent (one of the most powerful agents in the journalism industry) and told her that he would bring [her] on his future 'new show' at Fox News as a frequent on-air guest." *Id*. ¶ 65. To lure her back to his hotel room, he allegedly invited her to "further discuss her career opportunities at his hotel." *Id*. ¶ 66. These claims are reminiscent of those raised in the Weinstein cases. The Complaint plausibly alleges the element of enticement.

Henry disputes this conclusion on two grounds. First, he asserts that because he and Eckhart had commenced a consensual sexual relationship prior to the alleged enticement, it is not plausible that he needed to entice her to engage in a sex act. Henry Mem. at 17 n.7; Henry Reply at 2. As an initial matter, while Henry characterizes his pre-existing relationship with Eckhart as "consensual," Henry Mem. at 2; *see also id.* at 1, 7, 10, 15, Eckhart disputes this characterization, alleging that she "relented to sexual intercourse with [Henry] against her will" because she "fear[ed] that her career would be over if she refused Mr. Henry's sexual advances." Compl. ¶ 49. In any event, even if the relationship was at some point consensual, that does not compel the conclusion that no enticement could have occurred. A person may engage in sexual activity with the same person due to enticement on one occasion and absent any enticement on another; the Court sees no basis to conclude that every sexual encounter between parties must fall under the TVPA in order for a plaintiff to have such a claim. This is especially true where, as here, there are sizable gaps in time between each encounter between the parties. *See* Compl. ¶¶ 53–57 (second sexual encounter occurred in September 2015); *id*. ¶¶ 64–73 (third sexual encounter occurred in February 2017). A person may also wish to end a consensual sexual relationship and decide not to do so because he or she has been "enticed" to remain in the relationship. Accordingly, whether

15

the first sexual encounters between Henry and Eckhart were "enticed" does not determine whether a later sexual encounter was.  For these reasons, Henry's contention that the Weinstein cases are distinguishable because none of the parties there engaged in a consensual relationship prior to the alleged enticements does not persuade the Court to find that there could have been no enticement here.

Henry also argues that Eckhart could not have been enticed by his offers because, as a Fox News producer herself, she must have known that his promises were empty.  Henry Mem. at 17.  He contends that "she, as a Fox Producer, knew better than anyone who had power at Fox News to determine guest appearances" and that because she had no experience as a political commentator, "Eckhart would have known that she never would have been chosen as the person to make any appearance, let alone frequent appearances, to engage in high level political analysis." *Id*. at 17 & n.6.  "The problem with [this] argument," however, "is that it requires the Court to draw inferences in [Henry's] favor and against [Eckhart]—the opposite of what the Court must do on a motion to dismiss." *Lawson v. Rubin*, 17-CV-6404 (BMC), 2018 WL 2012869, at *14 (E.D.N.Y. Apr. 29, 2018).  "Although evidence produced in discovery may eventually show that the inferences [Henry] seeks to draw are the correct ones, the Court must draw those inferences in plaintiffs' favor at this stage." *Id*. at *15.  Eckhart has alleged that Henry was "an extremely powerful man at . . . Fox News."  Compl. ¶ 43.  That she would have taken him at his word when he told her he could "bring Ms. Eckhart on his future 'new show' at Fox News as a frequent on-air guest" is thus a reasonable inference to make. *Id*. ¶ 65.  At the very least, Henry has provided the Court no reason to conclude that his promises to "get [Eckhart] in a room with some really powerful people" and to "introduce her to his agent"—both promises he made immediately prior to the alleged rape—were not believable. *Id*. ¶¶ 50, 65.

Eckhart has thus adequately pled that Henry enticed her, satisfying the first element of a TVPA claim.

## 2. Commercial Sex Act

The TVPA defines "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3). Here, the things of value promised to Eckhart were an offer to help advance her career by "get[ting] her in a room with some really powerful people," an offer to "introduce her to his agent (one of the most powerful agents in the journalism industry)," and a promise to "bring [her] on his future 'new show' at Fox News as a frequent on-air guest." Compl. ¶¶ 50, 65. Courts in this Circuit have repeatedly held that such pledges of career support qualify as "thing[s] of value" for the purposes of this statute, even if the promisor does not actually deliver on the promise. *See Canosa*, 2019 WL 498865, at *22, n.26 (a plaintiff's "reasonable expectation of receiving something of value in the future, based on [the defendant's] repeated representations that [plaintiff] would," is "sufficient to satisfy" the statutory term "commercial sex act"); *Noble*, 335 F. Supp. 3d at 521 ("The contention . . . that [plaintiff] was given nothing of value—that the *expectation* of a film role, of a modeling meeting, of '[Weinstein's] people' being 'in touch with her' had no value—does not reflect modern reality.") (emphasis added); *Ardolf v. Weber*, 332 F.R.D. 467, 478 (S.D.N.Y. 2019) (holding that "[the d]efendant's alleged fondling of [the p]laintiffs' genitals was commercial in nature because he offered them valuable career advancement, including future modeling jobs, to allow it to happen") (citations omitted); *Geiss*, 383 F. Supp. 3d at 168 (holding that "the TVPA extends to enticement of victims by means of fraudulent promises of career advancement, for the purpose of engaging them in consensual or . . . non-consensual sexual activity"); *David*, 431 F. Supp. 3d at 304 (plaintiff received a "thing of value" from a meeting to discuss a prospective acting job, even though she never ultimately received the role).

Henry argues that the Complaint does not allege that his promises and offers of career advancement were made in exchange for sex. Henry Mem. at 18. It is true that Eckhart does not assert that Henry explicitly conditioned his promises and offers on anything, including sex. But the TVPA

contains no requirement of an explicit *quid pro quo* in order to establish that a sex act was "commercial." Indeed, in none of the Weinstein cases was the defendant accused of offering the plaintiffs movie roles only on the condition that they have sex with him, and the courts in those cases did not find this lack of explicit *quid pro quo* fatal to the plaintiffs' claim. *See generally David*, 431 F. Supp. 3d 290; *Geiss*, 383 F. Supp. 3d 156; *Noble,* 335 F. Supp. 3d 504.

Eckhart has thus plausibly pled that she engaged in a commercial sex act, satisfying the second element of a sex trafficking claim.

### 3.  Knowing that Force or Fraud Will Be Used

To satisfy this third prong, Eckhart must "plausibly allege knowledge, or a modus operandi, associated with [the] 'enticement,' that Defendant enticed Plaintiff with knowledge that means of force or fraud would be used to cause a commercial sex act to take place." *Noble*, 335 F. Supp. 3d at 517–18. "In other words, [Eckhart] must allege that [Henry] had an awareness or understanding that 'if things go as he has planned, force, fraud or coercion will be employed to cause his victim to engage in a commercial sex transaction.'" *David*, 431 F. Supp. 3d at 301 (quoting *United States v. Todd*, 627 F.3d 329, 334 (9th Cir. 2010)).  Eckhart must also allege that this knowledge existed "at the initial recruitment or enticement stage." *Noble*, 335 F. Supp. 3d at 518.

Henry contends that Eckhart has failed to plausibly plead a modus operandi because, although the Complaint contains allegations of sexual misconduct by other women, *see* Compl. ¶¶ 135, 137, 142, 145, 151, 156, 159, 175, "none of the other women identified in the [Complaint] alleges that Mr. Henry used fraud or force to coerce them into engaging in a commercial sex act." Henry Mem. at 19.  Even if the Court were to accept Henry's characterization of these other accusations, however, the lack of modus operandi is not fatal to Eckhart's claim.  A modus operandi is but one of several ways a plaintiff can show knowledge.  And here, Eckhart adequately alleges knowledge—of both intent to use force and intent to use fraud—through other means.

The accusations in the Complaint charge that Henry's promises to Eckhart became more elaborate and concrete over time, culminating in the most explicit of his offers immediately before the alleged rape. *See* Compl. ¶¶ 50, 65. In *Noble*, the court concluded that the defendant's promises, which "became more frequent and elaborate" over time, indicated that he acted with "knowledge that fraud would be used" to obtain sexual gratification. *Noble*, 335 F. Supp. 3d at 518. The same is true here. Further, it appears from the Complaint that Henry failed to follow through on a single one of his offers to assist Eckhart. *See generally* Compl. The defendant in *Noble* did the same, a fact that the court concluded was "sufficient to support an inference of intent to defraud." *Noble*, 335 F. Supp. 3d at 518.

Eckhart also makes accusations that support the conclusion that Henry knew he would use force against her. In particular, she alleges that Henry sent her messages in the lead up to the February 2017 rape that suggest an intent to use violence against her. *See* Compl. ¶ 61 (alleging that in early 2017, Henry texted Eckhart that she was "[g]ona [*sic*.] get tossed around like a lil rag doll"); *id*. ¶ 63 (asserting that Henry messaged Eckhart that he liked her "[o]wned & submissive").[5] Henry also brought handcuffs with him to their February 2017 rendezvous, which further supports the conclusion that the alleged rape was premeditated. *Id*. ¶ 69.[6]

Based on these accusations, the Court concludes that Eckhart has plausibly pled that Henry knew he would use force or fraud to entice her to engage in a commercial sex act, satisfying the third element of a sex trafficking claim. Henry's motion to dismiss Eckhart's TVPA claim against him is thus denied.

---

[5] As Henry notes in his motion for a more definite statement, Eckhart has not alleged the precise date on which these messages were sent. Henry Mem. at 41. Because Eckhart alleges that the two had no contact after the assault, however, the Court presumes that these messages were sent prior to the assault. Compl. ¶ 82. If discovery reveals otherwise, the Court may reconsider this matter on a motion for summary judgment.

[6] Although Henry's use of degrading language and handcuffs does not, in and of itself, definitively establish that the sexual relationship was nonconsensual and procured only by the threat of violence, the Court must draw all permissible inferences in Eckhart's favor at this stage in the litigation. It will thus adopt Eckhart's characterization of this conduct as nonconsensual for the purposes of the instant motion.

### B.  Fox News

Eckhart does not accuse Fox News of directly engaging in sex trafficking, but rather, of being a "beneficiary" of Henry's sex trafficking pursuant to Section 1595(a), which allows recovery against a defendant who (i) "knowingly benefits" (ii) from "participation in a venture" (iii) that it "knew or should have known" has engaged in sex trafficking.  18 U.S.C. § 1595(a).  The statute defines "venture" as "any group of two or more individuals associated in fact, whether or not a legal entity."   18 U.S.C. § 1591(e)(6).  Henry's professional relationship with the network arguably qualifies as a "venture" under this definition.  *See* Compl. ¶ 7 ("Henry . . .  was one of Fox News' highest-rated anchors.").   The Complaint further asserts that Fox News benefitted from this venture and did so knowingly.  *See id.* ¶ 133 (asserting that Fox News "was at all times aware that if it took action [against] . . . Henry, it would potentially be costing itself millions of dollars" because Henry "generate[d] revenue for the Company").  The Complaint further alleges that Henry used his venture with Fox News to engage in sex trafficking in violation of the statute in that he used his position at the network and his ability to bring Eckhart onto his show as a guest contributor to entice her into committing commercial sex act.  *See id.* ¶ 65 (Henry offered to "bring [] Eckhart on his future 'new show' at Fox News as a frequent on-air guest").

Even assuming that Eckhart has sufficiently alleged the first two elements, however, she has not shown that Fox News "knew or should have known" that any Fox-Henry venture "[had] engaged in an act in violation of" the sex-trafficking statute. 18 U.S.C. § 1595(a).  Eckhart pleads that "Fox News was well aware" that Henry often engaged in "inappropriate sexual misconduct."  Compl. ¶¶ 126, 131.  But none of the conduct that she alleges Fox News had knowledge of rises to the level of sex trafficking.  For example, Fox News knew of Henry's affair, *id.* ¶ 3, and that he completed a sex addiction rehabilitation program at its request, *id.* ¶ 4.  Eckhart alleges that "it was an 'open secret' at Fox News that Mr. Henry was a serial harasser" who "flirted with younger women in the office."  *Id.* ¶¶ 114–15.  She also asserts that several female employees told Paul, Weiss investigators that Henry had engaged in sexually

inappropriate conduct towards them. *Id.* ¶ 5. She further claims that Fox News received a written complaint, stating that "the prospect of Henry's greater prominence on Fox [News] was crushing for female colleagues after the network had promised sweeping changes following Ailes' ouster." *Id.* ¶¶ 6, 113. To be sure, as discussed further below, these allegations could have put Fox News on notice that Henry was engaged in sexual harassment. But none of these allegations involve Henry using force or fraud to obtain a commercial sex act from any of these women. In sum, these allegations, while troubling, are insufficient to establish that Fox News knew or should have known that Henry was specifically engaged in sex trafficking. *See J. B. v. G6 Hosp., LLC*, No. 19-CV-07848 (HSG), 2020 WL 4901196, at *10 (N.D. Cal. Aug. 20, 2020) ("Significantly, while Plaintiff's allegations suggest that [defendant] quite possibly should have been aware of some nefarious conduct, they do not suggest that [defendant] should have known that the venture constituted sex trafficking that violated the TVPRA."). Fox News's motion to dismiss Eckhart's TVPA claim against it is thus granted.

Nonetheless, should discovery uncover evidence that supports Eckhart's contention that Fox News knew or should have known that Henry was using his position at the network to coerce women into engaging in sexual activity with him in exchange for professional benefit, the Court may allow Plaintiff the opportunity to amend the Complaint at that time.

## II.   Hostile Work Environment

Eckhart alleges that Defendants discriminated against her in violation of federal, state, and local law by "subjecting her to sexual harassment[,] assault, rape and a hostile work environment." Compl. ¶¶ 227, 238, 253.[7] Pursuant to Title VII and the NYSHRL, to state a claim of discrimination through

---

[7] In her opposition to the instant motion, Eckhart asserts that she has also raised a claim of *quid pro quo* sexual harassment. Pl. Fox Opp. at 18 n.5 (faulting Fox News for "not . . . address[ing] Plaintiff's claim for sexual harassment under a *quid pro quo* theory of liability" in its memorandum in support of its motion to dismiss). The Complaint, however, does not contain any *quid pro quo* claim, and Eckhart may not assert one now for the first time in responding to the motion to dismiss. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (holding that a complaint did not state a cause of action where the plaintiff had alleged the elements of a claim for the first time in a memorandum opposing the defendant's motion to dismiss); *see also Ifill v. N.Y. State Court Officers Ass 'n*, 655 F. Supp. 2d 382, 393 (S.D.N.Y.

the creation of a hostile work environment, a plaintiff must plausibly allege that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn v. City of New York*, 795 F.3d 297, 320–21 (2d Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *see also Summa v. Hofstra Univ.*, 708 F.3d 115, 123–24 (2d Cir. 2013) ("Hostile work environment claims under both Title VII and the NYSHRL are governed by the same standard."). The NYCHRL standard for establishing a hostile work environment is similar but "more permissive, omitting the requirement that the complained-of conduct be severe or pervasive." *Moazzaz v. MetLife, Inc*, No. 19-CV-10531 (JPO), 2021 WL 827648, at *8 (S.D.N.Y. Mar. 4, 2021).

Defendants do not dispute Plaintiff's position that sending lewd and derogatory texts and engaging in sexual violence could constitute harassment and/or create a hostile work environment. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus. Inc. v. Ellerth,* 524 U.S. 742 (1998) (holding that "even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability."). They nonetheless raise a number of arguments as to why they are not liable. Fox News first asserts that Eckhart failed to exhaust Title VII's administrative remedies before bringing suit. *See* Fox Mem. at 14. Both Defendants challenge the timeliness of Eckhart's claims and contend that even if the claims were timely, that they cannot be held liable for them. *See* Fox Mem. at 12–16; Henry Mem. at 23–30. The Court will assess these challenges in turn.

## A. Exhaustion of Administrative Remedies

Title VII of the Civil Rights Act of 1964 permits a private plaintiff to file suit in federal court, but only after that plaintiff has exhausted her administrative remedies and received notice of her "right

---

2009) (stating that a plaintiff "may not amend his complaint to add new claims by raising them for the first time in his motion papers."). The Court thus declines to assess Eckhart's claim of *quid pro quo* harassment.

to sue" from the Equal Employment Opportunity Commission ("EEOC").  *See Hernandez v. Premium Merch. Funding One, LLC*, 19-CV-1727 (WHP), 2020 WL 3962108, at *3 (S.D.N.Y. Jul. 13, 2020) (citing 42 U.S.C. § 2000e-5).  Before a right to sue letter may be issued, the statute requires a plaintiff to file an administrative charge with the EEOC and give the EEOC the opportunity to investigate the charge and determine whether it wishes to bring suit on the plaintiff's behalf.  42 U.S.C. § 2000e-5(b).  If the EEOC declines to prosecute the case itself, or if it fails to begin its own civil action within 180 days of the filing of the administrative charge, then a right to sue letter must be issued.  *Id*. § 2000e-5(f).

Yet a plaintiff need not always wait the full 180 days to file suit.  Pursuant to EEOC regulation, in instances where "the District Director, the Field Director, the Area Director, the Local Director, the Director of the Office of Field Programs or upon delegation, the Director of Field Management Programs has determined that it is probable that the Commission will be unable to complete its administrative processing of the charge within 180 days from the filing of the charge," the Commission will issue a right to sue letter upon request, regardless of how many days have passed since the filing of the administrative charge.  29 C.F.R. § 1601.28(a)(2).

Here, the EEOC appears to have issued Eckhart a right to sue letter pursuant to this regulation. It issued the letter fewer than 180 days after Eckhart first filed an administrative charge.  *See* Compl. ¶ 16.  Fox News asserts that this letter was issued in violation of the statute and that it is thus invalid.  *See* Fox Mem. at 15.

In essence, Defendant's argument is a challenge to the validity of the EEOC's regulation permitting early right to sue letters.  Defendant raised this same argument in the action against brought against it by Cathy Areu.  *See Areu v. Fox News Network, LLC*, 20-CV-8678 (RA).  Here, as there, the Court declines to adopt Defendant's urged conclusion and will instead follow the reasoning set forth in *Hernandez*, supra.  In *Hernandez*, Judge Pauley addressed a nearly identical challenge to this regulation and concluded—after a thorough analysis conducted under the two-step *Chevron* framework—that the

practice of issuing early right to sue letters does not violate the statute. *See Hernandez*, 2020 WL 3962108, at *5–7 (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984)).   Fox News has not articulated a persuasive reason to depart from Judge Pauley's conclusion or to disagree with his careful and thorough analysis of the issue.

Finding no other flaw in Eckhart's right to sue letter, the Court concludes that Eckhart has exhausted her administrative remedies.

### B. Timeliness

As a general matter, claims brought pursuant to the NYSHRL and NYCHRL are timely only if filed within three years of a defendant's last discriminatory act. N.Y. C.P.L.R. § 214(2); N.Y.C. Admin. Code § 8-502(d); *see also Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 248−49 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013) ("In general, the statute of limitations under the NYSHRL and the NYCHRL is three years.").   Claims brought under Title VII are timely only if the plaintiff files an administrative charge with the EEOC "within 300 days of the alleged discriminatory acts." *Flaherty v. Metromail Corp.*, 235 F.3d 133, 136 n.1 (2d Cir. 2000) (citing 42 U.S.C. § 2000e5(e)(1)).

An exception to this general rule exists, however, in the continuing violation doctrine, which "extends the limitations period for all claims of discriminatory acts committed under an ongoing policy of discrimination even if those acts, standing alone, would have been barred by the statute of limitations." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir. 1998) (quoting *Annis v. Cnty. of Westchester*, 136 F.3d 239, 246 (2d Cir. 1998)) (internal quotation marks and emphasis omitted).   Where, as here, the plaintiff raises a hostile work environment claim, the continuing violation doctrine applies so long as "all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Drew v. Plaza Const. Corp.*, 688 F. Supp. 2d 270, 279 (S.D.N.Y. 2010) (quoting *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002)) (internal quotation marks omitted); *see also Morgan*, 536 U.S. at 122 ("A charge alleging a hostile work

environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the [limitations] period.").

A plaintiff may establish an unlawful employment practice in one of two ways. First, he or she may "demonstrate that the defendant had adopted a discriminatory policy or practice, such as the use of discriminatory lists or employment tests, prior to and during the limitations period." *Nicholas*, 974 F. Supp. at 265 (citing *Lambert*, 10 F.3d at 53). Alternatively, she may "identify[] specific and related incidents of discrimination that an employer permits to continue unremedied for a period of time." *Hansen v. Danish Tourist Bd.*, 147 F. Supp. 2d 142, 155 (E.D.N.Y. 2001); *see also Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir. 1996). "To qualify as a series of related acts, the events . . . must not be isolated and sporadic outbreaks of discrimination, but a dogged pattern." *Nicholas*, 974 F. Supp. at 267 (quoting *Sunshine v. Long Island Univ.*, 862 F. Supp. 26, 29 (E.D.N.Y. 1994)) (internal quotation marks omitted). To this end, a court assessing whether an act is done pursuant to a discriminatory policy or practice must consider the totality of the circumstances alleged, rather than any given incident in isolation. *See Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 62 (2d Cir. 1998) (holding that the district court erred in basing its decision "solely on [the] reported instances of harassment, instead of on the totality of the circumstances"); *see also Morgan*, 536 U.S. at 115 (remarking that in the context of a hostile workplace claim, "[t]he 'unlawful employment practice' . . . cannot be said to occur on any particular day [and instead] occurs over a series of days or perhaps years"). Further, due to the "fact-specific and sensitive" nature of employment discrimination cases and the "amorphous" nature of hostile work environment claims, courts must make "an individualized assessment of whether incidents and episodes are related." *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 77 (2d Cir. 2010) (citing *Morgan*, 536 U.S. at 118).

The Complaint alleges that the majority of the harassing conduct to which Henry subjected Eckhart occurred between "some point in 2014" and February 2017—firmly outside the limitations

period.  Compl. ¶¶ 36, 78, 82.[8]  Eckhart asserts, however, that the three interactions she had with Henry in 2018, described in paragraphs 85 through 87 of the Complaint, were committed pursuant to Henry's "continuing pattern of harassing behavior," and thus suffice to render her hostile workplace claim timely in full pursuant to the continuing violation doctrine.  Pl. Fox Opp. at 14–17.  Henry, in response, characterizes these interactions as "innocuous," and urges the Court not to find them to be a continuation of his earlier alleged conduct.  Henry Mem. at 32.

The Court recognizes certain similarities between the three interactions of 2018 and Henry's prior harassing behavior towards Eckhart.  In each of the three interactions that occurred in 2018, Henry sent Eckhart an unsolicited message.  Compl. ¶¶ 85–87.  Eckhart alleges that unsolicited messages like the ones sent in 2018 were often the first step in Henry's "pattern" of sexual harassment, and were typically "followed by unwelcome sexual advances."  Pl. Henry Opp. at 24 n.7 (citing Compl. ¶¶ 123, 134–181).  Moreover, Henry sent two of these three messages immediately after he witnessed Eckhart turning or running away from him in person, and continued to send the messages even after Eckhart did not respond.  Compl. ¶¶ 85–87.  In these messages, Henry alluded to Eckhart's desire not to see him, asking Eckhart "why'd you turn away today" and sending her an image of a football player in the Heisman pose (a defensive gesture in which the player extends his arm to block contact).  *Id.* ¶¶ 85, 87.  This is reminiscent of multiple prior messages he sent her accusing her of playing "hard to get" after she declined his invitation to drinks.  *Id.* ¶¶ 42, 62.

At the same time, certain aspects of these interactions suggest that they were not related.  Unlike the messages sent in and before 2017, none of the messages sent in 2018 were expressly sexual in nature, and, considered on their own, do not appear to be harassing in nature.  *Id.* ¶¶ 85–87.  As Henry rightly

---

[8] Eckhart also alleges in the Complaint that she was subject to "incessant verbal, written and emotional abuse" by her supervisor, Liz Claman, starting in January 2013.  Compl. ¶¶ 23, 29.  The Court does not understand Eckhart to be bringing a claim based on this alleged abuse by Claman, nor would any such claim survive because it is not alleged that Claman treated Eckhart this way "because of [Eckhart's] race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(b); *see also* N.Y. Exec. Law § 296(a); N.Y.C. Admin. Code § 8-107(1).

notes, this renders this case different from the case law on which Eckhart relies to make her argument. Henry Mem. at 32.  In each of those cases, at least one aspect of the later-in-time interactions could be construed, even in isolation, to constitute harassment or discrimination.  *See Robinson v. Brooklyn Coll.*, 09-CV-2174 (DLI), 2010 WL 3924012, at *5 (E.D.N.Y. Sept. 29, 2010) (defendant sent an e-mail during the limitations period that contained "sarcastic language [intended] to overtly disparage and insult" plaintiff); *Isbell v. City of N.Y.,* 316 F. Supp. 3d 571, 586 (S.D.N.Y. 2018) (defendants transferred African American plaintiff to different departments and then replaced her with a non-African American person within the limitations period); *Drew v. Plaza Const. Corp.*, 688 F. Supp. 2d 270, 279 (S.D.N.Y. 2010) (defendant "directed profanity at [the plaintiff] and raised his voice in a demeaning manner" during the limitations period).  Further, over a year passed between the last clearly harassing interaction and the 2018 messages.  *See* Compl. ¶¶ 80, 85.  Some courts have held this extended passage of time fatal to a continuing violation claim.  *See Purcell v. N.Y. Inst. of Tech. - Coll. of Osteopathic Med.*, 931 F.3d 59, 65 (2d Cir. 2019) (concluding that because the plaintiff's claims were "separated by almost two years, during which period he does not allege any discrimination by" the defendant, the plaintiff had "not plausibly alleged that he is the victim of any 'ongoing' discriminatory practice or policy").  *But see Morgan*, 536 U.S. at 118 (explaining that even if nearly a year has lapsed between discriminatory events, a hostile work environment may exist for that entire period).

Nonetheless, drawing all plausible inferences in Eckhart's favor, the Court concludes that a reasonable factfinder could determine that the 2018 messages were part of the same overarching harassment that occurred from 2014–2017. The fact that the 2018 messages were not expressly sexual or harassing in nature may weaken Eckhart's argument that the 2018 messages were a continuation of Henry's prior harassment, but they do not compel a conclusion that there was no continuing violation. To begin with, as noted above, the Court must not consider the 2018 messages in isolation, but in context. *See Distasio*, 157 F.3d at 62.  In context, the messages appear consistent with Henry's alleged long-

standing pattern of sexually harassing communications.  The messages were unsolicited and could be construed to express frustration with Eckhart for declining his advances or appearing "hard to get." He continued to send them, moreover, even in face of repeated signals that she was not interested in speaking with him either in person or by message.  Furthermore, the pleadings suggest that long stretches of time often separated Henry and Eckhart's communications, even during the 2014 through 2017 period.  *See* Compl. ¶ 53 (indicating that several months passed between Eckhart's first sexual encounter with Henry and their next interaction).  This may be due to the fact that Henry and Eckhart lived in different cities and appear to have interacted primarily when Henry was in New York.  *See*, *e.g.*, Compl. ¶¶ 54–57 (the parties' second sexual encounter occurred when Henry was visiting Fox News's New York studio).  That over a year passed between the 2017 and 2018 interactions, then, may not be as significant here as it was in a case like *Purcell*.  Finally, the fact that the 2018 messages were not expressly sexual in nature is not fatal to the finding of a continuing violation, since "'facially neutral incidents [of harassment] may be included among the totality of the circumstances that courts consider in any hostile work environment claim,' so long as . . . there is some evidentiary basis for inferring that [they] were motivated by the plaintiff's gender." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547–548 (2d Cir. 2010) (quoting *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002)).  Particularly where the same individual—in this case, Henry—"engage[s] in some harassment that is explicitly discriminatory and some that is not, the entire course of conduct is relevant to a hostile work environment claim." *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 388 (2d Cir. 2020). Here, the fact that Henry's 2018 messages to Eckhart were sent after he is alleged to have violently raped her colors the Court's perception of them.  A picture of a football player doing a defensive measure certainly takes on a different meaning when it is sent by an alleged rapist to his purported victim immediately after she "physically ran away from" him.

To be clear, a reasonable factfinder could ultimately conclude that the 2018 messages are too dissimilar or too removed from the harassment alleged in the 2014–2017 period to be considered a

continuing violation. *See Calcutti v. SBU, Inc.*, 224 F. Supp. 2d 691, 697 (S.D.N.Y. 2002) (citation omitted) ("Questions of fact that arise in applying a statute of limitations are for the trier of fact."); *Katz v. Goodyear Tire & Rubber Co.*, 737 F.2d 238, 243 n.2 (2d Cir. 1984) ("Where the statute of limitations operates as an affirmative defense . . . issues of fact as to the application of that defense must be submitted to the jury."). Henry may well be able to persuade a jury (or the Court after the development of a full factual record) that the 2018 messages were innocuous. But they may have instead been the continuation of his longstanding practice of sending Eckhart unsolicited messages followed by lewd or pornographic images and sexual propositions. Because both inferences can reasonably be drawn from the face of the Complaint, at this stage of the litigation, the Court will adopt the inference more favorable to Eckhart. The Court thus finds that a continuing violation has been plausibly pled.[9]

Because the continuing violation doctrine applies, the statute of limitations runs from the date on which Henry sent Eckhart the final of the three 2018 messages. The first message was sent on October 5, 2018. Compl. ¶ 85. The second was sent "[l]ess than three weeks later"—meaning on or before October 26, 2018. *Id*. ¶ 86. The third message is undated, although it seems to have occurred around the same time, and at least occurred at some time in 2018. *See id*. ¶ 88. Because 2018 was within three years of the commencement of this litigation, Eckhart's NYSHRL and NYCHRL claims are timely.

The Title VII statute of limitations, however, is significantly shorter and has not been satisfied here. For Eckhart's Title VII claim to survive, she must have filed her charge with the EEOC within 300 days of the last discriminatory act she suffered. 42 U.S.C. § 2000e-5(e)(1). The Complaint does not explicitly state the date on which Eckhart filed her administrative charge. *See* Compl. ¶ 16. It does assert, however, that "[o]n September 15, 2020, Ms. Eckhart received her Notice of Right to Sue from

---

[9] Defendants also express concern that holding that the 2018 interactions were a continuation of the prior alleged harassment would in effect prohibit a person accused of harassment from ever speaking to his alleged victim again without risking a re-opening of the statute of limitations. Henry Reply 15–16. But the Court does not think its holding on this matter will open the door as wide as Henry fears. Henry did not just "say hello" to Eckhart; over the course of several weeks or months, he persisted in sending her several unsolicited messages, in response to what he acknowledged were multiple attempts to evade interaction with him, and which arguably continued his previous theme that Eckhart was "hard to get." Compl. ¶¶ 54–57.

the EEOC." *Id*. And in her opposition to the instant motion, she acknowledges—albeit implicitly—that she received this notice within 180 days of filing her charge. Pl. Fox Opp. at 17 (recognizing that the EEOC "issued Eckhart an early right to sue notice"). Accordingly, the administrative charge must have been filed no earlier than March 19, 2020.

Although the dates are not precise, it seems clear to the Court at this juncture that over 300 days passed between the last discriminatory act—which occurred at some point in late 2018—and the filing of the administrative charge—which occurred no earlier than March 2020. Eckhart's claim for discrimination under Title VII is therefore untimely and must be dismissed.

### C. Henry's Liability

Henry contends that even if Eckhart's NYSHRL and NYCHRL discrimination claims are timely, he cannot be liable for his conduct toward her under these statutes. Henry Mem. at 23–25. Eckhart seeks to hold Henry liable under both a direct liability theory and an aiding and abetting theory. *See* Compl. ¶¶ 237–66. Henry disputes his liability under either theory.

#### 1. Direct Liability

In claims of discrimination under the NYSHRL, direct individual liability is "limited to individuals with ownership interest or supervisors, who themselves[] have the authority to hire and fire employees." *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 365–66 (S.D.N.Y. 2018). The Complaint contains no allegations to support the conclusion that Henry was ever Eckhart's supervisor, or that he had the authority to hire or fire her. Indeed, nowhere does Eckhart allege that the two ever worked together. Instead, Eckhart argues that because Henry promised to bring her on his show but did not claim that his ability to do so was dependent on the approval of others, he thus had the power to hire her. Pl. Henry Opp. at 19. But having someone on one's show as a guest does not alone form the basis of an employer-employee relationship. If it did, Fox News's anchors would be the employers of each of their guest correspondents, which this Court and others have previously found to be untrue.

*See Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 442–44 (S.D.N.Y. 2018); *see also*

Decision on Motion to Dismiss in *Areu v. Fox News Network, LLC*, 20-CV-8678 (RA) (opinion issued

simultaneously with this opinion). The Court thus concludes that Henry may not be held directly liable

for the alleged violations of the NYSHRL.

The NYCHRL, however, provides a broader basis for direct individual liability than does the

NYSHRL. "The NYCHRL makes it unlawful for 'an employer or an employee or agent thereof, because

of the actual or perceived . . . gender . . . of any person . . . to discharge from employment such person

or to discriminate against such person in compensation or in terms, conditions or privileges of

employment.'" *Malena*, 886 F. Supp. 2d at 366 (quoting NYCHRL § 8-107(1)(a)). "Thus, the NYCHRL

provides for individual liability of an employee 'regardless of ownership or decisionmaking power.'" *Id.*

(quoting *Banks v. Corr. Servs. Corp.*, 475 F. Supp. 2d 189, 200 (E.D.N.Y. 2007)). Under this standard,

Henry may be held directly liable for the alleged breaches of the NYCHRL.

Henry seeks to circumvent this conclusion by urging the Court to instead follow *Hughes v.

Twenty-First Century Fox*, which concluded that "[s]ince the NYSHRL 'uses virtually identical language

to the applicable NYCHRL provision, claims under both statutes are subject to the same analysis.'" 304

F. Supp. 3d at 450–51 (quoting *Emmons v. City Univ. of N.Y.*, 715 F. Supp. 2d 394, 421 (E.D.N.Y.

2010)). The Court, however, finds *Malena* more persuasive in this regard. Among other things, the

quote from *Emmons* on which the *Hughes* court relied was referring to the element of actual

participation—which is the same between the two statutes—not that of supervisory authority or

ownership interest—which is not. *Compare* N.Y.C. Admin. Code § 8-107(1) (NYCHRL) (making it

unlawful for "an employer or an employee or agent thereof" to discriminate), *with* N.Y. Exec. Law §

296(a) (NYSHRL) (prohibiting "employer[s]" from discriminating). The Court thus follows the

reasoning of *Malena* and not that of *Hughes* on this issue. As an employee of Eckhart's employer who

actually participated in the alleged harassment, Henry may be directly liable for his alleged discrimination under the NYCHRL.

## 2. Aiding and Abetting

In instances where a person is not directly liable for violating the NYSHRL, that person may still be liable if he is found to have "aid[ed], abet[ted], incite[d], compel[led] or coerce[d] the doing of any of the acts forbidden under this [provision], or to attempt[ed] to do so."  N.Y. Exec. Law § 296(6).[10] Eckhart asserts that she seeks to hold Henry liable "for aid[ing] Fox in establishing a work environment that has, for years, permitted the unrepentant sexual harassment and assault of women."  Pl. Henry Opp. at 20.  She has not, however, pled any facts to support this theory of liability.  Although she claims that Henry contributed to the general climate at Fox News, she has not pled, for example, that he "facilitate[d]," "clean[ed] up after," or "cover[ed] up" anyone else's misconduct.  Compl. ¶ 220.

The only unlawful harassment Eckhart claims to have suffered was by Henry himself, and the Court doubts that Henry could aid and abet a violation of the NYSHRL by his employer that is premised *entirely* upon his own misconduct. Such a theory would turn the NYSHRL into "a limitless backstop capturing all persons who do not meet the definition of 'employer,' and thus would erase any distinction the legislature sought to draw" between employers and non-employers. *Lippold v. Duggal Color Projects, Inc.*, No. 96 CIV. 5869 (JSM), 1998 WL 13854, at *3 (S.D.N.Y. Jan. 15, 1998) (citing *Trovato v. Air Express Int'l*, 655 N.Y.S.2d 656, 657 (2d Dep't 1997)). Although the Second Circuit has found individual defendants liable under § 296(6) even where their own conduct created the hostile work environment that they were alleged to have aided and abetted, *see Tomka*, 66 F.3d at 1317, several courts since *Tomka*, including New York appellate courts, have held that "[a]n individual may not be held liable

---

[10] The same is true for the NYCHRL.  *See Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 344 (S.D.N.Y. 2009)  ("A claim for aider and abettor liability is also cognizable under the NYCHRL and is susceptible to the same standard as under the NYSHRL, as language of the two laws is 'virtually identical.'").  But because Henry may be held directly liable for violating the NYCHRL, the Court need not address Eckhart's claim that he is liable under the NYCHRL as an aider and abettor of discrimination.  *Cf. Hughes*, 304 F. Supp. 3d at 450–51 (assessing plaintiff's aiding and abetting claims against only those defendants against whom direct liability could not be imposed).

. . . merely for aiding and abetting his own discriminatory conduct but only for assisting another party in violating the NY[S]HRL." *Virola v. XO Communications, Inc.*, No. 05-CV-5056 (JG), 2008 WL 1766601, at *20 (E.D.N.Y. Apr. 15, 2008); *Malena*, 886 F. Supp. 2d at 367 (same); *Strauss v. New York State Dep't of Educ.*, 26 A.D.3d 67, 73 (3d Dep't 2005) ("[W]e hold that individuals cannot be held liable under Executive Law § 296(6) for aiding and abetting their own violations of the Human Rights Law."). In *Malanga v. NYU Langone Med. Ctr.*, No. 14-CV-9681 (WHP), 2015 WL 7019819 (S.D.N.Y. Nov. 12, 2015), Judge Pauley limited *Tomka*'s reach to cases where there were "*multiple* individual defendants alleged to have been engaged in direct, related discriminatory acts against the plaintiff," such that each individual defendant aided and abetted his fellow defendants' acts. *Id.* at *5, n.3 (emphasis added). In *Malanga*, like this case, a single "primary discriminatory actor" was alleged to have aided and abetted "her own illegal actions," which the court held to be an insufficient basis for liability under § 296(6).  *Id.* at *5.  *See also Caravantes v. 53rd St. Partners, LLC*, No. 09–cv–7821 (RPP), 2012 WL 3631276, at *21 (S.D.N.Y. Aug. 23, 2012) ("Unlike in *Tomka*, where three co-workers allegedly aided and abetted each other in the harassment, here [defendant] acted alone with respect to his harassment of [plaintiff]. Under these circumstances, Courts have been reluctant to impose individual liability for aiding and abetting under the NYSHRL or NYCHRL.").[11] Finding these decisions persuasive, the Court concludes that Eckhart has failed to plausibly plead a claim for aiding and abetting liability against Henry.  Because he cannot be held directly liable for his alleged violations of the NYSHRL, Eckhart's NYSHRL claims against Henry are dismissed in full, although her NYCHRL claim against him survives under the direct liability theory addressed above.

---

[11] *But see Johnson v. County of Nassau*, 82 F.Supp.3d 533, 536–37 (E.D.N.Y. 2015) ("Regardless of whether other employees contributed to the discrimination, under *Tomka*, a plaintiff may succeed in a claim under the NYSHRL by showing the employer entity's having encouraged, condoned, or approved the discriminatory conduct of a sole employee—the same discriminatory conduct which then, perhaps circularly, proves individual liability under the aiding and abetting provision of Section 296(6)." (internal citations omitted)); *Tully-Boone v. N. Shore-Long Island Jewish Hosp. Sys.*, 588 F. Supp. 2d 419, 427 (E.D.N.Y. 2008) (individual defendant may be "held liable for aiding and abetting allegedly unlawful discrimination by her employer even where her actions serve as the predicate for the employer's vicarious liability").

### D.  Fox News's Liability

Just as Henry contends he cannot be held liable for his discriminatory and harassing conduct against Eckhart, so too does Fox News, albeit on different grounds.

#### 1.  NYCHRL

Under the NYCHRL, a court may only impute an employee's harassing conduct to an employer (1) "where the offending employee 'exercised managerial or supervisory responsibility'" over the victim; (2) "where the employer knew of the offending employee's unlawful discriminatory conduct and acquiesced in it or failed to take 'immediate and appropriate corrective action'"; or (3) "where the employer 'should have known' of the offending employee's unlawful discriminatory conduct yet 'failed to exercise reasonable diligence to prevent [it].'" *Zakrzewska v. New Sch*., 928 N.E.3d 1035, 1039 (N.Y. 2010) (quoting N.Y.C. Admin. Code § 8107(13)(b)(1)–(3)).  As stated above, Henry was not Eckhart's manager or supervisor.  Fox News can thus be held liable for Henry's conduct only if it knew or should have known about it.  It argues that Eckhart has plausibly pled neither.  The Court disagrees.

Eckhart pleads the following facts in support of her assertion that Fox News knew or should have known about Henry's harassing behavior:

She alleges that "it was an 'open secret' at Fox News that Mr. Henry was a serial harasser who used his power to prey on younger female employees," Compl. ¶ 4, and supports this accusation with a series of corroborating statements allegedly made by current and former Fox News employees. *See id.* ¶ 114 (quoting a news report in which "one [Fox News] staffer . . . recalled how she was repeatedly warned about [Mr.] Henry's behavior"); *id.* ¶ 116 (quoting another staffer in that same news report saying that she "heard it from some males who were aware about names [she] should stay away from or watch out for [and] Henry consistently came up"); *id.* ¶ 117 (noting that a former Fox News producer told Eckhart that she "[couldn't] see how [Fox News] couldn't" have known about Mr. Henry, and that "[she] fe[lt] like [she] knew about this even before [she] went to Fox.  If not then, early on there").

She also alleges that in 2017, Fox News received a written complaint, stating that "the prospect of Henry's greater prominence on Fox [News] was crushing for female colleagues after the network had promised sweeping changes following Ailes' ouster."  *Id*. ¶¶ 6, 113.  Fox News contends that because this complaint makes no explicit mention of sexual harassment, the network had no reason to believe it was at all related to sexual misconduct.  Fox Mem. at 17.  But the Complaint's reference to Roger Ailes' ouster for engaging in sexual misconduct with at least twenty women, Compl. ¶¶ 96–97, its reference to the "sweeping changes" that were promised to result from it, *id*. ¶ 113, and its assertion that Henry's ascent would be crushing specifically "for female colleagues," *id*. ¶ 6, all support the inference that this complaint was related to some claim of sexual misconduct, even if it did not say so explicitly.

Finally, Eckhart references Paul, Weiss's 2016 internal investigation into sexual harassment in the company, during which multiple women allegedly reported that Henry had engaged in sexually inappropriate conduct towards them.  Compl. ¶¶ 5, 111.  As Eckhart points out, a company can be presumed to have knowledge of complaints made to investigators working on its behalf.  *See Patane v. Clark*, 508 F.3d 106, 115 (2d Cir. 2007).  The facts of *Patane* differ from those of the instant case, in that the investigator the plaintiff reported to in *Patane* was an employee of the defendant, while the agent reported to here was an outside actor.  Nonetheless, the internal investigation still at the very least bolsters the inference that Fox News was aware of Henry's conduct, particularly in view of Eckhart's allegation that Paul, Weiss shared its report with "multiple members of Fox News' senior management" including "Fox News' Executive Vice President of Human Resources, Kevin Lord, as well as Fox News['s] President and Executive Editor, Jay Wallace, and Fox Business Network['s] President, Lauren Petterson."  Compl. ¶¶ 5, 111.

Because these allegations suffice, at this stage, to establish that Fox News knew or should have known of Henry's misconduct, *see Zakrzewska*, 14 N.Y. 3d at 479, Fox News cannot escape liability under the NYCHRL for Henry's alleged harassment.

35

### 2. NYSHRL

Under the NYSHRL, liability for an employee's discriminatory acts may not be imputed to an employer "unless the employer became a party to it by encouraging, condoning, or approving it." *Forrest v. Jewish Guild for the Blind*, 819 N.E.2d 998, 1011 (N.Y. 2004) (quoting *Matter of State Div. of Human Rights v. St. Elizabeth's Hosp.*, 487 N.E.2d 268, 269 (N.Y. 1985)). "Condonation, which may sufficiently implicate an employer in the discriminatory acts of its employee to constitute a basis for employer liability under the [state] Human Rights Law, contemplates a knowing, after-the-fact forgiveness or acceptance of an offense. An employer's calculated inaction in response to discriminatory conduct may, as readily as affirmative conduct, indicate condonation." *St Elizabeth's Hosp.*, 487 N.E.2d at 269.

The Court finds that Fox News is plausibly alleged to have condoned Henry's discrimination and harassment and may therefore be liable for it under the NYSHRL. Eckhart claims that "Fox News ignored the many, many red flags" surrounding Henry—namely, the above-cited allegations and rumors of sexual impropriety—and "rewarded Mr. Henry with a series of promotions," which she claims, "only emboldened him and encouraged him to escalate his mistreatment of women." Compl. ¶¶ 8–9. She further alleges that "so long as Mr. Henry was continuing to generate revenue for the Company, it was willing to look the other way and even provide him access to additional victims." *Id.* ¶ 133. Accepting these factual allegations as true, the Court concludes that Eckhart has plausibly pled that Fox News condoned Henry's harassing behavior.

\*\*\*

In sum, Defendants' motion to dismiss Eckhart's claims of discriminatory harassment and a hostile work environment is granted in part. Plaintiff's Title VII claim against Fox News is dismissed as untimely and her NYSHRL claim against Henry is dismissed for failure to state a claim. Her

NYSHRL claim against Fox News and her NYCHRL claims against both Defendants may proceed to the next stage in this litigation.

## III.   Retaliation

To demonstrate a prima facie case of retaliation, a plaintiff "must show (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (quoting *McMenemy v. City of Rochester*, 241 F.3d 279, 282–83 (2d Cir. 2001)).  Under Title VII and the NYSHRL, an action qualifies as an adverse employment action only if it is "materially adverse to a reasonable employee or job applicant."  *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010); *see also Benzinger v. Lukoil Pan Ams., LLC*, 447 F. Supp. 3d 99, 124 (S.D.N.Y. 2020).  The adverse action alleged need not relate to the specific terms and conditions of employment so long as "a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Burlington Northern & Santa Fe Railway v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  Under the NYCHRL, on the other hand, an action may be an adverse employment action so long as it is "reasonably likely to deter a person from engaging in protected activity."  N.Y.C. Admin. Code § 8-107(7); *Fletcher v. Dakota, Inc.*, 99 A.D.3d 43, 51–52 (1st Dep't 2012) (noting that the statute prohibits retaliation of any kind that "disadvantage[s]" a plaintiff even if it does "not result in . . . a materially adverse change" to the plaintiff's employment).

Here, the Complaint alleges three forms of retaliation against Fox News—terminating Eckhart's employment, issuing a press release about Henry's termination, and filing a motion for sanctions against her attorney pursuant to Federal Rule of Civil Procedure 11. It also alleges an additional form of

retaliation against both Henry and Fox News: filing what he claimed were nude and partially nude pictures of her on the public docket.  The Court will discuss each in turn.

### A. Termination

Fox News contends that Eckhart has failed to plausibly allege that she was fired for engaging in a protected activity.  Fox Mem. at 19.[12]  Under all three statutes, a protected activity is any "action taken to protest or oppose statutorily prohibited discrimination." *Scott-Robinson v. City of New York*, 15-CV-9703 (NRB), 2016 WL 7378775, at *3 (S.D.N.Y. Dec. 15, 2016) (quoting *Fernandez v. Windmill Distrib. Co*., 159 F. Supp. 3d 351, 367 (S.D.N.Y. 2016)).  "[G]eneralized complaints of unfair treatment" do not qualify as a protected activity.  *McGullam v. Cedar Graphics, Inc*., 04-CV-2891 (AKT), 2008 WL 3887604, at *9 (E.D.N.Y. Aug. 20, 2008), *aff'd*, 609 F.3d 70 (2d Cir. 2010).  Instead, "in order to be protected activity[,] the complainant must put the employer on notice that the complainant believes that discrimination is occurring."  *Ramos v. City of New York*, 96-CV-3787 (DLC), 1997 WL 410493, at *3 (S.D.N.Y. July 22, 1997).  "[N]o magic words . . . must be used" when making such a complaint, so long as the employer could "reasonably have understood" that the employee was complaining about discrimination.  *Id*.; *Sherman v. Cnty. of Suffolk*, 71 F. Supp. 3d 332, 352 (E.D.N.Y. 2014) ("[I]mplicit in the requirement that the employer have been aware of the protective activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." (quoting *Jackson v. Syracuse Newspapers*, 10-CV-1362 (NAM), 2013 WL 5423711, at *20 (N.D.N.Y. Sept. 26, 2013)) (internal quotation marks removed)).  Courts must assess an employee's complaint in context, rather than in isolation.  *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 113 (2d Cir. 2019).

---

[12] Eckhart does not allege that Henry played any role in her termination.  *See* Pl. Henry Opp. at 20 (asserting that her retaliation claim against Henry stems only from "his conduct after Plaintiff filed the instant action").

In February 2020—four months before her termination—Eckhart informed her manager, Brad Hirst, as well as the Senior Vice President of Human Resources at Fox News, Denise Collins, "about the abuse and hostility that she had endured" at Fox News.  Compl. ¶ 90.  Concededly, however, she "did not explicitly mention sexual harassment or misconduct" when she made this complaint.  *Id*.  Yet she asserts that Hirst and Collins nonetheless understood that she was complaining about unlawful sexual harassment at this time.  Pl. Fox Opp. at 5.  She urges that her complaint to Collins and Hirst must be read in context.  Pl. Fox Opp. at 25–26.  In the years immediately preceding this complaint, Fox News received complaints of sexual harassment and sexual misconduct by over twenty female employees.  *See* Compl. ¶¶ 95–99, 111.  Given that context, Eckhart contends that it would be reasonable for an executive at the network to understand her reference to the "abuse and hostility" she endured as a reference to sexual abuse or gender-based harassment.  Pl. Fox Opp. at 25–26.  She also notes that upon her termination in June 2020, Collins—who was present when she made her initial complaint in February 2020—asked her if "if she had been sexually harassed and/or assaulted while employed by Fox News."  Compl. ¶ 94.  She reasons that Collins asking her this question upon her exit from the company suggests that Collins understood Eckhart's initial complaint to have been about sexual harassment and/or assault, which would render it protected activity.

Viewing the allegations in the light most favorable to Eckhart, the Court finds this inference to be plausible. Fox News counters by characterizing Collins's question as a "standard question" that is a "best practice" followed by many employers, and urges the Court not to draw the inference Eckhart proposes.  Fox Mem. 21.  This may be true, but because it was not alleged in the Complaint, this assertion is not properly before the Court at this time.  Discovery may reveal that this was indeed a standard question that Fox News asks of all its departing employees, and a factfinder may not accept the inference that Eckhart has put forth.  But at the present juncture, confining its inquiry only to the four corners of the operative Complaint, the Court agrees with Eckhart that the allegations are sufficient.

Eckhart has thus plausibly alleged that Fox News understood that she was opposing unlawful gender discrimination when she complained about "the abuse and hostility that she had endured for years" in February 2020, and therefore that she engaged in protected activity.  Compl. ¶ 90.  And because this protected activity occurred in close proximity to her termination (about four months before it), and because, according to Eckhart, prior to her termination she had received only positive feedback and several promotions, the Court concludes that she has plausibly alleged "a causal connection between" her complaints and her termination.  *Jute*, 420 F.3d at 173.[13]  Eckhart's retaliatory termination claim thus survives.

## B. Press Release

Eckhart next asserts that the press release Fox News issued following Henry's termination was retaliatory, in that (1) it stated only that Henry had engaged in "sexual misconduct" rather than "rape," thereby "whitewash[ing]" Henry's misdeeds and in so doing, sending a message that Fox "remained committed to . . . protecting the reputations of serial harassers, and even rapists,"  Pl. Fox Opp. at 27; and (2) because Eckhart was not provided with advance notice of the press release, its publication "forced [her] to confront her rapist and relive her experience through public news reports."  *Id*. at 27–28.  Fox

---

[13] Although some courts have found a gap of about four months between protected activity and termination to be an insufficient basis on its own to draw an inference of causation, *see Kouakou v. Fideliscare New York*, 920 F. Supp. 2d 391, 401 (S.D.N.Y. 2012); *Dixon v. Int'l Fed'n of Accts.*, 416 F. App'x 107, 110 (2d Cir. 2011), the Second Circuit has repeatedly made clear that there is no "bright line" rule regarding the necessary temporal proximity, *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (passage of six months between protected activity and alleged retaliation, under the circumstances of the case, was sufficient to support an inference of a causal connection). *See also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("Though this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship."). This flexible approach has allowed courts to "exercise . . . judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Espinal*, 558 F.3d at 129. In this case, the combination of Eckhart's positive performance record and feedback continuing right up to her February 2020 complaint to Hirst and Collins, *see* Compl. ¶¶ 30, 33, as well as the proximity of her alleged protected activity to her termination, supports an inference of a causal connection. *See Kurlender v. Ironside Grp., Inc.*, 18-CV-3839 (JFB), 2019 WL 1317405, at *5 (E.D.N.Y. Mar. 22, 2019) ("Given plaintiff's detailed allegations that he was terminated from his position for supposed 'poor performance,' yet he had not received any ratings or evaluations as to performance, and had even been assured 'that his performance was superior and that he was doing a great job,' in conjunction with the temporal proximity [of six or seven months] between plaintiff's protected activity and his termination, the Court concludes that plaintiff has plausibly stated a claim for retaliatory termination." (internal citations omitted)).

News disputes that the press release was "reasonably likely to deter a person from engaging in [a protected activity]." Fox Mem. at 22 (citing *Ramirez v. Michael Cetta Inc.*, 19-CV-986 (VEC), 2020 WL 5819551, at *20 (S.D.N.Y. Sept. 30, 2020)).[14]

Even when viewing the pleadings in the light most favorable to Eckhart and making all reasonable inferences in her favor, the Court cannot agree that this press release was likely to deter protected activity. To be sure, from Eckhart's perspective, it would have been preferable for her to have had advance notice of the press release. But especially given the fact that she no longer worked for the network at that time, it was not reasonable for her to expect the network to run it by her before issuing it. With regard to the language used in the press release, the Court is unconvinced that Fox News's decision to announce that Henry was fired for "sexual misconduct" rather than "rape" would have any effect on a future employee's decision to report sexual harassment. Eckhart has not plausibly pled that this press release was retaliatory.

### C. Sanctions Motion

Defendants advance multiple arguments as to why Fox News's filing of a Rule 11 motion against Eckhart's counsel is not retaliatory. The Court need not address each of these arguments, for it holds, as it does in *Areu*, that this act was a "reasonable defensive measure[]," which the Second Circuit has held "do[es] not violate the anti-retaliation provision of Title VII, even though [it is] adverse to the charging employee." *Richardson v. Comm. on Human Rights & Opportunities*, 532 F.3d 114, 123–24 (2d Cir. 2008); *Gaughan v. Rubenstein*, 261 F. Supp. 3d 390, 420 n.4 (S.D.N.Y. 2017) (holding that the filing of motions "as part of . . . defenses in litigation[]" is not retaliatory); *see also Steffes v. Stepan Co.*,

---

[14] Henry is not alleged to have played any role in the issuance of this press release.

144 F.3d 1070, 1075 (7th Cir. 1998) (noting that "it will be the rare case in which conduct occurring within the scope of litigation constitutes retaliation").[15]

### D.  Lewd Photographs

Henry likewise contends that his filing on the public docket of nude and partially nude photos Eckhart sent him cannot be deemed retaliatory because this too was done as part of his defense in this litigation.   Henry Mem. at 29.[16]   The Court disagrees.   As noted above, only "*reasonable* defensive measures" are immune from allegations of retaliation.   *Richardson*, 532 F.3d at 124 (emphasis added). The filing of these photographs was by no means reasonable.

As an initial matter, it was not a reasonable defensive measure to file these photographs in connection with the motion to dismiss, since the photographs could not be of use to the Court at this stage of the case.   A court may not consider extrinsic documents in deciding a motion to dismiss unless those documents are "incorporated by reference" into the complaint or "the complaint 'relies heavily upon [their] terms and effect,' which renders the document[s] 'integral' to the complaint."   *Deluca v. AccessIT Group, Inc.*, 695 F. Supp. 2d 54, 59–60 (S.D.N.Y. 2010) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)).   "To be incorporated by reference, the Complaint must make a clear, definite and substantial reference to the documents."   *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330–31 (S.D.N.Y. 2003).   A document is integral to a complaint "only when it is clear that the

---

[15] Nor need the Court engage with Eckhart's argument regarding the continued authority of *U.S. v. N.Y.C. Transit Authority*, 97 F.3d 672 (2d Cir. 1996) following the Supreme Court's decision in *Burlington Northern & Santa Fe Railway v. White*, 548 U.S. 53 (2006). Pl. Henry Opp. at 23.  Even if *Burlington* did overrule *N.Y.C. Transit Authority*'s holding in regard to reasonable defensive tactics—which it arguably did not—numerous post-*Burlington* decisions, including the ones cited above, continue to hold as the Circuit did in *N.Y.C. Transit Authority*.  *See Richardson*, 532 F.3d at 123; *Gaughan*, 261 F. Supp. 3d at 420 n.4.

[16] Even if Henry's attorney was the one who directly performed the act of filing the document containing the nude photos on ECF, Henry does not claim that she did so without his consent or direction.  The Court will thus proceed to analyze this claim under the assumption that Henry is individually responsible for the filing of the photographs.  *See Canale v. Manco Power Sports, LLC*, No. 06-CV-6131 (PKL), 2010 WL 2771871, at *4 (S.D.N.Y. July 13, 2010) ("[I]t is well established that a party is responsible for the actions of his or her attorney.").

plaintiff relied on the document in preparing his complaint." *Williams v. City of New York*, 14-CV-5123 (NRB), 2015 WL 4461716, at *2 (S.D.N.Y. July 21, 2015) (emphasis omitted).

The photographs meet neither of these standards. Henry contends that because Eckhart incorporated several communications between Eckhart and Henry in the Complaint, that she incorporated the communications and images she sent him at other times, including the complained of photographs. Henry Reply at 13. It is true that, in some instances, courts have considered electronic communications between parties in conjunction with a motion to dismiss where the plaintiff quoted from or otherwise relied on those communications in the complaint. *See Rotberg v. Jos A. Bank Clothiers, Inc.*, 345 F. Supp. 3d 466, 475 (S.D.N.Y. 2018); *Lopez-Serrano v. Rockmore*, 132 F. Supp. 3d 390, 400 (E.D.N.Y. 2015). But this is not such a case. Henry has presented these photographs totally devoid of context. Although they were alleged to have been sent by Eckhart to Henry in 2017, the photographs are otherwise undated. And there is nothing in their presentation that indicates that they were directly responsive to or related to any of the messages quoted in the Complaint. It is true that the photographs are sexual in nature, as were the messages quoted in the Complaint. But this cannot be enough to render them "incorporated" into the Complaint; to hold otherwise would open the floodgates to years of electronic communications being introduced on a motion to dismiss, which to the Court's knowledge, no court has permitted.

More to the point, given the highly sensitive nature of these images, even if they were appropriate to consider on a motion to dismiss, that does not mean that they were appropriate to file on the public docket. Indeed, their relevance would have been well understood by the Court had Henry simply described them and they would have been equally accessible to the Court had they been filed under seal. The Court does not take lightly the profound invasion of privacy and bodily autonomy the filing of these photographs must have caused Ms. Eckhart. It thus concludes that this action was not a "reasonable defensive measure," and because the publication of images such as these might deter a future victim

43

from bringing litigation, Eckhart has plausibly pled that the filing of these images was retaliatory. *See Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 67–68 (2006) (holding that an act is retaliatory under Title VII if "a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination'" (quoting *Rochon*, 438 F.3d at 1219)).

Fox News argues that even if this act was retaliatory, Eckhart has failed to plausibly plead that "the company had [any]thing to do with [it]." Fox Mem. at 23. The Court agrees. The Complaint alleges "upon information and belief, Fox News was aware of and ratified the retaliatory decision to file these highly sensitive photographs." Compl. ¶ 206. To support this allegation, Eckhart cites to another lawsuit against Fox News, in which Fox News "steered" a former employee to Catherine Foti (Henry's lawyer) for representation who then "cherry-picked purported 'evidence' to make the plaintiffs look like liars because they were at times friendly with their harasser." *Id*. ¶ 208. At most, this allegation suggests that Fox News may have known that this lawyer would engage in "victim shaming." *Id*. ¶ 209. But it does not support the inference that Fox News ratified this particular conduct. Furthermore, the retaliatory conduct Henry's lawyer was accused of having engaged in on a prior occasion is of an entirely different ilk than the graphic images she publicly filed here.

Accordingly, while Eckhart has plausibly pled that the filing of these images was retaliatory, she may raise this claim only against Henry, not against Fox News.

## IV.   Unlawful Dissemination of an Intimate Image

Eckhart next seeks to hold Defendants liable for the filing of the lewd photographs on the public docket pursuant to New York's Civil Rights Law §52-b, which provides that:

> (1) Any person depicted in a still or video image, regardless of whether or not the original still or video image was consensually obtained, shall have a cause of action against an individual who, for the purpose of harassing, annoying or alarming such person, disseminated or published, or threatened to disseminate or publish, such still or video image, where such image:
>
> (a) was taken when such person had a reasonable expectation that the image would remain private; and

> (b) depicts (i) an unclothed or exposed intimate part of such person; or (ii) such person engaging in sexual conduct, as defined in subdivision ten of section 130.00 of the penal law, with another person; and
>
> (c) was disseminated or published, or threatened to be disseminated or published, without the consent of such person.

N.Y. C.L.S. Civ. R. § 52-b(1).  The statute provides for several exceptions, including the "dissemination or publication of an intimate still or video image made during lawful and common practices of law enforcement, legal proceedings or medical treatment."  *Id*. § 52-b(3)(b).

Defendants contend that the nude and partially nude images filed by Henry were filed pursuant to this exception, and thus they cannot be held liable for the dissemination of these images. While it is true that these images were filed in conjunction with a legal proceeding, subsection (3)(b) does not grant blanket immunity for legal proceedings.  Instead, it only grants immunity for "lawful and common practices" in legal proceedings.  *Id*.  Without question, filing nude or partially nude photographs of a plaintiff on a public docket is not "common," even in cases alleging sexual misconduct.  Subsection (3)(b)'s exception thus does not apply.

Henry further argues that even if the exception to liability does not apply, Eckhart's Section 52-b claim still fails because "(1) the photographs did not display unclothed or exposed intimate parts, [and] (2) the purpose of filing the photographs was not to harass, annoy, or alarm Eckhart."  Henry Mem. at 35.  Although the statute does not define "intimate parts," the criminal law equivalent of this statute defines the term to include a person's "pubic area." N.Y. Penal Law § 245.15(2) ("For purposes of this section[,] 'intimate part' means the naked genitals, pubic area, anus or female nipple of the person."). While Henry redacted (in only the most technical sense) Eckhart's "exposed" intimate body parts from the pictures, at least one of the images still shows Eckhart's exposed pubic area. This argument thus fails.

Whether the photographs were filed to harass, annoy, or alarm Eckhart is a question of fact about which reasonable minds could disagree.  The Complaint alleges that "Mr. Henry was motivated by [a]

45

desire to publicly harm and humiliate Ms. Eckhart" in filing the images.  Compl. ¶ 198.  Henry responds that the photographs were not intended to harass, annoy, or alarm, but rather were disseminated in an effort to "defend[] himself" from the instant charge.  Henry Mem. at 35.  Because both explanations are reasonable, and in reviewing a motion to dismiss, a court must "draw all reasonable inferences in plaintiff['s] favor," the Court accepts Eckhart's explanation.  *Freedom Holdings Inc. v. Spitzer*, 357 F.3d 205, 216 (2d Cir. 2004).  Eckhart has plausibly pled a claim for unlawful dissemination of an intimate image against Henry.

The same is not true in relation to Fox News.  Eckhart seeks to hold Fox News liable for the dissemination of the images by claiming that the network "caused and allowed" the photographs to be published.  Compl. ¶ 274.  As a preliminary matter, for the reasons articulated above in Section III.D, the Court concludes that Eckhart has not plausibly pled that that Fox News played any role in the filing of these images.  But even if she had, her Section 52-b claim against Fox News would still fail.  On its face, the statute only establishes a cause of action against "[the] individual who . . . disseminated or published, or threatened to disseminate or publish" intimate images.  N.Y. C.L.S. Civ. R. § 52-b(1).  Even if Fox News had "caused and allowed" the photographs to be filed, it did not disseminate the images itself, and so it cannot be liable under Section 52-b.

## V.    Gender-Motivated Violence

Finally, Eckhart seeks to hold Henry liable under New York City's Gender Motivated Violence Act ("GMVA"), which provides a civil cause of action for an "injur[y] by an individual who commit[ted] a crime of violence motivated by gender."  N.Y.C. Admin. Code § 10-1104.  The statute defines "crime of violence" as "an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law . . . if the conduct presents a serious risk of physical injury to another, whether or not those acts actually resulted in criminal charges, prosecution or conviction."  N.Y.C. Admin. Code § 10-1103.  It defines "crime of violence motivated by gender" as a "crime of violence

committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender." *Id*.  Accordingly, to state a claim for a violation of the GMVA, a plaintiff must plead that "(1) the alleged act constitutes a misdemeanor or felony against the plaintiff; (2) presenting a serious risk of physical injury; (3) that was perpetrated because of plaintiff's gender; (4) in part because of animus against plaintiff's gender; and (5) resulted in injury." *Hughes*, 304 F. Supp. 3d at 455.

Henry contends that the Complaint does not include any specific allegations of his animosity towards women, and that Eckhart has therefore failed to plausibly plead a claim under the GMVA.  The parties dispute the meaning of the term "animus" within the context of the GMVA, which does not define the term.  Nor is there a single "plain meaning" of the term: "it can mean 'prejudiced and often spiteful or malevolent ill will' [but] [i]t can also mean . . . 'basic attitude or governing spirit.'"  *Id*. at 88–89 (citing Merriam-Webster's Collegiate Dictionary (11th ed)).  The New York lower courts, and some federal courts in this District in turn, have required in some cases for a plaintiff to show more than just "reprehensible conduct against female victims" to establish gender animus, *Hughes*, 304 F. Supp. 3d at 455, and have instead required a showing of "extrinsic evidence of the defendant's express hatred toward women as a group," *Breest v. Haggis*, 180 A.D.3d 83, 92 (1st Dep't 2019).  *See, e.g.*, *Hughes*, 304 F. Supp. 3d at 455 (requiring the plaintiff to show "specific allegations that [the defendant] harbored or expressed any animosity toward women" other than the fact of the rape itself); *Adams v. Jenkins*, 2005 WL 6584554, at *1 (Sup. Ct., N.Y. Cty. Apr. 22, 2005) (finding claims of violence by the defendant in the incident in question insufficient to establish gender animus).  More recently, however, the First Department in *Breest v. Haggis* held otherwise, concluding, in a case where a man allegedly raped a woman, that "[m]alice or ill will based on gender is apparent from the alleged commission of the act [of rape] itself," and thus that when a plaintiff alleges rape she need not make a separate showing of pre-existing gender animus to state a claim under the GMVA.  *Breest*, 180 A.D.3d at 94.

Here, however, regardless of whether the act of rape is sufficient on its own to plead gender-based animus, Eckhart's GMVA claim survives. The totality of her allegations includes not only the alleged sexual assaults themselves but also numerous claims that Henry acted inappropriately with and used degrading language toward other women. *See* Compl. ¶¶ 5–6, 134–181. Moreover, Henry sent a number of messages to Eckhart that could reasonably be interpreted as expressing gender-based animus.  In one message, he called her a "little whore" who was going to "get tossed around like a lil rag doll."  Compl. ¶ 61.  In another, he described her as "[o]wned & submissive." *Id*. ¶ 63.  In other messages subsequent to the alleged February 2017 "violent, painful rape," *id*. ¶ 74, Henry told Eckhart "When u r owned u don't get a choice" and said he would "make [Eckhart his] little whore again," *id*. ¶ 77, which is language he is alleged to have used with another woman, *id*. ¶ 154.  Although Henry insists that this manner of speaking was part of a consensual and mutual relationship dynamic between him and Eckhart, *see* Henry Mem. at 1, at this stage of the litigation, the Court must interpret the allegations in the light most favorable to Eckhart. Having done so, the Court finds that Henry's messages to Eckhart bolster the inference of animus that can be drawn from the alleged sexual assaults themselves.  *See HB v. Monroe Woodbury Cent. Sch. Dist.*, 11-CV-5881 (CS), 2012 WL 4477552, at *17 (S.D.N.Y. Sept. 27, 2012) ("[T]he use of gendered or sexually loaded insults such as 'bitch,' 'whore,' 'prude,' and 'slut' can certainly be indicative of animus on the basis of sex."); *E.E.O.C. v. A. Sam & Sons Prod. Co., Inc*., 872 F. Supp. 29, 35 (W.D.N.Y. 1994) ("The term 'whore' is usually gender-specific and is certainly more offensive when directed at a woman. Thus the inference is sufficiently strong that [the] conduct was directed at [plaintiff] because she was a woman."); *Bell v. City of Chicago*, No. 03 C 2117, 2004 WL 3119014, at *12 n.11 (N.D. Ill. Dec. 20, 2004) (finding "the repeated and frequent use [of the word 'whore'] to be strongly suggestive of gender-based animus").

Considering both Henry's conduct and language together, courts have found similar allegations sufficiently demonstrative of gender-based animus to survive a motion to dismiss.  *See*, *e.g.*, *Jugmohan*

*v. Zola*, 98-CV-1509 (DAB), 2000 WL 222186, at *2–4 (S.D.N.Y. Feb. 25, 2000) (finding animus adequately alleged when plaintiff claimed that defendant violently sexually assaulted her and also had an "extensive history of acting in a humiliating, abusive, or degrading sexual manner exclusively toward other women"); *Crisonino v. New York City Hous. Auth.*, 985 F. Supp. 385, 391–93 (S.D.N.Y. 1997) (gender animus pled when plaintiff alleged that defendant "called [her] a 'dumb bitch' and later shoved her").[17] Accepting Eckhart's well-pleaded allegations as true and considering them in the light most favorable to her, the Court concludes that the combination of sexual assault and the repeated use of derogatory language supports an inference of Henry's animus toward women. Accordingly, regardless of whether rape on its own can give rise to an inference of gender-based animus, Eckhart has plausibly pled a claim under the GMVA.

## VI.   Additional Remedies Sought

Henry has filed three additional motions in conjunction with his motion to dismiss: a motion for sanctions against Eckhart and her counsel, a motion to strike certain portions of the Complaint, and a motion for a more definite statement.  The Court denies all three motions.

### A.   Sanctions

Henry asks the Court to sanction Eckhart and her counsel pursuant to its "inherent authority." Henry Mem. at 4.  As Henry rightly notes, "[f]ederal courts possess certain 'inherent powers' including 'the ability to fashion an appropriate sanction for conduct which abuses the judicial process.'" *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1182 (2017).

Henry urges the Court to conclude that Eckhart "abuse[d] the judicial process" by including allegations by several anonymous women in her complaint, including one that has since been retracted

---

[17] Although the courts in these cases were interpreting the federal Violence Against Women Act, rather than the GMVA, the New York statute was modeled after VAWA and adopted in response to the Supreme Court's decision in *United States v. Morrison,* 529 U.S. 598 (2000) to strike down VAWA's civil rights remedy for gender-motivated crimes. *See* <u>Breest</u>, 180 A.D.3d at 85.

in part.  Henry Mem. at 39–40.  Regarding the anonymity of these accusers, the Court finds no grounds

for sanctions, for it is "entirely proper and common for a plaintiff to rely on confidential witnesses in a

complaint."  *Plumbers and Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Arbitron, Inc*.,

278 F.R.D. 335, 341 (S.D.N.Y. 2011).  With respect to the allegations that have been retracted, the Court

notes that the veracity of those allegations is a question of fact that remains unresolved.  *See* Henry Mem.

at 38 ("In a recent media article, the individual identified as Jane Doe 1 publicly disclaimed the

allegations attributed to her, telling a reporter that these allegations were 'inaccurate,' and several aspects

were simply false."); Pl. Henry Opp. at 35 ("Plaintiff has a good faith basis to believe that the allegations

are a true and accurate representation of Jane Doe 1's experiences with Henry.").  Because Plaintiff still

purports to have a good faith basis to believe the allegations are true, the Court cannot conclude at this

time that Plaintiff's failure to remove them from the Complaint upon their retraction is sanctionable.

### B.  Motion to Strike

Henry moves to strike the Complaint's allegations involving anonymous recipients of

inappropriate messages from him and allegations about his counsel's tactics.  A party moving to strike

has a high burden and must demonstrate that: "(1) no evidence in support of the allegations would be

admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the

allegations to stand would result in prejudice to the movant."  *Roe v. City of N.Y*., 151 F. Supp. 2d 495,

510 (S.D.N.Y. 2001); *see also In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig*., 218 F.R.D.

76, 78 (S.D.N.Y. 2003) ("Generally, motions to strike are viewed with disfavor and infrequently

granted.").  An allegation should not be stricken from a complaint when it is found to be "directly

relevant to one of the main issues in th[e] case."  *Lynch v. Southampton Animal Shelter Found. Inc*., 278

F.R.D. 55, 69 (E.D.N.Y. 2011).  Eckhart's allegations concerning anonymous witnesses and non-Fox

News employees are relevant to her claim of sexual harassment because they contribute to her argument

that Henry acted pursuant to a pattern, as well as her claim that Fox News knew or should have known

of Henry's misconduct.  Her allegation concerning Fox News's prior dealings with Ms. Foti, while insufficient to prove the point Eckhart intended it to prove, is still relevant to her retaliation claim. Henry's motion to strike is thus denied.

### C.  Motion for a More Definite Statement

Whether "to grant a motion for a more definite statement is a matter within the discretion of the trial court." *In re Argo Commc'ns Corp*., 134 B.R. 776, 797 (Bankr. S.D.N.Y. 1991).  Henry asserts that the Complaint's omission of precise dates for several key events has prevented him from "fil[ing] a responsive pleading and . . .  the Court [from] analyz[ing] the sufficiency of Eckhart's claims."  Henry Mem. at 41.  But because approximate dates for these events can be discerned from the face of the Complaint, the absence of allegations of precise dates does not impede Henry's ability to adequately defend himself.  *See Riccio v. Gent Unif. Rental Corp*., No. 06 Civ. 0708 (SJF)(WDW), 2006 WL 3499219, at *2 (E.D.N.Y. Dec. 2, 2006) (denying motion for more definite statement where "by examining the complaint as a whole as well as additional material [p]laintiff provided, [d]efendant can discern dates and approximate dates of events and the bases of the discrimination claims").  Moreover, the information Henry seeks will likely be revealed during discovery.  The motion for a more definite statement is thus denied.

### CONCLUSION

For the reasons stated above, Defendants' motions to dismiss are granted in part and denied in part.  Specifically, the following are dismissed:

- The first cause of action as it pertains to Fox News;
- The second cause of action;
- The third cause of action as it pertains to the press release and the sanctions motion;
- The fourth cause of action as it pertains to Henry;
- The fifth cause of action as it pertains to the press release, the sanctions motion, and Eckhart's private photographs and messages (against Fox News only);
- The sixth cause of action;
- The eighth cause of action as it pertains to the press release and the sanctions motion;
- The ninth cause of action; and

- The eleventh cause of action as it pertains to Fox News.

The following claims are not dismissed:

- The first cause of action as it pertains to Henry;
- The third cause of action as it pertains to Eckhart's termination (against Fox News only) and Eckhart's private photographs and messages (against Henry only);
- The fourth cause of action as it pertains to Fox News;
- The fifth cause of action as it pertains to Eckhart's termination (against Fox News only) and Eckhart's private photographs and messages (against Henry only);
- The seventh cause of action;
- The eighth cause of action as it pertains to Eckhart's termination (against Fox News only) and Eckhart's private photographs and messages (against Henry only);
- The tenth cause of action; and
- The eleventh cause of action as it pertains to Henry.

The motion for sanctions, the motion for a more definite statement, and the motion to strike are denied.

The stay of discovery entered by the Court, Dkt. 40, and continued by Magistrate Judge Gorenstein, *see* Dkt. 148, is hereby lifted. Within two weeks of the date of this order, the parties are directed to meet and confer and submit a joint letter regarding next steps in this litigation to the Court and Judge Gorenstein, who will continue to supervise all pretrial matters.

The Clerk of Court is respectfully directed to terminate the motions pending at docket entries 83, 89, 117, and 123.

SO ORDERED.

Dated:      September 9, 2021
            New York, New York

RONNIE ABRAMS
United States District Judge