UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────┐
│ USDC-SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC#:                            │
│ DATE FILED:                      │
└─────────────────────────────────┘
```

CATHY AREU,

                    Plaintiff,

          v.

FOX NEWS NETWORK, LLC, ED HENRY,
SEAN HANNITY, TUCKER CARLSON,
and HOWARD KURTZ,

                    Defendants.

20-CV-8678 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Cathy Areu, a former Fox News contributor, brings this action against the network and four of its most prominent employees: Tucker Carlson, Sean Hannity, Ed Henry, and Howard Kurtz (the "Individual Defendants"). Areu accuses the network and the Individual Defendants (together, "Defendants") of discriminating against her on the basis of her gender and retaliating against her for opposing that discrimination. According to Areu, the Individual Defendants made overtures and comments to her indicating that they expected her to "pay to play"—that is, they expected her to engage with them sexually or romantically, or at the very least "accept [their] misogynistic behavior," in exchange for professional success at the network. Defendants deny the factual allegations and move to dismiss Areu's claims. For the reasons set forth below, the motions to dismiss are granted, although Areu will be given an opportunity to file an amended complaint.

First, Areu alleges that Defendants discriminated against her on the basis of her gender by subjecting her to sexual harassment and a hostile work environment. But a plaintiff may only pursue such a discrimination claim if she is an employee or "covered non-employee" of the defendant. To qualify as a covered non-employee—a standard that differs slightly depending on whether the Court is

applying state, local, or federal law—Areu must plausibly allege that she was paid by the network or that she received something of substantial value from it in exchange for her work.  Because she has not made such a showing, nor alleged that she was a Fox News employee, the Court must dismiss her claims of discrimination.

Second, Areu alleges that the network discriminated against her by subjecting her to a lengthy hiring process for a paid position while hiring male applicants for such positions more quickly.  Yet Areu has provided the Court with almost no information about those applicants other than their gender.  Without any factual allegations about the qualifications of these male applicants, the Court cannot fairly compare them to Areu.  As a result, Areu has not sufficiently alleged that Fox News favored them over her on the basis of gender.

Third, Areu claims the Individual Defendants retaliated against her for opposing their purportedly "misogynistic" practices.  She alleges that Carlson, Henry, and Kurtz made "clear and/or implied" sexual advances toward her, and that Hannity attempted to "auction[ her] off" to the men on his set.  Areu maintains that when she rejected these advances, or otherwise failed to respond in the "'right' way" to the allegedly sexist conduct, the men sought to "punish" her—either by refusing to provide her career assistance or ceasing to invite her to appear on their shows.  The facts pled in the Complaint do not, however, support a legal claim for retaliation.  This is true with respect to Carlson, Hannity, and Kurtz because Areu does not adequately allege that their conduct constituted actionable discrimination and/or that her responses to that conduct communicated a "protest or opposition" to discrimination, so as to constitute protected activity under the anti-retaliation laws.  As for Henry, Areu does plausibly allege that she engaged in protected activity by rejecting his overt sexual advances.  But she has not alleged that Henry responded to her rejection in a way that can be characterized as actionable retaliation because she has not claimed that he changed his behavior in response to that rejection in a way that adversely affected her employment, or otherwise disadvantaged her.

Lastly, Areu alleges that Fox News retaliated against her by way of its conduct during this litigation—namely, by filing a sanctions motion and leaking emails to the press that contradict Areu's claims. In the Court's view, these allegations demonstrate no more than the network's reasonable defense of itself, and do not themselves form the basis of a retaliation claim.

In sum, Areu has failed to state a claim for discrimination or retaliation under any of the applicable laws. The Court thus grants Defendants' motions to dismiss in full. At Areu's request, however, the Court will allow her an additional opportunity to submit an amended complaint that addresses these deficiencies, should she have a good-faith basis to do so.

The parties have also filed cross-motions for sanctions. Fox News's sanctions motion is grounded in its allegation that Areu filed legally frivolous claims—based on factual allegations she allegedly knows to be untrue—for the improper purposes of generating publicity, defaming Defendants, and extorting a settlement. Areu denies these accusations and urges that Defendants engaged in sanctionable misconduct by filing the motion in the first instance. In the Court's view, neither party's zealous advocacy in this contentious case warrants sanctions. Both motions are denied.

A more fulsome analysis of Areu's claims as well as a recitation of the factual allegations underlying them follows.

## BACKGROUND[1]

The Court draws the following facts from the Complaint, Dkt. 2.[2]  For the purposes of this motion, the Court accepts all of Plaintiff's well-pled facts as true, as it must.  *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).

### I.   The Hiring Process at Fox News

Areu alleges that Fox News—like other news and media companies—does not employ a "traditional approach" to hiring.  Compl. ¶¶ 42-43.  Instead, persons hoping to be employed by the company as paid contributors "undergo a 'field test' of sorts wherein their previous on-air work serves as their resume and their interview often takes the form of an engagement as a[n unpaid] contributor, pundit or analyst . . . auditioning live on a network program."  *Id.* ¶ 43.

The anchors and hosts of these programs are allegedly "given extensive control and influence" over which contributors they invite to appear.  *Id.* ¶ 59.  In particular, the most powerful anchors, like Hannity and Carlson, "have unbridled control over their programming."  *Id.* ¶ 62.  Because appearing as a guest on Fox News programs serves as the "interview" portion of the application process to become a paid contributor, being invited onto these programs is an important step in the hiring process.  As Areu alleges, "[w]ith a single stroke [the network anchors] can make or break one's career at Fox."  *Id.*

---

[1] This opinion uses the following citations: "Compl." for the operative complaint, Dkt. 2; "Fox Mem." for the memorandum of law in support of the motion to dismiss brought by Fox News, Carlson, Hannity, and Kurtz, Dkt. 4; "Henry Mem." for the memorandum of law in support of Henry's motion to dismiss, Dkt. 7; "Areu Fox Opp." for Areu's memorandum in opposition to the motion to dismiss brought by Fox News, Carlson, Hannity, and Kurtz, Dkt. 35; "Areu Henry Opp." for Areu's memorandum of law in opposition to Henry's motion to dismiss, Dkt. 34; "Fox Reply" for the reply memorandum in support of the motion to dismiss brought by Fox News, Carlson, Hannity, and Kurtz, Dkt. 37; "Henry Reply" for the reply memorandum of law in support of Henry's motion to dismiss, Dkt. 36; "Sanctions Mem." for the memorandum of law in support of the motion for sanctions brought by Fox News, Carlson, Hannity, and Kurtz, Dkt. 14; "Sanctions Opp." for Areu's memorandum of law in opposition to the sanctions motion, Dkt. 31; and "Sanctions Reply" for the reply memorandum in support of the sanctions motion, Dkt. 33.  All citations to the docket relate to the docket in case number 20-CV-8678, unless otherwise noted.

[2] Although Areu has twice amended her complaint, the operative complaint is titled "Amended Complaint."  For simplicity, the Court will refer to this operative complaint as "the Complaint" throughout this opinion.

## II.    Cathy Areu

Plaintiff Cathy Areu was an aspiring on-air personality at Fox News.  Compl. ¶ 48.  In 2017, she began appearing on a variety of Fox News programs including "Tucker Carlson Tonight," "Media Buzz with Howard Kurtz," "Hannity," "The Ingraham Angle," "Outnumbered," "Fox and Friends," "Fox and Friends First," "Waters' World," "The Story," "Fox News @ Night," "Cavuto Live," "Your World," and "Coast to Coast." *Id*. ¶ 49.  She would sometimes appear as often as five times per week.  *Id*.  When she was not appearing on shows, she was preparing for them by staying up to date on current events, which enabled her to be able to discuss any topic with little notice.  *Id*. ¶ 50.

Areu was never paid for her appearances on Fox News, but the network paid for some of her accommodations, including her travel and lodging when she traveled to appear on the network.  *Id*. ¶ 51.  In 2018, Areu found particular success with her "Liberal Sherpa" segments on Tucker Carlson's show.  *Id*. ¶ 54.  As a result, Areu "began having serious conversations with a myriad of employees at Fox News[] regarding being brought on board as a paid contributor."  *Id*. ¶ 57.  According to her agent, "Fox News was in final discussions to bring her on board as an official paid contributor" in 2018.  *Id*. ¶ 58.

The paid contributor position never materialized for Areu.  Instead, over the course of several years, her invitations to appear on Fox News dried up.  She went from appearing "regularly" in 2018, to "being blacklisted from the majority of Fox News' most well-known shows in 2019", to "being completely removed from the air in 2020."  *Id*. ¶ 176.  Areu attributes this change of course to several encounters she had with Fox News's male anchors, in which she alleges the anchors sexually harassed her and/or made sexual or romantic advances towards her which she did not reciprocate.  *Id.*  A review of these allegations follows, organized chronologically.

### III.    Sean Hannity

On March 8, 2018, Areu was scheduled to appear on "The Sean Hannity Show."  Compl. ¶ 94. On that date, she brought a male friend to Fox News's studio with her.  *Id*.  According to Areu, Hannity seemed "annoyed" that she had brought this guest.  *Id*. ¶ 95.  Hannity asked Areu about her relationship with her guest and asked the guest if he was taking Areu on a date that night.  *Id*. ¶¶ 95, 98.  When the guest did not respond affirmatively, Hannity "loudly call[ed] out to other males in the room" asking if they would take Areu on a date, describing her as a "beautiful woman."  *Id*. ¶¶ 98–99.  He then gave some money to Areu's guest, encouraging him to take Areu on a date and to use the money to buy drinks—particularly the "pineapple drink that is made specifically for Mr. Hannity at Del Frisco's."  *Id*. ¶¶ 100–101.

Although she allegedly felt "rattled" by this exchange, Areu later "emailed the show to thank Mr. Hannity for having her on, and for [paying for] the drinks [she had with her male friend]" because "[a]s anyone in the TV industry will attest, thanking a show for an appearance is proper etiquette if you want to get asked back."  *Id*. ¶¶ 101–102.  Areu also texted a Fox News staffer, noting "don't tell [Hannity] [that she does not like the pineapple drink]," to which the staffer responded, "your secret is safe with me."  *Id*. ¶ 103 (alterations in original).

### IV.    Tucker Carlson

Areu claims that, unlike now, she was once a "regular" on "Tucker Carlson Tonight," appearing on the show twenty times in 2018 alone.  Compl. ¶ 159.

One of these appearances occurred on or around November 30, 2018.  *Id*. ¶ 140.  On that occasion, Carlson asked Areu to remain in the studio until the end of the show after her segment had finished taping.  *Id*. ¶ 144.  After the show ended, when only Carlson, Areu, and one or two other staffers remained in the studio, Carlson allegedly began changing his clothes in front of Areu and told her that "he would be alone in New York City that night, and that he would be staying alone in his hotel room."  *Id*. ¶ 150.

Areu alleges that this statement was a "test" to see if "she [would] be open to his suggestion of a sexual encounter with him." *Id*. ¶ 151. Instead of responding "the 'right' way," *id*. ¶ 152, Areu asked Carlson why he wanted to speak with her, then "listed her credentials," and reminded him that she "ha[d] the number one segment on his show," which she believed "made her worthy of . . . consideration" for a job with him, *id*. ¶¶ 153–154. After Carlson made a joke about Areu to his two male colleagues who remained in the room—asking "you guys didn't find her on the street after all?"—Areu left the studio. *Id*. ¶¶ 154–156.

The next morning, Areu noticed that her taped segment from Carlson's show had been removed from the Fox News Facebook page. *Id*. ¶ 158. In the months that followed, she was invited to appear on Carlson's show only four more times. *Id*. ¶ 159. In 2020, she was told by Carlson's staff that Carlson was no longer interested in having her on his show at all. *Id*. ¶ 163.

## V.   Ed Henry

In May 2019, following the taping of a show Henry was hosting at Fox News's New York City studio, Areu and Henry took a picture together on Areu's phone, which she then sent to Henry via text message. Compl. ¶ 168. After obtaining Areu's cell phone number through that text message, Henry sent Areu what she described as a "slew of wildly inappropriate sexual images, messages and videos … including many texts in which he implied that Ms. Areu should have sex with him and that he would assist Ms. Areu's career if she did so." *Id*. He also texted her on one occasion that he would "buy [her] wine" if she "perform[ed] tasks," a remark she took to be sexual. *Id*. ¶ 80. The two later engaged in a phone conversation about Areu's desire for paid employment at Fox News. *Id*. ¶ 174. During this call, Henry "berat[ed]" Areu for being "boring," which Areu interpreted as meaning "[un]willing to engage in sexual acts with him." *Id*.

Following this phone call, Henry ceased communicating with Areu.  *Id.* ¶ 175.  When confronted

with why he had not responded to her, he told Areu "you decided to be a jerk which made me sad."  *Id*.

¶ 175.

Areu further notes in the Complaint that during an investigation into sexual harassment at Fox

News, "multiple women complained that Mr. Henry had subjected them to sexual harassment and/or

unwanted sexual messages."  *Id*. ¶ 26.  She also alleges that "Fox News, including, upon information

and belief, Fox News's Executive Vice President of Human Resources, Kevin Lord, as well as Fox

News's President and Executive Editor, Jay Wallace, and Fox Business Network's President, Lauren

Peterson, was on notice of Mr. Henry's sexual misconduct towards other women at Fox at least as early

as 2017."  *Id*. ¶ 36.  No disciplinary action was taken against Henry at that time.  *Id*. ¶¶ 27, 36.

## VI.    Howard Kurtz

Areu alleges that she was "a relative regular" on Kurtz's show, "Media Buzz," from 2017 through

2020.  Compl. ¶ 108.  Unlike some other Fox News anchors, Kurtz booked guest contributors for his

show himself, rather than through a booking agent.  *Id*. ¶ 109.  He would frequently contact Areu directly,

asking her to appear on his show.  *Id*.

On July 9, 2019, Areu learned that both she and Kurtz were in New York City and sought to meet

with him to discuss the prospect of obtaining a paid contributor position at Fox News.  *Id*. ¶ 115.  By

email, Kurtz suggested that Areu meet with him in the lobby of his hotel in the evening.  *Id.* ¶ 116.  Areu

declined the invitation, but invited Kurtz to dinner with her and a friend.  *Id*.  He declined that invitation,

but the two tentatively agreed to meet after dinner.  *Id*.  Around 9:00 p.m. that night, Kurtz told Areu

that he "[d]idn't get much sleep last night so [he was] going to bed."  Kurtz. Decl. Ex. 1 at 6.[3]  At 9:16

---

[3] As a general rule, a court may only consider the facts alleged in the complaint on a motion to dismiss.  *See, e.g., Radiancy, Inc. v. Viatek Consumer Prods. Group*, 138 F. Supp. 3d 303, 316 (S.D.N.Y. 2014).  Nonetheless, where documents are either integral to the complaint or incorporated into the complaint by reference, a court may consider those documents as well.  *See, e.g., Chambers v. Time Warner, Inc*., 282 F.3d 147, 152–53 (2d Cir. 2002).  During oral argument, the parties agreed that because Areu had incorporated portions of her email conversation with Kurtz from that night in the Amended Complaint, the Court was permitted to consider the entire email conversation from that night.  See Tr. at 18:9–12; 30:20–

p.m. Areu responded "What?! Give me your cell. I'll be right there. I'm totally available right now!!!!!!" *Id.* When Kurtz did not respond, Areu emailed him again at 9:21 p.m. "What's your room number? What name are you under? What's your cell? I'm coming over. We can do it the easy way or the hard way." *Id.* at 7. Kurtz did not respond to these messages. Compl. ¶ 118. According to Areu, the reason she sent these messages so late at night was because she hoped they would be received "too late and Mr. Kurtz would be asleep or unavailable," thus allowing Areu to avoid meeting Kurtz without being rude to him. *Id.* ¶ 117.

Kurtz later told Areu, "I have to remember that you're the only woman here who tells me she's at a hotel to simply tell me she's there. You don't invite me over or come to my hotel room…I've made a mental note." *Id.* ¶ 120. After this incident, Areu appeared on Kurtz's show only three more times. *Id.* ¶ 121. Following her last appearance, Kurtz criticized her performance, which Areu alleges was out of character with the "years of [him] being pleased with her appearances." *Id.* ¶ 122.

## VII.   Other Male Contributors

In the Complaint, Areu also makes reference to three other male contributors at Fox News: Dan Bongino, Gianno Caldwell,[4] and Lawrence Jones.   These men were hired by Fox News as paid contributors during the same time period in which Areu was working as an unpaid contributor. Compl. ¶¶ 66, 68, 70. Areu alleges that none of these men went through a lengthy audition process like she did, but were instead hired in a matter of months. *Id.* ¶¶ 65, 66, 68. She also asserts that they were not subject to the same pattern of sexual harassment to which she and other female applicants were allegedly subjected. *Id.* ¶ 71.

---

31:11; *see also Kaplan v. Wings of Hope Residence, Inc.*, 18-CV-2972 (ADS) (AKT), 2020 WL 616630, at *4 (E.D.N.Y. Feb. 7, 2020) (considering text messages "proffered by the Defendants" because "[i]n his amended complaint, the Plaintiff made express references to [those] text messages").

[4] Areu also makes allegations against Caldwell in the Complaint, although he is not named as a defendant in this lawsuit. Specifically, Areu alleges that Caldwell sent her a video of himself with Ann Coulter, allegedly knowing that Areu was interested in meeting Coulter, with the message "We def need to get together." Compl. ¶¶ 130–132. When Areu responded by offering to take Caldwell and Coulter to lunch, Caldwell responded, "Take me to lunch." *Id.* ¶ 137.

## VIII.    Areu's Complaints

In July 2020, Areu emailed Amy Sohnen, the Vice President of Talent Development at Fox News, and reported that she had received pornographic text messages from Henry and that Henry was "not the only one" who had sent her such texts.   Compl. ¶¶ 185-186.   She subsequently filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").   *Id.* ¶ 9.   On September 9, 2020, at Areu's request, the EEOC issued a "right to sue" letter.   *Id.*; *see also* 20-CV-5593, Dkt. 42 (notice of Areu's receipt of right-to-sue letter).

## IX.    This Lawsuit

On July 20, 2020, in conjunction with former Fox News employee Jennifer Eckhart, Areu filed a complaint that alleged discrimination and retaliation under the New York State Human Rights Law (the "NYSHRL") and the New York City Human Rights Law (the "NYCHRL").   20-CV-5593, Dkt. 1. After obtaining a right to sue letter from the EEOC, Areu added claims under Title VII of the Civil Rights Act of 1964 ("Title VII").

On or around August 7, 2020, counsel for Fox News, Carlson, Hannity, and Kurtz served Areu's then counsel—Douglas H. Wigdor and Michael J. Willemin of Wigdor LLP—with notice that these Defendants intended to seek sanctions against Areu and Wigdor under Federal Rule of Civil Procedure 11(c).   *See* 20-CV-5593, Dkt. 32.   As required by Rule 11, Defendants indicated that they would give Plaintiff's counsel 21 days to amend the complaint before filing the contemplated sanctions motion.   *Id*.

On August 27, 2020, Areu retained new counsel: James Vagnini of Valli Kane & Vagnini LLP. 20-CV-5593, Dkt. 36.   The Court then granted Areu a 14-day extension of the Rule 11 safe harbor, allowing her until September 11, 2020 to file an amended complaint or response to the Rule 11 notice. 20-CV-5593, Dkt. 35.

Areu timely filed an amended complaint.   20-CV-5593, Dkt. 38.   Insisting that this amended complaint did not resolve the issues identified in the safe-harbor notice, Fox News, Carlson, Hannity,

and Kurtz filed a motion for sanctions against Areu, Wigdor, and Vagnini on September 29, 2020.  20-CV-5593, Dkt. 52.

On October 8, 2020, after hearing argument and receiving letters from all parties on the matter, the Court ordered that this action be severed from Eckhart's lawsuit.  20-CV-5593, Dkt. 75.  The actions were severed on October 19, 2020.  Dkt. 1.

On October 19, 2020, Areu filed the operative Complaint in this docket.  Dkt. 2.  Defendants responded with the instant motions to dismiss.  Dkt. 3; Dkt. 6.

## LEGAL STANDARD

On a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a court must accept as true all well-pled facts and draw all reasonable inferences in the light most favorable to the plaintiff.  *Kassner*, 496 F.3d at 237.  "To survive a motion to dismiss, the plaintiff's pleading must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face if it allows "'the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Whiteside v. Hover-Davis, Inc*., 995 F.3d 315, 323 (2d Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678).  "The role of the court at this [Rule 12(b)(6)] stage of the proceedings is not in any way to evaluate the truth as to what really happened, but merely to determine whether plaintiff's factual allegations are sufficient to allow the case to proceed."  *Doe v. Columbia Univ*., 831 F.3d 46, 59 (2d Cir. 2016).

**DISCUSSION**

I.    **Subject Matter Jurisdiction and Exhaustion of Administrative Remedies**

As a preliminary matter, the Court must determine whether it has jurisdiction to address Areu's claims.

In the Complaint, Areu asserts that subject matter jurisdiction exists 1) because she has brought claims under federal law, thus allowing the court to exercise federal-question jurisdiction pursuant to 28 U.S.C. § 1331; and 2) because complete diversity exists between her and Defendants, whom she has sued for over $75,000 in damages, thus allowing the court to exercise diversity jurisdiction pursuant to 28 U.S.C. § 1332.  Compl. ¶ 11.  Following Defendants' attestation that Areu and Defendant Carlson are both residents of Florida, Fox Mem. at 5, Areu appears to have dropped her claim of diversity jurisdiction.  Accordingly, she may pursue her claims only if federal-question jurisdiction exists.  Because she has alleged violations of Title VII, a federal statute, her claims involve a question of federal law.  *See Fort Bend County v. Davis*, 139 S. Ct. 1843, 1850 (2019) ("Federal courts exercise jurisdiction over Title VII actions pursuant to 28 U.S.C. § 1331's grant of general federal-question jurisdiction, and Title VII's own jurisdictional provision, 42 U.S.C. §2000e-5(f)(3).").

Defendants counter that Areu has failed to comply with Title VII's administrative-charge-filing requirement, and that this Court thus lacks jurisdiction over this action.  Fox Mem. at 6.  Pursuant to the Supreme Court's 2019 decision in *Fort Bend County v. Davis*, however, "Title VII's charge-filing requirement is . . . . not a jurisdictional prescription delineating the adjudicatory authority of courts" but rather a "claim-processing rule."  139 S. Ct. at 1850-51.  Nevertheless, because that rule is mandatory, a failure to satisfy the charge-filing requirement is no less fatal to a plaintiff's Title VII claim than if the rule were jurisdictional.  The Court must therefore assess whether Areu satisfied this requirement before addressing the merits of her allegations.

Title VII permits a private plaintiff to file suit in federal court, but only after that plaintiff has exhausted her administrative remedies and received notice of her "right to sue" from the EEOC. *See, e.g., Hernandez v. Premium Merch. Funding One, LLC*, 19-CV-1727 (WHP), 2020 WL 3962108, at *3 (S.D.N.Y. Jul. 13, 2020) (citing 42 U.S.C. § 2000e-5). Before a right-to-sue letter may be issued, a plaintiff must file an administrative charge with the EEOC and give the EEOC the opportunity to investigate the charge and determine whether it wishes to bring suit on the plaintiff's behalf. 42 U.S.C. § 2000e-5(b). If the EEOC declines to prosecute the case itself—or if it fails to begin its own civil action within 180 days of the filing of the administrative charge—then a right-to-sue letter must be issued. *Id*. § 2000e-5(f).

Yet a plaintiff need not always wait the full 180 days to bring suit. Pursuant to EEOC regulation, in instances where "the District Director, the Field Director, the Area Director, the Local Director, the Director of the Office of Field Programs or upon delegation, the Director of Field Management Programs has determined that it is probable that the Commission will be unable to complete its administrative processing of the charge within 180 days from the filing of the charge," the Commission will issue a right-to-sue letter upon request, regardless of how many days have passed since the filing of the administrative charge. 29 C.F.R. § 1601.28(a)(2).

Here, the EEOC appears to have issued Areu a right-to-sue letter pursuant to this regulation. It issued the letter fewer than 180 days after Areu first filed an administrative charge with the EEOC, upon her request and after finding that "it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge." 20-CV-5593, Dkt. 42. Defendants assert that this letter was issued in violation of the statute and is thus invalid. Fox Mem. at 7–8.

Defendants' argument essentially challenges the validity of the EEOC's regulation permitting early right-to-sue letters. In *Hernandez v. Premium Merchant Funding One, LLC*, Judge Pauley addressed a nearly identical challenge to this regulation and concluded—after a thorough analysis

13

conducted under the framework set forth in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*—that the practice of issuing early right-to-sue letters does not violate the statute.  *See* 2020 WL 3962108, at *6–7 (citing 467 U.S. 837, 842–43 (1984)).  Defendants have not articulated a compelling reason to depart from Judge Pauley's conclusion or to disregard his persuasive analysis of the issue.  The Court thus declines to do so at this time.  Finding no other flaw in Areu's right-to-sue letter, the Court deems it sufficient to permit Areu to bring claims under Title VII in this action.

Neither Defendants' challenge to subject matter jurisdiction nor their argument about Plaintiff's exhaustion of administrative remedies suffice as grounds on which to dismiss the Complaint.

## II.   Title VII, the NYSHRL, and the NYCHRL — Gender Discrimination

### A.  Discriminatory Employment Practices

Areu alleges that "Defendant Fox News has discriminated against [her] on the basis of her gender in violation of Title VII by subjecting her to disparate treatment based upon her gender, including, but not limited to, subjecting her to sexual harassment and a hostile work environment."  Compl. ¶ 191.  In her opposition to the instant motion, as well as at oral argument, Areu also raised a claim of *quid pro quo* sex discrimination.  *See* Areu Fox Opp. at 11–14; Tr. at 35:24–36:4.  She claims that as a result of this harassment, she "was denied the opportunity to work in an employment environment free of unlawful discrimination."  Compl. ¶ 191.  As Defendants rightly note, however, an employer "logically cannot discriminate against a person in the 'conditions or privileges of employment' if no employment relationship exists."  *Wang v. Phx. Satellite Television US, Inc*., 976 F. Supp. 2d 527, 532 (S.D.N.Y. 2013); *see also Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125, 136 (2d Cir. 1999) ("It is inherent in the definition of a [] hostile work environment . . . that the person against whom the hostility is directed must be in an employment relationship with the employer."); *Mormol v. Costco Wholesale Corp*., 364 F.3d 54, 57 (2d Cir. 2004) (stating that "*quid pro quo*" harassment requires alteration of the terms and conditions of plaintiff's "employment").

14

As a threshold matter, then, the Court must determine whether Areu was a Fox News employee.

### 1. Title VII

"The definition of the term 'employee' provided in Title VII is circular: The Act states only that an 'employee' is an 'individual employed by an employer.'" *O'Connor v. Davis*, 126 F.3d 112, 115 (2d Cir. 1997) (quoting 42 U.S.C. § 2000e(f)). In response, the Second Circuit has established a two-part test to determine employee status in instances where a clear, contractual, employer-employee relationship cannot be established. *See id.*

To clear the first step—a prerequisite to a finding of employment—the plaintiff must demonstrate "that she was hired by the putative employer. To prove that she was hired, she must establish that she received remuneration in some form for her work." *United States v. City of N.Y.*, 359 F.3d 83, 91–92 (2d Cir. 2004); *see also O'Connor*, 126 F.3d at 115–116 ("Where no financial benefit is obtained by the purported employee from the employer, no 'plausible' employment relationship of any sort can be said to exist.").[5] This remuneration need not be a salary, but it must convey a "substantial benefit[]" to the putative employee. *City of N.Y.*, 359 F.3d at 92; *see also York v. Ass'n of the Bar*, 286 F.3d 122, 126 (2d Cir. 2002) (holding that financial benefits must meet a minimum level of "significance" to qualify as remuneration). Further, the benefits conveyed may not be "merely incidental" or "a necessary incident" of the work performed. *York*, 286 F.3d at 126. Nor may they be "vague benefits", such as "networking opportunities," "widespread publicity" or "name recognition." *See Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 444 (S.D.N.Y. 2018).

---

[5] The second step requires the Court to weigh the following thirteen factors articulated by the Supreme Court in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989): (1) "the hiring party's right to control the manner and means by which the product is accomplished"; (2) "the skill required"; (3) "the source of the instrumentalities and tools"; (4) "the location of the work"; (5) "the duration of the relationship between the parties"; (6) "whether the hiring party has the right to assign additional projects to the hired party"; (7) "the extent of the hired party's discretion over when and how long to work"; (8) "the method of payment"; (9) "the hired party's role in hiring and paying assistants"; (10) "whether the work is part of the regular business of the hiring party"; (11) "whether the hiring party is in business"; (12) "the provision of employee benefits"; and (13) "the tax treatment of the hired party." *Id*. at 751–52.

Courts in this Circuit have found the following benefits sufficiently substantial to qualify as remuneration: "health insurance[,] vacation[,] sick pay[,] . . . a retirement pension, . . .life insurance, . . . death benefits, [and] disability insurance." *York*, 286 F.3d at 126 (collecting cases). In contrast, the following benefits have been found to be insufficiently substantial: networking opportunities, *id.*, "the opportunity to showcase [one's] work for casting directors," *Glaser v. Upright Citizens Brigade, LLC*, 377 F. Supp. 3d 387, 396 (S.D.N.Y. 2019), and reimbursement for travel expenses or hair and make-up services, *Hughes*, 304 F. Supp. 3d at 443.

In the Complaint, Areu pleads no facts about her remuneration, other than recounting that she once told Kurtz that Fox "spent $12k on [her] remote hits last week alone [and were] flying [her] up [to their studio] once a month for Fox Nation shows." Compl. ¶ 114. In her opposition to the instant motion, Areu lists other benefits she claims to have received from Fox News, including "hair and makeup, transportation, and lodging" as well as "'plugs' for her magazine." Fox Opp. at 7. She also alleges that Fox News hired and paid a company run by Areu "to provide hair and makeup services to Fox on air personalities." *Id*. But besides a brief mention of travel expenses, Compl. ¶ 114, none of these allegations were included in the Complaint. Accordingly, the Court will not now consider them. *See Goodman v. Port Auth. of N.Y. & N.J.*, 850 F. Supp. 2d 363, 380 (S.D.N.Y. 2012) ("[M]emoranda and supporting affidavits in opposition to a motion to dismiss cannot be used to cure a defective complaint." (internal quotation marks omitted)); *see also Houston v. Seward & Kissel, LLP*, 07-CV-6305 (HB), 2008 WL 818745, at *9 (S.D.N.Y. Mar. 27, 2008) (rejecting plaintiff's submission of "factual averments" for the first time in its opposition brief).[6]

---

[6] The Court notes that most of the benefits Areu alleges to have received have already been rejected by the courts of this Circuit as insufficiently substantial to qualify as remuneration. *See Hughes*, 304 F. Supp. 3d at 443 (holding that hair, makeup, and transportation "fall short of the 'minimum level of significance or substantiality' required to establish employee status in the absence of a salary" because "[t]hey are merely benefits incidental to the activity performed— appearances on Fox's television program" (quoting *York v. Assoc. of the Bar of the City of N.Y.*, 286 F.3d 122, 126 (2d Cir. 2002))).

In sum, Areu has failed to plausibly allege that she was ever an employee of Fox News and is thus unable to make out a Title VII discrimination claim.

## 2. The NYSHRL

The NYSHRL does not specifically define "employee." *See* N.Y. Exec. Law § 292. Courts have held, however, that "the standards for recovery under [the NYSHRL] . . . are the same as the federal standards under [T]itle VII[.]" *Forrest v. Jewish Guild for the Blind*, 819 N.E.2d 998, 1006 n.3 (N.Y. 2004); *see also Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1177 (2d Cir. 1996) (considering plaintiff's "state law claims in tandem with [the] Title VII claims because New York courts rely on federal law when determining claims under the New York Human Rights Law"). Accordingly, Areu is not a Fox News employee under state law for the same reasons she is not a Fox News employee under Title VII.

The Complaint asserts that "Ms. Areu is also a covered 'non-employee' under the NYSHRL . . . as she worked as a contractor and/or vendor and/or consultant for Fox News Network, LLC." Compl. ¶ 16. Yet the NYSHRL only covers non-employees who "provid[e] services [to an employer] pursuant to a contract in the workplace or who [are] employee[s] of such contractor, subcontractor, vendor, consultant or other person providing services pursuant to a contract in the workplace." N.Y. Exec. Law § 296-d. In her opposition to the instant motion, Areu claims that she "had an unwritten contract [with Fox News] wherein she performed services in exchange for plugs for her company/magazine, which she specifically negotiated with Defendants." Areu Fox Opp. at 10. Yet the Complaint makes no mention of this purportedly unwritten contract. The Court will therefore disregard this factual contention. *See Goodman*, 850 F. Supp. 2d at 380; *Houston*, 2008 WL 818745, at *9.

Areu has thus not alleged that she was a covered non-employee as defined by the NYSHRL.

### 3.  The NYCHRL

The NYCHRL makes it unlawful for an "employer" to discriminate against "any person . . . in compensation or in terms, conditions or privileges of employment."  N.Y.C. Admin Code § 8-107(1)(a). Although this statutory provision does not use the word employee, "[c]ourts have routinely found that the threshold remuneration condition that is essential for an individual to qualify as an 'employee' under Title VII and the NYSHRL also applies to NYCHRL claims."  *Ayyaz v. City of New York*, 19-CV-1412 (LTS) (SN), 2021 WL 1225684, at *7 (S.D.N.Y. Mar. 31, 2021) (citing *Wang*, 976 F. Supp. 2d at 536 (holding that the plain meaning of the NYCHRL, the case law, interpretations of Title VII and the NYSHRL, as well as legislative history support the conclusion that unpaid interns are not protected by the NYCHRL)).  Areu thus is not a Fox News employee under the NYCHRL law for the same reasons she is not a Fox News employee under Title VII or the NYSHRL.

Like the NYSHRL, the NYCHRL covers some non-employees.  Specifically, the law protects "interns, freelancers and independent contractors."  N.Y.C. Admin Code § 8-107(23).  Areu does not purport to have been an intern at Fox News.  Nor was she a freelancer, a term defined by New York City's Freelance Isn't Free Act ("FIFA") as one that is "hired or retained as an independent contractor by a hiring party to provide services in exchange for compensation."  *Id.* § 20-927; *see Turner v. Sheppard Grain Enterprises, LLC*, 68 Misc. 3d 385, 387 (N.Y. Sup. Ct. 2020) (finding that plaintiff was a freelancer where evidence showed that the plaintiff "provide[d] his operations management expertise to defendant in exchange for compensation").  Because Areu never received compensation from Fox News, she also does not qualify as an independent contractor, which New York law defines as one who "agrees to do a specific piece of work for another for a lump sum or its equivalent who has control of himself and his helpers, as to when, within a reasonable time, he shall begin and finish the work, as to the method, means or procedure of accomplishing it."  *Beach v. Velzy*, 143 N.E. 805, 806 (N.Y. 1924); *see also Favale v. M.C.P. Inc.*, 125 A.D.2d 536, 536 (N.Y. App. Div. 1986).

In sum, Areu has not plausibly alleged that she is either an employee or covered non-employee of Fox News under any of the applicable laws.  This deficiency in her pleadings, notably her failure to allege that she received any cognizable remuneration for her appearances on Fox News, is fatal to her discrimination claims under all three statutes—regardless of whether that discrimination entailed sexual harassment, a hostile work environment, or *quid pro quo* discrimination.

### B.  Failure to Hire

Areu further alleges that Fox News discriminated against her because it failed to hire her as a paid contributor and did so on the basis of her gender.  Compl. ¶ 192.  A "'failure-to-hire claim is distinguishable from other employment discrimination claims in that it necessarily applies in most circumstances to non-employees seeking employment positions rather than current employees.  The relevant employment status inquiry in a failure-to-hire claim is the status of the position an applicant is seeking rather than the current relationship between the applicant and the would-be employer.'"  *Hughes*, 304 F. Supp. 3d at 445 (quoting *Suri v. Foxx*, 69 F. Supp. 3d 467, 475–76 (D.N.J. 2014)).  Consequently, Areu's status as a non-employee does not prevent her from raising a claim of discriminatory failure to hire.

Pursuant to Title VII, a plaintiff alleging such a claim "must first make out a prima facie case of discrimination by showing that (1) [s]he is a member of a protected class, (2) [s]he was qualified for the job for which s[]he applied, (3) [s]he was denied the job, and (4) the denial occurred under circumstances that give rise to an inference of invidious discrimination."  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  The NYSHRL applies the same standard.  *See Carr v. North Shore - Long Island Jewish Health Sys*., 14-CV-3257 (JS) (SIL), 2015 WL 4603389, at *2 n.2 (E.D.N.Y. July 30, 2015) (citing *Mittl v. New York State Div. of Human Rights*, 794 N.E.2d 660, 662 (N.Y. 2003)).  To survive a motion to dismiss, a plaintiff alleging discriminatory failure to hire under the NYCHRL must plead facts sufficient to support an inference that she has "'been treated less well at least in part because of a

protected trait.'" *Jablonski v. Special Counsel, Inc.*, 16-CV-5243 (ALC), 2017 WL 4342120, at *5 (S.D.N.Y. Sept. 28, 2017) (emphasis omitted) (quoting *Bell v. McRoberts Protective Agency*, 15-CV-0963 (JPO), 2016 WL 1688786, at *4 (S.D.N.Y. Apr. 25, 2016)).

In the Complaint, Areu attempts to raise an inference of discrimination by contrasting her inability to obtain a paid contributor position at Fox News with the experiences of three male contributors: Dan Bongino, Gianno Caldwell, and Lawrence Jones. Compl. ¶¶ 65–70. She alleges that each of these three men were quickly hired by the network without the long period of unpaid contributor status to which Areu was subjected. *Id*. While this may be true, Areu alleges too few facts about these men and their qualifications to raise an inference of discrimination, even at the pleading stage. It is well established in this Circuit that a plaintiff seeking to raise an inference of discrimination through disparate treatment "must show she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir.1997)); *see also Bucek v. Gallagher Bassett Servs., Inc.*, No. 16-CV-1344, 2018 WL 1609334, at *14 (S.D.N.Y. Mar. 29, 2018) (collecting cases and holding that the plaintiff must provide evidence of proposed comparator's relevant characteristics, such as prior experience). Absent any information about Bongino, Caldwell, and Jones—other than their gender and that they were hired as paid contributors without a lengthy audition process—Areu has not raised an inference of discrimination, even under the NYCHRL's more lenient standard. The Court cannot conclude that their hiring is evidence that Fox News was acting with discriminatory intent when it failed to hire Areu as a paid contributor.

The Complaint thus fails to plausibly plead a claim of discriminatory failure to hire under any of the three applicable laws.

**III.     Title VII, the NYSHRL, and the NYCHRL — Retaliation**

Unlike in the context of employment discrimination, Areu's non-employee status at Fox News does not preclude her from bringing a retaliation claim against Defendants.  *See Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) ("Title VII's anti-discrimination and anti-retaliation provisions 'are not coterminous'; anti-retaliation protection is broader and 'extends beyond workplace-related or employment-related retaliatory acts and harm.'" (quoting *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006))).  To plead a prima facie case of retaliation, a plaintiff "'must show (1) participation in protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'"  *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (quoting *McMenemy v. City of Rochester*, 241 F.3d 279, 282–83 (2d Cir. 2001)).  Under Title VII and the NYSHRL, an action qualifies as an adverse employment action only if it is "'materially adverse to a reasonable employee or job applicant.'"  *Hicks*, 593 F.3d at 165 (quoting *White*, 548 U.S. at 54).  Under the NYCHRL, on the other hand, an action may be adverse if it is "reasonably likely to deter a person from engaging in protected activity."  N.Y.C. Admin. Code § 8-107(7); *Fletcher v. Dakota, Inc.*, 99 A.D.3d 43, 51–52 (N.Y. App. Div. 2012) (holding that the NYCHRL prohibits retaliation of any kind that "disadvantaged" a plaintiff even if it does qualify as a materially adverse change to the plaintiff's employment).

Here, the Complaint alleges four forms of retaliation.  The Court will discuss each in turn.

### A.  Career Opportunities and Advancement

The crux of Areu's retaliation claims lies in her allegation that her refusal to "play along" with the Individual Defendants' sexual or sexist comments and romantic overtures motivated them to retaliate against her by declining to provide her career advice and assistance and, in some cases, ceasing to invite her to appear on their shows.  *See* Areu Fox Opp. at 18–19 ("After Areu refused the [I]ndividual Defendants' clear and/or implied advances, each subjected her to retaliation with respect to appearances on their shows and/or their refusal to interact with her regarding story ideas.").

In response, Defendants contend that these claims fail as a matter of law because refusing an unwanted sexual advance is not protected activity.  Fox Mem. at 18.  It is true that some judges in this District have concluded that "resisting a supervisor's sexual advance, without more, is not enough to state a claim for a retaliation."  *Williams v. N.Y.C. Dep't of Educ.*, 19-CV-1353 (CM), 2019 WL 4393546, at *12 (S.D.N.Y. Aug. 28, 2019); *see also Del Castillo v. Pathmark Stores, Inc.*, 941 F. Supp. 437, 439 (S.D.N.Y. 1996) (holding that plaintiff's "modest allegations" of sexual advances from her supervisor could "hardly suffice to support a retaliation claim").  Yet other judges in this District—as well as "the majority of courts" within the Circuit—have held otherwise.  *Johnson v. MediSys Health Network*, 10-CV-1596 (ERK) (VVP), 2011 WL 5222917, at *16 (E.D.N.Y. June 1, 2011); *see also Hughes*, 304 F. Supp. 3d at 447; *Laurin v. Pokoik*, 02-CV-1938 (LMM), 2005 WL 911429, at *4 (S.D.N.Y. Apr. 18, 2005); *Little v. Nat'l Broad. Co., Inc.*, 210 F. Supp. 2d 330, 386 (S.D.N.Y. 2002).  The Court shares the majority view.

A "protected activity" as defined in 42 U.S.C. § 2000e-3 is an "action taken to protest or oppose statutorily prohibited discrimination."  *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000). There is no question that sexual harassment is prohibited discrimination.  *Cf. Prophete-Camille v. Stericycle, Inc.*, 14-CV-7268 (JS) (AKT), 2017 WL 570769, at *11 (E.D.N.Y. Feb. 13, 2017) (remarking that the plaintiff had "oppos[ed] statutorily prohibited conduct—namely, [the defendant's] sexual

harassment").  In the Court's view, resisting or opposing workplace sexual harassment—a category that may include a refusal to engage in unwanted sexual activity—must be protected activity within the confines of Title VII.   In other words, when an individual in a position of power penalizes another at work or denies that person business opportunities for refusing to engage sexually, he or she commits actionable retaliation.

Whether Areu has plausibly alleged that she engaged in the above-described protected activity, however, is a separate inquiry, as is whether this purported protected activity motivated Defendants to take any adverse actions against her.   The Court will proceed through these inquiries allegation by allegation.

### 1.  Tucker Carlson

In the Complaint, Areu recounts an incident in which Tucker Carlson allegedly asked her to remain in the studio after his show finished filming, at which time he "changed his clothes in front of her" and made comments to her about how "he would be alone in New York City that night, and … would be staying alone in his hotel room."  Compl. ¶¶ 148, 150.  Areu claims that she responded to Carlson's comment by turning the conversation to work.  *Id*. ¶¶ 153–154.  After Carlson purportedly made a joke about Areu to his two male colleagues who remained in the room, Areu left the studio.  *Id*. ¶¶ 154–156.  In her opposition to the instant motion, Areu characterizes the above conduct as a "refus[al]" of "[Carlson's] clear and/or implied [sexual] advances."  Areu Fox Opp. at 19.

As noted above, this Court is of the firm view that refusing a sexual advance may indeed amount to protected activity.  But even when reading the Complaint in the light most favorable to Areu, the Court cannot conclude that Areu has plausibly alleged refusal of a sexual advance from Carlson.  To begin with, Carlson did not proposition Areu.  While he allegedly mentioned that he was staying alone in his hotel room in New York, he did not invite her to his hotel room—or anywhere for that matter—nor did he even identify the hotel at which he was staying.  *See* Compl. ¶ 150.  The Court is well aware that

many sexual propositions are subtle, but the mere mention—in the presence of others—of staying alone in an unnamed hotel does not suffice in these circumstances.  It is true that Areu alleges that just prior to this statement, Carlson "began changing his clothes in front of [her] and one other male employee."  *Id.* ¶¶ 148–149.  Changing clothes in front of someone while mentioning staying alone in a hotel could surely, in many a circumstance, amount to a sexual advance.  But if Carlson, just off his program, had changed clothes in a fashion that was either revealing or at all sexually suggestive, the Court assumes that Areu would have so alleged.  She has not.  Although Carlson's alleged conduct could conceivably be consistent with a sexual advance, albeit subtle, it is also "just as much in line" with innocuous, lawful behavior in these particular circumstances.  *See Twombly*, 550 U.S. at 554.

In any event, even assuming Areu has plausibly alleged that Carlson was in fact "suggest[ing] a sexual encounter with him (whether it was that evening or at some point in the future)," *id.* ¶ 150, she has not pled that, in response, she took any "action … to protest or oppose statutorily prohibited discrimination," *Cruz*, 202 F.3d at 566.  The only action Areu cites is the ambiguous assertion that "she refused to play along."  Compl. ¶ 152.  To be clear, in certain cases, silence or a refusal to engage with a sexual proposition—perhaps a failure to go to a hotel room upon an invitation—may convey a rejection of that proposition.  *See Johnson*, 2011 WL 5222917, at *16.  But for silence or a refusal to "play along" to be fairly interpreted as an opposition to or rejection of a sexual advance, either the advance or the refusal must be sufficiently clear so as to permit an inference that opposition to sex discrimination was communicated to the defendant.  *See Lenzi*, 944 F.3d at 113 (protected activity only if employer could "reasonably have understood" that employee was complaining about discrimination).

This is not that case.  Here, the ambiguity in both Carlson's purported advance and Areu's purported refusal to that advance prevent the Court from concluding that Areu has plausibly alleged that she engaged in protected activity within the meaning of the anti-retaliation laws.

Areu has thus failed to adequately plead a claim of retaliation against Carlson.

24

### 2.   Howard Kurtz

In the Complaint, Areu recounts one occasion on which Howard Kurtz invited her to meet him in the lobby of his hotel.  Compl. ¶¶ 115–116.  The two had apparently been communicating for several months about Areu's prospects for a paid position at the network, and Areu alleges that after she reached out, Kurtz invited her to meet with him in the lobby of his hotel.  *Id.*  When Areu "politely declined" the invitation but invited Kurtz to dinner with her and a friend instead, he demurred.  *Id*. ¶ 116.  The two then tentatively agreed to meet after Areu's dinner, but Kurtz emailed to tell her that he was going to bed.  *See* Kurtz Decl. Ex. 1 at 6.  Seven minutes later, at 9:16 p.m., Areu responded that she was "totally available right now" and would be "right there."  Receiving no response, Areu emailed again five minutes later to ask him his room number and declare that she was "coming over."  *Id*. at 7.  Kurtz apparently did not respond that night.  *See id.*  The following day, in the "greenroom before [his show] went live," Kurtz told Areu "I have to remember that you're the only woman here who tells me she's at a hotel to simply tell me she's there.  You don't invite me over or come to my hotel room . . . I've made a mental note."  Compl. ¶ 120.

As with Carlson, Areu characterizes her conduct as a "refus[al]" of "[Kurtz's] clear and/or implied [sexual] advances."  Areu Fox Opp. at 19.  Taken in isolation, Kurtz's comment to Areu about the "mental note" he made when she "[did]n't invite [him] over or come to [his] hotel room" lends support to the allegation that he reacted in a retaliatory fashion.  But for Areu to state an actionable retaliation claim against Kurtz, she must satisfy the threshold showing that she "protest[ed] or oppose[ed] statutorily prohibited discrimination," *Cruz*, 202 F.3d at 566.  She has not done so.  After declining his initial invitation to meet in the lobby of his hotel, she later made repeated efforts to find him there, even going so far as to ask him which room he was staying in and insist that she would be "right there."  Kurtz Decl. Ex. 1 at 7.  When considering the email thread as a whole, the Court cannot conclude that Areu plausibly alleged that she conveyed to Kurtz the rejection of a sexual advance, or any other opposition

or protest to his conduct.  She thus did not engage in protected activity in relation to Kurtz.  *See Lenzi*, 944 F.3d at 113; *Richardson*, 532 F.3d at 123 (protected activity must be "known to the defendant").

Areu has thus failed to adequately plead a claim of retaliation against Kurtz.

### 3.  Sean Hannity

Areu has likewise failed to plausibly allege that she engaged in protected activity in relation to Sean Hannity.  As an initial matter, the Complaint lacks factual support for Areu's assertion that Hannity made a "clear and/or implied advance[]" toward her, Areu Fox Opp. at 18–19.  She recounts that on one occasion when she brought a male guest into the studio, Hannity asked her about her relationship status, described her as a "beautiful woman," "auctioned [her] off" for a date, and pressured her male guest to take her out.  Compl. ¶¶ 95–101.  Were Areu an employee of Fox News, this conduct may well be relevant to a claim for gender discrimination or hostile work environment.  That conduct does not, however, amount to a "clear and/or implied [sexual] advance[]," Areu Fox Opp. at 18–19, even when viewed in the light most favorable to Areu.

However Hannity's alleged behavior is characterized, Areu's claim of retaliation against him fails because the Complaint contains no allegation that could plausibly be interpreted as her protesting or opposing discriminatory conduct.  *See Cruz*, 202 F.3d at 566.   According to the Complaint, she refused to "play along" with Hannity's "misogynistic" behavior.  *See* Compl. ¶ 102.  But she alleges no facts that indicate that she in fact did so.  She later "emailed the show to thank Mr. Hannity for having her on, and for [paying for] the drinks" because "[a]s anyone in the TV industry will attest, thanking a show for an appearance is proper etiquette if you want to get asked back."  *Id*. ¶¶ 101–102.  To constitute protected activity, "'the complainant must put the employer on notice that the complainant believes that discrimination is occurring.'"  *Bass v. NYNEX*, No. 02 Civ. 5171, 2004 WL 1941088, at *7 (S.D.N.Y. Sept. 1, 2004) (quoting *Ramos v. City of New York*, No. 96 Civ. 3787(DLC), 1997 WL 410493, at *3 (S.D.N.Y. July 22, 1997)).  Areu did not do so here.

Areu has thus failed to adequately plead a claim of retaliation against Hannity.

### 4. Ed Henry

By contrast, the Court finds that Areu has adequately pled that her rejection of Ed Henry's advances constitutes protected activity. Henry is alleged to have sent graphic images and inappropriate text messages to Areu, which she interpreted as implicitly communicating that "Ms. Areu should have sex with him and that he would assist Ms. Areu's career if she did so." Compl. ¶ 168. Areu claims that when she did not indicate to Henry that she would be willing to engage in sexual acts with him, he "berat[ed]" her for being "boring," then ceased communicating with her. *Id.* ¶ 174. Drawing all reasonable inferences in Areu's favor, these allegations plausibly demonstrate that Areu engaged in the protected activity of rejecting Henry's sexual advances and that Henry was aware of that rejection.

Yet Areu has failed to plausibly allege that this protected activity resulted in any adverse action. While she does claim that he implied via text message that he would assist her career if she had sex with him, *id.* ¶ 168, the Complaint contains no allegation that Henry ever actually made such an offer to her or took any steps to help advance her career at Fox News. Areu claims in her opposition to the instant motion that after she "refused [Henry's] sexual advances . . . [he] refused to interact with her" and when she "attempted to pitch additional stories to him, he did not respond." Areu Henry Opp. at 23. But Areu has not alleged that she ever appeared on a show hosted by Henry or that he previously played any role, direct or indirect, in her position as an unpaid contributor at Fox. In sum, Areu pleads no facts to support the inference that her refusals of his sexual advances motivated a change in Henry's behavior that was professionally detrimental to her. Even under the NYCHRL's more lax definition of adverse action, a defendant's conduct must "disadvantage[]" a plaintiff. *See Fletcher,* 99 A.D.3d at 51–52 (citing N.Y.C. Admin. Code § 8-107(7)). The conduct alleged does not suffice to meet either that standard or the more rigorous standards employed by the NYSHRL and Title VII.

Areu has thus failed to adequately plead a claim of retaliation against Henry.

### B.  Failure to Hire

Areu further alleges that Fox News retaliated against her by not hiring her as a paid contributor, and that the network did so in response to her refusal to engage in *quid pro quo* sexual relationships with its male anchors.  Compl. ¶ 198.  Unlike the decision to invite guest contributors onto their respective shows, the Individual Defendants are not alleged to have had the authority to make decisions as to the hiring of paid contributors.  Although Areu alleges that Fox News's male hosts and anchors had the ability to "make or break one's career at Fox," *id.* ¶ 62, she does not plausibly allege that these men had any authority to hire a person as a paid contributor.  Instead, the Complaint suggests that this decision was made by a Fox News executive, without specifying precisely who that person might be.  *See id.* ¶ 114 (in July 2019, Areu asked Kurtz how she "should . . . go about convincing Amy and Lauren, or whoever makes the decision over there" to hire her).  Areu has not pled that Fox News's executives had knowledge that she engaged in protected activity by allegedly rejecting Henry's sexual advances.[7]

The Court thus concludes that Areu has failed to adequately plead that Fox News failed to hire her as a paid contributor for retaliatory reasons.

### C.  Releasing Emails and Filing a Sanctions Motion

The Complaint further alleges that Fox News engaged in two additional forms of retaliation: filing a Rule 11 sanctions motion and "leaking cherry-picked emails to the media to portray Ms. Areu as someone who invited sexual harassment."  Compl. ¶¶ 4–5.  These actions cannot support a claim for retaliation because both were reasonable defensive measures, which the Second Circuit has held "'do not violate the anti-retaliation provision of Title VII, even though [they are] adverse to the charging employee and result in differential treatment.'"  *Richardson v. Comm. on Human Rights &*

---

[7] Sometime in July 2020, Areu reported to Amy Sohnen, the Vice President of Talent Development, that Henry and others at Fox News had sent her "pornographic messages."  Compl. ¶¶ 185-186.  Because she did not send that email until after she was allegedly "blacklisted from the majority of Fox News' most well-known shows in 2019 and … completely removed from the air in 2020," *id.* ¶ 176, however, Areu has not plausibly alleged that such protected activity motivated Fox News executives to not hire her as a paid contributor.

*Opportunities*, 532 F.3d 114, 123 (2d Cir. 2008) (quoting *United States v. New York City Transit Auth.*, 97 F.3d 672, 677 (2d Cir. 1996)); *see also Steffes v. Stepan Co.*, 144 F.3d 1070, 1075 (7th Cir. 1998) (noting that "it will be the rare case in which conduct occurring within the scope of litigation constitutes retaliation").

*Hughes v. Twenty-First Century Fox* is instructive in this regard.   In *Hughes*, Fox News was accused of leaking a story to the *National Enquirer* that painted the plaintiff in a negative light and advanced an allegedly false narrative regarding the plaintiff's accusations.   *See* 304 F. Supp. 3d at 449. Judge Pauley reasoned that "given that [the plaintiff] was expected to charge Fox [News] with sexual harassment claims, [Fox News's] attempt to blunt the inflammatory force of her allegations was a colorable defense to protect their business."   *Id*.   The same is true here.   None of the emails released are alleged to have been doctored or fabricated.   Indeed, it is likely that these emails would become public if this action proceeded to trial.

Similarly, the Court concludes that Defendants' filing of a Rule 11 sanctions motion in this action was a permissible litigation strategy.   *See Gaughan v. Rubenstein*, 261 F. Supp. 3d 390, 420 n.4 (S.D.N.Y. 2017) (holding that the filing of motions "as part of . . . defenses in litigation[] … do[es] not constitute an adverse action for purposes of stating a retaliation or discrimination claim").

These allegations thus do not form the basis of a claim of retaliation.

## IV.   Leave to Amend

Plaintiff has requested leave to further amend her Complaint in the event that any portion of Defendants' motions to dismiss is granted.   In response, Defendants urge the Court to deny leave to amend, arguing that it would be "futile" because Areu has "fail[ed] to identify any new facts that she would allege to make her claims survive."   Fox Reply at 10.   While it is true that Areu has not identified specific facts she would plead in a further amended complaint, the Court is not yet in a position to assume that further amendment would be futile.   *See Obra Pia Ltd. v. Seagrape Inv'rs LLC*, 19-CV-7840 (RA),

2021 WL 1978545, at *3 (S.D.N.Y. May 18, 2021) ("Ordinarily a plaintiff should be granted leave to amend at least once after having the benefit of a court's reasoning in dismissing the complaint." (citing *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec. LLC*, 797 F.3d 160 (2d Cir. 2015))).

Areu will thus be granted one final opportunity to amend her Complaint, if she has a good-faith basis to do so.

## V.   **Sanctions**

Lastly, Defendants Fox News, Carlson, Hannity, and Kurtz have filed a motion for sanctions pursuant to Federal Rule of Civil Procedure 11 against Areu's current and former counsel. *See* Dkt. 13.[8] They assert that Areu's claims are both factually and legally frivolous, and were brought for an improper purpose. Sanctions Mem. at 12. Areu's current counsel seeks sanctions against Defendants in return, retorting that the Rule 11 motion was itself filed for an improper purpose. *See* Vagnini Opp. at 26. Areu's former counsel does not seek sanctions but requests a declaration that the "filing of the Rule 11 Motion was an improper abuse of the litigation process." Wigdor Opp. at 27.

Federal Rule of Civil Procedure 11(b) dictates, in relevant part, that when an attorney files pleadings, that attorney is certifying, to the best of his or her knowledge, that "(1) [the pleadings are] not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and] (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b). Rule 11(c) further provides that "[i]f, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the

---

[8] Defendant Henry is not party to the sanctions motion.

violation." Fed. R. Civ. P. 11(c). The Second Circuit has advised courts that Rule 11 sanctions should be "made with restraint." *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 334 (2d Cir. 1999); *see also Shin Park v. Seoul Broad Sys. Co.*, 05-CV-8956 (BSJ) (DFE), 2008 WL 619034, at *1 (S.D.N.Y. Mar. 6, 2008) ("Courts have cautioned litigants that Rule 11 sanctions are reserved for extraordinary circumstances."). The decision to impose sanctions under Rule 11 is always discretionary. *See Perez v. Posse Comitatus*, 373 F.3d 321, 325 (2d Cir. 2004). Here, the Court declines to impose sanctions against either party.

Areu's claims are not legally frivolous. The Second Circuit defines the term legally frivolous to mean in this context that "the legal position has 'no chance of success,' and there is 'no reasonable argument to extend, modify or reverse the law as it stands.'" *Fischoff v. Coty Inc.*, 634 F.3d 647, 654 (2d Cir. 2011) (quoting *Morley v. Ciba-Geigy Corp.*, 66 F.3d 21, 25 (2d Cir. 1995)). Although Areu's claims fail because she has not pled sufficient facts to support them, the Court now grants her leave to amend to do so.

Nor are her claims factually frivolous. As an initial matter, some of Areu's allegations— including that Henry sent her pornographic images and that Kurtz told her that he "made a mental note" of the fact that she "d[idn't] invite [him] over or come to [his] hotel room"—are seemingly undisputed. Compl. ¶ 120. Defendants do proffer evidence that they claim contradicts other factual allegations contained in Areu's complaint. But none of this evidence suffices for the Court, on this record, to definitively determine that Areu's allegations are false. A pleading runs afoul of Rule 11(b)(3) only where, "after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact." *Kropelnicki v. Siegel*, 290 F.3d 118, 131 (2d Cir. 2002) (internal quotation marks omitted); *see Kiobel v. Millson*, 592 F.3d 78, 81 (2d Cir. 2010) ("A statement of fact can give rise to the imposition of sanctions only when the particular allegation is utterly lacking in support.").

Moreover, some of the Defendants' evidence includes emails and messages from Areu that allegedly demonstrate that Areu was receptive to the advances of certain Defendants.  Sanctions Mem. at 17–18 (citing Kurtz Decl., Ex. A at 2–5).  The Court will not grant sanctions on this basis.  As other courts have previously recognized, a victim of workplace sexual harassment may often feel pressure to "play nice" or supplicate her harasser in order to avoid harmful professional consequences.  *See Hughes*, 304 F. Supp. 3d at 448.  To use this conduct by an alleged victim to discredit her claims would be to oversimplify what may have been a nuanced and complex situation.  *See Guzman v. News Corp*., No. 09 Civ. 09323 (LGS), 2013 WL 5807058, at *14 (S.D.N.Y. Oct. 28, 2013) ("Civility toward a harasser does not excuse harassment or signify subjective acceptance, particularly in an employment setting").  Other factual disagreements—such as the number of times Areu appeared on a given program before and after the alleged retaliation began—will, if Plaintiff succeeds in stating a claim in her next amended complaint, be resolved through discovery and need not be addressed at this stage.

Lastly, for the reasons stated above in section III.C., Areu's sanctions motion also fails. Recognizing that sanctions are to be used very sparingly in extreme cases, the Court will not impose sanction on any party.

**CONCLUSION**

For the reasons stated above, the motions to dismiss are granted and the motion for sanctions is denied.  Plaintiff's motion for leave to file an amended complaint is granted.  If she so chooses, Plaintiff must file an amended complaint no later than September 30, 2021.  Failure to file an amended complaint by that date will result in dismissal of this action with prejudice.   The Clerk of Court is respectfully directed to terminate the motions pending at docket entries 3, 6, and 13 in case number 20-CV-8678 and docket entries 52, 86, and 97 in case number 20-CV-5593.

SO ORDERED.

Dated:     September 9, 2021
           New York, New York

                                           RONNIE ABRAMS
                                           United States District Judge