```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK

In re:                              :
                                         Docket #1:20-cv-05593-
ECKHART, et al.,                    : RA-GWG

                 Plaintiffs,        :

  - against -                       :

FOX NEWS NETWORK, LLC, et al.,      : New York, New York
                                      February 14, 2022
                 Defendants.        :
                                      TELEPHONE CONFERENCE
------------------------------------ :


                      PROCEEDINGS BEFORE
               THE HONORABLE GABRIEL W. GORENSTEIN,
                 UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiffs:          WIGDOR LLP
                         BY:  RENAN F. VARGHESE, ESQ.
                         85 Fifth Avenue, 5th Floor
                         New York, New York 10003
                         212-257-6829


For Defendants Fox News:  PROSKAUER ROSE LLP
                          BY:  KATHLEEN MCKENNA, ESQ.
                               RACHEL SARAH FISCHER, ESQ.
                          11 Times Square
                          New York, New York 10036
                 212-969-3130




Transcription Service:  Carole Ludwig, *Transcription Services*
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com


Proceedings conducted telephonically and recorded by
electronic sound recording;
Transcript produced by transcription service
```

APPEARANCES CONTINUED:

For Defendant Ed Henry:      MORVILLO, ABRAMOWITZ, GRAND,
                              IASON & ANELLO P.C.
                             BY:  CATHERINE FOTI, ESQ.
                             565 5th Avenue
                             New York, New York 10017
                             212-880-9530

<u>INDEX</u>

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None | | | | |

```
 1                          PROCEEDINGS                    4

 2              THE CLERK:  We're here in the matter of Eckhart

 3   et al v. Fox News Network et al, case number 20-cv-5593.

 4              Could we have appearances of counsel, beginning

 5   with the plaintiff?

 6              MR. RENAN VARGHESE:  Good afternoon, your Honor.

 7   This is Renan Varghese from Wigdor LLP for the plaintiff,

 8   Jennifer Eckhart.

 9              MS. KATHLEEN MCKENNA:  Good afternoon, your

10   Honor. Kathleen McKenna from Proskauer Rose, joined by my

11   colleague, Rachel Fischer, who will be handling this

12   conference.

13              MS. RACHEL FISCHER:  Good afternoon.

14              MS. CATHERINE FOTI:  Good afternoon, your Honor.

15   It's Catherine Foti from Morvillo, Abramowitz, Grand,

16   Iason, & Anello, P.C., on behalf of Ed Henry.

17              HONORABLE GABRIEL W. GORENSTEIN (THE COURT):

18   Okay.  Welcome, everyone.  This is a recorded line, but

19   any further recording or dissemination of the proceeding

20   is forbidden.  Also, anyone who's not speaking should keep

21   themselves on mute.

22              We're here based on two letters, February 4th

23   and February 8th, dockets 192 and 193.  I've read the

24   letters, but, you know, we should go over them.  And we'll

25   do them one issue at a time.  So I'll hear from plaintiff
```

```
1                        PROCEEDINGS                    5

2   as to the first issue.

3           MR. VARGHESE:  Thank you, your Honor.  And this

4   is Renan Varghese from Wigdor.  The first issue that we

5   identified in our initial correspondence report is the

6   issue of the discovery of other complaints of

7   discrimination, harassment, sexual assault and rape.  Just

8   by way of background, we represent Jennifer Eckhart, who

9   is a former associate producer at Fox News, and we allege

10  that while Ms. Eckhart was employed by Fox News, she was

11  sexually assaulted and raped by one of the anchors for the

12  company, Ed Henry, and that she complained about his

13  conduct and was subsequently terminated in retaliation for

14  her complaint.  Both Fox News and Ed Henry moved to

15  dismiss Ms. Eckhart's claims; and as part of Fox News'

16  motion to dismiss, it argued that Ms. Eckhart never

17  engaged in protected activity.

18          I've alleged in the Complaint Ms. Eckhart never

19  used the term "sexual harassment" or, quote/unquote,

20  "rape" in her Complaint, but she did complain about an

21  abusive and toxic working environment.  And, as we

22  explained in opposing Fox News' motion to dismiss, given

23  the other complaints of harassment, discrimination and

24  sexual abuse that Fox News received before Ms. Eckhart's

25  complaint and in and around when Ms. Eckhart had
```

```
 1                          PROCEEDINGS                      6

 2   complained about the sexual abuse and rape, that Fox

 3   should have known that what Ms. Eckhart was complaining

 4   about or speaking about was about sexual misconduct.  And

 5   even if Fox didn't know, which is what Fox News has

 6   contended, it should have known, given the larger context.

 7   And so that is one of the reasons --

 8            THE COURT:  Is there anything in Judge Abrams'

 9   decision or anywhere else that says the standard is

10   "should have" as opposed to what they understood?  I mean,

11   you can only retaliate against someone for a reason, and

12   the reason is one you know about, not one that you should

13   have known.  I mean, they would have to actually

14   understand it, right?  They would have to actually believe

15   that she was complaining about protected activity for them

16   to be liable for retaliation, right?

17            MR. VARGHESE:  No, that --

18            THE COURT:  It doesn't matter as much for what

19   we're doing today, but I was just surprised you said that.

20            MR. VARGHESE:  Well, no, I don't think that's

21   exactly accurate, your Honor.  You can't -- case law is

22   clear that you can't look at a complaint of discrimination

23   in isolation.  And you have to look at it in the larger

24   context of the -- what's going on and what the human

25   resources recipient and the company knew and what is
```

1
2   reasonable for them to know.  That goes to the whole line
3   of cases saying that there are no magic words required in
4   order to engage in protected activity.  It's not a matter
5   of the plaintiff used this language, and based on this
6   language it's clear that the defendant knew.  It's the
7   plaintiff -- given everything, what the plaintiff said and
8   given the larger context of her complaint, that is what is
9   necessary to examine in order to determine whether the
10  company could fairly have been considered to be on notice.
11  The standard is not you didn't use the right words, so we
12  can stick our head in the sand and we don't have to do any
13  further investigation, and you're out of luck.  That's not
14  the way the case law has viewed those kind of complaints.
15  And I would point the Court to the *Lenzi v. Systemax* case,
16  Second Circuit 2019 decision where the Court reversed
17  summary judgment where the district court read the case in
18  isolation and said that instead that the Court needs to
19  read the Complaint in context to determine whether, quote,
20  "it reasonably suggested," end quote, that the plaintiff
21  was engaging in protected activity.
22          So it's not that Fox News can just say, "We
23  didn't think this was protected activity.  That is the end
24  of the analysis," because, I mean, if that were the case,
25  then there's no -- then Judge Abrams should have dismissed

```
 1                        PROCEEDINGS                 8
 2  the retaliation case in its entirety.  The issue should be
 3  permitted to go to discovery.  And one of the things we
 4  need to prove in discovery is that, given the larger
 5  context of the other complaints that were made around the
 6  time before Ms. Eckhart complained about -- made her own
 7  complaint about the sexual abuse and rape that she was
 8  subjected to, Fox should have known.  And the only way for
 9  us to do that -- Fox says in their opposition letter that
10  we should just ask their employees what they understood
11  the complaint to mean.  But, with all due respect, that's
12  not the issue here.  And also, that's not how employment
13  discrimination cases work.  It's not a matter of you take
14  a deposition and you ask, "Did you discriminate against
15  the plaintiff?"  Answer, "No."  Well, I guess case
16  withdrawn, then, because there's nothing left to say.
17  Under Fox News' argument, there would be no need for
18  document discovery.
19          That's not the (indiscernible).  We're entitled
20  to look at the other complaints and the specific language
21  used in those complaints to see whether or not Fox should
22  have been on notice of Ms. Eckhart's complaint.  For
23  example, if -- and, again, this is just a hypothetical;
24  I'm not saying this is what happened.  But, if, for
25  example, we have -- based on public reporting, we know
```

1                          PROCEEDINGS                    9

2   that Gretchen Carlson and Megyn Kelly both thought they

3   were subject to sexual harassment at Fox.  If they used

4   the same language that Ms. Eckhart used, if they said, "We

5   believe we were subject to abuse and a toxic work

6   environment," then Fox would have known that those kinds

7   of statements are statements that women who are afraid to

8   explicitly invoke "sexual harassment" or "abuse" or "rape"

9   use in making complaints of discrimination and that it

10  would have been unreasonable for Fox to just look at the

11  explicit language that Ms. Eckhart used in her -- in

12  speaking to Fox when deciding whether or not to engage in

13  protected activity.

14          That is the first prong as to why we believe

15  those documents are relevant --

16          THE COURT:  Just to finish out on that prong, I

17  mean, I think part of what you're talking about relates to

18  substantive issues of discrimination and maybe not

19  necessarily about judging whether someone has retaliated

20  for protected activity.  But let's put that to the side

21  for the moment.  Let's assume you're right.  What's the

22  limiting principle on this?  Do we have discovery on

23  twenty different complaints as to what they were, whether

24  they really were sexual harassment or not?  What's the

25  limiting principle here, or is there none?

```
 1                        PROCEEDINGS                10
 2              MR. VARGHESE:  I don't know that there's a way
 3    to fairly apply a limiting principle.  The question isn't
 4    -- you know, in other cases that I have litigated where
 5    there have been -- where we're talking about a huge
 6    company with a -- where there are, you know, dozens and
 7    dozens of complaints of discrimination, we have taken a
 8    sampling or done something along those lines to give a
 9    fair representation of the other complaints.  But first, I
10    don't know that we are talking about dozens and dozens.
11    If, you know, your Honor is right and if it is twenty --
12              THE COURT:  No, but it's not so much the number
13    of complaints; it's what do you get for those complaints.
14    For example, if one of the complaints is someone -- I
15    mean, I'm not sure if these are written or there's notes
16    of them or whatever it is -- let's assume there's some
17    document that's reflective of the complaint, either, you
18    know, some form that's filled out afterwards or --
19    something, do you just get that, or do you then get to do
20    discovery on that complaint to see whether it was really a
21    complaint of sexual harassment or misconduct?
22              MR. VARGHESE:  Well, I don't think for the
23    purposes of this case, I don't think it matters whether it
24    was ultimately found to be that the individual was the
25    victim of sexual harassment or misconduct.  I think for
```

```
 1                      PROCEEDINGS                11
 2   this issue, I think the language that was used and how Fox
 3   interpreted it are the key points.  So, for example, going
 4   back to my hypothetical --
 5            THE COURT:  So all you need is that initial --
 6   all you need is that initial whatever it is, the note of
 7   the meeting or the document containing the complaint?
 8            MR. VARGHESE:  No, because it's also -- no for
 9   two reasons.  One, it's also how Fox interpreted the
10   complaint.  So if an employee came to Fox and said, "I
11   feel like I have been subject to abuse and a toxic work
12   environment," which is what Ms. Eckhart says, but if
13   another employee came to Fox and said that and then Fox
14   believed that that was a sexual harassment complaint or
15   sexual misconduct complaint and proceeded to investigate
16   that complaint based on the language that we've used, that
17   would show that Fox easily should have known that
18   Ms. Eckhart herself was complaining about sexual
19   harassment, sexual abuse, even though that wasn't the
20   language that she used, that that's how Fox interpreted --
21            THE COURT:  Right.  So I think -- I think
22   you're -- I think that that suffers from perhaps a
23   disassociation with reality because if the employer gets a
24   complaint of toxic work environment, you know, I mean
25   unless they have some form that says, "We shall
```

```
 1                        PROCEEDINGS              12
 2   investigate this as sexual harassment," as opposed to we
 3   just shall investigate this, I don't know how you ever get
 4   to the point where you find out whether they investigated
 5   it as sexual harassment.
 6            MR. VARGHESE:  Well, but I guess that is what my
 7   point is when your Honor is asking is the only thing that
 8   we're entitled to the documents about the language of the
 9   complaint and what -- the form your Honor hypothesized
10   might exist.  This is why the investigation itself is
11   important, both to this factor and to the Faragher-Ellerth
12   defense that Fox has pled, which is what the --
13            THE COURT:  I really want to keep these
14   separate, if you don't mind.  Let's figure out what you're
15   entitled to under this theory, and then we'll talk about
16   the other one.  Okay?
17            MR. VARGHESE:  Okay.
18            THE COURT:  So I'm still not buying it here,
19   because the way Judge Abrams, it seems to me, framed it --
20   and I think that is what should guide us here -- is are
21   there actually complaints -- the way I think she framed it
22   was were there a whole bunch of complaints of sexual
23   harassment and misconduct; and therefore when the next
24   person who came in with a complaint that didn't use the
25   magic words, should they -- was that really understood by
```

1
2  them to be a complaint about sexual harassment.  So it's
3  not that you look at prior complaints of toxic
4  environment; you look at prior complaints of sexual
5  harassment along with that.
6         MR. VARGHESE:  I agree with that, your Honor;
7  that's 100% true.  But the issue is not did the plaintiff
8  state, "I am complaining about sexual harassment."  Did
9  she use the words "sexual harassment" --
10         THE COURT:  The plaintiff or the complainer?
11  I'm sorry, who's --
12         MR. VARGHESE:  Sorry, the complainer -- I'm
13  sorry, I apologize for my inartful language.  The question
14  is whether the individual who is making the complaint, if
15  not, did they say, "I am complaining about sexual
16  harassment," or "I am complaining about sexual
17  misconduct," or, "I'm complaining about sexual abuse."
18  That's not the standard.  The standard isn't you have to
19  trigger -- you have to use specific language or, as the
20  case law likes to refer to it, you have to use specific
21  magic words in order to make out -- in order to engage in
22  protected activity.  That is --
23         THE COURT:  Okay, I'm not saying -- I'm not
24  saying you have to use magic words, but there would have
25  to be something in there -- I'm not talking about your

1                              PROCEEDINGS                    14

2   client, because that's where we get into the no-magic-

3   words-required problem.  Here we're talking about one step

4   removed from that, which is we're trying to figure out

5   what Fox understood or your formulation should have

6   understood from the plaintiff's complaint.  And we're

7   going one step away from that to say, well, let's -- to

8   figure out what's going on, let's look at some other

9   complaints.  And I'm trying to figure out what the

10  limiting principle is.  And maybe you'll say there is

11  none, because if there is none, then any complaint by

12  anybody -- maybe presumably female -- I don't know if your

13  Complaint is saying it's only females who were harassed --

14  has to be -- about their work environment has to be looked

15  at, has to be figured out exactly what the complaint was,

16  you have to track the investigation and then figure out

17  what was found in that investigation.  And that's -- we

18  have to do a full discovery, emails, everything, to figure

19  out what happened in that person's case.  So if that's

20  your reason, tell me; and if it's not, tell me what the

21  limiting principle is.

22             MR. VARGHESE:  No, I think your Honor is correct

23  that we do have to look at more than just the language of

24  the complaint.  And I will point your Honor to Judge

25  Abrams' decision, and specifically, page 39 of her

```
 1                      PROCEEDINGS                    15
 2  decision where she states -- and I'm just going to quote
 3  from the decision -- "Concededly, however, she," referring
 4  to Ms. Eckhart, "did not explicitly mention sexual
 5  harassment or misconduct when she made this complaint.
 6  Yet, she asserts that Hurst and Collins nonetheless
 7  understood that she was complaining about unlawful sexual
 8  harassment at the time.  She urges that her complaint to
 9  Collins and Hurst must be read in context.  In the years
10  immediately preceding this complaint, Fox News received
11  complaints of sexual harassment and sexual misconduct by
12  over 25 female employees.  Given that context" --
13           THE COURT:  Twenty, but go ahead.
14           MR. VARGHESE:  I'm sorry, "-- by over 20 female
15  employees.  Given that context, Eckhart contends that it
16  would be reasonable for an executive at the network to
17  understand her reference to the abuse and hostility she
18  endured as a reference to sexual abuse or gender-based
19  harassment.  She also notes that, upon her termination in
20  June 2020, Collins, who was present when she made her
21  initial complaint in February 2020, asked her if she had
22  been sexually harassed and/or assaulted while employed by
23  Fox News.  She reasoned that Collins asking her this
24  question upon her exit from the company suggests that
25  Collins understood Eckhart's initial complaint to have
```

```
 1                         PROCEEDINGS                    16

 2   been about sexual harassment and/or assault, which would

 3   render this protected activity.  Viewing the allegations

 4   in the light most favorable to Eckhart, the Court finds

 5   this inference to be plausible."

 6            THE COURT:  I'm familiar with it.  I've been

 7   having this entire discussion with you having read that

 8   several times.  So why did you just repeat it?  Explain it

 9   to me.

10            MR. VARGHESE:  Well, the whole point is that you

11   can't look -- it's not just the language of the complaints

12   that other employees made that's relevant; it's how Fox

13   interpreted that language and how Fox responded to that

14   language, because that's the only way that a Court could

15   or ultimately a fact-finder could ultimately decide

16   whether or not Fox reasonably should have known that

17   Ms. Eckhart was complaining about sexual harassment,

18   sexual abuse and sexual misconduct despite the fact that

19   she didn't invoke that specific language.  And --

20            THE COURT:  We're going in circles here.  I keep

21   asking you what's the limiting principle.  Do you for each

22   of those twenty complaints get to go through the entire

23   investigation, all the emails about how that particular

24   person was treated, depose that person to find out how

25   that was treated, depose the people who -- her boss to
```

```
 1                           PROCEEDINGS                    17
 2   find out what happened?  What's the limiting principle
 3   here?  Or is there none, in which case, just tell me that.
 4           MR. VARGHESE:  I think the limiting principle in
 5   the sense that your Honor's talking about it is that we
 6   would limit it to complaints made by female employees.  At
 7   this point we do not intend to depose all -- we don't
 8   intend to depose these employees who made these complaints
 9   because at the end of the day, the question is what Fox
10   should have known or understood based on the content of
11   these complaints.  So what we would use those complaints
12   for is to speak to the relevant individuals at Fox who
13   either received these complaints or subsequently
14   investigated these complaints and then decide -- and based
15   on that, show that Fox knew or reasonably should have
16   known that Ms. Eckhart was complaining about or was
17   engaging in protected activity.
18           THE COURT:  Okay, well, now we're getting
19   somewhere.  So I wrote down what you said.  It sounds like
20   you want the actual complaints, which, you know,
21   presumably are in writing, because that's the only way
22   you'd get them.  And you want to depose Hurst and Collins
23   about what they knew about them.  Is there something more,
24   or am I misunderstanding you?
25           MR. VARGHESE:  That is -- well, not just
```

```
 1                          PROCEEDINGS                    18
 2   Collins.  To the extent that other people, for example, if
 3   another person received a complaint at Fox's HR and that
 4   person -- because Collins reports up to Kevin Lord, who's
 5   the vice president of human resources.  If, for example,
 6   another HR person received a similar complaint and told
 7   Kevin Lord that this -- "I think this complaint that
 8   didn't mention sexual harassment or abuse, misconduct,
 9   etc., was actually complaining about such misconduct,"
10   then I think that would be relevant, as well.
11            THE COURT:  Okay.  So you want complaints to HR
12   by females about something -- complaints about work
13   environment in some time period we haven't established yet
14   before your client did so, and then you want to be able to
15   depose some people in HR -- we're not sure who yet --
16   about them.  But that's it.  In terms of document
17   requests, what you want are the complaints?
18            MR. VARGHESE:  Yes, we want to see the
19   complaints, and we want to -- but we also want to see
20   Fox's response to the complaints, like, to see whether or
21   not Fox investigated -- I'm sorry?
22            THE COURT:  There's someone who doesn't have
23   their line muted.  If they can mute it, please?
24            You want to see Fox's response?
25            MR. VARGHESE:  Yes, the investigations of the
```

```
 1                         PROCEEDINGS                 19
 2  complaints.  And I know your Honor doesn't want to get
 3  into the Faragher-Ellerth issue, so I'll --
 4            THE COURT:  Not yet.  No, no.  I want to see
 5  what you can justify just on this.
 6            MR. VARGHESE:  Understood, your Honor.
 7            THE COURT:  Okay.  So Fox's response.  Well,
 8  that could be -- I'm not sure what you mean by that, the
 9  response to the complainant or the series -- the entire
10  investigation that then occurred after this complaint,
11  including all the emails and everything else?
12            MR. VARGHESE:  Well, for this point, for the
13  notice point alone -- and, again, I'm not referring to the
14  Faragher-Ellerth issue -- we just want to see whether or
15  not an investigation was done.
16            THE COURT:  Whether or not.
17            MR. VARGHESE:  Based on the language that was --
18  based on the complaint itself, whether or not the
19  complaint -- that Fox believed the complaint was
20  sufficient to warrant a subsequent investigation.
21            THE COURT:  Okay.  Now you can go onto Faragher-
22  Ellerth.
23            MR. VARGHESE:  Okay.  Thank you, your Honor.
24  Just to be clear, these are the same document requests,
25  but in this context we do want to see the actual
```

```
 1                          PROCEEDINGS                  20
 2   investigations that Fox conducted.  We don't necessarily
 3   need to see every single email reviewed or every single
 4   person who was interviewed; but to the extent that there
 5   was an investigative report which summarized what
 6   happened, that would be the, to use your Honor's words,
 7   the limiting factor for the Faragher-Ellerth defense or
 8   rather, the Faragher-Ellerth --
 9            THE COURT:  But let's talk -- before we get to
10   documents, let's talk about the bigger picture on this.
11   So you say in this Little case that supervisors routinely
12   -- evidence of supervisors routinely dismissing complaints
13   by nonparty employees was found relevant, right?
14            MR. VARGHESE:  Yes, your Honor.
15            THE COURT:  Do you have Little in front of you?
16            MR. VARGHESE:  I can pull it up.
17            THE COURT:  I don't think it's nonparties.  The
18   same thing for (indiscernible).  You tell me if I'm wrong.
19   Take your time.
20            MR. VARGHESE:  I think your Honor's right about
21   Little, looking at it now.
22            THE COURT:  All right, well, it was a critical,
23   logical underpinning of your argument.  You've got to be
24   really careful when you write parentheticals, all right?
25            MR. VARGHESE:  Understood, your Honor.
```

```
 1                       PROCEEDINGS                    21
 2              THE COURT:  It causes me to lose -- it will
 3    cause me to lose trust in you when I see something like
 4    that.  When I read it, I thought, wow, nonparties; it
 5    really stood out at me.  And then when I looked at the
 6    case, it was wrong.  So --
 7              MR. VARGHESE:  I'll give you -- I'll provide
 8    your Honor --
 9              THE COURT:  So I'm not sure -- sorry?
10              MR. VARGHESE:  Well, I can provide your Honor
11    with a case, if your Honor wants a different case.
12              THE COURT:  Well, let's talk about the logic of
13    this, because I think the defendants have cited cases
14    saying otherwise.  Maybe you want to talk about those.
15              MR. VARGHESE:  Yes, I will talk about those.  I
16    think the -- I'm not saying there are no cases where --
17    I'm not saying -- let me take a step back.  I'm not saying
18    solely by virtue of the fact that a defendant cites to the
19    Faragher-Ellerth defense, that every single complaint and
20    investigation becomes relevant.  That is not what --
21    that's not the point of our argument in this case.
22              The point of our argument in this case is that
23    defendants have stated that Ms. Eckhart didn't engage in
24    protected activities.  We disagree with that.  If the
25    Court or the fact-finder ultimately decides that
```

```
1                        PROCEEDINGS                    22
2   Ms. Eckhart did engage in protected activity, the
3   Faragher-Ellerth defense would not be an issue, we would
4   contend.  And perhaps the Court would disagree with --
5            THE COURT:  Say that last sentence again.  I
6   didn't follow that.  Say it again.
7            MR. VARGHESE:  If Ms. Eckhart did engage in
8   protected activity, we would contend that Faragher-Ellerth
9   wouldn't act to bar her claims because then defendants
10  can't show that she unreasonably failed to take advantage
11  of the --
12           THE COURT:  Right.  That's why -- that's why
13  we're talking about this.  You want to be able to say --
14           MR. VARGHESE:  Right.
15           THE COURT:  -- oh, it wasn't a real *bona fide*
16  system; and, therefore, she didn't have to participate --
17  I'm sorry, not that she didn't have to participate -- not
18  a *bone fide* system -- yes, that she didn't have to
19  participate in, exactly.
20           MR. VARGHESE:  Yes, your Honor.  And that if
21  they are -- if it turns out that what Ms. Eckhart had
22  stated was not sufficient to engage in protected activity
23  and they -- ultimately the Court or a fact-finder decides
24  that she needed to be more explicit about her complaint
25  and link it more explicitly to sexual harassment or sexual
```

PROCEEDINGS                    23

1

2   misconduct, then what we're trying to show here is because

3   of the fact that defendants are saying that the language -

4   - her -- that her fear of reprisal was unreasonable and

5   that's why the Faragher-Ellerth -- and so the Faragher-

6   Ellerth defense bars -- she's out of luck.

7          But what we're trying to show is that the reason

8   she didn't want to explicitly use terms like "rape" or

9   "sexual assault" and "sexual harassment" was that based

10  on -- even based on public reporting at the time, there

11  was a concern at Fox News, and particularly amongst female

12  employees at Fox News, that if they complained, that they

13  would be retaliated against.  And so the issue that we're

14  trying to get at with these document requests is to show

15  that that kind of concern was her concern and the reason

16  she didn't use more explicit language was reasonable,

17  given the circumstances.

18          THE COURT:  Okay.  I understand why you want to

19  do it.  I'm trying to understand again the limiting

20  principle or maybe there is none.  And I'm not saying

21  you're entitled to it at all, but I just need to

22  understand where you're going with this.

23          MR. VARGHESE:  I don't --

24          THE COURT:  So, first of all, the cases that are

25  cited by the defendant, they're just wrong or they're

```
 1                           PROCEEDINGS                    24
 2   distinguishable?
 3            MR. VARGHESE:   I think they're incorrect in the
 4   larger context of what we know and what our client
 5   understood about Fox News and the way that it responded to
 6   such cases in the past.   It's not a situation where you're
 7   talking about a plaintiff just saying on her own, without
 8   any basis, "I didn't feel comfortable going to -- I didn't
 9   feel comfortable going to HR, I didn't feel comfortable in
10   making a more explicit complaint."   Ms. Eckhart's
11   complaints have to be looked at in the larger context of
12   how a -- of the environment at Fox News and a concern that
13   admittedly and reportedly was shared by a lot of other
14   women.   And so the fact that these other women shared her
15   concerns, and to the extent that these women talked about
16   those concerns to Fox or Fox was aware of them I think is
17   all relevant to the efficacy of Fox's policies and whether
18   or not Ms. Eckhart's decision not to use more explicit
19   language in her complaints was reasonable, given the
20   circumstances.
21            Again, I think the issue really comes down to
22   given the circumstances.   I don't think an issue like this
23   can be examined just based on a blanket rule saying that
24   other complaints are not relevant in any case where
25   Faragher-Ellerth defense is applied.   I think there has to
```

```
 1                         PROCEEDINGS                  25
 2  be some limited -- there has to be some principle as to
 3  when such complaints are relevant and when such complaints
 4  are not relevant.  Here it's not -- again, I think that
 5  it's important to take into account the history of Fox
 6  News, the reporting about Fox News and the reporting about
 7  how women at Fox News looked at the company and looked at
 8  HR because it goes into things that Ms. Eckhart herself
 9  took into account when she decided to use the language
10  that she used.  And so that is what makes these things
11  relevant.
12          And in terms of the limiting principle, again I
13  would say that we would look to the nature of the
14  complaint and any kind of report about the investigation
15  into the complaint.
16          I'm sorry?
17          THE COURT:  We have someone who's not on mute.
18  If necessary, I can get into our system to mute everybody.
19  But I'm going to once again ask anyone to put themselves
20  on mute if they're not speaking.
21          THE COURT:  Okay.  Were you finished, or do you
22  have more?  It sounds like this is justifying the same
23  thing you wanted before, the complaint -- I wrote this
24  down -- the complaints and their response or whether or
25  not they responded.
```

```
 1
 2          MR. VARGHESE:  That's correct, your Honor.
 3          THE COURT:  Okay.  All right, let me hear from
 4  Ms. Fischer.
 5          MS. FISCHER:  Good afternoon, your Honor.  Would
 6  you like me to start with the first argument that was
 7  raised about whether the other complaints inform whether
 8  the plaintiff engaged in protected activity?
 9          THE COURT:  You can do it any way you like.
10          MS. FISCHER:  Okay.  Well, I think it's
11  important to note at the outset what it is that plaintiff
12  has sought here, which I understand you talked about some
13  limiting principles on this call, but she had thought all
14  complaints of gender discrimination at the company over a
15  lengthy period of time, including electronic discovery
16  that yields 100,000 documents which Fox would need to
17  review and analyze for responsiveness based on the search
18  terms that were provided.  So it's quite expansive in
19  terms of what plaintiff is seeking here.
20          THE COURT:  Well, let's -- let me help you out
21  here, because if I'm going to do this, I'm going to limit
22  it just the way I talked about here, and Mr. Varghese, you
23  talked about, which is the actual complaint and some
24  document that's the response, not some kind of email
25  search.  But go ahead.
```

```
 1                      PROCEEDINGS                    27

 2          MS. FISCHER:  Thank you.  The first rationale

 3   the plaintiff provides --

 4          THE COURT:  Maybe now that you know that, maybe

 5   it's not -- maybe I've brokered this for you.  Is there

 6   still objection or --

 7          MS. FISCHER:  There is still objection.

 8          THE COURT:  Okay, go ahead.

 9          MS. FISCHER:  So the first rationale that

10   plaintiff provided, which is this argument that looking at

11   other people's complaints will inform whether she

12   participated in protected activity, whether she made a

13   complaint of sexual harassment.  The problem with this

14   argument that plaintiff has asserted today and in her

15   letter is that it all comes down to how did Hurst and

16   Collins understand her statement at the time; did they

17   understand her to be complaining of sexual harassment or

18   not.  And the way to get at that is to ask them, what did

19   Ms. Eckhart say in the meeting, what did you understand

20   her to be complaining about and why.  This isn't a subject

21   of, well, if we look at all these other things and maybe

22   there's some thread we can put together to link these

23   various statements.  The question is what did they

24   understand at the time, not to your Honor's point, should

25   have known, but what did they actually understand.  And
```

```
1                        PROCEEDINGS                    28

2    there's a very simple way to get at that, which is to ask

3    them.  It's still --

4           THE COURT:  Well, Mr. Varghese says I'm wrong.

5    He says that there's a "should have" component.

6           MS. FISCHER:  I think as a matter of fact you

7    can't have a "should have" component on a retaliation

8    claim because retaliation claims, you can only retaliate

9    against someone for engaging in protected activity if

10   you're aware that they engaged in that protected activity.

11   If you're not aware, you didn't understand the complaint

12   to be a complaint falling under that category of protected

13   activity, then by definition it's not unlawful

14   retaliation.  That "should have" component we completely

15   disagree with.  And this is a whole fishing expedition

16   into well, maybe we can link a bunch of things together

17   and put together something that, you know, maybe looks

18   like there's some rational reason why somebody should have

19   known something they didn't know, that's not what the law

20   provides for.  The question is what did they know at the

21   time.  And the way to get at that is to ask them that

22   question, ask them their recollections of the meeting, and

23   you'll have an answer.

24          It doesn't require this, you know, significant

25   discovery, which even as limited, it's still confidential
```

2  information, it's still information relating to third

3  parties who have nothing to do with any of this.  And

4  there's really -- it's not warranted in this case.  And

5  none of the rationales that were given for -- that were

6  provided by plaintiff's counsel really hold any water in

7  this case and authorize the disclosure of this

8  information.  They've certainly cited no case on this.

9  We're not aware of any case where a Court has ordered this

10  type of discovery for the purpose of ascertaining whether

11  the plaintiff engaged in protected activity.  And we don't

12  think there's a basis for it here.

13             THE COURT:  Okay.  Anything else?

14             MS. FISCHER:  On -- would you like me to get

15  into the Faragher-Ellerth or --

16             THE COURT:  This is your chance to say what you

17  wish to say.  Just I couldn't tell if you were done or

18  not.

19             MS. FISCHER:  Okay.  So on the Faragher-Ellerth

20  point, again, plaintiff is claiming that she needs this

21  broad discovery about, you know, other complaints of

22  discrimination, other investigations at Fox, in order to

23  ascertain how Fox responded to her alleged complaint.  So

24  she's saying that Faragher-Ellerth requires a disclosure

25  of all of this information, but we've cited cases on this.

PROCEEDINGS                    30

1

2  This exact argument has been rejected by Courts in this

3  district.   The question on a Faragher-Ellerth defense is

4  what did -- how did the company respond to the plaintiff's

5  complaint, not how did they respond to other people's

6  complaints.  And I understand plaintiff making this

7  argument that, well, she saw things in the news that made

8  her hesitate to come forward.  Okay, I mean, she can

9  testify to that, she can take that position that she had

10  some good-faith basis not to complain or not to use words

11  that would reasonably put someone on notice that she was

12  complaining of harassment.  She can certainly make that

13  argument, but that doesn't mean she gets discovery into

14  all of these other people's complaints and what they said

15  and what they complained about.  That will inform nothing

16  as to the Faragher-Ellerth defense.  That will inform

17  nothing as to whether Fox responded appropriately or not

18  as to the plaintiff in this case, Ms. Eckhart.  So on that

19  basis, you know, plaintiff again has not cited any case

20  law that would authorize the disclosure of this

21  significant information in this context.  And, in fact,

22  the cases go exactly contrary to the position that she has

23  articulated here.

24          THE COURT:  All right --

25          MS. FISCHER:  As --

```
 1                       PROCEEDINGS                  31
 2              THE COURT:  Yes.  I'm sorry.  I thought you were
 3   done.  Go ahead.
 4              MS. FISCHER:  No, I know she subsequently in her
 5   second letter asserted a third argument.  I don't know --
 6   I mean, that hasn't been addressed on this call; but if
 7   you would like to, I'm happy to address it.
 8              THE COURT:  I'm not dealing with the other
 9   letters today.  In fact, if I forget to, at the end remind
10   me that I'm going to talk about those, when we're going to
11   deal with those letters or how.
12              No, I have what's before me.  The --
13              MR. VARGHESE:  I'm sorry, your Honor --
14              THE COURT:  Yes.
15              MR. VARGHESE:  I'm sorry, can I just make one
16   point?  I promise not to belabor it; I just want to
17   clarify one issue.
18              THE COURT:  Go ahead.
19              MR. VARGHESE:  When your Honor said that you are
20   not inclined to order any kind of email searches because I
21   said I don't want emails, when I said I don't want emails,
22   I was referring to -- I believe you -- and perhaps I
23   misheard your Honor -- and I apologize -- I believe your
24   Honor made reference to the fact do we want to see the
25   emails that Fox reviewed as part of the investigation.
```

```
 1                         PROCEEDINGS                    32
 2   But to the extent, for example, that -- and I know your
 3   Honor doesn't want to get into the second letter today, so
 4   I won't -- again, I won't belabor this -- but to the
 5   extent that if an individual put Fox on notice or it made
 6   a complaint of discrimination by email, we do think that
 7   that would still be relevant, that just because it's in an
 8   email doesn't mean that we shouldn't be entitled to it.  I
 9   just wanted to clarify that when I said we don't want the
10   emails, I wasn't referring to if the complaint itself was
11   in an email.
12              THE COURT:  Got it.
13              Okay, here's my ruling on this.  I'm inclined to
14   agree with the defendants on the Faragher-Ellerth issue.
15   But Judge Abrams was pretty clear in finding prior
16   complaints of sexual harassment and sexual misconduct to
17   be subject to an inference that they would put the
18   defendants on notice that when a female came in to
19   complain about a toxic work environment, that was a sexual
20   harassment complaint, and they would have understood it
21   that way and they might have taken action because they --
22   you know, and the allegation is that they took action
23   because it was that sort of complaint.  So that's the
24   reality here is we have that part of Judge Abrams'
25   opinion.  And I just don't think it's enough to say,
```

```
 1                       PROCEEDINGS                    33
 2  "Well, just ask the people and see what they thought."  I
 3  think the plaintiffs are entitled to a little bit more.
 4            And the little bit more here would be the actual
 5  complaints, whether they came in by email or some other
 6  form, to human resources, within some reasonable time
 7  period prior to the plaintiff's complaint and to some
 8  responsive document as to how that was disposed of.  So
 9  there should be no burden.  The thing that I'm concerned
10  about is are defendants -- obviously, (indiscernible) is
11  with the privacy of the people who complained.  And so I
12  think a lot has to be done to preserve that, certainly
13  designating as confidential, maybe even Attorney's Eyes
14  Only, because the people who complained should not be
15  dragged into the -- their names should not be appearing in
16  any public record, at least not at this stage.  So that's
17  my ruling on that.  There should be that production.
18            Any questions about the ruling before we go to
19  the next issue?
20            MS. FISCHER:  Yes, your Honor.
21            THE COURT:  Mr. Varghese, anything?
22            MR. VARGHESE:  No, your Honor.
23            THE COURT:  From defendant?
24            MS. FISCHER:  Yes, your Honor.  Because in this
25  case the question is what Hurst and Collins understood,
```

```
 1                       PROCEEDINGS                    34
 2  shouldn't the complaints be limited -- the production of
 3  any complaints be limited to the complaints that they
 4  received?
 5             THE COURT:  Yes, well, let's talk about that.
 6  That is a point that got jumped over.  And the plaintiff
 7  talked about it a little bit.  I need to understand a
 8  little more about who's getting complaints, how, when and
 9  where.  Are these two people -- I mean, what matters is,
10  you know, the chain of decision-making, as to who made the
11  decision to terminate, and, you know, whether they were
12  being advised by Hurst, Collins -- I mean, not "advised,"
13  but whatever the right word is; were they working with
14  Hurst, Collins, was there a relationship there; are they
15  people in New York, are they some other place.  So if you
16  want to talk about that, Ms. Fischer, go ahead.
17             MS. FISCHER:  Sure.  So Mr. Hurst was
18  Ms. Eckhart's boss.  He's not a human resources employee;
19  he's been production.  And Ms. Collins is senior vice
20  president of human resources.  And Ms. Eckhart alleges
21  that she complained to the two of them at a meeting.  Now,
22  the --
23             THE COURT:  I mean Collins -- here's what you
24  have to get around, Ms. Fischer.  Collins is, I assume,
25  part of a unit, the human resources unit, which shares
```

```
 1                        PROCEEDINGS                    35
 2  information and might -- and, you know, doesn't operate in
 3  some compartmentalized way.  If this was General Motors
 4  with -- I'm not sure that's the right example -- but some
 5  company with a million offices all over the place, maybe
 6  that would be less true.  But -- and I'm not sure I can
 7  really figure this all out right now, but if Collins is a
 8  high-level or even a medium-level person in human
 9  resources and is prone to get information and if human
10  resources shares it with the person who does -- shares the
11  information with the person who does the firing, then I'm
12  not sure we can just say, "Oh, this only goes to people
13  who happen to complain to Collins or Hurst."
14            MS. FISCHER:  Well, Hurst was the -- Hurst and
15  Collins were involved in the performance management of the
16  plaintiff, including her PIP, her Performance Improvement
17  Plan that she was placed on and then her subsequent
18  termination.  There was no -- you know, I don't believe
19  there was -- it's not as if they were reporting to
20  somebody else; Hurst was her boss.  Hurst was the person
21  to whom Ms. Eckhart reported.  And --
22            THE COURT:  Okay.  Let's focus on Collins,
23  because I assume that, whenever there's a complaint of
24  this kind, somehow human resources is going to hear about
25  it.  And I assume that's how you're going to look for
```

```
 1                        PROCEEDINGS                    36
 2   these complaints.  I assume they have some kind of system
 3   of logging this.  And you're going to see, well, you have
 4   these females complaining in the previous X number of
 5   years.  And it's going to be from some human resources
 6   source.  Is that the way this company operated or not?
 7              MS. FISCHER:  I think that that's correct, yes.
 8              THE COURT:  Okay.  So --
 9              MS. FISCHER:  It would be some human resources
10   source.
11              THE COURT:  Yes.  And, presumably, the human
12   resources people don't operate in their personal little
13   bubble so that Collins just deals with her stuff and never
14   tells anyone at human resources of anything else.  And to
15   the extent that someone complains about another boss and
16   went to a different human resources vice president, that
17   that isn't something that is not shared.  So, you know,
18   it's hard to see how you're going to limit it.  I mean,
19   maybe if you told me they were offices that weren't
20   talking to each other, we could talk about that.  But, in
21   the absence of that, I'm not sure I'm going to see a way
22   to limit it.  And if you guys want to try to work this
23   out, I'd love it to not have to deal with it now.  But if
24   you want me to try to rule on it, go ahead.
25              MS. FISCHER:  Well, I think as a matter of
```

```
 1                      PROCEEDINGS                    37
 2   facts, if the argument is, you know, there may have been
 3   something that Hurst and Collins heard at some other point
 4   in time that, you know, should have caused them to
 5   interpret Eckhart's complaint as one of sexual harassment,
 6   it would have to be something that they knew.  And if
 7   there were something that Collins -- the level of detail
 8   did not come across; you know, if somebody says, oh, so-
 9   and-so complained and I'm investigating it or something
10   like that, you know, somebody who works in HR -- I mean,
11   there would have to be a level of detail in order for
12   information about these other complaints to be informative
13   on that overall question of what did Collins know.  It
14   wouldn't be enough for her to just have known, okay --
15             THE COURT:  Wait, hold on, hold on.  Are you
16   talking about details in the other people's complaints?
17             MS. FISCHER:  I'm saying detail in terms of the
18   information brought to Collins' attention.
19             THE COURT:  Right.  In the complaint.
20             MS. FISCHER:  I mean, is --
21             THE COURT:  So you only have to -- you don't
22   have to search for, you know, toxic environment
23   complaints; you have to look for sexual harassment and
24   sexual misconduct complaints.  That's the way Judge Abrams
25   explains it, and I think it makes perfect sense.  So if
```

```
 1                        PROCEEDINGS                  38
 2   those are being brought to Collins' attention by anybody
 3   in HR, even if they weren't made to Collins herself, that
 4   seems to me it's fair game, unless you can show me that --
 5            MS. FISCHER:  Okay.  So that o--
 6            THE COURT:  -- she's in a tunnel, a bubble.
 7            MS. FISCHER:  I do not think she's in a bubble,
 8   and I think the explanation that your Honor just provided
 9   was very helpful, that if something was brought to -- it's
10   not just something that may have been handled by someone
11   else in HR; it would have to have been brought to
12   Ms. Collins' attention in order for it to be relevant to
13   that --
14            THE COURT:  Right.  But I think it's going to be
15   a little hard for you to say -- I don't think you're going
16   to be able to do this document production by saying I'm
17   going to now get all the -- let's say there's, you know,
18   twenty HR complaints in the relevant time period to HR.
19   Now I'm going to go through those twenty and ask
20   Ms. Collins if she heard about those.  I don't think I
21   want you to do that process.  I think that's a process --
22   I think that it's not appropriate for the defendants to
23   screen that way.
24            It's certainly fair for Collins to say at a
25   deposition or in an affidavit or any other time she never
```

PROCEEDINGS                    39

knew about any of this, but I'm not going to take away
from plaintiff the possibility of saying to Collins, "Boy,
you never heard about person X?  You never heard about
person Y?  It's in the same HR department as you."  You're
going to have to show she's in a bubble before I would say
that she literally doesn't talk to people, not about these
particular complaints, but because there's some office
that's so far flung, it can -- you know, in another city
or whatever it is, and we never talked about it, about
their own complaints.  If you could provide some evidence
like that generically, maybe I would allow you to limit
it.  But you shouldn't otherwise assume that's what's
going to happen.

            MS. FISCHER:  Okay.

            THE COURT:  Okay.  Let's --

            MS. FISCHER:  I'm --

            THE COURT:  -- I'd like to hear the next issue
unless you have something more on this.

            MS. FISCHER:  I do have one other question,
which is the ruling was that there would be discovery of
complaints within some reasonable time period before
Ms. Eckhart complained, and I was just wondering if
there's any further direction on that point.

            THE COURT:  Well, no one presented it to me as

```
 1                        PROCEEDINGS                40
 2   an issue.  So is it an issue?  I guess you didn't want to
 3   do it at all.  How many years were you going back,
 4   Mr. Varghese?
 5            MR. VARGHESE:  I think we said 2015, which is
 6   five years before her complaint.  And I can -- I mean, I
 7   think it's something we could -- like, I could work out
 8   with Fox.  But, I mean, I'm happy to hash out --
 9            THE COURT:  Okay, was she there for five years
10   beforehand?
11            MR. VARGHESE:  She was there for -- she was
12   there for more than five years before it.
13            THE COURT:  Okay.  I mean, I was going to say
14   four or five.  So four and a half.  How's that?
15            Okay, let's go to the next issue.  I'll hear
16   from plaintiff.
17            MR. VARGHESE:  Thank you, your Honor.  I mean,
18   the next issue are documents concerning Ed Henry's travel
19   and expenses in this case.  The reason that we sought
20   these documents is that defendant Henry argued that in the
21   context of plaintiff's TBPA and Gender-Motivated Violence
22   Act claims, that she cannot just rely on his treatment of
23   her and that instead she has to show some kind of pattern
24   or modus operandi.  We don't necessarily agree with that,
25   but again we do think we should be entitled to take
```

1
2  discovery on this issue, on the issue of his treatment of
3  other individuals to the extent that they were similar to
4  his treatment of Ms. Eckhart so in the event that he makes
5  the same argument at summary judgment, we do have, besides
6  our legal arguments on that point, we do have evidence
7  that we can point to, as well, that shows that, for
8  example -- I mean, one of the things we've asked for in
9  this case are complaints by other women that Ed Henry
10 harassed them.  Presumably, once we get those information,
11 we can look at his travel expenses and his travel
12 itinerary and see if this person complained he harassed
13 them in, you know, New York in January 2016, and Ed Henry
14 was in New York in January 2016 working for Fox.  And so
15 that's why we think we're entitled to this information.
16 And I don't really see what the burden is in terms of
17 producing a single employee's travel itinerary and expense
18 reports.  You know, and to the extent that they need to be
19 more confidential, I mean, that's fine.
20         THE COURT:  Ms. Fischer?
21         MS. FISCHER:  I think the issue is we don't --
22 it's unclear what plaintiff is seeking, given that we've
23 already produced four years of Mr. Henry's expenses, which
24 were in our initial production last month.  Those were
25 collected by outside counsel at a different firm that

```
 1                      PROCEEDINGS                    42
 2   investigated Ms. Eckhart's allegation.  So we've
 3   produced --
 4           THE COURT:  And that -- okay, I now recall your
 5   saying this.
 6           Let's get Mr. Varghese's -- why isn't that
 7   enough, Mr. Varghese?
 8           MR. VARGHESE:  Well, two things.  One, I don't
 9   know that the way that it was framed to us is that they
10   collected the expenses, stopping at June of 2018.  I don't
11   see any reason why they can't produce his expenses from
12   June 2018 till he was terminated.  If he engaged in
13   similar conduct after June 2018, that would still be
14   relevant.  It doesn't mean -- June 2018 seems to me an
15   arbitrary cutoff.  I don't see any reason why we shouldn't
16   get the remainder of his expenses.
17           THE COURT:  How much longer was he there?  How
18   much longer was he there?
19           MR. VARGHESE:  I believe it was until -- I'm not
20   sure of the exact date in 2020 -- it was two years -- two
21   more years.
22           And then the only other point I would make is
23   I'm not -- and maybe this is all of the documentation they
24   have about his business-related travel during that time
25   period -- but I didn't see anything that would give us the
```

```
 1                        PROCEEDINGS                    43
 2  indication that this also covered his travel schedule
 3  while working for Fox, you know, when he was on
 4  assignment, when he traveled to different areas, different
 5  parts of the country, etc.
 6           THE COURT:  It only had what, then?
 7           MR. VARGHESE:  It was his expense report.
 8           THE COURT:  As opposed to -- I'm sorry, what
 9  didn't it have?  What's supposed to --
10           MR. VARGHESE:  His travel -- any kind of travel
11  reports, you know, to the extent that he was assigned to
12  go to -- to the extent he was posted anywhere but didn't
13  submit expenses with that, I mean, I would think that
14  wouldn't be very burdensome to produce.
15           THE COURT:  I've totally lost you.  You think
16  that he traveled somewhere but didn't put in for expenses?
17           MR. VARGHESE:  Well, I guess that's my point.  I
18  don't know that -- if it's Fox's position that this is all
19  there is about his travel, then that's fine.  That just
20  wasn't clear to me based on their production.  If there
21  are --
22           THE COURT:  Oh, all right.
23           MR. VARGHESE:  -- if there are additional
24  documents about his travel that are not contained in what
25  has been produced to us --
```

```
 1                        PROCEEDINGS                    44

 2              THE COURT:  I mean, I'm a little confused,

 3   though, about this post -- I'm confused about this post

 4   June 2018 period.  The travel report or expense report,

 5   whatever it is, it seems to me is the tail of a dog, and

 6   the dog is what he was actually, you know, doing during

 7   this period.  What is the -- I just -- it's hard to

 8   understand how an expense report's going to show you

 9   anything.  I mean, it's not going to show you harassment.

10              MR. VARGHESE:  Well, again, it's hard to say

11   this without getting all of the discovery.  But, again,

12   hypothetically, we haven't received the complaints made by

13   other women about Henry yet.

14              THE COURT:  No, but you've seen this

15   investigation file with the expense reports, right?

16              MR. VARGHESE:  We've seen the expense reports,

17   but, for example, let's say that in his expense reports he

18   has an expense for a January 1, 2017, at the Marriott in

19   New York City; and then when we get the complaints of

20   discrimination made or the complaints of mistreatment by

21   other women and one of those women says he made -- and he

22   engaged in inappropriate conduct with me at the Marriott

23   Hotel in January of 2017, that would show -- and, again,

24   we don't necessarily agree that our client needs to show

25   that he engaged in a modus operandi or treated other women
```

```
 1                          PROCEEDINGS                    45
 2   the same way that he did in order to make out the claims;
 3   but the fact remains it is a defense that he has raised.
 4   And to the extent that the expense reports and his travel
 5   itinerary help us show that while he was traveling for Fox
 6   in other instances, he harassed other women or engaged in
 7   misconduct with other women, that would go to rebut that
 8   potential argument.
 9            THE COURT:  Ms. Fischer?
10            MS. FISCHER:  I don't think the reports are
11   going to show one way or another whether he harassed
12   anybody.  What has been alluded to is that there may be --
13   and, you know, we agree to look for any other complaints
14   against Mr. Henry.  And I guess what's being said here is
15   that there might be some corroborating evidence in the
16   expense reports.  But the expense reports are really
17   beside the point.  They're not going to show who he was
18   with.  They're not going to show what he was doing with
19   people behind closed doors, if anything, who he was having
20   dinner with, who he, you know, was traveling with and
21   what-have-you.  So these expense reports really show
22   nothing.
23            And it's important to note, you know, plaintiff
24   has now said he wants the expense reports from 2018 until
25   2020.  The allegation in this case of sexual harassment is
```

```
 1                        PROCEEDINGS                    46
 2  that Mr. Henry sexually assaulted Ms. Eckhart in February
 3  of 2017.  And because Mr. Henry was a coworker and not a
 4  supervisor of Ms. Eckhart, Fox can only be liable for that
 5  conduct if it knew or should have known of the harassment.
 6  And, certainly, any conduct that may have occurred after
 7  2018 has nothing -- it's not in dispute; there was no
 8  further sexual contact between Ms. Eckhart and Mr. Henry
 9  after 2017, after early 2017.  You know, what happened in
10  2019, what happened in 2020 is not relevant, in any event.
11  But the expense reports won't get you there.  The expense
12  reports are not going to inform on the question of was he
13  harassing other women or not, and certainly not what Fox
14  knew about it.
15            THE COURT:  Right.  Well, they want that as
16  corroboration.  I mean, I agree it's of limited utility.
17  But it seems like the burden is virtually zero.  I mean,
18  is there any real burden to this?
19            MS. FISCHER:  It depends what's being sought.  I
20  mean, the expense reports can be produced.  I'm not sure
21  what was asked for in terms of like travel logs or
22  something.  I'm not sure that that's a document that
23  exists.  I think the expense reports indicate where
24  expenses were incurred, the city and state in which
25  expenses were incurred.  I mean --
```

```
 1                      PROCEEDINGS                    47

 2            THE COURT:  Right.

 3            MS. FISCHER:  -- it's not relevant.

 4            THE COURT:  Well, it's very tangentially

 5    relevant for corroborative purposes.  So I'm going to --

 6    and since it seems like there's literally almost no burden

 7    to producing the expense reports, don't worry about

 8    whatever this travel thing is, because it seems like the

 9    thing we do know about are the expense reports.  They were

10    in the investigation file and you've referred to them.  So

11    produce the expense reports until his termination.  If

12    there's some burden to it, you can come back to me.

13            Any --

14            MS. FISCHER:  Thank you.

15            THE COURT:  -- questions about the ruling from

16    plaintiff?

17            MR. VARGHESE:  No, your Honor.

18            THE COURT:  From defendant?

19            MS. FISCHER:  No, your Honor.

20            THE COURT:  Okay, let's go to the next issue.

21    Mr. Varghese?

22            MR. VARGHESE:  Thank you, your Honor.  The next

23    issue are we are seeking documents concerning exit

24    interviews conducted at Fox from 2018 to the present.  The

25    reason that we are seeking these documents is that, as I
```

```
 1                        PROCEEDINGS                    48
 2   mentioned earlier, part of our client's allegations in
 3   this case is that she was asked by Ms. Collins whether she
 4   had ever been subject to sexual harassment or assault
 5   during her employment at Fox and that this is evidence
 6   that they understood her earlier complaints to implicate
 7   issues of sexual harassment and sexual assault.  And Fox
 8   had said in its motion to dismiss that this was a standard
 9   question that did not demonstrate any knowledge on its
10   part.  And this is something that Judge Abrams spoke to in
11   her decision.  I believe that it was on the same page 39
12   about -- yeah, it's --
13             THE COURT:  Yes, 39, yes, yes.
14             MR. VARGHESE:  Yes.  And so that's why we want
15   it, to see whether and in what circumstances this kind of
16   question was asked to employees who were leaving Fox and
17   whether in fact it was a standard question or it was a
18   question only asked of specific individuals and if it was
19   only asked of specific individuals what did they have in
20   common, it's if our belief is that they only asked those
21   questions when they believed that the employee was subject
22   to sexual harassment or assault.
23             THE COURT:  Okay.  Ms. Fischer.
24             MS. FISCHER:  If the question is was this a
25   standard question or not, there's a much easier way to get
```

```
 1                        PROCEEDINGS                    49
 2   at that.  This is one that really is much more easily
 3   directed as a deposition question.  It could potentially
 4   be answered with a yes or no; now, "Is this a standard
 5   question, and who did you ask this question to?"
 6           Notes from exit interviews with third parties
 7   will undoubtedly contain sensitive and irrelevant
 8   information.  These are people who are leaving the company
 9   for any number of reasons.  And the notes from those
10   meetings won't necessarily inform on this issue.  The
11   question of whether it was Fox's practice to ask this
12   question should be directed at Ms. Collins, and it can be
13   -- and an answer could be given on that.  It would be
14   incredibly --
15           THE COURT:  Did she use a checklist?  Is there
16   like some checklist for exit interviews?  You would think
17   so.  Do you know?
18           MS. FISCHER:  I don't know.  I don't know.  But
19   we -- you know, that's something we could look into.
20           THE COURT:  Yes, I mean, I'm wondering if it's a
21   free-for-all or if people have a protocol, and is there a
22   manual about what you ask in an exit interview.
23           Anyway, here's my ruling on that.  You should
24   certainly produce any manual, any checklist, anything else
25   about how exit interviews are conducted.  Otherwise, it
```

```
1                       PROCEEDINGS                    50

2    should be dealt with in a deposition question.

3              All right, next issue.  Job duties --

4              MR. VARGHESE:  The --

5              THE COURT:  Sorry?  Mr. Varghese?

6              MR. VARGHESE:  I'm sorry, I didn't mean to cut

7    your Honor off.  Your Honor, so the next issue is the job

8    duties and specifically his role with different programs

9    that --

10             THE COURT:  Well, I mean, it's hard -- I read

11   your piece and I read the other side's piece.  And, you

12   know, we have to do this by the actual interrogatories,

13   not by some characterization of job duties.  And I just --

14   I can't even tell what the dispute is.  I mean, if you've

15   gotten his personnel file and employment agreements and so

16   forth, what is it you need?

17             MR. VARGHESE:  Well, the personnel file and the

18   employment agreements don't speak to what he was able to

19   or not able to do in terms of, you know, one of the issues

20   in this case was was it reasonable for Ms. Eckhart to rely

21   on his statements that he could increase her on-air

22   visibility or have her as an honored guest on his shows.

23   But the documents that we've seen don't really speak to

24   whether or not he had that kind of power.  And if in the

25   negotiation or creation of those shows that kind of thing
```

PROCEEDINGS                      51

was discussed about who would have that role or whether Ed

Henry had any say in that, that would all be relevant.

That's why we asked for the specific programs and segments

that he worked on, because the question is did he have the

ability to make the kind of promises that he made, and if

so, then his argument that Ms. Eckhart should have known

that he couldn't do that falls by the wayside.  Obviously,

if he could do it and there are documents or contracts or

negotiations in which he reserved for himself the right to

have some say over, you know, who his contributors are,

who people that appear on air are, that would be relevant

in this case.  And so that is why we did it in the more

granular level that we did instead of asking for a

specific document about just the job duties that was in

his personnel file, because in our experience, that kind

of thing -- it's not always in there.  That's why we were

looking at other avenues where this kind of information

could be found.

THE COURT:  Okay.  So you're interested in

documents that would state one way or the other whether he

could decide who appears on air?

MR. VARGHESE:  Yes, whether he could decide who

appears on the programs that he had or that he was

negotiating on.

```
 1                         PROCEEDINGS                  52

 2              THE COURT:  That's much narrower than what you

 3    had.  Defendants may still have an objection.  But if you

 4    were going to get something, that seems to me is the most

 5    you would get, which is are there documents that reflect

 6    one way or the other as to whether had the ability to

 7    decide who appears on air when he's hosting.

 8              Okay, so with that narrowed in that way,

 9    Ms. Fischer, what's the objection?

10              MS. FISCHER:  I'm just not sure what we would be

11    looking for, because his authority, you know, what the

12    responsibilities of his role are and authority in his role

13    would be in the contract.  I mean, if there was some back-

14    and-forth before the entry of those contracts, that

15    doesn't go to the ultimate question of what he's permitted

16    to do under his contract.

17              THE COURT:  Well, yes, but there are things --

18    I'm not saying that -- we still have to deal with how we

19    would find such documents and whether it's reasonable to

20    ask you to look for them; and if so, how.  That's a

21    different question.  But on a question of just pure

22    relevance, you know, an employee -- I've seen hundreds of

23    employees' contracts, and they don't spell out everything.

24    And, you know, they say some generic thing about what your

25    duties are, but they may not say something as granular as
```

```
 1                        PROCEEDINGS                    53
 2   this.  And that might be the subject merely of oral
 3   negotiation that say, yeah, now that you're in this job,
 4   you get to pick who appears on the air.  Of, if an email,
 5   you know, now that you're in the job, you get to pick on
 6   the air.  Or an email that says all selection of guests is
 7   done by this person.  So if that existed, that's relevant.
 8            Now, if it's too burdensome to find this, then
 9   that's a different question.  So on the pure relevance
10   question, it seems relevant to me.  So if you want to talk
11   about, you know, how to find this, it might not -- I mean,
12   maybe the answer is you -- you know it's all in someone's
13   head, and you'd have to depose whoever was involved in
14   producing the shows to get the answer to that question.
15   But maybe there's a way to get something that could be
16   written.  I don't know.  Maybe you want to think about it.
17            MS. FISCHER:  Well, if the documents are not --
18   on the relevance piece, you know, it doesn't go to whether
19   she was harassed, it doesn't go to what Fox knew about it,
20   it doesn't go to whether there was retaliation.  But in
21   terms of how we find the documents, if it's not in his
22   contract and if it's not in his personnel file, I'm just
23   not sure that there's another repository where this could
24   be obtained, if it exists.
25            THE COURT:  All right, well, that may not be
```

```
 1                        PROCEEDINGS              54
 2   unreasonable.  I mean, Mr. Varghese, this may be something
 3   that you have to ask people to find out how that
 4   particular aspect of the job was done.
 5              MR. VARGHESE:  I think -- I mean, look, to
 6   Ms. Fischer's point, if the document doesn't exist, it
 7   doesn't exist.  Again, obviously, they don't have to
 8   create something out of whole cloth to respond to a
 9   document request.  But I don't think there are -- you
10   know, there are specific programs and segments that we
11   identified here.  I don't think it would be that difficult
12   to go to the emails in the time period that those programs
13   and segments were being produced and at least make a
14   reasonable search to see if there is anything responsive
15   to these requests.  Again, if there's not, then that's
16   fine.  But I think --
17              THE COURT:  Well, maybe we need to deal with
18   this in part two.  There may not be a way to do this or
19   there may be a way to do this that gets some limited
20   number of responsive documents.  So the ruling is this
21   fairly narrow thing is relevant; and whether there's a
22   reasonable way to get it, it seems to me, is going to be
23   conducted through email searches.  And if you can't agree,
24   I'm sure it will come to me.
25              All right, let's go to the next issue.  I think
```

```
 1                        PROCEEDINGS                    55
 2   it's the last one.  Hold on.  Before anyone talks, let me
 3   just look at this.
 4            Yes, I don't need to hear argument on this.  The
 5   plaintiff knows her complaints.  So if she wants to refer
 6   to the specific complaint and ask who has knowledge of it,
 7   she can do that.  But the term "complaints" is too
 8   generic.
 9            Any questions, Mr. Varghese?
10            MR. VARGHESE:  No, your Honor.
11            THE COURT:  Ms. Fischer, any questions?
12            MS. FISCHER:  no, your Honor.
13            THE COURT:  Okay, so on the ESI, Mr. Henry
14   apparently feels he wasn't involved in this.  And he's,
15   you know, you've got to redo this with Mr. Henry being
16   involved.  And I'm not convinced that -- it's pretty rare
17   anymore that people come to me and say, "Judge, pick the
18   search terms."  Usually people, like, run the search terms
19   and say -- and they talk to the other side and they say,
20   "This is crazy.  This comes up with 100,000 documents.
21   Let's talk about what we can do to get things to a
22   reasonable number here."  And after they've gone through
23   that whole process, then sometimes they come to me and
24   they say, "Judge, they want to run this term.  It comes up
25   with 5,000 documents.  We want to do this term; it comes
```

```
 1                        PROCEEDINGS                     56
 2   up to 500.  You know, we did a sample of theirs, and
 3   here's all the irrelevant ones that we got when we did the
 4   5,000.  So this is obviously a complete waste of time as
 5   part of the process, too."  And then I have a reasoned
 6   judgment for picking among search terms.  Is that process
 7   skipped, is it planned, did I not read the letters
 8   carefully enough?  I admit I just skimmed them.  Is that
 9   something that's going to happen or not?
10            MR. VARGHESE:  Do you want me to --
11            THE COURT:  I think the defendants really are
12   the ones who should answer that.
13            MR. VARGHESE:  Okay.
14            MS. FISCHER:  So we have been engaging in that
15   process, and in our meet-and-confers with plaintiff's
16   counsel, you know, there have been search terms where
17   we've been able to explain, you know, this is a term
18   that's hitting on X hits; and we looked at 200 of them or
19   whatever, and, you know, none of them were relevant, and
20   we have been able to narrow the terms in that way.  I do
21   think in light of the Court's ruling today, particularly
22   about other complaints of discrimination, I think that,
23   you know, that really -- that was a major dispute on the
24   ESI.  So I think that we are in the -- I think that, you
25   know, given that, I think we have some direction on where
```

```
 1                          PROCEEDINGS                    57

 2   the ESI is going, based on the Court's ruling.

 3               THE COURT:  Okay.  Did I read the letters --

 4               MS. FISCHER:  But we have been involved --

 5               THE COURT:  I mean, have you been doing sampling

 6   and so forth?

 7               MS. FISCHER:  Yes, yes, we absolutely have.

 8   We've had several conversations with plaintiff's counsel,

 9   we've been exchanging hit -- we've been providing the hit

10   reports.  And where there have been words that have been

11   hitting, you know, "overhitting," as we would say, we

12   provide an explanation.  You know, we've done those types

13   of test searches; we've been doing all of that.

14               THE COURT:  Okay.  Good.  So I'd like people to

15   come back to me.  I would love it if you could do it in a

16   joint letter that kind of starkly lays out -- if you can't

17   agree -- that starkly lays out the choices.  You know, we

18   do this search and we end up with this many hits, and we

19   do it the plaintiff's way and it's that many hits, and

20   it's going to take us X number of hours, and so forth.  It

21   would be great to have it as a joint letter issue by

22   issue.  But if that's proving too unwieldy, you can use

23   the usual process.  But I'm going to ignore the current

24   letters because Mr. Henry wasn't involved.

25               MS. FISCHER:  Thank you, your Honor.
```

```
 1                        PROCEEDINGS                    58

 2            THE COURT:  Okay.  Any -- I think we're done.

 3  Any questions or anything further from the plaintiff's

 4  side?

 5            MR. VARGHESE:  No, I don't see anything.

 6            THE COURT:  Ms. Fischer, anything further?

 7            MS. FISCHER:  Nothing further.

 8            THE COURT:  And Mr. Henry's lawyer, I'm sorry, I

 9  wrote down your name and --

10            MS. FOTI:  It's Ms. Foti, yes, Catherine Foti.

11  No, you've --

12            THE COURT:  Ms. Foti, anything further from you?

13            MS. FOTI:  No, your Honor.  You've dealt with

14  our issues.  Thank you.

15            THE COURT:  Okay.  Thank you, everyone.  Good-

16  bye.

17            (Whereupon, the matter is adjourned.)

18

19

20

21

22

23

24

25
```

59

C E R T I F I C A T E

    I, Carole Ludwig, certify that the foregoing transcript of proceedings in the case of Eckhart et al v. Fox News Network, LLC et al, Docket #20-cv-05593-RA-GWG, was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature_____

              Carole Ludwig

Date:    February 16, 2022