M9KQeckO

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   JENNIFER ECKHART and CATHY
     AREU
 4
                    Plaintiffs
 5
              v.                          20 Civ. 5593 (RA)
 6                                        (Via Teams Videoconference)

 7   FOX NEWS NETWORK LLC., ED
     HENRY, et al.,
 8
                    Defendants
 9
     ------------------------------x
10                                        New York, N.Y.
                                          September 20, 2022
11                                        3:00 p.m.

12   Before:

13                      HON. RONNIE ABRAMS

14                                        District Judge

15                          APPEARANCES

16   WIGDOR LLP
          Attorneys for Plaintiff Jennifer Eckhart
17   MICHAEL J. WILLEMIN
     RENAN F. VARGHESE
18

19   PROSKAUER ROSE LLP
          Attorneys for Defendant Fox News Network
20   RACHEL FISCHER
     YONATAN GROSS-BODER
21

22   MORVILLO ABRAMOWITZ GRAND IASON & ANELLO PC
          Attorneys for Defendant Ed Henry
23   CATHERINE FOTI

24

25
```

M9KQeckO

1          (The Court and all parties appearing via Teams

2     videoconference)

3          THE COURT:  Good afternoon.  This is Judge Abrams.

4     We're here for Eckhart v. Fox News and Ed Henry.  We're here

5     for oral argument and motion for reconsideration.

6          Who do I have on the line, please.

7          MR. WILLEMIN:  Michael Willemin and Renan Varghese for

8     the plaintiff.  Good morning -- good afternoon, rather.

9          THE COURT:  Good afternoon.

10          MS. FOTI:  Good afternoon, your Honor, Catherine Foti

11     for defendant Ed Henry.

12          MS. FISCHER:  Rachel Fischer and Yonatan

13     Grossman-Boder, your Honor, for Fox News Network.

14          THE COURT:  Good afternoon.

15          Is there anyone else who would like to state their

16     appearance today?

17          Why don't we get started.  As I just noted, we're here

18     for oral argument on Mr. Henry's motion for reconsideration of

19     certain rulings of the Court's September 9, 2021 decision on

20     his motion to dismiss.

21          Let me just start.  I do want to just note that

22     Mr. Henry rightly notes that the Court made an inadvertent

23     error in summarizing its holdings on the final page of its

24     opinion by stating that the third cause of action as it

25     pertains to Eckhart's private photographs and messages against

Henry only survives.  Plaintiff's third cause of action was, of

course, a retaliation claim under Title VII against Fox News

only because Eckhart did not allege this cause of action -- did

not allege it with respect to Mr. Henry and because individuals

are, of course, not liable under Title VII.

I just want to confirm defendant's understanding that

Henry's third cause of action survives only as it pertains to

Eckhart's termination against Fox News, as I believe is

otherwise clear from the opinion.  That was just a minor error,

but I did want to confirm that, get it out of the way.

I also wanted to start -- this may be a little

unorthodox, but I wanted to start by telling you what my

thinking is on at least one issue, and I'll hear the parties

out if they want to be heard, but I feel pretty confident about

this.

So it's clear to me from the law that to establish a

claim for retaliation under New York State or City Human Rights

Law, that a plaintiff must allege some adverse employment

action within the employment context.  At the time of the

filing of the photographs, neither Henry nor Eckhart were

employed at Fox or otherwise had an employment action.

While it's true that this defendant focused its

retaliation argument below primarily on whether Henry was

Eckhart's supervisor, nonetheless, it did raise this issue, and

I am inclined to find that it would be clear error to allow

M9KQeckO

1    those claims to go forward.

2          So if plaintiff's counsel wants to be heard on this,

3    I'll hear you out, but I do think that that was, frankly,

4    simply error.

5          MR. WILLEMIN:  Understood, your Honor.

6          I'd just like to be heard briefly.

7          I think the dispositive case is the *Griffin v. Sirva*

8    case because in that case, the Court of Appeals was addressing

9    a question certified by the Second Circuit under the aiding and

10    abetting section of the New York State Human Rights Law, and in

11    that case, the Court addressed the issue of whether or not that

12    aiding and abetting liability, which is textually exactly the

13    same as retaliation liability in the sense it applies to any

14    person, extends liability to a non-employer, and in that case

15    the defendant in the case was a non-employer.  Not like a

16    coworker; it wasn't a coworker-employer issue.  It was a third

17    party that was not an employer.  And the Court of Appeals held

18    in the affirmative that under the aiding and abetting language,

19    which is just the same as the retaliation language, that a

20    non-employer -- in this case, that would be Ed Henry -- is any

21    person for the purposes of the state and city human rights

22    statutes.  And to the extent there is any question about the

23    fact that Ms. Eckhart was an employee at Fox at the time, post

24    employment retaliation claims are regularly -- are regularly,

25    especially in litigation context, upheld as being actionable.

So when you have --

          THE COURT:  Sorry.  Can I just stop you there and just

focus on *Griffin*?  Didn't the plaintiff still need to plead the

underlying employment relationship with the employer?

          MR. WILLEMIN:  At the time -- well, not to -- I don't

believe -- and, I mean, I can look back at the case, but I

don't believe that one had anything to do with the other;

meaning, obviously there needed to be -- to the extent that you

go after the one defendant, because the first two questions

that were certified had to do, I think, with the first

defendant, which was the employer, so to the extent that the

plaintiff had to go after that employer, there's an employment

relationship that was required for the underlying claims of

discrimination.

          But a retaliation claim uses different language, and

an aiding and abetting claim uses different language.  And

plaintiffs -- you never have to establish an employment

relationship at the time something happened, otherwise post

employment retaliation wouldn't be a fit.  So post retaliation

is a fit.  You can have an actionable retaliation claim for

something that in this case, any person pursuant to the

language of the statute and pursuant to the decision in *Griffin*

does with respect to --

          THE COURT:  But there's still an employment

relationship.  I mean, look, I know, for example, that there

M9KQeckO

```
1    are certain cases where courts have found plaintiffs to have

2    stated a retaliation claim where they are no longer an employee

3    because -- sorry -- but the plaintiff still needed to allege an

4    ongoing economic relationship between themselves and defendant.

5    That happened in the Schmitt case, 178 A.D. 3d. 578.  But here,

6    what was the employment relationship between Henry and Eckhart

7    at the time that the photos were filed?

8             MR. WILLEMIN:  But I guess my -- for instance, if I

9    could just address Schmitt for a minute?  Respectfully, that's

10   not what Schmitt said.  It was an "or" there.  I'll get the

11   precise language.  I'm pulling it up now.  But the ongoing

12   economic relationship language in Schmitt was an "or".  What

13   Schmitt held was:  That there's jurisprudential grounding for

14   expanding the boundaries of the employment context that is

15   central to discrimination and retaliation claims in Section

16   8-107(7) -- the retaliation provisions -- to the extent

17   necessary to provide redress when there exists some nexus

18   between the retaliatory harm alleged and a relationship

19   characterized in some manner as one of employment, past or

20   present.

21            So to the extent there's a relationship between --

22   this is what Schmitt held -- the harm that is alleged -- in

23   this case, obviously the harm from the filing of the

24   photographs -- and the nexus of the past employment

25   relationship, the courts have been very consistent that that
```

M9KQeckO

| | |
|---|---|
| 1 | language, when you take *Schmitt* and you take *Griffin* together, |
| 2 | that that would provide a basis for a claim against any person |
| 3 | who engages in retaliatory harmful acts against someone where |
| 4 | there's a nexus between that retaliatory harm and a past |
| 5 | employment relationship. |
| 6 | THE COURT:  So, look, I'll tell you, I will re-read |
| 7 | *Schmitt*.  I'll take a closer look at *Griffin*.  This is how I'm |
| 8 | inclined to rule, but I will take a close look before |
| 9 | proceeding further. |
| 10 | And if Henry's counsel wants to be heard on this issue |
| 11 | now, I'm happy to hear you out just so I have both your |
| 12 | arguments sort of on the record, but what I thought would be |
| 13 | more productive for purposes of this argument was to focus on |
| 14 | liability under New York Civil Rights Law 52-B and with respect |
| 15 | to the statute of limitations issue. |
| 16 | Why don't I turn back to Henry's counsel.  If anyone |
| 17 | would like to be heard on this issue, I'm happy to hear you |
| 18 | out. |
| 19 | MS. FOTI:  Thank you, your Honor. |
| 20 | Just really one sentence on that issue, which is that |
| 21 | in *Griffin*, what Mr. Willemin neglects to point out is that was |
| 22 | an editor because it was aiding and abetting of the employer |
| 23 | retaliation.  That's the crucial piece that's missing in terms |
| 24 | of Henry and Eckhart and their relationship.  There's no |
| 25 | underlying employer retaliation.  So that, I think, really ends |

1    the discussion of *Griffin*, and I would also say in terms of

2    *Schmitt* because in *Schmitt* there was ongoing employment

3    relationship with the plaintiff.  It might not be an employer

4    in terms of (unintelligible), but there was an ongoing

5    relationship where she was relying on the publication to pursue

6    her employment interest because she was an art curator, and it

7    was an art publication.  So I would strongly agree with your

8    Honor's inclination to say that retaliation claims not go

9    forward on those grounds.

10           I'd like to turn now to --

11           THE COURT:  Mr. Willemin, if you want to respond on

12   that issue, maybe we can do it a little -- have the argument be

13   a little unorthodox in the sense that we can go back and forth

14   on each of the three issues.

15           MR. WILLEMIN:  It will be 15 seconds.

16           So, your Honor, hopefully this will be helpful.  The

17   language in Schmitt that your Honor referenced said that the

18   relationship didn't fit neatly into the categories of what

19   would normally be an anti-discrimination claim.

20           But it says:  That should not require dismissal of the

21   claim against Artforum -- which is the third party -- as a

22   former employer, or, alternatively, as a participant in an

23   ongoing economic relationship.

24           So there's an "or" there, and in this case there was

25   an employment relationship.

M9KQeckO

1              And with respect to the aiding and abetting, again --

2              THE COURT:  Just to stop, I mean, Henry was never

3     Eckhart's employer.

4              MR. WILLEMIN:  Understood, but the retaliation

5     provision under the New York City Human Rights Law and the New

6     York State Human Rights Law specifically identifies any person.

7              THE COURT:  No, I know that.  I'm just saying you're

8     quoting language, and this situation doesn't fall into either

9     of the scenarios to the language you've quoted.  I just want to

10    make that clear.

11             MR. WILLEMIN:  Understood.  But in that case, that

12    entity had liability as a former employer.  But in this case

13    their liability lies as against Henry because he's any person.

14             And the aiding and abetting language was not tied in

15    the *Griffin* case to a requirement that the other corporate

16    defendant had liability.  So that's not what the *Griffin* case

17    decided.  The certified question was not answered by saying,

18    oh, because there's another entity that has liability; it was

19    answered on a textual reading of the New York City -- or in

20    that case New York State Human Rights Law and the "any person"

21    language.

22             THE COURT:  As I said, I'll take a close look at those

23    two cases, and I'll rule on that.

24             I'm happy to move on and hear from you, Ms. Foti, on

25    the 52-B issue.  I want to say something about that as we

M9KQeckO

start.  I found that issue as to whether Mr. Henry violated

52-B very difficult.  I found it difficult then.  I find it

difficult now.  You're not going to convince me that it wasn't

wrong to file the photographs.  I just want to be clear about

that.  I think that that was wrong, and I think it was terrible

judgment to do that because I could not consider them on a

motion to dismiss.

        That being said, that is a different question from

whether Mr. Henry can be found liable for a violation of that

statute.  And two of the things that I have been kind of

struggling with -- and I'd like you both to address -- is,

number one, you know, can it be the case that you can be held

responsible for violating the statute for filing something on a

motion to dismiss that might be perfectly appropriate to file

on a motion for summary judgment or at trial?  Can that really

be the case?  And I think, Mr. Willemin, that is a question

ultimately more for you.

        But then I struggled a lot with the difference between

Mr. Henry's actions and what was alleged specifically with

respect to Mr. Henry versus the legal team.  You know, I have

Ms. Foti's affidavit, which, setting aside whether it's proper

to consider it on a motion to dismiss, which, frankly, I don't

think it is, but I am sort of left with the question of:  Has

plaintiff even alleged that Mr. Henry himself did this as

opposed to his legal team?  Do you want to address questions of

M9KQeckO

1    agency in that respect?  I don't know, it may, frankly, even

2    present a conflict of interest for counsel with respect to

3    addressing this issue.

4           So those were some of the things that I've been

5    struggling with on what I think is a very difficult question.

6    But with that said, Ms. Foti, I'd be happy to hear from you.

7           MS. FOTI:  Thank you, your Honor.

8           So, your Honor, I have to take issue with one thing

9    you said, which is that you could not consider these pictures

10   on the motion to dismiss, which I think is crucial to the

11   decision-making here and crucial to deciding whether or not it

12   was appropriate.  Those pictures were in fact part and parcel

13   of the WhatsApp communications that are contained in the

14   complaint.  The complaint cuts out a piece of WhatsApp

15   communications that Ms. Eckhart has decided she wants to point

16   to as establishing a pattern of harassment and establishing an

17   alleged rape, and then doesn't choose to include any of the

18   responsive communications.  That is -- you know, that's her

19   right

20          But I strongly would suggest to the Court that

21   Mr. Henry has a right to set forth his factual narrative and

22   why that is not accurate once those discussions are

23   incorporated into the complaint.  Those discussions come along

24   with the pictures that were included.  They weren't separate.

25   They were part and parcel of the communications back and forth.

M9KQeckO

1    And I understand that I think we probably mis -- I don't think

2    misled, but probably did not make it clear to the Court because

3    we were attempting to understand what the date was of the

4    alleged rape.  We did not want to assert what we thought the

5    date was of the alleged encounter the plaintiff was referring

6    to in our motion to dismiss, so we did block out the dates on

7    the pictures.

8         But if your Honor had asked, we would have, I think,

9    been able to tell you in chambers as to the dates on those

10   pictures, in fact, surround -- first, one predates by two days

11   the date of the alleged rape, February 8.  One is on the date

12   of the alleged rape, February 10.  And one is after by about

13   ten days.  And then there were a number of those that come

14   after the alleged rape.

15        It is crucial, I think, to understanding that that is

16   why these pictures are incorporated into the complaint by

17   reference.  They show the communications.  Those pictures came

18   with other communications from WhatsApp.  What we have are

19   those pictures remaining.  We have, I think, from those

20   pictures the ability to support Mr. Henry's counterfactual

21   narrative that this was a completely consensual relationship.

22        THE COURT:  Did you really think I was going to decide

23   if it was a consensual relationship on a motion to dismiss?

24   Could I really have decided that?  Even if you're assuming that

25   those pictures were incorporated into the complaint, how could

M9KQeckO

I have made that assessment?  Doesn't that require credibility

assessments, among other things?

             MS. FOTI:  Your Honor, but the question is whether or

not we had an appropriate basis to include them in a motion to

dismiss for purposes of presenting Mr. Henry's factual

narrative, and what it does go to is whether or not he would be

responsible for sex trafficking, okay, because the whole issue

about the pattern and whether or not that was a consensual

relationship, this was evidence of the fact that this was a

different type of relationship; but all the relationships they

alleged in the complaint, all the other relationships they

allege in the complaint that set forth a pattern of sex

trafficking were completely different than what this

relationship was about.  Those pictures demonstrate that the

pattern does not exist.

             So I think that is something that you could have

decided.  You chose not to, I understand that, but you could

have decided that.  So I do think though that there was a basis

to incorporate them.  And I am sorry that your Honor determined

that the judgment was wrong, but in our judgment at the time,

it was important as advocates for this client to advocate very

zealously for what his side of the story was.

             Unfortunately, we are faced with, obviously, an

atmosphere in this country where when you present the

narrative, as plaintiffs are allowed to present, of alleged

M9KQeckO

1   rape, that is to be believed by the Court.  It's to be taken as

2   true.  That's completely understandable legally.  It also is

3   believed by the vast majority of the public.  And what has

4   happened in many cases, and in this case in particular, the

5   plaintiff then goes on to publicize her version of the event

6   broadly throughout the country by sitting in on radio shows, by

7   presenting --

8        THE COURT:  Just to be clear, I don't want to cut you

9   off, but I have not put a gag order on either you or your

10  client.  He can get out there and say whatever he'd like to

11  say.  He could have denied this vigorously, which he has.

12  There is a statute that prevents the publication of photos of

13  this sort that has a limited exception that I want to talk

14  about.  And so I do understand his desire and your desire for

15  him to defend himself, for you to zealously defend him, but

16  there is this particular statute that prevents the publication

17  of photos of this sort, and it has an exception that I want to

18  talk about, but I want to let you finish your thought, if you'd

19  like to, first, about exactly what the meaning of "common" is

20  under the New York Civil Rights Law and any cases that

21  interpret what that means in the context of legal proceedings.

22  In any event, I didn't want to cut you off.

23        MS. FOTI:  Your Honor, the only thing I wanted to

24  conclude with is that it was a judgment in order to zealously

25  represent our client.  We appreciate your being willing to

M9KQeckO

1    allow us to present Professor Green's affidavit.  I think if

2    you look at that affidavit, we are under the ethical rules, and

3    that was one reason we thought you could consider this under a

4    motion for reconsideration, is that I don't know that the

5    ethical rules were considered.  Under the ethical rules, we

6    were responsible to put forth our client's reasonable position,

7    I think that we believed it was reasonable.  I understand why

8    the Court decided that it did not want to consider them, but we

9    had a basis on which we believed the Court could consider them.

10         THE COURT:  Do you think that plaintiff has plausibly

11   alleged that Mr. Henry published these photos as opposed to

12   counsel?  Is there even a legal distinction between the two or

13   is anything that counsel does in this respect attributable to

14   the client?  Can that argument be made here?

15         MS. FOTI:  I don't think it can, your Honor, because

16   it was counsel's decision to put these in the motion to

17   dismiss.  Whether or not it was based on Mr. Henry's

18   presentment of the evidence, that's not sufficient to say that

19   Mr. Henry has violated the Civil Rights Section 52-B.  He has

20   not published anything.

21         I understand that he is being represented by counsel,

22   but counsel has made what we would say is a legitimate decision

23   to publish these pictures in a way that they thought was

24   completely consistent with the law.  And there are no

25   allegations whatsoever that Mr. Henry made any decision to do

M9KQeckO

1    this.  In fact, I would say the history of this case

2    demonstrates that he did not retaliate.  He went out and he

3    said that he did not do this; that it was a consensual

4    relationship and nothing else.

5            At no time prior to what we believe was an appropriate

6    time in the legal proceedings did Mr. Henry take any

7    opportunity to publish these pictures or to even discuss the

8    fact that these pictures existed.  Counsel waited until what we

9    understood was an appropriate time in the legal proceedings to

10   be able to publish the pictures in a way that we understood to

11   be appropriate.

12           The New York Civil Rights Law, Section 52-B, does make

13   (unintellible) the filing of any picture that the person

14   depicted, a still or video image, unclothed or showing an

15   exposed intimate part.  There is an exception, and I know

16   that's what you're interested in, your Honor, and that is that

17   you can in fact make these filings if there is a lawful and

18   common practice of law enforcement, legal proceedings, or

19   medical treatment.

20           So your Honor looked at the issue as to whether or not

21   filing on the public docket was common.  I have to take issue

22   with that, your Honor, respectfully, because if in fact you're

23   now looking at what is, in fact, common, it sort of reads out

24   of the entire statute the fact that what we're talking about is

25   the filing of nude pictures, right?  The only way that the

M9KQeckO

statute makes any sense is that the filing of nude pictures is the essence of the statute, and what we're talking about is an exception. So for the Court to say that it is not common to file these pictures, even though it's redacted, would undercut the entire meaning of the statute. The statute would not -- you couldn't have an exception because it's not common in general to file nude pictures except in the course of trying to defend someone. And it is common to put forth evidence that is incorporated by reference in the complaint in a motion to dismiss. That is, in fact, a common practice.

We have not found any case law to discuss the definition of common in this context, but certainly I think the fact that the incorporated by reference provision is common, that that should undercut any allegation here that there was a violation of Section 52-B.

Now, specifically, I know you also -- and I want to address this, there's a reference in the opinion about the fact that whether or not something, you know, the naked pictures were, in fact, properly redacted. And your Honor refers to New York Penal Law 245 to talk about the fact that an intimate part means pubic area, but that law actually reads that an intimate part means naked genitals, pubic area, anus or female nipple. So that is defined by naked. We, in fact, took effort to make sure that the portions that were not allowed to be publicly filed were, in fact, redacted. So I don't think that there can

M9KQeckO

| | |
|---|---|
| 1 | be a violation of the statute in any case because the parts |
| 2 | that are defined as naked have, in fact, been redacted.  So |
| 3 | those have not been publicly filed. |
| 4 | THE COURT:  All right.  Thank you. |
| 5 | Mr. Willemin, do you want to respond on this? |
| 6 | MR. WILLEMIN:  Sure. |
| 7 | So with respect to the propriety of filing the |
| 8 | photographs, I don't believe -- and I won't re-litigate here |
| 9 | the issue -- that these were somehow incorporated in the |
| 10 | complaint.  I think your Honor had that correct in the original |
| 11 | decision.  I don't know that it needs to be re-addressed, but |
| 12 | the bigger problem -- or one of the bigger problems, among |
| 13 | many -- is that these photographs were not even related to the |
| 14 | legal arguments that were made by Henry in his motion.  There |
| 15 | was no basis upon which the Court, if it even were to review |
| 16 | those photographs, could have come to some sort of different |
| 17 | conclusion with respect to the motion to dismiss. |
| 18 | There was no argument made by Henry that because of |
| 19 | these photographs, this claim should be dismissed or that claim |
| 20 | should be dismissed.  It was disconnected from the legal |
| 21 | arguments in the case.  And so that -- and I think Ms. Foti |
| 22 | just sort of revealed the reason why these were attached is |
| 23 | because they wanted to get them out to the public and respond |
| 24 | publicly to Ms. Eckhart's allegations, which is not the |
| 25 | appropriate forum to do on a motion to dismiss when the |

M9KQeckO

documents are not appropriately attached or related to legal

arguments.  And so that in and of itself makes it uncommon.

The idea that this reads the sort of litigation exception out

of the statute is just simply incorrect.  This is why I wanted

to address your first question.

There are plenty of situations in which it might be

considered common for these types of photos to be utilized in

litigation.  One would be under seal.  One would be maybe

completely redacted.  Perhaps at trial, it would be appropriate

for third parties to be -- these photographs to be put in front

of third parties because a trial, obviously, has a different

set of rules with respect to public access that you would have

at this stage.  Maybe during depositions they could be

disclosed to a court reporter because that would be just sort

of ordinary practice.  I think there are a lot of criminal

cases where nude photographs might be appropriately viewed, in

a sense, as common.  But it is not common.  There is no case --

I've never seen anything like this in ten years for a defendant

to take marginally redacted photographs of the plaintiff in

really obvious personal circumstances, and, without notifying

us, just put them on the docket and then refuse to have them

temporarily sealed while the Court decides whether or not they

should be sealed.  The idea -- I think there was a reference in

the papers to this where there's a disfavoring of filing sealed

documents.  But that's no excuse because we have a protective

M9KQeckO

```
 1    order.  I know that wasn't the issue when the motion was filed,
 2    but there's a protective order that's issued in every case of
 3    this nature that provides for pre-court approval or review of
 4    the filing of documents that would otherwise be considered
 5    sensitive or confidential.
 6           So for Ms. Foti to argue that because there is a
 7    disfavoring of documents being sealed, she couldn't have sought
 8    consulting with us first or sought consulting with the Court
 9    before doing that.  That does not make what she did -- and I'll
10    get to the point about Henry in a minute.  That does not make
11    what happened here common.  This is just not common.  And there
12    are plenty of circumstances, like I said, where you could call
13    it common to have a photograph like this disclosed to a third
14    party in litigation.  It does not undo the exception.  But this
15    was a particularly egregious maneuver by defendant.
16           And in terms of the allegation with respect to
17    Mr. Henry, I mean, we allege -- and this is something that I
18    can, obviously if the Court wants further information on it,
19    provide it.  I wasn't necessarily expecting this particular
20    question.  But we say in paragraph 198 that it was clear that
21    Mr. Henry was motivated by the desire to publicly harm and
22    humiliate Ms. Eckhart by falsely claiming she sent him graphic
23    pictures.  So if you read the allegations in context, it's
24    clear that we're alleging it's Mr. Henry's motive that was at
25    play here, and --
```

M9KQeckO

1          THE COURT:  Let me just stop you there.

2          It's still going to be plausible that he did it,

3    right?  He didn't publish these on Twitter.  He didn't put them

4    on Instagram.  He didn't put them on Facebook, right?  How

5    could it be that Mr. Henry, as opposed to his lawyers, filed

6    this?  And is that distinction an appropriate legal distinction

7    to be made between an individual and counsel?

8          MR. WILLEMIN:  Well, your Honor's footnote 16 in the

9    original decision of the motion to dismiss, I think, holds

10   correctly that that is not an appropriate distinction to be

11   made.  But even if it were, then there would be a conflict

12   because, I mean, respectfully, then Ms. Foti would be the

13   defendant in this case, and, you know, Mr. Henry can argue, I

14   suppose, that he had nothing to do with this.  But it's really

15   an issue for discovery.  I mean, Ms. Foti, just by submitting

16   that affidavit, has made it clearly an issue for discovery.

17         Mr. Henry's knowledge and his consent and direction

18   with respect to publishing these is an issue that could be

19   further explored.  But as a practical matter, it's his papers.

20   So maybe he didn't click the ECF button, but no plaintiff

21   clicks the ECF button, but it's his papers.  It might have been

22   drafted by Ms. Foti, but it is him as a party that's taking the

23   position, and it's him as a party that's filed those papers.

24   They're filed on his behalf by Ms. Foti.  I think that's what

25   ECF actually even says when you look at the ECF--

M9KQeckO

         THE COURT:  Let me stop you there.

         Do you know any of case in which an individual has

been found liable under this provision for something that their

lawyer filed in a legal proceeding?

         MR. WILLEMIN:  I'm not aware of in either direction a

case that addresses that particular issue; but at the end of

the day, Ms. Foti is an agent of Mr. Henry with respect to this

action, and basic principles of agency bring her conduct back

to Mr. Henry.

         THE COURT:  Most of those cases with respect to agency

deal with situations where a client was responsible for what a

lawyer did or didn't do in a particular action, but not a

filing of a whole cause of action, liability on a whole cause

of action because of conduct of a lawyer.  So if there are

cases on that, I would be interested in seeing them where you

can find those scenarios even outside of the Rule 52-B context.

         MR. WILLEMIN:  I mean, I think in analogous

circumstances, I mean, every case that involve retaliatory

litigation of the human rights law, every case involves a

document that was ultimately filed by counsel and filed with

the advice and direction of counsel, but that document is still

a defendant's document, right?

         So, for instance, if we are right on Mr. Henry being

potentially liable under the New York State and City Human

Rights Laws, he would be liable for the fact that this document

M9KQeckO

1    was filed in retaliation for Ms. Eckhart's decision to raise

2    claims.  That issue did not even come up at any point during

3    any briefing, and it's just -- so any time a retaliatory piece

4    of litigation is filed, it's never the attorney that is the one

5    who's sued for that.  It's always the client.  And it's liable

6    under the statute.  It's no different being liable under the

7    City Human Rights Law than it is being liable under a different

8    statute violation.

9            So I don't see that there's a -- let's put it this

10   way:  Either Mr. Henry or Ms. Foti is appropriately a defendant

11   in the case.  I think, based on everything I've just said, that

12   it's Mr. Henry's paper, and so I think based on principles of

13   agency, I think even if you put aside agency -- I know that

14   Ms. Foti filed it, but it's his papers -- and just like he

15   would be liable, not for her conduct, but for the fact that his

16   papers did something that violated the law, just like his

17   papers would have violated the anti-retaliation statutes, if

18   he's still covered by those statutes.  So I don't know if there

19   was anything else sort of specific I wanted to say.  I am not

20   sure.  I hopefully have addressed your questions.

21           THE COURT:  I have two more questions.

22           So, one, are you aware of any case law that defines

23   the word "common" under this provision under 52-B of the New

24   York Civil Rights Law?  And how I can interpret it in a context

25   like this one?

M9KQeckO

```
1         MR. WILLEMIN:  I don't.  I think maybe we could

2    obviously brief this -- we could brief this ten more times.  We

3    could brief issues of statutory construction, but, generally

4    speaking, the rule is that the word has its common usage, or

5    its ordinary usage.  I don't think it's right to say common

6    common.  So it would have to be something that happens with

7    some degree of frequency.  I don't know whether it's something

8    that happened ten times, a hundred times or 200 times, but I

9    can just say that no one -- between me, between your Honor, I

10   think between Ms. Foti and everyone in this Zoom -- has ever

11   even heard it happened once, anything like this.  So I don't

12   see under any definition how you could possibly categorize

13   something as common.

14        One other point I wanted to make, actually, because I

15   wanted to make this with respect to the retaliation claim.  But

16   the ethics opinion is really neither here nor there.  Whether

17   Ms. Foti violated the rules of professional conduct has nothing

18   to do with whether or not this statute was violated or if the

19   anti-retaliation statutes were violated.  The anti-retaliation

20   statutes, the issue is the motive of Mr. Henry, not whether or

21   not -- there may be some overlap between retaliatory conduct

22   and violation of rules of professional conduct, but the two are

23   not the same.  It's a different set of rules.

24        And the same can be said for 52-B.  So I did want to

25   make that point as well.  And even if it were somehow an out to
```

M9KQeckO

say that, well, I can't be held liable for retaliation or for

52-B because my attorney didn't violate the rules of

professional conduct -- which, again, doesn't make any sense --

but even if that were an out for a defendant, that would be

something that would to be decided after discovery, not on a

pre-discovery basically expert report that I think we

appropriately didn't respond to at this stage because expert

discovery is for somewhere down the line.

THE COURT:  Let me ask you a question.  Do you think

that these photos could be filed in connection with a motion

for summary judgment?

MR. WILLEMIN:  I think they should be filed under

seal.  I mean, yeah, at some --

THE COURT:  Would it be a violation of 52-B to file

these in connection with a motion for summary judgment?

MR. WILLEMIN:  If what happened today, now, happened

on the motion for summary judgment, meaning we weren't

consulted, the issue wasn't brought before the Court, there was

no opportunity given for the Court to decide, then I think it

would be just as uncommon on a motion for summary judgment as a

motion to dismiss, and it would be a violation of 52-B.

But I could see a situation in which the Court on a

motion for summary judgment might say that it is at this point

appropriate or more common, so to speak -- I would argue

otherwise -- such that the behavior wouldn't ultimately, once

M9KQeckO

the Court has a chance to review it, violate 52-B.  And I can
certainly understand at trial that there is going to need to
be -- I get that, right?  I mean, that would be what I would
say, I would most concede that if we try this case in front of
a jury, the jury is going to have to see these pictures, but
that doesn't make this common.  It just doesn't.

THE COURT:  Can you respond to counsel's argument with
respect to this being incorporated by reference into the
complaint because it was part of the back-and-forth.  I mean,
look, it is true that I have looked at even in this case other
texts that weren't in the complaint, right, and I think
properly so.  I think that was actually with respect to one of
the defendant's that Ms. Areu sued, but why is this not
incorporated into the complaint as part of those texts back and
forth?

MR. WILLEMIN:  Well, for one, I don't think that
there's any actual clarity on when all these texts were sent
because I think many of them were screenshotted after the fact,
so I don't want to make a firm representation, but I don't
believe that my client is going to testify that any of them
were sent after the rape.  But, I mean, the prevailing case
law -- I think we addressed this in the context of the Areu
case, although I wasn't her attorney at the time -- is not that
every single communication even within the same, I don't even
know if I want to call it chain, right?  Because something

M9KQeckO

happens one day, something happens a few days later, something

happens a few days later.  And so I think that it's fair in

this case to say that what we included in the complaint were

specific incidences of his inappropriate and lewd such

comments, written comments, and that this is far enough afield,

certainly not something that we were relying on in any way.

Because usually they apologize -- but usually when you

incorporate something into a complaint is because a plaintiff

is inherently relying on it, right?  So you've referenced a

contract that you're relying on, but you didn't attach it to

the complaint.  I'm not saying that that is always the case,

but that's where this normally comes up.  Here, we obviously

weren't relying on it in any way.

          But I think the bigger point, I think a much more

important point is where I started, which is it didn't have

relevance to the legal arguments, and it could have been filed

under seal.  Just because something is incorporated into a

complaint doesn't mean that you can just file it on a public

docket however you'd like to the extent that there is basis for

such materials to be filed under seal.  Those are the bigger

issues.  And you'll note, we didn't really take issue -- even

though I think it was inappropriate -- with the fact that Henry

re-filed many of the communications at issue on the public

docket with respect to a second motion to dismiss, even after

the Court said that that extrinsic evidence in its sealing

M9KQeckO

1    decision was not for consideration.

2           So I'm not trying to take a scatter-shot approach.  I

3    am not trying to be unreasonable, but this was completely

4    uncommon and unusual.  Even if it was incorporated into the

5    complaint, the way in which they went about this, it never had

6    to be filed on the public docket, ever.  And the Court in

7    determining that it should be sealed at the time being has held

8    that it shouldn't have been filed on the public docket.  So if

9    it shouldn't have been filed on the public docket, and we can't

10   think of any other case in which anything like this has ever

11   happened, it's not common.  And so that's how I'd respond to

12   that.

13          THE COURT:  What's the intent requirement for the

14   statute?

15          MR. WILLEMIN:  It's annoy, harass.  I don't want to

16   misstate it, but I believe it's to harass or annoy.  And I

17   think that the Court's decision -- in deciding this case, the

18   Court held that that was what we had alleged the intent to be

19   in doing this, and that Henry had alleged, obviously, a less

20   nefarious motive than that, but you can't undo a pleading,

21   right?  So at the end of the day, our allegations in the

22   original decision, I think you addressed this specifically,

23   were sufficient to meet the standard, which I believe is to

24   harass or annoy.  And so that's what I believe the answer is.

25          THE COURT:  Thank you.

M9KQeckO

1          Ms. Foti, do you want to respond to any of those

2     points?

3          MS. FOTI:  Yes, your Honor, a number of them.  So 52-B

4     specifically requires that the filing be for the purpose of

5     harassing, annoying or alarming such person, disseminate or

6     publish or threaten to disseminate or publish such a still or

7     video image, and then there's the exception.  So a cause of

8     action only arises when the purpose is harassing, annoying or

9     alarming such person.  Here, the purpose is to present

10    Mr. Henry's side of the story or even for Mr. Henry to present

11    his defense.  It doesn't fall within any of those three

12    parameters.  There's no allegation in the complaint that

13    suggests Mr. Henry intended to do any of those things.

14         Let me go back to the common language because I note

15    it's something you're focusing on, and, unfortunately, there

16    doesn't seem to be any case law on it, and I have to suggest

17    there's no case law on it because what they're talking about is

18    they're talking about lawfully common practice of law

19    enforcement in legal proceedings, is that where there's a

20    common practice is a motion to dismiss, is the complaint, is

21    the opposition to these motions, and summary judgment motions,

22    and it's a fact presentation at trial.  Those are the common

23    elements of a legal proceeding.  And a motion to dismiss was a

24    common element of a legal proceeding.

25         I understand that Mr. Willemin said many times that

M9KQeckO

1    he's never seen this, he's never seen this.  Your Honor, we

2    have never seen someone cut and paste their text messages and

3    place them into a complaint completely devoid of context.

4    We've never seen that, right?  So that would not turgidly, I

5    guess, be that common.  But what is common is in fact when

6    someone does something like that and cuts and pastes from the

7    exact communication that accompanied these pictures, then

8    they're incorporated by reference.  And that is what has

9    happened here.

10          Significantly, one of the things that I think is

11   somewhat odd -- and I question as to how the statute applies at

12   all -- is that Ms. Eckhart is saying that many of these

13   pictures are not even of her; that they are pictures she took

14   off the internet.  If they're pictures she took off the

15   internet, then I don't know that the statute applies

16   whatsoever.  And if the pictures that are of her are the ones

17   that are less salacious, then they are not naked pictures, and

18   so they cannot be the basis for a violation of this statute.

19          THE COURT:  All right.  Thank you.

20          Why don't we turn to the last issue, which is the

21   statute of limitations issue.  Who would like to be heard first

22   on that.  I mean, it's your motion, Ms. Foti, so I'll turn to

23   you.

24          MS. FOTI:  Yes, your Honor.

25          On the statute of limitations, I do think there was an

M9KQeckO

1   error in the interpretation of the case law.  And what has

2   happened in terms of the cases is that to find that there was a

3   violation, the additional acts after the statute of

4   limitations, they themselves have to have amount to an act of

5   harassment.  It can't simply be that those acts trigger

6   something in someone's mind to recall the previous harassment.

7   Those acts themselves need to be acts of harassment.

8          That is not what happened here.  We've got three text

9   messages basically saying hello.  "Hello.  Yo."  The second one

10  I think is "Why did you take away," and then there was the

11  Heisman trophy, which suggests that someone -- it was an

12  attempt to communicate.  But that in and of itself is not

13  sufficient to make out an allegation of harassment.

14         THE COURT:  Can you just respond to the line in my

15  opinion that says:  "A picture of a football player doing a

16  defensive measure certainly takes on a different meaning when

17  it is sent by an alleged rapist to his purported victim

18  immediately after she 'physically ran away from him.'"

19         Can you respond to that, please?

20         MS. FOTI:  Sure, your Honor.

21         So the allegation itself about the Heisman trophy

22  picture, there's nothing in that that suggests harassment.  It

23  suggests an attempt to communicate, I agree.  But if your Honor

24  were correct, then every attempt to communicate with someone

25  who allegedly was the subject of your harassment would then

M9KQeckO

1      continue the statute of limitations.

2            The fact is that might bring back what happened to

3      her, but that is not sufficient under the case law.  But

4      specifically under *Drew v. Plaza*:  In determining a violation

5      exists only if "all acts are part of the same unlawful

6      employment practice and at least one act falls within the time

7      period."

8            Again, the point that is making is that one of the

9      acts has to fall within the time period.  One of the acts.  Not

10     any act.  It has to be one of the acts of harassment.  And so

11     that I do respectfully suggest that your Honor was not correct

12     in the finding that there was a violation that the act

13     continued past the statute.

14            THE COURT:  Thank you.

15            Mr. Willemin, can you respond to that and particularly

16     the argument that Ms. Foti just made that if this is the case,

17     it extends the statute of limitations in a situation in which

18     any offender has contact with the person, you know, on an

19     ongoing basis.

20            MR. WILLEMIN:  Yes.  So, as your Honor, I think,

21     pointed out in the opinion, that's just not the case.

22            The reason that this is part of a continuing violation

23     is because of the similarity it shares with the conduct that

24     happened back in 2014, 2015, 2017 where there were multiple

25     unsolicited messages to our client and multiple occasions in

M9KQeckO

1    which Mr. Henry said, "You're playing hard to get" or in some

2    way tried to then back that up with making her feel bad so that

3    she would come to be with him, and that led to what it led to.

4            If he had just come and said hello, and she walked

5    away, and he didn't then re-engage in a way similar to what he

6    did in 2015, 2016, 2017 when he was sexually assaulting her,

7    that would not be in and of itself a communication that would

8    restart the statute of limitations.  It might be uncomfortable,

9    but the reason that this is part and parcel to the overall

10   pattern and practice is because of the similarities it shares

11   with the prior event.  If he had sent her an email saying, "Do

12   you want to come to my show tomorrow?"  And she ignored it, and

13   he ignored it, and they went on their separate ways, that would

14   not re-trigger statute of limitations.

15           But like the case that was just cited *Drew v. Plaza*,

16   even what Ms. Foti just said, one of the acts of harassment has

17   to be within the statute of limitations period.  This is an act

18   of harassment.

19           What Ms. Foti didn't say, because the case doesn't

20   say, is that you have to have an independently actionable

21   hostile work environment within the limitations period.  And so

22   this is an act of harassment that is part of an ongoing hostile

23   work environment.  It's ripe within the definition that *Drew*

24   would consider appropriate, and it also fits right in the

25   definition of what your Honor decided consistent with Second

M9KQeckO

Circuit case law *McCollum, Kater, Ramsey*, and your Honor, I
think even a week after the decision in this case, issued a
decision in *Dikombi v. The City University of New York* case in
which your Honor held the same thing, relying on the Second
Circuit as well.

So the idea that Mr. Henry could never have a
communication or what have you without extending the statute of
limitations is just a red herring because it has to do with the
similarity with which the conduct shared with the earlier
conduct.  And that's the whole point of the Continuing
Violations doctrine.  A hostile work environment obviously does
not occur in a single moment in time.  It occurs over a period
of time, from the first act of harassment to the last.  Neither
the first act of harassment, nor the last act of harassment,
nor any act of harassment in between the period of the hostile
work environment has to be independently actionable in order
for that act of harassment to count towards the hostile work
environment.

This hostile work environment began in 2015 or 2014,
and it ended in the end of 2018.  And just because the first,
the bookend conduct is not independently actionable, has no
bearing on whether the length of time that this hostile work
environment happened.

They also cite the *Williams* case, but the *Williams*
case -- first of all, the *Williams* case is non-actionable

1    conduct that occurred during the limitations period, was not

2    even directed at the plaintiff.  And in the *Williams* case

3    decided that in the plaintiff's own view, it was nothing more

4    than a trivial inconvenience.  I don't think *Williams* can

5    fairly be read because it did not analyze the specific issue of

6    whether or not it had to have been independently actionable.

7    It just simply noted in that case that it wasn't.

8            I would argue -- and maybe I don't need to for all the

9    reasons I just said -- that it is independently actionable,

10   frankly, when she runs away from him and he puts up a stop

11   sign, knowing that that is subjectively and objectively hostile

12   given the history of the parties to which your Honor alluded,

13   which is that the last time he did something like that, he

14   raped her.  And so even though on its own act devoid of

15   context, putting a Heisman sign might not be objectively

16   hostile in the context of this case, even if it were required

17   to be independently actionable, I would argue it is.  That is

18   also what the *Williams* case says in a footnote, it says:  One

19   can easily imagine a single comment that objectifies women be

20   made in circumstances where that comment would, for example,

21   signal views about the role of women in the workplace and be

22   actionable.  And that's in context what Henry's comment, his

23   stop sign and hard to get, and the things he did in 2018 are

24   consistent with his view of the role of Ms. Eckhart, at least,

25   in the workplace, insofar as his sexual gratification.

M9KQeckO

1          So I think under any analysis, the Continuing

2     Violations Doctrine would apply.

3          THE COURT:  All right.  Thank you.

4          Ms. Foti if you want to respond briefly.  If for

5     reason the call ends, we'll get back on.  I just got a five

6     minute notice, but I'm happy to hear you out, Ms. Foti.

7          MS. FOTI:  I will be brief, your Honor.

8          The fact of the matter is I disagree with

9     Mr. Willemin.  It does have to be independently actionable.

10    That is what *Williams* said.  What *Williams* determined was that

11    the comment that was after the limitations period was a petty,

12    slight, or trivial inconvenience.  That is what, I would say,

13    these comments, this yo, the Heisman trophy is not

14    independently actionable.  It is completely different than the

15    conduct that they're alleging led to the alleged rape, which

16    was, you know, "Come out to dinner with me."  They're alleging

17    that she was required to come to a conference room for the

18    sexual act where she was performing oral sex on him; that she

19    had to go to dinner with him.  She didn't feel like she could

20    avoid it.  And there was long discussions, you know, sort of at

21    dinner, and she was required to go to the hotel room.  The fact

22    that he went by and said hello is of a completely different

23    nature.

24          Finally, the hard-to-get comment, I understand your

25    Honor has identified that as being something of a similar

M9KQeckO

1    nature.  I just don't agree that that is the case because the

2    hard-to-get comment, if you look at the context of both

3    parties' interactions, is a comment that first was used by

4    Ms. Eckhart calling herself hard to get.  So that was in the

5    context of their relationship the fact they're saying hard to

6    get may have something to do with the underlying relationship

7    but has nothing to do with the fact that just saying "hello"

8    and "yo, why did you go take away from me" is the same as hard

9    to get.  That is taken completely out of context, your Honor.

10   So I think it is significant for you that the *Williams* case is

11   a case that is helpful here.

12           THE COURT:  Thank you all for your advocacy today.

13           Sorry, Mr. Willemin, did you want to say one more

14   thing?

15           MR. WILLEMIN:  Just on the last point.  It says we

16   plead twice that Mr. Henry accused Ms. Eckhart of playing hard

17   to get in paragraph 62 and in paragraph 42, and so that's the

18   pleading.

19           THE COURT:  All right.  Thank you all.

20           Look, these are difficult questions, and I appreciate

21   your advocacy today.

22           What I'd like you to do is if you could order the

23   transcript of today's proceeding as quickly as possible, and I

24   will try and rule promptly.  So thank you and enjoy the day.

25           (Adjourned)