**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

JENNIFER ECKHART,

                    Plaintiffs,

        v.

FOX NEWS NETWORK, LLC and ED HENRY, in his
individual and professional capacities,

                    Defendants.

Case No. 20-CV-5593 (RA) (GWG)

---

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANT ED HENRY

Eden P. Quainton
Quainton Law, PLLC
2 Park Ave., 20th Fl.
New York, New York 10169
Tel: (212) 419-0575
eden.quainton@quaintonlaw.net

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 2

   I.    THE COURT SHOULD ENTER SUMMARY JUDGMENT AGAINST PLAINTIFF ON HER ALLEGATIONS OF SEX TRAFFICKING. ........................................................ 14

     A.   There is No Genuine Issue of Fact that Ed "Enticed" or "Recruited" Jennifer For a "Commercial" Sex Act. ...................................................................................... 15

     B.   There is No Genuine Issue of Fact That Ed Knew He Would Use Fraud or Force to Entice Jennifer. ........................................................................................................ 19

   II.   THE COURT SHOULD ENTER SUMMARY JUDGMENT AGAINST PLAINTIFF ON HER CLAIMS OF "REVENGE PORN" ........................................................................ 21

   III.  THE COURT SHOULD ENTER SUMMARY JUDGMENT AGAINST PLAINTIFF ON HER CLAIMS OF GENDER MOTIVATED VIOLENCE, ASSAULT AND BATTERY 24

   IV.  THE COURT SHOULD ENTER SUMMARY JUDGMENT AGAINST PLAINTIFF ON HER EMPLOYMENT-RELATED CLAIMS. ............................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Aguirre v. Best Care Agency, Inc.*,
   961 F. Supp. 2d 427 (E.D.N.Y. 2013) ................................................................. 15

*Amaker v. Foley*,
   274 F.3d 677 (2d Cir. 2001) ................................................................................ 13

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ..................................................................................... 13, 14

*Ardolf v. Weber*,
   332 F.R.D. 467 (S.D.N.Y. 2019) ......................................................................... 20

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ............................................................................................ 13

*Crawford v. Dep't of Investigation*,
   324 Fed. Appx. 139 (2d Cir.2009) ...................................................................... 14

*D'Amico v. City of N.Y.*,
   132 F.3d 145 (2d Cir.1998) ................................................................................. 14

*David v. Weinstein Co. LLC*,
   431 F. Supp. 3d 290 (S.D.N.Y. 2019) ............................................................ 15, 20

*Done v. HSBC Bank USA*,
   No. 09-CV-4878 JFB ARL, 2010 WL 3824142 (E.D.N.Y. Sept. 23, 2010) ............ 23

*Eckhart v. Fox News Network, LLC*,
   2021 WL 4124616 (S.D.N.Y. Sept. 9, 2021) ................................................... 22,23

*Fujitsu Ltd. v. Fed. Express Corp.*,
   247 F.3d 423 (2d Cir.2001) ................................................................................. 14

*Green v. Mount Sinai Health Sys., Inc.*,
   No. 17-CV-3999 (VEC), 2019 WL 4392691 (S.D.N.Y. Sept. 12, 2019),
     *aff'd*, 826 F. App'x 124 (2d Cir. 2020) ........................................................... 13

*Hughes v. Twenty-First Century Fox, Inc.*,
   304 F. Supp. 3d 429 (S.D.N.Y. 2018) .................................................................. 24

*Marseille v. Mount Sinai Health Sys., Inc.*,
   No. 18-CV-12136 (VEC), 2021 WL 3475620 (S.D.N.Y. Aug. 5, 2021),
     *aff'd sub nom. Marseille v. Mount Sinai Hosp.*,
     No. 21-2140, 2022 WL 14700981 (2d Cir. Oct. 26, 2022) ................................. 13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)..................................................................................................... 14

*Noble v. Weinstein*,
   335 F. Supp. 3d 504 (S.D.N.Y. 2018)................................................................. 15, 18, 19, 20

*Powell v. Merrick Acad. Charter Sch.*,\
   No. 16-CV-5315 (NGG) (RLM), 2018 WL 1135551 (E.D.N.Y. Feb. 28, 2018)..................... 23

*Raskin v. The Wyatt Co.*,
   125 F.3d 55 (2d Cir.1997)........................................................................................... 14

*Scotto v. Almenas*,
   143 F.3d 105 (2d Cir. 1998)......................................................................................... 13

*Shuvalova v. Cunningham*,
   2010 WL 5387770 (N.D. Cal. Dec. 22, 2010). ................................................................ 15

*Sista v. CDC Ixis N. Am., Inc.*,
   445 F.3d 161 (2d Cir. 2006).......................................................................................... 13

*Todd v. United States*,
   2012 WL 2952084 (W.D. Wash. June 26, 2012)........................................................ 19, 20

*United States v. Campbell*,
   111 F. Supp. 3d 340 (W.D.N.Y. 2015) ............................................................................ 18

*United States v. Evans,*
   476 F. 3d 1176 (11th Cir. 2007) ................................................................................... 15

*United States v. Marcus*,
   487 F. Supp. 2d 289 (E.D.N.Y. 2007)
   *rev'd on other grounds*, 538 F. 3d 97 (2d Cir. 2008).................................................... 19

*United States v. Morrison,*
   529 U.S. 598 (2000)................................................................................................... 19

*United States v. Todd*,
   627 F. 3d 329 (9th Cir. 2010) ...................................................................................... 15

*United States v. Walls*,
   784 F. 3d 543 (9th Cir. 2015) ...................................................................................... 15

*Vasquez v. Cnty. of Rockland*,
   No. 13 CIV. 5632 (SLC), 2020 WL 883514 (S.D.N.Y. Feb. 24, 2020) .................................. 14

**Statutes**

18 U.S.C.A. § 1591 .................................................................................................... 19
22 U.S.C. § 7101(b)(1) .............................................................................................. 15
CRL § 52-b ....................................................................................................... 21, 22, 23
CRL § 52-b(1) ............................................................................................................ 21
CRL § 52-b(1)(b) ....................................................................................................... 22
Gender Motivated Violence Act, N.Y.C. Code § 8–904 .......................................... 24
N.Y. Penal Law § 245.15(2) ..................................................................................... 22
N.Y.C. Admin. Code § 8-107(1) ............................................................................... 25
Victims of Trafficking and Violence Protection Act of 2000, 22 U.S.C. § 7107 ................. passim

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................. 13
Fed. R. Civ. P. 56(e) ................................................................................................. 13
Federal Rule of Civil Procedure 56 .......................................................................... 13

## PRELIMINARY STATEMENT

This is a case about sex and "sexting." Sometimes rough, sometimes extreme.  Always consensual. Rape, assault, grooming, trafficking—these words and concepts have nothing to do with this case, and were simply made up years after the events in question by Plaintiff Jennifer Eckhart ("Plaintiff" or "Jennifer")—whether jilted lover, victim of gold-digging plaintiff's lawyers, or ambitious schemer willing to do or say anything to claim a place in the spotlight neither the Court nor Defendant Ed Henry ("Defendant" or "Ed") will likely ever know for sure. The only thing that is clear after four years of litigation, millions of dollars in legal fees, countless hours of deposition and document review, is that Jennifer has no case. There are no facts to support Jennifer's claim that Ed lured Jennifer into sex with promises of fame or fortune, when the record is clear that she was the one inviting explicit sexual advances from Ed, she was the party who eagerly teased, excited, aroused and encouraged Ed, she was she was the person who chased and pursued—all both before and after events she now characterizes as "rape" and "assault." Jennifer is no country ingenu lost in the big city, but a smart, talented, promising television journalist. There is no universe in which the acts she engaged in with gusto and pleasure had some unspoken reserve, were forced on her by some professional superior with the power to make or break her career. Ed had no hierarchical relationship to Jennifer and worked in an entirely different division of Defendant Fox News Network, LLC ("Fox" or "FNN"). Even had he wanted to use the affection he obviously felt for a sharp, attractive woman who could match him in quick sexual repartee, he had no power to do so, and the idea that Jennifer was too silly to think otherwise itself smacks of misogyny. In fact, Jennifer's case is an insult to the "Me Too" movement. There have never been clearer facts of mutually pleasurable sex and sexting between two consenting adults, unpersuasively warped, distorted, twisted beyond recognition.

1

Here, there are no genuine issues of material fact and summary judgment in favor of Ed must be entered so this misguided and damaging case can end.

## STATEMENT OF FACTS

In January 2013, Jennifer Eckhart ("Jennifer") began working as a Freelance Administrative Assistant to Liz Claman. Fourth Amended Complaint in the FNN New York office. *See* Defendant's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("56.1") ¶ 3. From 2015-2018, Jennifer was a researcher/booker for a business show, The Claman Countdown, an on-air show anchored by Liz Claman. *Id.* ¶ 6. Jennifer was a talented woman who rose from her initial position as freelance administrative assistant to that of assistant producer in seven years. *Id*. ¶¶ 4, 8. Liz Claman is an anchor at the Fox Business Network, a division of Fox News Media separate from the division for which Ed worked. *Id.* ¶ 5. Jennifer was terminated by Fox on June 12, 2020, for performance reasons. *Id.* ¶ 8. Issues surrounding Jennifer's performance began in 2018 and continued into 2019 and 2020. *Id.*

Ed was a political commentator with a specialization in covering the White House, which he did for a decade, and national politics generally. *Id.* ¶ 2. Jennifer was subject to the supervision of Brad Hirst, the Executive Producer of the Claman Countdown, Liz Claman's on air show. *Id*. ¶ 6. Mr. Hirst had the sole authority to discipline Jennifer. *Id.* The authority to direct Jennifer's day-to-day activities was shared between Brad Hirst and Alicia Cascardi, the Senior Producer for the Claman Countdown. *Id.* ¶ 7. Ed had no authority to discipline, supervise or direct the activities of Jennifer. *Id.* ¶¶ 6, 7.

The first contact Ed had with Jennifer was on December 18, 2013, when Jennifer, who apparently had been following Ed on Twitter, commented on one of Ed's tweets about the film Anchorman 2. *Id.* ¶ 10. Jennifer initiated the communications with Ed. *Id.* About two hours after Jennifer initiated communication with Ed on Twitter, Ed reached out to Jennifer over email with the comment "Haha nice tweet:)" and Jennifer responded, "Ha! Big fan of yours.…Thanks for

the follow :). *Id.* ¶ 11.[1] According to Jennifer, sometime in 2014, she received a private message from Ed that read "beautiful," to which Jennifer responded telling Ed that she was a fan of his and that it would be an honor to meet him. FAC ¶¶ 37-38. Ed replied by telling Jennifer that he was in New York and inviting her to meet him in the green room, a common area where people congregate before going on air. FAC ¶ 39. Jennifer agreed, and the two had their picture taken. FAC ¶ 40.

The instigator of any flirtation between the parties was Jennifer, not Ed. After taking the photo mentioned above with Jennifer, Ed reached out to her using an email he guessed would be her work email address at Fox Business and asked, "this you?:)" to which Jennifer replies, "Maybe:)"–again adding the smiley face emoji. 56.1 ¶ 15. Only then does Ed answer "hard to get," to which Jennifer replies, "very hard." *Id.* Then, after Ed indicates amusement with a reply that simply says "ha," Jennifer invites him to communicate with her using her personal email address: "Try me here:"                                    *Id*. Later Ed sent Jennifer a link to download the WhatsApp messaging app. *Id.* ¶ 16. About an hour later, Jennifer responded to Ed, "Done. How do I find you?" *Id.*  ¶ 17. Unsolicited, Jennifer included her own personal telephone number along with this question. *Id*.

At some point later in 2014, after Jennifer and Ed's initial flirtation over email, the two had sex. *Id*. ¶ 18. When this sexual encounter occurred, Ed was staying at the Marriott Marquis hotel and met Jennifer for drinks at the hotel bar. *Id*. ¶ 19. Ed invited Jennifer to his room and Jennifer went willingly to Ed's room and had sex with him there. *Id*.  ¶ 20. At no point did Jennifer ever say "no" to sexual intercourse. *Id*.  ¶ 21. Jennifer did not say anything to indicate she was not agreeing to have consensual sex. *Id*. Before Ed and Jennifer had sex, Ed made no statements that he could use any influence – even if he had any, which he did not, *see supra* at 2

---

[1] The textual characters :) correspond to a "smiley face" emoji used to convey happiness, contentment, or agreement. *Id.*

– on behalf of Jennifer in any way. *Id.* ¶ 22. While Jennifer allegedly brought a yellow legal pad with her purportedly to ask career questions of Ed, she never took the legal pad out of her purse. *Id.* In the six years after this encounter, Jennifer did not tell her boyfriend, her close friend, her therapist or anyone else about the encounter until she filed her lawsuit against FNN and Ed in 2020. *Id.* ¶ 23. When Jennifer consulted a therapist, Dr. Oakes in 2017, she did not mention any assault at any time by Ed, whether relating to her 2014 sexual encounter with Ed or otherwise. *Id.* ¶ 24. In fact, when Jennifer met with Dr. Oakes for the first time, in October 2017, her "primary presenting symptoms" were that "she had had a very, very old, close friend recently die and she was experiencing a lot of grief . . . and so, there was some, you know, anxiety that would be anticipated." *Id.* ¶ 25. Jennifer did not so much as hint at any unwanted sexual relations with Ed. *Id.* In her deposition testimony Jennifer makes no allegation that any violence was used in this encounter. *Id.* ¶ 24. Ed's recollection of the incident is that they both had oral sex with each other and then had intercourse and that Jennifer texted Ed afterwards saying that she wanted "more of it." *Id.* ¶ 26. Ed's testimony is consistent with the subsequent exchanges between the parties. *See infra* at 5-11.

After this first alleged sexual encounter, another encounter took place at the Fox News New York offices on September 16, 2015. *Id.* ¶ 27. Before the sexual encounter occurred, Jennifer took off her panties and put them in an envelope for Ed, which she handed to him as he passed by her desk. *Id.* ¶ 28. Jennifer had a meeting at the New York Stock Exchange that day with Liz Claman and went to the meeting without her panties on. *Id.* ¶ 29. After taking off her panties and putting them in an envelope for Ed, Jennifer called a cab so that she and Liz Claman could go to the New York Stock Exchange. *Id.* ¶ 30. While the cab was waiting, Jennifer went up to see Ed in his office and performed oral sex on him. *Id.* ¶ 31. After performing oral sex on Henry, Jennifer went down to the cab with Liz Claman, without going to the bathroom to check on her appearance. *Id.* ¶ 32. When Jennifer got in the cab, Ms. Claman has no recollection that

Jennifer appeared flustered. *Id.* ¶ 33. The only person Jennifer claims to have told about this incident prior to filing her complaint was her then boyfriend Andrew Holt ("Mr. Holt") in 2019, four years later. *Id.* ¶ 34. However, Mr. Holt has no recollection of hearing anything about this incident. *Id.* ¶ 35. At the time Jennifer claims to have told her boyfriend about the alleged assault by Ed, Jennifer had been receiving warnings about her work performance. *Id.* ¶¶ 8, 36. On the day of the sexual encounter with Ed, Jennifer posted a picture on Instagram of her smiling NYSE media entrance badge that she had received "after months of waiting and anticipation" and the hash tags #soproud and #tear. *Id.* ¶ 37. Ed had nothing to do with Jennifer receiving this badge. Jennifer makes no allegation that Ed had any power to influence Jennifer's receipt of a press badge for admission to the NYSE. *Id.* ¶ 38.

Contrary to Jennifer's claim that she was so upset after this interaction that she avoided she avoided Ed, she willingly engaged in sexual banter clearly indicating her pleasure in and desire for oral sex. On October 21, 2015, Jennifer emailed Ed that she had a "top secret server" from which she "had wiped all the dirty pictures with a cloth"—a playful reference to the Hilary Clinton email server scandal. *Id.* ¶ 39. Ed responded to this email by saying "I'd like to wipe you with my tongue." *Id.* ¶ 40. Twenty minutes later, Jennifer sent an email back to Ed saying, "***I bet you would, dirty boy. Come n get it.***" *Id.* ¶ 41. (emphasis added). A few months after Jennifer performed oral sex on Ed and then told him to "come n get it," on January 2, 2016, she sent Ed a playlist of songs, with word "Enj…". *Id.* ¶ 42. In her message accompanying the play list, Jennifer asked Ed, "Think this is long enough?" *Id.* ¶ 43. The playlist of songs has titles such as: "All Eyes on You," *Id.* ¶ 44(a), "Cockiness (Love it When You Eat It)," *Id.* ¶ 44(b), "Coffee (F**ing).ft.Whale," *Id.* ¶ 44(c), ""F**k You All the Time," *Id.* ¶ 44(d), "Into the Morning," *Id.* ¶ 44(e). *See also* Declaration of Ed Henry, dated September 30, 2024, ¶¶ 1-5.

A few months after Jennifer sent Ed her list of playlist songs, in May 2016, a news story broke that Ed was having an affair with a Las Vegas stripper named Natalie Lima. 56.1 ¶ 45. Ed

left Fox for treatment and only returned in September 2016. *Id.* ¶ 46. Not long after Ed's return, in early February 2017, Jennifer sent Ed a series of scantily clad or nude erotic photographs of herself (or someone she presented as herself). *Id.* ¶ 47. The photographs were extremely graphic and included images of a woman's red-polished fingernails parting the lips of a glistening vagina and a woman's almost naked bottom arching backwards away from the center of the frame. *Id.* ¶ 47(c) and (g). Contemporaneously, Ed and Jennifer engaged in consensual sexting revolving around rough sexual activity known as "S&M." *Id.* ¶ 49. Jennifer sent Ed a photograph of a belt, to which Ed replied "mindmeld." *Id.* ¶ 50. Jennifer told Ed she would "always obey and make myself available to u," and added the image of a big red kiss to her message. *Id.* In a separate message, Jennifer told Ed, "You NEED my 26-year-old pussy." *Id.* ¶ 51. Ed responded, "Gentle little whore. Gonna get tossed around like a rag doll," to which Jennifer replied simply, "Love that." *Id.*

On or about February 10, 2017, following Jennifer's highly provocative sexting, which included the erotic photograph of a woman's nearly naked rear end Jennifer sent to Ed on the morning of February 10, *id*. ¶ 52, Ed and Jennifer had another sexual encounter. *Id.* ¶ 48. It is not disputed that this encounter involved the extreme practice of "fisting," the use of handcuffs, a belt with which Ed struck Jennifer on the back, and vaginal intercourse. *Id.* ¶ 53. However, it is also not disputed that when Jennifer refused consent, Ed respected her boundaries. Ed wanted the encounter to include anal intercourse and asked Jennifer if she would consent to anal sex. *Id.* ¶ 54. Jennifer declined Ed's request and Ed respected her wishes. *Id.* After the encounter, Jennifer claims her face was bright red, she had a bloody lip, her wrists were bleeding, but that she walked off shoeless through the hotel lobby holding her high heels in her hands without attracting the attention of anyone. *Id.* ¶ 55.

Jennifer is a well-educated woman. *Id.* ¶ 56. She went to Auburn University from 2008-2010, and to the University of Florida from 2010-2012, graduating with a Bachelor of Science in

telecommunications. *Id.* Yet she did not go to the police after the sexual encounter with Ed, which she alleges was "rape." *Id.* ¶ 57. She did not go to the hospital for the preparation of a "rape kit" to preserve evidence after the sexual encounter she alleges was "rape." *Id.* ¶ 58. Jennifer had her first session with therapist Margaret Oakes on October 3, 2017. *Id.* ¶ 59. Jennifer did not discuss any incident of alleged rape or assault during this initial session or at any time in 2017. *Id.* ¶ 60. Jennifer did not tell her parents about the alleged "rape." *Id.* ¶ 61. Jennifer did not tell her best friend, a woman named          , about the alleged "rape." *Id.* ¶ 62. Jennifer did not tell one of her best friends,                    , about the alleged "rape." *Id.* ¶ 63. Jennifer did not tell any female friends about the February sexual encounter with Ed. until after she filed her complaint more than three years later. *Id.* ¶ 64. Jennifer did not tell anyone at FNN, including anyone at human resources, about the alleged "rape" until she filed her lawsuit more than three years later. *Id.* ¶ 65. In fact, Jennifer did not tell any third party about the alleged "rape" until two years later, when she told her then boyfriend that she had allegedly been assaulted by Ed, without providing any details. *Id.* ¶ 66.

Even more tellingly, immediately after the sexual encounter with Ed in February 2017, Jennifer continued to send Ed more erotic photos of herself and other women. *Id.* ¶ 67. On February 20, 2017, shortly after the alleged "rape," Jennifer sent Ed the following:

   a. A photograph of herself in black lingerie with the tips of the two middle fingers of her left hand inserted into her panties. *Id.* ¶ 68(a).

   b. A photograph of herself lying sideways in her underwear on the bed, breast thrust forward. *Id.* ¶ 68(b).

   c. A photograph of a woman from a side view showing a nearly naked bottom. *Id.* ¶ 68(c).

   d. A photograph of her own fully exposed, slightly parted vagina lathered in soap. *Id.* ¶ 68(d).

On February 21, 2017, Jennifer sent Ed photograph of herself, lying facing down on a bed in lingerie, looking straight at the camera, smiling and kicking her high heels up

behind her. *Id.* ¶ 69. On February 23, 2017, Jennifer sent Ed a selfie of a half-naked

woman in green panties with a green mesh top pulled up to expose her breasts up to the

nipples. *Id.* ¶ 70. On February 25, 2017, Jennifer sent Ed a self of a woman's upper body

with prominent cleavage protruding from a black frilled top. *Id.* ¶ 71. Of the fifteen erotic

photographs Jennifer sent to Ed, Jennifer claims five were not of her, but were of other

women. *Id.* ¶ 72. These five photographs were previously submitted under seal as

Exhibits I, G, M, T and U to the Declaration of Cathy Foti, dated October 19, 2020, Dkt.

85 (the "Foti Decl."). *Id.* ¶ 73. The ten remaining photographs were redacted to obscure

any sexual body parts. *Id.* ¶ 74.

Ed and Jennifer also continued sexting in the weeks after and months after the

alleged rape, with frequent references to rough, consensual sex, with Jennifer often

initiating. *Id.* ¶ 75. Jennifer then made explicit her pleasure with her sexual relationship

with Ed. Valentine's Day in 2017 fell on Tuesday, February 14, 2017. *Id.* ¶ 80. On the

afternoon of February 14, 2017, at 1:07 p.m., Ed wrote to Jennifer, "Again, please," to

which Jennifer responds, "You didn't get enough." *Id.* ¶ 81. Ed responds, "Nowhere

close," to which Jennifer replies, "***Fucking dirty boy. I love it***." *Id.* ¶ 82 (emphasis

added).  At 4:17 p.m., Ed writes to Jennifer, "I bet, you'll cum back for more." *Id.* ¶ 88.

Jennifer responds, "***Want it. Badly.***" *Id.* ¶ 89 (emphasis added). Then, that evening,

February 14, 2017, at 6:05 p.m., Jennifer sends Ed a selfie of herself in a revealing black

top showing the areola of her left breast, with the comment, "***Come do me in the back of***

***this cab***," followed by the image of big red kiss. *Id.* ¶ 90.

In another exchange after the alleged rape, Ed says that they only "met for a quick

drink," to which Jennifer responds, "sore wrists, marks on my ass, a broken nail, bruise

on my leg . . ." and a final comment Jennifer has not preserved, presumably because it

reaffirms her statements that "I love it" and "Want it Badly." *Id.* ¶ 91. In still another

exchange, Ed asked Jennifer if he could use his "fingers." *Id.* ¶ 92. Jenifer responded, "So tight," to which Ed said, "Miss" and Jennifer replied, "Miss more." *Id.*

In 2017, the Conservative Political Action Committee ("CPAC") conference was held in Washington D.C. from February 22-February 25. *Id.* ¶ 93. Before the CPAC conference, Jennifer texted Ed, "***You wanna fuck me at CPAC***?" *Id.* ¶ 94 (emphasis added). Ed responded, "No I mean it's an excuse to get your tight ass to DC." *Id.* ¶ 95. Jennifer replied, "Ha. You NEED my tightness." *Id.* ¶ 96. Jennifer made clear their sexual relationship was unrelated to anything to do with work: "I don't need a work excuse to come see you in DC." *Id.* Ed then stated, "Then get your ass on it," to which Jennifer replied, "I will eventually." *Id.* ¶ 97. Jennifer never went to CPAC to meet Ed that year. *Id.* She thus made clear that she was the one to decide when and if to see Ed, and he could not dictate when they should meet, obviously ignoring his statement, "get your ass on it."

On still another occasion after the alleged rape, Ed texted Jennifer "Gonna make you my little whore again." *Id.* ¶ 98. Jennifer responded, "***Good. Someone needs to take ownership of this pussy***." *Id.* ¶ 99 (emphasis added). Ed stated, "Lame boys don't know how you like to be sucked and f***d." *Id.* ¶ 100. Jennifer responded, "No one can handle me." *Id.* ¶ 101. Ed replied, "Except me; came on your face; and you loved it." *Id.* ¶ 102. Jennifer failed to preserve her response to this comment, *id.* ¶ 103, again no doubt because Jennifer confirmed her previous expressions of pleasure and desire.

After the alleged rape, during which Jennifer declined Ed's request for anal sex, Ed and Jennifer continued sexting for many months. *Id.* ¶ 104. On April 13, 2017, Jennifer sent Ed a provocative photograph of a well-endowed woman in a revealing white bikini thrusting her breasts forward onto the green cushion of a sun- lounger by a pool. *Id.* ¶ 105. Later, Ed refers to another incident in which he and Jennifer engaged in anal

sex. *Id.* ¶ 106. During this sexting exchange Jennifer sent Ed a provocative photograph of her legs with the comment, "***Come meet me***." *Id.* ¶ 107 (emphasis added). Ed responds to Jennifer's request that Ed "come meet" her by saying, "Those leggz." *Id.* ¶ 108. Jennifer continued to invite sexual contact from Ed, saying, "***Come spread them and slide my bikini off***." *Id.* ¶ 109. Ed commented, "U need." *Id.* ¶ 110. Jennifer did not deny Ed's statement, adding, "Maybe it's the daquiri talking." *Id.* ¶ 111. Ed banters in response, "The more impaired the better." *Id.* ¶ 112. Jennifer followed with, "That's how you like me. Weak and submissive." *Id.* ¶ 113. Ed concluded the exchange with a reference to a previous sexual encounter involving anal sex, saying, picking up on Jennifer's previous comment that someone needed to take "ownership" of her "pussy, *see supra* at 9, "owned and submissive. More anal." *Id.* ¶ 114. On yet another occasion, Jennifer sent Ed a message asking Ed to tell her why it would be "worth it" to see him and imploring Ed to "entice me." *Id.* ¶ 115. In response, Ed queries, "Do you like when Daddy eats you out." *Id.* ¶ 116. Jennifer responds, "***So much***." *Id.* Jennifer adds, still prodding Ed to take even more direct action, "But it's going to take more than that. What else" *Id.* ¶ 117. Ed follows with "and when he tastes your ass." *Id.* ¶ 118. Jennifer has not preserved the remainder of this exchange. *Id.* ¶ 118

In addition to the obviously consensual nature of the sexting relationship and its repeated confirmation of the pleasure Jennifer has derived from sex with Ed and her desire for more sexual contact, there is not the slightest indication in any of these messages that Ed is offering anything "commercial" to Jennifer. His comments may be crude, but they relate to sex, not business. Moreover, although Jennifer adopts the role playing of the weak, submissive partner, she makes clear repeatedly that she is in charge of their sexual encounters. On another occasion, Ed and Jennifer arrange to meet for a late-night drink at the Marriott. *Id.* ¶ 120. Ed and Jennifer banter about who is in the

dominant position in the relationship, with Jennifer asking, "I thought I was in charge," and Ed confirming "you are." *Id*.

    For all their provocative sexting, Jennifer and Ed had only limited sexual encounters, even when Jennifer is at her most provocative. On April 13, 2017, Jennifer sent Ed a photo of a busty woman in a revealing white bikini. *Id*. ¶ 123. However, the parties did not engage in sex at that time or in February or March after any of their provocative banter. *Id*.[2] This may be because, at the time of Jennifer's sexting with him, Ed had another sexual partner who stated that she enjoyed S&M of the same kind Ed had engaged in with Jennifer. *Id.* ¶ 124. This woman stated, "I gave you the same type of sexual activity. . .bdsm stuff. That you and her did." *Id.* ¶ 125. In response to this woman's jealousy, Ed "unfollowed" Jennifer on Twitter. *Id.* ¶ 126. At approximately the same time, Ed deleted his "likes" of Jennifer's Instagram photos. *Id.* ¶ 127. This likely triggered Jennifer's anger at being "thrown over" for another woman.

    On August 5, 2017, Jennifer completely broke off her written communications with Ed. *Id.* ¶ 128. Jennifer admitted she deleted direct messages to and from Ed over Twitter after the sexual encounter in February 2017 and that she simply deleted whatever she wanted to delete. *Id.* ¶ 129. Jennifer also deleted "the majority" of her text exchanges through WhatsApp, the parties' primary platform for sexting and Jennifer's communication of erotic photographs of herself and other women. *Id*. ¶ 130-131. To preserve the messages she did not delete, Jennifer used her work iPhone to take a selective set of pictures of messages and photos from her chats with Ed through the WhatsApp platform and then texted these messages and photos to her personal phone. *Id*.

---

[2] The parties dispute whether they had sex after April 2017. Ed maintains they had sex on more time, in the summer of 2017, which Jennifer denies. Ed asserts that his reference to "more anal," *supra* at 10, indicates they had previously had anal sex after the February encounter when Jennifer expressly declined Ed's request.

¶ 132. All the WhatsApp messages preserved for litigation are selectively chosen

photographs of only a portion of Jennifer's communications with Ed. *Id.*[3] Many of these

messages, including most of the ones Jennifer thinks are incriminating, have been cut off

to obscure a final comment by Jennifer expressing pleasure, agreement or desire. *Id.*

Jennifer's implausible account of her sexual experiences with Ed in light of her

own repeated advances to Ed and expressions of pleasure and satisfaction in the

relationship both before and after experiences she recharacterizes as "assault" and "rape"

years after the fact dovetails with the timing of Fox's expression of concerns about her

performance and, in particular, her truthfulness. *Id.* ¶ 8 (issues about Jennifer's

performance began in 2018 and continued into 2019 and 202).

On June 10, 2020, Brad Hirst stated that Jennifer had created a "disaster" through

an "epic fail." *Id.* ¶ 137. Brad also stated on this occasion his concern that Jennifer had

been guilty of plagiarism, writing, "***Plagiarism***, in addition to the inattention, poor

editorial judgement and basic lack of professionalism, all violate the PIP." *Id.* (emphasis

added).[4] On May 29, 2020, Alicia Cascardi underscored concerns about whether Jennifer

had copied from other sources, in manner than varied from "***full plagiarism*** to this kind

of copying where she uses the same sentence structure but changes a word or two." *Id.* ¶

140. Ms. Cascardi also wondered "whether she [Jennifer] was being honest," *Id.* ¶ 141,

"if Jen was telling the truth,"  *Id.* ¶ 143, noting, in a comment that echoes the

fundamental problem with Jennifer's selective presentation of a partial history of a

relationship with a person she is accusing of criminal conduct, "without asking to

---

[3] At the time Jennifer deleted her WhatsApp communications, she believed she had a legal claim
against Ed and she deliberately preserved a select number of messages because she wanted to
"keep a record. *Id*. ¶ 133-34.
[4] A PIP is the acronym for a Performance Improvement Plan. *Id.* ¶ 137.

physically see her emails, we can't 100% know if she is telling truth." *Id.* Jennifer's

looseness with the truth was put in service of her career ambition. Brad Hirst was also

concerned that Jennifer was falsely presenting herself "Fox Business on air talent." *Id.* ¶

144.

## **LEGAL STANDARD**

To succeed on summary judgment, a movant must show that "there is no genuine dispute

as to any material fact and [that she] is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Amaker v. Foley*, 274 F.3d

677, 680-81 (2d Cir. 2001); *Marseille v. Mount Sinai Health Sys., Inc.*, No. 18-CV-12136

(VEC), 2021 WL 3475620, at *3 (S.D.N.Y. Aug. 5, 2021), *aff'd sub nom. Marseille v. Mount*

*Sinai Hosp.*, No. 21-2140, 2022 WL 14700981 (2d Cir. Oct. 26, 2022). Pursuant to Federal Rule

of Civil Procedure 56, summary judgment is warranted if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c). If the moving party meets its initial burden of

demonstrating the absence of a disputed issue of material fact, the burden shifts to the

nonmoving party to present "specific facts showing a genuine issue for trial." Fed. R. Civ. P.

56(e); *see also* G*reen v. Mount Sinai Health Sys., Inc.*, No. 17-CV-3999 (VEC), 2019 WL

4392691, at *2 (S.D.N.Y. Sept. 12, 2019), *aff'd*, 826 F. App'x 124 (2d Cir. 2020) (citing *Sista v.*

*CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). The nonmoving party may not then rely

solely on "conclusory allegations or unsubstantiated speculation" in order to defeat a motion fo

summary judgment. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). If the evidence

favoring the nonmoving party is "merely colorable . . . or is not significantly probative, summary

judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (internal

citations omitted).

While questions of credibility generally go to the jury, this is not always the case. *See Vasquez v. Cnty. of Rockland*, No. 13 CIV. 5632 (SLC), 2020 WL 883514, at *9 (S.D.N.Y. Feb. 24, 2020) (plaintiff's statements alone are an insufficient basis for the Court to conclude that [defendant's] conduct was malicious or sadistic); *Beauvoir v. Falco,* 345 F. Supp. 3d 350, 368 (S.D.N.Y. 2018) (uncorroborated, self-serving testimony is insufficient to defeat summary judgment); *Crawford v. Dep't of Investigation*, 324 Fed. Appx. 139 (2d Cir.2009) (affirming award of summary judgment in favor of defendant, where plaintiff presented testimony from uncorroborated source, as well as "speculation, hearsay and other inadmissible rumor, and conclusory allegations"); *Raskin v. The Wyatt Co.*, 125 F.3d 55 (2d Cir.1997) ("only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment"). As the Supreme Court has said, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby, Inc.*, 477 U.S. at 252. To defeat summary judgment, nonmoving parties "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and they "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir.2001) (internal quotation marks omitted) (internal quotation marks omitted). At the summary judgment stage, a nonmoving party "must offer some ***hard evidence*** showing that its version of the events is not wholly fanciful." *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir.1998) (emphasis added).

## LEGAL ARGUMENT

## I.    THE COURT SHOULD ENTER SUMMARY JUDGMENT AGAINST PLAINTIFF ON HER ALLEGATIONS OF SEX TRAFFICKING.

In enacting the Victims of Trafficking and Violence Protection Act of 2000, 22 U.S.C. § 7107 (the "TVPA"), Congress recognized that human trafficking, particularly of women and

children in the sex industry 'is a modern form of slavery, and it is the largest manifestation of slavery today.'" *United States v. Walls*, 784 F. 3d 543, 548 (9th Cir. 2015) (quoting 22 U.S.C. § 7101(b)(1)); *see also United States v. Todd*, 627 F. 3d 329, 333 (9th Cir. 2010) (Congress was focused on "the traffic in the sexual services of women based on importing women from around the world by force or fraud"). The TVPA "criminalizes and attempts to prevent slavery, involuntary servitude, and human trafficking for commercial gain." *United States v. Evans,* 476 F. 3d 1176, 1179 (11th Cir. 2007). A plaintiff suing under the Act must show that the defendant knowingly and in interstate commerce "(1) recruited, enticed, harbored, transported, provided, obtained, or maintained by any means a person; (2) knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud . . . or any combination of such means will be used; (3) to cause the person to engage in a commercial sex act." *Noble v. Weinstein*, 335 F. Supp. 3d 504, 515 (S.D.N.Y. 2018). There is no genuine issue of material fact as to any of the elements of the TVPA. Specifically, there is no genuine issue that Ed "enticed" or "recruited" Jennifer within the meaning of the TVPA, that he used force, threats of force, or fraud to entice Jennifer, or that any "commercial sex act" was involved.

A.    There is No Genuine Issue of Fact that Ed "Enticed" or "Recruited" Jennifer For a "Commercial" Sex Act.

The core *actus reus* of a TVPA violation is "recruit[ing], entic[ing], harbor[ing], transport[ing], provid[ing], obtain[ing], or maintain[ing]" victims of sex trafficking. *See Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 447 (E.D.N.Y. 2013). Words like "enticed" and "recruited" are not defined in the statute and courts therefore have interpreted these words consistent with their "ordinary meaning." *David v. Weinstein Co. LLC*, 431 F. Supp. 3d 290, 300 (S.D.N.Y. 2019). This alleged enticement or recruitment must ***precede*** the alleged "commercial sex act." *Shuvalova v. Cunningham*, 2010 WL 5387770, at *4 (N.D. Cal. Dec. 22, 2010).

Here, there is no evidence that Ed "enticed" or "recruited" Jennifer in violation of the TVPA. Jennifer alleges three sexual encounters with Ed. In the first sexual encounter, months after their initial communications, Jennifer agreed to meet Ed at his hotel for drinks and, after

15

drinks, accepted Ed's invitation to his hotel room. *See supra at 3*. There, Ed and Jennifer had sex. *Id*. Jennifer does not adduce any evidence that Ed improperly enticed her or that he ever even discussed offering to do anything to advance her career prior to this first sexual encounter. Jennifer claims that she brought a yellow legal pad with her to her first meeting with Ed because she wanted to get career advice, but admits she never took the legal pad out of her purse, so Ed could not possibly have known she intended to use the legal pad. *See supra* at 4. In fact, the only statement Jennifer attributes to Ed during this encounter is a vague, non-specific comment that Ed could get Jennifer in a room with "really powerful people." FAC ¶ 50. That statement, however, came only ***after*** they had sex, and thus, cannot be used to establish "enticement" for purposes of the TVPA. Moreover, at the time of this encounter, Jennifer already was employed by Fox Business, allegedly working herself through the ranks, while Ed was just a correspondent for Fox News. Four years of discovery have not produced any evidence to support an argument that Ed had any authority over Jennifer or any ability to force Fox to affect Jennifer's position. *See supra* at 2.

The second alleged sexual encounter between Jennifer and Ed purportedly took place in the Fox News' New York offices in September 2015. *See supra* at 4. Jennifer has not brought forward any evidence that Ed said anything to her about her career, or that she had any reasonable basis to believe that Ed, who worked in a completely different division at Fox, had any authority over her. The only item of value Jennifer was concerned with on the date she gave Ed oral sex was her new press badge at the New York Stock Exchange. *See supra* at 5. There is no evidence that Ed had any power to procure a press badge or that he offered or was asked to produce such a badge. The parties subsequent exchange in the month after the incident makes clear Jennifer was interest in sex, not something commercial, from Ed. *See supra* at 5 ("***Come n get it, dirty boy***").

The February 2017 encounter is Jennifer's third bite at the TVPA apple, and this too fails

16

in light of the uncontroverted evidence in the record. In her complaint Jennifer concocts a story that Ed promised to put her on his new show, dragged her across the street to his hotel room with the promise they would discuss career opportunities, and when he had her in the room, completely surprised her with violent sex acts. FAC ¶¶ 65-67.

However, the uncontroverted documentary evidence is that ___*Jennifer*___ was the pursuer ___*before*___ there was any mention of Ed's new show, sending Ed a highly provocative playlist of sexually explicit songs she hoped would be "long enough" in early January 2016. *See supra* at 5. In the lead up to the alleged "rape," and before any suggestion that Jennifer was looking for career opportunities or knew of ___*Ed's show, which Jennifer only allegedly learned of the night of the alleged "rape,"*___ Jennifer initiated the S&M theme by sending Ed an image of a belt with the comment, "always obey and make myself available to u," followed by a big red kiss, *supra* at 6; Jennifer made clear she was excited by the prospect of rough, dominating sex with Ed, id. (Jennifer: "You NEED my 26-year-old pussy." Ed: "Gentle little whore. Gonna get tossed around like a lil rag doll." Jennifer: "Love that."); and Jennifer peppered Ed with a series of the most provocative imaginable sexual photographs of herself, including one with her fingers teasing into her panties, and one with her red fingertips playing with her glistening vagina, *id*. Moreover, nothing whatsoever about Jennifer's subsequent conduct lends any credence to the claim that she engaged in rough sex with Ed because he forced her to with promises of career advancement. Jennifer ___*never once*___ mentions this theme in any text, message, or email to Ed.

Instead, she continues bombarding Ed with salacious provocative photographs of herself, including one of her naked vagina lathered in soap, *see supra* at 7, and repeated requests for more sex with Ed, *see supra* at 8 ("fucking dirty boy, I love it"), ("you wanna fuck me at CPAC?"), ("come do me in the back of the cab"); *see supra* at 9 ("Someone needs to take ownership of this pussy"); *see supra* at 10 ("come meet me"), ("Come spread them [my legs] and slide my bikini off"), making clear she is the one making sexual demands, not the other way

around. *See supra* at 10 ("Do you like when Daddy eats you out." "So much." "But it's going to take more than that. What else?" "When Daddy tastes your ass.").

Moreover, although Jennifer suddenly claims that Ed promised to have her on this speculative show as a guest, she, as an assistant producer, and former booker/researcher, knew better than anyone who had power at Fox News to determine guest appearances. Jennifer had spent her entire career booking business guests and then assisting with the production of business shows in an entirely different division from the one where Ed worked. *See supra* at 2. Ed was a well-known political reporter which a specialization in White House coverage and national politics, areas in which Jennifer had no experience. *Id.* At the time of the events at issue, Jennifer was a "researcher/booker" for The Claman Countdown, a business show. *Id*. Jennifer is well-educated woman, *supra* at 6, who rose from the position of freelance administrative to assistant producer in seven years. *Supra* at 2. Presenting her as someone so naïve as to think that she could suddenly become a political commentator when she knew she had no relevant experience, demeans her as a woman.[5]

Jennifer's TVPA claim also cannot advance to trial because she does not provide any evidence of a "commercial sex act." The TVPA defines "commercial sex act' as "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3). As a result of this definition, courts have historically limited the application of the TVPA to economic activity and, in particular, sexual exploitation for profit. *See United States v. Campbell*, 111 F. Supp. 3d 340, 344-46 (W.D.N.Y. 2015) (TVPA was intended to regulate an

---

[5] Jennifer's relationship with Ed is as far from the "casting couch" that reflects "modern reality," *Noble*, 335 F. Supp. 3d at 521 and Note 8, as one can imagine. Jennifer's additional new allegation, nowhere mentioned in her first three tries at a complaint, that Ed offered to introduce her to his agent, does not get Jennifer over the hurdle created by her own prior conduct, her evident willingness to have sex with Ed, her unmistakable pleasure in sexual relations with Ed for their own sake without any suggestion of professional advancement ("I don't need a work excuse to come see you"), and her continued pursuit of Ed even after events she characterizes as "rape." Jennifer's own words and actions establish beyond peradventure that there is no genuine issue of material fact that Ed "enticed" Jennifer.

"economic 'class of activities'"). As such, "commercial sex acts are necessarily economic in nature . . . and distinguishable from laws governing gender-motivated crimes of violence and not involving such economic activity." *Todd v. United States*, 2012 WL 2952084, at *6 (W.D. Wash. June 26, 2012); *see also United States v. Morrison,* 529 U.S. 598, 613 (2000) ("Gender-motivated crimes of violence are not, in any sense of the phrase, economic activity."). To establish a commercial sex act, therefore, a plaintiff must provide evidence that the alleged sex-trafficking victim was "sexually exploited for profit." *See United States v. Marcus*, 487 F. Supp. 2d 289, 307 (E.D.N.Y. 2007) *rev'd on other grounds*, 538 F. 3d 97 (2d Cir. 2008) (wherein the government contended that it is consistent with the statute's purpose to focus inquiry of what is a "commercial sex act" on "whether a given individual has been sexually exploited for profit"). Here, the documentary evidence establishes beyond question that Jennifer voluntarily engaged in sex with Ed for pleasure, not for any economic or commercial motive within the meaning of any of the above cases. *See supra* at 3-11. The alleged commercial motive was only even alleged to have arisen *after* Jennifer made perfectly clear by her actions that she was eagerly pursuing Ed for raunchy sex.

     B.    <u>There is No Genuine Issue of Fact That Ed Knew He Would Use Fraud or Force to Entice Jennifer.</u>

In addition to failing to show that Ed "enticed" Jennifer, Jennifer also fails to show that Ed knew he would use "fraud" or "force," as required under the TVPA. The TVPA requires showing that a defendant receive something of a value "knowing that force, fraud, or coercion . . . will be used to cause the person to engage in a commercial sex act." 18 U.S.C.A. § 1591. This element requires a plaintiff to allege "awareness, at the initial recruitment or enticement stage, that certain prohibited means will be employed to achieve a perverse end goal: a commercial sex act." *Noble*, 335 F. Supp. 3d at 518. This knowledge is commonly pled by showing a defendant's "pattern of behavior" or a "*modus operandi*," such that [the defendant] knew that he had a

pattern of using fraud or force to cause commercial sex acts with victims." *Ardolf v. Weber*, 332 F.R.D. 467, 475 (S.D.N.Y. 2019); *Noble*, 335 F. Supp. 3d at 518. In other words, the plaintiff must show that "if things go as [the defendant] has planned, force, fraud or coercion will be employed to cause his victim to engage in a commercial sex transaction." *Todd*, 627 F.3d at 334. This does *not* mean that if parties engage in S&M sex, then *ipso facto*, prohibited force was used to *cause* the encounter. To show that Ed planned to use force to cause her to engage in an S&M sex act, Jennifer must do more than show that force was used in the act itself. In the *Weinstein* cases, for example, Harvey Weinstein was alleged to have fraudulently coerced women to have sex with him by promising film roles, and "engaged in a pattern of doing the same with other women over decades." *David*, 431 F. Supp. 3d at 301. From this pattern of behavior, the Court could properly infer Harvey Weinstein's intent when engaging in similar practices. For the same reasons that Ed cannot be said to have "enticed" Jennifer, there is no genuine issue of material fact that Ed, ***who was pursued by Jennifer***, knew he would have to use force or deception for sex with Jennifer. *Supra* at 5-11; 18-19.[6]

In an apparent recognition that her original pleadings did not adequately plead a *modus operandi*, the FAC adds allegations concerning various other women, in an attempt to satisfy this element of the TVPA. *See* FAC ¶ 134-81. These allegations are largely fabricated, as evidenced by the fact that a number of the allegations have been publicly repudiated by the women alleged to be involved. *Id.* ¶ 145. Jennifer has no evidence suggesting that other women were coerced into sex with Ed. *See David*, 431 F. Supp. 3d at 301.The woman with whom Ed was most intimate during the period in question admits that she voluntarily engaged in "bdsm" with Ed out of romantic interest in Ed, not because he defrauded her or forced her in anyway. *Id.* ¶ 124-125. Brooke Hammerling, by her own account, said that she "didn't really care" about Ed's moves because he had no ability to influence her career and "felt like swatting him away like a fly."

---

[6] ***Jennifer's suggestion*** that they use a belt during sex cannot be seen as a threat by Ed.

20

FAC ¶ 135. Likewise, the allegations regarding Ms. Marroquin, who also did not work at Fox

News, set forth only that Ms. Marroquin sought out Ed to teach her about the industry, not that

he ever offered her anything of value. *See* FAC ¶ 141.

With respect to two of the four Jane Does, Jennifer alleges only that Ed sent one an

inappropriate picture and exchanged messages with another prior to her working at Fox News

who admits that she had "[n]o real issues" with Ed after she came to work at Fox News. *See* FAC

¶¶ 151, 164. The allegations regarding the other two Jane Does have been publicly repudiated by

the women alleged to be involved. 56.1 ¶ 145. Specifically, Jane Doe 1 never claimed that Ed

forced her into any sexual encounter and actually told Jennifer that any relationship she had with

Ed was entirely consensual. In addition, Jane Doe 1 never told Jennifer that Ed invited Jane Doe

3 to a hotel room but only that Jane Doe 3 and Ed had drinks. *See id*. Cathy Areu, discussed at

length in Jennifer's pleading, *see* FAC ¶ 165-181, has been completed discredited and her

companion action was dismissed with prejudice. 56.1 ¶ 146. Most recently, Jennifer's attorneys

disseminated an obviously absurd claim that Ed had assaulted a woman on a boat, subjecting

themselves to Rule 11 sanctions. *Id.* ¶¶ 147-49. The facts presented undermine the notion that Ed

acted with anything remotely similar to the Weinstein-like *modus operandi* of a media mogul.

## II.     THE COURT SHOULD ENTER SUMMARY JUDGMENT AGAINST PLAINTIFF ON HER CLAIMS OF "REVENGE PORN"

Jennifer alleges that Ed violated CRL § 52-b by filing certain photographs Jennifer sent

to Ed on the public docket. *See* FAC ¶¶ 252-254. The New York Civil Rights Law prohibits

publishing photographs, taken with the expectation that the photographs would remain private, of a

person's "unclothed or exposed intimate parts . . . for the purpose of harassing, annoying or alarming

such person." CRL § 52-b (1). On October 19, 2020, Ed filed fifteen photographs as exhibits to

the Declaration of Catherine Foti and redacted any nudity from the images. *See* Dkt. 85. The

Court rejected Ed's argument that a statutory exception applied and permitted the CRL § 52-b to

proceed, holding that "While Henry redacted (in only the most technical sense) Eckhart's 'exposed' intimate body parts from the pictures, at least one of the images still shows Eckhart's exposed pubic area." *Eckhart v. Fox News Network, LLC*, 2021 WL 4124616, at *24 (S.D.N.Y. Sept. 9, 2021).

However, CRL § 52-b provides that a plaintiff must be the person in the image for there to be a cause of action.  *See* CRL § 52-b(1)(b) ("<u>Any person depicted in a still or video image</u>, . . . shall have a cause of action against an individual who, for the purpose of harassing, annoying or alarming such person, disseminated or published, . . . such still or video image, where such image: . . . (b) depicts an unclothed or exposed intimate part <u>of such person</u>; and (c) was disseminated or published . . . without the consent <u>of such person</u>.") (emphasis added).

Plaintiff's CRL § 52-b claim is based only on the 10 photographs that Plaintiff admits are of her. *See* FAC ¶ 252 (citing ten of the fifteen exhibits at ECF No. 85: Exhibits G, H, J, K, L, N, O, P, R and S). Jennifer testified that she is not depicted in the five other photographs she sent to Ed (Exhibits I, M, Q, T, and U). 56.1 ¶¶ 72, 73. The five images (Exhibits I, M, Q, T, and U) that Jennifer states do not depict her cannot form the basis of a § 52-b claim. These include the photograph the Court relied on in denying Ed's motion to dismiss. The ten pictures that do depict Plaintiff fall outside of the statute because they do not depict "an unclothed or exposed intimate part."

Although CRL § 52-b does not define "intimate part," the criminal law equivalent of this statute defines the term to mean "the naked genitals, pubic area, anus or female nipple of the person."  N.Y. Penal Law § 245.15(2). Nine of the ten photos depict Jennifer posing in lingerie, 56.1 ¶ 74, Quainton Decl. Quainton Decl. **Ex. 21**, **Ex. 24**, **Ex. 25**, **Ex. 30**, **Ex. 31**, **Ex. 32**, **Ex. 33**, **Ex. 34**, **Ex. 35**. (Exhibits G, H, K, L, N, O, P, R, S to the Foti Decl.) and the remaining photo 56.1 ¶ 74, Quainton Decl. **Ex. 23**, (Exhibit J to the Foti Decl.) is a redacted image of Jennifer's breasts. Aside from the fact that the word "unclothed" modifies "intimate part," the nine photos

do not depict Jennifer "unclothed" (let alone an "unclothed…intimate part," as is required under

the statute) because Jennifer is wearing lingerie. Further, 56.1 ¶ 74, Quainton Decl. **Ex. 23**,

(Exhibit J to the Foti Decl.)  does not depict Jennifer's "unclothed or exposed intimate parts"

because the "female nipple of the person" is entirely redacted. Thus, there is no genuine dispute

of fact that the ten images underlying Jennifer's CRL § 52-b claim fall outside of the statute

because they do not "depict[] an unclothed or exposed intimate part" of Jennifer.  Ed is entitled

to judgment as a matter of law.[7]

Moreover, by putting naked photographs of herself at issue, *see, e.g.*, Second Amended

Complaint, Dkt. ¶ 60, and claiming these photographs were evidence of "rape," Jennifer

incorporated by reference into her pleadings other naked photographs that are "integral" to her

allegations. *Powell v. Merrick Acad. Charter Sch.*, No. 16-CV-5315 (NGG) (RLM), 2018 WL

1135551, at *3 (E.D.N.Y. Feb. 28, 2018) (court may consider documents that are "integral" to

the complaint); *Done v. HSBC Bank USA*, No. 09-CV-4878 JFB ARL, 2010 WL 3824142, at *2

(E.D.N.Y. Sept. 23, 2010) (documents of which plaintiff knew and on which he implicitly relied

were "integral" to complaint).

---

[7] Additionally, the Court also said that "reasonable minds could disagree" about whether the photographs were filed "to harass, annoy, or alarm" Plaintiff, but ultimately drew "all reasonable inferences in plaintiff['s] favor" at the motion to dismiss stage and accepted Jennifer's explanation as to why Ed allegedly filed the photos. *Eckhart*, 2021 WL 4124616, at *24. Ed did not file the photographs to harass, annoy, or alarm Jennifer, but rather to defend himself from Jennifer's unfounded allegations. It is now clear beyond doubt that Jennifer has no valid claim against Ed and the photographs were not published for any improper purpose but simply to establish the basic facts in the case, namely, that Jennifer pursued Ed before the alleged "rape" and manifested pleasure and desire for additional sexual relations after the encounter. *See supra* at 6-11. Filing the photographs in this context – when a defendant has been wrongly accused of a crime – is not part of a plan to "harass" or "annoy," but part of a reasonable desire of a wrongly accused defendant to clear his name.

III.    **THE COURT SHOULD ENTER SUMMARY JUDGMENT AGAINST
        PLAINTIFF ON HER CLAIMS OF GENDER MOTIVATED VIOLENCE,
        ASSAULT AND BATTERY**

To sustain a claim for a violation of the Gender Motivated Violence Act, N.Y.C. Code § 8–

904 (the "GMVA"), a plaintiff must present facts to show that "(1) the alleged act constitutes a

misdemeanor or felony against the plaintiff; (2) presenting a serious risk of physical injury; (3)

that was perpetrated because of plaintiff's gender; (4) in part because of animus against plaintiff's

gender; and [5] resulted in injury." *Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d

429, 455 (S.D.N.Y. 2018). There is no genuine issue of material fact surrounding the alleged

rape: the sexual encounter was voluntary, involved S&M role play of which Jennifer knew in

advance and for which Jennifer subsequently expressed pleasure and a desire to repeat the sexual

activity, as had one of Ed's other sexual partners at the time. *See supra* 6-11.

Moreover, Jennifer's complete absence of any contemporaneous confirmation of her

subsequent account, the lack of any admissible supporting evidence that would corroborate her

portrayal of Ed as Weinstein-like "monster," her failure to even mention anything about the

incident to her therapist, her mother, her best friends, the police, the hospital, any representative

of Fox HR or anyone at all until years after the incident when her performance was under review

at FNN, her self-interested and bad faith deletion and obscuring of messages unfavorable to her

narrative, and her history of prevaricating on the job, all combine to thoroughly discredit the

credibility of her conclusory, unsupported allegations. *See Vasquez v. Cnty. of Rockland*, 2020

WL 883514, at *9, *Beauvoir,* 345 F. Supp. 3d at 368; *Crawford*, 324 Fed. Appx. 139; *Raskin v.

The Wyatt Co*., 125 F.3d 55 (2d Cir.1997).

Here, there is no "hard evidence" of any kind to support Jennifer's allegations. *See supra*

at 3-11. Her entire case rests on unsupported conclusory statements contradicted by documentary

evidence in the case.  Moreover, her selective presentation of evidence and her willful

destruction of material evidence, 56.1 ¶¶129, 131, 133, and her concealment of exonerating language within texts that she has produced in discovery while she only selectively quoted from these texts in her pleadings, *id.*, 91, 122, 132, 133, all support summary judgment here. Put simply, outlandish and shocking claims cannot go to the jury without more than uncorroborated statements that are themselves *contradicted* by documentary evidence in the form of photographs and text messages sent or submitted by the plaintiff herself. For the same reasons, Jennifer's assault and battery claims, which all revolve around the same incidents, and are contradicted by the same documentary evidence discussed above, cannot proceed.

## IV.    THE COURT SHOULD ENTER SUMMARY JUDGMENT AGAINST PLAINTIFF ON HER EMPLOYMENT-RELATED CLAIMS.

Judge Abrams found that Ed could be directly liable for participating in creating a hostile work environment under the N.Y.C. Admin. Code § 8-107(1) for sending "lewd" messages to Jennifer. Order, at 22, 31-32. However, Judge Abrams did not have before her a full factual record when she made her ruling on Ed's motion to dismiss. In particular, Judge Abrams did not have the benefit of the actual, two-way, nature of the raunchy exchanges between Jennifer and Ed because of Jennifer's deceptive and, indeed, bad faith pleading that deliberately omitted the portions of her exchanges showing she was a willing participant in the back-and-forth with Ed. On the full factual record before the Court, it is evident that Jennifer and Ed were voluntarily "sexting" and having sex with each other and no claim for creation of a hostile work environment has been made out on such a record.

Respectfully submitted,

*/s/ Eden P. Quainton*
Eden P. Quainton, Esq
Quainton Law, PLLC
2 Park Ave., 20th Fl.
New York, New York 10169
Tel: (212) 419-0575
eden.quainton@quaintonlaw.net

25

*Attorneys for Defendant Ed Henry*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel certifies that on December 9, 2024, the foregoing document, together with the accompanying Rule 56.1 Statement and the Declaration of Eden P. Quainton, dated December 9, 2024, was filed through the CM/ECF system and thereby served electronically on counsel for Plaintiff Jennifer Eckhart and Defendant Fox News Network, LLC.

**QUAINTON LAW, PLLC**

*/s/ Eden Quainton*_____
EDEN P. QUAINTON, ESQ.
2 Park Avenue, 20th Floor
New York, New York 10016
Email: eden.quainton@quaintonlaw.net
*Attorneys for Defendant Matt Couch*

27