**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- X
JENNIFER ECKHART,                                    :
                                                     :
                              Plaintiff,             :    Case No. 1:20-cv-05593 (RA) (GWG)
                                                     :
              v.                                     :
                                                     :
FOX NEWS NETWORK, LLC and ED HENRY,                  :
in his individual and professional capacities,       :
                                                     :
                              Defendants.            :
--------------------------------------------------------------X

**PLAINTIFF'S RESPONSES TO DEFENDANT'S STATEMENT OF UNDISPUTED**
**MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1**

 Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the

Southern District of New York ("Local Civil Rules") and the Individual Rules of this Court,

Plaintiff Jennifer Eckhart ("Ms. Eckhart" or "Plaintiff") submits the following response to the

Statement of Material Facts of Defendant Fox New Network, LLC ("Fox News" or

"Defendants").  All statements admitted herein are admitted without prejudice and solely for the

purpose of responding to Defendant's Statement of Material Facts pursuant to Local Civil Rule

56.1.  All citations to exhibits ("Ex. __") in Plaintiff's responses are to the documents attached to

the Declaration of Michael J. Willemin in opposition to the instant motion ("Willemin Decl.")

submitted herewith, unless otherwise noted, or to Defendants' papers, exhibits or declarations.

## <u>PLAINTIFF JENNIFER ECKHART'S RESPONSES</u>

Pursuant to Local Rule 56.1, defendant FOX NEWS NETWORK LLC ("FNN"),

respectfully submits this statement of material facts as to which they contend there is no genuine

issue to be tried:[1]

## <u>The Parties</u>

**Defendant FNN**

1.    Defendant FNN is a national news network headquartered in New York, New York.
       (Dkt. 157, Judge Abrams Opinion & Order, at 3.)

       **<u>Response to Paragraph 1:</u>**

       Admit.

**Plaintiff Jennifer Eckhart**

2.    Plaintiff Jennifer Eckhart ("Eckhart") is a former employee at FNN who worked in the
       New York City office.  (McKenna Decl. Ex. 1, Deposition Transcript of Jennifer Eckhart
       ("Eckhart Tr."), 23:5-7, 40:2-11, 47:13-16, 53:21-24.)

       **<u>Response to Paragraph 2:</u>**

       Admit.

3.    Eckhart was initially hired by FNN in January 2013 as an administrative assistant to Liz
       Claman, the anchor of Countdown to the Closing Bell ("Countdown"), a show that aired
       on the Fox Business Network.  (Eckhart Tr., 39:20-40:11, 41:8-11; McKenna Decl. Ex. 4,
       Deposition Transcript of Liz Claman ("Claman Tr."), 11:10-21.)

       **<u>Response to Paragraph 3:</u>**

       Admit.

4.    When Eckhart joined FNN, she aspired to be an on-air journalist.  (Eckhart Tr., 40:12-
       15.)

---

[1]    Headings are used in this Statement of Material Facts Solely for organizational purposes
and the convenience of the Court; they are not intended to be, nor should they be construed as,
assertions of fact.

**Response to Paragraph 4:**

Admit.

5.     In June 2015, Eckhart was a production assistant on Countdown.  (McKenna Decl. Ex. 5, Deposition Transcript of Brad Hirst ("Hirst Tr."), 17:19-25, 55:25-56:3; Eckhart Tr., 42:10-43:8.)

**Response to Paragraph 5:**

Admit.

6.     In June 2015, Brad Hirst began working on Countdown as the show's executive producer and as Eckhart's direct supervisor.  (Hirst Tr., 14:19-15:12, 55:25-56:3.)

**Response to Paragraph 6:**

Admit.

7.     In or around December 2015, Hirst promoted Eckhart to be a "researcher/booker" for Countdown.  (Eckhart Tr., 48:9-12; Hirst Tr., 18:7-22.)

**Response to Paragraph 7:**

Admit.

8.     In August 2018, there was an opening for an associate producer on Countdown and Hirst promoted Eckhart to the role.  (Eckhart Tr., 53:5-20; Hirst Tr., 21:10-22:15; McKenna Decl. Ex. 15.)

**Response to Paragraph 8:**

Admit.

9.     Eckhart worked in FNN's New York City office continuously from her time of hire until her employment was terminated on June 12, 2020.  (Eckhart Tr., 23:5-7, 47:13-16, 53:21-24.)

**Response to Paragraph 9:**

Admit.

**Defendant Ed Henry**

10.    Defendant Ed Henry ("Henry") was hired by FNN as an on-air employee in 2011 and was terminated on July 1, 2020.  (McKenna Decl. Ex. 2, Deposition Transcript of Edward

Henry ("Henry Tr."), 51:9-14; McKenna Decl. Ex. 12.)

**Response to Paragraph 10:**

Admit.

11. In 2011, Henry was the "Chief White House Correspondent," based in Washington, D.C. (Henry Tr., 51:9-16.)

**Response to Paragraph 11:**

Admit.

12. In May 2016, FNN learned through a media report that beginning in 2015, Henry had a consensual extramarital affair with a stripper in Las Vegas. (Henry Tr., 134:21-135:3, 135:25-136:7, 314:24-317:5; https://www.intouchweekly.com/posts/ed-henry-affair-mistress-100998/.)

**Response to Paragraph 12:**

Admit.

13. In May 2016, FNN responded to Henry's extramarital affair by suspending Henry and taking him off the air for four months, and then reducing his annual compensation by approximately 30-40% and removing him as Chief White House Correspondent. (Henry Tr., 71:8-74:24, 82:9-23, 139:5-6, 313:13-18, 317:20-318:8, 327:10-328:18, 417:19-23.)

**Response to Paragraph 13:**

Admit.

14. During Henry's time off the air, he attended a treatment program with Dr. Harry Haroutunian and a therapist. (Henry Tr., 136:22-137:23, 139:5-140:2.)

**Response to Paragraph 14:**

Admit.

15. In or around September 2016, Henry returned to work at FNN after Dr. Haroutunian advised FNN that Henry had successfully completed the program and strongly recommended that Henry gradually reintegrate into the workplace with an adjusted work schedule. (Henry Tr., 82:22-23; McKenna Decl. Ex. 7, Deposition Transcript of Kevin Lord ("Lord Tr."), 70:5-10; McKenna Decl. Ex. 16.)

**Response to Paragraph 15:**

Admit.

16.     When Henry returned to work, he believed that his employment could be terminated if
        FNN learned that he was having sexual relations with an FNN employee.  (Henry Tr.,
        417:24-418:7.)

**Response to Paragraph 16:**

Dispute.  Fox News' indifference towards sexual conduct in the workplace or between

colleagues – both consensual and nonconsensual – is prolific and well documented and was well

known by Mr. Henry.  Ex. 12 (Mr. Henry's lawsuit detailing Fox News' history of whitewashing

sexual misconduct, including "a widely known affair between a subordinate and ███████

████████████"); see also ASFM at ¶¶ 413-421.

17.     In December 2019, more than three years after he returned to work, Henry became the
        co-anchor of the show America's Newsroom on the Fox News Channel.  (Henry Tr.,
        82:22-23, 311:7-9, 347:15-17.)

**Response to Paragraph 17:**

Admit.

18.     Throughout his employment at FNN, Henry primarily worked in Washington, D.C., but
        he sometimes traveled to New York City for work purposes.  (Henry Tr., 51:9-16, 69:8-
        12, 171:12-13, 310:25-311:6.)

**Response to Paragraph 18:**

Admit.

**Eckhart's Role as a Producer**

19.     As a producer for *Countdown* on the Fox Business Network, Eckhart had multiple
        responsibilities relating to the preparation for and production and promotion of each
        day's show, including: (i) attending a daily production team editorial meeting at 9:00 a.m.
        to discuss upcoming *Countdown* segments; (ii) creating and circulating a morning
        rundown sheet to be used during the 9:00 a.m. meeting (a "rundown sheet" is a document
        that identifies a show's guest blocks and commercial breaks); (iii) attending a daily
        meeting at 10:00 a.m. with Claman to brief her on that day's show; (iv) making and
        following up on booking requests for guests to appear on *Countdown*; (v) creating in-

depth and thorough "research packets" for Claman to use during the show to assist her with guest interviews; (vi) drafting suggested questions and talking points for Claman to use during guest interviews; (vii) pre-interviewing the show's guests; (viii) being available during the airing of *Countdown* and preparing the "elements" of the show for the broadcast, such as introductions, graphics, hot boards, and banners that would display on-screen; and (ix) posting *Countdown* segments on social media after the show. (Eckhart Tr., 43:9-46:21, 54:4-19, 74:25-75:6, 80:22-25, 339:20-23; Hirst Tr., 35:7-23, 40:14-41:5; Claman Tr., 130:10-17.)

**Response to Paragraph 19:**

Admit that these were some of Ms. Eckhart's responsibilities at various times throughout

her employment as a producer for *Countdown*, but dispute any insinuation that these

responsibilities were hers alone, rather than responsibilities that were shared by the production

team.  Ex. 5 (Eckhart Dep.) at 79:3-80:21.

### Eckhart's Performance in 2017 and Early 2018

20.     On numerous occasions beginning in at least October 2017, Eckhart sent text messages to a co-worker to advise him that she would be late to work and to ask him to do the morning rundown sheet because she was running late.  (Eckhart Tr., 75:8-77:23, 80:3-13, 81:7-10; McKenna Decl. Ex. 17.)

**Response to Paragraph 20:**

Admit.

21.     In December 2017, Eckhart attended an event at which she conducted on-camera interviews; she then wrote an article about the event and edited a video package that she sent to FoxBusiness.com for publication. (McKenna Decl. Ex. 18.)

**Response to Paragraph 21:**

Admit.

22.     Eckhart did not pitch the story to Fox Business or get editorial approval beforehand, and she was instructed that, in the future, she must pitch story ideas in advance for approval. (McKenna Decl. Ex. 18.)

**Response to Paragraph 22:**

Dispute that Ms. Eckhart did not pitch the story to Fox Business or get editorial approval.

McKenna Decl. Ex. 18 at p. FOX 000060; Ex. 5(Eckhart Dep.) at 166:17-167:13.

23.    Footage of Eckhart's on-camera interviews from the December 2017 event is featured in her publicly available "demo reel," which is a compilation of video footage to help Eckhart achieve her on-air aspirations of becoming a TV journalist.  (Eckhart Tr., 55:24-56:7; see https://jennifereckhart.com/reel.)

**Response to Paragraph 23:**

Admit.

24.    In 2018, Eckhart received a performance evaluation from Hirst for her work as a researcher/booker during the period of July 2017 through June 2018.  (Eckhart Tr., 92:8-23; McKenna Decl. Ex. 19.)

**Response to Paragraph 24:**

Admit.

25.    Hirst advised Eckhart in her 2018 performance evaluation that over the next year the Countdown team would depend on Eckhart to carry a heavier load in the show's production.  (Eckhart Tr., 92:8-23; McKenna Decl. Ex. 19 at FOX 000002.)

**Response to Paragraph 25:**

Admit.

26.    Eckhart advised Hirst that her long-term goal was to pursue a position in a reporting capacity and that she was "ready and willing" to apply for any on-camera position.  (Eckhart Tr., 92:8-23; McKenna Decl. Ex. 19 at FOX 000003.)

**Response to Paragraph 26:**

Admit.

27.    Eckhart frequently arrived late to work, which continued after Eckhart was promoted to the role of associate producer.  (Hirst Tr. 44:9-13, 45:5-18, 46:5-17.)

**Response to Paragraph 27:**

Admit that there were days that Ms. Eckhart arrived at work late. Dispute the characterization that Ms. Eckhart was "frequently" late for work, as the use of that term is not supported by objective numbers and Mr. Hirst testified that he did not how many times Ms. Eckhart was late. Ex. 8 (Hirst Dep.) at 46:14-17. Further dispute the statement that Ms. Eckhart's frequent lateness occurred prior to her promotion, as the cited testimony states the opposite.

### Eckhart's March 2018 Warning Regarding Her Consistent Tardiness, and Her Continued Tardiness Thereafter

28.    Between January 3, 2018 and March 16, 2018, Eckhart reported herself as late or absent from work and/or asked her co-worker to do the morning rundown sheet for her at least 15 times. (Eckhart Tr., 77:19-23, 81:7-10; McKenna Decl. Ex. 17, pp. 11-18, 33.)

**Response to Paragraph 28:**

Admit.

29.    On March 16, 2018, Eckhart had a mid-year review with Hirst. (Eckhart Tr., 73:18-74:19; McKenna Decl. Ex. 20.)

**Response to Paragraph 29:**

Admit.

30.    On the day of her March 16, 2018 mid-year review, Eckhart asked her co-worker to complete the morning rundown sheet for her because she needed to feed her cat, Hampton. (Eckhart Tr., 77:19-23; McKenna Decl. Ex. 17 at FOX 002641.)

**Response to Paragraph 30:**

Admit.

31.    During Eckhart's March 16, 2018 mid-year review, Hirst and Eckhart discussed Eckhart's work performance, including her consistent tardiness, failure to complete her social media responsibilities (which were to "Tweet out" from Claman's personal Twitter account the show's segments of the day), and her overall performance. (Eckhart Tr., 73:18-75:6, McKenna Decl. Ex. 20.)

**Response to Paragraph 31:**

Admit.

32. During this review, Hirst also told Eckhart that lateness would not be tolerated and could lead to disciplinary action, that she could be punished for failing to handle social media duties in the future, and that "these two areas of concern could severely hinder her advancement." (Eckhart Tr., 73:18-75:6; McKenna Decl. Ex. 20.)

    **Response to Paragraph 32:**

    Admit.

33. After her March 16, 2018 mid-year review, Eckhart told her co-worker at least 33 more times in 2018 that she was going to be late or absent from work, or otherwise asked him to handle the morning rundown sheet for her. (Eckhart Tr., 77:19-23, 81:7-10; McKenna Decl. Ex. 17, pp. 19-32, 34-36.)

    **Response to Paragraph 33:**

    Admit.

34. The explanations that Eckhart sent to her co-worker for her tardiness in 2018 varied, but she consistently communicated them to her co-worker on the morning she was going to be tardy, and her explanations included: Eckhart not feeling well (McKenna Decl. Ex. 17, pp. 24, 34); train issues (id. at pp. 19, 20, 25, 28, 29, 30, 32, 35); issues with Eckhart's cat (id. at pp. 23, 25); Eckhart going out to breakfast with her mom (id. at p. 22); Eckhart "coming via u-haul to work" because she had been helping her boyfriend settle into his new apartment (id. at p. 27); Eckhart going to bed late the night before (id. at p. 31); Eckhart running back to her apartment because she forgot something (id. at p. 35); and Eckhart dealing with an "emergency" in her apartment building (id. at p. 36). (Eckhart Tr., 77:19-23.)

    **Response to Paragraph 34:**

    Admit.

35. In January 2019, Hirst told Eckhart during a mid-year review discussion that she needed to show up to work on time. (Eckhart Tr., 123:15-124:2; McKenna Decl. Ex. 29.)

    **Response to Paragraph 35:**

    Admit.

36. Eckhart's lateness continued to be a problem in 2019. (Eckhart Tr., 81:20-22.)

**Response to Paragraph 36:**

Admit that there were days that Ms. Eckhart arrived at work late in 2019. Dispute the use of the term "problem," as the cited testimony does not support this characterization.

37. From the beginning of 2019 until early July 2019, Eckhart reported herself as late or absent, or otherwise requested that someone else handle the morning rundown sheet for her, at least 19 times. (Eckhart Tr., 81:20-83:4; McKenna Decl. Ex. 17, pp. 36-43; McKenna Decl. Exs. 21-27.)

**Response to Paragraph 37:**

Admit.

38. On June 6, 2019, Eckhart told Hirst that she would be absent from work that day because she was sick, and Hirst advised Eckhart that she needed to submit a doctor's note to Human Resources because she had already used her allotted sick days for the year. (Eckhart Tr., 94:8-24; McKenna Decl. Ex. 23.)

**Response to Paragraph 38:**

Admit.

**Eckhart's July 2019 "Below Expectations" Performance Review**

39. In early July 2019, Alicia Cascardi, Countdown's senior producer, advised Hirst that Eckhart had been late or absent on every single day that Hirst took off from work so far that year. (McKenna Decl. Ex. 28; Hirst Tr., 16:9-12.)

**Response to Paragraph 39:**

Admit.

40. In July 2019, Eckhart received an evaluation of her performance as an associate producer for the period July 2018 through June 2019. (Eckhart Tr., 108:11-13, 108:24-109:5, 117:16-20; McKenna Decl. Ex. 29.)

**Response to Paragraph 40:**

Admit.

41. In Eckhart's July 2019 performance review, Hirst rated Eckhart's overall performance as "Below Expectations." (Eckhart Tr., 110:5-10; McKenna Decl. Ex. 29 at FOX000004.)

**Response to Paragraph 41:**

Admit.

42. Eckhart's "Below Expectations" rating from Hirst correlated with a numerical rating of 2 out of 5. (Eckhart Tr., 110:5-10; McKenna Decl. Ex. 29.)

**Response to Paragraph 42:**

Admit.

43. In Eckhart's July 2019 performance review, Hirst provided Eckhart with the following feedback: [Eckhart] seems to have great challenges arriving to work on time. She is often late multiple days per week. I have discussed this situation with her multiple times over the last year and a half, including her quarterly review on March 19, 2018, yearly review the first week of July 2018, and again at our mid-year review the third week of January 2019. I warned her that if the behavior continued it would be reflected on her review. It has and it is now. Jen has a different excuse every day, but still can't seem to arrive on time. The lateness and sick calls are morale killers and can not continue. This is her final warning and the next lateness will lead to disciplinary action. (McKenna Decl. Ex. 29; Eckhart Tr., 115:14-116:12.)

**Response to Paragraph 43:**

Admit.

44. After Eckhart's July 2019 performance review, she continued to report that she would be late to work. (Eckhart Tr., 82:8-83:4; McKenna Decl. Ex. 17, pp. 44-53.)

**Response to Paragraph 44:**

Admit.

45. In September 2019, Eckhart sent Hirst an email saying that she was running late to work, and Hirst told Eckhart that "lateness is unacceptable" and that this was her "final warning" regarding her lateness. (Eckhart Tr., 99:6-100:3; McKenna Decl. Ex. 30.)

**Response to Paragraph 45:**

Admit, but dispute the insinuation that this was a "final warning" in the sense that Ms. Eckhart would be terminated if she was late again, as the cited document does not support that interpretation.

46.    After September 2019, Eckhart continued to tell her co-worker that she was going to be late to work for various reasons, including train issues, appointments, and running to "pick up something" for her boyfriend's birthday.  (Eckhart Tr., 82:8-83:4; McKenna Decl. Ex. 17, pp. 47-50.)

**Response to Paragraph 46:**

Admit.

### Eckhart's September 2019 Unauthorized Disclosure of a Proprietary FNN Graphics Package

47.    In September 2019, approximately two weeks before launching a new on-screen graphics package as part of a costly ad campaign, Fox Business conducted rehearsals using the new graphics package.  (Hirst Tr., 94:2-95:23; Eckhart Tr., 100:5-25; McKenna Decl. Ex. 31.)

**Response to Paragraph 47:**

Admit.

48.    During the rehearsals, video footage was taken of Eckhart sitting as an "anchor" on the set of Maria Bartiromo's show, *Mornings with Maria*.  (Eckhart Tr., 100:5-25, 102:16-21; Hirst Tr., 95:15-23; McKenna Decl. Ex. 31.)

**Response to Paragraph 48:**

Admit.

49.    After the rehearsals, Eckhart took video images of herself from FNN's proprietary system and then posted the images on her personal Instagram page.  (Hirst Tr., 94:2-95:23; Eckhart Tr., 100:5-25; McKenna Decl. Ex. 31.)

**Response to Paragraph 49:**

Admit that Ms. Eckhart posted images of herself on her personal Instagram page.

Dispute that that she "took video images of herself from FNN's proprietary system," as that

contention is not supported by the materials cited and any contention that the images themselves

were "proprietary" is a legal conclusion insufficiently supported by the record.

50.    In doing so, Eckhart publicly revealed FNN's costly, proprietary graphics package two weeks before the Company's planned release of that business information.  (Hirst Tr., 94:2-95:23; Eckhart Tr., 100:5-25; McKenna Decl. Ex. 31.)

**Response to Paragraph 50:**

Admit that Ms. Eckhart posted images of herself on her personal Instagram page.

Dispute the contention that the graphics package was "proprietary," as that contention is a legal

conclusion insufficiently supported by the record.

51.    Hirst told Eckhart that posting the graphics package on her Instagram page was a premature reveal of the graphics, and that in doing so she had revealed proprietary information belonging to the network.  (Eckhart Tr., 102:2-8.)

**Response to Paragraph 51:**

Admit.

52.    Hirst viewed Eckhart's conduct to be a very serious infraction.  (Hirst Tr., 95:25-96:3.)

**Response to Paragraph 52:**

Dispute.  Ms. Eckhart was not disciplined in any way in connection with this event.  She

was never told she could not post the images.  Ex. 8 (Hirst Dep.) at 95:7-12.  She was told to take

the images down, did so and was apologetic.  Ex. 5 (Eckhart Dep.) at 101:2-103:16.

53.    Hirst told Eckhart to remove the photo from Instagram immediately because the graphics package had not been revealed to the general public yet.  (Eckhart Tr., 102:13-21.)

**Response to Paragraph 53:**

Admit.

54.    Eckhart removed the photo containing FNN's proprietary graphics from her Instagram page at Hirst's instruction.  (Eckhart Tr., 103:9-16.)

**Response to Paragraph 54:**

Admit.

### Eckhart's 2019 Unauthorized Participation in a Public Event as a "Representative" of FNN

55.    In 2019, Denise Collins, FNN's Senior Vice President of Human Resources, received a complaint from FNN's Media Relations Department about Eckhart.  (McKenna Decl. Ex. 9, Deposition Transcript of Denise Collins ("Collins Tr. I"), 23:21-22; McKenna Decl. Ex. 10, Deposition Transcript of Denise Collins ("Collins Tr. II"), 52:5-14, 55:8-11.)

**Response to Paragraph 55:**

Admit.

56.    The Media Relations Department told Collins that Eckhart had appeared on material promoting an event that listed Eckhart as representing FNN or, at least, gave the impression that Eckhart was representing FNN.  (Collins Tr. II, 52:5-14.)

**Response to Paragraph 56:**

Admit.

57.    Any FNN employee who appears in public and identifies as being "Fox News" requires clearance from Media Relations.  (Collins Tr. II, 52:22-53:3.)

**Response to Paragraph 57:**

Dispute.  Ex. 5 (Eckhart Dep.) at 174:4-186:2.

58.    The Media Relations Department told Collins that the title that Eckhart used on the material was different from her "actual title" that was reflected in FNN's systems.  (Collins Tr. II, 53:8-54:14.)

**Response to Paragraph 58:**

Admit.

59.    The Media Relations Department asked Collins to address these matters with Eckhart.  (Collins Tr. II, 53:8-54:14.)

**Response to Paragraph 59:**

Admit.

60.    Collins counseled Eckhart that she must obtain clearance from Media Relations before appearing as representing FNN (or agreeing to so) and must use her accurate job title, and Eckhart said that she understood.  (Collins Tr. II, 54:24-56:8; *see also* Eckhart Tr., 183:21-185:13.)

**Response to Paragraph 60:**

Admit.

**FNN Decides to Place Eckhart on a Performance Improvement Plan**

61.    Between September 2019 and mid-January 2020, Eckhart reported herself as late or absent from work at least 16 times.  (Eckhart Tr., 81:7-10, 82:8-17; McKenna Decl. Exs. 17, 32, 33.)

**Response to Paragraph 61:**

Admit.

62.    On January 6, 2020, Hirst received an email from Cascardi saying: "there's a point at which I can't do [Eckhart's] work for her. It's becoming a daily thing." (McKenna Decl. Ex. 14.)

**Response to Paragraph 62:**

Admit that the email states this, but the contentions therein are hearsay, not supported by

admissible evidence and, therefore, are disputed.

63.    On January 30, 2020, Hirst received an email from Cascardi about Eckhart's demeanor and work ethic, which Cascardi explained were weighing on the team as whole, had been noticed by Claman, and were leaving Cascardi and Hirst to perform work that Eckhart failed to do herself.  (McKenna Decl. Ex. 34.)

**Response to Paragraph 63:**

Admit that the email states this, but the contentions therein are hearsay, not supported by

admissible evidence and, therefore, are disputed.

64.    Claman told Hirst that she believed Eckhart was more concerned about becoming an on-air journalist than being a producer.  (Claman Tr., 138:3-7.)

**Response to Paragraph 64:**

Admit that the email states this, but the contentions therein are hearsay, not supported by

admissible evidence and, therefore, are disputed.

65.    On February 4, 2020, Hirst received an email from Cascardi identifying concerns involving Eckhart that arose between December 31, 2019 and February 4, 2020, which included Eckhart: (i) repeatedly coming in late or being absent on days when Hirst was off-site or the team was otherwise short-staffed; (ii) raising her voice at Hirst and Cascardi and getting "nasty" with Hirst when he told her to stop making appointments that interfere with the work day; (iii) asking during a broadcast to leave work early because her mom was in town and they were seeing a show; (iv) ignoring a direct request

15

from Hirst and then "giv[ing] attitude about it"; (v) putting up banners in the wrong format and with a spelling error, and then "g[iving] attitude" when told to correct the errors; (vi) being unable to answer questions that Claman asked Eckhart regarding her segments; and (vii) failing to acknowledge emails that provided segment instructions. (McKenna Decl. Ex. 35.)

**Response to Paragraph 65:**

Admit that the email states this, but the contentions therein are hearsay, not supported by

admissible evidence and, therefore, are disputed.

66.    Cascardi also memorialized in her February 4, 2020 email that, during Eckhart's mid-year review on February 3, 2020, Hirst told Eckhart that she was slipping backward and needed to clean up her act.  (McKenna Decl. Ex. 35.)

**Response to Paragraph 66:**

Admit that the email states this, but the contentions therein are hearsay, not supported by

admissible evidence and, therefore, are disputed.

67.    In February 2020, Hirst, Cacardi, and Collins began the process of determining whether Eckhart needed to be placed on a Performance Improvement Plan.  (Hirst Tr., 87:23-88:10.)

**Response to Paragraph 67:**

Admit.

68.    A Performance Improvement Plan ("PIP") is designed to advise an employee of their performance issues and what they need to do to correct those issues, and it provides the employee with a specific amount of time to make such corrections or else possibly face termination of their employment.  (Hirst Tr., 58:25-59:7.)

**Response to Paragraph 68:**

Admit.

69.    Hirst, Cascardi, and Collins met to discuss Eckhart's performance and placing her on a PIP.  (Collins Tr. II., 71:22-72:5, 82:22-83:9.)

**Response to Paragraph 69:**

Admit.

70.     During the meeting, Cascardi provided Collins with notes concerning Eckhart's performance issues.  (Collins Tr. II, 80:10-23, 82:11-16, 83:23-84:10.)

**Response to Paragraph 70:**

Admit.

71.     Collins was aware that Eckhart had received a "2" rating on her 2019 performance review.  (Collins Tr. II, 80:10-23.)

**Response to Paragraph 71:**

Admit.

72.     Hirst and Cascardi advised Collins that they had raised their concerns about Eckhart's performance issues with Eckhart in real time.  (Collins Tr. II, 83:15-17.)

**Response to Paragraph 72:**

Admit.

73.     During the meeting, Collins, Hirst, and Cascardi discussed placing Eckhart on a PIP. (Collins Tr. II, 71:22-72:5; Hirst Tr., 87:23-88:10.)

**Response to Paragraph 73:**

Admit.

**Eckhart's Misappropriation of Company Resources**

74.     On February 7, 2020, after Collins, Hirst, and Cascardi met to discuss Eckhart's performance, Hirst learned that Eckhart had used Fox Business resources without approval to book a camera crew, get her hair and makeup done, conduct on-camera "stand-up" and "red carpet" interviews at an American Heart Association "Go Red for Women" charity event (the "Go Red event"), and then compile and use the footage to edit a package.  (Eckhart Tr., 137:10-14; Claman Tr., 123:16-20; Hirst Tr., 110:7-16, 112:11-15, 115:9-12, 117:22-118:14; McKenna Decl. Ex. 38.)

**Response to Paragraph 74:**

Dispute.  Ms. Eckhart's use of Fox News resources was not without approval.  Ex. 5

(Eckhart Dep.) at 137:7-140:6, 166:25-168:3.

75.     Later that same day, Hirst advised Collins that he had just discovered information concerning Eckhart's use of company resources without his approval.  (McKenna Decl. Ex. 38.)

**Response to Paragraph 75:**

Admit.

76.     Eckhart had booked a camera man and requested a "Fox Business mic flag" and camera light to shoot footage at the Go Red event.  (McKenna Decl. Exs. 39, 40; Eckhart Tr., 141:16-144:20.)

**Response to Paragraph 76:**

Admit.

77.     Eckhart knew that the Fox Business Network was paying for the camera man she had booked.  (Eckhart Tr., 146:4-15.)

**Response to Paragraph 77:**

Admit.

78.     Hirst determined that Eckhart had charged the cost of the camera man and editing work to the *Countdown* budget, without his approval.  (Hirst Tr., 115:9-12, 117:22-118:14, 120:4-8.)

**Response to Paragraph 78:**

Admit.

79.     Hirst is the only person on the *Countdown* team with the authority to approve charges to the show's budget for the funding of a camera crew.  (Hirst Tr., 118:10-119:15.)

**Response to Paragraph 79:**

Dispute.  Ex. 5 (Eckhart Dep.) at 137:7-140:6, 166:25-168:3.

80.     Eckhart did not discuss with Hirst that she wanted to book a camera crew for the Go Red event.  (Eckhart Tr., 146:16-19.)

**Response to Paragraph 80:**

Admit.

81.   After Eckhart attended the Go Red event, she had an editor at Fox News Channel edit the footage that she took at the event.  (McKenna Decl. Ex. 41; Eckhart Tr., 149:23-150:13.)

**Response to Paragraph 81:**

Admit.

82.   Hirst is the only person on the *Countdown* team with the authority to approve charges to the show's budget for the editing of a package.  (Hirst Tr., 118:10-119:15.)

**Response to Paragraph 82:**

Dispute.  Ex. 5 (Eckhart Dep.) at 137:7-140:6, 166:25-168:3.

83.   Eckhart did not ask Hirst if she could use the services of an FNN editor to edit the footage that she took at the Go Red event.  (Eckhart Tr., 150:14-24.)

**Response to Paragraph 83:**

Admit.

84.   After Eckhart had an FNN editor edit the footage, she wrote an article about the Go Red event and submitted it for publication on FoxBusiness.com, but FoxBusiness.com did not accept the article.  (Eckhart Tr., 154:4-12.)

**Response to Paragraph 84:**

Admit.

85.   After Fox Business declined her Go Red event article, Eckhart approached Fox Entertainment, and they posted her article.  (Eckhart Tr., 155:8-13.)

**Response to Paragraph 85:**

Admit.

86.   Collins told Hirst that Eckhart's use of company resources without obtaining approval from Hirst was completely unacceptable.  (McKenna Decl. Ex. 38.)

**Response to Paragraph 86:**

Admit.

87.   Hirst believed that Eckhart booked a camera crew to film her at the Go Red event so that she could use the video footage in her personal demo reel to achieve her goal of becoming on-air talent.  (Hirst Tr., 110:14-23, 112:11-20.)

**Response to Paragraph 87:**

Dispute.  Ex. 5 (Eckhart Dep.) at 137:7-140:6, 166:25-168:3.

88.    Eckhart used her Go Red event video package in her personal demo reel.  (Eckhart Tr., 55:24-56:7, 157:3-6; https://jennifereckhart.com/reel.)

**Response to Paragraph 88:**

Admit.

89.    Eckhart shared five different posts on Instagram with images of her interviewing celebrities at the Go Red event, during which she was holding a "Fox Business" microphone and appearing with the label "Jennifer Eckhart, Fox Business."  (Eckhart Tr., 155:14-156:18; McKenna Decl. Ex. 42.)

**Response to Paragraph 89:**

Admit.

**Eckhart's February 10, 2020 Meeting with Hirst and Collins**

90.    Hirst and Collins met with Eckhart on February 10, 2020 to discuss the Go Red event and a PIP.  (Eckhart Tr., 159:14-161:15, 170:13-171:13; McKenna Decl. Ex. 43.)

**Response to Paragraph 90:**

Admit.

91.    During the meeting, Hirst told Eckhart that she did not follow the proper protocol when booking a camera crew for the Go Red event, and Eckhart apologized.  Hirst and Collins then told Eckhart that they were going to deliberate and think about putting her on a PIP.  (Eckhart Tr., 160:13-23; 163:25-164:9.)

**Response to Paragraph 91:**

Admit.

92.    After Hirst and Collins told Eckhart that they were considering placing her on a PIP, Eckhart said that she was working in a "toxic environment" under FNN management.  (Eckhart Tr., 161:2-6.)

**Response to Paragraph 92:**

Admit.

93.    Eckhart complained about frequent screaming, daily cursing, feeling "ganged up on" by jealous "mean girls" on staff, and feeling bullied – referring to purported conduct by female colleagues on *Countdown*, all of whom Eckhart identified by name to Collins and Hirst during the meeting.  (Eckhart Tr., 102:16-17, 170:5-171:13, 185:19-187:2, 188:17-189:9, 191:2-21; McKenna Decl. Ex. 43.)

**Response to Paragraph 93:**

Admit.

94.    In raising these concerns, Eckhart used the phrase "hostile work environment," which she understood to "go hand in hand" with a "toxic" work environment.  (Eckhart Tr., 195:12-25.)

**Response to Paragraph 94:**

Admit.

95.    Eckhart did not tell Collins or Hirst anything about sexual harassment or Henry during the February 10, 2020 meeting.  (Eckhart Tr., 194:18-195:11, 196:20-197:7, 202:20-203:6.)

**Response to Paragraph 95:**

Dispute.  The cited testimony establishes, and Ms. Eckhart admits, that she did not use

the term sexual harassment or name Ed Henry.  However, Ms. Eckart's references to, *inter alia*,

a hostile work environment, did relate to sexual harassment and Ms. Collins would have

understood them as such.  Ex. 61 (Eckhart Decl.) at 2; ASMF ¶¶361-365.

96.    After the February 10, 2020 meeting, Eckhart made notes memorializing the meeting, which she produced in discovery, in which she wrote: "In addition to the emotional and verbal abuse that goes on, I have not yet mentioned the sexual harassment that goes on at every level in this building that I've experienced first-hand on office property." (Eckhart Tr., 170:13-171:13, 194:18-24; McKenna Decl. Ex. 43.)

**Response to Paragraph 96:**

Admit.

**FNN Places Eckhart on a Performance Improvement Plan**

97.    After the February 10, 2020 meeting, there were some delays in placing Eckhart on the PIP because planning for the COVID-19 pandemic was "all consuming" for Collins. (Collins Tr. II, 73:19-74:5.)

**Response to Paragraph 97:**

Admit.

98. After the February 10, 2020 meeting, Hirst received emails from Cascardi concerning Eckhart's performance, including emails reflecting that Eckhart arrived late to work on February 12, 14, 18 and 19, 2020; spent the entire time during multiple team meetings on her phone; and failed to timely and accurately complete assignments. (McKenna Decl. Exs. 44, 45.)

**Response to Paragraph 98:**

Admit.

99. Collins and Hirst created a PIP for Eckhart. (McKenna Decl. Ex. 13.)

**Response to Paragraph 99:**

Admit.

100. Between February 10, 2020 and March 5, 2020, Eckhart had several incidents of lateness, absences, and unprofessional behavior that demonstrated to Hirst that his February discussion with Eckhart "clearly didn't have a major impact." (McKenna Decl. Ex. 13.)

**Response to Paragraph 100:**

Admit that the email states this, but the contentions therein are hearsay, not supported by

admissible evidence and, therefore, are disputed.

101. On March 6, 2020, Eckhart was placed on a PIP. (Eckhart Tr., 203:22-205:2; McKenna Decl. Exs. 46, 47.)

**Response to Paragraph 101:**

Admit.

102. Hirst gave Eckhart a copy of the PIP. (Eckhart Tr., 204:23-205:2; McKenna Decl. Ex. 47.)

**Response to Paragraph 102:**

Admit.

103.   The purpose of the PIP was to address serious concerns regarding Eckhart's performance and outline the specific criteria she needed to meet to improve her job performance, workplace behaviors, and communication style to an acceptable level; Hirst specifically identified "professionalism" and "reliability" as being among Eckhart's performance issues.  (McKenna Decl. Exs. 46, 47.)

**Response to Paragraph 103:**

Dispute.  The purpose of the PIP was to retaliate against Ms. Eckhart for engaging in

protected activity.  ASMF ¶¶361-365.

104.   Hirst provided Eckhart with numerous "Deliverables" in the PIP:

- Arriving to work on time each day by 8:45am ET and completing the morning rundown sheet.
- Complying with all professional and ethical journalistic standards.
- Producing all editorial materials accurately and on deadline.
- Completing booking assignments in a timely fashion, including weeknights and weekends.
- Paying attention and taking copious notes in all meetings.
- Actively participating in production of the broadcast in the control room.
- Treating colleagues in a professional and courteous manner.
- Requesting approval for any appointments that could impact standard work hours at least two weeks in advance.
- Requesting vacation time at least two weeks in advance.

(McKenna Decl. Exs. 46, 47.)

**Response to Paragraph 104:**

Admit that the PIP contains the statements cited.

105.   Hirst advised Eckhart in the PIP that she was not currently meeting expectations in her job performance and needed to "immediately improve" her job performance in order to meet the minimum requirements for her position as an Associate Producer.  (McKenna Decl. Exs. 46, 47.)

**Response to Paragraph 105:**

Admit that the PIP contains the statements cited.

106.   Hirst further advised Eckhart in the PIP: "If you fail to satisfactorily complete any assignment or meet any expectation of the Plan, during or after the Plan period, you will be subject to further performance management or disciplinary action, up to and including

the immediate termination of your employment without any further warning or notice to you."  (McKenna Decl. Ex. 47.)

**Response to Paragraph 106:**

Admit that the PIP contains the statements cited.

107.  Eckhart signed the PIP in acknowledgement that she had been presented with the document and understood that she must improve her performance.  (Eckhart Tr., 204:25-205:2; McKenna Decl. Ex. 47.)

**Response to Paragraph 107:**

Admit that Ms. Eckhart signed the PIP in acknowledgement that she had been presented with the document.  Dispute the contention that the signature constituted an acknowledgment that Ms. Eckhart needed to improve her performance.  McKenna Decl. Ex 47 at FOX 003285 ("I acknowledge that I have been provided with a copy of this Plan for my records, and that my signature below is an acknowledgment of the delivery of the Plan, not my agreement with the Plan.").

### Eckhart's Continued Performance Issues After Being Placed on the Performance Improvement Plan

108.  After Eckhart was placed on the PIP, Hirst received weekly reports from Cascardi concerning Eckhart's work.  (Hirst Tr., 89:23-90:3; McKenna Decl. Exs. 48-55.)

**Response to Paragraph 108:**

Admit.

109.  Hirst received a summary of Eckhart's performance for the week of March 23, 2020, which reflected that Eckhart had not completed the morning rundown sheet at all since she began working from home and she had stopped sending the sheet "months ago." (McKenna Decl. Ex. 49.)

**Response to Paragraph 109:**

Admit that the email states this, but the contentions therein are hearsay, not supported by admissible evidence and, therefore, are disputed.

110.    After Hirst received a summary of Eckhart's performance throughout the week of April 13, 2020, which reflected that:

- For several days, Eckhart was unresponsive to multiple emails from a fairly high-profile potential *Countdown* guest.

- On April 13, Eckhart sent Cascardi a pitch for a medical-related guest who claimed to have a treatment for the Coronavirus. However, Eckhart presented her pitch without having done "due diligence" such as asking if the company had FDA approvals or where the company was in testing.  After Cascardi asked Eckhart for more information about the guest, they learned that the company had no regulatory approvals in the United States. Cascardi felt that this pointed to Eckhart's lack of editorial knowledge on the subject matters covered at both Fox Business Network and Fox News Channel.

- On April 16, Eckhart was unresponsive to an email assignment from Cascardi and to an email that Cascardi had sent to Eckhart copying a *Countdown* guest.

- Also on April 16, after Cascardi requested that all producers be online on Slack during *Countdown* broadcasts for ease of communication, Eckhart was not online during that day's show, which was part of a "pattern" of Eckhart's conduct.

    (McKenna Decl. Ex. 50.)

**Response to Paragraph 110:**

Admit that the email states this, but the contentions therein are hearsay, not supported by

admissible evidence and, therefore, are disputed.

111.    On April 23, 2020, Eckhart made what Hirst viewed to be a "major editorial mistake," in which she failed to include a guest's name in the introduction script for her segment. (McKenna Decl. Ex. 56.)

**Response to Paragraph 111:**

Admit that Ms. Eckhart did not include the guest name in the introduction script for her

segment.  Dispute the contention that this was a "major editorial mistake" or that Hirst viewed it

as such.  Ex. 5 (Eckhart Dep.) at 209:10-210:25.

112.    On Hirst received a summary of Eckhart's performance throughout the week of April 27, 2020, which reflected that:

- For weeks, Eckhart had not completed the morning rundown sheet before the 9:00 a.m. meeting, and on April 27 Hirst had to remind Eckhart that she was responsible for sending out the sheet.

- On April 28, Eckhart's work product reflected that she had not been listening to prior instruction and displayed a "very clear lack of editorial understanding and journalistic standards."

- On April 29, Eckhart had to ask a colleague where to find certain information that was emailed to the team at least daily; Eckhart also should have known where to find the information because she had performed the same task for past show segments.

- Also on April 29, during the live *Countdown* broadcast, Hirst requested that Eckhart "cut a SOT" (a sound bite), which was a task that Eckhart could have performed herself.  Instead, however, Eckhart sent the task to an editing team and then failed to follow up on her request. As a result, the SOT missed its airtime.  Rather than take responsibility for the delay, Eckhart placed the blame on the editing team.

- On April 30, there were multiple grammatical and formatting issues in Eckhart's on-screen graphics, and Cascardi had to correct them all, including some recurring errors that Cascardi had already discussed with Eckhart.

- Also on or around April 30, Eckhart failed to follow up with a CEO who was a potential guest on *Countdown*.

(McKenna Decl. Ex. 55; Eckhart Tr., 47:4-6.)

**Response to Paragraph 112:**

Admit that the email states this, but the contentions therein are hearsay, not supported by admissible evidence and, therefore, are disputed.

113.    Hirst received a summary of Eckhart's performance throughout the week of May 4, 2020, which reflected that:

- On May 4, Eckhart's guest was "MIA" during the show.  Eckhart did not respond to team communications about the issue and only became involved after the situation was settled, when she asked the

26

guest to tweet out his appearance; this was a task that Eckhart was asked to do hours before. This followed an incident the prior week when Eckhart was found doing personal tasks during the live show instead of paying attention to her emails or helping with urgent needs for the live broadcast.

- On May 5 during the team's morning meeting, Claman asked questions about Eckhart's segment, but Eckhart stayed silent.

- On May 6, Eckhart was assigned to prepare a segment that was scheduled to air during the 3:00 p.m. broadcast. At 2:40 pm, Eckhart asked Cascardi questions about the segment, even though the information that Eckhart asked about had been covered on Countdown the day before and had been referenced in multiple articles. Cascardi accordingly was concerned that Eckhart was not doing the appropriate background work for her segments and was doing such work much too late in the day.

- On May 7, Eckhart was unresponsive to multiple emails from the public relations representative for her assigned guest.

- At some point prior to May 8, Claman asked Eckhart to book a segment with the CEO of Reynolds Consumer Products because their Hefty-brand garbage bags "were supposedly being worn by nurses in NYC who didn't have proper gowns & PPE" during COVID-19. But rather than book the CEO of Reynolds Consumer Products, Eckhart instead booked the CEO of Reynolds American – a tobacco company.

(McKenna Decl. Ex. 52.)

**Response to Paragraph 113:**

Admit that the email states this, but the contentions therein are hearsay, not supported by

admissible evidence and, therefore, are disputed.

114. Hirst received a summary of Eckhart's performance throughout the week of May 11, 2020, which reflected that:

- On May 11, Claman complained to Cascardi about Eckhart's packets and about how interview questions that Eckhart drafted made no sense and did not flow in a natural way to help keep interviews going.

- On May 13, multiple Countdown team members – including Claman – were shocked, insulted, and taken aback by Eckhart's behavior during the 10:00 a.m. team meeting when Eckhart insulted another show segment.

- On May 14, Eckhart repeated a previous mistake that Cascardi had already corrected and informed her about. Rather than accept her mistake, Eckhart blamed another co-worker.

- Also on May 14, Eckhart replied to a request from Cascardi and Ambrosi to conduct follow-up calls with companies that the show sought to book as guests by sending the exact same notes that she had provided three weeks prior, which demonstrated that Eckhart had not followed up with the companies assigned to her.

(McKenna Decl. Ex. 53.)

**Response to Paragraph 114:**

Admit that the email states this, but the contentions therein are hearsay, not supported by admissible evidence and, therefore, are disputed.

115. The summary that Hirst received of Eckhart's performance throughout the week of May 11, 2020 also included the following summary by Cascardi:

> [Eckhart's] performance this week dwindled further and her disrespectful attitude was put on display with a vengeance. She blamed coworkers (including her [Executive Producer] [Hirst]) for two errors this week and took no responsibility of her own in either situation. She has shown an increasing lack of respect for her managers, anchor and the other staff members. She continues to come into our 10am meeting unprepared on her guests and unable to present anything regarding her segments or why the guest is on the show. She also puts in the most bare minimum effort possible on her segments and they are still being completed with errors and editorial inaccuracies, leaving others to fix her mistakes. She continues to leave her Senior Producer in particular, to deal with extra work due to her lack of attention and care to her basic job duties. She has failed to correct patterns of behavior and actions that were outlined in her PIP. And her overall pattern of "improving" for short periods (a week or two max) after being confronted about her various issues has also persisted. After those short periods of acting more "professionally," she reverts back to her usual self and the whole cycle is kicked off again. It's clear she has no desire to be on this team or show. She doesn't respect [Hirst] or [Cascardi] or any

28

of her teammates, including [Claman]. Her patterns of deceit and
dishonesty have continued as well. And the institution of a PIP has
still yet to make a dent when it comes to her poor performance.

(McKenna Decl. Ex. 53.)

**Response to Paragraph 115:**

Admit that the email states this, but the contentions therein are hearsay, not supported by

admissible evidence and, therefore, are disputed.

116.    The Hirst received a summary of Eckhart's performance throughout the weeks of May 18
and May 25, 2020, which reflected that:

- On May 18, the "biggest story of the day in market" was Moderna
  advancing to human trials for the COVID-19 vaccine.  Countdown
  was hosting the CEO of Veeva, a software company that aids in
  vaccine and drug trials and whose client is Moderna.  The Veeva
  CEO was Eckhart's assigned guest for the day.  Eckhart's research
  packet and introductory script for Claman did not state that
  Moderna was Veeva's client, and Claman only became aware of
  this information because Claman happened to ask the guest
  directly before air if they had any connection to Moderna.
  Eckhart's error was most concerning because Veeva had provided
  information through its public relations team that Moderna was its
  client, and pre-interview and in-depth research fall under the direct
  responsibilities of segment producers.

- On May 19, Claman requested that Eckhart no longer be
  responsible for producing any high-profile guests, given her lack of
  effort and attention to her segments.

- On May 20, Eckhart was assigned the "Countdown Closer"
  segment, which is viewed as the "easiest segment of the show"
  because it requires little research and is a short segment with less
  production needed.  Claman felt that this was both "a demotion in
  duties" and "a last chance" for Eckhart on the team.  Cascardi felt
  that if Eckhart was unable to consistently produce this segment or
  made editorial mistakes, then there would "literally be nothing left
  to assign her to do."  Eckhart "had no ideas of her own" for the
  segment and "couldn't get her pitch across without help from
  others."

- On May 22, when Eckhart pitched an audio recording known as a
  SOT that had not made it to air the day before, Eckhart commented

to Claman that it was a "snooze-fest."  Claman questioned why they would air the SOT "if it's boring," and Eckhart responded, "well it's already cut," with no further justification for her pitch.

- Also on May 22, the team learned that Eckhart posted on Instagram a picture of herself from a Fox Business rehearsal set, which could give the impression Eckhart was on-air talent.  The image depicted Eckhart on set and displayed "Fox Business" branding.

- On May 26, Eckhart "lightly plagiarized her intro from the New York Times" by changing a word or two in the copy but using essentially the same sentence structure.  Cascardi stated that this conduct was part of "a pattern" that varied "from full plagiarism to this kind of copying where she uses same sentence structure but changes a word or two."

- On May 27, Eckhart was assigned a guest whom she had produced twice before, including in the previous month.  Despite this previous work, Eckhart could not recall anything about the guest.  At the 10:00 a.m. team meeting, Eckhart still could not "present her guest" and read from her research packet from the month before.  Claman noticed that Eckhart was "clearly reading off [an] old packet" and messaged Cascardi on Slack to complain about Eckhart's "inability to present her segment (again)."

(McKenna Decl. Ex. 54 at FOX 001966-71.)

**Response to Paragraph 116:**

Admit that the email states this, but the contentions therein are hearsay, not supported by admissible evidence and, therefore, are disputed.

117.  On May 29, 2020, Hirst received an email from Cascardi with detailed reports of Eckhart's performance for every business day from May 18 through May 29, 2020, and a summary of the immediately preceding week which stated:

> [Eckhart] had another uneven week which included multiple errors and a lack of preparedness for her segments. Things have escalated to the point that [Claman] continues to ask for [Eckhart] not to be put on any high-profile guest segments. [Eckhart] continues to cause extra work for those around her due to her lack of preparedness and consideration for her basic job duties. Well past her 60-day probation period, [Eckhart] has yet to correct many of the issues singled out in her PIP. Her inability to fix these issues on a

30

permanent basis continues to weigh on the show and the team, with her Senior Producer and Executive Producer bearing much of the brunt.

(McKenna Decl. Ex. 54 at FOX001966.)

**Response to Paragraph 117:**

Admit that the email states this, but the contentions therein are hearsay, not supported by admissible evidence and, therefore, are disputed.

118.    The following week, on June 4, 2020, Hirst forwarded Cascardi's last two weekly reports to Collins and advised Collins that things were "not getting better" and were in fact "getting worse." Hirst also told Collins that Claman had lost confidence in Eckhart's ability to produce segments after several major editorial mistakes. (McKenna Decl. Ex. 57.)

**Response to Paragraph 118:**

Admit that the email states this, but the contentions therein are hearsay, not supported by admissible evidence and, therefore, are disputed.

119.    By June 4, 2020, Hirst believed that Eckhart "had not lived up to" her PIP, that the situation was "coming to a head," and that something needed to be done. (McKenna Decl. Ex. 57.)

**Response to Paragraph 119:**

Admit that the email states this, but dispute the contention that Hirst genuinely believed that Ms. Eckhart had failed to live up to her PIP or that her subsequent termination was the result of such purported failure (or any other non-retaliatory reason). ASMF at ¶¶358-359, 523-530 (outlining Ms. Eckhart's consistently positive performance), ¶¶361-370 (evidencing that Ms. Eckhart was terminated in retaliation for engaging in protected activity).

120.    On June 10, 2020, Hirst advised Collins of what he viewed to be an "epic fail" by Eckhart in her assigned segment. During the previous day's 10:00 a.m. team meeting, Claman recited word-for-word what she wanted Eckhart's segment to be about, but when Eckhart sent Hirst her packet, the script did not contain anything that Claman had requested. Apart from not paying attention in the meeting, Eckhart had essentially

"lifted" content in her packet word-for-word from the guest's market notes, which Hirst told Eckhart was completely unacceptable.  (McKenna Decl. Ex. 54 at FOX001961.)

**Response to Paragraph 120:**

Dispute.  Ex. 5 (Eckhart Dep.) at 215:5-217:24.

121.    Hirst emailed Collins that Eckhart's "epic fail" was just the latest example of the problems that they had been discussing for several months, and that Eckhart's inattention, poor editorial judgment, and basic lack of professionalism all demonstrated that she had failed to achieve the objectives set forth in her PIP.  (McKenna Decl. Ex. 54 at FOX001961.)

**Response to Paragraph 121:**

Admit that the email states this, but the contentions therein are hearsay, not supported by

admissible evidence and, therefore, are disputed.  Further dispute the contention that Hirst

genuinely believed that Ms. Eckhart had failed to live up to her PIP or that her subsequent

termination was the result of such purported failure (or any other non-retaliatory reason).  ASMF

at ¶¶ 358-359, 523-530 (outlining Ms. Eckhart's consistently positive performance), ¶¶361-370

(evidencing that Ms. Eckhart was terminated in retaliation for engaging in protected activity).

122.    As Eckhart's performance did not improve after she was placed on the PIP, following Eckhart's "epic fail," Hirst determined that Eckhart's employment should be terminated.  (Hirst Tr., 130:13-131:5.)

**Response to Paragraph 122:**

Dispute.  ASMF at ¶¶ 358-359, 523-530 (outlining Ms. Eckhart's consistently positive

performance), ¶¶361-370 (evidencing that Ms. Eckhart was terminated in retaliation for engaging

in protected activity).

**Eckhart's June 12, 2020 Termination for Performance Issues**

123.    FNN terminated Eckhart's employment on June 12, 2020 during an in-person meeting with Collins and Hirst in an FNN Human Resources conference room.  (Eckhart Tr., 301:4-16.)

**Response to Paragraph 123:**

Admit.

124.    Hirst told Eckhart that FNN was terminating her employment due to her tardiness, failure to achieve the objectives set forth in her PIP, premature public disclosure of FNN's proprietary graphics package, and misappropriation of company resources in connection with the Go Red event.  (Hirst Tr. 130:13-131:5; Eckhart Tr., 301:19-302:15.)

**Response to Paragraph 124:**

Admit.

125.    After Eckhart was advised of her termination, she read verbatim from a script that she had prepared in advance of the meeting.  (Eckhart Tr., 302:16-303:2, 304:2-305:6; McKenna Decl. Ex. 58.)

**Response to Paragraph 125:**

Admit.

126.    As part of her script, Eckhart referred to "the emotional, verbal and the sexual harassment that goes on at every level in this building."  (Eckhart Tr., 304:2-15; McKenna Decl. Ex. 58 at PL_F000762.)

**Response to Paragraph 126:**

Admit.

127.    Prior to this making this statement, Eckhart had never raised any concerns of sexual harassment to anyone at FNN.  (Eckhart Tr., 194:18-195:11, 196:20-197:7, 202:20-203:6, 235:19-236:3; Collins Day Tr. II, 110:20-111:5.)

**Response to Paragraph 127:**

Dispute.  See Response to ¶ 95.  ASMF at ¶¶361-366.

128.    After Eckhart finished reading her script, Collins asked Eckhart if she had been sexually harassed or assaulted.  (Eckhart Tr., 302:16-303:2; Collins Tr. II, 92:14-24, 95:22-25.)

**Response to Paragraph 128:**

Dispute.  See Response to ¶ 95.  ASMF at ¶¶361-366.

129.    Eckhart did not answer Collins' question about whether she had been sexually harassed or assaulted.  (Eckhart Tr., 303:17-22; Collins Tr. II, 95:22-96:14.)

**Response to Paragraph 129:**

Admit.

**Eckhart Was Aware of FNN's Complaint Procedures**

130.  FNN has established procedures for employees to report complaints of harassment, discrimination, or retaliation either directly to Human Resources or the legal department, or through a third-party system called Alertline which allows for anonymous complaints. (McKenna Decl. Ex. 59 at FOX 001267-69; Eckhart Tr., 221:11-222:16; Collins Tr. I, 131:2-22; Lord Tr., 33:11-22, 186:11-19.)

**Response to Paragraph 130:**

Dispute on the basis that the statement is temporally indefinite, which renders this contention immaterial.  The cited handbook was published in 2019, years after Ms. Eckhart was sexually assaulted and raped by Mr. Henry.  Further dispute that any of the cited procedures were "established," as they were not widely known nor were they followed.  ASFM ¶¶422-448.

131.  FNN Human Resources and senior leadership informed employees, both verbally and in writing, of the multiple avenues available to raise concerns about sexual harassment. (Lord Tr., 57:7-58:7, 60:18-61:3; Claman Tr., 66:18-67:4, 108:16-109:23.)

**Response to Paragraph 131:**

Dispute on the basis that the statement is temporally indefinite, which renders this contention immaterial.  Mr. Lord did not even arrive at Fox News until after Ms. Eckhart was sexually assaulted by Mr. Henry and Ms. Claman's testimony makes clear that information regarding the various avenues through which one could complain was "more pronounced" only after Mr. Ailes was ousted.  Ex. 9 (Lord Dep.) at 62:16-17; Ex. 2 (Claman Dep.) at 108:10-109:7. Further dispute on the basis that the referenced policies were not widely known nor were they followed.  ASFM ¶¶ 422-448.

132.  In or around the summer of 2016, Gretchen Carlson, a former on-air talent for FNN, filed a lawsuit alleging that FNN's then-Chairman and CEO Roger Ailes sexually harassed her.  (Collins Tr. I, 77:25-78:11; McKenna Decl. Ex. 8, Deposition Transcript of Jay Wallace ("Wallace Tr."), 168:3-5; Eckhart Tr., 231:12-20.)

**Response to Paragraph 132:**

Admit.

133. After Ms. Carlson filed her lawsuit, Ailes was exited from FNN, and FNN's parent company, 21st Century Fox, retained the law firm Paul, Weiss to conduct an investigation regarding Ms. Carlson's claims. (Collins Tr. I, 77:2-79:17.)

**Response to Paragraph 133:**

Admit.

134. In or around September 2016, it was publicly reported that Ms. Carlson's lawsuit settled for $20 million. (*See, e.g.*, N.Y. Times, *Fox Settles With Gretchen Carlson Over Roger Ailes Sex Harassment Claims*, https://www.nytimes.com/2016/09/07/business/media/fox-news-roger-ailes-gretchen-carlson-sexual-harassment-lawsuit-settlement.html; NPR, *Fox Will Pay Gretchen Carlson $20 Million To Settle Sexual Harassment Suit*, https://www.npr.org/sections/thetwo-way/2016/09/06/492797695/fox-news-will-pay-gretchen-carlson-20-million-to-settle-sexual-harassment-suit; Vanity Fair, *Fox Settles with Gretchen Carlson for $20 Million – and Offers an Unprecedented Apology*, https://www.vanityfair.com/news/2016/09/fox-news-settles-with-gretchen-carlson-for-20-million.)

**Response to Paragraph 134:**

Admit.

135. Eckhart read about Ms. Carlson's claims in the media. (Eckhart Tr., 231:12-23.)

**Response to Paragraph 135:**

Admit.

136. After Ailes' departure from FNN, Fox Corporation engaged a Workplace Professionalism and Inclusion Council ("WPIC") for FNN in support of its commitment to its policies against sexual harassment. (Wallace Tr., 168:19-25.)

**Response to Paragraph 136:**

Admit that Fox Corporation engaged a Workplace Professionalism and Inclusion Council

("WPIC") for Fox News. Dispute that Fox News had a commitment to its policies against sexual

harassment. ASFM ¶¶ 422-448.

137.  After Ailes's departure from FNN, the Company made its Human Resources function larger and more visible to its employees to ensure that employees knew how to raise complaints of sexual harassment.  (Lord Tr., 51:18-53:8, 55:25-56:17; Wallace Tr., 167:2-6, 167:17-168:2.)

**Response to Paragraph 137:**

Dispute.  ASFM ¶¶ 422-448.

138.  In or around 2016, FNN increased the frequency of its mandatory sexual harassment trainings to on an annual basis.  (Collins Tr. I, 211:9-17, 215:21-216:3.)

**Response to Paragraph 138:**

Admit.

139.  In or around 2016, FNN made its posters regarding how to report complaints of sexual harassment more visible and placed posters on every floor and in the office bathrooms. (Collins Tr. I, 214:7-215:6, 216:8-10; Claman Tr., 109:15-23; McKenna Decl. Ex. 60.)

**Response to Paragraph 139:**

Admit.

140.  In 2017, FNN had a Fox News Employee Handbook in effect that included Mandatory Reporting of Harassment or Discrimination provisions that expressly require employees to contact Human Resources, the legal department, or the Alertline with concerns about possible harassment and provide employees with contact information for each such resource.  (Declaration of Denise Collins in Support of FNN's Motion for Summary Judgment ("Collins Decl.") ¶¶ 3-4; Collins Decl. Ex. 1.)

**Response to Paragraph 140:**

Dispute.  The policy is undated and the declaration is equivocal as to the date.

Declaration of Denise Collins in Support of FNN's Motion for Summary Judgment ("Collins

Decl.") ¶ 3 ("In or around 2017…") (emphasis added); Collins Decl., Ex. 1.

141.  On April 3, 2017, Lord sent a memo to all FNN employees urging any employee who had any concerns about behavior in the workplace to raise their concerns with him, FNN's legal department, or Paul, Weiss, and Lord provided their contact information to employees.  (Eckhart Tr., 223:2-25; McKenna Decl. Ex. 62.)

**Response to Paragraph 141:**

Admit.

142.    While she was employed by FNN, Eckhart was in possession of the FNN employee handbook which contained FNN's procedures for addressing concerns about harassing, discriminatory, or retaliatory conduct and contained a complaint form for reporting harassment, discrimination, and retaliation.  (Eckhart Tr., 220:25-222:16; McKenna Decl. Exs. 59, 63.)

**Response to Paragraph 142:**

Dispute on the basis that the statement is temporally indefinite, which renders this

contention immaterial.  The cited handbook was published in 2019, years after Ms. Eckhart was

sexually assaulted and raped by Mr. Henry, and Ms. Eckhart testified that her receipt of this

handbook was the first time she was notified of the referenced policies.  Ex. 5 (Eckhart Dep.) at

222:17-21.

143.    Eckhart knew how to find information about how to make a complaint, and she referred to the FNN employee handbook on multiple occasions.  (Eckhart Tr., 227:2-14.)

**Response to Paragraph 143:**

Dispute on the basis that the statement is temporally indefinite, which renders this

contention immaterial.  The handbook discussed in the cited testimony was published in 2019,

years after Ms. Eckhart was sexually assaulted and raped by Mr. Henry, and Ms. Eckhart

testified that her receipt of this handbook was the first time she was notified of the referenced

policies.  Ex. 5 (Eckhart Dep.) at 222:17-21.

144.    In addition to the employee handbook, FNN publishes Standards of Business Conduct that include policies against discrimination and harassment. (Eckhart Tr., 227:15-230:7; McKenna Decl. Ex. 64 at FOX 001366-67, Ex. 65 at FOX 000289-90.)

**Response to Paragraph 144:**

Dispute on the basis that the statement is temporally indefinite, which renders this

contention immaterial.  The cited policies were published in 2019 and 2020, years after Ms.

Eckhart was sexually assaulted and raped by Mr. Henry.  McKenna Decl. Exs. 64, 65.

145.    In Eckhart received training concerning FNN's Standards of Business Conduct on
        multiple occasions.  (Eckhart Tr., 229:4-7.)

    **Response to Paragraph 145:**

    Admit.

146.    While she was employed by FNN, Eckhart was aware of the policies contained in FNN's
        Standards of Business Conduct.  (Eckhart Tr., 229:4-230:7; McKenna Decl. Ex. 65.)

    **Response to Paragraph 146:**

    Dispute on the basis that the statement is temporally indefinite, which renders this

contention immaterial.  The cited policies were published in 2019 and 2020, years after Ms.

Eckhart was sexually assaulted and raped by Mr. Henry.  McKenna Decl. Exs. 64, 65.

147.    During her employment at FNN, Eckhart received anti-discrimination and anti-
        harassment training on multiple occasions.  (Eckhart Tr., 224:9-225:2.)

    **Response to Paragraph 147:**

    Admit.

148.    Eckhart did not raise any complaints about sexual harassment or retaliation until after her
        termination from FNN.  (Eckhart Tr., 235:19-25.)

    **Response to Paragraph 148:**

    Dispute.  See Response to ¶ 95.

149.    Eckhart's belief that other women at FNN who raised concerns were retaliated against is
        based on conversations that Eckhart had with other women after she filed her lawsuit.
        (Eckhart Tr., 230:8-235:8.)

**Response to Paragraph 149:**

Admit.

**On June 25, 2020, Eckhart's Counsel Advises FNN of Eckhart's Sexual Harassment Allegations, and FNN Promptly Retains Outside Counsel to Investigate the Allegations**

150.   Eckhart did not tell anyone at FNN about her sexual encounters with Henry until after she was terminated from FNN on June 12, 2020.  (Eckhart Tr., 326:12-15, 373:25-374:6, 376:14-16; 432:18-23, 558:6-8.)

**Response to Paragraph 150:**

Admit.

151.   On June 25, 2020, Eckhart's counsel at Wigdor LLP contacted FNN to communicate allegations that Henry had sexually harassed Eckhart.  (McKenna Decl. Ex. 6, Deposition Transcript of Gregg Gilman ("Gilman Tr."), 15:19-16:18; McKenna Decl. Ex. 66.)

**Response to Paragraph 151:**

Admit, but further state that the allegations relayed were not limited to sexual

harassment.  McKenna Decl. Ex. 66 at FOX 002828-31.

152.   On June 25, 2020, the same day that FNN learned of Eckhart's allegations from her counsel, FNN engaged Gregg Gilman and Sharon Cohen, attorneys at Davis & Gilbert LLP ("D&G"), to conduct an independent investigation of the facts and circumstances concerning Eckhart's allegations against Henry, as conveyed to FNN by Eckhart's counsel.  (Gilman Tr., 5:5-9, 6:19-7:2, 15:19-16:18; McKenna Decl. Ex. 66.)

**Response to Paragraph 152:**

Dispute the contention that the investigation was "independent," as even the investigator

admitted that his investigation was stymied by Fox News' in-house counsel, who failed to

provide relevant information, lied about the existence of prior complaints against Mr. Henry and

denied the investigator access to relevant witnesses, among other things.  Ex. 6 (Gilman Dep.) at

10, 12, 18-19, 20-25, 36-37; Ex.9 (Lord Dep.) at 251-252; Ex. 72.

153.   FNN informed D&G that Wigdor LLP had communicated to FNN that Eckhart had allegedly: met Henry in 2014; connected with him on social media and the application WhatsApp; in the spring or summer of 2015 agreed to have drinks with him, which led to a sexual encounter in a hotel room; in September 2015 at Henry's request took off her

panties, put them in an envelope, and gave them to Henrry while at FNN's office; in September 2015 engaged in oral sex with Henry at FNN's New York office; in 2016 communicated with Henry after he returned to work following a four-month leave of absence resulting from his public affair in Las Vegas; and, in 2017 agreed to have drinks with Henry again, which led to a "violent rape" in a hotel room. (Gilman Tr., 15:19-16:18; McKenna Decl. Ex. 66.)

**Response to Paragraph 153:**

Admit generally, but dispute any insinuation that this was all that was conveyed and/or

that any of the sexual encounters were consensual. McKenna Decl. Ex. 66 at FOX 002828-31

(containing comprehensive notes taken regarding what was conveyed).

154.   D&G was given information concerning Eckhart's allegations at or around 3:30 p.m. on June 25, 2020, and they interviewed Henry at or around 5:00 p.m. that same day. (Gilman Tr., 38:22-39:4, 40:6-13; Henry Tr., 416:20-417:4.)

**Response to Paragraph 154:**

Admit.

155.   D&G asked Henry about his alleged sexual encounters with Eckhart, and Henry stated that they were all consensual. (Gilman Tr., 42:23-43:13.)

**Response to Paragraph 155:**

Admit.

156.   Prior to being interviewed by D&G, Henry never told any FNN employees that he had sexual relations with Eckhart, and he had no reason to believe that anyone at FNN knew of his sexual encounters with Eckhart. (Henry Tr., 417:5-18, 418:14-17.)

**Response to Paragraph 155:**

Admit.

157.   Henry made an effort to conceal his relationship with Eckhart from FNN. (Henry Tr., 417:24-418:17.)

**Response to Paragraph 157:**

Dispute.  It is not credible that Mr. Henry made any effort to conceal his misconduct, as he has openly and notoriously engaged in inappropriate sexual misconduct, both in and outside of the workplace, throughout his entire career.  ASFM ¶¶371-399.

158.  D&G asked Henry to provide text messages; emails; photos; receipts, invoices or other documentation relating to the hotel stays pertaining to Eckhart's allegations; and any other relevant documentation.  (Gilman Tr., 15:19-16:18; McKenna Decl. Ex. 66.)

**Response to Paragraph 158:**

Admit.

159.  On June 26, 2020, Henry provided D&G with photographs.  (Gilman Tr., 15:19-16:18; McKenna Decl. Exs. 66-71.)

**Response to Paragraph 159:**

Admit.

160.  Henry advised D&G that he did not have records of his communications with Eckhart. (Gilman Tr., 15:19-16:18; McKenna Decl. Exs. 66, 84.)

**Response to Paragraph 160:**

Admit.

161.  On June 29, 2020, D&G told Eckhart's counsel that they wanted to speak with Eckhart as soon as possible, stating that Eckhart's counsel was free to be present for the interview, and further stating that if Eckhart's counsel did not want to make Eckhart available to speak with D&G, then D&G would speak directly with Eckhart's counsel about her allegations.  (Gilman Tr., 15:19-16:18; McKenna Decl. Ex. 66.)

**Response to Paragraph 161:**

Admit.

162.  That same day, D&G discussed with Eckhart's counsel her allegations, and thereafter requested any documents, text messages, communications, pictures, or videos that would corroborate Eckhart's allegations. (Gilman Tr., 15:19-16:18; McKenna Decl. Ex. 66.)

**Response to Paragraph 162:**

Admit.

163.    Eckhart's counsel advised D&G that Eckhart had documents related to her allegations, but they did not provide those documents to D&G.  (Gilman Tr., 15:19-16:18; McKenna Decl. Ex. 66.)

**Response to Paragraph 163:**

Admit.

164.    D&G asked Eckhart's counsel if there were any witnesses who could corroborate Eckhart's allegations, and Eckhart's counsel stated that he was not aware of any witnesses.  (Gilman Tr., 15:19-16:18; McKenna Decl. Ex. 66.)

**Response to Paragraph 164:**

Dispute.  Ex. 72.

165.    D&G reiterated their request to interview Eckhart directly, and Eckhart's counsel stated that D&G could not interview Eckhart unless it was agreed that nothing Eckhart said during her interview could be used in any future proceedings.  (Gilman Tr., 15:19-16:18; McKenna Decl. Ex. 66.)

**Response to Paragraph 165:**

Admit.

166.    D&G did not agree to that condition because D&G believed it would impede their ability to ascertain Eckhart's veracity as it would provide Eckhart with a disincentive to be truthful, and there would be no consequence if Eckhart was not truthful.  (Gilman Tr., 15:19-16:18, 27:13-31:13; McKenna Decl. Ex. 66.)

**Response to Paragraph 166:**

Admit that D&G did not agree to that condition.  Dispute the purported reason for D&G's refusal.  Ex. 72 (Willemin to Gilman: "The fact that you are refusing to speak with her under these conditions puts the lie to the claim that Fox just wants to gather all of the facts. In reality, Fox only wants to essentially depose our client and have a record that it can use to its benefit in litigation. If Fox had any interest whatsoever in actually gathering facts it would agree to the

42

conditions and interview our client. It might not be what Fox wants, but it is obviously better

than nothing if fact gathering is the purpose of the interview. That Fox is refusing to do the

interview simply reaffirms its disregard for victims of sexual misconduct. It is only concerned

about protecting itself. Finally, the claim that you will suddenly be at a loss as to how to evaluate

Ms. Eckhart if you can't use the interview in litigation makes absolutely no sense.").

167.    In addition to the photographs that Henry provided, D&G reviewed emails that were
        exchanged between Henry and Eckhart using their FNN email addresses and Henry's
        FNN expense reports from the 2015 through 2017 fiscal years.  (Gilman Tr., 15:19-16:18;
        McKenna Decl. Ex. 66.)

        **Response to Paragraph 167:**

        Admit.

        ### FNN Terminates Henry's Employment After the Investigative Findings
        ### Demonstrate that Henry Violated FNN Policy

168.    On June 30, 2020, D&G provided FNN with a written Preliminary Report summarizing
        their investigation and providing interim factual findings.  (Gilman Tr., 54:13-55:8;
        McKenna Decl. Ex. 73.)

        **Response to Paragraph 168:**

        Admit.

169.    When D&G submitted the Preliminary Report, they were still waiting for further
        information that they had requested, including copies of Henry's communications with
        Eckhart, copies of Henry's expense reports, invoices, or receipts regarding his hotel stays,
        and copies of Henry's corporate credit card statements.  (Gilman Tr., 54:23-55:8;
        McKenna Decl. Ex. 73.)

        **Response to Paragraph 169:**

        Admit.

170.    When D&G's interim factual findings included findings that Eckhart and Henry had
        exchanged numerous communications between 2014-2017 and engaged in three in-
        person sexual encounters: one in the spring of 2015, one in September 2015, and one in
        February 2017.  (McKenna Decl. Ex. 73.)

**Response to Paragraph 170:**

Admit.

171.    D&G determined that it was an "uncontroverted fact" that in September 2015, Eckhart performed oral sex on Henry in an office on the 17th Floor of Fox Headquarters. (McKenna Decl. Ex. 73.)

**Response to Paragraph 171:**

Admit, but dispute any insinuation that this occurrence was not a sexual assault.

172.    Jay Wallace, the President of FNN, and Kevin Lord, the Executive Vice President of Human Resources, reviewed the Preliminary Report.  (Wallace Tr., 86:23-87:3; McKenna Decl. Ex. 74.)

**Response to Paragraph 172:**

Admit.

173.    On June 30, 2020, Lord and Wallace determined that the Preliminary Report supported terminating Henry because he had engaged in oral sex on FNN premises, which violated FNN's policies.  (Lord Tr., 260:3-11; Wallace Tr., 178:6-13; McKenna Decl. Ex. 74; Declaration of Marsheila Hayes in Support of FNN's Motion for Summary Judgment ("Hayes Decl."), Ex. 2 at FOX000206, 209.)

**Response to Paragraph 173:**

Admit that Mr. Henry was fired.  Dispute that Mr. Wallace made the decision to

terminate him for engaging in sexual misconduct rather than as a public relations stunt to get out

ahead of Ms. Eckhart's impending lawsuit.  Ex. 12 (Mr. Henry's lawsuit detailing Fox News'

history of whitewashing sexual misconduct, including "a widely known affair between a

subordinate and ████████████████████"); ASMF at ¶¶449-522 (Fox News has a

longstanding history of failing to punish and sweeping under the rug acts of sexual harassment

and assault).

174.    Henry was terminated on July 1, 2020.  (McKenna Decl. Ex. 12.)

**Response to Paragraph 174:**

Admit.

175. That same morning, FNN senior leadership sent an email to all employees stating that FNN had received a complaint about Henry involving allegations of willful sexual misconduct in the workplace; investigated the claims; and terminated Henry based on the investigative findings. (McKenna Decl. Ex. 76.)

**Response to Paragraph 175:**

Admit.

176. FNN senior leadership further stated that it "strictly prohibits all forms of sexual harassment, misconduct, and discrimination," and "encourage[d] any employee who has a sexual harassment, discrimination or misconduct complaint of any form to report it immediately." (McKenna Decl. Ex. 76.)

**Response to Paragraph 176:**

Admit.

**D&G Provides FNN with its Final Report Concerning Eckhart's Allegations**

177. D&G provided a Final Report to FNN on July 17, 2020. (Gilman Tr., 15:19-16:10; McKenna Ex. 66.)

**Response to Paragraph 177:**

Admit.

178. In the period between D&G's issuance of the Preliminary Report and the Final Report, Henry did not provide D&G with any of his text message or email communications with Eckhart or documentation related to his hotel stays. (Gilman Tr., 15:19-16:10; McKenna Ex. 66.)

**Response to Paragraph 178:**

Admit.

179. In the period between D&G's issuance of the Preliminary Report and the Final Report, D&G learned that Henry did not use his corporate credit card for certain expenses pertaining to Eckhart's allegations. (Gilman Tr., 15:19-16:10; McKenna Ex. 66.)

**Response to Paragraph 179:**

Admit.

180. In the period between D&G's issuance of the Preliminary Report and the Final Report, D&G reviewed Eckhart's social media accounts and had a forensic expert review the metadata for the photographs that Henry had provided prior to issuance of the Preliminary Report. (Gilman Tr., 15:19-16:10; McKenna Ex. 66.)

**Response to Paragraph 180:**

Admit.

181. D&G's interim factual finding that Eckhart and Henry had engaged in three sexual encounters (one in the spring of 2015, one in September 2015, and one in February 2017) did not change when D&G issued their final factual findings. (Gilman Tr., 15:19-16:10; McKenna Ex. 66.)

**Response to Paragraph 181:**

Admit, but dispute any insinuation that the encounters were consensual.

**Prior to Eckhart's Allegations, FNN Was Aware of Two Reports Concerning Sexual Activity Regarding Henry That Did Not Concern Unwelcome Sexual Activity or Eckhart**

182. In or around March 2017, ████████████, an FNN journalist, raised concerns to Lord about the fact that FNN continued to employ Henry after he had an extramarital affair with a Las Vegas stripper that was made public in 2016. (Lord Tr., 63:8-66:7; Wallace Tr., 136:10-13.)

**Response to Paragraph 182:**

Admit, but dispute any insinuation that the encounters were consensual.

183. Lord, who had joined FNN a few months prior, in January 2017, did not know who Henry was and therefore asked ████████ questions regarding her concerns, explained that an extramarital affair with somebody outside of the Company is different than sexual harassment within the Company, and told ████████ that he would learn more about the situation. (Lord Tr., 7:17-18, 66:13-68:7.)

**Response to Paragraph 183:**

Admit.

184. In May 2017, FNN received an email from ████████, in which she complained about a disciplinary dispute with her managers. (Lord Tr., 122:23-124:11; McKenna Decl. Ex. 77.) In that same email, ████████ expressed her belief that Henry's 2016 return to the workplace was "demoralizing" for female employes, given his extramarital affair with a Las Vegas sex worker. (Lord Tr., 122:23-124:11; McKenna Decl. Ex. 77.)

**Response to Paragraph 184:**

Admit.

185.   Lord discussed ████████████ concerns with Bill Shine, then the Co-President of FNN, who advised Lord that Henry had an extramarital affair with a Las Vegas stripper and thereafter completed and satisfied the requirements of a sexual rehabilitation program. (Lord Tr., 69:2-70:10; McKenna Decl. Ex. 3, Deposition Transcript of Bill Shine ("Shine Tr."), 20:5-9, 24:10-11.)

**Response to Paragraph 185:**

Admit.

186.   In April 2017, ████████████, a producer, disclosed to Wallace and Lord that she previously had a consensual affair with Henry.  (Wallace Tr., 93:18-94:11; Lord Tr., 194:2-196:22, 198:16-20; Hayes Decl. ¶¶ 3-5.)

**Response to Paragraph 186:**

Admit.

187.   Henry and ████████████ were involved in a consensual affair from approximately 2014 to 2015 or 2016, prior to the report of Henry's affair with the Las Vegas stripper and prior to Henry's suspension.  (Henry Tr., 82:19-21, 421:16-23; Hayes Decl. ¶ 6.)

**Response to Paragraph 187:**

Admit.

188.   ████████████ wanted to make management aware of the prior romantic relationship after she heard that Henry might become an anchor on the show that she produced.  (Wallace Tr., 93:18-94:11, 190:16-21; Hayes Decl. ¶ 7.)

**Response to Paragraph 188:**

Admit.

189.   Henry concealed his relationship with ████████████ from FNN.  (Henry Tr., 421:24-422:3.)

**Response to Paragraph 189:**

Dispute. It is not credible that Mr. Henry made any effort to conceal his misconduct, as he has openly and notoriously engaged in inappropriate sexual misconduct, both in and outside of the workplace, throughout his entire career. ASFM¶¶371-399, 449-463.

190.    ████████ made it clear to FNN that her relationship with Henry was consensual. (Wallace Tr., 93:18-94:11, 190:10-15, 190:22-191:3; Hayes Decl. ¶¶ 11-12.)

**Response to Paragraph 190:**

Admit.

191.    ████████ also told FNN that she had heard rumors that Henry was in a sexting relationship with a woman who worked for a different news organization; that two FNN employees had helped Henry "cover up" a prior sexting relationship in or about 2015; that Henry was "sleeping with a desk assistant at the D.C. Bureau"; that she did not feel that he should represent the company given his "body of work", meaning his 2016 publicly reported affair; and that she did not think that he should to be promoted to a position such as anchor in which he "could prey on women" and continue to embarrass the company. (Lord Tr., 196:6-22; Hayes Decl. ¶ 9; McKenna Decl. Ex. 78.)

**Response to Paragraph 191:**

Dispute that Mr. Henry's "body of work" was limited to his 2016 affair with a stripper.

Admit the rest.

192.    ████████ declined to identify the sources of these rumors except to report that ████ ████ an FNN employee, told her that ████ had heard about Henry's rumored sexting relationship from a friend whose boyfriend worked at the news organization where the woman with whom Henry had "sexted" also worked. (Lord Tr., 200:11-203:16, 222:9-223:8; McKenna Decl. Ex. 11, Deposition Transcript of ████████ ("████ Tr."), 18:17-22; McKenna Decl. Ex. 78; Hayes Decl. Ex. 1.)

**Response to Paragraph 192:**

Admit.

193.    ████████ did not allege that any of Henry's behavior was unwelcome, non-consensual, or otherwise harassing. (Hayes Decl. ¶¶ 11-12; McKenna Decl. Ex. 78.)

**Response to Paragraph 193:**

Admit.

194.    Lord looked into the rumors that ██████ reported concerning Henry.  (Lord Tr., 201:17-24, 204:3-11, 205:19-206:13, 214:7-215:14, 228:4-7.)

**Response to Paragraph 194:**

Admit, but dispute the contention that the investigation was in any way adequate.  See

ASMF at ¶¶ 462-463.

195.    With respect to the rumor that Henry was engaged in a sexting relationship with a woman who worked for a different news organization, Lord interviewed ██ who reported that she heard the rumor from a friend who was dating the head of the other news organization.  (Lord Tr., 205:19-22, 215:8-14, 228:4-7; ██ Tr., 18:17-22, 21:6-17, 27:9-20.)

**Response to Paragraph 195:**

Admit.

196.    Lord also called the head of that news organization, who told Lord that he was not aware of a sexting relationship involving one of his employees.  (Lord Tr., 204:3-205:11.)

**Response to Paragraph 196:**

Admit.

197.    Bill Shine, then the Co-President of FNN, had also contacted the head of that organization, who Shine reported knew nothing about Henry making any of his employees uncomfortable.  (McKenna Decl. Ex. 61.)

**Response to Paragraph 197:**

Admit.

198.    Lord explored the rumor that there had been a "cover up" of a prior sexting incident by speaking to the current employee who was allegedly involved, who never heard of Henry sexting with anyone.  (Lord Tr., 214:7-215:7; Boughton Decl. ¶¶ 3-4.)

**Response to Paragraph 198:**

Dispute.  Ex. 9 (Lord Dep.) at 192:3-193:15, 207:10-209:5.

49

199.    Lord investigated ███████' allegation that Henry was sleeping with a desk assistant in the D.C. Bureau by determining who held that title and then directing a Human Resources business partner to speak with employees in that office to assess whether there were any concerns.  None were reported.  (Lord Tr., 205:25-206:13; Collins Tr. I, 74:9-16.)

**Response to Paragraph 199:**

Dispute.  The testimony is that Mr. Lord asked his subordinate to do some "sensing sessions," (whatever that means), but it is not credible that these sessions were actually done. Mr. Lord could not identify a single person who was supposedly spoken to, and there are no notes or other documents suggesting that this was done.  Ex. 9 (Lord Dep.) at 148:6-149:19, 205:25-207:4, 210:10-211:17.  Moreover, Mr. Henry was in fact sleeping with a Desk Assistant at the time of this purported investigation.  McKenna Decl., Ex. 114 at ¶ 6.

### Unbeknownst to FNN Until After Eckhart's Termination, Eckhart and Henry Begin Communicating Through Social Media in 2013 and Thereafter Privately Exchange Sexual Communications

200.    Eckhart and Henry's first interaction occurred through Twitter on December 18, 2013, when Eckhart replied to a tweet that Henry posted.  (Eckhart Tr., 244:16-245:23; McKenna Decl. Ex. 79; Henry Tr., 171:25-172:21.)

**Response to Paragraph 200:**

Dispute.  Ex. 5 (Eckhart Dep.) at 236:4-9.

201.    Eckhart sent Henry a direct message ("DM") on Twitter saying that she was a "big fan" of his work and that it would be an "honor to meet him one day."  (Eckhart Tr., 346:7-17, 347:7-8.)

**Response to Paragraph 201:**

Admit.

202.    When Henry received Eckhart's Twitter DM, he was in New York City to make an appearance on an FNN show and invited Eckhart to meet him in one of the FNN green rooms.  (Eckhart Tr., 346:10-17, 350:13-351:2.)

**Response to Paragraph 202:**

Admit.

203.    Eckhart accepted Henry's invitation, and Eckhart and Henry met in a green room, where they took a picture together on Eckhart's phone.  (Eckhart Tr., 350:13-351:13; McKenna Decl. Ex. 80.)

**Response to Paragraph 203:**

Admit.

204.    The metadata for the photo that Eckhart and Henry took in the green room reflects that this interaction occurred on June 13, 2014.  (Eckhart Tr., 350:13-20; McKenna Decl. Ex. 80.)

**Response to Paragraph 204:**

Admit.

205.    Henry thereafter sent Eckhart a DM on Twitter asking for a copy of the photo, which Eckhart provided.  Henry wrote to Eckhart via Twitter DM, "You are way more beautiful in person."  (Eckhart Tr., 355:22-356:3; Henry Tr., 176:19-22.)

**Response to Paragraph 205:**

Admit.

206.    On the same day that Eckhart and Henry took a picture in the green room, Eckhart provided Henry with her personal email address because that was her preferred way of Henry contacting her.  (McKenna Decl. Ex. 81; Eckhart Tr., 354:23-355:4, 358:2-359:3.)

**Response to Paragraph 206:**

Admit.

207.    Also on that same day, Henry asked Eckhart, via their personal emails, to download the messaging application "WhatsApp"; Eckhart downloaded WhatsApp approximately one hour later and asked Henry how she could find him.  (Eckhart Tr., 358:10-359:3; McKenna Decl. Exs. 82, 83.)

**Response to Paragraph 207:**

Admit.

208.    After June 13, 2014, Eckhart and Henry continued to communicate through WhatsApp, their personal email addresses, and private Twitter DMs.  (Eckhart Tr., 357:8-358:9, 366:3-7, 393:22-394:9; Henry Tr., 32:12-20.)

**Response to Paragraph 208:**

Admit.

209.    Eckhart never used a corporate phone to communicate with Henry.  (Eckhart Tr., 357:14-15.)

**Response to Paragraph 209:**

Admit.

210.    Eckhart and Henry's communications sometimes contained sexual references, such as Henry asking Eckhart how "tight" she was – referring to her vagina – and Eckhart responding that she was "tight" or "so tight."  (Eckhart Tr., 371:4-372:16.)

**Response to Paragraph 210:**

Admit.

211.    Eckhart deleted many of the messages that she exchanged with Henry.  (Eckhart Tr., 347:12-348:3, 366:15-367:6, 394:10-15, 396:24-397:5, 398:25-399:7, 448:14-22, 480:5-9, 514:9-11, 515:10-12.)

**Response to Paragraph 211:**

Admit.

212.    Henry did not preserve any of the messages that he exchanged with Eckhart.  (Henry Tr., 36:22-37:2; McKenna Decl. Ex. 84.)

**Response to Paragraph 212:**

Dispute.  Mr. Henry maintained a number of emails, social media communications and

photographs exchanged between Ms. Eckhart and himself.  See Dkt. No. 391 at Exs. 7-26.

213.    Eckhart produced certain of her communications with Henry in discovery in this action, copies of which are attached to the McKenna Declaration as Exhibit 85.

**Response to Paragraph 213:**

Admit.

214.    Both Eckhart and Henry admit that McKenna Declaration Exhibit 85 are not all of the communications that they exchanged with each other because they both deleted

numerous messages. (Eckhart Tr., 347:12-348:3, 366:15-367:6, 394:10-15, 396:24-397:5, 398:25-399:7, 448:14-22, 480:5-9, 514:9-11, 515:10-12; Henry Tr., 36:22-37:2.)

**Response to Paragraph 214:**

Admit.

## Eckhart and Henry Have Sexual Intercourse in 2014

215.  Sometime in 2014, Eckhart and Henry agreed, via WhatsApp, to meet for drinks at the Marriott Marquis hotel in New York City. (Eckhart Tr., 379:10-24, 381:18-21; Henry Tr., 349:18-22.)

**Response to Paragraph 215:**

Admit.

216.  Henry and Eckhart each had at least one drink at the hotel bar before going to Henry's hotel room, where they had sexual intercourse. (Eckhart Tr., 386:8-21, 418:16-419:2; Henry Tr., 125:9-14, 126:2-4.)

**Response to Paragraph 216:**

Admit, but dispute that the encounter was consensual.

217.  Following this encounter, Eckhart continued to communicate with Henry. (McKenna Decl. Ex. 75.)

**Response to Paragraph 217:**

Admit.

## Eckhart Performs Oral Sex on Henry in September 2015

218.  Eckhart and Henry's next sexual encounter occurred in September 2015. (Eckhart Tr., 447:5-448:13, 453:16-455:11; Henry Tr., 349:23-350:4.)

**Response to Paragraph 218:**

Admit, but dispute any insinuation that the encounter was consensual.

219.  On September 16, 2015, Henry was at FNN's New York office, working in a guest office. Henry messaged Eckhart and asked her to remove her underwear and put them in an envelope for him to come pick up from her desk. (Eckhart Tr., 447:8-10, 448:3-6, 467:22-468:10; Henry Tr., 132:22-133:9; McKenna Decl. Ex. 86.)

**Response to Paragraph 219:**

Admit.

220. Eckhart removed her underwear and put them in an envelope for Henry, which he
retrieved from her desk about 20-30 minutes later. (Henry Tr., 133:15-20; Eckhart Tr.,
448:23-450:7.)

**Response to Paragraph 220:**

Admit.

221. On that same day, Henry invited Eckhart to visit his guest office on the 17th floor of
FNN's New York City office. (Eckhart Tr., 453:14-20.)

**Response to Paragraph 221:**

Admit.

222. Eckhart was scheduled to go to the New York Stock Exchange with Claman that day, so
she called for a car to bring Claman to the New York Stock Exchange and then went to
Henry's guest office. (Eckhart Tr., 453:20-454:9.)

**Response to Paragraph 222:**

Admit.

223. When Eckhart arrived at Henry's guest office, she performed oral sex on Henry.
(Eckhart Tr., 237:23-238:5, 454:8-455:11; Henry Tr., 132:15-21.)

**Response to Paragraph 223:**

Dispute. Ms. Eckhart did not "perform oral sex" on Mr. Henry. She was sexually

assaulted. Ex. 5 (Eckhart Dep.) at 455:4-11 ("He began forcefully kissing me and he pinned me

against the wall and he took his hand and he shoved my head down. And I had never seen a man

undo his pants so quickly. He took off his belt, like, really fast. Still kept his pants on -- his

zipper -- his fly was just open. And he took his hand on my head and used his hand to force me

into giving him oral sex against my will.").

224.    Eckhart then left Henry's office and joined Claman in the car to go to the New York Stock Exchange to produce that day's live show.  (Eckhart Tr., 464:6-9, 468:21-24.)

**Response to Paragraph 224:**

Admit.

225.    When Eckhart worked on Claman's show, *Countdown*, the show aired from 3:00 p.m. until 4:00 p.m., the last hour of trade on Wall Street.  (Eckhart Tr., 41:8-17.)

**Response to Paragraph 225:**

Admit.

226.    At 4:19 p.m. on September 16, 2015, the day on which Eckhart performed oral sex on Henry before going to the New York Stock Exchange with Claman, Eckhart sent Henry an email saying, "does your tattoo say chief?  sexiest fucking thing ever."  (McKenna Decl. Ex. 87.)

**Response to Paragraph 226:**

Dispute that Eckhart "performed oral sex" on Mr. Henry.  <u>See</u> Response to ¶ 223.

227.    Henry has a tattoo of the word "Chief" in the area above his penis.  (Henry Tr., 31:11-15.)

**Response to Paragraph 227:**

Admit.

**<u>Eckhart and Henry Continue to Exchange Sexual Communications</u>**

228.    After their 2015 oral sex encounter, Eckhart and Henry exchanged communications, many of which contained sexual content or sexual connotations.  (Eckhart Tr., 474:5-16, 478:7-13, 483:8-17, 486:23-25, 488:14-16, 489:25-490:3, 493:21-494:5; McKenna Decl. Exs. 88-94.)

**Response to Paragraph 228:**

Admit.

229.    On January 2, 2016, Eckhart sent Henry a music playlist via Dropbox, with the message, "Think this is long enough?" (Eckhart Tr., 483:10-23; McKenna Decl. Exs. 90, 95.)

**Response to Paragraph 229:**

Admit.

230.   The music playlist that Eckhart sent to Henry included numerous songs with sexual lyrics and connotations, including the songs "Cockiness (Love It When You Eat It)," "Coffee (Fucking)," and "Fuck You All the Time."  (McKenna Decl. Ex. 95.)

**Response to Paragraph 230:**

Admit.

231.   On January 13, 2016, Eckhart emailed Henry a link to an article about a man who got a "Henry the Hoover" vacuum tattoo above his crotch.  Henry responded to the email saying, "yes and," to which Eckhart responded, "WAY hotter than 'chief,'" referencing the tattoo that Henry has directly above his penis.  (Eckhart Tr., 488:7-490:18; McKenna Decl. Exs. 91-93.)

**Response to Paragraph 231:**

Admit.

232.   Eckhart alleges in the Fourth Amended Complaint that she and Henry exchanged numerous communications via WhatsApp in early 2017, and she produced the following copies of those communications in discovery[2]:

---

[2] Only portions of the communications in Paragraph 232 of FNN's 56.1 Statement were quoted by Plaintiff in her Fourth Amended Complaint.  (*See* Fourth Am. Compl., ¶¶ 61-63.)



(McKenna Decl. Ex. 96.)



(McKenna Decl. Ex. 89.)



(McKenna Decl. Ex. 97.)

**Response to Paragraph 232:**

Admit.

**Eckhart and Henry's Third In-Person Sexual Encounter in February 2017**

233.    Eckhart and Henry met again in person in February 2017 for drinks at Fresco by Scotto in New York City.  (Eckhart Tr., 503:17-504:3, 534:15-23.)

**Response to Paragraph 233:**

Admit.

234.    After they had a drink together at the bar, Eckhart and Henry went to Henry's room at the Omni Hotel.  (Eckhart Tr., 535:23-536:4, 536:15-22; Henry Tr., 350:5-8.)

**Response to Paragraph 234:**

Admit.

235.    Eckhart and Henry had sexual intercourse in Henry's hotel room.  (Eckhart Tr., 539:22-540:3; Henry Tr., 107:23-108:16.)

**Response to Paragraph 234:**

Dispute.  Ms. Eckhart did not "have sex" with Mr. Henry.  Rather, she was violently

raped and beaten by him.  Ex. 5 (Eckhart Dep.) at 537:2-541:12.

236.    Henry placed handcuffs on Eckhart and photographed her naked in the handcuffs. (Eckhart Tr., 537:7-15; Henry Tr., 109:2-19.)

**Response to Paragraph 236:**

Admit.

237.    At one point during the sexual encounter, Henry put his fist in Eckhart's vagina. (Eckhart Tr., 539:22-24; Henry Tr., 115:6-15.)

**Response to Paragraph 237:**

Admit.

238.    Eckhart believes that this February 2017 in-person sexual encounter occurred before Valentine's Day (February 14) in 2017.  (Eckhart Tr., 504:18-22.)

**Response to Paragraph 238:**

Admit.

### Eckhart and Henry Continue to Communicate After Their Third In-Person Sexual Encounter

239.    Eckhart alleges in the Fourth Amended Complaint that she and Henry exchanged numerous communications via WhatsApp after their February 2017 in-person sexual encounter and produced the following copies of those communications in discovery[3]:

---

[3] Only portions of the communications in Paragraph 239 of FNN's 56.1 Statement were quoted by Plaintiff in her Fourth Amended Complaint.  (*See* Fourth Am. Compl., ¶¶ 77-80.)



(McKenna Decl. Ex. 98.)



(McKenna Decl. Ex. 99.)



(McKenna Decl. Ex. 100.)



(McKenna Decl. Ex. 101.)



(McKenna Decl. Ex. 102.)



(McKenna Decl. Ex. 103.)

**Response to Paragraph 239:**

    Admit.

240.    On the evening of February 14, 2017, Eckhart sent Henry a picture of herself in a cab along with the message, "Come do me in the back of this cab 💋."  (McKenna Decl. Exs. 104, 105; Eckhart Tr., 594:24-595:3.)





**Response to Paragraph 240:**

Admit.

241.    At some point in time, Eckhart sent Henry seven photographs, five of which are of herself in a black bra and underwear, and one of which is a photo of a woman's vagina that Eckhart states is not of herself but that she found on the Internet and sent to Henry. (McKenna Decl. Exs. 106-112; Eckhart Tr., 636:6-13, 637:7-12, 638:8-13, 639:1-640:1, 640:2-7, 640:15-21, 641:22-642:3.)

**Response to Paragraph 241:**

Admit.

### Henry and Eckhart's Limited Interactions After Summer 2017[4]

242.    On August 5, 2017, Eckhart saved some of her communications with Henry to her laptop and then deleted all of her other text messages, photos, and email communications with Henry.  (Eckhart Tr., 396:6-397:5, 672:23-673:3.)

**Response to Paragraph 242:**

Admit.

243.    After August 5, 2017, Henry reached out to Eckhart a handful of times.  (Eckhart Tr., 673:9-20; Henry Tr., 399:16-400:13.)

**Response to Paragraph 243:**

Admit.

244.    In or around the fall of 2018, Eckhart began dating Andrew Holt, who she met on a dating app.  (Eckhart Tr., 627:7-628:21, 629:8-9.)

**Response to Paragraph 244:**

Admit.

245.    Between the February 2017 sexual encounter and October 2018, Eckhart would at times see Henry in an elevator or around her desk, where he would "wave" or "signal" Eckhart, but she would never respond or reciprocate.  On some of these occasions, Henry would "hang around" Eckhart's desk, but Eckhart claims she would leave the area until he was gone.  (Eckhart Tr., 241:4-10, 679:14-680:11.)

---

[4] There is a dispute of fact between Eckhart and Henry as to whether Eckhart and Henry had another in-person sexual encounter in June 2017.  (Henry Tr., 180:16-182:17, 189:7-190:8; Eckhart Tr., 604:7-10.)  FNN does not take a position as to this dispute of fact, and this fact is not material to FNN's motion for summary judgment.

**Response to Paragraph 245:**

Admit.

246.    On October 5, 2018, Henry and Eckhart passed each other as Eckhart was entering FNN's New York office building and Henry was exiting the building. (Eckhart Tr., 676:3-677:2.) On October 6, 2018 at 3:37am, Henry emailed Eckhart's personal email address asking, "Why'd you turn away today." (McKenna Decl. Ex. 37; Eckhart Tr., 677:6-678:22.) Eckhart did not respond to Henry's message. (Eckhart Tr., 673:18-20, 682:15-683:14.)

**Response to Paragraph 246:**

Admit.

247.    On October 26, 2018, Henry and Eckhart had an encounter in the hallway at FNN's New York office where Eckhart again did not greet Henry but instead turned away from him. (Henry Tr., 409:20-410:3; Eckhart Tr. 691:8-19.) Henry sent Eckhart a DM on Twitter, in which he said, "YO!" (McKenna Decl. Ex. 72; Henry Tr., 408:23-409:10.) Eckhart did not respond to Henry's message. (Eckhart Tr., 673:18-20.)

**Response to Paragraph 247:**

Admit.

248.    On another occasion in October 2018, around the time of the other two October 2018 messages, Henry messaged Eckhart a picture of the Heisman Trophy, which depicts a football player with his hand extended to ward off a defender, to ask why she turned away from him. (Henry Tr., 412:21-414:9.) Eckhart did not respond to Henry's message. (Eckhart Tr., 673:18-20; Henry Tr. 414:8-9.)

**Response to Paragraph 248:**

Admit.

249.    After these October 2018 messages, Henry may have sent Eckhart one political article that she did not respond to. (Eckhart Tr., 694:12-695:8.)

**Response to Paragraph 249:**

Admit.

250.    There were no additional communications between Eckhart and Henry after October 2018. (Henry Tr., 473:3-15; Eckhart Tr., 694:12-695:8.)

**Response to Paragraph 250:**

Admit.

**FNN Was Not Aware of Henry's Other Sexual Interactions with Women Until After Eckhart Was Terminated.**

**Brooke Hammerling**

251.    The Fourth Amended Complaint alleges that Henry made sexual advances towards a woman named Brooke Hammerling.  (Fourth Am. Compl., ¶¶ 134-39.)

**Response to Paragraph 251:**

Admit.

252.    Ms. Hammerling never worked at FNN.  (Henry Tr., 239:23-24, 240:22-24.)

**Response to Paragraph 252:**

Admit.

253.    Henry met Ms. Hammerling when Henry was employed at CNN.  (Henry Tr., 239:19-240:4.)

**Response to Paragraph 252:**

Admit.

254.    Henry and Ms. Hammerling exchanged flirtatious messages during Henry's employment at CNN, and they possibly exchanged a couple of messages shortly after Henry joined FNN in 2011.  (Henry Tr., 239:19-240:4, 429:2-430:5.)

**Response to Paragraph 254:**

Dispute.  The messages were not merely flirtatious.  As per Ms. Hammerling, "[b]ut he was such a disgusting, little lecherous guy.  I think pathologically to be honest . . . But he definitely made the moves on me and I said no which was fine I felt like swatting him away like a fly . . . [I] was stunned by the openness and swiftness of the [s]exual nature of his messages to me.  Even when I tried to just brush them off and think he was just a horny little dude… and try to keep it professional . . . He would always come back with something sexual and perverted.

And I would say something to some of my friends, and they would all roll their eyes and be like UGH .... Yeah he's a horn Dog." Ex. 38. Further dispute the contention that Ms. Hammerling engaged in the flirtatious messaging. Id.

255.   Henry and Ms. Hammerling never had any sexual relationship. (Henry Tr., 239:19-240:4, 429:10-11.)

   **Response to Paragraph 255:**

   Admit.

256.   Henry did not tell anyone at FNN about his communications with Ms. Hammerling. (Henry Tr., 430:6-15.)

   **Response to Paragraph 256:**

   Admit.

**Roxie Marroquin**

257.   The Fourth Amended Complaint alleges that Henry made sexual advances towards a woman named Roxie Marroquin. (Fourth Am. Compl., ¶¶ 140-48.)

   **Response to Paragraph 257:**

   Admit.

258.   Ms. Marroquin did not work at FNN. (Henry Tr., 85:23-25, 87:5-12, 136:11-137:10, 148:7-10.)

   **Response to Paragraph 258:**

   Admit.

259.   In or around 2015, Henry had an encounter with Ms. Marroquin in a Las Vegas hotel room. (Henry Tr., 85:23-25, 87:5-12, 136:11-137:10, 148:7-10.)

   **Response to Paragraph 259:**

   Admit.

260.   In the hotel room, Henry and Ms. Marroquin were naked in a bathtub together but did not have sexual intercourse. (Henry Tr., 148:11-149:11.)

**Response to Paragraph 260:**

Admit.

261. Henry did not disclose to FNN that he and Ms. Marroquin had met and were once naked together in a bathtub.  (Henry Tr., 150:17-151:6.)

**Response to Paragraph 261:**

Admit.

**Cathy Areu**

262. A woman named Cathy Areu was a co-plaintiff in this lawsuit when it was initially filed on July 20, 2020.  (Dkt. 1.)

**Response to Paragraph 262:**

Admit.

263. Ms. Areu's claims were thereafter severed and dismissed in their entirety.  (Dkt. 158.)

**Response to Paragraph 263:**

Admit.

264. Ms. Areu served as an occasional unpaid guest for FNN.  (Henry Tr., 231:22-25.)

**Response to Paragraph 265:**

Admit.

265. Henry and Ms. Areu were in communication and exchanged sexual pictures and GIFs. (Henry Tr., 234:20-24.)

**Response to Paragraph 265:**

Admit.

266. On July 1, 2020, after Henry's termination from FNN, Ms. Areu claimed that Henry had sent her pornographic texts.  (McKenna Decl. Ex. 36, ¶ 7.)

**Response to Paragraph 266:**

Admit.

267. FNN retained D&G to investigate the allegations, and D&G reported to FNN that there was no evidence to support Ms. Areu's allegations. (McKenna Decl. Ex. 36, ¶¶ 7, 12.)

**Response to Paragraph 267:**

Dispute. The investigator refused to answer questions about his investigation into Ms. Areu's claims. Ex. 6 (Gilman Dep.) at 63:10-68:15.



268. In the Fourth Amended Complaint, Eckhart alleges sexual contact between Henry and a woman referenced as "Jane Doe 1", who Eckhart later identified as ███████. (Fourth Am. Compl., ¶¶ 149-61; McKenna Decl. Ex. 113.)

**Response to Paragraph 268:**

Admit.

269. ███████ is a ███████ at FNN who met Henry in or around the Fall of 2016. (McKenna Decl. Ex. 114, ¶¶ 1, 3; Henry Tr., 423:25-424:4.)

**Response to Paragraph 269:**

Admit.

270. Henry was never ███████ supervisor and ███████ did not report to Henry. (McKenna Decl. Ex. 114, ¶ 3; Henry Tr., 424:5-7.)

**Response to Paragraph 270:**

Admit.

271. Henry and ███████ communicated through their personal email addresses. (McKenna Decl. Ex. 114, ¶¶ 4, 5.)

**Response to Paragraph 271:**

Admit, but further state that ███████ and Mr. Henry also communicated *via* messaging applications. Ex. 37; Ex. 52.

272. In or around November 2016, ███████ and Henry became involved in a welcome, consensual extramarital relationship that continued until around March or April of 2020. (McKenna Decl. Ex. 114, ¶¶ 5, 6, 10, 12; Henry Tr., 41:6-16, 424:17-21.)

**Response to Paragraph 272:**

Dispute.  Ex. 82 (███████ saying "I believed at the time it was consensual but I now

know better that it was predatory and I told her he was very emotionally abusive); Ex. 47 (███

███ describing her relationship with Mr. Henry: "I was victimized too, it's not as 'consensual'

as I thought"); Ex. 34 (███████ describing Mr. Henry as a "predator"); Ex. 35 (███████

describing Mr. Henry as a "creep"); Ex. 36 (███████ describing the relationship, "Yes def a

power imbalance.  And I absolutely now believe that he used ████████████

███████ to his advantage too."); Ex. 37; 45 (███████ describing Mr. Henry as an "addict"

and a "sex addict"); Ex. 39 (███████ describing Mr. Henry as "emotionally abusive"); Ex. 40

(███████ describing Mr. Henry as "psychotic"); Ex. 41 (███████ describing that Mr. Henry

sent her an unsolicited picture of his penis, which was a memory that she had "repressed"); Ex.

42 (███████ describing that she cried herself to sleep over Mr. Henry because of "how mean

he could be"); Ex. 43 (███████ referring to Mr. Henry as a monster and noting that he

"manipulated so many girls" and was "so evil to so many girls"); Ex. 44 (███████ describing

Mr. Henry as "a psychopath"); Ex. 46 (███████ describing that she was in a "deep

depression" and suicidal because of Mr. Henry); Ex. 48 (███████ saying that she is "scared of

Ed" and does not want him to "retaliate" against her); Ex. 49 (███████ describing Mr. Henry

as an "extra fucking predator"); Ex. 50 (███████ stating that she "told some [that] Ed was

emotionally abusive"); Ex. 51 (███████ stating that she "was so freaking manipulated by

Ed"); Ex. 5 (Eckhart Dep.) at 266:17-267:8 (███████ told Ms. Eckhart that Mr. Henry coerced

her into having sex in his office).

273.    ███████ never told anyone at FNN about her relationship with Henry until after
        Eckhart filed her lawsuit.  (McKenna Decl. Ex. 114, ¶ 11.)

**Response to Paragraph 273:**

Dispute.  Ex. 5 (Eckhart Dep.) at 285:19-286:2, 287:19-288:7; see also ¶ 199; Response

to ¶ 199 (the relationship was known to Fow News).

274.   ████████ has no reason to believe that anyone at FNN knew about her relationship with
Henry because they both went to great lengths to hide their relationship.  (McKenna Decl.
Ex. 114, ¶ 11.)

**Response to Paragraph 274:**

Dispute.  Ex. 5 (Eckhart Dep.) at 285:19-286:2, 287:19-288:7; see also ¶ 199; Response

to ¶ 199 (the relationship was known to Fow News).

275.   Henry is not aware of anyone, other than ████████ and himself, who knew about their
relationship during his employment at FNN.  (Henry Tr., 50:11-20.)

**Response to Paragraph 275:**

Admit, but their relationship was known by Fox News.  Ex. 5 (Eckhart Dep.) at 285:19-

286:2, 287:19-288:7; see also ¶ 199; Response to ¶ 199 (the relationship was known to Fow

News).

████████

276.   In the Fourth Amended Complaint, Eckhart alleges sexual contact between Henry and a
woman referenced as "Jane Doe 4", who Eckhart later identified as ████████.
(Fourth Am. Compl., ¶¶ 162-64; McKenna Decl. Ex. 113.)

**Response to Paragraph 276:**

Admit.

277.   In 2010, Henry started interacting on social media with ████████, a local news
producer at ████████.  (McKenna Decl. Ex. 115, ¶ 2.)

**Response to Paragraph 277:**

Admit.

278.   In 2012, Henry sent sexually explicit communications to ████████, who then worked
at ████████.  (McKenna Decl. Ex. 115, ¶ 3.)

**Response to Paragraph 278:**

Admit.

279.  ███████ sent Henry pictures of her breasts.  (Henry Tr., 254:24-255:2.)

**Response to Paragraph 279:**

Dispute.  Ex. 53 at ¶ 3.

280.  Through statements made in a December 2023 declaration that Eckhart produced in discovery in her lawsuit, ███████ claims that, in 2013 or 2014, while she was still employed at █████, she met Henry in a hotel room in Las Vegas, where Henry and ███████ kissed until ███████ told Henry to stop.  (McKenna Decl. Ex. 115, ¶ 4.)

**Response to Paragraph 280:**

Admit.

281.  ███████ became employed as a producer at FNN in October 2014.  (McKenna Decl. Ex. 115, ¶ 8.)

**Response to Paragraph 281:**

Admit.

282.  Through her December 2023 declaration, ███████ claims that, in or around November or December 2014, she met Henry at a bar and Henry tried to kiss her, but ███████ told Henry to stop.  (McKenna Decl. Ex. 115, ¶ 9.)

**Response to Paragraph 282:**

Admit.

283.  ███████ never told anyone at FNN about her experiences with Henry.  (McKenna Decl. Ex. 115, ¶ 10.)

**Response to Paragraph 283:**

Admit.

284.  During ███████ employment at FNN, she saw Henry about once a month and only at work, and Henry did not make any sexual advances towards her for almost three years. (McKenna Decl. Ex. 115, ¶ 10.)

**Response to Paragraph 284:**

Admit.

285.    In or around June 2018, ████████ got a new job at ██████ and had a "going away" party with FNN colleagues at a bar in New York.  (McKenna Decl. Ex. 115, ¶ 11.)

**Response to Paragraph 285:**

Admit.

286.    Through her December 2023 declaration, ████████ claims that at her going away party at a bar in Midtown Manhattan, Henry put his hand under a table and fingered ████ ██████ without consent; ████████ does not know if anyone saw what happened or remember if she pushed Henry's hand away or how she reacted.  (McKenna Decl. Ex. 115, ¶ 11.)

**Response to Paragraph 286:**

Admit.

████████

287.    In the Fourth Amended Complaint, Eckhart alleges sexual contact between Henry and a woman referenced as "Jane Doe 2", who Eckhart later identified as ████████.  (Fourth Am. Compl., ¶¶ 151; McKenna Decl. Ex. 113.)

**Response to Paragraph 287:**

Admit.

288.    ████████ formerly worked at FNN as a ████████████.  (McKenna Decl. Ex. 116, ¶¶ 3, 7.)

**Response to Paragraph 288:**

Admit.

289.    Henry was not ████████ supervisor, and he had no role in her hiring, oversight, or promotion at FNN.  (McKenna Decl. Ex. 116, ¶ 4.)

**Response to Paragraph 289:**

Admit.

290.    ███████ and Henry developed a mutually flirtatious banter relationship that took place primarily over email and text, but they never had any physical or romantic relationship. (McKenna Decl. Ex. 116, ¶¶ 5, 6; Henry Tr., 44:12-16.)

**Response to Paragraph 290:**

Admit.

291.    ███████ asked Henry to download the application Snapchat, through which they exchanged flirtatious pictures.  (Henry Tr., 46:4-23.)

**Response to Paragraph 291:**

Admit.

292.    Through a September 2023 declaration that Eckhart produced in discovery in her lawsuit, ███████ claims that on one occasion, Henry sent her an unsolicited photo of his penis via Snapchat.  (McKenna Decl. Ex. 116, ¶ 8.)

**Response to Paragraph 292:**

Admit.

293.    ███████ does not recall contemporaneously telling anyone at FNN about the photo, nor does she specifically recall telling anyone at FNN about the photo until 2020, after Eckhart's allegations against Henry were made public.  (McKenna Decl. Ex. 116, ¶¶ 9-11.)

**Response to Paragraph 293:**

Dispute.  ███████ testified (through declaration) that she "likely first told people at Fox News about the incident in the 2016 time frame, after the story came out about a relationship between Mr. Henry and a Vegas stripper."  McKenna Decl., Ex. 116 at ¶ 11.

███████

294.    During his deposition, Henry was asked to identify anyone at FNN with whom he had a sexual relationship during his employment at FNN, and Henry identified a woman named ███████.  (Henry Tr., 42:12-43:6.)

**Response to Paragraph 294:**

Admit.

295.    In or around 2015, Henry had a consensual sexual relationship with ███████ who was a producer at FNN.  (Henry Tr., 49:19-23, 418:22-419:17, 419:15-20; 420:15-23.)

**Response to Paragraph 295:**

Admit.

296.    ███████ did not report to Henry.  (Henry Tr., 419:12-14.)

**Response to Paragraph 296:**

Admit.

297.    Henry kept his sexual relations with ██████ a secret from FNN, and he does not believe that anyone at FNN ever learned about their relationship.  (Henry Tr., 49:24-50:3, 420:9-23.)

**Response to Paragraph 297:**

Dispute.  It is not credible that Mr. Henry made any effort to conceal his misconduct, as he has openly and notoriously engaged in inappropriate sexual misconduct, both in and outside of the workplace, throughout his entire career.  ASFM at ¶¶ __-__.

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

298.    In 2012, Ms. Eckhart graduated with a BS in in telecommunications from the University of Florida.  Ex. 5 (Eckhart Dep.) at 18:2-5.

299.    Ms. Eckart joined Fox News in January 2013.  Her aspirations were to be an on-air journalist.  ¶¶ 3-4.

300.    Ms. Eckhart believed that working at Fox News would help you get closer to her goal of being an on-air reporter and that she could meet people at Fox News that could help her become an on-air reporter.  Ex. 5 (Eckhart Dep.) at 40:16-23.

301.    While employed by Fox News, Ms. Eckhart had the opportunity to interact with Fox News reporters, and it remained her aspiration to be an on-air reporter or talent during the time she worked at Fox News.  Ex. 5 (Eckhart Dep.) at 40:16-24-41:7, 93:10-25.

### Additional Facts Regarding Relevant Interactions with Mr. Henry

302.    Ms. Eckhart's first communication with Mr. Henry was when he sent her a direct message on (then) Twitter, that said, "beautiful."  Ex. 5 (Eckhart Dep.) at 236:4-9, 246:12-23.

303.    At the time, Ms. Eckhart was 24 years old.  Ex. 5 (Eckhart Dep.) at 372:24-373:4.

304.    Following their initial communications and meeting, "[Mr. Henry] incessantly blew up [Ms. Eckhart's] phone demanding that [she] meet him for a quick drink.  [She] felt uncomfortable doing so, so [she] remember[s] him inviting [her] to have a drink that same night, to which [she] came up with an excuse because [she] didn't feel comfortable meeting him. And, luckily, [she] got out of that, but his communication with [her] persisted and he seemed really adamant about wanting to have a drink with [her]."  Ex. 5 (Eckhart Dep. 366:3-14).

305.    Mr. Henry would send Ms. Eckhart sexually suggestive text messages.  Examples include, "I bet you're really good in bed" and asking Ms. Eckhart how "tight" she was and if she

had a boyfriend.  Ex. 5 (Eckhart Dep.) at 371:2-11.  He also asked Ms. Eckhart what her favorite

sexual positions were and sent her (unsolicited) pornographic images and videos.  Id.

306.    Ms. Eckhart responded to some of these messages because she felt she had to, but

they made her very uncomfortable.  Ex. 5 (Eckhart Dep.) at 372:17-373:24.

307.    The photos and videos that Mr. Henry included "[w]omen getting slapped,

women getting abused, gang bangs [and] other pornographic images," and were "really

disturbing," "really upset" Ms. Eckhart and made her "super uncomfortable.  Ex. 5 (Eckhart

Dep.) at 374:11-375:25.

308.    Ms. Eckhart did not respond to these videos.  Ex. 5 (Eckhart Dep.) at 374:11-

375:25.

309.    Ms. Eckhart also did not tell Mr. Henry to stop sending them because she "was a

young girl, just starting her journalism career and [ ] did not feel [she] was in a position of power

to tell the chief White House correspondent of Fox News that [she] was uncomfortable with the

material he was sending [her]."  Ex. 5 (Eckhart Dep.) at 376:2-13.

310.    Ms. Eckhart did not tell anyone at Fox News that she was receiving the videos

because she was "scared and [ ] didn't want to lose [her] job."  Ex. 5 (Eckhart Dep.) at 376:17-

377:9.  Ms. Eckhart was concerned that any disclosure on her part would filter back to Mr. Henry

who had power and influence at Fox News and could get her fired.  Id.

311.    After being worn down by his multiple advances, Ms. Eckhart finally agreed to

meet Mr. Henry for a drink at the Marriott Marquis hotel.  Ex. 5 (Eckhart Dep.) at 379:8-19.

312.    Ms. Eckhart did not feel like she could say no to the request.  Ex. 5 (Eckhart

Dep.) at 383:14-16.

313.    Hopeful that she could use the opportunity to seek career advice, Ms. Eckhart brought with her a yellow legal pad with career related questions.  Ex. 5 (Eckhart Dep.) at 379:8-19.

314.    The questions on the pad included questions about Mr. Henry's work and career progression.  Ex. 5 (Eckhart Dep.) at 387:3-24.  She asked Mr. Henry about how he got to where he was in his career and whether he had any journalistic advice.  Id.  She also told him that she had on-air aspirations and wanted to be in front of the camera.  Id.

315.    Mr. Henry then told Ms. Eckhart that he wanted to have another drink up in his room, and that he wanted to discuss her career further.  Ex. 5 (Eckhart Dep.) at 417:6-12.

316.    When they got to the room, Mr. Henry did not initially discuss Ms. Eckhart's career.  Instead, he locked the door and forcefully started kissing her.  Ms. Henry threw Ms. Eckhart against the wall, quickly undressed her, threw himself on top of her on the bed and had intercourse with her without her consent.  Ex. 5 (Eckhart Dep.) at 418:16-419:2.

317.    Ms. Eckhart did not say "no" or fight Mr. Henry off because she was afraid of him and was not sure what would happen to her if she said no.  Ex. 5 (Eckhart Dep.) at 420:3-9.

318.    After having intercourse with Ms. Eckhart, Mr. Henry told her that she was beautiful and that she was wasting her time behind the scenes as a production assistant.  He said that she should be on camera becoming a star, and that he could put her in the room with really powerful people and decision-makers at Fox News.  Ex. 5 (Eckhart Dep.) at 424:4-13.

319.    The next physical interaction between Ms. Eckhart and Mr. Henry occurred on September 16, 2015.  SMF at ¶ 218.

320. On that day, Mr. Henry texted Ms. Eckhart on WhatsApp and demanded that she remove her underwear and put them in an envelope for him to retrieve at her desk. Ex. 5 (Eckhart Dep.) at 448:3-10.

321. Ms. Eckhart acquiesced to the demand because she felt that she would be punished professionally if she did not. Ex. 5 (Eckhart Dep.) at 450:14-24.

322. After Mr. Henry retrieved the underwear, he began to text Ms. Eckhart about what a dirty girl she is and told her to come see him in the guest office on at Fox News on the 17th floor of the building. Ex. 5 (Eckhart Dep.) at 453:14-24.

323. Ms. Eckhart felt that if she did not acquiesce to Mr. Henry's demands, she would be punished professionally, so she went to the guest office. Ex. 5 (Eckhart Dep.) at 456:19-457:2.

324. When she arrived, Mr. Henry was sitting at a desk and on the phone. Ex. 5 (Eckhart Dep.) at 453:14-455:11, 461:17-24. Ms. Eckart told Mr. Henry that she had to go because she was very busy, but he signaled for her to come into the room and close the door. Id. Ms. Eckhart did not close the door, but sat down and continued to express that she had to go and was very busy. Id. Mr. Henry proceeded to hang up the phone and closed the door himself. Id. Mr. Henr began forcibly kissing Ms. Eckhart, pinned her against the wall and shoved her head down with his hand. Id. Mr. Henry took off his belt, opened his fly, put his hand on Ms. Eckhart's head and used it to force her to give him oral sex against her will by jerking her head back and forth and grabbing on to her hair. Id.

325. After Mr. Henry's suspension, he continued to send Ms. Eckhart inappropriate sexual messages, some of which Ms. Eckhart responded to because she was afraid that if she did not she could lose her job. Ex. 5 (Eckhart Dep.) at 476:22-24.

326.    Mr. Henry told Ms. Eckhart on a number of occasions that that she must obey him, or be disciplined.  Ex. 5 (Eckhart Dep.) at 476:25-477:18.

327.    Ms. Eckhart sent the playlist referenced in MSF ¶¶ 229-230 to Mr. Henry because he demanded that she do so.  Ex. 5 (Eckhart Dep.) at 483:10-484:7.

328.    Ms. Eckhart's next physical interaction with Mr. Henry was on February 10, 2017.  Mr. Henry was in town to anchor Fox & Friends.  Ex. 5 (Eckhart Dep.) at 503:17-504:3.  Mr. Henry was staying at the Omni Berkshire Hotel, which Fox paid for.  Id.; Ex. 78.  He had messaged Ms. Eckhart over WhatsApp and asked to meet with him for a quick drink and to discuss her career at a restaurant called Fresco by Scotto.  Id.

329.    Ms. Eckhart met Mr. Henry at Fresco by Scotto, where Mr. Henry was waiting for her at the bar.  Ex. 5 (Eckhart Dep.) at 534:12-541:11.

330.    Mr. Henry announced that Fox News was going to give him his very own show.  Ex. 5 (Eckhart Dep.) at 534:12-541:11.

331.    This made Ms. Eckhart even more fearful of Mr. Henry because it demonstrated his power within the network.  Ex. 5 (Eckhart Dep.) at 534:12-541:11.

332.    Mr. Henry told Ms. Eckhart that he wanted to bring her on his future show.  Ex. 5 (Eckhart Dep.) at 534:12-541:11.

333.    He also asked her how her job was going and whether she had an agent.  Ex. 5 (Eckhart Dep.) at 534:12-541:11.

334.    Mr. Henry reiterated that Ms. Eckhart should be in front of the camera, rather than behind it, producing.  Ex. 5 (Eckhart Dep.) at 534:12-541:11.

335.    Mr. Henry and Ms. Eckhart each had one drink.  Ex. 5 (Eckhart Dep.) at 534:12-541:11.

336.    At that point, Mr. Henry asked Ms. Eckhart to discuss his impending promotion and her future at the network at his hotel.  Ex. 5 (Eckhart Dep.) at 534:12-541:11.

337.    Mr. Henry assured Ms. Eckhart that they would only be going for drinks.  Ex. 5 (Eckhart Dep.) at 534:12-541:11.

338.    Ms. Eckhart genuinely wanted to discuss her career and on-air aspirations, and agreed to go with Mr. Henry.  Ex. 5 (Eckhart Dep.) at 534:12-541:11.

339.    However, when the two left the restaurant, Mr. Henry forcibly pulled Ms. Eckhart by the arm and she started to panic.  Ex. 5 (Eckhart Dep.) at 534:12-541:11.

340.    She tried to come up with an excuse not to go, saying that her feet were hurting in her high heels.  Ex. 5 (Eckhart Dep.) at 534:12-541:11.

341.    That excuse did not seem to satisfy Mr. Henry, who continued to yank on her arm and lead her down the street.  Ex. 5 (Eckhart Dep.) at 534:12-541:11.

342.    As described by Ms. Eckhart: "After entering his hotel room, we did not have a drink. We did not discuss my career as was promised. Mr. Henry forced himself on me as he had done in the past. He ripped my dress and my coat off. Again, pinned me against a wall. And immediately turned -- after taking my clothes off, he turned me around really forcefully and proceeded to apply metal handcuffs to my wrists and throw me on the bed.  Mr. Henry then proceeded to take out his iPhone. I don't know if it was his work phone or his personal phone, but he proceeded to take photographs of me, helpless and restrained on the bed, and naked, and in that moment I knew that he was taking those degrading and humiliating photographs of me to store in his phone as collateral and deep down he knew that I would never want such humiliating photographs of me ever released. I asked him where -- "What do you intend on doing with these photos, like, like where am I going to see these photos." And he just laughed and laughed. I

asked him to delete the photos and he refused. And it was in that moment that I knew that what was going to happen next was going to be really bad.  I told him that the handcuffs were hurting my wrists. I asked him to remove them. He did not. He instead laughed at me and told me that -- and I assumed this was a threat, but "Yup, it helps when you've got friends with the NYPD, or you have a friend who's a cop," which is that moment he was basically telling me, "You  can't go to the police because I'm friends with the police and the police are on my side."  That's how I took that -- what I took that to mean at the time.  After he was done taking photographs of me against my consent, he proceeded to turn me over and violently hit me in the face multiple times . . . Ed Henry slapped me in the face multiple times, left my face bright red, and he really hurt me. Mr. Henry then turned me back upside down and removed his belt and proceeded to whip me with his belt multiple times. I asked for him to stop. He said no. Mr. Henry then turned me over again and proceeded to shove his fist up my vagina, which really hurt me. I felt really scared. I feel scared right now. And after he had done that to me, he then proceeded to forcefully rape me. He did not use a condom. I have tried so hard to forget this night from ever happening. I'm sorry for crying. I'm just -- he really, really injured me.  After he was finished with me, I guess he felt it was okay now for him to unrestrain me and remove the handcuffs that I had asked him to remove. My wrists were bleeding. I had a bloody lip. My -- I had red whipping marks all over my ass, my chest, everywhere. All over my body. My wrists were bleeding from the handcuffs. My vagina hurt, after he performed sadistic and painful acts on me of which I did not consent to.  After he removed the handcuffs, I quickly got dressed. How courteous, he asked if he could call me an Uber home. Had he not raped me, I probably would have taken him up on that offer, but I wanted to get the hell out of that hotel room. So I said, "No, I'll find my own way home," and I did. I ran out of the hotel lobby without my high heels on. I was holding them. I

flagged down a taxi. A taxi immediately pulled up. I got inside the taxi. The taxi -- I immediately started crying and the taxi driver turned around and asked if I was okay. I clearly was not. I had just been violently raped. And he asked where he needed to take me and I said, "Please just take me home." He asked me where home was and I told him my address. And he took me home. And before I got out of the cab, the cab driver told me that he would pray for me.  And I thanked him and I went upstairs and I cried myself to sleep."  Ex. 5 (Eckhart Dep.) at 534:12-541:11.

343.    After Mr. Henry violently raped Ms. Eckhart, he made numerous attempts to contact her.  Ex. 5 (Eckhart Dep.) at 240:18, 679:14-681:18.

344.    Between the date of this rape and the interaction described in SMF ¶246, Ms. Eckhart saw Mr. Henry "all the time."  Ex. 6 (Eckhart Dep.) at 679:14-681:18.  When she saw him, he would make advances towards her and wave and signal at her.  Id.

345.    On a handful of occasions, Mr. Henry passed by Ms. Eckhart's desk, she ran away from the desk and her colleague, Stu Oppenheim, would have to text her when the coast was clear.  Ex. 5 (Eckhart Dep.) at 241:4-10, 679:14-681:18.

346.    Ms. Eckhart had previously told Mr. Oppenheim that Mr. Henry was a problem and would often stalk her and hang around her desk, and that she did not feel comfortable being in his presence.  Ex. 5 (Eckhart Dep.) at 242:4-12, 679:14-681:18.

**Additional Facts Regarding Eckhart's Employment and Reporting Structure,
As Well As the Managerial and Supervisory Responsibilities of Claman and Henry**

347.    Ms. Eckhart reported to Ms. Clayman as well as Mr. Hirst.  Ex. 5 (Eckhart Dep.) at 363:21-25.

348.    Anchors are responsible for promotion decisions in relation to their editorial staff. Ex. 5 (Eckhart Dep.) at 66:8-12.

349.    Anchors make demands of their bookers if they want particular guests on their shows.  Ex. 5 (Eckhart Dep.) at 48:13-23.

350.    Anchors also controlled various aspects of the day-to-day work of administrative and production assistants assigned to their show, including requiring staff to collect dry cleaning, run personal errands, babysit their children and direct food ordering decisions.  Ex. 5 (Eckhart Dep.) at 51:12-52:21.

351.    Anchors can direct other employees, including production employees, to take their place in connection with events that they are unable to attend.  Ex. 5 (Eckhart Dep.) at 138:9-24, 140:7-12, 167:5-13, 174:17-20.

352.    Relatedly, anchors can task other employees, including production employees, to ask questions of people while covering for them at these events.  Ex. 5 (Eckhart Dep.) at 138:9-24, 140:7-12, 151:2-17, 167:5-13.

353.    Anchors are empowered with the authority to give permission to employees to cover events.  Ex. 5 (Eckhart Dep.) at 147:10-148:2, 152:7-16, 167:5-13, 174:17-20.

354.    Mr. Henry was in a position of power at Fox News and had a lot of influence with superiors at the Company.  Ex. 5 (Eckhart Dep.) at 265:7-12.

355.    Mr. Henry used his influence to put in a good word for ▮▮▮▮▮ with upper management when she was seeking a promotion.  Ex. 5 (Eckhart Dep.) at 266:3:10, 268:22-269:5; Ex. 7 (Henry Dep.) at 227:14-229:2..

356.    This was just one of the many examples of which Ms. Eckhart was aware of anchors and/or correspondents at Fox News helping to advance the careers of women.  Ex. 5 (Eckhart Dep.) at 266:3-10.

357.    Mr. Henry was superior to Ms. Eckhart within the Fox News organization.  Ex. 5 (Eckhart Dep.) at 362:12-19.

358.    On August 23, 2018, Ms. Eckhart received her 2018 performance review.  Ex. 73. She received an overall rating of 4 out of 5, *i.e.*, "exceeds expectations."  Id.  The review reads in part, "Jen is one of the most talented booker/researchers at the network and is an invaluable member of the Countdown team;" "She played a major role in the success of a small, but talented team that has grown the ratings of the show over 30% over the course of the last 52-weeks, making it the second highest rated business news program in the nation.  This year, Jeri has dramatically increased her responsibilities. She often handles multiple segments per day, including the crucial A Block reporter hit. Jen may be the best news writer on the team and understands the urgency of adding the most up to the minute detail of every story she writes . . . Jen's research packets are packed with information to give Liz additional 'value added' material. She thinks about creative ways to produce elements to complement her segments and has a clear and concise writing style that complements Liz's 'voice.'  Jen was instrumental in producing several major events for Team Countdown this year;" "Jen is an excellent employee who takes responsibility for her actions. She is one of the most dependable members of the staff and treats everyone equally."  Id.

359.    On July 10, 2019, Ms. Eckhart received her 2019 performance review.  Ex. 54. The review reads in part: "Jen is one of the most editorially sound members of our staff. Her research packets are thoughtful and typically well prepared.  She is an excellent writer and researcher who understands the needs and expectations of the anchor and Executive Producer. She is a pleasure to work with;" "Jen is an extremely detail oriented producer.  Her research packets are filled with information that generally makes its way onto television with great

frequency. She is a solid writer and spends a lot of time preparing packets for the anchor;" "Jen

has a nose for news and is constantly looking for the newest breaking detail to add to the top of

her scripts. She handles breaking news easily and responds positively to change. She prepares in

advance of any field shoots by coordinating packets for guests in advance, showing great

initiative."

360.    Mr. Hirst referred to himself as the "House Dad at Kappa Delta." Ex. 55 at FOX

002097. In the same email chain, Ms. Cascardi referred to the production team as a "sorority

house." Id.

361.    A few minutes prior to the February 10, 2024 meeting between Ms. Eckahrt, Mr.

Hirst and Ms. Collins, Ms. Eckhart was pulled aside by Mr. Hirst. Ex. 5 (Eckhart Dep.) at 160:5-

163:17, 198:16-200:10. Mr. Hirst advised Ms. Eckhart that the three of them would be meeting

about the Go Red event. Id. Mr. Hirst told Ms. Eckhart needed to watch her tone and

temperament in the meeting, and that if she become defense or lodged complaints she would face

repercussions. Id.

362.    During the February 10, 2024 meeting between Ms. Eckhart, Mr. Hirst and Ms.

Collins, Ms. Eckhart was accused of not following proper protocol in connection with the Go

Red event. Ex. 5 (Eckhart Dep.) at 160:5-161:15, 163:18-164:9, 169:14-170:8, 186:8-187:23,

192:16-193:197:7. Ms. Eckhart defended herself, explaining that she had followed the exact

same protocol for numerous other shoots. Id. Nevertheless, Ms. Eckhart apologized and stated

that she did not know she had failed to follow proper protocol. Id. Mr. Hirst and Ms. Collins

told Ms. Eckhart that they were considering whether to put her on a PIP. Id. Ms. Eckhart then

said that she was working in a toxic and hostile work environment. Id. Ms. Eckhart was crying

during the meeting. Id. At that point, as Ms. Eckhart started to provide more detail, Mr. Hirst

put his hand up to indicate to Ms. Eckhart that she needed to stop talking.  Ms. Collins turned to

Mr. Hirst and asked him whether he thought Ms. Eckhart was working in a toxic work

environment.  Id.  He said no, which seemed to satisfy Ms. Collins.  Id.  Ms. Eckhart did not

expressly mention sexual harassment or Mr. Henry because of the way she was shut down during

the meeting.  Id.

363.     Right after the February 10, 2024 meeting, Ms. Eckhart wrote a note to herself

that included, *inter alia*: (i) "In addition to the emotional and verbal abuse that goes on, I have

not yet mentioned the sexual harassment that goes on at every level in this building that I've

experienced firsthand on office property;" and (ii) "I plan to follow-up with Human Resources

on the status of the situation, but still remain frightened to come forward with my sexual

harassment claims."  Ex. 56.

364.     Neither Mr. Hirst nor Ms. Collins followed up on Ms. Eckhart's complaints in any

way, nor did Mr. Hirst even report them to his supervisor, Mr. Schreier.  Ex. 3 (Collins Dep.) at

86-89; Ex. 10 (Schrier Dep.) at 23-24.

365.     Ms. Collins purported not to even remember Ms. Eckhart's complaint, and instead

insisted that Ms. Eckhart's complaints were related solely to Alicia Cascardi.  Ex. 3 (Collins

Dep.) at 86-89.

366.     These denials are not credible given the contemporaneous notes.  Ex. 79.

367.     The reason that Ms. Eckhart had not previously complained about sexual

harassment or Mr. Henry's conduct is because it was an open secret at Fox News that woman

who lodged complaints would be retaliated against and punished.  Ex. 5 (Eckhart Dep.) at 230:8-

22.

368.    Moreover, Mr. Lord admitted that no one ever told him about Ms. Eckhart's complaints, and conceded that they should have been followed up upon and investigated.  Ex. 9 (Lord Dep.) at 240-242.

369.    Ms. Eckhart was aware of the following examples of women at Fox News who complained about sexual harassment and were retaliated against or terminated: Gretchen Carlson, Julie Roginsky, Cathy Areu, Diana Falzone, Britt McHenry and Tamera Holder.  Ex. 5 (Eckhart Dep.) at 231:11-20.

370.    When Mr. Hirst handed Ms. Eckhart the PIP, he assured her that it was nothing to worry about and told her that he knew that she would be able to excel and eventually get to a point where she would be taken off the plan, as they just wanted to have her on it for a month. Ex. 5 (Eckhart Dep.) at 205:10-206:10.

### <u>Additional Facts Regarding Mr. Henry's Sexual Misconduct Towards Others</u>

371.    Mr. Henry sexually assaulted his former colleague ███████.  Ex. 53. According to ███████, Mr. Henry's communications with her became increasingly uncomfortable as he would send her sexually explicit messages about what he would want to do to her if they ever met in person.  Ex. 53.  Then, in a Las Vegas hotel, Mr. Henry entered ██ ███████ room, launched himself at her and began to kiss her.  Ex. 53.  After getting over her shock at the situation, ███████ refused to continue and told Mr. Henry that his behavior was extremely inappropriate.  Ex. 53.  A year or two later, Mr. Henry suggested to ███████ that he had a hand in her getting a role at Fox News.  Ex. 53.  Two months later, Mr. Henry again attempted to kiss ███████ without her consent.  Ex. 53.  Finally, in 2018, at a going away party for ███████, Mr. Henry sexually assaulted her: "At some point, Henry was sitting across from me at a table, and though we had not had a physical encounter in years, he suddenly

and very unexpectedly put his hand under the table and under my skirt and fingered me.  He did this without my consent . . . I remember feeling considerable distress and confusion." Ex. 53.

372.    Mr. Henry lied about his interactions with ███████ during his deposition.  Ex. 7 (Henry Dep.) at. 253-256.

373.    ████████, a ████████ with whom Mr. Henry had an affair at Fox News (starting in November 2016), testified *via* declaration that on one occasion he hit her so hard that she began to cry.  Ex. 57.

374.    ████████ testified in her declaration, "[a]t some point after I shared my personal contact information with Ed, he sent me an unsolicited picture of a penis, which I assumed was his own. I was shocked." Ex. 57.

375.    During his deposition Mr. Henry lied and testified that he never sent a picture of his penis to ████████ .  Ex. 7 (Henry Dep.) at 225.

376.    Mr. Henry admitted to engaging in inappropriate sexual banter with many other subordinates and colleagues, including ████████ and Cathy Areu. Ex. 7 (Henry Dep.) at 43-45.

377.    ████████ testified in her declaration: "at one point Mr. Henry sent me a photo of his penis, via Snapchat. I never asked for or solicited the photo, and never in any way indicated to Mr. Henry that I wanted to see a picture of his penis. I was shocked and upset when I saw the photo, and threw my phone aside." Ex. 58.

378.    During his deposition, Mr. Henry lied and testified that he never sent a picture of his penis to ████████, which was a lie.  Id.

379.    As for Ms. Areu (who was seeking Mr. Henry's assistance with getting a job at Fox News), Mr. Henry sent her various sexual GIFs and images, including a photograph of a

vagina being clamped shut with clothespins, as well as a video entitled "fastest video ever," in which an interviewee exposes her vagina to get a job.  Ex. 7 (Henry Dep.) at 234-235; Ex. 59 (Amended Complaint filed by Ms. Areu against Fox News, Mr. Henry and others).

380.    After sending the latter video, Mr. Henry asked Ms. Areu if she was available for an interview.  Ex. 59 (Amended Complaint filed by Ms. Areu against Fox News, Mr. Henry and others).

381.    ██████████ was another female colleague of Mr. Henry's who was subjected to unwanted sexual communications. ████████████████████.  At the time, it made her so uncomfortable that she forwarded the message to then-Fox News host ████████ . ██████████████. ████████ agreed that the message was inappropriate. ████████████████ ████████ also ultimately disclosed this communication to Mr. Lord in April 2017.  Ex. 14; ████████████████

382.    Roxie Marroquin was dating a Fox News White House correspondent and colleague of Mr. Henry's in 2015 when Mr. Henry reached out to her through a private Twitter DM.  See https://www.truehollywoodtalk.com/woman-claims-ex-fox-news-anchor-ed-henry-sends-private-investigator-to-silence-her-from-exposing-their-extra-marital-rendezvous/.

383.    Ms. Marroquin, who was at the time only 25 years old and seeking a mentor in the media industry, asked Mr. Henry to "meet up…just as friends of course," and suggested that "maybe [he] c[ould] teach [her] a few things about the industry."  See https://www.truehollywoodtalk.com/woman-claims-ex-fox-news-anchor-ed-henry-sends-private-investigator-to-silence-her-from-exposing-their-extra-marital-rendezvous/.

384.    Mr. Henry, seizing yet another opportunity to take advantage of a young woman, began texting Ms. Marroquin sexual messages, including stating that she had a "tight body" and

"must have given [her ex-boyfriend] amazing sex."  See

https://www.truehollywoodtalk.com/woman-claims-ex-fox-news-anchor-ed-henry-sends-private-investigator-to-silence-her-from-exposing-their-extra-marital-rendezvous/.

385.    Mr.  Henry then invited Ms. Marroquin to meet him at The Wynn hotel in Las

Vegas, Nevada.  See https://www.truehollywoodtalk.com/woman-claims-ex-fox-news-anchor-ed-henry-sends-private-investigator-to-silence-her-from-exposing-their-extra-marital-rendezvous/.

386.    When Ms. Marroquin arrived at the Wynn hotel – after telling Mr. Henry that she

only wanted to be friends – Mr. Henry asked her to go back to his hotel room, purportedly

because he did not want people to recognize him in public.  See

https://www.truehollywoodtalk.com/woman-claims-ex-fox-news-anchor-ed-henry-sends-private-investigator-to-silence-her-from-exposing-their-extra-marital-rendezvous/.

387.    When the two arrived at his hotel room, Mr. Henry drew up a bubble bath and

directed Ms. Marroquin to join him in it.  See https://www.truehollywoodtalk.com/woman-claims-ex-fox-news-anchor-ed-henry-sends-private-investigator-to-silence-her-from-exposing-their-extra-marital-rendezvous/.

388.    After she got into the bathtub, Mr. Henry began touching her breasts and vagina

and asked her to touch him.  See https://www.truehollywoodtalk.com/woman-claims-ex-fox-news-anchor-ed-henry-sends-private-investigator-to-silence-her-from-exposing-their-extra-marital-rendezvous/.

389.    Ms. Marroquin submitted to the pressure of Mr. Henry's advances.  See

https://www.truehollywoodtalk.com/woman-claims-ex-fox-news-anchor-ed-henry-sends-private-investigator-to-silence-her-from-exposing-their-extra-marital-rendezvous/.

390.    Soon thereafter, Mr. Henry began to panic out of fear that Ms. Marroquin would expose their sexual encounter.  See https://www.truehollywoodtalk.com/woman-claims-ex-fox-news-anchor-ed-henry-sends-private-investigator-to-silence-her-from-exposing-their-extra-marital-rendezvous/.

391.    He began sending her harassing messages demanding that she meet with him and threatening her.  See https://www.truehollywoodtalk.com/woman-claims-ex-fox-news-anchor-ed-henry-sends-private-investigator-to-silence-her-from-exposing-their-extra-marital-rendezvous/.

392.    In one message, Mr. Henry wrote: "If you are talking [to a magazine] I am pushing back super hard and pointing out [her ex-boyfriend] so that I tell the truth.  Tell me you are not talking or I am going to [the] magazine to push back hard."  See https://www.truehollywoodtalk.com/woman-claims-ex-fox-news-anchor-ed-henry-sends-private-investigator-to-silence-her-from-exposing-their-extra-marital-rendezvous/.

393.    Mr. Henry subsequently arranged to meet with Ms. Marroquin at a restaurant in Washington, D.C.  However, when Ms. Marroquin arrived at the restaurant with her son, she was, instead, confronted by a private investigator who told her to "keep her mouth closed" and that he knew where she lived.  See https://www.truehollywoodtalk.com/woman-claims-ex-fox-news-anchor-ed-henry-sends-private-investigator-to-silence-her-from-exposing-their-extra-marital-rendezvous/.

394.    He also threatened that Mr. Henry would sue her.  See https://www.truehollywoodtalk.com/woman-claims-ex-fox-news-anchor-ed-henry-sends-private-investigator-to-silence-her-from-exposing-their-extra-marital-rendezvous/.

395.    In Ms. Marroquin's words: "I have nothing to hide…Ed Henry is a sexual predator.  I do know that he preys on girls who are very young and very impressionable."  See https://www.truehollywoodtalk.com/woman-claims-ex-fox-news-anchor-ed-henry-sends-private-investigator-to-silence-her-from-exposing-their-extra-marital-rendezvous/.

396.    ████████████████████ with whom Mr. Henry had an affair.  This affair was well known to others at Fox News.  Ex. 4 (██ Dep.) at 28-29.

397.    Mr. Henry was also "sexting" another woman in the industry, which came to the attention of ██████ and, eventually, to Fox News' HR and top executives.  Ex. 4 (██ Dep.) at 18-21.

398.    After this action was filed, one of Mr. Henry's former colleagues at CNN, Brooke Hammerling, tweeted, "No chance @foxnews didn't know about Ed Henry.  He was a menace to many of us on the comms side when he was @cnn and everyone talked about it.  Literally so so so gross." Ex. 74.

399.    ██████████, who worked with Mr. Henry in the DC Bureau, said that her and others openly discussed Mr. Henry's behavior towards women and a sexual relationship he was having with a producer in New York City.  Ex. 1 (██ Dep.) at 16-19, 23, 25.

**ADDITIONAL FACTS REGARDING MR. HENRY'S CAREER AT FOX NEWS**

400.    When the news of Mr. Henry's sex worker affair broke, he was earning ████ per year.  Ex. 7 (Henry Dep.) at 73-75.

401.    While he was "suspended" – *i.e.*, sent to a sex rehabilitation program – he was still paid.  Ex. 7 (Henry Dep.) at 72; Ex. 3 (Collins Dep.) at 238-239; Ex. 6 (Gilman Dep.) at 14-15..

402.    Then, for a few months, Mr. Henry's compensation was cut to ███ per year. Ex. 7 (Henry Dep.) at 73-75.

403.    However, by the beginning of 2017, Fox News decided to *increase* Mr. Henry's compensation to ███ per year.  Ex. 7 (Henry Dep.) at 73-75.

404.    Fox News continued to increase Mr. Henry's compensation and he ultimately was earning ███ at the time of his departure.  Ex. 7 (Henry Dep.) at 73-75.

405.    Mr. Henry's responsibilities also increased over time, as he began hosting Fox and Friends on the weekend and eventually was given the Anchor position on America's Newsroom.  Ex. 7 (Henry Dep.) at 79.

406.    Mr. Henry's second contract with Fox News ran from July 2014 to July 2017.  Ex. 75; Ex. 7 (Henry Dep.) at 53-54.

407.    During that time, Mr. Henry was employed as the Chief White House Correspondent and a General Assignment News Reporter.  Ex. 7 (Henry Dep.) at 58.

408.    Prior to the expiration of the second contract, and on the heels of his suspension, Mr. Henry entered into a third contract in March 2017.  Ex. 80; Ex. 7 (Henry Dep.) at 58-61.

409.    Fox News started to negotiate that contract after Mr. Henry's suspension, and before he raped Ms. Eckhart in February 2017.  Ex. 7 (Henry Dep.) at 61.

410.    This third contract reflects that Mr. Henry would be promoted to an anchor position, and Mr. Henry testified that he was being considered for that promotion by late-2016, mere months *after* his suspension ended.  Ex. 7 (Henry Dep.) at 61-62.

411.    This was confirmed by Mr. Wallace.  Ex. 11 (Wallace Dep.) at 143-144.

412.    Mr. Lord was completely cut out of the decision to give Mr. Henry this third contract.  Ex. 9 (Lord Dep.) at 74.

## Additional Facts Regarding Sexual Harassment at Fox News

413.    In 2016, Former Fox News anchor Gretchen Carlson, and at least 20 other

women, accused former-Fox News Chairman and CEO Roger Ailes, of sexual misconduct.  See

https://www.huffpost.com/entry/roger-ailes-accusers-list_n_57a9fa19e4b06e52746db865.

414.    Shortly thereafter, Bill Shine ("Mr. Shine") (who played an integral role in this

case, as described below), who Fox News installed as Co-President of the Company after Mr.

Ailes' departure, left Fox News following accusations that he aided and abetted the sexual

harassment crimes of Roger Ailes.  See https://www.nytimes.com/2018/07/05/us/politics/bill-

shine-fox-news.html.

415.    Mr. Shine's Co-President, Jack Abernathy, was also accused of sexual

harassment, but remains employed.  See

https://www.nytimes.com/2017/01/10/business/media/bill-oreilly-sexual-harassment-fox-news-

juliet-huddy.html.

416.    Later, reports were published that exposed the lengthy history of sexual

harassment allegations against Fox News' biggest and highest earning star, Bill O'Reilly,

including reports that Fox News offered him a massive $100 million contract over four years

notwithstanding its prior knowledge of his sexual misconduct.  See

https://www.nytimes.com/2017/04/01/business/media/bill-oreilly-sexual-harassment-fox-

news.html; https://www.nytimes.com/2017/10/21/business/media/bill-oreilly-sexual-

harassment.html.

417.    Specifically, by January 2017, Fox News was aware that Mr. O'Reilly had

entered into at least six settlement claims of sexual harassment, including a January 2017

settlement of a claim involving allegations of "repeated harassment, a nonconsensual sexual

relationship and the sending of gay pornography and other sexually explicit material." <u>See</u>

https://www.nytimes.com/2017/10/21/business/media/bill-oreilly-sexual-harassment.html.

418.    One month later, in February 2017 – at the same time Fox News was renewing

Mr. Henry's contract – Fox News renewed Mr. O'Reilly's contract.

https://www.nytimes.com/2017/10/21/business/media/bill-oreilly-sexual-harassment.html.

419.    Incredibly, when confronted about this by the New York Times, the Company

said, "Fox News 'surely would have wanted to renew' Mr. O'Reilly's contract, noting that 'he

was the biggest star in cable TV.'" <u>See</u>

https://www.nytimes.com/2017/10/21/business/media/bill-oreilly-sexual-harassment.html.

420.    Mr. O'Reilly was only terminated by Fox News months later when advertisers

started dropping his show, "The O'Reilly Factor," and the Murdoch family learned that federal

prosecutors were on the verge of learning about his bombshell January 2017 settlement.  <u>See</u>

https://www.nytimes.com/2017/10/21/business/media/bill-oreilly-sexual-harassment.html;

https://www.forbes.com/sites/maddieberg/2017/04/04/here-are-all-the-advertisers-who-have-

dropped-bill-oreilly/?sh=24d69c377987.

421.    In a desperate attempt to try to salvage what remained of Fox News' documented

history and reputation of animus toward women in the workplace, Fox News made the strategic

decision to promote a female, Suzanne Scott, to be its current Chief Executive Officer,

notwithstanding the fact that a litany of individuals allege that she, too, covered up claims of

sexual harassment, including those perpetrated by Mr. Ailes.  <u>See</u>

https://www.theguardian.com/media/2018/may/17/suzanne-scott-who-is-she-fox-news-ceo-

female-miniskirt-rule.

## **Fox News' Inadequate Human Resources Department and Policies**

422.    Ms. Collins joined Fox News in 2001 and has held the role of Senior Vice

President of Human Resources since approximately 2015.  Ex. 3 (Collins Dep.) at 28:4-8.

423.    Until January 2017, Ms. Collins was the Senior HR professional at Fox News;

yet, she was unaware of a single complaint of sexual harassment that had been brought against

Mr. Ailes or Mr. O'Reilly during her tenure.  Ex. 3 (Collins Dep.) at 70-81.

424.    As described by on-air personality, ███████, prior to January 2017, "[t]here was

no place to really report the behavior . . . [t]here was no real HR or avenue where we could

report the behavior."  Ex. 4 (███ Dep.) at 57-58.

425.    Ms. ███ added that employees at Fox News "weren't told where to go, if [they]

had complaints of sexual harassment."  Ex. 4 (███ Dep.) at 59.

426.    That was true from 2004 all the way through the time that Gretchen Carlson sued

Fox News and Mr. Ailes in July 2016.  Ex. 4 (███ Dep.) at 59.

427.    Ms. ███ was not the only one who felt this way, and the women with whom Ms.

███ interacted were also always fearful of retaliation if they reported sexual harassment.  Ex. 4

(███ Dep.) at 59-62.

428.    In January 2017, Fox News hired Kevin Lord and he has overseen HR at Fox

News since that time.  Ex. 9 (Lord Dep.) at p. 7.

429.    Mr. Lord previously worked for NBC, where he oversaw the HR function for the

Today Show.  Ex. 9 (Lord Dep.) at p. 17.

430.    Under Mr. Lord's watch at NBC, Matt Lauer, the host of the Today Show,

sexually harassed multiple women and NBC Universal's CEO used his position of power to

force NBC anchor Hadley Gamble into a sexual relationship.  Ex. 9 (Lord Dep.) at 18-22; see

also https://www.nytimes.com/2023/05/02/business/media/hadley-gamble-jeff-shell-fired.html;

https://people.com/tv/matt-lauer-sexual-harassment-assault-allegation-breakdown/.

431.    While Fox News might not have known this at the time Mr. Lord was hired, its parent company, Fox Corporation, was well aware of it when Mr. Lord was promoted in 2019. Ex. 9 (Lord Dep.) at p. 15.

432.    Mr. Lord was ostensibly hired to help grow the HR function, make it more visible within the organization and give a fresh set of eyes to recruitment, development, training and sexual harassment complaint procedures.  Ex. 9 (Lord Dep.) at 51-53.

433.    As to the latter, one of the goals was to build a more robust HR team so that employees would know how to complain about harassment.  Ex. 9 (Lord Dep.) at p. 56.

434.    Indeed, Mr. Lord admitted that prior to his arrival, various bureaus, including the D.C. bureau in which Mr. Henry worked, did not even have full-time HR support.  Ex. 9 (Lord Dep.) at 56-57.

435.    In the lead-up to his hire, Mr. Lord purportedly never discussed Mr. Ailes, nor was he filled in on the litany of sexual harassment complaints that had been made against Fox News' most important anchor, Bill O'Reilly.  Ex. 9 (Lord Dep.) at 76.

436.    Moreover, Mr. Lord was cut out of all involvement with Fox News' decision to extend Mr. O'Reilly's contract in February 2017 despite the many allegations of sexual harassment that had been made against him.  Ex. 9 (Lord Dep.) at 83.

437.    In addition, when asked about the decision to reemploy Mr. Henry after his sex scandal, Mr. Lord said that he did not have the authority to even suggest that Fox News revisit that decision despite being the top HR professional at the Company.  Ex. 9 (Lord Dep.) at 139.

Mr. Lord also was not involved in the decision to renew Mr. Henry's contract in 2017. Ex. 9 (Lord Dep.) at 74.

438.    Mr. Lord was unable to even provide an opinion as to whether the allegations against Mr. Ailes were true, a totally embarrassing position to take under oath and one that firmly establishes that Mr. Lord is in the pocket of Fox Corporation executives. Ex. 9 (Lord Dep.) at 34-41.

439.    When pressed on the issue in a teleconference deposition, Mr. Lord abruptly put Ms. Eckhart's counsel on mute and walked out of the deposition. Ex. 9 (Lord Dep.) at 34-41.

440.    Mr. Lord similarly refused to answer questions about whether Mr. Ailes' termination was related to the many complaints of sexual harassment made against him. Ex. 9 (Lord Dep.) at 47-49.

441.    Mr. Lord did not know if a single one of the women who made allegations against Mr. Ailes ever did so through Fox News' AlertLine, nor could he speak to "what was in place" before he joined. Ex. 9 (Lord Dep.) at 49-50.

442.    Accordingly, Mr. Lord was not even privy to what it was that he was supposedly brought it to improve. Ex. 9 (Lord Dep.) at 49-50, 76.

443.    Moreover, Fox News did not even bother to inform Mr. Lord – its highest-ranking HR official – of the various allegations of sexual harassment and rape that arose during this litigation, including: ██████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████ Ex. 9 (Lord Dep.) at 76-80, 155.

444.    Nor did Mr. Lord have any idea whether those allegations had been investigated. Ex. 9 (Lord Dep.) at 76-80, 155.

445.    After Mr. Ailes was terminated, an outside law firm, Paul Weiss, was hired to conduct a "sweeping" investigation into Fox News' culture and complaints of sexual harassment. Ex. 3 (Collins Dep.) at 77.

446.    Not one policy change was made at Fox News as a result of Paul Weiss' investigation.  Ex. 3 (Collins Dep.) at 211-212.

447.    Ms. Collins testified that during the Paul Weiss investigation she did not "notice any change" in the environment at Fox News other than Mr. Ailes' departure.  Ex. 3 (Collins Dep.) at 213.

448.    Mr. Lord testified that he was not aware of a single person who was disciplined as a result of the investigation.  Ex. 9 (Lord Dep.) at 303.

**Fox News Disregards Complaints About Ed Henry**

449.    Shortly after Mr. Lord joined Fox News, he hosted a sensitivity training concerning sexual harassment and discrimination for the D.C. bureau.  Ex. 9.

450.    Before the training, Mr. Lord was approached by ███████ who told Mr. Lord about Mr. Henry's affair with the Las Vegas sex worker and her concerns that Mr. Henry had been brought back to work at Fox News.  Ex. 9 (Lord Dep.) at 63-66.

451.    Mr. Lord promised ███████ that he would speak with folks back at the office, and he did later speak with Mr. Shine.  Ex. 9 (Lord Dep.) at 69-70.

452.    Mr. Shine explained that Mr. Henry had completed treatment at a sexual rehabilitation center, and that was that.  Ex. 9 (Lord Dep.) at 70.

453.    No one ever circled back with ███████.  Ex. 17.

454. Shine would later go on to refer to Mr. Henry as "a troubled soul, but [ ] actually a good guy." Ex. 18.

455. In April 2017, ███████ informed Mr. Wallace about her affair with Mr. Henry. Ex. 11 (Wallace Dep.) at 93-96.

456. She was interviewed by HR on April 24, 2017. Exs. 18, 19, 20.

457. During her interview, ███████ conveyed that she had learned that Mr. Henry was being considered as an anchor for one of the shows she produced. Exs. 18, 19, 20.

458. ███████ disclosed her affair, and also conveyed that she had heard from two reliable sources that there was "some covering up of Ed's sexting incidents by the DC team" (she believed by ███████████████████████████████████████████ ███████████████████████████████████████████ ███████ **before** the news of Mr. Henry's affair with a sex worker broke (and before the violent rape of Ms. Eckhart). Exs. 18, 19, 20.

459. She also disclosed that Mr. Henry used his Company device for sexting and was sleeping with a desk assistant at the D.C. Bureau. Exs. 18, 19, 20.

460. ███████ went on to explain that "people across DC & NY have reached out to ████ expressing their discomfort and disdain" that Mr. Henry was back at Fox News and warned that if Mr. Henry was given an anchor position he would use his position of power to prey on women. Exs. 18, 19, 20

461. Finally, ███████ said that Mr. Henry had not changed after graduating from his "sex addict's camp." Exs. 18, 19, 20.

462.    Unbelievably, not one person asked Mr. Henry about any of these allegations in connection with any supposed "investigation," which is something that Mr. Lord was entirely unable to explain.  Ex. 9 (Lord Dep.) at 207-211.

463.    Moreover, though Mr. Lord claimed at his deposition that IT was brought in to try to determine whether Mr. Henry used his Company device for sexting, that claim was demonstrably false, as there is not one document to support it and Mr. Lord had no recollection of any outcome into that process (that never occurred).  Ex. 9 (Lord Dep.) at 217-220.

464.    Then, on May 22, 2017, ████████ sent an email to various Fox News executives, including Mr. Lord, Mr. Wallace, Bill Sammon and Bryan Boughton, the D.C. Bureau Chief.  Ex. 17.

465.    The email alleged retaliation in connection with ████████ decision to report discrimination to Paul Weiss.  Ex. 17.

466.    Specifically, after the report was made, ████████ was given a bogus final warning that cited an incident from four years prior.  Ex. 17.

467.    The email reads, in part:

- [T]he 2013 incident is part of a pattern of bullying female employees by ████████.

- I do not think that it is a coincidence that this reprimand comes less than three weeks after my conversation with Paul Weiss [on] April 28.  During that conversation, as I am sure you are aware, I engaged in protected activity by discussing various discriminatory and harassing behaviors I have witnessed in my workplace.

- I believe it is only a matter of time before a rival news outlet picks the scab of the DC bureau which has an unflattering nickname, "the Hume plantation," [in reference to anchor ████████] where "they like to keep down women and African Americans."

- After the [Paul Weiss] meeting, the individuals on whose watch gender, age and sexual harassment settlements occurred – ████

███████████████████████████, -- now threaten my termination.

- Moreover, I find the bullying tactics used in an attempt to deny me of my right to work in an environment free of discrimination and harassment to be gender based discrimination and hostile work environment. ████████████ is a witness.

- By example, Washington DC correspondent Ed Henry who had a well-documented extramarital affair with a Las Vegas sex worker, and reportedly sent texts of his penis to her, returned to work and was promoted to high profile anchoring shifts. I heard from co-workers in DC who said it was demoralizing for the women and protected minorities after the Ailes investigation, and public commitments by the Murdoch's to a culture change.

- My co-workers who have less seniority asked me to raise the issue with HR Kevin Lord during the DC sensitivity training which I did, but there was no follow up from Lord.

- I raised similar concerns with ████████████ who said that he considered Henry's situation a closed matter, and his view was shared by Bill Shine, Suzanne Scott, Jay Wallace and Bill Sammon. In a bullying tone, ████████ told me "never to raise it again."" This behavior was designed to silence legitimate questions about management's decision to increase the TV profile of an employee who had shamed the network, and acted inappropriately on assignment, at the height of the Ailes sexual harassment scandal.

- One of our colleagues called the Henry elevation to anchoring a "self-inflicted wound" for the network that showed Ailes' remaining lieutenants would resist the Murdoch's genuine call for and commitment to culture change. Along with many female colleagues, I too was subjected to grossly inappropriate behavior by Roger Ailes.

- In the process of trying to understand how executives came to such a decision about Henry, I was told by a co-worker that it is an "open secret" in NY that ███████████████ was having an affair with his ██████████ ████████████ who was then promoted.

Ex. 17.

468.    ████████ was never interviewed, another fact that Mr. Lord lied about during his deposition.  Cf Ex. 9 (Lord Dep.) at 167 with Ex. 3 (Collins Dep.) at 272.

469.    Fox News did nothing to genuinely investigate the concerns raised in this email. Mr. Lord claimed that he asked his subordinate to engage in "sensing sessions" with employees in the D.C. Bureau.  Ex. 9 (Lord. Dep.) at 131-141.

470.    However, he was not aware of a single piece of evidence to support the contention that this entirely inadequate process ever even occurred.  Ex. 9 (Lord. Dep.) at 131-141.

471.    He also did not know to whom his subordinate had spoken, and claimed that someone had followed up with ████████, but this also was clearly untrue.  Ex. 9 (Lord. Dep.) at 131-136.  Moreover, Mr. Lord never even spoke with his subordinate about anything she was told during these supposed "sensing sessions."  Ex. 9 (Lord. Dep.) at 131-141.

472.    He also could not remember any details about the investigation, and did not know whether any employees were actually asked specific questions, as opposed to being asked generally about how things were going.  Ex. 9 (Lord. Dep.) at 160-162.

473.    Mr. Lord forwarded ████████ email to the subordinate who supposedly did the "sensing sessions" with a flippant joke, "welcome to Fox News."  Ex. 76.

474.    He also disparaged ████████ in the email, and, of course, said nothing about an investigation.  Ex. 76.

475.    Fox News' eventual response to ████████ email makes clear that no investigation was ever done, and that her concerns around sexual harassment and discrimination were completely ignored, as they were not even referenced in the response.  Ex. 21.

476.    Moreover, the response states explicitly that the Company is not going to investigate the concerns.  Ex. 21.

477.     Finally, Mr. Henry confirmed that no investigation was done, as no one ever asked Mr. Henry any questions about ███████ concerns.  Ex. 7 (Henry Dep.) at 257-259.



486.     ████████████████████████████████████, was the subject of approximately five complaints of discrimination, retaliation and/or hostile work environment. Ex. 3 (Collins Dep.) at 44-54.  He was never disciplined and remains employed by Fox News.

Ex. 3 (Collins Dep.) at 44-54.  At least one of the complainants was later terminated.  Ex. 3 (Collins Dep.) at 73.

487.    In addition to Ms. ███ own experiences with Mr. Ailes (see ███████████████████████████████████████████████), she also identified other victims of sexual harassment, including ████████████████████████████████.  Ex. 4 (███ Dep.) at p. 49. ████████████████████ were sexually harassed by Mr. Ailes, and ██████ was sexually harassed by both Mr. Ailes and ██████████.  Ex. 4 (███ Dep.) at 53; Ex. 1 (███ Dep.) at 44-57. ████████ was sexually harassed by ██████████.  Ex. 4 (███ Dep.) at 55.

488.    ██████████████████████████████ was alleged to have sexually harassed Fox News ████████████████████, who made a complaint through the Company's AlertLine.  Ex. 25; Ex. 3 (Collins Dep.) at 98, 144.  Ms. Collins determined that the allegations were unsubstantiated because ██████████ also texted flirtatious messages to ██████, despite the fact that ██████████ explained that she felt she had to do so.  Ex. 3 (Collins Dep.) at 137-138, 149-150, 162-163.  Indeed, she explained that when she did not submit to his sexually inappropriate comments, ██████████ would become angry and retaliate against her.  Ex. 25.  ██████████ also explained that she reported this behavior to many managers, none of whom took remedial action (and one of whom remarked, "better you than me").  Ex. 25.  These managers violated their own reporting obligations, but Ms. Collins could not remember if those violations were even investigated.  Ex. 3 (Collins Dep.) at 176-177.

489.    Another supervisor that worked with ██████████████, openly encouraged his colleagues to look at photographs of yet another female colleague, ██████████ ████████████████████.  Ex. 3 (Collins Dep.) at 170-171.  This was reported to Ms.

Collins but was never investigated even though Ms. Collins admitted that the same would be a violation of Fox News' policies.  Ex. 3 (Collins Dep.) at 170-171.

490.     Fox News ███████████████████ was sexually harassed by ███████████ ███████ while he was working with her on a story.  Ex. 3 (Collins Dep.) at 217-218.

491.     ████████████████████████████████████████ sexually harassed Fox News ████████████████ over the course of five or six years.  Ex. 3 (Collins Dep.) at 219-220.

492.     In 2011, Fox News Executive ███████ was investigated by Ms. Collins for making a sexual advance towards ████████████████████, and retaliating against her after the advance was rejected.  Ex. 77 (Collins Dep., Day 2) at 14-18.  During the course of the investigation, Ms. Collins did nothing to prevent ████████ from continuing to report to Mr. ████.  Ex. 77 (Collins Dep., Day 2) at 32-33.  Ms. Collins cleared Mr. █████.  Ex. 77 (Collins Dep., Day 2) at 34.  Mr. ██████ continued to work at Fox News over the course of the next 12 years.  See ███████████████████████████████████████████ ██████████████████████/. He was finally terminated in 2023 when it was discovered that he was a serial sexual harasser and stalker.  See ████████████████████████████████████████████████ ████████████████████████.

493.     Fox News personality ████████████████████ sexually harassed his colleague, ████████████.  Even though Mr. Lord testified that Fox News personality ██████ ████████████████ send Fox News employee ████████████ inappropriate sexual texts, but had no recollection of whether ██████ (who plays a very prominent role on Fox News to this day) was disciplined at all.  Ex. 9 (Lord Dep.) at 95-96.

494.    In November 2016, former Fox News ████████████████ sexually harassed former Fox News ██████████████ . Ex. 26. Ms. Collins could not even remember the outcome of her "investigation" into these allegations, but at most ████████ received "counseling." Ex. 3 (Collins Dep.) at 266-267.

495.    In November 2017, Fox News Reporter ██████████ was accused of sexual harassment by ███████ . Ex. 27. He admitted to the sexual harassment, including physical touching and attempting to force a kiss onto █████ without her consent. Ex. 27. Literally nothing was done other than HR telling Mr. ████ that they "did not want to have this conversation again." Ex. 27. It was not until later, when Fox News learned that Mr. ████ had sexually harassed at least three different woman – and that the media was going to report on the same – that he was terminated. ██████████████████████████████████
████████████████████████████████

496.    In December 2017, █████████ filed a complaint with Mr. Lord about uncomfortable and sexually harassing behavior by one of the Company's male █████ Ex. 28. The only action that was taken is that the █████ was told to stop making advances towards women on his floor. Ex. 29.

497.    In July 2019, ██████████ made an HR complaint against ██████████ , whom she accused of making sexually inappropriate comments and advances, including telling her that she was hot and that he had a crush on her. Ex. 30. When she explained that she had a ████████ ██████ asked whether she was █████ and told her he was lusting for her. Ex. 30. Even though ████████ admitted to this (and additional) outrageous behavior, he was not terminated and received only a written warning. Ex. 31. Mr. Lord said that he was going to look

into this decision after his deposition, but ███████ remains employed by Fox News.  Ex. 9

(Lord Dep.) at 286; ████████████████████████████████

498.    Mr. Lord claimed that Fox News has a "zero tolerance policy" for sexual

harassment, but admitted that someone who was found to have engaged in sexual harassment

might not face termination.  Ex. 9 (Lord Dep.) at 97-98.

499.    Mr. Lord could recall only one person who he terminated for sexual harassment –

a woman.  Ex. 9 (Lord Dep.) p. 291.

500.    Mr. Henry himself has alleged that Fox News affirmatively takes steps to cover

up serious sexual misconduct, including rape.  Ex. 32 at ¶ 10.

501.    Mr. Henry has alleged that Suzanne Scott, who currently runs Fox News, "has

long been an instrument to cover up the existence of sexual misconduct at Fox News."  Ex. 32 at

¶ 12; Ex. 7 (Henry Dep.) at 271-272.

502.    Among other examples, Ms. Scott allegedly had "whitewash[ed]actual instances

of willful sexual misconduct by Fox's employees, including a widely-known affair between a

subordinate and ████████████████████," (his then-████████████).  Ex. 7 (Henry

Dep.) at 275-276.

503.    Naturally, Mr. ████████ denied the affair, though he admitted to assisting ████

████ in obtaining promotions at Fox News.  Ex. 11 (██████ Dep.) at 23-26.  However, Fox

News' handling of the matter is illustrative of its apathy towards improper sexual misconduct.

Indeed, the issue of Mr. ████████ relationship with ████████ was well known back in 2016,

but it was not "investigated" until 2020.  Ex. 11 (██████ Dep.) at 35, 38.  Mr. ████████ testified

that Mr. Lord and Ms. Claflee did the investigation and concluded that Mr. ████████ and ████

████ had been "too close," though no remedial action was taken.  Ex. 11 (██████ Dep.) at

30.  Mr. Lord testified that an outside law firm (not he and Ms. Claflee) did the investigation and

determined that there was no wrongdoing.  Ex. 9 (Lord Dep.) at 178.   In contrast, Ms. Collins

testified that it was her understanding that the allegation was investigated and that Mr. ████

and ██████████ *did* have a sexual relationship in violation of Fox News' anti-fraternization

policies.  Ex. 3 (Collins Dep.) at 290.

504.    In another example cited by Mr. Henry, former Fox News ███████████

██████, who was the ██████████████████████ had an affair with a female

subordinate that was swept under the rug by Fox News.  Ex. 7 (Henry Dep.) at 284.  This was

reported directly to Mr. Lord, who took no remedial action.  Ex. 7 (Henry Dep.) at 286.

505.    Mr. Henry also alleged that, █████████████████████████

██████████, had an affair with his subordinate and suffered no consequences.  Ex. 7 (Henry

Dep.) at 288-290.

506.    In another allegation, former Fox News Journalist ████████████ is said to

have sexually assaulted a female writer.  Ex. 7(Henry Dep.) at 290:18-291:17.  Rather than being

summarily terminated, Mr. ████████ was permitted to leave on his own terms (and even

thanked the then-deceased Roger Ailes on his way out the door).  <u>See</u>

████████████████████████████████████████████████████

████████████████████████████████

507.    Finally, Mr. Henry alleges that former Fox News host ██████████████████

made untoward sexual advances towards a male colleague.  This was reported to Mr. Lord, who

took no remedial action.  Ex. 7 (Henry Dep.) at 294.

**<u>Additional Facts Regarding Fox News' Investigation of the Allegations Herein</u>**

508.    To investigate the allegations brought in this action, Fox News hired Gregg Gilman, Esq., at Davis & Gilbert.  Ex. 6 (Gilman Dep.) at 10.  Mr. Gilman is a management-side employment attorney who has never represented a plaintiff in an employment case.  Ex. 6 (Gilman Dep.) at 10.

509.    Mr. Gilman's points of contact at Fox News were then-employment counsel, Carl Guida, and then-General Counsel, Lilly Claflee.  Ex. 6 (Gilman Dep.) at 10-12.

510.    Right off the bat, Mr. Guida and Ms. Claflee lied to Mr. Gilman and told him that no prior complaints of workplace harassment or discrimination had been made against Mr. Henry.  Ex. 6 (Gilman Dep.) at 12.

511.    They also failed to disclose to Mr. Gilman the various workplace affairs in which Mr. Henry had engaged, the aforementioned "sexting" incident and coverup, the discomfort that multiple women expressed regarding his presence at Fox News, etc.  Ex. 6 (Gilman Dep.) at 18

512.    Mr. Gilman asked to speak with various witnesses because Plaintiff's counsel told him that they would have relevant information – including Mr. Lord.  Ex. 33; Ex. 6 (Gilman Dep.) at 20-25.

513.    Fox News refused to let him speak with any witnesses.  Ex. 33; Ex. 6 (Gilman Dep.) at 20-25.

514.    In fact, Mr. Guida and Ms. Claflee did not even bother telling Mr. Lord (or any other witness) that we suggested that Mr. Gilman speak with him.  Ex. 9 (Lord Dep.) at 251-252.

515.    Instead, Fox News just lied to Mr. Gilman and said that those witnesses had no relevant information.  Ex. 6 (Gilman Dep.) at 20-25.

516.    Mr. Gilman conceded that the aforementioned misconduct would have been relevant to the investigation.  Ex. 6 (Gilman Dep.)  at 36-27.

517.    As explained by Mr. Lord:

Q:    And regardless of -- if you were doing an investigation -- let's put yourself in Davis & Gilbert shoes, and then we will put Davis & Gilbert in your shoes.  You said to Fox News's general counsel, "Hey, I would  like to talk to Kevin Lord because I think he might have some information about Ed Henry."  And Fox  News's general counsel said, "No, you cannot talk to Kevin Lord."  And Fox News's general counsel didn't even ask Kevin Lord whether or not there is information that he had that he might be able to provide to Davis & Gilbert.  Do you -- does that sound like an appropriate investigation to you?

A:    No.

Ex. 9 (Lord Dep.) at 258-259.

## Final Additional Facts

518.    In 2016 – prior to the February 2017 rape – Ms. Claman told Ms. Eckart, "Oh Jennifer, everyone at Fox News knows that Ed Henry is a sex addict.  That's no secret."  Ex. 61 (Eckhart Decl.) at ¶3.

519.    In a sworn declaration submitted by Mr. Lord in connection with Ms. Areu's claims – in support of a motion that he never read – Mr. Lord claimed that the investigators into Ms. Areu's claims found no evidence to support the claims.  Ex. 9 (Lord Dep.) at 102-108.

520.    During his deposition, Mr. Lord admitted that he did not even know the outcome of the investigation.  Ex. 9 (Lord Dep.) at 102.

521.    Ms. Areu also made allegations against Mr. Hannity, Tucker Carlson and Howard Kurtz.  Mr. Lord had no idea as to the outcome of the investigation into those allegations.  Ex. 9 (Lord Dep.) at 111-114.

522.     Despite all of these red flags, Fox News President Jay Wallace ("Mr. Wallace")
testified that prior to Ms. Eckhart coming forward, Mr. Wallace knew of <u>no</u> information
regarding Mr. Henry that made him at risk for losing his job at Fox News.  Ex. 11 (Wallace
Dep.) at p. 87.  He also testified that he had <u>no</u> reservations about Mr. Henry being given an
anchor role, as is discussed further, below.  Ex. 11 (Wallace Dep) at 91.

523.     In October 2015, Ms. Claman was told that Ms. Eckhart might be transferred off
of her show.  She wrote: "I was kicked in the proverbial solar plexis just now when I got news I
might lose the very person I mentioned in our meeting last week I ***need***  to see promoted and
kept on my show. You asked me what I needed for the show and I said, 'I need Jennifer Eckhart
who's a rockstar on my team but only a PA to be promoted from PA to something higher because
she is doing way more than Jackie D' Ambrosi who is a booker, been here for years and just
doesn't seem to be able to handle what's given her.'"  Ex. 66.

524.     On December 7, 2015, the Senior Vice President of Programming at Fox
Business, Thomas Bowman, emailed Ms. Eckhart congratulating her on her stellar on-camera
reporting for a package she put together for the Company stating, "You're wasting your time
here [at Fox News]... you should be on TV becoming a star."  Ex. 63.

525.     On December 22, 2015, Mr. Hirst wrote Ms. Eckhart a hand-written letter stating,
"Thank you for making ["Countdown to the Closing Bell"] 'must see TV!' I appreciate your
hard work and dedication.  Congratulations on your promotion."  Ex. 64.

526.     On July 1, 2016, in one of Ms. Eckhart's employee performance evaluations, Mr.
Hirst wrote, "Ms. Eckhart was promoted to researcher/booker and has played a major role in the
success of a small, but dedicated team that has grown the ratings of the show over 100% over the
course of the last year."  Ex. 65.

527.     On July 1, 2017, in one of Ms. Eckhart's most glowing performance evaluations, Mr. Hirst wrote, "Ms. Eckhart often handles multiple segments per day, including the crucial A block reporter hit.  Ms. Eckhart may be the best news writer on the team, and understands the urgency of adding the most up-to-the-minute detail of every story she writes.  Ms. Eckhart is an invaluable part of the 'Countdown to the Closing Bell' team at Fox Business, and has limitless potential."  Ex. 67.

528.     In December 2019, Ms. Claman gave a hand-written, personalized card to Ms. Eckhart, stating, "Thank you for that 'special something' you always add to your segments and for being so great! Thanks for all your hard work and for putting up with all the drama we deal with. Xo, Liz."  Ex. 68.

529.     Similarly, on December 12, 2019, Mr. Hirst praised Ms. Eckhart by writing her a note that said, "Thank you for making my life easier each day! May 2020 bring you much joy."  Ex. 69.

530.     Finally, on February 6, 2020, Ms. Eckhart received a congratulatory email from Ms. Claman in which she praised Ms. Eckhart's producing skills writing, "Highest rated segment was yours on Peloton!!  Woo hoo!"  Ex. 70.

531.     Fox News' policies expressly permit the monitoring of Company devices.  Ex. 72.

532.     While serving as a reporter for the network as Chief White House Correspondent and Chief National Correspondent before being promoted to co-anchor of America's Newsroom, Mr. Henry had a staff of individuals report to him that consisted of a field producer, a cameraman, and an audio man.  Ex. 61 (Eckhart Decl.) at ¶4.

533.    Mr. Henry was responsible for directing the day-to-day activities of these individuals, and had the power to have them removed and replaced if they did not perform up to his expectations.   Ex. 61 (Eckhart Decl.) at ¶5.

534.    During Ms. Eckhart's tenure as a production assistant, booker and associate producer, it was her responsibility to coordinate correspondent/reporter hits for *Countdown to the Closing Bell* on the Fox Business Network.  The show would often use reporters from Fox News for its live broadcasts, and it was Ms. Eckhart's responsibility to work in tandem with Ed Henry's staff and him directly to make sure his live television appearances were tailored to his specific demands.  Ex. 61 (Eckhart Decl.) at ¶6.

535.    Mr. Henry and his staff would email Ms. Eckhart the elements they needed for his live TV hits, and it was her job to ensure that all graphical elements were in place and ready to go ahead of his on-air appearance.  Ex. 61 (Eckhart Decl.) at ¶7.

536.    If a certain graphical element that was requested by Mr. Henry was missing or there was a spelling error of any kind on a chyron (an electronically generated caption), Ms. Eckhart risked being penalized and subject to professional punishment.  Ex. 61 (Eckhart Decl.) at ¶8.

537.    There have been many reporter hits where, if the hit was not tailored exactly to the reporter's liking, or if a graphic was missing, the correspondent would report the mistake directly to my supervisor Brad Hirst to alert him of the error.  Ex. 61 (Eckhart Decl.) at ¶9.

538.    Ms. Eckhart would accompany Ms. Claman to shoots on the floor of the New York Stock Exchange to produce her live broadcasts.  Ex. 61 (Eckhart Decl.) at ¶10.

539.    If Ms. Eckhart made an error in connection with this work, she would be subject to discipline.  Ex. 61 (Eckhart Decl.) at ¶11.

540.    If an intro to a guest was not worded or phrased exactly to Ms. Claman's liking per her instructions during the daily editorial meeting, Ms. Eckhart would be written up and/or subject to discipline.  Ex. 61 (Eckhart Decl.) at ¶12.

541.    If Ms. Eckhart was unsuccessful at booking a particular guest despite her best efforts, Ms. Claman would be unhappy and she would be subject to discipline.  Ex. 61 (Eckhart Decl.) at ¶13.

542.    Ms. Claman would often require Ms. Eckart to perform humiliating and dehumanizing tasks such as cleaning out her refrigerator, color coordinating her dresses, organizing her shoes, cleaning and vacuuming her office, babysitting her children outside of business hours and forcing her to go to Louis Vuitton to have a purse of hers repaired.  Ex. 61 (Eckhart Decl.) at ¶14.

543.    To summarize, if she did not book a certain guest, put together extensive and thorough research packets on a daily basis, include specific graphics, and adhere to every order from Ms. Claman, Ms. Eckhart was not only lambasted in public in front of her fellow colleagues in the control room, during editorial meetings or over corporate email, but subject to harsher punishment and discipline, and reduced performance ratings.  Ex. 61 (Eckhart Decl.) at ¶ 15.

544.    Defendants' own documents show that Ms. Claman was capable of determining what work Ms. Eckhart would be assigned.  See McKenna Decl., Ex. 54 (noting that Ms. Claman allegedly did not want any more important work assigned to Ms. Eckhart).

545.    No investigation was even conducted into Ms. ███ report that Mr. Henry subjected her to unwanted sexual communications.  Ex. 9 (Lord Dep.) at pp. 226-227.

546.    On August 14, 2014, Ms. Claman wrote to Ms. Eckhart over email, "You are truly the kindest and best." Ex. 62.

547.    In June 2021 Fox News agreed to be fined a record $1,000,000 by the New York City Commission on Human Rights (the "Commission"), after the Commission initiated its own investigation into a series of high-profile reports alleging a culture of pervasive sexual harassment and retaliation at the network. The agreement requires Fox News to hold regular sexual harassment training and implement an approved policy and complaint procedure for reporting of discrimination and harassment complaints that allows for multiples levels of reporting. Ex. 81.

548.    After the 2014 interaction in which Mr. Henry had sexual intercourse with her without her consent, Ms. Eckhart went home that evening and cried herself to sleep. Ex. 61 (Eckhart Decl.) at ¶16.

Dated:  November 19, 2024
        New York, New York                        Respectfully submitted,

                                                  **WIGDOR LLP**

                                                  By:  _____
                                                       Michael J. Willemin

                                                  85 Fifth Avenue
                                                  New York, NY 10003
                                                  Telephone: (212) 257-6800
                                                  Facsimile: (212) 257-6845
                                                  mwillemin@wigdorlaw.com

                                                  *Attorney for Plaintiff*

121