UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JENNIFER ECKHART,

                    Plaintiff,

          v.

FOX NEWS NETWORK, LLC and ED HENRY,
in his individual and professional capacities,

                    Defendants.

---

No. 20-cv-5593 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Jennifer Eckhart brings this action asserting claims of sexual assault, sex trafficking, revenge porn, harassment, negligence and retaliation against Fox News Network, LLC, her former employer, and Ed Henry, a former Fox News correspondent and anchor. In brief, Eckhart alleges that Henry sexually harassed and raped her and that Fox News condoned or ignored the risk that Henry would do so. She also asserts that Fox News fired her because she complained about sexual harassment, and that once this litigation began Henry filed explicit photos of her on the public docket in violation of New York's "revenge porn" law.

Defendants now move for summary judgment on each of Eckhart's claims against them. Henry argues that he cannot be liable for harassing or assaulting Eckhart because no reasonable jury could find that their sexual activity was nonconsensual. He likewise contends that no reasonable jury could find him liable for sex trafficking because it could not conclude that he "enticed" her or knew that he would use fraud or force to cause her to engage in a sex act with him as required by the law. As for the revenge porn claims, Henry asserts that several of the pictures do not depict Eckhart, and the ones that do fail to depict actionable nudity or sexual conduct within

the meaning of the statute.  Fox News, for its part, argues that no reasonable jury could find that it should have known that Henry would assault Eckhart because it did not learn of his alleged misconduct until much later.  It also contends that summary judgment should be granted on Eckhart's retaliation claims because she never complained to the network about sexual harassment before her firing, and because it had legitimate, non-pretextual reasons for terminating her in any event.

For the reasons that follow, Henry's motion for summary judgment is granted in part as to Eckhart's revenge porn claim but denied as to the remainder, while Fox News' motion for summary judgment is granted in full.

## BACKGROUND

### I.    Eckhart and Henry's Interactions

The following facts are undisputed unless otherwise noted.  Eckhart began working at Fox News in January 2013, when she was hired as a freelance administrative assistant to Liz Claman, host of the *Claman Countdown* on Fox Business Network.  Dkt. 388-1 ("Henry Rule 56.1 Stmt.") ¶¶ 4–6.  She first came into contact with Henry—then Chief White House Correspondent at Fox News, *id.* ¶¶ 165, 175—in December 2013, when Eckhart responded to one of Henry's tweets about a popular movie, Dkt. 391 ("Quainton Decl.") Ex. 7.  Two hours later, Henry sent Eckhart an email saying "haha nice tweet:)," to which Eckhart responded in part "Ha!  Big fan of yours . . . . Thanks for the follow :)."  *Id.* Ex. 8.

Although most of their messages were later deleted, the ones remaining sketch an outline of the course of their relationship.  Sometime in 2014, Henry sent Eckhart a private message saying "beautiful."  Henry Rule 56.1 Stmt. ¶ 12.  Eckhart responded by telling Henry that she was a fan of his and that it would be an honor to meet him.  *Id.*  Henry then told Eckhart that he was in New

York and invited her to meet him in the green room to take a picture, which she did. *Id.* ¶¶ 13–14. Henry contacted Eckhart again in June 2014, when he sent an email to her work account asking "this you?  :)." *Id.* ¶ 15; Quainton Decl. Ex. 9. Eckhart responded "Maybe :)," to which Henry said "hard to get." Quainton Decl. Ex. 9. Eckhart replied "Very hard" and, after another back-and-forth, told Henry to "[t]ry" her on her personal email address. *Id.*

Henry later invited Eckhart to begin messaging on the messaging service WhatsApp. Henry Rule 56.1 Stmt. ¶ 16; Quainton Decl. Ex. 10. According to Eckhart, Henry then started to "incessantly bl[o]w up [her] phone" with messages "demanding that she meet him for a quick drink." Dkt. 433 ("Eckhart Rule 56.1 Stmt. to Henry") ¶ 186 (alterations omitted). He also sent her sexually explicit text messages, including one that stated "I bet you're really good in bed" and others inquiring about her favorite sexual positions. *Id.* ¶ 187. Eckhart says that Henry also sent her unsolicited pornographic images and videos which depicted "women getting slapped" and "abused." *Id.* ¶¶ 187, 189 (alterations omitted).

Although Eckhart responded to many of these messages, she maintains that she did so out of pressure. In her words, she was a "young girl" who had "just start[ed] her journalism career" and could not afford "to tell the [C]hief White House Correspondent that she was uncomfortable with the material he was sending her." *Id.* ¶ 190 (alterations omitted).

Eckhart eventually agreed to meet Henry for a drink later in 2014 at the Marriott Marquis hotel in New York City. Eckhart Rule 56.1 Stmt. to Henry ¶¶ 19–20. The parties vigorously dispute the events of that evening. Henry says that he invited Eckhart to his room, where the two had consensual oral and vaginal sex. Henry Rule 56.1 Stmt. ¶¶ 20–21. He also recalls that Eckhart texted him afterwards that she wanted "more of it." *Id.* ¶ 26.

While Eckhart agrees that the two had sex, she insists it was not consensual. Eckhart Rule 56.1 Stmt. to Henry ¶¶ 19–21. In her telling, she did not feel that she could say no to Henry's invitation to get drinks. *Id.* ¶ 192. She did, however, hope that she could use the opportunity to get career advice, and brought a legal pad with career-related questions about Henry's work and career progression. *Id.* ¶ 193. After she asked him several questions on those topics at the hotel bar, Henry invited her to his room for another drink, and allegedly said that he wanted to discuss her career further. *Id.* ¶ 195. Eckhart again "felt like she could not say no" and acquiesced. *Id.* ¶ 196. But when they got to his room, Henry locked the door and started "forcefully" kissing her. *Id.* ¶ 197. According to Eckhart, he then threw her against a wall, undressed her, threw himself on top of her on the bed and had sex with her. *Id.* Although Eckhart admits she did not say "no" or fight Henry off, she maintains that she entered a state of shock, and was afraid of what he would do if she protested. *Id.* ¶¶ 199–200. Once they finished, Eckhart says that Henry told her that she was beautiful and should become an on-camera star. *Id.* ¶ 201. He further stated that he could put her in the room with powerful decisionmakers at Fox News. *Id.*

Their next physical interaction occurred the following year, on September 26, 2015. *Id.* ¶ 202. Henry was again in the New York office and sent Eckhart a message demanding that she remove her underwear and put them in an envelope for him. *Id.* ¶ 203. She complied with Henry's request, she says, because she feared professional consequences otherwise. *Id.* ¶ 204. Henry retrieved the envelope with her underwear and then texted her to come see him in a guest office in the building. *Id.* ¶ 205.

Eckhart went to that office as requested, where she performed oral sex on him. *Id.* ¶ 31. Eckhart again disputes that this incident was consensual. *Id.* By her account, she only went to Henry's guest office out of fear of retaliation, and tried to leave immediately by telling him she

was very busy. *Id.* ¶ 207.  Henry allegedly closed the door and began forcibly kissing her before pinning her against a wall.  Eckhart says he then grabbed her head and forced her to give him oral sex. *Id.*

The two exchanged sexually explicit messages over the next few months.  In October 2015, for instance, Eckhart emailed Henry that she had a "top secret server" from which she "had wiped all the dirty pictures with a cloth"—an apparent reference to the recent news story about Hilary Clinton wiping her server. *Id.* ¶ 39; Quainton Decl. Exs. 9, 12.  Henry replied "I'd like to wipe you with my tongue," to which Eckhart responded "I bet you would, dirty boy.  Come n get it." Eckhart Rule 56.1 Stmt. to Henry ¶ 40–41; Quainton Decl. Ex. 12.  A few months later, in January 2016, Eckhart sent Henry a playlist of songs with sexual titles, including "Cockiness (Love it When You Eat It)" and "F*ck You All the Time."  Eckhart Rule 56.1 Stmt. to Henry ¶¶ 42–44; Quainton Decl. Exs. 14–18.  Although Henry says she sent these messages to invite sexual contact, Eckhart maintains that she did so "under threat" because she was "in fear" of losing her job.  Dkt. 430 ("Willemin Decl. to Henry") Ex. 3 at 476 (Eckhart Deposition).

Later that year, in May 2016, a story broke that Henry had been having "an extramarital affair with a stripper in Las Vegas."  Eckhart Rule 56.1 Stmt. to Henry ¶ 168.  Fox News suspended him for four months so he could complete a sex rehabilitation program. *Id.* ¶¶ 171–72.  Soon after Henry returned to work, in early February 2017, Eckhart sent Henry a series of erotic pictures, purportedly of herself. *Id.* ¶ 47.  Most of the photos depicted Eckhart in lingerie or partially nude. The others were pictures of scantily clad or nude women (with their faces obscured) that Eckhart had found online. *Id.*; Willemin Decl. to Henry Ex. 3 at 533 (Eckhart Deposition).  Eckhart and Henry sent each other sexually explicit messages around the same time, many of which discussed rough and violent sexual acts.  In one exchange, Eckhart sent Henry a picture of a belt; Henry said

she was playing "hard to get" to which Eckhart responded "Not true. Always obey and make myself avail to u" with a red lips emoji. Henry replied "#obey [o]r #discipline." Eckhart Rule 56.1 Stmt. to Henry¶¶ 49–50; Quainton Decl. Ex. 27.

Days later, the two had another explicit exchange and discussed meeting up that Friday, February 10, 2017. At one point, Eckhart told Henry in graphic detail that he "need[ed]" her, and Henry responded that she was going to "get tossed around like a lil rag doll." Eckhart Rule 56.1 Stmt. to Henry ¶ 51; Quainton Decl. Ex. 28. Eckhart replied simply by saying "Love that." *Id.* Eckhart affirms that she sent these messages, though she maintains that she "was not being flirtatious." Quainton Decl. Ex. 2 at 508 (Eckhart Deposition). She testified that she "was scared that if [she] didn't tell him what he wanted to hear, [she] would get punished both physically and professionally." *Id.* That fear was particularly intense, in her view, because Henry "had already sexually assaulted [her]" and "caused her great bodily harm." *Id.*

Eckhart claims that on Friday, February 10, 2017, Henry raped her. The day's events are fiercely disputed. According to Henry, Eckhart sent him a picture that morning of a woman's bottom wearing only "thong-like underwear." Henry Rule 56.1 Stmt. ¶ 52; Quainton Decl. Ex. 26. Henry, who was in town to anchor *Fox & Friends*, then asked her to get a drink at a Midtown restaurant. Henry Rule 56.1 Stmt. ¶ 52. After a quick drink, the two went to Henry's nearby hotel, where he says they had consensual—albeit rough—sex. *Id.* ¶ 53. Henry acknowledges that they engaged in "extreme" sexual practices, including using "handcuffs" as well as "a belt with which [Henry] struck [Eckhart] on the back," but insists that they did so willingly. *Id.*

In sharp contrast, Eckhart says she was violently raped and beaten. By her telling, she sent Henry the intimate picture that morning—which in truth was a picture of another woman she had found online—"because he just asked to see a picture of [her] ass." Willemin Decl. to Henry Ex.

6

3 at 533–34 (Eckhart Deposition).  She also maintains that Henry invited her over not for sex but "for a quick drink and to discuss [her] career," *id.* at 503, and says she acquiesced only because she was afraid of him and feared retaliation, Eckhart Rule 56.1 Stmt. to Henry ¶ 214.  When she arrived at the restaurant, Henry allegedly announced that Fox News was giving him his very own show, and he said he wanted to bring her on as a guest.  *Id.* ¶¶ 216–18.  Eckhart says this news caused "a wave of fear" to come over her, as it meant Henry would be "more emboldened" and "empowered."  Willemin Decl. to Henry Ex. 3 at 535 (Eckhart Deposition).  Henry also asked her how her job was going and whether she had an agent, after which he offered to introduce her to his high-profile agent.  *Id.* at 549.  After one drink, Henry asked if she wanted to discuss his promotion and her career at his hotel; he allegedly assured her they would only be going for drinks. Eckhart Rule 56.1 Stmt. to Henry ¶ 223.  Because Eckhart "genuinely wanted to discuss [her] career" and "on-air aspirations," she agreed to go to his hotel.  Willemin Decl. to Henry Ex. 3 at 536 (Eckhart Deposition).

       As soon as they left the restaurant, however, Henry began to "forcefully" pull her, which caused her to panic.  *Id.*  She tried to come up with an excuse that her high heels were hurting her but Henry, undeterred, "forced [her] over to his hotel" down the street.  *Id.*  As Eckhart testified, as soon as they entered his room, Henry immediately "forced himself" on her.  *Id.* at 537.  He "ripped" off her dress and coat and "pinned" her against a wall.  He then placed metal handcuffs on her wrists and threw her on the bed.  *Id.*  Henry proceeded to take pictures of her naked on the bed, without her consent, which he later sent to a group chat of friends.  *Id.* Ex. 65.  She asked him to delete the photos and remove the handcuffs but he simply "laughed at [her]" and remarked that "it helps when you've got friends with the NYPD."  *Id.* Ex. 3 at 537–38 (Eckhart Deposition). Eckhart interpreted this as a threat to not go to the police.  *Id.* at 538.

Henry allegedly hit her "violently" in the face multiple times, before taking off his belt and whipping her several more. *Id.* at 538–39. She asked him to stop, but he ignored her. *Id.* at 539. Henry then "forcefully rape[d] her." *Id.* at 539–40. When it was over, her wrists and lip were bleeding, and she had whip marks all over her body. She quickly got dressed and declined Henry's offer to get her an Uber. Eckhart then ran out of the hotel lobby without shoes and flagged down a cab, which took her home. *See id.* at 540. Henry disputes this account and insists the sex was entirely consensual.

In the days following the alleged rape, Eckhart and Henry continued to exchange sexual messages, including some that referenced the handcuffs and rough sex. Eckhart Rule 56.1 Stmt. to Henry ¶¶ 76–79 (Eckhart texting "You put all your friends in cuffs?" and mentioning "sore wrists, marks on [her] ass, broke a nail, bruise on [her] leg"); *id.* ¶ 81–82 (Eckhart texting "You didn't get enough" and "F*cking dirty boy. I love it."); *id.* ¶ 83 (Henry texting "F*ck you and your safe word"); *id.* ¶ 88–89 (Eckhart texting "Want it. Badly.").

The two engaged in more sexually charged conversation over the next several months. *Id.* ¶¶ 89–104; Quainton Decl. Ex. 49. At one point, Henry and Eckhart discussed who was in the dominant position in their relationship, with Eckhart saying "I thought I was in charge" and Henry confirming "[y]ou are." Eckhart Rule 56.1 Stmt. to Henry ¶ 120; Quainton Decl. Ex. 54. In these exchanges, Henry often used violent and aggressive language, such as "when u r owned U don't get a 'Choice,'" Eckhart Rule 56.1 Stmt. to Henry ¶ 238, "You didn't get enough . . . Bruised battered begging for more," *id.* ¶ 81, and "You needed to take your punishment," *id.* ¶ 239.

Henry also asserts that Eckhart continued to send him sexually explicit photos, including several in the weeks right after the alleged rape. Henry Rule 56.1 Stmt. ¶¶ 68–72. Ten of these fifteen photos depicted her in underwear or partially nude and the remaining five were photos

Eckhart had found online of other women who were partially unclothed or naked.  *Id.*  Eckhart admits that she sent the photos but asserts that she did so before the alleged rape on February 10. *Id.*[1]

Despite their explicit messaging, the parties did not have any sexual contact following the alleged rape.  *Id.* ¶ 123.[2]  They did, however, see each other frequently in the office.  *Id.* ¶ 240. Henry also shared some of the explicit photos of Eckhart with a group chat, Willemin Decl. to Henry Ex. 63, calling Eckhart a "whore" and saying that she "took the belt," *id.* Ex. 64.

A few months after the February 2017 incident, Eckhart deleted some—but not all—of her communications with Henry.  Eckhart Rule 56.1 Stmt. to Henry ¶¶ 131, 245.  She explained at her deposition that seeing reminders of Henry and the rape was traumatizing.  *Id.*  She did, however, preserve some of their exchanges by taking screenshots on her phone, which are part of the record in this case.  *Id.* ¶¶ 132, 135, 246.  Henry also deleted their conversations that same year, claiming he wanted to hide his infidelity from his wife.  *Id.* ¶ 244.

## II.    Eckhart's Employment at and Termination from Fox News

Eckhart worked at Fox News from 2013 until her termination in 2020.  Dkt. 376 ("Fox Rule 56.1 Stmt.") ¶¶ 3, 9.  She was initially hired as an administrative assistant on the *Claman Countdown* but received several promotions to production assistant, researcher/booker and finally associate producer.  *Id.* ¶¶ 3–8.

---

[1] Although the photos depict time stamps after the alleged rape, Eckhart maintains that those dates could refer to "when they were uploaded" or "edited" as opposed to "sent."  Willemin Decl. to Henry Ex. 3 at 636 (Eckhart Deposition).

[2] At Eckhart's deposition, Henry's counsel asked whether she had another sexual encounter with Henry on June 19, 2017, a date on which the parties exchanged several explicit messages.  Willemin Decl. to Henry Ex. 3 at 601–02 (Eckhart Deposition).  Eckhart denied that they met that day, *id.*, and Henry does not assert otherwise in his Rule 56.1 Statement.

The parties dispute Eckhart's performance in these roles. Eckhart characterizes her performance as "good" and cites various instances of praise she received from superiors over the years. Dkt. 413 ("Eckhart Opp. to Fox") at 18. In 2014 and 2015, for instance, Claman told her she was "the kindest and best," said she "need[ed] to see [Eckhart] promoted and kept on [her] show" and called her a "rockstar." Dkt. 424 ("Eckhart Rule 56.1 Stmt. to Fox") ¶¶ 522–23, 546. Senior Vice President Thomas Bowman also called her a "star," and her direct supervisor Brad Hirst thanked her for her "hard work and dedication," saying she "played a major role" in the show's recent success in the ratings. *Id.* ¶¶ 524–26. In 2017, Hirst also said Eckhart "may be the best news writer on the team" and was "an invaluable part" of it. *Id.* ¶ 527.

Her 2018 performance review was particularly strong. She received a rating of 4 out of 5 and was labeled "one of the most talented/booker/researchers at the network." *Id.* ¶ 358. The review also called her "invaluable," "instrumental," "an excellent employee" and "one of the most dependable members of the staff." *Id.* Her 2019 review was also had positive aspects, saying she was "one of the most editorially sound members of [the] staff," "an excellent writer and researcher" and always prepared in advance of any field shoots. *Id.* ¶ 359. She continued to receive direct praise from supervisors in 2019 and early 2020, including messages from Claman saying "Thank you for that 'special something' you always add to your segments and for being so great! Thanks for all your hard work" and "Highest rated segment was yours on Peloton!!" and another from Hirst saying "Thank you for making my life easier each day!" *Id.* ¶¶ 528–30.

Although Fox does not dispute that Eckhart received this praise, it paints Eckhart's performance in a much different light. As Eckhart admits, she was consistently late for work, and her supervisors regularly flagged her tardiness as a performance issue. In 2017, she was late or absent sixteen times and had to ask a co-worker to perform some of her morning duties for the

*Claman Countdown*.  Fox Rule 56.1 Stmt. ¶ 20.  In the first two-and-a-half months of 2018, she

was late or absent another fifteen times and again had to ask co-workers to cover for her.  *Id.* ¶ 28.

During her mid-year review in March 2018, Hirst flagged her "consistent tardiness" as an issue,

and later said that her "lateness would not be tolerated and could lead to disciplinary action."  *Id.*

¶¶ 29–32.

Despite that warning, Eckhart was late at least thirty-three more times in 2018 and

repeatedly asked her co-worker to handle her duties in her absence.  *Id.* ¶ 33.  Although Eckhart

was promoted to associate producer in August 2018, *id.* ¶ 8, Hirst continued to warn her about her

lateness, including at her mid-year review in January 2019, *id.* ¶ 35.  That did not rectify the issue,

as she was late or absent at least nineteen times from the beginning of 2019 through early July

2019.  *Id.* ¶ 37.

Largely due to her tardiness, Eckhart received a low rating in her 2019 review, a 2 out of

5 score meaning "Below Expectations."  *Id.* ¶¶ 40–42.  Although the review had some positive

statements about her performance, as noted just above, much of it was negative.  Hirst wrote that

"[Eckhart] seems to have great challenges arriving to work on time" and was "often late multiple

days per week."  *Id.* ¶ 43.  He continued that he had warned her repeatedly about this issue, but

Eckhart "ha[d] a different excuse every day . . . .  The lateness and sick calls are morale killers and

can[]not continue."  *Id.*  He also gave Eckhart a "final warning" that "the next lateness w[ould]

lead to disciplinary action."  *Id.*  Eckhart continued to be late nonetheless.  *Id.* ¶¶ 44, 46.  After she

told Hirst that she would be late one day in September 2019, he told her that "lateness is

unacceptable" and that "any further infractions will be reported directly to Human Resources for

disciplinary action."  *Id.* ¶ 45.

Eckhart reportedly committed other infractions around this time. In September 2019, Fox News tested out a new and proprietary graphics package before its planned release, and video footage was taken of Eckhart sitting as a mock "anchor" on set. *Id.* ¶¶ 47–48. Eckhart then posted photos of the footage on Instagram, which prematurely revealed the new graphics package. *Id.* ¶¶ 49–50. Hirst immediately told Eckhart to take the pictures down and warned her that she had revealed the network's proprietary information. *Id.* ¶¶ 51–54.

At another point in 2019, Fox News' Media Relations department sent a complaint to Denise Collins, senior vice president of Human Resources ("HR"), after Eckhart appeared on material promoting an outside event. *Id.* ¶¶ 55–56. The materials listed her as a "representative" of Fox News and identified her position as something other than her "actual title" at the network. *Id.* ¶ 58. The complaint said that Eckhart had violated company policy by failing to preclear her appearance and using the wrong title. *Id.* ¶ 60.

Eckhart was then late at least sixteen more times between September 2019 and mid-January 2020. *Id.* ¶ 61. In January, her supervisors exchanged several emails stating their displeasure with Eckhart's lateness.[3] A senior producer on the *Claman Countdown* emailed Hirst that "there's a point at which I can't do [Eckhart's] work for her. It's becoming a daily thing." *Id.* ¶ 62. She again complained several weeks later that Eckhart's "demeanor and work ethic weighs on the team as a whole, has been noticed by Liz [Claman] and interferes with you and me most in particular because we are [the] ones left constantly to . . . actually do the work she refuses to do." *Id.* ¶ 63. Claman also told Hirst that she believed Eckhart was prioritizing her personal ambition of becoming an on-air journalist over her current role as producer. *Id.* ¶ 64. In early February 2020,

---

[3] Eckhart objects to these emails as inadmissible hearsay. That objection is overruled, because the emails are being offered not for their truth but to "show the state of mind of Defendant's representatives in making various employment decisions with regard to Plaintiff." *Kaur v. N.Y.C. Health & Hosps. Corp*, 688 F. Supp. 2d 317, 323 (S.D.N.Y. 2010) ("[T]he truth of the assertions in the documents is irrelevant.").

Hirst and two other supervisors met and discussed placing Eckhart on a Performance Improvement Plan ("PIP").  *Id.* ¶¶ 67–73.

Fox News then learned on February 7, 2020 that Eckhart had arranged "red carpet" access for her and a Fox News cameraman to shoot footage of her interviewing celebrities at a charity event.  *Id.* ¶¶ 74–76.  She then had an editor at Fox News edit the footage and charged the cost of the camera and editing work to the *Countdown* budget.  *Id.* ¶¶ 74, 78, 81.  According to Fox News, this was "misappropriation" of company resources, as Eckhart never received approval for this event by clearing it with Hirst.  *Id.* ¶ 80.  Eckhart claims that she told Claman about the event in advance, Dkt. 427 ("Willemin Decl. to Fox") Ex. 5 at 138 (Eckhart Deposition), although Fox News maintains that only Hirst had authority to approve the expenditure, Dkt. 458 ("Fox Rule 56.1 Reply") ¶ 79.

Hirst and Collins then met with Eckhart on February 10, 2020 to discuss her recent performance issues.  Eckhart Rule 56.1 Stmt. to Fox ¶ 90.  Hirst told Eckhart that she had broken protocol when she attended the charity event and informed her that they were thinking about putting her on a PIP.  *Id.* ¶ 91.  After Eckhart learned about the potential PIP, she told them that she was working in a "toxic environment" and complained of frequent screaming and cursing as well as incidents where she was "ganged up on" by jealous "mean girls" on the staff and otherwise bullied.  *Id.* ¶¶ 92–93.  Eckhart identified by name several colleagues—all female—who had contributed to this perceived hostility.  *Id.* ¶ 93.

The parties dispute whether Eckhart's "toxic environment" statement was a complaint about sexual harassment.  Eckhart concedes that she never mentioned "sexual harassment" by name during the meeting, and identified only female employees as the source of the toxic environment.  *Id.* ¶¶ 93–95.  Her notes memorializing the meeting after the fact include the

following reflection: "In addition to the emotional and verbal abuse that goes on, I have not yet mentioned the sexual harassment that goes on at every level in this building that I've experienced first-hand on office property." *Id.* ¶ 96. She further wrote that "I plan to follow-up with Human Resources on the status of this situation, but still remain frightened to come forward with my sexual harassment claims." *Id.* ¶ 363.

Hirst and Collins began to develop Eckhart's PIP in the month after the meeting. *Id.* ¶ 99. During that period, Hirst told Collins that Eckhart had continued to be late and absent and stated that their "discussion clearly didn't have a major impact on her attitude." Dkt. 370 ("McKenna Decl.") Ex. 13 at 4.[4] They formally placed Eckhart on a PIP on March 6, 2020. Eckhart Rule 56.1 Stmt. to Fox ¶ 101. The PIP listed several "Deliverables" for Eckhart, including arriving to work by 8:45 a.m., completing her morning tasks, meeting her other deadlines and requesting approval in advance for vacation and appointments that would cause her to miss work. McKenna Decl. Ex. 47. The PIP also informed Eckhart that she was not currently meeting expectations and needed to "immediately improve" her performance. *Id.* at 2. It further warned her that failure to meet the PIP's requirements could result in "further performance management or disciplinary action, up to and including the immediate termination of [her] employment." *Id.* at 4. According to Eckhart, however, Hirst also assured her that the PIP was nothing to worry about and would only last a month. Eckhart Rule 56.1 Stmt. to Fox ¶ 370.

In Fox News' view, Eckhart's performance did not improve. According to weekly reports that Hirst received, Eckhart regularly failed to complete her morning tasks, did not respond to important emails, was unprepared during meetings and prepared sloppy and under-researched

---

[4] While Eckhart is correct that this email cannot be used for the truth of the matter asserted—that Eckhart was late—it can be used to show Hirst's motivations for proceeding with the PIP. *See Kaur*, 688 F. Supp. 2d at 323.

pitches for segments. *Id.* ¶¶ 110–17.[5] She also created graphics with multiple errors and made other mistakes that disrupted the show, such as failing to edit a soundbite and booking the wrong guest. *Id.* These summaries further detailed how Claman requested that Eckhart be taken off production duties for any high-profile guests due to her mistakes, and how Eckhart was reassigned to a segment viewed as the "easiest" one on the show. *Id.*

Her final performance summaries came in May and June 2020, which characterized her as being "unprepared," putting in the "most bare minimum effort" and having "failed to correct patterns of behavior and actions that were outlined in her PIP." *Id.* ¶ 115. They also stated that she "continue[d] to cause extra work for those around her due to her lack of preparedness" and noted that she was "[w]ell past her 60-day probation period" during which she had to improve under the PIP. *Id.* ¶ 117. Her last weekly summaries said things were "not getting better" and were in fact "getting worse." *Id.* ¶ 118. By June 4, 2020, Hirst concluded that Eckhart "had not lived up to" her PIP. *Id.* ¶ 119.

Finally, on June 10, 2020, Hirst emailed Collins about an incident in which Eckhart had botched a segment. *Id.* ¶ 120. According to Hirst, Claman had told her "word-for-word" what the segment should be, but Eckhart failed to include any of that information in her script. She instead "lifted" text verbatim from the guest's market notes, which Hirst believed to be completely unacceptable. *Id.* Eckhart denies that she lifted any material and maintains that Hirst told her the segment was "great." Willemin Decl. to Fox Ex. 5 at 215 (Eckhart Deposition).

Hirst then decided to terminate Eckhart. On June 12, 2020, Hirst and Collins fired her in an in-person meeting. Eckhart Rule 56.1 Stmt. to Fox ¶ 123. Hirst told her that she was being

---

[5] As above, these summaries are admissible to "show the state of mind of Defendant's representatives in making various employment decisions with regard to Plaintiff." *Kaur*, 688 F. Supp. 2d at 323,

terminated due to her tardiness, failure to comply with the PIP, premature public disclosure of the proprietary graphics package and misappropriation of company resources in connection with the charity event. *Id.* ¶ 124. Eckhart disputes those motivations and maintains that she was fired for complaining about sexual harassment during the February 10, 2020 meeting. *Id.* ¶ 122. After Eckhart was told of her termination, she read from a script she had brought to the meeting that referred to "the emotional, verbal and the sexual harassment that goes on at every level in this building." *Id.* ¶ 125–26. Collins then asked her if she had been sexually harassed or assaulted, but Eckhart did not answer. *Id.* ¶¶ 128–29.

Two weeks later, Eckhart's counsel contacted Fox News and informed it that Henry had engaged in inappropriate sexual conduct. *Id.* ¶ 151. Fox News hired a law firm to investigate those allegations the same day. *Id.* ¶ 152. The firm interviewed Henry later that afternoon and asked about the three sexual encounters he had with Eckhart. *Id.* ¶ 154. Henry admitted that these incidents had occurred but insisted they were consensual. *Id.* ¶ 155. Although the firm also asked to speak with Eckhart and see her communications with Henry, she declined. *Id.* ¶¶ 161–63.

On June 30, 2020, the law firm provided a written report of its preliminary findings to Fox News. *Id.* ¶ 168. The report concluded that Eckhart and Henry had engaged in numerous communications between 2014 to 2017 and had engaged in three sexual encounters, including the September 2015 incident in which Eckhart performed oral sex on Henry in the Fox News office. *Id.* ¶ 170. Jay Wallace, the president of Fox News, and Kevin Lord, the executive vice president of HR, then reviewed the report and concluded that Henry would be terminated for engaging in sexual activity on Fox News premises. *Id.* ¶¶ 172–73. Henry was terminated on July 1, 2020. *Id.* ¶ 174.

III.    **Henry's Other Affairs and Allegations**

According to Eckhart, Henry engaged in other sexual misconduct while employed at Fox News.  In May 2016, the network learned that Henry had been having a consensual, extramarital affair with a stripper in Las Vegas.  *Id.* ¶ 12.  The network suspended Henry, took him off the air for four months, reduced his annual compensation by thirty to forty percent and removed him as Chief White House Correspondent.  *Id.* ¶ 13.

During his suspension, Henry attended a treatment program with a doctor and a therapist. *Id.* ¶ 14.  Eckhart asserts that this was a "sex rehabilitation program" to treat sex addiction, and that Fox News required Henry to attend it.  *Id.* ¶ 401.  Fox News insists that it merely "suggest[ed]" he attend the program, Dkt. 375 ("Fox News Br.") at 16, and disputes that it was a "sex rehabilitation program," Fox Rule 56.1 Reply ¶ 401.  Kevin Lord, the executive vice president of HR at Fox News, however, similarly described the program as a "sexual rehabilitation center." Willemin Decl. to Henry Ex. 8 at 70 (Lord Deposition).

Henry returned to work in September 2016 after his treating doctor advised Fox News that he had successfully completed the program.  Eckhart Rule 56.1 Stmt. to Fox ¶ 15.  Despite the suspension, Fox News gave Henry a raise at the start of 2017, increasing his salary to a level around forty percent higher than his pre-suspension pay.  *Id.* ¶ 403.  It later gave him another sizable raise and further increased his responsibilities, making him a weekend host of *Fox and Friends* and an anchor on *America's Newsroom*.  *Id.*  ¶ 405.

Soon after Henry returned from his suspension, in November 2016, he began a sexual relationship with an entry-level employee (identified as "Jane Doe 1" in Eckhart's complaint) at Fox News.  Eckhart Rule 56.1 Stmt. to Henry ¶ 250; Fox Rule 56.1 Reply ¶ 269.  According to the woman's declaration, Henry sent her an unsolicited picture of his penis before they became

involved. Eckhart Rule 56.1 Stmt. to Henry ¶ 251. Once they began their affair, he at one point

hit her so hard she began to cry. *Id.* ¶ 251. Although the woman described Henry as "emotionally

abusive," McKenna Decl. Ex. 114 ¶ 12, she nonetheless stated that she did not "feel forced or

coerced into doing anything [she] did not want to do" at any point "during [her] relationship with

[him]," *id.* ¶ 6.[6] Henry admits that this affair happened and that the two engaged in "S & M," or

"sadistic and masochistic" sex. Willemin Decl. to Henry Ex. 5 at 42 (Henry Deposition). Although

Eckhart suspects that Jane Doe 1 told someone else at Fox News about the affair, the woman

maintains that she never reported her relationship to HR. McKenna Decl. Ex. 114 ¶¶ 13–14.

According to Fox News, Jane Doe 1 never told anyone at the network about her relationship with

Henry until after Eckhart filed this lawsuit. *See* Fox Rule 56.1 Stmt. ¶ 273.

In another incident, Henry and another Fox News employee ("Jane Doe 2" in the

complaint) developed a "mutually flirtatious banter relationship" that never evolved into anything

"physical or romantic." Fox Rule 56.1 Reply ¶ 290. The two primarily exchanged emails and

texts as well as "flirtatious pictures" over the messaging app Snapchat. *Id.* ¶ 291. At one point,

Henry sent the woman an unsolicited picture of his penis over the app. *Id.* ¶ 292; *see also*

McKenna Decl. Ex. 116 ¶ 8 ("I was shocked and upset when I saw the photo, and threw my phone

aside"). Although the woman stated that she "likely first told people at Fox News about the

incident in the 2016 time frame," she acknowledged that she did not have a "specific recollection

of any such conversation(s)." Fox Rule 56.1 Reply ¶ 293 (quoting McKenna Decl. Ex. 116 ¶ 11).

---

[6] Although the woman sent Eckhart several text messages saying that she was "victimized" and that Henry was a "predator" who relied on a "power imbalance," Eckhart Rule 56.1 Stmt. to Fox ¶ 272, in her declaration she explained that although she regretted her decision to enter into a relationship with Henry, that relationship "was at all times welcome and consensual irrespective of what [she] said in [her] text exchanges with [Eckhart]," McKenna Decl. Ex. 114 ¶ 12. In any event, those messages are unsworn hearsay and Eckhart does not argue that they are admissible under any of the exceptions to the hearsay rules. *See Patterson v. County of Oneida*, 375 F.3d 206, 222 (2d Cir. 2004) (refusing to consider out-of-court statements that were not "reaffirmed in an affidavit" or otherwise admissible under a hearsay exception).

Another woman ("Jane Doe 4" in the complaint) alleges that Henry began sending her sexually explicit messages in 2012, before she worked at Fox News. Fox Rule 56.1 Stmt. ¶¶ 277–78. She initially responded to Henry "politely" to "maintain professional ties given his status in the industry." Willemin Decl. to Fox Ex. 13 ¶ 3. In 2013 or 2014, she says that Henry entered a hotel room in which she was staying, "immediately launched" himself at her and began kissing her before she objected. *Id.* ¶ 4. After she joined Fox News, Henry told her that he had a hand in getting her a role at Fox News, *see id.* ¶ 8, and two months later tried to kiss her again "without her consent," *id.* ¶ 9. The woman eventually left Fox News in June 2018 and held a going away party with her colleagues that Henry attended. *Id.* ¶ 11. According to the woman, Henry sexually assaulted her at the party by "suddenly and very unexpectedly put[ting] his hand under the table and under [her] skirt and finger[ing] her . . . without [her] consent." *Id.* She never told anyone at Fox News about these incidents. Fox Rule 56.1 Reply ¶ 283.

Henry also had affairs with other women at the network.[7] He admitted in his deposition to having a consensual affair with a producer around 2015, although he did not believe that anyone at the network learned about their relationship. Fox Rule 56.1 Reply ¶¶ 294–97. In April 2017, another producer at the network informed Wallace and Lord that she too had had a consensual affair with Henry around 2014 to 2016. *Id.* ¶ 186–87. She also told Wallace and Lord of various other rumors she had heard about Henry's affairs, including a "sexting relationship" with a woman at another network, another sexting relationship that Fox News had allegedly helped Henry "cover

---

[7] Eckhart further asserts that Henry had an affair with a non-Fox employee, Roxie Marroquin, in which Henry pressured her into unwanted sexual contact. Eckhart Rule 56.1 Stmt. to Fox ¶¶ 382–95. Eckhart's only source for this allegation is a news article, however, which is "inadmissible hearsay." *Blair v. Inside Ed. Prods.*, 7 F. Supp. 3d 348, 362 n.11 (S.D.N.Y. 2014) (internal quotation marks omitted). The same is true of other out-of-court statements and messages referenced in Eckhart's papers, *see, e.g.*, Eckhart Rule 56.1 Stmt. to Fox ¶ 398 (Tweet by Brooke Hammerling), which were not "reaffirmed in an affidavit" and thus cannot be used to oppose summary judgment, *Patterson*, 375 F.3d at 222.

up" and an affair he had with a desk assistant. *Id.* ¶ 191. The woman added that she did not think Henry should be promoted to an anchor role in which he "could prey on women." *Id.* She did not allege, however, that any of Henry's behavior was unwelcome or nonconsensual. *Id.* ¶ 193.

These allegations prompted Lord to look into the rumors about Henry. *Id.* ¶ 194. He interviewed the individual who was the apparent source of the rumor that Henry was sexting a woman at another news organization. *Id.* ¶ 195. He also called the head of that other network, who told Lord that he was not aware of the sexting relationship. *Id.* ¶ 196. Lord said he asked others to explore the "cover up" and desk assistant rumors but was not able to determine whether these incidents had occurred. *Id.* ¶¶ 198–99. Eckhart admits that Lord called the head of the other network but disputes that Lord actually sent subordinates to investigate the other rumors. *Id.* According to Fox News, it did not confirm that any of these other affairs occurred until 2020, after Eckhart filed this suit. *See* Fox News Br. at 18.

## IV. Eckhart's Lawsuit and Revenge Porn Allegations

Eckhart filed her original complaint on July 20, 2020, which she has since amended several times. Dkt. 1. On October 19, 2020, Henry filed a motion to dismiss her second amended complaint accompanied by a series of sexually explicit photographs that Eckhart had sent him. Dkt. 85 Exs. G–U. Several of the photos were redacted in part to obscure nudity but were otherwise available on the public docket. *Id.* A month later, Eckhart filed a third amended complaint adding a new claim that Henry had violated New York's "revenge porn" law by filing the images. Dkt. 113.

Henry and Fox News moved to dismiss Eckhart's third amended complaint, Dkt. 117, which the Court granted in part and denied in part, Dkt. 157. Eckhart subsequently filed a fourth amended complaint in December 2022, which is the operative complaint. Dkt. 227. The parties

then completed discovery, after which Henry and Fox News filed the instant motions for summary judgment in September and October of 2024.

## LEGAL STANDARD

Summary judgment must be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit'" and genuinely in dispute if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In deciding whether a material dispute exists, courts must "resolve all ambiguities and draw all permissible inferences in favor of the party against whom summary judgment is sought." *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (internal quotation marks omitted). "Assessments of credibility and choices between conflicting versions of events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1012 (2d Cir. 1996). To that end, "[s]ummary judgment is inappropriate when the admissible materials in the record make it arguable that the claim has merit." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (internal quotation marks omitted). "[E]vidence of the non-movant is to be believed," *id.* (quoting *Anderson*, 477 U.S. at 255), and the moving party bears the burden of showing that, despite that evidence against it, a reasonable jury would have to find in its favor, *see Anderson*, 477 U.S. at 256.

## DISCUSSION

### I.    Gender-Motivated Violence, Assault and Battery

Henry first moves for summary judgment on Eckhart's state-law claims of assault, battery and violations of the Gender-Motivated Violence Act ("GMVA"). Although these claims are not

legally identical, they share a common thread: consent can be a defense to each. *See Tardif v. City of New York*, 991 F.3d 394, 410 (2d Cir. 2021) ("Civil battery [in New York] is an intentional wrongful physical contact with another person without consent." (internal quotation marks omitted)); 6A Michael N. Giuliano, New York Jurisprudence § 5 (2d ed. 2025) ("The general rule that a person cannot recover damages for a wrong occasioned by an act to which that person has consented applies in civil actions for assault or assault and battery."); *Micari v. Mann*, 481 N.Y.S.2d 967, 969 (Sup. Ct. 1984) ("[C]onsent of the plaintiffs to the performance of the sexual acts complained of would [generally] be a complete defense."); *People v. Weinstein*, 42 N.Y.3d 439, 465 (2024) (acknowledging the "consent defense" to sex offenses which are GMVA predicates). Henry makes his motion for summary judgment on this ground alone, arguing that it is beyond dispute that Eckhart consented to all of their sexual activity. *See* Dkt. 389 ("Henry Br.") at 24; *see also id.* at 1 (arguing that such activity was "[a]lways consensual").[8] He points to Eckhart's explicit messages and intimate photographs as proof positive of that consent and asserts that this evidence refutes Eckhart's testimony that she was assaulted and raped.

The Court disagrees. While a reasonable jury could conclude that Eckhart consented to some or all of their sexual activity, it could also conclude otherwise. In her deposition, Eckhart testified at length that Henry forced her to engage in sexual activity without her consent, and on three separate occasions. In her words, she met him at the Marriott Marquis hotel in 2014 with the intention of discussing her career, only for Henry to lock the door, "forcefully" kiss her, "thr[o]w [her] against the wall," "quickly t[ake] off [her] dress," "thr[o]w himself on top of [her]" and "have

---

[8] Henry's defense is a targeted one: that Eckhart participated willingly and voluntarily in all of their sexual activity. He does not argue that she was required to verbally or physically resist, nor does he raise questions about the precise scope of the consent defense in civil actions, such as whether he would be liable if he forced her into sexual activity by using threats (overt or implicit) of professional retaliation. The Court thus addresses only Henry's argument that Eckhart affirmatively consented to all of their sexual activity.

very quick sexual intercourse with [her]." Willemin Decl. to Henry Ex. 3 at 418 (Eckhart Deposition); *see also id.* at 427 ("He forced himself on me."). Although Eckhart conceded that she never fought back or said "no," she also testified that she "didn't feel like [she] had a choice because [she] was scared of him" and "wasn't sure what would happen if [she] said no." *Id.* at 420. She also stated she did not kiss him "voluntarily" or "consensually." *Id.* at 426.

Eckhart likewise maintains that Henry used force during their sexual interactions in 2015 and 2017. She testified that, in September 2015, Henry again "forcefully kiss[ed]" her in a Fox News guest office, after which he "pinned [her] against the wall," "shoved [her] head down" and "used his hand to force [her] into giving him oral sex against her will." *Id.* at 455. And as to the incident in February 2017, Eckhart testified that he invited her to drinks to "discuss [her] career," *id.* at 503, but then "forced himself" on her, "ripped" off her dress, put "metal handcuffs on her," took naked pictures of her, hit her with his hands and belt and "forcefully rape[d]" her. *Id.* at 537–40. As she put it, she was "violently raped" and "did not consent" to these "sadistic and painful acts." *Id.* at 540–41.

This testimony is sufficient to defeat summary judgment. At this stage, the Court must accept Eckhart's testimony—that Henry forced her into sexual acts against her will—as true. *Anderson*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed."). Even though Henry has offered a "conflicting version[]" of what transpired—that she consented—a reasonable jury could choose to credit her narrative, and in doing so reject Henry's consent defense. *Rule*, 85 F.3d at 1011. Put simply, Eckhart's testimony "make[s] it arguable that [her] claim has merit," which precludes Henry's bid for summary judgment here. *Redd*, 678 F.3d at 174 (internal quotation marks omitted).

Henry insists that Eckhart's testimony is incredible and contradicted by other evidence, most notably the sexually charged text messages she sent him before and after the incidents in question. Neither argument moves the needle. First off, the Court may not assess Eckhart's credibility at this stage, and must resolve all "credibility questions" in her favor. *Id.* (internal quotation marks omitted); *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) ("[I]t is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage."). A jury may well find that Eckhart's text messages—many of which were sexually explicit—belie her testimony that she did not pursue or consent to the sexual interactions she had with Henry. But that credibility inquiry falls squarely within the province of the jury, and the Court may not wade into it at this stage.

As for Henry's contradicted-by-the-record argument, he is correct that summary judgment may be granted in spite of a plaintiff's testimony "in the rare circumstance where the plaintiff relies exclusively on [that] testimony, much of which is contradictory and incomplete." *Jeffreys*, 426 F.3d at 555. But this narrow exception does not apply here. There is no evidence that refutes Eckhart's assertion that the three sexual incidents were nonconsensual. To be sure, she admits to sending sexual messages and photographs that a jury could interpret as inviting sexual relations with Henry. *See People v. Jovanovic*, 700 N.Y.S.2d 156, 168–69 (1st Dep't 1999) ("[T]he jury could have inferred from the [sexual] messages that the complainant had shown an interest in [violent sex] with [defendant]."). But those messages could be read in other ways too. A reasonable jury could, for instance, find that Eckhart voluntarily sent some messages to be friendly, or even flirtatious, yet did not consent to the violent sexual encounters that followed. *See Jovanovic*, 700 N.Y.S.2d at 169 (discussing possibility that victim later "withdrew her consent"). Or a reasonable jury could conclude that some of the sexual activity was consensual while some

24

was not.  *See id.*  And even if, as Henry claims, Eckhart sent many of the messages after the alleged assaults, her therapist explained how such behavior is "fairly common" of assault victims, who often try to "placat[e] or appeas[e] the perpetrator" in order "to minimize the likelihood of additional assaults or harassment."  Willemin Decl. to Henry Ex. 7 at 85.  At bottom, none of the messages—or the fact that Eckhart sent them—establishes beyond dispute that she consented to all of their sexual conduct.  This forecloses Henry's argument that those messages render her testimony too "contradictory" or "inconsisten[t]" to be credited at summary judgment.  *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010).

The record, moreover, includes evidence that Henry harassed and even assaulted other female colleagues, including one incident where he digitally penetrated a woman under a table without her consent.  *See* Eckhart Rule 56.1 Stmt. to Henry ¶ 248 (alleging that Henry "suddenly and very unexpectedly put his hand under the table and under [her] skirt and fingered her . . . without [her] consent.").  A reasonable jury could believe those accounts and infer that Henry engaged in similar misconduct with Eckhart.  *See Carroll v. Trump*, 124 F.4th 140, 162 (2d Cir. 2024) (affirming admission of testimony that defendant committed another sexual assault under Federal Rules of Evidence 413 and 415 and noting that "the jury could reasonably infer [from past assaults] that [defendant] engaged in similar conduct with other women").  A reasonable jury could also make a similar inference from Henry's texts, which previewed the allegedly violent nature of their encounters.  *See, e.g.*, Willemin Decl. to Henry Ex. 58 ("Bruised battered begging for more" and "You needed to take your punishment").  Finally, Eckhart's ex-boyfriend testified that she told him she was sexually assaulted by a Fox News anchor—a conversation that Henry

admits took place at least a year before she filed this suit.  Henry Rule 56.1 Stmt. ¶ 34.[9]  While this evidence is certainly not conclusive, it nonetheless lends some support to Eckhart's contentions.

In short, the parties have offered two "conflicting versions of events" as to consent, neither of which is definitively contradicted by the record—and both of which remain possible at this stage.  *Rule*, 85 F.3d at 1011.  Because it is not "quite clear what the truth is," *Redd*, 678 F.3d at 174 (internal quotation marks omitted), Henry may not obtain summary judgment on the ground that Eckhart consented.

## II.    Sex Trafficking

Henry also moves for summary judgment on Eckhart's claim that he engaged in sex trafficking in violation of the Victims of Trafficking and Violence Prevention Act of 2000 ("TVPA"), 22 U.S.C. § 7107.  To prevail on that claim, Eckhart must show that Henry "knowingly and in interstate or foreign commerce:  (1) recruited, enticed, harbored, transported, obtained, or maintained by any means a person; (2) knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud . . . or any combination of such means will be used; (3) to cause the person to engage in a commercial sex act." *Noble v. Weinstein*, 335 F. Supp. 3d 504, 515 (S.D.N.Y. 2018) (internal quotation marks omitted).

Eckhart asserts that Henry satisfied these elements because he enticed her into sex by indicating that he could help advance her career at Fox News.  Henry responds that Eckhart failed to establish a genuine dispute that he enticed her and that he knew that fraud or force would be used.

---

[9] This statement is admissible under Federal Rule of Evidence 801, which permits the introduction of a prior out-of-court statement "to rebut an express or implied charge that the declarant recently fabricated" her testimony.  Fed. R. Evid. 801(d)(1)(B).

### A.    Enticement

Henry first asserts that there is no dispute as to whether he "enticed" Eckhart into sex.  As the Court explained in its opinion denying Henry's motion to dismiss, a defendant may satisfy this element by "making empty promises of career opportunities."  *Eckhart v. Fox News Network, LLC*, No. 20-cv-5593, 2021 WL 4124616, at *8 (S.D.N.Y. Sept. 9, 2021) (citing *David v. Weinstein Co. LLC*, 431 F. Supp. 3d 290, 301 (S.D.N.Y. 2019) and *Noble*, 335 F. Supp. 3d at 517).  Although the TVPA requires some sort of *quid pro quo*, that deal can be implicit.  *See id.* at *9.  For that reason, "a plaintiff's expectation of receiving improved job opportunities [in exchange for sex] is sufficient" to show enticement.  *Martinez v. 189 Chrystie St. Partners, LP*, No. 22-cv-3111 (VEC), 2023 WL 5390442, at *5 (S.D.N.Y. Aug. 22, 2023) (citing *Eckhart*, 2021 WL 4124616 at *6).

Here, Eckhart testified about multiple instances in which Henry alluded to helping her career in advance of their sexual encounters.  She detailed how, when she first met Henry for a drink in 2014, he "started asking [her] about [her] career," Willemin Decl. to Henry Ex. 3 at 386 (Eckhart Deposition), and then told her "he wanted to have another drink with [her] up in his room" so they could "discuss [her] career further," *id.* at 417.  Once they reached his room, she says he forced himself on her and had sex with her without her consent.  *See id.* at 427.  After they were done, Henry told her that she could be "a star" and that "he could put [her] in the room with really powerful people and decision[]makers at Fox."  *Id.* at 424.  She further testified that, just before Henry allegedly raped her in 2017, he offered to introduce her to his agent and to have her as a guest on his new show.  *See id.* at 534–36, 549.  He also invited her to his room under the pretext of discussing her "future at the network."  *Id.* at 536.

Henry makes several arguments that this testimony falls short of establishing a triable issue as to enticement, but the Court disagrees.  He first asserts that he "[n]ever even discussed offering

to do anything to advance her career prior to th[eir] first sexual encounter" in 2014. Henry Br. at 16. But Eckhart specifically testified that Henry offered to discuss her career in his room before they had any sexual contact that evening. *See* Willemin Decl. to Henry Ex. 3 at 417 (Eckhart Deposition). And as other courts in this district have recognized, that sort of offer—a meeting with an influential industry figure to discuss one's career—is inherently valuable and amounts to enticement "in and of itself." *Noble*, 335 F. Supp. 3d at 521.

Henry also contends that he cannot be liable under the TVPA because Eckhart pursued him first, and because she "voluntarily engaged in sex with him for pleasure" as opposed to a commercial motive. Henry Br. at 17, 19. But there is an open factual dispute as to whether Eckhart voluntarily had sex with Henry to begin with—and even if she did, whether she did so with the hope of benefiting her career. That alone precludes the Court from granting summary judgment on this ground. In any event, even if Eckhart had been the first pursuer, that would not foreclose her TVPA claim. As the Court explained in its earlier opinion, "a person may engage in sexual activity with the same person due to enticement on one occasion and absent any enticement on another." *Eckhart*, 2021 WL 4124616, at *9; *cf. Jovanovic*, 700 N.Y.S.2d at 197–98 (discussing how a victim may withdraw consent). So even if Eckhart pursued him on one occasion, as Henry claims, she may still have been enticed on another.

Henry's final argument is that Eckhart could not have been enticed by his offer to appear as a guest on his new show because she would have known that she was unqualified to be an on-air commentator. As a threshold matter, this argument would not defeat Eckhart's claim even if it were correct, because she also testified about other offers of career support that could separately support her TVPA claim. *See, e.g.*, Willemin Decl. to Henry Ex. 3 at 424 (Eckhart Deposition) (offer to "put [her] in the room with really powerful people"); *id.* at 536 (offer to introduce her to

Henry's agent). At any rate, evidence in the record suggests that Eckhart may have been qualified to be an on-air guest. *See* Eckhart Rule 56.1 Stmt. to Henry ¶¶ 163–64 (stating that Eckhart served as a guest on Fox News shows twice in 2018). Because the Court cannot conclude that Eckhart's reliance on Henry's alleged promises was unreasonable, it may not grant summary judgment on that ground.

### B.    Knowledge of Force or Fraud

Henry also contends that Eckhart failed to create a genuine dispute as to the TVPA's force-or-fraud element. This element requires Eckhart to show that Henry was "aware[]" that he would use "force" or "fraud" to "cause [her] to engage in a sex act" at the time he recruited or enticed her. *Noble*, 335 F. Supp. 3d at 518. "In other words, Eckhart must [show] that Henry had an awareness or understanding that, if things go as he planned, force, fraud or coercion will be employed to cause his victim to engage in a commercial sex transaction." *Eckhart*, 2021 WL 4124616, at *10 (internal quotation marks omitted).

A reasonable jury could conclude that Henry had such knowledge here. First, Eckhart testified that Henry made varied offers to help her career over the span of several years, yet there is no evidence that Henry ever followed through on them. That fact would support a reasonable inference that Henry knew he was making fraudulent promises that he would never fulfill. *See Noble*, 335 F. Supp. 3d at 518. Those offers, moreover, became more elaborate and generous over time, as Henry went from general offers of career support to concrete proposals to introduce Eckhart to his agent and put her on his show. This escalation over time likewise indicates an awareness that the promises were empty. *See Eckhart*, 2021 WL 4124616, at *10 (citing *Noble*, 335 F. Supp. 3d at 518).[10]

---

[10] Eckhart also points to Henry's affairs with other women as evidence that he had a "modus operandi" of coercing women into sex with fraudulent offers of career support. But much of that evidence is inadmissible hearsay, *see*

A reasonable jury could also find that Henry was aware he would use force to have sex with Eckhart at the time that he initially enticed her.  As the record shows, Henry sent her messages in the lead up to the February 2017 encounter that indicated he intended to use violence against her.  *See, e.g.*, Eckhart Rule 56.1 Stmt. to Henry ¶ 51 (Henry texting Eckhart that she was "[g]onna get tossed around like a rag doll").  And Eckhart testified that Henry also used force during their earlier sexual encounters, including by forcefully kissing her, throwing her up against a wall, throwing her onto a bed and using his hand to force her to give him oral sex.  *See id.* at ¶¶ 197–200, 207.  The fact that Henry is alleged to have used force during all three of their sexual encounters could provide strong support for a jury finding that he knew he would do so at the time of the alleged enticement.

## III.    Revenge Porn

Henry also moves for summary judgment on Eckhart's claim that he violated New York's revenge porn law, N.Y. Civ. Rights Law § 52-b, by filing explicit photographs of her on the public docket in this case.  He first argues that some of those photographs do not in fact depict her, which would foreclose her claims as to those pictures.  As for the other photographs that do depict her, he contends that none meet the legal criteria of revenge porn under the statute.  The Court agrees on both fronts.

Starting with the statute, Section 52-b prohibits the dissemination of certain explicit photographs of people who are unclothed or engaged in sexual activity with another person:

---

Willemin Decl. to Fox Ex. 73 (direct messages from Brooke Hammerling to Eckhart); Eckhart Rule 56.1 Stmt. to Henry ¶¶ 263–64 (news article), which the Court may not consider at summary judgment, *see Patterson*, 375 F.3d at 222.  As for the other women, nothing indicates that Henry made any false promises to Jane Doe 1; to the contrary, it appears that he *did* follow through on his offer to put in a good word for her at the network.  *See* Eckhart Rule 56.1 Stmt. to Henry ¶ 253; Willemin Decl. to Henry Ex. 5 at 228–29 (Henry Deposition).  And while it appears that Henry may have falsely told another woman that he helped get her a role at Fox News, that single incident is not enough to establish a modus operandi.  *See* Eckhart Rule 56.1 Stmt. to Henry ¶ 248.

(1) Any person depicted in a still or video image . . . shall have a cause of action against an individual who, for the purpose of harassing, annoying or alarming such person, disseminated or published, or threatened to disseminate or publish, such still or video image, where such image:

> (a) was taken when such person had a reasonable expectation that the image would remain private; and
>
> (b) depicts (i) an unclothed or exposed intimate part of such person; or (ii) such person engaging in sexual conduct, as defined in subdivision ten of section 130.00 of the penal law, with another person; and
>
> (c) was disseminated or published, or threatened to be disseminated or published, without the consent of such person.

N.Y. Civ. Rights Law § 52-b.  Paragraph (b)(ii) incorporates the definition of "sexual conduct" from the New York Penal Law, which defines such conduct as "vaginal sexual contact, oral sexual contact, anal sexual contact, aggravated sexual contact, or sexual contact."  N.Y. Penal Law § 130.00(10).  That criminal provision further defines "sexual contact" as "any touching of the sexual or other intimate parts of a person for the purpose of gratifying sexual desire of either party," and clarifies that this "includes the touching of the actor by the victim, as well as the touching of the victim by the actor, whether directly or through clothing, as well as the emission of ejaculate by the actor upon any part of the victim, clothed or unclothed."  *Id.* § 130.00(3).

As an initial matter, Henry argues that Eckhart's claims as to some of the photographs must fail because they are not pictures of her to begin with.  That is correct.  As Eckhart herself testified, five of the fifteen photographs do not depict her and are instead images of other women that she found on the Internet.  *See* Willemin Decl. to Henry Ex. 3 at 645 (Eckhart Deposition); *see also* Dkt. 85 Exs. I, M, Q, T, U.  Because Section 52-b limits its private right of action to those "depicted in [the] still or video image," Eckhart may not bring claims premised on those five photographs.

The more hotly disputed issue is whether the remaining photographs—which indisputably do depict her—are actionable under Section 52-b.  *See* Dkt. 85 Exs. G, H, J, K, L, N, O, P, R, S.  Eckhart offers two reasons for why they are, but neither bears scrutiny.

31

She first asserts that several of the photographs are actionable under Section 52-b(1)(b)(i) because they depict her exposed "intimate part[s]." While Section 52-b does not define this term, its criminal counterpart defines it to mean "the naked genitals, pubic area, anus or female nipple of the person." N.Y. Penal Law § 245.15(2). The parties agree that none of the photographs depict Eckhart's naked genitals, anus or nipples. Eckhart nonetheless argues that several of the photographs of her in lingerie are actionable because they depict her unclothed or exposed "pubic area," which is the region "of or near the sexual organs on the outside of a person's body." *Pubic*, Cambridge Dictionary (last visited March 12, 2025), https://dictionary.cambridge.org /us/dictionary/english/pubic.

That argument fails. In each of the pictures in question, Eckhart is wearing a bottom piece of underwear such that none of her genitals are visible whatsoever. *See* Dkt. 85 Exs. L, N, S. While she contends that one can still see her "pubic area" around the edges of her underwear, in fact her pubic area is obscured by that underwear. And none of the exposed areas are proximate enough to her genitals so as to qualify as her pubic area under the statute.

To be sure, the Court indicated in its earlier opinion that at least one of the redacted pictures depicted a woman's pubic area. *See Eckhart*, 2021 WL 4124616, at *24 (denying Henry's motion to dismiss this claim). As it turns out, however, these pictures were ones of other women, not Eckhart. *See* Eckhart Rule 56.1 Stmt. to Henry ¶ 72. Indeed, these pictures illustrate by comparison why the pictures of Eckhart are not actionable under paragraph (b)(i). The statute does not prohibit "suggestive" or "nearly revealing" images, but only those that depict the pubic area itself. These photos of other women meet that definition; they show a fully exposed female pubic area with only narrow redactions to obscure the genitals, leaving the rest of the surrounding area

fully visible.  *See* Dkt. 85 Ex. I, Q.  That same region, by contrast, is entirely covered by clothing in the pictures of Eckhart, which thus do not depict her "pubic area" as required by the statute.

The Court also rejects Eckhart's second argument that one of the photos shows her "engaging in sexual conduct . . . with another person" in violation of Section 52-b(1)(b)(ii).  As both parties agree, this picture depicts Eckhart inserting her fingers under the waistband of her underwear toward her pubic area.  *See* Dkt. 85 Ex. N.  Relying on only part of the relevant statutory language, Eckhart argues that "sexual conduct" is defined to include "sexual contact," which means "any touching of the sexual or intimate parts of a person for the purpose of gratifying sexual desire of either party."  N.Y. Civ. Rights Law § 52-b(1)(b)(ii) (cross-referencing N.Y. Penal Law § 130.00(10) for the definition of "sexual conduct"); *see also* N.Y. Penal Law § 130.00(1), (10) (defining "sexual contact").  According to her theory, this photo shows sexual conduct because Eckhart is touching *herself* in order to gratify the sexual desire of Henry, to whom she sent the picture.  In other words, Eckhart reads Section 52-b(1)(b)(ii) to cover not only pictures depicting two parties touching each *other* for sexual purposes but also photos of one party touching themselves, even if there is no physical contact with another person.

The plain text forecloses this argument.  "It is . . . a cardinal principle of statutory construction that [courts] must give effect, if possible, to every clause and word of a statute."  *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (internal quotation marks omitted).  Here, if the legislature had intended for Section 52-b(1)(b)(ii) to impose liability on those who send pictures of a victim touching *themselves*, then it could have drafted the provision to cover pictures that depict a "person engaging in sexual conduct."  But the legislature included an additional—and crucial—qualifier:  a "person engaging in sexual conduct, as defined in [Section 130.00(10)], *with another person*."  N.Y. Civ. Rights Law § 52-b(1)(b)(ii) (emphasis added).  This specific phrasing

can only be read as limiting paragraph (b)(ii) to pictures that depict touching between two people—otherwise, the phrase "with another person" would be read out of the statute entirely.  *See Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 477–78 (2017).

This reading finds reinforcement in the structural interplay between paragraph (b)(ii) and New York Penal Law § 130.00, which supplies the definition of "sexual conduct."  N.Y. Penal Law § 130.00(10) (defining sexual conduct as "vaginal sexual contact, oral sexual contact, anal sexual contact, aggravated sexual contact, or sexual contact").  Once that definition of "sexual conduct" is plugged into paragraph (b)(ii), it would read as covering any image that "depicts . . . such person engaging in . . . *sexual contact with another person*."  *See id.* (emphasis added).  Again, the inclusion of "with another person" can only mean that the provision covers physical contact between two people—not solitary acts.  There is no other possible meaning of "contact with another person."

New York precedent further confirms that the text means what it says.  In *People v. Ditta*, the New York Court of Appeals construed the phrase "sexual contact" in Section 130.00 and explained that it occurs when "the defendant himself touched the other person, . . . caused the other person to touch him, or . . . caused the other person to touch a third person."  52 N.Y.2d 657, 661 (1981).  In the four decades since, other courts in the state have repeatedly recited this same standard, which limits "sexual contact" to instances where there is contact between two persons.  *See, e.g.*, *People v. Grubert*, 76 N.Y.S.3d 101, 103 (2d Dep't 2018) ("Sexual contact could mean the defendant touching [the victim], [the victim] touching the defendant, or the defendant causing a third person to touch [the victim].");  *People v. Shoemaker*, 641 N.Y.S.2d 914, 915 (3d Dep't 1996);  *People v. Freeman*, 950 N.Y.S.2d 493, 2012 WL 255762, at *5 (N.Y. Crim. Ct. Jan. 30, 2012);  *see also* N.Y. Penal Law § 130.00 *supplementary practice commentaries* (discussing

"Sexual contact" and *Ditta*).  No court has embraced, or even hinted at, the sweeping reading Eckhart presses here.

Eckhart's only argument to the contrary is that "sexual contact" is defined in a non-exclusive manner such that it could extend to a single person touching themselves.  *See* N.Y. Penal Law § 130.00(3) ("'Sexual contact' means any touching of the sexual or other intimate parts of a person for the purpose of gratifying sexual desire of either party.  It includes the touching of the actor by the victim, as well as the touching of the victim by the actor, whether directly or through clothing, as well as the emission of ejaculate by the actor upon any part of the victim, clothed or unclothed.").  According to Eckhart, because this provision uses the non-limiting term "includes," it could be stretched to cover instances of self-touching.

That argument fails on multiple fronts.  First, as already discussed, Section 52-b(1)(b)(ii) includes the "with another person" qualifier, which by its plain text excludes pictures that depict mere self-touching.[11]  Second, the amendment history of Section 130.00(3) indicates that "sexual contact" encompasses only a few types of touching, none of which is victim-on-victim.  Originally, Section 130.00(3) defined "sexual contact" as simply "any touching of the sexual or other intimate parts of a person for the purpose of gratifying sexual desire of either party," without the clarifying sentence that "[i]t includes the touching of the actor by the victim," and so on.  N.Y. Penal Law § 130.00 *supplementary practice commentaries* (discussing "Sexual contact" element).  The *Ditta* court then interpreted this original definition of "sexual contact" as limited to three categories of touching:  victim touched by actor, actor touched by victim and victim touched by third person. Three years later, the legislature amended the statute, adding the clarifying sentence that sexual

---

[11] Of course, if the image also depicted nudity—"an unclothed or exposed intimate part" of the victim—then it would be independently actionable under paragraph (b)(i).  The pictures of Eckhart do not meet that criteria either, as already discussed.

contact "includes the touching of the actor by the victim, as well as the touching of the victim by the actor, whether directly or through clothing, as well as the emission of ejaculate by the actor upon any part of the victim, clothed or unclothed." Notably, this amendment mentioned only two of the three categories identified in *Ditta*—actor-touching-victim and victim-touching-actor—yet omitted the touching-by-third-person category. *Id.*

Contrary to Eckhart's assertion, this amendment cannot be construed as expanding "sexual contact" to include self-touching. For one thing, every example in the clarifying sentence involves touching between the actor and victim (including indirect touching by "emission of ejaculate"), which indicates that "sexual contact" is limited to instances of interpersonal touching. *See United States v. Williams*, 553 U.S. 285, 294 (2008) ("[A] word is given more precise content by the neighboring words with which it is associated."). More telling still, while *Ditta* recognized that touching by a third person could also qualify, the legislature jettisoned that category when it amended the statute. If anything, this deliberate omission signals that Section 130.00(3) is now *narrower*, not broader, than it was pre-amendment, as it no longer includes third-person touching. There is thus no textual basis to argue that the statute now extends to self-touching too. And in any event, Eckhart's strained interpretation collides with the statute's clear requirement that the image depict a "person engaging in sexual conduct . . . with another person," as already discussed. N.Y. Civ. Rights Law 52-b(1)(b)(ii).

The necessary conclusion is that a plaintiff may not bring a "sexual contact" claim under Section 52-b(1)(b)(ii) for dissemination of photographs that show a plaintiff touching only herself. The Court thus grants Henry's motion for summary judgment on this claim.

IV.    **Harassment**

Henry and Fox News also move for summary judgment on Eckhart's sexual harassment claims, which allege several different forms of liability under the New York City Human Rights Law ("NYCHRL") and New York State Human Rights Law ("NYSHRL"). Eckhart's claims against Henry assert that he is directly liable under the NYCHRL for sexually harassing her. Her claims against Fox News assert that it is (1) indirectly liable under the NYCHRL because it should have known that Henry would assault her yet failed to stop him, and (2) indirectly liable under the NYSHRL because it knew about and condoned Henry's alleged misconduct. Although the Court rejects Henry's arguments, it agrees that Fox News is entitled to summary judgment on these claims.

A.    **NYCHRL Claims Against Henry**

Henry moves for summary judgment on Eckhart's NYCRHL claim against him, arguing that he could not have harassed her because she consented to his communications and conduct. *See* Henry Br. at 25. As discussed above, however, a reasonable jury could conclude that Eckhart did not consent to some or all of Henry's alleged misconduct. Henry's motion as to this claim is thus denied.

B.    **NYCHRL Claim Against Fox News**

Eckhart also brings NYCHRL claims against Fox News under theories of indirect liability. Under the NYCHRL, an employee's harassing conduct may be imputed to his employer only where (1) "the offending employee 'exercised managerial or supervisory responsibility'" over the victim, or (2) "the employer knew of the offending employee's unlawful discriminatory conduct and acquiesced in it or failed to take 'immediate and appropriate corrective action,'" or (3) the employer 'should have known' of the offending employee's unlawful discriminatory conduct yet

'failed to exercise reasonable diligence to prevent [it].'" *Zakrzewska v. New Sch.*, 14 N.Y.3d 469, 479 (2010) (quoting N.Y.C. Admin. Code § 8-107(13)(b)(1)–(3)).

Eckhart invokes two of these theories here, arguing that Fox News is liable because Henry was her "manager or supervisor," N.Y.C. Admin. Code § 8-107(13)(b)(1), and because it should have known about his alleged misconduct and failed to prevent him from harming her, *id.* § 8-107(13)(b)(3). As Fox News correctly notes, however, the Court already rejected the first argument in its earlier opinion resolving Fox News' motion to dismiss. *See Eckhart*, 2021 WL 4124616, at *18 (explaining that NYCHRL requires that employee have "exercised managerial or supervisory responsibility over victim" and finding that "Henry was not Eckhart's manager or supervisor" (internal quotation marks omitted)). Eckhart did not move for reconsideration on that ground, so the law-of-the-case doctrine bars her attempt to re-raise it here. *See MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558, 570–71 (S.D.N.Y. 2017).

Fox News can thus be held liable for Henry's actions only if its management or supervisors knew or should have known about that purported misconduct yet failed to prevent Henry from harming Eckhart. On this record, the Court agrees that no reasonable jury could make that finding.

As a threshold matter, there is no direct evidence that Fox News was aware of Henry's alleged harassment of Eckhart before it occurred. Eckhart acknowledges that she did not tell anyone at the network about their relationship until after she was terminated in mid-2020. *See* Eckhart Rule 56.1 Stmt. to Fox ¶ 150. Nor is there any indication that Henry revealed their relationship to others, or that Fox News management or HR otherwise learned about it. *See id.* ¶ 156; *see also* McKenna Decl. Ex. 2 at 417 (Henry Deposition).

Attempting to plug this evidentiary gap, Eckhart asserts that Fox News knew that Henry was harassing *other* women at the network, which put it on notice that he might do the same (or

worse) to her. She points to several pieces of evidence in support of that theory, including that Fox News knew about Henry's extramarital affairs, that women came forward with accusations against him in April 2017 and that Fox News sent him to sex rehabilitation treatment in May 2016.

No reasonable jury could find Fox News liable based on that evidence. For starters, even though Fox News eventually learned about Henry's extramarital affairs, it did not know about many of them until after Eckhart and Henry's final sexual encounter in 2017. *See* McKenna Decl. Ex. 114 ¶ 13 (Jane Doe 1 Declaration) ("I did not report my relationship with [Henry] to . . . Human Resources."); *id.* Ex. 115 ¶ 10 (Jane Doe 4 Declaration) ("I never told anyone at Fox News about my experiences with Henry."); *id.* Ex. 2 at 49–50, 420 (Henry Deposition) (testimony that Fox News never learned about other affair and did not question him about it); Fox Rule 56.1 Reply ¶ 186 (other woman did not disclose Henry affair to network until April 2017). Because there is no evidence that Fox News learned about these affairs until April 2017 or later, no reasonable jury could find that they put it on notice that Henry would assault her.

The only affair that Fox News learned of before that date was the affair Henry had with a stripper between 2015 and 2016. *See* Eckhart Rule 56.1 Stmt. to Fox ¶ 12. But the record establishes that this relationship was "consensual," *id.*—which would not have put Fox News on notice that Henry would harass or assault Eckhart. This conclusion aligns with precedent from other courts applying comparable harassment laws, which have concluded that awareness of consensual affairs does not put an employer on notice that nonconsensual misconduct will follow. *See, e.g.*, *King v. MCI Telecomms. Corp.*, No. 94 C 421, 1997 WL 124254, at *7 n.2 (N.D. Ill. Mar. 17, 1997) (knowledge of an alleged harasser's "consensual" sexual relationship with his previous secretary "cannot reasonably be regarded as giving [the employer] notice that [he]

sexually harassed his secretaries"), *aff'd*, 142 F.3d 440 (7th Cir. 1998).[12]  In one particularly apt case, a plaintiff argued that her employer "should have known" that a colleague would harass her because he had "consensual sexual relationships with two different employees," one of which his supervisors knew about.  *Schmidt v. Medicalodges, Inc.*, 492 F. Supp. 2d 1302, 1309 (D. Kan. 2007).  The court rejected that argument, holding that an employer's "knowledge of [a consensual sexual] relationship does not raise a reasonable inference that [the defendant] was also engaging in unwelcome sexual harassment."  *Id.*

This rule is also consistent with New York law on constructive knowledge, which often arises in the analogous context of negligent supervision.  As with NYCHRL lawsuits, a claim for negligent supervision requires the plaintiff to show that her employer "knew" or "should have known" that another employee would engage in the misconduct that harmed her.  *Travis v. United Health Servs. Hosps., Inc.*, 804 N.Y.S.2d 840, 884–85 (3d Dep't 2005) (internal quotation marks omitted).  In applying that should-have-known standard, courts have required plaintiffs to show that the employer was aware of "prior misconduct" by the employee that was "*of the same kind that caused the injury*" to the plaintiff.  *Doe v. Alsaud*, 12 F. Supp. 3d 674, 681 (S.D.N.Y. 2014) (emphasis added); *Zanghi v. Laborers' Int'l Union of N. Am.*, 778 N.Y.S.2d 607, 608 (4th Dep't 2004) (employer must have knowledge of employees' "propensit[y] . . . for the type of behavior that caused the plaintiff's harm"); *cf. Kirkman ex rel. Kirkman v. Astoria Gen. Hosp.*, 611 N.Y.S.2d 615, 616 (2d Dep't 1994) ("for the sort of behavior which caused the injured party's harm").  For instance, even knowledge that an employee "sexually harass[ed] other employees by attempting

---

[12] *See also Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1154 (10th Cir. 2006) (professor's consensual relationships with two students did not put university on notice that students, including plaintiff, were at risk of sexual harassment); *Jackson v. Cintas Corp.*, 391 F. Supp. 2d 1075, 1101 (M.D. Ala. 2005) ("The court is not persuaded that the 'rumors' of [the employee's] alleged consensual affair with another subordinate employee is sufficient to place [the employer] on constructive notice of [the employee's] alleged propensity to engage in unwelcome sexually harassing conduct.").

to date them" will not put his employer on notice that he would "commit a sexual assault"—a much more serious form of misconduct. *Doe*, 12 F. Supp. 3d at 681 (citing *Anderson v. Adam's Mark Hotels & Resorts,* No. 99–1100, 2000 WL 390107, at *1–2 (10th Cir. 2000)). Because sexual harassment is a "lesser allegation of prior wrongdoing," knowledge of the former will not put an employer on notice of the latter. *Id.* ("[G]eneral, unrelated or lesser allegations of prior wrongdoing are insufficient."). Put simply, even "a propensity to sexually harass is not sufficient to establish a propensity to sexually assault." *O'Rear v. Diaz*, No. 24-cv-1669 (PAE), 2025 WL 283169, at *11 (S.D.N.Y. Jan. 23, 2025) (quoting *Lee v. Albaran*, No. 23-cv-11215 (NSR), 2024 WL 4987310, at *6 (S.D.N.Y. Dec. 5, 2024)).

By the same logic, Fox News' knowledge of Henry's consensual affairs did not put it on notice that he would engage in nonconsensual conduct like harassment or assault. Consensual extramarital affairs may well be a form of "wrongdoing," but they are of a different "type" and certainly a "lesser" degree than nonconsensual sexual harassment and assault. *Doe*, 12 F. Supp. 3d at 681. To impute knowledge of such conduct to an employer, at minimum a plaintiff will need to show that it was aware of prior nonconsensual sexual misconduct by the employee.

Eckhart offers no such evidence here. While she seeks to invoke statements by Claman and another individual at Fox News' DC bureau that Henry was a "sex addict" and "unfaithful to his wife," neither claim involved Henry engaging in anything nonconsensual or unwelcome. *See* Fox Rule 56.1 Reply ¶ 518 (statement from Claman to Eckhart); Willemin Decl. to Fox Ex. 1 at 17 (testimony from other individual about Henry's unfaithfulness); *see also* Fox Rule 56.1 Reply ¶ 182 (complaint by journalist at Fox News that Henry was allowed to return to work after consensual affair with stripper). At best, Eckhart points to the declaration by Jane Doe 2—the woman who testified that she "likely" told "people at Fox News" that Henry sent her an unsolicited

picture of his penis.  McKenna Decl. Ex. 116 ¶ 11.  The problem with this evidence is that Jane Doe 2 clarified that she "ha[d] no specific recollection" of actually telling others at Fox, *id.*, nor did she testify that she had told anyone who was a "manager[] or supervisor[]" at the network, as would be required to impute knowledge under the NYCHRL.  *See* N.Y.C. Admin. Code § 8-107(13)(b)(2).  Opposing summary judgment requires "specific facts," and "speculation" that this woman might have told others who might have been management is not enough.  *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (internal quotation marks omitted) ("The non-moving party may not rely on conclusory allegations or unsubstantiated speculation.").

Other reports of misconduct by Henry came too late in time.  For instance, Eckhart points to the report Fox News received in April 2017 from a producer who had a consensual affair with Henry and who also conveyed several rumors she had heard about his other affairs and "sexting" incidents.  Fox Rule 56.1 Reply ¶ 186.  This report, however, came two months after Henry and Eckhart's last sexual encounter that February.  Because Fox News could not have "prevent[ed]" the alleged harms to Eckhart with this information, it cannot save her NYCHRL claim.[13]  N.Y.C. Admin. Code § 8-107(13)(b)(3).  The same is true of the various other allegations against Henry that Fox News first learned about over the course of this lawsuit.  *See, e.g.*, Fox Rule 56.1 Reply ¶ 286 (accusation by woman that Henry digitally penetrated her at going-away party).

---

[13] Eckhart's opposition does not invoke—or even mention—the text messages that Henry sent her in 2018, nor did Eckhart cite those messages at argument after Fox News asserted that this producer's report occurred after their last sexual encounter.  She instead argued only that Fox News is liable because it failed to prevent Henry from sexually assaulting her in 2014, 2015 and 2017.  *See* Eckhart Opp. to Fox at 1–4, 23–27.  When, as here, "a plaintiff fails to raise claims in opposition to dismissal in the district court, any such claims are forfeited."  *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 487 n.9 (S.D.N.Y. 2017) (deeming fraud claims premised on certain misstatements forfeited when not raised in opposition, even though they were alleged in pleadings); *Nigro v. City of New York*, No. 19-cv-2369 (JMF), 2020 WL 7629455, at *3 (S.D.N.Y. Dec. 22, 2020) (finding legal theory forfeited when plaintiff "did not press [it] in his opposition" and opted to rely on other theory instead).  Accordingly, Eckhart has forfeited any argument that Fox News is liable because it failed to prevent Henry from sending these messages in 2018.

Finally, Eckhart makes an inferential argument that Fox News must have suspected that Henry engaged in nonconsensual misconduct because it sent him to sexual rehabilitation therapy in 2016 after learning of his affair with a stripper. In her view, the network would only have taken a step that drastic if it surmised that he was engaging in more serious misconduct—as she claims he in fact was.

The problem with this argument is that it is pure speculation. Despite years of document discovery and depositions of decisionmakers at the network, Eckhart offers no evidence that Fox News sent Henry to treatment because it suspected harassment or assaults. As just surveyed at length, nothing in the record indicates that Fox News knew of such nonconsensual behavior at the time, toward Eckhart or others. In fact, Eckhart even deposed Fox News' head of HR, Kevin Lord, who maintained that he knew of no reason other than the stripper affair for referring Henry to treatment. *See* Willemin Decl. to Henry Ex. 8 at 73 (Lord Deposition). She likewise deposed Denise Collins, the senior VP of HR, who shared Lord's understanding. *See* Willemin Decl. to Fox Ex. 3 at 74 (Collins Deposition); Willemin Decl. to Henry Ex. 1 at 239 (Collins Deposition). Eckhart may suspect that Fox News had other motivations for referring Henry to treatment, but on this record that is no more than a hunch—which cannot "provide a basis upon which to deny the motion" for summary judgment. *Scotto*, 143 F.3d at 114 (internal quotation marks omitted).

### C.     NYSHRL Claim Against Fox News

For similar reasons, the Court also grants Fox News' motion for summary judgment on Eckhart's claim that it condoned Henry's sexual misconduct in violation of the NYSHRL. Like with the NYCHRL, an employee's misconduct can be imputed to his employer under the NYSHRL. This requires, however, a showing that "the employer became a party to [that misconduct] by encouraging, condoning, or approving it." *Forrest v. Jewish Guild for the Blind*,

3 N.Y.3d 295, 311 (2004). And unlike the NYCHRL, imputing liability by condonation requires "actual notice." *Int'l Healthcare Exch., LLC v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 361 (S.D.N.Y. 2007); *Swiderski v. Urb. Outfitters, Inc.*, No. 14-cv-6307 (JPO), 2017 WL 6502221, at *9 (S.D.N.Y. Dec. 18, 2017). A plaintiff must therefore do more than show her employer "should have known" about the misconduct—she must show that it knew about the misconduct and then "forg[a]ve[]" or "accept[ed]" it "after-the-fact." *In re State Div. of Hum. Rts. ex rel. Greene v. St. Elizabeth's Hosp.*, 66 N.Y.2d 684, 687 (1985).

Eckhart cannot make that showing here. Fox News did not have actual notice of Henry's alleged misconduct towards her until she first reported it to the network through her counsel on June 25, 2020—three years after their last sexual encounter. Eckhart Rule 56.1 Stmt. to Fox ¶ 151. Once the network finally learned of his behavior, its response was the opposite of forgiveness: it swiftly investigated and terminated him just six days later. *Id.* ¶ 174. Because no reasonable jury could find on this record that Fox News condoned Henry's behavior toward Eckhart after learning of it, summary judgment is granted as to this claim.

## V.    Retaliation

Fox News also moves for summary judgment on Eckhart's claims that it fired her in retaliation for complaining about sexual harassment. Eckhart brings these claims under Title VII, the NYSHRL, and the NYCHRL. These federal and state law claims are reviewed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013) (citing 411 U.S. 792 (1973)). A plaintiff must first establish a *prime facie* case of retaliation by showing (1) "participation in a protected activity," (2) "the defendant's knowledge of the protected activity," (3) "an adverse employment action," and (4) "a causal connection between the protected activity and the adverse

employment action." *Id.* (internal quotation marks omitted). If she does, the burden shifts to the defendant, who must "articulate some legitimate, non-retaliatory rationale" for its actions. *Id.* at 845. The plaintiff must then show that the proffered reason is pretextual and that retaliation was the "but-for cause" of her termination. *Id.* at 845–46.

Fox News contends that Eckhart failed to make out a *prima facie* case, and that even if she had she could not rebut Fox News' legitimate reasons for terminating her. The Court agrees on both fronts.

### A.     *Prima Facie* **Case**

First, no reasonable jury could find that Eckhart engaged in "protected activity," which defeats her *prima facie* case at the threshold. *Id.* at 844. Protected activity means conduct that "put[s] the employer on notice that the complainant believes that discrimination is occurring." *Eckhart*, 2021 WL 4124616, at *20 (internal quotation marks omitted). "No magic words must be used when making such a complaint, so long as the employer could reasonably have understood that the employee was complaining about discrimination." *Id.* (alterations and internal quotation marks omitted).

Eckhart argues that she engaged in protected activity on February 10, 2020, when she met with Collins and Hirst and told them she was working in a "toxic environment." *See* Eckhart Rule 56.1 Stmt. to Fox ¶ 92. Although Eckhart never mentioned sexual or gender-based harassment by name, she says that Collins should have "understood" her complaint to be "implicating" such harassment. Eckhart Opp. to Fox at 32. As Eckhart points out, the Court accepted this argument at the motion to dismiss stage, finding it plausible that Collins had understood Eckhart's comment as raising concerns about sexual harassment.

That possibility, however, has since been refuted by discovery. Most significantly, Eckhart's notes memorializing the February 10 meeting concede that she did *not* convey concerns about sexual harassment to Collins: "In addition to the emotional and verbal abuse that goes on, I have not yet mentioned the sexual harassment that goes on at every level in this building that I've experienced first-hand on office property." Eckhart Rule 56.1 Stmt. to Fox ¶ 96. Put simply, not even Eckhart believed that she had mentioned sexual harassment to Collins. In fact, her notes stated that she might raise such a complaint to HR at some point in the future but "still remain[ed] frightened" to do so. *Id.* ¶ 363 ("I plan to follow-up with Human Resources on the status of this situation, but still remain frightened to come forward with my sexual harassment claims."). No reasonable jury could conclude that Collins divined a sexual harassment complaint from Eckhart's statements when Eckhart repeatedly acknowledged that she said nothing of the sort.

The rest of the February 10 conversation further dispels the notion that Eckhart's comments were interpreted as raising sexual harassment. As Eckhart concedes, she primarily complained to Collins and Hirst about the "mean girls" environment at the network, and mentioned various incidents where others had screamed at, cursed at and otherwise bullied her. *Id.* ¶ 92–93. None of these complaints implicated sexual harassment, however. Indeed, Eckhart even identified several of the culprits by name—all of whom were female. Because these were only "[g]eneralized complaints of unfair treatment," they cannot "qualify as a protected activity." *Eckhart*, 2021 WL 4124616, at *38 (quoting *McGullam v. Cedar Graphics, Inc.*, No. 04-cv-2891 (AKT), 2008 WL 3887604, at *9 (E.D.N.Y. Aug. 20, 2008), *aff'd*, 609 F.3d 70 (2d Cir. 2010)).

Eckhart also points to the fact that Collins asked her whether "she had been sexually harassed" during her June 12, 2020 termination meeting—a statement that the Court relied on in denying Fox News' motion to dismiss. *Eckhart*, 2021 WL 4124616, at *39 (citing Third Amended

Complaint).  At the time, it appeared that Collins had raised this issue out of the blue, which made it plausible that she had interpreted Eckhart's earlier "toxic environment" statement to refer to sexual harassment and was now following up about that topic.  But once again, discovery has refuted that inference.  As it turns out, Eckhart was the first party to refer to "sexual harassment" at the termination meeting—when she read from a prepared script protesting her firing—which then prompted Collins to ask her if she had indeed been harassed.  Eckhart Rule 56.1 Stmt. to Fox ¶ 126.  Given that timeline, Collins' question does nothing to suggest that she believed Eckhart to have raised sexual harassment several months before.

Nor does Eckhart offer evidence of "a causal connection between the protected activity and the adverse employment action"—the fourth element of a *prima facie* case.  *Zann Kwan*, 737 F.3d at 844.  According to Eckhart, she made her complaint about a "toxic environment" on February 10, 2020 and was then placed on a PIP on March 6, 2020.  This close "temporal proximity," in her view, suggests that she was placed on the PIP (and later fired) because of her complaint.  Eckhart Opp. to Fox at 32.

That argument too fails.  "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."  *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001).  That describes this case.  Eckhart's performance issues—including her constant lateness, regular absences, disclosure of Fox News' proprietary graphics package and misappropriation of its resources—were well-documented throughout 2019, the year before Eckhart made her purported complaint.  She even received a "Below Expectations" rating of 2 out of 5 in her 2019 review.  Eckhart Rule 56.1 Stmt. to Fox ¶¶ 40–42.  And as the record shows, Collins and Hirst were considering placing Eckhart on a PIP *before* she made the February 10,

47

2020 complaint.  *Id.* ¶ 67.  They then had the February 10 meeting with Eckhart, and formally placed her on the PIP on March 6, after Hirst observed that Eckhart continued to be late and absent from work.  *See* McKenna Decl. Ex. 13 at 4.  In other words, Eckhart was on the brink of being placed on a PIP in advance of her supposed complaint, which defeats any causal inference.

At bottom, no reasonable juror could conclude that Eckhart engaged in protected activity when she complained of a toxic environment at the February 10, 2020 meeting, or that such a complaint was causally tied to her placement on a PIP or later termination.  These deficiencies alone foreclose Eckhart's claim.

### B.    Legitimate, Non-Retaliatory Reasons

Even if Eckhart had made out a *prima facie* case, her claims would still fail at the third step of the *McDonnell-Douglas* standard.  Under this framework, the burden would shift to Fox News to "articulate some legitimate, non-retaliatory rationale" for terminating her.  *Zann Kwan*, 737 F.3d at 845.  Fox News has done so here.  As Hirst and Collins explained at the June 2020 termination meeting, Eckhart had been habitually late for work, prematurely disclosed a proprietary graphics package on social media, misappropriated company resources for a charity event and consistently performed poorly while on her PIP.  *See* Eckhart Rule 56.1 Stmt. to Fox ¶ 124.  Because those are legitimate reasons for terminating her, Eckhart's retaliation claim could proceed only if she can show they were pretextual, at the third step of *McDonnell-Douglas*.  *Zann See Kwan*, 737 F.3d at 845–46.

On this front, Eckhart insists that the real reason for her termination was because she raised sexual harassment "complaints" to Collins at their February 10, 2020 meeting.  She argues that her supposed performance issues were pretextual and "fabricated" because she had received "constant[] praise[]" at work.  Eckhart Opp. to Fox at 33.  But the record belies that claim.

Although Eckhart had received praise through 2018—and even a promotion and 4 out of 5 annual rating—the tide turned soon thereafter. Her 2019 performance review was "Below Expectations"—2 out of 5—and flagged her habitual lateness as a key issue. Eckhart Rule 56.1 Stmt. to Fox ¶¶ 40–42. She received several "final warnings" about tardiness not long after, *id.* ¶¶ 43, 45, and then in the fall of 2019 committed the two infractions where she mistakenly revealed the new graphics packages and misrepresented her title at Fox News at an outside event, *id.* ¶¶ 47–60. These issues continued to pile up, which prompted Collins and Hirst to put her on a PIP and subsequently terminate her when she did not improve. Nothing indicates that Eckhart's performance issues were "fabricated or exaggerated," despite Eckhart's claim to the contrary. Eckhart Opp. to Fox at 33. Because Eckhart offers nothing indicating pretext, her claim also fails at the third step of the *McDonnell-Douglas* framework.

## VI.    Negligent Supervision

Finally, Fox News moves for summary judgment on Eckhart's common-law claim that Fox News negligently supervised, retained and disciplined Henry. It argues that this claim is categorically barred by the New York Workers' Compensation Law, which supplies the exclusively remedy for damages allegedly caused by the negligence of an employer. Fox News Br. at 33.

The Court agrees. As the New York Workers' Compensation Law states, "[t]he right to compensation or benefits under this chapter, shall be the exclusive remedy to an employee . . . when such employee is injured or killed by the negligence or wrong of another in the same employ." N.Y. Workers' Comp. L. § 29(6). The Second Circuit has confirmed that this exclusive-remedies provision bars claims like the one brought by Eckhart here. *See Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 138 (2d Cir. 2001) (rejecting negligent supervision claim brought

by flight attendant alleging coworker raped her).  Eckhart conceded this point at oral argument and advanced no argument that could save this claim.  The Court thus grants Fox News' motion for summary judgment on this claim.

## CONCLUSION

For these reasons, Henry's motion for summary judgment is granted as to Eckhart's revenge porn claims but denied as to her claims for gender-motivated violence, assault, battery, sex trafficking and harassment.  Fox News' motion for summary judgment is granted in its entirety.  The Clerk of Court is respectfully directed to terminate the motions pending at docket entries 367, 382, 384, 387 and 388.  Trial of Eckhart's remaining claims against Henry is hereby scheduled for May 12, 2025.

SO ORDERED.

Dated:    March 12, 2025
          New York, New York

                                   Ronnie Abrams
                                   United States District Judge

50